**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
-------------------------------------------------------------------- X
MIA CASTRO, M.D., HEIDI BOULES, M.D.,                   :
ASHLEY ELTORAI, M.D., JODI-ANN                          :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and                 :       Civil Action No.:
ELIZABETH REINHART, M.D.,                               :
                                                        :
                        Plaintiffs,                     :       **COMPLAINT**
                                                        :
                v.                                      :
                                                        :       **Jury Trial Demanded**
YALE UNIVERSITY, YALE NEW HAVEN                         :
HOSPITAL, INC. and MANUEL LOPES                         :
FONTES, M.D, in his individual and professional        :
capacities,                                             :
                                                        :
                        Defendants.                     :
-------------------------------------------------------------------- X

　　　　Plaintiffs Mia Castro, M.D., Heidi Boules, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Plaintiffs") allege against

Defendants Yale University (the "University"), Yale New Haven Hospital, Inc. ("YNHH" or the

"Hospital") (together, "Yale") and Manuel Lopes Fontes, M.D. (altogether "Defendants"):

## PRELIMINARY STATEMENT

　　　　1.　　　　Behind Yale University's veneer of prestige and privilege lies a troubling pattern

and history wherein the voices of women within its student body, professor and employee ranks

who courageously come forward with complaints of sexual harassment against men in positions

of power are suppressed and ignored.

　　　　2.　　　　Powerful men at Yale University are repeatedly given "passes" and the "benefit of

the doubt" when the victims of their sexual misconduct come forward, whereas their victims are

forced to go through hoops just to obtain a modicum of justice.  Through this pattern of

deliberate indifference, Yale University intends to send a message that the University will stand

not behind those who have been innocently victimized by persons in power, but behind those who most contribute to the University's prestige and fortune.

3.      This lawsuit is intended to finally give a voice to those women whose stories of harrowing sexual misconduct at Yale University have been stifled for far too long, and to bring about justice against both the powerful men that have targeted them, and those at the University who have protected and supported these men.

4.      The six Plaintiffs in this lawsuit are all highly accomplished, dedicated and well-respected female doctors within Yale's Department of Anesthesiology.  All six of them were sexually harassed by the same male supervisor, Defendant Manuel Lopes Fontes, M.D., a Professor of Anesthesiology and (among other titles), incredibly, the anesthesiology department's Vice Chair of Diversity, Equity and Inclusion.[1]

5.      Dr. Fontes's sordid history of sexually harassing and acting inappropriately towards female subordinates (both at Yale and at other institutions at which he previously worked) is well known and documented.  Yet, Yale welcomed him with open arms, and he remains a distinguished leader within the anesthesiology department.

6.      Shockingly, after complaining about Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Dr. Fontes's unlawful behavior persisted, and, in fact, Plaintiffs have been subjected to blatant retaliation for their complaints.

---

[1]      That is, until Yale University caught wind that Plaintiffs had engaged counsel and removed him from this position to save face.

7.     Further, in addition to sexual harassment and unlawful retaliation, Dr. Fontes has also discriminated against Plaintiff Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

8.     Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful harassing behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

9.     This dreadful reality cannot be better illustrated than by Dr. Fontes's appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Plaintiffs and other women Dr. Fontes has victimized would be a gross understatement.

10.     Apparently emboldened by Yale's decision to protect him at the expense of those he has abused (of whom there are many), even after Plaintiffs complained about his harassing behavior, Dr. Fontes sexually harassed Plaintiff Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably asked her where her "partner in crime" was, which was a reference to Plaintiff Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

11.     Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Defendants have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation, including, but not limited to, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"),

in addition to violations of Connecticut's common law for assault, battery and invasion of privacy.

## ADMINISTRATIVE REQUIREMENTS

12.     On or about December 4, 2019, Plaintiffs Dr. Boules, Dr. Castro, Dr. Eltorai and Dr. Reinhart filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 200e *et seq.* ("Title VII").  Likewise, on or about December 5, 2019, Plaintiffs Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver filed charges of discrimination with the EEOC against Defendants alleging violations of Title VII.

13.     These EEOC charges were dual-filed with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") alleging violations of the Connecticut Fair Employment Practices Act ("CFEPA") against Defendants.

14.     When Plaintiffs receive their Notices of Right to Sue from the EEOC and their Release of Jurisdiction from the CHRO, they will seek leave to amend this Complaint to assert claims under Title VII and the CFEPA arising from the same facts as alleged herein.

15.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under federal law, namely Title IX.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because both the University and YNHH maintain their principal executive offices in this District, and a substantial part of the acts

or omissions giving rise to this action, including the unlawful employment practices alleged

herein, occurred in this District.

## PARTIES

18.    Plaintiff Heidi Boules, M.D. is an adult resident of Long Island City, New York.

Dr. Boules is an attending physician and assistant professor of clinical anesthesiology within the

anesthesiology department at Yale.

19.    Plaintiff Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr.

Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology

residency at Yale.

20.    Plaintiff Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut.

Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within

the anesthesiology department at Yale.

21.    Plaintiff Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at

Yale.

22.    Plaintiff Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at

Yale.

23.    Plaintiff Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut.  Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

24.    Yale University is an academic university and educational institution that receives

financial assistance from the Federal government.  Yale University operates a School of

Medicine, and works in conjunction with YNHH to operate a medical residency program, the

mission and purpose of which is educational.  At all relevant times, Defendant Yale University

has employed and continues to employ all Plaintiffs, controls and has controlled the terms and conditions of Plaintiffs' employment, and qualifies as an employer and/or joint employer under all relevant statutes.

25.     Yale New Haven Hospital, Inc. is a teaching hospital and works in conjunction with Yale University to operate a medical residency program, the mission and purpose of which is educational.  YNHH's medical residency program is affiliated with Yale University's School of Medicine.  YNHH is also a private corporation that is principally engaged in the business of providing health care, and receives financial assistance from the Federal government.  At all relevant times, Defendant YNNH has employed and continues to employ all Plaintiffs, controls and has controlled the terms and conditions of Plaintiffs' employment, and qualifies as an employer and/or joint employer under all relevant statutes.

26.     The medical residency program operated at YNHH inures benefit to Yale University, and Yale University's affiliation to YNHH's medical residency inures benefit to YNHH.  YNHH and the University share staff, funding, and other support.

27.     Defendant Manuel Fontes Lopes, M.D. is an adult resident of Connecticut.  Dr. Fontes is a Professor of Anesthesiology, former Vice Chair of Diversity, Equity and Inclusion, Division Chief of the Cardiac Anesthesiology division, and former Director of Clinical Research, Anesthesiology, at Yale.  Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and, in particular, the anesthesiology department at Yale.  At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority over Plaintiffs' employment and the terms and conditions thereof.  Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.      Yale University's Troubling History of Protecting Male Doctors Accused of Sexual Harassment**

28.      Despite being considered one of the top universities in the world, Yale University has a disturbing history of doing shockingly little to address or prevent the perpetration of sexual harassment and misconduct against female subordinates by male doctors in positions of power, which has allowed and encouraged this conduct to continue, resulting in a harassing and hostile work environment.

29.      Even more alarming, and despite what has obviously been mere "lip service" by administrators about how the University is "dedicate[ed to] eradicate[ing] sexual misconduct at Yale," the University has displayed a well-chronicled pattern of failing to take complaints of sexual harassment seriously.

30.      Rather, the default practice at Yale University has been to rush to the defense of perpetrators of sexual misconduct and to refuse to hold them accountable, especially those who generate revenue and grant funding for the University.

31.      Simply put, Yale University has a record of prioritizing revenues over the rights of its female workforce and student body, and of unfairly protecting powerful male harassers at the expense of their innocent female victims.

32.      For example, Dr. Michael Simons, the former Chair of Yale's cardiology department and one of the University's more prodigious grant winners, was found by a University-Wide Committee on Sexual Misconduct in 2013 of having sexually harassed a female postdoctoral researcher, creating a hostile work environment for her and mistreating her boyfriend who was also a cardiologist at Yale.

33.     Despite these findings, Yale continued to employ Dr. Simons, and allowed him to retain two prestigious leadership posts within the cardiology department.

34.     Then, in June 2018, Yale University astonishingly honored Dr. Simons by awarding him another esteemed endowed chair.  In fact, according to reports, Yale University's president, Peter Salovey, even wrote to Dr. Simons to personally congratulate him (referring to Dr. Simons as "Mike" in his letter), to tell him that he was "delighted to convey [Yale's] pleasure in [his] accomplishments" and that "endowed chairs are awarded to those whose scholarship has brought distinction to the university."

35.     According to reports, the Yale University School of Medicine's dean, Robert Alpern, M.D., even supported the University's tone-deaf decision to endow Dr. Simons a new chair, and referred to Dr. Simons as "defenseless."

36.     According to reports, months later, only after over one thousand faculty members, medical trainees, students and alumni signed a letter voicing their "disgust and disappointment," did Yale University rescind the chair endowment, but not before offering Dr. Simons the monetary bonus that came with the appointment – a minimum of $140,000 per year – to voluntarily relinquish the chair.

37.     Similarly, the current Chair of the Pharmacology Department at Yale, Joseph Schlessinger, M.D., was sued in 2006 by a former secretary who accused him of sexual misconduct, and the University of doing nothing to stop him.

38.     The victim alleged that Dr. Schlessinger, among other things, would brag to her about having slept with 46 different women, joke about his penis size, show her photos of naked men ejaculating and comment on her breasts.

39.     The victim further alleged that when she brought the allegations to the attention of Yale officials, nothing was done to protect her.

40.     Likewise, in 2015, two federal lawsuits were filed against Rex Mahnensmith, M.D., a Yale Nephrology professor and director of a Yale-affiliated clinic, accusing him of sexually harassing female clinic employees.

41.     These allegations included him pressing his erect penis against the back of a female social worker while she sat on a stool; approaching a nurse as she ate lunch and thrusting his pelvis into the back of her chair in a sexual manner; and going into a patient's room where a nurse was sitting on a stool and pressing his erect penis against her back while holding and rubbing her shoulders.

42.     When one of his victims reported Dr. Mahnensmith's behavior to her supervisor, she was allegedly told that this was simply the "culture of the clinic."

43.     The lawsuits alleged that Dr. Mahnensmith's inappropriate behavior towards those he worked with was common knowledge at the University, yet nothing was done to stop it.

44.     Recently, Eugene Richmond, M.D., a Yale University Professor of Psychiatry and decades-long member of the Yale University School of Medicine faculty, was determined by an independent investigator to have sexually assaulted at least five Yale University students and sexually harassed at least eight students over a period of 25 years.

45.     The assaults allegedly took place in a bedroom Dr. Richmond required students to share with him at a research facility on the Caribbean island of St. Kitts.

46.     Most upsetting, even though Yale University investigated his behavior in *1994*, and reprimanded him for "failing to maintain professional and appropriate boundaries between

himself and his students," it did nothing to ensure that he no longer brought students to his Caribbean research facility, allowing the attacks to continue for years.

47.      Recently (and unsurprisingly given these incidents of sexual harassment and inappropriate sexual conduct, and Plaintiffs' own appalling experiences), a survey by the Association of American Universities found that Yale University has a substantially higher than average rate of sexual harassment as compared to other similar institutions.

48.      In fact, the survey found that 11.7% of women in graduate or professional programs at Yale University received unwanted sexual touching, and that 30.6% of women in graduate or professional schools were harassed by a faculty member or instructor.

49.      Moreover, almost half of all students (49.2%) experienced one or more sexually harassing behaviors, but only 15.6% of people reported these behaviors, which speaks to the lack of efficacy of Yale University's reporting resources.

50.      Clearly, Yale University has an endemic and not isolated problem with effectively addressing and preventing sexual harassment and sexual misconduct on its campus.

## II.   DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES, WHICH PUT YALE ON NOTICE OF HIS PROPENSITY TO PERPETRATE SEXUALLY HARASSING BEHAVIOR

51.      Dr. Manuel Fontes is a highly decorated and distinguished figure within the medical field, and in particular within the area of anesthesiology.

52.      Upon information, however, prior to joining Yale's faculty, Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

53.      Upon information, Dr. Fontes left his position at Cornell University after having an affair with a female resident physician.

10

54.     Upon information, Dr. Fontes then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses before his departure from the institution.

55.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the anesthesiology department in 2015.

56.     In fact, upon information, in or around the Spring of 2015, the anesthesiology department's Residency Program Director, Dr. Jeffrey Schwartz, was specifically told about Dr. Fontes's alleged conduct perpetrated at Duke University.  Dr. Schwartz manages and coordinates Yale's anesthesiology residency program, and is responsible for addressing and handling resident concerns.  Dr. Schwartz reported and still reports directly to the Chair of the anesthesiology department, who was at that time and is to this day, Roberta Hines, M.D.  Upon information and belief, the anesthesiology department's residency coordinator discussed his awareness of Dr. Fontes's alleged misconduct at Duke University with Dr. Hines and/or other supervisors at Yale.

57.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

58.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital, who shall be identified herein as Dr. X.

59.     Specifically, in 2015, upon information, when Dr. X presented a research proposal to Dr. Fontes, who was the director of clinical research at the time, Dr. Fontes berated her and criticized her research proposal.  Upon information, hours later, while Dr. X was in the

Hospital, Dr. Fontes came up to her and told her that he would in fact be willing to help her with her research. Upon information, Dr. Fontes then proceeded to suddenly kiss Dr. X, unwantedly, on the mouth. Upon information, Dr. Fontes then proceeded to wipe the saliva off Dr. X's face, and told her, "I am looking out for you."

60.     Upon information, in the ensuing months, Dr. Fontes expressed to Dr. X multiple times that he wanted her to join the cardiac anesthesiology team at Yale. Upon information, Dr. X repeatedly told Dr. Fontes that she did not want to join the cardiac anesthesiology team.

61.     Then, upon information, in or around September 2015, following a lecture at the Hospital, Dr. X was in a kitchen adjacent to the lecture hall pouring a cup of coffee when Dr. Fontes suddenly came into the room and told her that he had started discussions with the Chair of the anesthesiology department, Dr. Hines, about moving Dr. X to the cardiac anesthesiology team. Upon information, Dr. Fontes also told Dr. X that he was someone who cared for her and loved her.

62.     Upon information, Dr. Fontes then proceeded to kiss Dr. X, unwantedly and uninvitedly, on the lips.

63.     Upon information, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine. Upon information, however, no disciplinary actions were taken against Dr. Fontes.

64.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven, Connecticut.

65.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

66.     Upon information, others in attendance, who included other attending physicians, found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

67.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

68.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, upon information, Dr. Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians, in a faculty meeting taking place in or around July 2016, that they should not attend parties or consume alcohol with residents.

69.     While, upon information, Dr. Hines acknowledged to the staff of the anesthesiology department attending physicians in attendance that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

70.     Dr. Hines's actions made it clear that she and Yale were more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the anesthesiology department rather than supporting a female resident who had been sexually assaulted.  It was apparent that no reasonable investigation was conducted into Dr. Fontes's clearly inappropriate behavior, including speaking with the female resident who had been assaulted, or other female residents or staff who Dr. Fontes may have also inappropriately touched.  This sent a message

13

that complaints or reports of inappropriate behavior by Dr. Fontes against female subordinates or staff would not be taken seriously, and effectively discouraged the reporting of such behavior.

71.     Most troubling, judging by his subsequent actions against Plaintiffs described herein, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.  Yale's inaction and deliberate indifference to the sexual harassment and assaults he committed made it more likely that Dr. Fontes would sexually assault or harass someone else, including Plaintiffs.

72.     Indeed, it was an "open secret," not just at Yale and within the anesthesiology department, but in the greater academic anesthesiology field, that Dr. Fontes harassed and behaved inappropriately towards female subordinates and other staff members.  In fact, female recruits to Yale's anesthesiology department, including some of the Plaintiffs, were warned about and told to keep their distance from Dr. Fontes prior to joining Yale.

73.     There is no question that appropriate persons at Yale who were in high-level, policy-setting positions of authority, including, but not limited to, the anesthesiology department's Chair, the department's residency coordinator, a Yale University Associate Dean and Ombudsperson, and numerous senior attending physicians within the anesthesia department, were well aware and put on actual notice of Dr. Fontes's penchant, both at Yale and before he joined Yale, for sexually harassing and mistreating female subordinates and staff.  Yet Yale did absolutely nothing to deter or prevent this behavior from recurring, or to effectuate change to what was clearly a sexually hostile environment.  Rather, it was Yale's official policy and/or custom to permit and display deliberate indifference towards the grave risks of sexual harassment and assault against female subordinates and staff posed by Dr. Fontes.  This was a

14

completely unreasonable and unacceptable manner in which to respond to serious accusations and evidence of sexual misconduct by a supervisor, and left Plaintiffs and other female subordinates of Dr. Fontes and staff vulnerable to Dr. Fontes's harassment and assaults.

74.     Yale was aware that Dr. Fontes posed a heightened risk to female subordinates and staff of being sexually harassed and assaulted.  Rather than take action to address this documented history of sexual misconduct, Yale, through their utter lack of remedial action, further emboldened Dr. Fontes and fostered an environment in which Dr. Fontes believed he could prey on female subordinates with impunity and without consequences.

75.     Yale could have, but failed to, take steps to respond to reports and complaints it received about Dr. Fontes's sexually harassing and inappropriate conduct that would have prevented Dr. Fontes's sexual harassment and assaults perpetrated against Plaintiffs, as alleged below.

## III.    SEXUAL HARASSMENT OF DR. BOULES

76.     Plaintiff Dr. Heidi Boules is an attending physician and assistant professor in the Yale anesthesiology department, specializing in pediatric anesthesiology.

77.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

78.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven, Connecticut under the guise of discussing work.

79.     After Dr. Boules reluctantly accepted this invitation, it soon became clear when the two later met that Dr. Fontes had no desire to actually discuss work.  Rather, as the two sat

side-by-side at the Union League Café, Dr. Fontes began to lean over and unwantedly touch Dr. Boules's body in a sexual manner.

80.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

81.     Days later, during a staff meeting, Dr. Fontes berated Dr. Boules in front of her colleagues, without any justification.  After the meeting, Dr. Fontes directed Dr. Boules to walk him to an elevator.  When Dr. Boules arrived with him at the elevator, Dr. Fontes proceeded to once again forcibly and unwantedly kiss Dr. Boules on the lips.

82.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he has seen her.  This has included an incident in which Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers just to simply and unnecessarily comment to her about how quiet her operating room was during a surgical case. Dr.  Fontes also unwantedly asked Dr. Boules out for drinks that day.

83.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes's sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## IV.     SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

84.     Plaintiff Dr. Mia Castro is a pediatric anesthesiology fellow at Yale, and completed her anesthesiology residency at Yale.

16

85.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

86.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

87.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

88.     This included an instance in which he yelled at and commanded Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

89.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

90.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

91.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

92.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

93.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

94.     While Dr. Castro was able to go on this mission trip to Peru, it is uncertain whether she will receive credit for it towards her fellowship requirements largely because of Dr. Fontes's unwillingness to support Dr. Castro's application in retaliation for her protected activity, which caused severe delays in the application and credit approval processes.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.     Pregnancy Discrimination

95.     Plaintiff Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

96.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

97.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

98.     Dr. Eltorai was shocked and taken aback by this inappropriate comment about her body made by her supervisor.  However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

99.     The next month, in October 2018, Dr. Eltorai asked Dr. Fontes, who was also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

100.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey.  However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

101.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.  Dr. Fontes's comments, however, were brushed aside, and his conduct was downplayed as him "just being a boy."

102.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (*i.e.*, that she would be scheduled to work the sufficient number of days to meet all of her unit requirements).

103.     Dr. Fontes was copied on these correspondences.  However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

104.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

105.    Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department, and complained that she was being punished by Dr. Fontes for taking maternity leave.

106.    Just one week after making these complaints, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

107.    By this time, Dr. Eltorai had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

108.    Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

109.    Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

110.    Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a few days because we want to speak with them first."  Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns about her.

111.    This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's protected pregnancy discrimination complaints.

20

112.    Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

113.    Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

114.    Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

115.    As further evidence of the pretextual nature of the decision to remove Dr. Eltorai from working in the ICU, Dr. Hines attempted to justify its decision by falsely alleging that Dr. Eltorai was provided with a "month-long, individualized course in Cardiac Anesthesiology in September 2018" as an "opportunity[y] for improvement." However, when Dr. Eltorai was hired to work at Yale, she made it clear to Dr. Fontes that she had almost no experience with the specific ICU population for whom she would be caring (cardiothoracic surgery). Dr. Fontes assured Dr. Eltorai that she would receive an extensive orientation for the first month or so she was at Yale (she started in July 2017), rather than immediately begin independent practice in the Cardiothoracic ICU ("CTICU"). However, this training opportunity was not presented to Dr. Eltorai as promised until September 2018. Notably, the very next month, in October 2018, a new male hire to the CTICU group at Yale underwent the exact same extensive orientation training in

the CTICU as Dr. Eltorai, before this male doctor was even permitted to practice one day in the CTICU.

   b.   **Sexual Harassment**

116.    Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

117.    In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

118.    Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

119.    This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

120.    Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

121.    Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

122.    Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition.  Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research

project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

123.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project.  Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

124.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis.  Dr. Eltorai backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

125.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

126.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

127.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

128.     However, despite her complaint, nothing was done to seriously address her complaints, nor to punish or deter Dr. Fontes from continuing his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint also contributed to that retaliatory decision.

## VI.   DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

129.     Plaintiffs Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters) are both attending physicians within Yale's anesthesiology department.

130.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

131.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

132.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

133.     Then, in April 2019, both Drs. Oliver attended a dinner for a potential new hire with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven, Connecticut.

134.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

135.    At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

136.    Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

137.    Both Drs. Oliver have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

**VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART**

138.    Plaintiff Dr. Elizabeth Reinhart is a third-year anesthesiology resident at Yale.

139.    In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, Connecticut, along with Dr. Fontes and another female attending physician.

140.    Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

141.    Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol.  This caused Dr. Reinhart to feel very uncomfortable.

142.    As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to unwantedly kiss her on the lips.  Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

143.    Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

144.    Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

145.    Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club in New Haven, Connecticut.

146.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?"  Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

147.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline from Yale despite video evidence of the assault and an acknowledgement by Dr. Hines in front of the anesthesiology department's senior staff that she had viewed such video.

148.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, wrapped his arm around and hugged her by the waist, and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician, who then came over to ask Dr. Reinhart whether she was alright.

149.     Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other Yale resident physicians also live, fearing that they would pressure and convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

150.     Soon thereafter, the female attending physician who drove Dr. Reinhart to her home reported to Dr. Schwartz, the Residency Coordinator, that, as a result of this incident, Dr. Reinhart did not feel safe or comfortable around Dr. Fontes.  Upon information, Dr. Schwartz then reported this incident to Dr. Hines, the anesthesiology department's chair.

151.     Then, a few weeks later, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology department's breakroom and began to unwantedly massage her back and shoulders.

152.     Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeffrey Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

153.     As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department's Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

154.     Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

155.    Incredibly, *days later*, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

156.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention to protect Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

157.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

158.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes continued to sexually harass Plaintiffs, and, upon information, other female Yale employees.

159.    Indeed, in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?"  When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

160.    Thus, not only did Dr. Fontes disregard the countless complaints lodged against him by Plaintiffs, but, likely knowing that he would not suffer any meaningful consequences for his predatory behavior from Yale, decided to actively mock Plaintiffs for making complaints, as if their complaints were all a big joke.

161.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to be esteemed institutions such as Yale University and Yale New Haven Hospital.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Title IX)**
***Against Yale University and Yale New Haven Hospital, Inc.***

162.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

163.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

164.    By the above described conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart were discriminated against on the basis of their sex by Yale, including but not limited to by sexual misconduct, sexual harassment and sexual assaults by Dr. Manuel Fontes.

165.    By the above described conduct, Defendants were on notice of the discriminatory conduct engaged in by faculty at Yale.  Yale failed to carry out their duties and obligations pursuant to Title IX to investigate and take corrective action.

166.    By the above described conduct, Yale allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

167.    By the above described conduct, Yale tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

168.    By reason of the continuous and ongoing nature of the above-described sexual assault, sexual abuse, sexual harassment and sexual discrimination conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

169.    As a direct and proximate result of Yale's unlawful actions or inactions, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

170.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title IX)**
***Against Yale University and Yale New Haven Hospital, Inc.***

171.    Plaintiffs Castro and Eltorai hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

30

172.    By the above described conduct, Yale has retaliated against Plaintiffs Castro and Eltorai in violation of Title IX by, *inter alia*, failing to properly investigate their claims of discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices.

173.    As a direct and proximate result of Yale's unlawful conduct in violation of Title IX, Plaintiffs Castro and Eltorai have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which they are entitled to an award of monetary damages.

174.    As a direct and proximate result of Yale's unlawful actions, Plaintiffs Castro and Eltorai have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

175.    Plaintiffs Castro and Eltorai are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

### THIRD CAUSE OF ACTION
(Assault)
*Against Manuel Lopes Fontes, M.D.*

176.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

177.     By the above described conduct, Defendant Fontes intentionally subjected Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart to a harmful or offensive sexual contact, and intended to cause Plaintiffs to suffer such a contact, resulting from his actions.

178.     As a direct and proximate result of Defendant Fontes's unlawful conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart to have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law.

### FOURTH CAUSE OF ACTION
**(Battery)**
***Against Manuel Lopes Fontes, M.D.***

179.     Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

180.     By the above described conduct, Defendant Fontes intended to cause a harmful or offensive contact with Plaintiffs, or an imminent apprehension of such a contact, and a harmful contact with Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart directly or indirectly resulted from Defendant Fontes's actions.

181.     As a direct and proximate result of Defendant Fontes's unlawful conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## FIFTH CAUSE OF ACTION
### (Invasion of Privacy)
### *Against Manuel Lopes Fontes, M.D.*

182.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

183.    By the above described conduct, Defendant Fontes subjected Plaintiffs to intentional acts which invaded the privacy of Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart, including their privacy in their own body and their privacy in matters relating to sex, and unreasonably intruded into the seclusion of their person and their protected privacy interests.

184.    Defendant Fontes intentionally intruded, physically or otherwise, upon the solitude or seclusion of Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart in a manner that was highly offensive to a reasonable person.

185.    As a direct and proximate result of Defendant Fontes's unlawful conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

B.       An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

C.       An award of compensatory damages for emotional distress in an amount to be determined at trial;

D.       An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputation and loss of career fulfillment;

E.       An award of punitive damages in an amount to be determined at trial;

F.       An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

G.       Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: March 12, 2020
       Hartford, Connecticut

                                          Respectfully submitted,

                                          **MADSEN, PRESTLEY & PARENTEAU, LLC**

                                          By: _____
                                               Todd D. Steigman (CT 26875)

                                          402 Asylum Street
                                          Hartford, CT 06103
                                          Tel: (860) 246-2466
                                          Fax: (860) 246-1794
                                          tsteigman@mppjustice.com

                                          **WIGDOR LLP**

                                          Douglas H. Wigdor
                                          (to file a motion to be admitted *pro hac vice*)
                                          Michael J. Willemin
                                          (to file a motion to be admitted *pro hac vice*)
                                          Tanvir H. Rahman
                                          (to file a motion to be admitted *pro hac vice*)

                                          85 Fifth Avenue
                                          New York, NY  10003
                                          Telephone:  (212) 257-6800
                                          Facsimile:  (212) 257-6845
                                          dwigdor@wigdorlaw.com
                                          mwillemin@wigdorlaw.com
                                          trahman@wigdorlaw.com

                                          *Counsel for Plaintiffs*