EXHIBIT A

Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 129,516

2018 WL 1785544

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

**Superior Court of Connecticut,
Judicial District of Waterbury at Waterbury.**

Ulyses ALVAREZ
v.
CITY OF MIDDLETOWN

UWYCV166029668S
|
March 16, 2018

Brazzel–Massaro, J.

## PROCEDURAL AND FACTUAL BACKGROUND

**\*1** The plaintiff, Ulyses Alvarez, filed this complaint in
two counts on January 25, 2016. The plaintiff named the
City of Middletown as the defendant. The plaintiff alleges
that the City of Middletown engaged in discrimination
against him on the basis of race and national origin, which
resulted in his discharge from the Middletown Police
Department. The first count of the plaintiff's complaint
alleges National Origin discrimination and the second
count alleges racial discrimination. Both counts are
brought pursuant to General Statutes § 46a–60(a)(1).

The plaintiff's complaint, and the submitted record,
reveals the following relevant facts. The plaintiff is a
Hispanic American citizen of Puerto Rican descent
residing in Waterbury, and was employed as a
probationary police officer by the defendant. In October
of 2013, the plaintiff applied to the defendant for a
position as a police officer and went through the hiring
process, which included a background check and an
interview with the chief of police. The plaintiff alleges
that while an employee of the defendant, Detective
Thomas Ganley, was performing the plaintiff's
background check he remarked that the plaintiff was "too
clean," in reference to the plaintiff being a Puerto Rican
from Waterbury. Nevertheless, the plaintiff's background

check cleared and Ganley recommended the plaintiff
move forward in the hiring process. Hence, the plaintiff
was interviewed by Police Chief William McKenna.
During the interview the plaintiff claims that McKenna
asked him if the plaintiff had any "side bitches," or "baby
mama drama," he should know about. Even so, shortly
thereafter the plaintiff received a conditional offer of
employment on November 13, 2013, provided he undergo
training at the Police Officer Standards and Training
Council (POST).

The plaintiff began attending POST on January 6, 2014.
While there, the plaintiff was the only Hispanic cadet out
of six recruits, and he alleges that he was subjected to
racial slurs and derogatory language by some of his
fellow trainees. Hence, the plaintiff graduated from POST
on June 14, 2014, and he subsequently entered into the
city's field training program. His supervising officer
during this period made note of several performance
deficiencies, including a lack of situational awareness,
organizational issues, difficulty writing reports and
various calls, and the plaintiff initially failed his firearms
training. His schedule was adjusted in response. On
November 12, 2014, the plaintiff was cleared to conduct
patrol work on his own.

On February 4, 2015, a female citizen, Jane Doe,[i] came
into the police headquarters and reported that the plaintiff
groped her and made her feel his genitals through his
pants while he was responding to a reported domestic
incident at her home. The plaintiff denied these
allegations, but was placed on administrative leave on
February 18, 2015, pending an internal affairs
investigation. Detective Ganley was assigned to complete
the investigation. During the course of his investigation,
Officer Arroyo, a colleague of the plaintiff's made a
statement to Ganley that, on the day on which the incident
between the plaintiff and Jane Doe was alleged to have
taken place, the plaintiff had met Arroyo for lunch and
bragged to him that he had received oral sex from one of
the individuals involved in the call he was on. The
plaintiff denied making this statement but does not
dispute that Arroyo reported such to Ganley.

**\*2** While the investigation was ongoing, McKenna
ordered a performance evaluation on the plaintiff, which
showed he still demonstrated notable performance
deficiencies, including a failure to file written reports. In
light of these deficiencies on March 4, 2015, McKenna
sent a letter to the plaintiff informing him that he would
be facing probationary discharge on March 6, 2015. The
plaintiff subsequently resigned on-that same date. On
May 4, 2015, the plaintiff filed a complaint with the

Connecticut Commission on Human Rights and Opportunities (CHRO). On October 30, 2015 the plaintiff received a release of jurisdiction issued by CHRO.

The plaintiff then initiated this action. The plaintiff alleges that his privilege of employment was interfered with on the basis of his race and national origin because a similarly situated Caucasian officer was not disciplined in the same manner, and comments were made to the plaintiff that he believes were racially motivated. Accordingly the plaintiff alleges that the defendant violated the Connecticut Fair Employment Practices Act, General Statutes § 46a–60(a)(1).

On March 10, 2016, the defendant filed its answer and special defenses, and admitted that it employed the plaintiff as a probationary police officer and that an investigation was conducted, but otherwise denied that allegations of the plaintiff's complaint. On August 11, 2016, the plaintiff filed his reply.

On August 18, 2017, the defendant moved for summary judgment on the basis that the plaintiff cannot prove his prima facie case of discrimination On October 20, 2017, the plaintiff filed his objection. On December 22, 2017, the defendant filed a reply, and the plaintiff filed a supplemental objection. Finally, on January 5, 2018, the defendant filed another reply. In support of their positions, the plaintiff and defendant filed numerous exhibits. The matter was heard at the short calendar on January 8, 2018.

DISCUSSION

A. Legal Standard

Practice Book § 17–49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Cefaratti v. Aranow,* 321 Conn. 637, 645, 138 A.3d 837 (2016). "... The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted.) *Wilson v. New Haven,* 213 Conn. 277, 279, 567

A.2d 829 (1989). "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent ... When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue ... Once the moving party has met the burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17–45]." *Ferri v. Powell–Ferri,* 317 Conn. 233, 228 A.3d 297 (2015).

In its memoranda in support of its motion for summary judgment, the defendant argues that the plaintiff has failed to state a prima facie case, and thus judgment should render for the defendants.[2] The defendant first contends that the plaintiff has failed to show that an adverse employment action has occurred, specifically, the defendant argues that the plaintiff has failed to show he was constructively discharged, as the plaintiff resigned prior to his termination. Next, the defendant asserts that, even assuming an adverse employment action occurred, the plaintiff cannot show an inference of discrimination as he has failed to show similarly situated comparators and only stray remarks from the basis of his action. Furthermore, the defendant contends that it had a legitimate reason for his discharge due to his serious performance deficiencies. Lastly, the defendant argues that the plaintiff cannot sriw pretext, as similarly situated officers were disciplined and routine practice was followed in exercising his termination.

*3 In his memoranda in opposition, the plaintiff asserts that he has stated a prima facie case and the defendant's motion should be denied. The plaintiff contends that he has suffered an adverse employment action, in that this discharge was inevitable as the decision regarding his termination had been made prior to his resignation. The plaintiff next contends that discrimination can be inferred through the following: (1) that the defendant has failed to discipline similarly situated individuals;(2) that several remarks were made to the plaintiff, by persons involved in his discharge, that were racially charged; and (3) that the ultimate decision to terminate the plaintiff's employment was based on impermissible stereotypes. Lastly the

Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 129,516

plaintiff asserts that the defendant's legitimate reason for his termination is a pretext, as the investigation against him was conducted in a biased manner, his performance was evaluated only after the accusation by Jane Doe, and similarly situated officers were not disciplined in the same manner.

A.

Prima Facie Case

"The framework this court employs in assessing disparate treatment discrimination claims under Connecticut law was adapted from the United States Supreme Court's decision in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny ... We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both ... Under this analysis the employee must first make a prima facie case of discrimination ... The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question ... The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Citations omitted, internal quotation marks omitted.) *Feliciano v. Autozone, Inc.,* 316 Conn. 65, 73–74, 111 A.3d 453 (2015). Summary Judgment is appropriate where a plaintiff presents no evidence upon which a reasonable trier of fact could base a conclusion that race discrimination is a determinative factor in the adverse employment action. See *Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir. 2000).

The plaintiff brings this action under CFEPA, § 46a–60 et. seq., which prohibits discrimination based on, *inter alia,* race, color, and national origin. "In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964 the federal statutory counterpart to § 46a–60." *Britell v. Dept. of Correction,* 247 Conn. 148, 164, 717 A.2d 1254 (1998).

To determine whether a plaintiff has established a prima facie claim for discrimination pursuant to § 46a–60(a)(1), the court employs the burden shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 802–04. See *Dept. of Transportation v. Commission on Human Rights & Opportunities* 272 Conn. 457, 463 n.9, 863 A.2d 204 (2005) ("[w]e note that the analytical framework set forth by the United States Supreme Court in McDonnell Douglas Corp. ... and its progeny is used to determine whether a complainant may prevail on a claim of disparate treatment under our state law." [Citation omitted.] ) Under the *McDonnell Douglas Corp.* analysis, "the employee must first make a prima facie case of discrimination. The employee may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision was actually motivated by illegal discriminatory bias." (Internal quotation marks omitted.) *Perez–Dickson v. Bridgeport,* 304 Conn. 483, 513, 43 A.3d 69 (2012).

"The burden of establishing a prima facie case [of discrimination] is a burden of production, not a burden of proof, and therefore involves no credibility assessment by the factfinder ... The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor" (Internal quotation marks omitted.) *Phadnis v. Great Expression Dental Centers of Connecticut, P.C.,* 170 Conn.App. 79, 87, 153 A.3d 687 (2017). "In order to establish a prima facie case, the [plaintiff] must prove that: (1) he is in the protected class, (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." (Internal quotation marks omitted.) *Jacobs v. General Electric Co.,* 275 Conn. 395, 400, 880 A.2d 151 (2005). "In addition to proffering direct evidence of discrimination with respect to the fourth prong, a litigant may present circumstantial evidence from which an inference may be drawn that similarly situated individuals were treated more favorably than [he] was." (Internal quotation marks omitted.) *Phadnis v. Great Expression Dental Centers of Connecticut, P.C., supra,* 88.

**\*4** The defendant does not dispute the first two prongs of the analysis that the plaintiff was a member of a protected class, nor that he was qualified for the position. Rather, the defendant disputes the remaining prongs.

The defendant first asserts that the plaintiff has failed to

Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 129,516

show that he was constructively discharged. Normally to prove a constructive discharge case a plaintiff must show that the employer intentionally created an intolerable work atmosphere that forces the employee to quit. See *Britell v. Dept. of Correction, supra*, 247 Conn. 178. Constructive discharge may also occur, however, if an employee "resigns in the face of inevitable termination." *Gorham v. Board of Education,* 7 F.Supp.3d 218, 232 (D.Conn. 2014). Furthermore, threats of termination may be sufficient to show constructive discharge. See *Dall v. St. Catherine of Siena Medical Center,* 966 F.Supp.2d 167, 178 (E.D.N.Y. 2013). In any event, the court declines to reach this issue, the plaintiff has not proven the other essential elements of his case. The plaintiff has not shown that the adverse employment action took place under circumstances giving rise to tan inference of discrimination; nor has he shown that the defendant's legitimate reason for his discharge is a pretext.

### B.

### Inference of Discrimination

Assuming an adverse action occurred; the plaintiff must show that it took place under circumstances giving rise to an inference of discrimination. "In regard to the fourth element of the plaintiff's prima facie case, circumstances that may give rise to an inference of discrimination are: (1) the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill the position; (2) the employer's criticism of the plaintiff's performance in ethnically degrading terms or invidious comments about others to the employee's protected group; (3) the more favorable treatment of employees not in the protected group; or (4) the sequence of events leading to the plaintiff's discharge or the timing of the discharge." *Snow v. Dari–Farms Ice Cream, Inc.,* Superior Court, judicial district of Fairfield, Docket No. CV–10–6009422–S (February 13, 2013, Sommer, J.). "Nothing in McDonnell Douglas Corp. ... limits the type of circumstantial evidence that may be used to establish the fourth prong of the test for a prima fade case of ... discrimination." *Craine v. Trinity College,* 259 Conn. 625, 640–41, 791 A.2d 518 (2003).

To establish the [fourth] prong [of the prima facie case], a

litigant may present circumstantial evidence from which an inference may be drawn that similarly situated individuals were treated more favorably than [he] was ... To be probative, this evidence must establish that the plaintiff and the individuals to whom [he] seeks to compare [himself] were similarly situated in *all material respects* ... [A]n employee offered for comparison will be deemed to be similarly situated in all material respects if (1) ... the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) ... the conduct for which the employer imposed discipline was of comparable seriousness." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Perez–Dickson v. Bridgeport, supra*, 304 Conn. 514. "[B]eing similarly situated in all material respects does not require one to demonstrate disparate treatment of an identically situated employee ... Employees need show only a situation sufficiently similar to [their own] to support at least a minimal inference that the difference of treatment may be attributable to discrimination." (Citation omitted; internal quotation marks omitted.) *United Technologies Corp. v. Commission on Human Rights & Opportunities,* 72 Conn.App. 212 226, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002).

**\*5** "[T]o satisfy [the] 'all material respects' standard for being similarly situated, a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards." (Internal quotation marks omitted.) *Kelly v. Sun Microsystems, Inc.* 520 F.Supp.2d 388, 390 (D.Conn. 2007). "In order for employees to be 'similarly situated' for the purposes of establishing a plaintiff's prima facie case, they ... must have engaged in conduct similar to the plaintiff's." (Internal quotation marks omitted.) *Norville v. Staten Island University Hospital,* 196 F.3d 89, 96 (2d Cir. 1999). Although the allegedly similar circumstances "need not be identical ... there should be a reasonably close resemblance of facts and circumstances." (Internal quotation marks omitted.) *Lizardo v. Denny's Inc.,* 270 F.3d 94, 101 (2d Cir. 2001). "[A] court can properly grant summary judgment ... where it is clear that no reasonable jury could find the similarly situated prong met." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Payton v. St. Mary's Hospital Corp.,* 118 Conn.App. 258, 268, 983 A.2d 56 (2009). A plaintiff cannot selectively pick our one comparator when others are available. See *Simpson v. Kay Jewelers, Division of Sterling, Inc.,* 142 F.3d 639, 646–47 (3d Cir. 1998) (holding that a "plaintiff cannot pick one comparator who was allegedly treated more favorably and completely ignore a significant group of comparators who were treated equally or less favorably").

Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 129,516

As to the relevancy of comments, "[i]n the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion ... It is well established that the stray remarks even of a decision maker, without more, cannot prove a claim of employment discrimination." (Citation omitted; internal quotation marks omitted.) *Chan v. Donahoe, 63 F.Supp.3d 271, 293–94 (E.D.N.Y. 2014)*.

In the present case, the plaintiff contends that discrimination can be inferred based upon the following: (1) that similarly situated comparators were not disciplined; (2) that remarks made to the plaintiff evince a discriminatory animus; and (3) that the actions against the plaintiff were motivated by impermissible racial stereotypes. These arguments are unpersuasive.

The plaintiff first argues that a Caucasian police officer, Austin Smith, came to work smelling of alcohol, and that his employment was not terminated; rather, he was simply suspended. From this, the plaintiff argues a similarly situated employee of a different race and origin was disciplined more leniently. This comparison is ill suited. As previously noted, the plaintiff and the individual to whom he seeks to compare himself must be similarly situated "in all material respects." *Perez–Dickson v. Bridgeport, supra*, 304 Conn. 514. Here, although the plaintiff and officer Smith were probationary officers, the conduct at issue is not of a sufficiently comparable nature. An odor of alcohol is not analogous to the conduct that formed the basis of the plaintiff's discharge, namely consistent performance deficiencies. See part II C of this memorandum of decision, See also *Walker v. Dept. of Children & Families, 146 Conn.App. 863, 876, 80 A.3d 94 (2013)*, cert. denied, *311 Conn. 917, 85 A.3d 653 (2014)* (no disparate treatment where plaintiff failed to show comparators exhibited similar performance issues). Accordingly, the plaintiff has failed to show a similarly situated comparator from which discrimination can be inferred.

The plaintiff next argues that several remarks made to him during his employment give rise to an inference of discrimination. In his objection, the plaintiff points to the statements of two actors that he alleges displayed racial and national origin animus and that were involved in the decision to terminate his employment; these being: Ganley who conducted the investigation against the plaintiff, and McKenna who ultimately recommended the plaintiff's probationary discharge.[3]

**\*6** The principal remarks identified by the plaintiff are as follows: The plaintiff testified in his deposition that Ganley, while conducting plaintiff's background check, stated the plaintiff was "too clean," specifically in reference to him being a Puerto Rican from Waterbury, Def.'s Exh. A (Alvarez Depo. 76: 17–25). The plaintiff also points to several comments posted by Ganley on Face book as purported proof of his discriminatory animus. See Pl's Obj. Docket # 139. As to McKenna, the plaintiff states that while being interviewed prior to his entry into POST that McKenna asked him if he had any "side bitches," or "baby mama drama" should know about prior to hiring him. See Pl's Exh. 1 (Alvarez Dep. 131: 6–15). The comments of each actor are considered in turn.

As to Ganley, these remarks are of little value to the court. The record shows that Ganley was not ultimately involved in the decision to end the plaintiff's employment, nor did he make a recommendation regarding the same. Def's Exh. Z (Ganley Dep., 24:15–18). Comments made by someone who did not make the adverse employment action, and that are not pertaining to the plaintiff's discharge, are of little probative worth. See *Dixon v. International Federation of Accountants, 416 Fed.Appx. 107, 110 (2d Cir. 2011)* (remark by supervisor that was not involved in termination of plaintiff's employment was insufficient to prove prima facie case). Moreover, the plaintiff has not identified other racially charged language, or behavior, that Ganley exhibited specifically towards him. Furthermore, that Ganley ultimately recommended the plaintiff move forward in the hiring process; Def's Exh. J. (Ganley Affidavit); militates against the conclusion that he harbored a discriminatory animus against him.

Nonetheless, the plaintiff argues that Ganley was motivated by racial stereotypes in conducting his investigation regarding Jane Doe's complaint, and that, by crediting Jane Doe and Officer Arroyo's statements over those of the plaintiff, Ganley displayed racial animus. This argument, however, is belied by the reality that Ganley credited Arroyo's testimony and Arroyo himself is of Puerto Rican descent. See Def's Exh. Y (Defendant's Responses to Interrogatories). Accordingly, the mere fact that Ganley credited Arroyo and Doe over the plaintiff does not provide evidence of discrimination. Furthermore, the investigation conducted by Ganley is ultimately irrelevant, in so far as the decision to terminate the plaintiff was made before the investigation was even completed based upon the plaintiff's performance deficiencies. As noted in Chief McKenna's letter of March 3, 2015, he recommended the plaintiff's discharge for a number of performance deficiencies and concluded by stating: "The pending internal investigation may add additional reasons to support my reasons to recommend

Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)
2018 Fair Empl.Prac.Cas. (BNA) 129,516

discharge." Pl's Exh. 9 (McKenna's letter to Mayor Drew, Pl's Exh. 9). Accordingly, only McKenna's statements and actions towards the plaintiff are relevant.

As to McKenna, this language while questionable, ultimately fails to give rise to an inference of discrimination. McKenna disputes making these comments, but even assuming they occurred these comments, although tasteless, do not directly reference race, and could possibly be construed as crude attempts at humor. See *Jackson v. Post University, Inc.,* 836 F.Supp.2d 65 (D.Conn. 2011) (comments in reference to African American plaintiff purportedly smoking marijuana not sufficient to give rise to inference of discrimination). That this is the only specific identified behavior on the part of McKenna that the plaintiff has identified leads to the conclusion that this is nothing more than a stray remark unrelated to the plaintiff's discharge, and as such, is insufficient to avoid summary judgment. See *Chan v. Donahoe, supra,* 63 F.Supp.3d 293–94.

**\*7** Furthermore, the court finds that the same actor inference applies here. "When the same actor hires a person already within the protected class, and then later fires the same person, it is difficult to impute to h[im] an invidious motivation that would be inconsistent with the decision to hire." (Internal quotation marks omitted.) *Carlton v. Mystic Transport, Inc.,* 202 F.3d 129, 137 (2d Cir. 2000), cert. denied, 530 U. S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). While the ultimate decision to hire or fire the plaintiff was vested in the mayor, McKenna recommended the plaintiff's hiring as well as his ultimate discharge within the relatively brief period of time he was employed by the City of Middletown, a little less than one and a half years. See *Jackson v. Post University, Inc., supra,* 836 F.Supp.2d 99 (application of same actor inference). Accordingly, in light of the foregoing, thee comments are insufficient to show an inference of discrimination.

Lastly, the plaintiff argues that the decision to terminate his employment was motivated by impermissible stereotypes. Leaving aside that the plaintiff's performance issues were well documented; see part II C of this memorandum of decision; and that the line of cases the plaintiff relies upon deal entirely with gender discrimination, this argument is unavailing and unsupported by any evidence. The plaintiff asserts that the McKenna decision to terminate the plaintiff's employment was based upon impermissible stereotypes, because in his letter to Mayor Drew recommending discharge he referred to various performance deficiencies the plaintiff exhibited. Specifically, McKenna wrote that it appeared the plaintiff could not grasp the department's

directives or training attempts, and that he was perhaps being defiant in his refusal to learn. Pl's Exh. 9 (Letter from McKenna to Mayor Drew). The plaintiff contends that "these statements implicate a known stereotype of Hispanics: lack of intelligence." Pl's Objection p. 24, Docket # 136. This argument, however, is conclusory and based entirely on speculation. "No genuine issue of material fact [is created] where [the] plaintiff [relies] on conclusory statements and personal assessment of the motives of the defendants in opposing summary judgment." (Internal quotation marks omitted.) *Marasco v. Connecticut Regional Vocational Technical School System,* 153 Conn.App. 146, 164, 100 A.3d 930 (2014), cert. denied, 316 Conn. 901, 111 A.3d 469 (2015). Accordingly, the plaintiff has failed to show an inference of discrimination.

C.

Legitimate, Non–Discriminatory Reason & Pretext

Even assuming, arguendo, that an inference of discrimination exists, the defendant has a legitimate non-discriminatory reason for the plaintiff's termination and the plaintiff has not shown that it is a pretext.

If the plaintiff establishes a prima facie case of discrimination, then the burden of production shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for its action. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 802. "The employer may ... rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question." *Feliciano v. Autozone, Inc., supra,* 316 Conn. 74. "This, too, is a burden of production, and the [employer] merely needs to state a nondiscriminatory reason." *Craine v. Trinity College supra,* 259 Conn. 643. The defendant asserts that the legitimate, nondiscriminatory reason for terminating the plaintiff's employment was namely his pervasive performance deficiencies. The plaintiff does not contest these deficiencies. Pl's Objection p. 16 Docket # 136. Aspects of the plaintiff's performance as an officer that were found to be deficient included: (1) that he initially failed his firearms training, and his schedule to complete the field training program had to be adjusted on several occasions to compensate, Def's Exh. U (McKenna Dep.,

53:5–16, 54:2–55:3); (2) that he had situational awareness issues, Pl's Exh. 9 (McKenna's letter recommending plaintiff's discharge), Def's Exh. I (Lukanik Memo re Alvarez Performance); (3) that he exhibited organizational issues and had difficulty remembering calls, *id.*; (4) that he had problems with reporting motor vehicle accidents correctly and showed an inability to recognize who was at fault, *id.*; (5) that he failed to write reports for fourteen calls that warranted a written report, Def's Exh. U (McKenna Dep., 55:4–9); and (6) that on three other occasions he had written inadequate reports, and had failed to fully investigate and collect relevant information relating to these cases. Def's Exh. I (Lukanik Memo re Alvarez) Def's Exh. U (McKenna Dep., 55: 4–9). Furthermore, that the plaintiff failed to write a report on the incident that gave rise to Jane Doe's complaint; Def's Exh. K, p. 39 (Internal Affairs Memo re Jane Doe); and his purported statements to Officer Arroyo, provided additional reasons for discharge. Accordingly, the defendant has set forth a legitimate nondiscriminatory reason for the plaintiff to show pretext.

**\*8** "After the [employee] has established a prima facie case, and the [employer] has produced evidence of a legitimate, nondiscriminatory reason for the employment action, [t]he [employee] retains the burden of persuasion. [The employee] now must have the opportunity to demonstrate that the [employer's] proffered reason was not true for the employment decision (Internal quotation marks omitted.) *Harris v. Dept. of Correction,* 154 Conn.App. 425, 431, 107 A.3d 454 (2014), cert. denied, 315 Conn. 925, 104 A.3d 921 (2015). To show pretext, the plaintiff must demonstrate that the defendant was motivated by an unlawful animus or that the defendant's explanation is unworthy of credence. See *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff must present "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the employment action." *Weinstock v. Columbia University,* 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003).

The plaintiff has failed to put forth evidence demonstrating that the defendant's reasons for terminating him were pretextual. The plaintiff sets forth several arguments regarding pretext.

First, the plaintiff contends that Ganley's investigation was motivated by discriminatory animus evidenced by his manner conducting the investigation and his determination of the plaintiff's credibility. This argument is unpersuasive, however, as Ganley was ultimately not a decision maker regarding the plaintiff's employment and credited a fellow Hispanic officer over the plaintiff. See Part II B of this memorandum of decision. The plaintiff makes note of the fact that after the investigation was opened, the plaintiff's performance was taken under scrutiny. This, however, is of no consequence. That performance investigation was conducted by an independent officer, Lukanik, who the plaintiff does not allege engaged in discriminatory behavior. Furthermore, the complaint that gave rise to the investigation did not originate within the police department, but rather was made by a civilian. Lastly, as noted previously, the decision to terminate the plaintiff's employment was ultimately made on the basis of the plaintiff's deficient performance. Pl's Exh. 9 (Letter to Mayor Drew from Chief McKenna). Second, the plaintiff contends that failing to properly document incidents is a "continuing and widespread problem throughout the departments." Pl's Exh. 5 (Ganley's Internal Affairs Report p. 40). Consequently, the plaintiff contends that by disciplining him for such conduct, he was singled out on the basis of his race. This, however, is a misstatement of fact. As noted by McKenna, officers have been disciplined on multiple occasions for failing to properly report incidents. Def's Exh. U (McKenna Dep. 28:1–31). Furthermore, it was noted that a Caucasian probationary police officer was terminated during his probationary period for failing to properly document reports and for disrespecting his supervisors. *Id.* Consequently, the plaintiff has proffered no evidence from which the court can infer he was singled out.

Third, and lastly, the plaintiff contends that the defendant deviated from practice in terminating his employment, rather than working to rehabilitate him. The plaintiff points to testimony of McKenna which indicates that the defendant will often work with an officer who is exhibiting performance deficiencies to correct them. Pl's Exh. 15 (McKenna Dep. 36:8–48:5). This argument, however, is belied by the reality that the plaintiff did receive supplemental training to correct his performance deficiencies. The plaintiff was given 624 hours of training, in contrast to the usual 480 hours, before his superior officers felt he was ready to patrol on his own. See Pl's Exh. 9. See also Def's Exh. E–1 (Lukanik memos documenting persistent performance issues by the plaintiff and ameliorative efforts). Consequently, when the defendant decided to terminate the plaintiff's employment in light of these long-standing, and seemingly uncorrectable, performance deficiencies it did not deviate from practice, particularly in light of the fact that similarly situated officers have been discharged. See Def's Exh. U (McKenna Dep. 28–31). Thus the plaintiff

has failed to demonstrate pretext.

summary judgment is granted.

**All Citations**

Not Reported in Atl. Rptr., 2018 WL 1785544, 2018 Fair Empl.Prac.Cas. (BNA) 129,516

CONCLUSION

**\*9** For the foregoing reasons, the defendant's motion for

## Footnotes

[1]   To protect the identity of the individual that made the complaint against the plaintiff both parties have referred to her throughout this action as "Jane Doe," and have redacted any mention of her identity from the record.

[2]   The defendant asserts that any claims or conduct asserted by the plaintiff that occurred prior to November 14 2014, 180 days from his CHRO complaint, are untimely and should not be considered pursuant to CFEPA, General Statutes § 46a–82(f). General Statues § 46a–82 governs the filing of a discrimination claim with the CHRO, and subsection (c) of that statute states in relevant part: "complaints filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination ..." "[T]he failure to meet the 180–day time limit in § 46a–82(e) is [not] without consequence ... [I]f a time requirement is deemed to be mandatory, it must be complied with, absent such factors as consent, waiver or equitable tolling. Thus, a complaint that is not filed within the mandatory time requirement is dismissable unless waiver, consent, or some other compelling equitable tolling doctrine applies. We conclude that the time limit of § 46a–82(e) is mandatory, and thus the commission could properly dismiss the plaintiff's complaint if it was not filed within 180 days of the alleged act if discrimination." *Williams v. Commissioner of Human Rights & Opportunities,* 257 Conn. 258, 284, 777 A.2d 645 (2001). In this case, there does not appear to be a separate and discrete cause of action alleged from conduct during this time, but the plaintiff does make note of statements by fellow trainees as well as statements that the plaintiff perceived as discriminatory by Ganley and McKenna during the hiring process. The plaintiff has not responded to or addressed this argument. In light of the above cited authorities, the court finds that any cause of action that could have been asserted arising directly from this conduct is time barred; however, the court will still consider these instances in determining whether he has proven his prima facie case. See *Nelson v. Bridgeport,* Superior Court, judicial district of Fairfield, Docket No. CV–06–5001428–S (September 27, 2012, Gilardi, J.T.R.) (court considered time barred actions in determining prima facie case); *Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir. 1981) (same).

[3]   The plaintiff also references other comments made to him by fellow trainees during his time at POST, as well as statements by officers after his graduation. See Pl's Obj. 6–7 Docket # 136. The plaintiff does not allege that these individuals, however, were involved in any adverse employment action against him, nor is there any basis in the record to conclude the same. While such evidence could be evidence of a hostile work environment action, such a claim is not pursued here, and would be time barred by the CHRO complaint; see footnote two; as well as by the fact that the lion's share of the allegedly discriminatory behavior occurred at a separate location outside the defendant's control, See *Velazquez v. Department of Correction,* Superior Court, judicial district of Fairfield, Docket No. CV 15–6051925–S (November 16, 2016, Krumeich, J.) (disparate incidents at different time and location by different persons time barred.) Accordingly, the only relevant comments are those addressed in the body of this decision.

**Alvarez v. City of Middletown, Not Reported in Atl. Rptr. (2018)**

2018 Fair Empl.Prac.Cas. (BNA) 129,516

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

2018 WL 1472523
United States District Court, D. Connecticut.

Noelle BATES, Plaintiff,
v.
CITY OF BRISTOL, Kenneth Cockayne, Cindy
Cockayne Lamarre, Edward Krawiecki, Jr., and
Diane Ferguson, Defendants.

No. 3:17-CV-01066-MPS
|
Signed 03/26/2018

**Attorneys and Law Firms**

Katherine L. Matthews, Gold & Levy, Hartford, CT, for
Plaintiff.

David L. Metzger, Kenneth R. Plumb, Raymond P. Pech,
Metzger, Lazarek & Plumb, LLC, Hartford, CT, for
Defendants.

**RULING ON MOTION TO DISMISS**

Michael P. Shea, U.S.D.J.

**I. Introduction**

**\*1** Noelle Bates, a legal secretary employed by the City of
Bristol, sued the City and city officials for violations of
the Connecticut Fair Employment Practices Act
("CFEPA"), Conn. Gen. Stat. § 46a-60, and Title VII
of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*
("Title VII"). (*see* ECF No. 1-1). Bates claims that she
was sexually harassed and retaliated against for
complaining about such harassment. Defendants move to
dismiss all 17 counts of Bates' complaint under Fed. R.
Civ. P. 12(b)(1), 12(b)(5), and 12(b)(6). Defendants argue
that Plaintiff failed (1) to bring her action in a timely
manner, (2) to exhaust administrative remedies, (3) to
serve process properly on one defendant, and (4) to file

her administrative complaint in a timely manner.

For the following reasons, Defendants' Motion to Dismiss
is GRANTED as to Counts 5, 6, 7, 9, 10, 11, 12, 13, 15,
and 17. Defendants' Motion to Dismiss is DENIED as to
Counts 1, 2, 3, 4, 8, 14, and 16.

**II. Background**
The following recitation of the facts is taken from Bates'
complaint, along with the exhibits attached to the parties'
briefs.

**A. Factual Allegations**

Bates has been employed as a legal secretary in the office
of the Bristol Corporation Counsel since 2009. (ECF No.
1-1 at ¶¶ 5–6). Defendant Kenneth Cockayne has been the
Mayor of the City of Bristol, Connecticut ("City"), since
November of 2013. (*Id.* at ¶¶ 10, 31). Defendant Edward
Krawiecki, Jr. is the Corporation Counsel for the City.
(*Id.* at ¶ 11). Defendant Diane Ferguson is the Personnel
Director for the City. (*Id.* at ¶ 9). Defendant Cindy
Cockayne Lamarre is an appointed official of the City and
serves as a member of the Bristol Zoning Commission
(*Id.* at ¶ 12). Bates claims that she was sexually harassed
by Cockayne and subsequently retaliated against for
complaining about such harassment. (*see* ECF No. 1-1).
In her complaint, Bates describes several encounters with
Cockayne, including one occurring in November of 2011
when Cockayne allegedly grabbed Bates and forced her
into his lap while he watched a pornographic video in his
office. (*Id.* at ¶ 24). A second occurred on October 24,
2013 when Cockayne allegedly put his hand up Bates'
skirt at a golf event at the Chippanee Golf Club. (*Id.* at ¶
27). Bates' complaint also includes several comments
made by Cockayne over the course of her employment. In
August of 2011, Cockayne allegedly invited Bates to
accompany him to a park "just to talk." (*Id.* at ¶ 19). In
2012 and 2013, Cockayne allegedly told Bates that he
could freely sexually harass her because he was an elected
official. (*Id.* at ¶¶ 25, 32).

On November 11, 2015, Bates notified her colleague of
Cockayne's behavior at the golf event. (*Id.* at ¶ 42). The
colleague then notified Ferguson and Krawiecki of

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

Cockayne's behavior. *Id.* Bates claims that she was subsequently retaliated against for making this complaint against Cockayne. (*Id.* at ¶¶ 45–89). She alleges, for example, that she received threatening letters reminding her of her at-will employment status, that she was video-taped by Cockayne and Ferguson, that she was told on numerous occasions that Cockayne wanted to fire her, that her work and usage of her WestLaw and CLEAR accounts were monitored, and that a co-worker rifled through her desk. (*Id.* at ¶¶ 46, 53, 75, 81, and 89).

**\*2** After Cockayne and Ferguson allegedly video-taped Bates, Bates met repeatedly with members of the Bristol Police Department. As a result of these meetings, Bates made a formal written statement regarding Cockayne's videotaping. (*Id.* at ¶¶ 54–70). Despite several requests, Bates was not able to obtain a copy of the incident report. (*Id.* at ¶ 70).

Bates' complaint also lists additional conduct by Cockayne, occurring from December 2015 through August 2016. (*Id.* at ¶¶ 53, 78, 83, and 87). For example, Cockayne allegedly told Bates that he was going to tell lies to Bates' husband, made defamatory comments about Bates, read a public statement at a City Council meeting regarding a consensual sexual relationship with Bates, and made defamatory and sexual comments about Bates to her co-worker. (*Id.*)

In 2016, the City of Bristol retained a consultant, Attorney Michael Rose, to investigate Bates' claims of sexual harassment and retaliation by Cockayne. (*Id.* at ¶ 73). Bates overheard her co-workers discussing the investigation by Attorney Rose and learned that Cockayne was making defamatory statements about her. (*Id.* at ¶ 78).

### B. Procedural History

On June 6, 2016, Bates filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") against the City. On August 22, 2016, Bates amended the complaint against the City, and on September 21, 2016, she filed four new complaints against the additional defendants in this case—Cockayne, Krawiecki, Ferguson, and Cockayne Lamarre. All five complaints claimed violations of the CFEPA and Title VII. (*see* ECF No. 25-1–25-5). On March 8, 2017, the CHRO issued releases of jurisdiction for all five complaints. (*see* ECF No. 25-6). Subsequently, Bates

brought this action in Connecticut Superior Court, claiming violations of the CFEPA and Title VII. (*see* ECF No. 1-1). A State Marshal effected service on the Defendants by leaving the summons and complaint at City Hall on June 6, 2017, and Bates filed the complaint in court on June 30, 2017. (ECF No. 1-1 at 49). Defendants later removed the case to this Court (*see* ECF No. 1), and filed a Motion to Dismiss all 17 counts in Plaintiff's complaint.

### C. Legal Theories

Counts 1 and 7 are for violations of 📑 Conn. Gen. Stat. Sec. 46a-60(a)(1) by the City and Cockayne, respectively. Counts 2 and 8 are for violations of 📑 Conn. Gen. Stat. Sec. 46a-60(a)(4) by the City and Cockayne, respectively. Counts 3 and 9 are for violations of 📑 Conn. Gen. Stat. Sec. 46a-60(a)(8) by the City and Cockayne, respectively. Counts 4 and 10 are for violations of Title VII by the City and Cockayne, respectively. Counts 5 and 11 are for intentional infliction of emotion distress by the City and Cockayne, respectively. Counts 6, 12, and 15 are for invasion of privacy by the City, Cockayne, and Ferguson, respectively. Counts 13, 14, 16, and 17 are for aiding and abetting violations of 📑 Conn. Gen. Stat. Sec. 46a-60(a)(5) by Cockayne, Ferguson, Krawiecki, and Cockayne Lamarre, respectively.

### III. Legal Standard

#### A. Rule 12(b)(1): Motion to Dismiss for Lack of Subject Matter Jurisdiction

A "case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." 📑 *Nike, Inc. v. Already, LLC,* 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted). The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." 📑 *Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir. 2002). "In resolving a motion to dismiss for lack of subject matter

jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The court construes the complaint liberally and accepts all factual allegations as true. *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009).

**B. Rule 12(b)(5): Motion to Dismiss for Insufficient Service of Process**

**\*3** A defendant may move to dismiss under Fed. R. Civ. P. 12(b)(5) for insufficient service of process. When a defendant challenges service of process, "the burden of proof is on the plaintiff to show the adequacy of service." *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp.2d 654, 658 (S.D.N.Y. 1997).

**C. Rule 12(b)(6): Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted**

Under Fed. R. Civ. P. 12(b)(6), a court must determine whether the Plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (129 S.Ct. 1937, 173 L.Ed.2d 868, 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Under *Twombly*, the Court accepts as true all of the complaint's factual allegations when evaluating a motion to dismiss. *Id.* at 572, 127 S.Ct. 1955. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (internal quotation marks omitted). For a complaint to survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's

claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, No. 09-cv-1412, 2010 WL 1654156, at *1, 2010 U.S. Dist. LEXIS 37795, at *2–3 (S.D.N.Y. Apr. 9, 2010) (internal quotation marks omitted). In deciding a Rule 12(b)(6) motion, I may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted).

**IV. Discussion**

The Plaintiff's September 18, 2017 Objection to Motion to Dismiss indicated that she did not object to the dismissal of Counts 5, 6, 7, 9, 10, 11, 12, and 15. (*see* ECF No. 28-1 at 1). The Objection also indicated that the plaintiff did not object to the dismissal of Count 17—the only count against Cockayne Lamarre, which Defendants have challenged for insufficient service of process—but Plaintiff later filed a supplemental Objection in which she reversed her position as to Count 17 based on a second effort to serve Cockayne Lamarre. (ECF No. 31-1). Accordingly, I dismiss Counts 5, 6, 7, 9, 10, 11, 12, and 15, and I address the Defendants' Rule 12(b)(5) challenge to Count 17 below.

The remaining counts are thus Counts 1, 2, 3, and 4 against the City, Counts 8 and 13 against Cockayne, Count 14 against Ferguson, Count 16 against Krawiecki, and Count 17 against Cockayne Lamarre. For the reasons discussed below, I dismiss Counts 13 and 17 but otherwise deny the motion to dismiss.

**A. Counts Challenged Under 12(b)(1) for Lack of Subject Matter Jurisdiction**

i. Counts 1, 2, 3, 8, 13, 14, and 16 were Timely Brought

**\*4** Defendants argue that this Court lacks subject matter

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

jurisdiction over Counts 1, 2, 3, 8, 13, 14, and 16 because Plaintiff did not bring her complaint in the time required by Conn. Gen. Stat. Sec. 46a-101(e).[1]

A party who files a complaint with the CHRO for employment discrimination may sue in court after receiving a release of jurisdiction from the CHRO:

> Any person who has timely filed a complaint with the [Commission on Human Rights and Opportunities] in accordance with section 46a-82 and who has obtained a release from the commission in accordance with section 46a-83a or 46a-101, may bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred, the judicial district in which the respondent transacts business, or the judicial district in which the complainant resides, except any action involving a state agency or official may be brought in the superior court for the judicial district of Hartford.

Conn. Gen. Stat. Sec. 46a-100. Section 46a-101 requires that "any action brought by the complainant in accordance with [S]ection 46a-100 shall be brought no later than ninety days after the date of the receipt of the release from the commission." Conn. Gen. Stat. Sec. 46a-101(e). At issue in the present case is what constitutes bringing an action in the Superior Court under Conn. Gen. Stat. Secs. 46a-100 and 46a-101(e). Bates asserts that an action is "brought" on the date the defendant is served, while Defendants contend that an action is "brought" on the date the complaint is filed in Superior Court.

To support their contention, Defendants rely heavily upon Wright v. Teamsters Local 559, 123 Conn.App. 1, 1 A.3d 207 (Conn. App. 2010) in which the Connecticut Appellate Court construed the CFEPA's similarly worded two-year time limit for bringing actions after the filing of the CHRO complaint. See Conn. Gen. Stat. Sec. 46a-102 ("Any action brought in accordance with section 46a-100 shall be brought within two years of the date of filing of the complaint with the commission...."). In Wright, the court stated that "Section 46a-102 requires a plaintiff to *file* his or her action in the Superior Court within two

years of filing a commission complaint ..." 1 A.3d at 209-10 (emphasis added). That statement, however, was dicta, as the issue before the court in Wright

> was not whether the Superior Court complaint was timely filed under § 46a-102 when using the original commission complaint to start the running of the statute of limitations, but rather, whether the plaintiff's allegations of age discrimination, raised for the first time in [an] amended commission complaint, related back to his original commission complaint under the relation back doctrine and, if not, whether this amendment extended the statutory time to bring the action in Superior Court pursuant to § 46a-102.

**\*5** Id. at 210. Indeed, the plaintiff in Wright did "not dispute that § 46a-102 required him to file his complaint in Superior Court within two years of filing his administrative complaint with the commission." Id. n. 4. Further, the brevity of the court's statement about "fil[ing]" an action and the lack of any supporting analysis cast doubt on whether the court even intended to convey a considered conclusion that "an action brought" in Section 46a-102 means an "action filed" in court. Such a conclusion would run counter to a long line of Connecticut cases holding, in a variety of contexts, that commencing or "bringing" an action under Connecticut law means serving the summons and complaint on the defendant. See, e.g. Rocco v. Garrison, 268 Conn. 541, 357–58, 848 A.2d 352 (2004) ("We begin our analysis by noting that there is no substantive distinction between the terms 'bringing' an action and 'commencing' an action. We further note that, under the law of our state, an action is commenced not when the writ is returned, but when it is served upon the defendant.") (internal citations, footnote, and quotation marks omitted); Rana v. Ritacco, 236 Conn. 330, 337, 672 A.2d 946 (1996) ("This court has long held that an action is brought once the writ, summons, and complaint have been served upon a defendant."). It seems unlikely that the Wright court read the term "brought" in Conn. Gen. Stat. Sec. 46a-102 to break with such well-established law without giving so much as a nod to it. Not surprisingly, then, neither

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

Connecticut trial courts nor this Court has interpreted *Wright* to work such a dramatic shift in Connecticut law. In *Davis v. Smith*, the Superior Court stated as follows:

> "[T]he Connecticut Supreme Court has long adhered to the rule that only actual service upon the defendant will satisfy the state statutes of limitations." *Converse v. General Motors Corp.*, 893 F.2d 513, 515 (2d Cir. 1990) (citing *Consolidated Motor Lines, Inc. v. M&M Transportation Co.*, 128 Conn. 107, 20 A.2d 621 (1941)). "It is well settled that in Connecticut (unless otherwise specified by the legislature) a case is considered 'brought' for purposes of a statute of limitations on the date of service of the complaint upon the defendant ..." *Kotec v. Japanese Educational Institute of N.Y*, 321 F.Supp.2d 428, 431 (D. Conn. 2004). Absent from § 46a-102 is any provision setting forth the manner in which a claim is considered "brought," and the defendants' interpretation of the Appellate Court's analysis of § 46a-102 in *Wright* contradicts well settled principles of Connecticut law.

*Davis v. Smith*, 2014 WL 6462244, at *5 (Conn. Super. Ct. Oct. 15, 2014). Further, the court noted that "[s]ince *Wright*, federal courts applying Connecticut law have continued to use the date of service upon the defendant as the date the action was brought as conforming to state law when deciding statute of limitations questions pursuant to § 46a-102." *Id.* at *12–13; *see, e.g. Farzan v. Bridgewater Assocs.*, 2017 WL 354685 at *9 (D. Conn. Jan. 24, 2017) (in case involving 90-day period in Section 46a-101(e), noting that "[u]nder Connecticut law a case is 'brought' on the date the complaint is served on the defendant."); *Hannah v. Wal-Mart Stores, Inc.*, 969 F.Supp.2d 229, 232 (D. Conn. 2013) (noting that a case is considered brought for purposes of a statute of limitations on the date of service upon the defendant; *Shlafer v. Wackenhut Corp.*, 837 F.Supp.2d 20, 24 (D. Conn. 2011) (holding that in order to comply with the statute of limitations under Conn. Gen. Stat. Sec. 46a-102, a defendant must be served within two years of the release from the CHRO).

Following these cases, I interpret the word "brought" in Conn. Gen. Stat. Sec. 46a-101(e) to mean "served on the defendant." As set forth above, the CHRO released jurisdiction of Bates' claims on March 8, 2017. The state marshal effected service of the Plaintiff's complaint on June 6, 2017. Under Conn. Gen. Stat. Section 52-593a, a cause of action is timely if a state marshal receives the process to be served within the time limit required by statute. In this case, the State Marshal received the process to be served by June 6, 2017, the ninetieth day from March 8, 2017. Therefore, with the exception of the

service upon Cockayne Lamarre, which is addressed below, Bates served the Defendants within the time period required by statute, and the action was timely "brought" under Conn. Gen. Stat. Sec. 46a-101(e).[2]

### ii. Counts 13, 14, and 16: Plaintiff Adequately Exhausted Administrative Remedies as to Counts 14 and 16 But Count 13 Fails[3]

**\*6** Bates contends that Ferguson, Cockayne, and Krawiecki aided and abetted Cockayne in his discriminatory and retaliatory conduct. Although no aiding and abetting claim was expressly set forth in Bates' CHRO complaints, the factual allegations of those complaints are sufficiently related to her aiding and abetting claims in this Court and, therefore, she did not need expressly to exhaust her administrative remedies with regard to those claims.

Conn. Gen. Stat. Sec. 46a-60(a)(5) states that "it shall be discriminatory action in violation of this section for any person, whether an employer or employee or not, to aid, abet, incite, compel, or coerce the doing of any act declared to be a discriminatory employment practice or attempt to do so ..." Counts 14 and 16 set forth aiding and abetting claims against Ferguson and Krawiecki, respectively, in connection with Cockayne's discriminatory and retaliatory conduct. (ECF No. 1-1 at 38–41). Bates admits that she did not expressly plead a Conn. Gen. Stat. Sec. 46a-60(a)(5) cause of action against Ferguson and Krawiecki in her CHRO complaints. (ECF No. 28-1 at 7). However, there is an

> exception [to exhaustion that] permits the court to exercise jurisdiction over a charge that was not presented during an administrative proceeding as long as it is reasonably related to the conduct complained of during the administrative proceedings, such that the claim could have been reasonably expected to grow out of the original charges.

*Longo v. Allied Mech. Servs., LLC*, 2013 WL 3766919, at *3 (Conn. Super. Ct. June 20, 2013). The facts underlying

Bates' aiding and abetting claims against Ferguson and Krawiecki were alleged in the CHRO complaint. Specifically, the CHRO complaint details multiple encounters between Bates and Ferguson in which (among other things) Ferguson told Bates that nothing could be done about Cockayne's behavior, threatened Bates with her at-will employee status, discussed Cockayne's desire to fire Bates, and accompanied Cockayne while he recorded a video of her while all of them were outside. (ECF No. 1-1 at ¶¶ 53, 55, 56, 58, 59, 60, 61, 65, 66, 70, 75, 79, 94, 98, 101, 103, 117, and 118). The complaint also describes encounters between Bates and Krawiecki in which (among other things) Krawiecki threatened Bates, told Bates that Cockayne wanted her fired, and verbally abused Bates. (ECF No. 1-1 at ¶¶ 33, 46, 47, 49, 51, 96, 99, and 100). Bates' charge of aiding and abetting is reasonably related to her allegations against Ferguson and Krawiecki in the CHRO proceedings because those allegations show that Ferguson and Krawiecki were helping Cockayne to act in a discriminatory manner. Therefore, the exception to the exhaustion doctrine applies because the aiding and abetting claim could have reasonably been expected to grow out of the original CHRO charges.

The aiding and abetting claim against Cockayne in Count 13, however, fails as a matter of law, because Cockayne could not have aided and abetted his own misconduct. In *Bolick v. Alea Group Holdings, Ltd.*, this Court looked to the dictionary definition of aiding and abetting:

> the dictionary defines "abettor" as a person who abets (incites or encourages) an offender. As a legal definition, "aid and abet is not a needless redundancy, ... it is a term of art meaning to assist the perpetrator of the crime while sharing the requisite intent ... By its plain language, this provision appears to contemplate liability towards a party who in some way helps or compels another to act in a discriminatory manner.

*7 278 F.Supp.2d 278, 282 (D. Conn. 2003)* (internal citations and quotation marks omitted). Count 13 alleges violation of *Conn. Gen. Stat Sec. 46a-60(a)(5)* by Cockayne. (ECF No. 1-1 at 38). Cockayne is the only Defendant who allegedly engaged in sexual harassment and sexual discrimination against Bates, however, and therefore cannot simultaneously be an aider and abettor. *See Bolick v. Alea Group Holdings, Ltd.*, 278 F.Supp.2d 278, 282 (D. Conn. 2003) (holding that "aiding and abetting liability ... requires that the individual assists another person in discriminatory conduct and a sole perpetrator cannot be held liable."). Thus, the aiding and abetting claim against Cockayne fails.

Accordingly, the Defendants' Motion to Dismiss is granted as to Count 13 and denied as to Counts 14 and 16.

**B. Count 17 Challenged Under 12(b)(5) for Insufficient Service of Process**

i. Plaintiff's Service of Process on Defendant Cockayne Lamarre was Untimely

Plaintiff originally attempted service on Cockayne Lamarre on June 6, 2017 through a state marshal. (*see* ECF No. 1-1 at 49). The marshal, however, erroneously served Cockayne Lamarre at the Bristol City Hall, rather than at her home address, despite the fact that she is not a city employee. After Defendants raised this point in their August 25, 2017 Motion to Dismiss, Plaintiff agreed that Count 17 could be dismissed in her Objection to Motion to Dismiss. (*see* ECF No. 28). It was not until October 13, 2017, in her Supplemental Objection to Motion to Dismiss, that Plaintiff objected to the dismissal of Count 17 and revealed that, on October 3, 2017, she had made a second effort to serve Cockayne Lamarre, this time at her home address. (*see* ECF No. 31-1).

Defendants contend, in their Supplemental Opposition brief, that service of process on Cockayne Lamarre remains improper and that Count 17 should be dismissed. First, Defendants argue that the October 3 service upon Cockayne Lamarre was improper under Fed. R. Civ. P. 4 because the summons did not bear the signature of the clerk or the seal of the court. Second, Defendants return to the argument made above in Section (IV)(A)(i), namely, that an action is brought on the date the action is filed in court, rather than the date the action is served on the defendant. Defendants argue, therefore, that Plaintiff did not bring the action in a timely fashion because the date of filing of the complaint in state court (June 30, 2017) was more than ninety days after the release from the CHRO (March 8, 2017). Finally, Defendants argue that, in any event, the October 3 service upon Cockayne Lamarre was not timely under Conn. Gen. Stat. Sec. 46a-101(e) because it occurred more than ninety days after the receipt of the release from the CHRO.

Fed. R. Civ. P. 4, governs the content, issuance, and service of a summons. *See* Fed. R. Civ. P. 4. Under Rule 4(b), "[o]n or after filing the complaint, the plaintiff may

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

present a summons to the clerk for signature and seal." *Id.* 4(b). "If the summons is properly completed, the clerk must sign, seal, and issue it to the plaintiff for service on the defendant." *Id.*; *see also* Fed. R. Civ. P. 4(a)(1)(F) & (G) (requiring that a summons be signed by the clerk and bear the court's seal). "A summons must be served with a copy of the complaint. The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) [90 days] and must furnish the necessary copies to the person who makes service." Fed. R. Civ. P. 4(c)(1).

With respect to Defendants' first argument, technical errors on a summons do not automatically render service on a defendant insufficient. *See* *Durant v. Traditional Invs., Ltd.*, 1990 WL 33611, at *4 (S.D.N.Y. Mar. 22, 1990) ("When the error in the summons goes to form rather than substance, amendment ... should be freely granted ... as courts should not deny a plaintiff her day in court due to technical imperfections in service."); *Macaluso v. N.Y.S. Dep't of Envtl. Conservation*, 115 F.R.D. 16, 17 (E.D.N.Y. 1986) (stating that "amendments to process are freely given because courts do not wish to deny plaintiffs their day in court for failure to observe mere technicalities."). A court may, however, deny amendment of service if the technical error results in prejudice towards the defendant or demonstrates a flagrant disregard of Fed. R. Civ. P. 4. *Deluca v. Access IT Group, Inc.*, 695 F.Supp.2d 54, 65 (S.D.N.Y. 2010).

**\*8** District courts within the Second Circuit have split as to whether an unsigned summons not bearing the Court's seal qualifies as a technical defect or a flagrant disregard of Rule 4. *Compare* *Krieger v. Am. Express Fin. Advisors*, 2000 WL 207119, at *4 (W.D.N.Y. Feb. 16, 2000) (denying defendant's motion to dismiss for insufficient service of process where plaintiff served an unsigned and unsealed summons); *Durant v. Traditional. Invest., Ltd.*, 1990 WL 33611, at *4 (S.D.N.Y. Mar. 22, 1990) (holding that a summons without clerk's signature and seal was not a flagrant substantive error because the defendant received sufficient notice and was not prejudiced), *with* *Macaluso v. N.Y.S. Dep't of Envtl. Conservation*, 115 F.R.D. 16, 18 (E.D.N.Y. 1986) (granting motion to dismiss for insufficient service of process because an unsealed, unsigned summons was not a mere technical defect, but rather a "complete disregard for the requirements of process set forth clearly and concisely in Rule 4.")

I need not take sides in this debate, however, because I agree with the Defendants' third argument that Plaintiff's service on Cockayne Lamarre was untimely under Conn. Gen. Stat. Sec. 46a-101(e).[4] As discussed above, Conn. Gen. Stat. Sec. 46a-101(e) requires that an action be brought within ninety days of receipt of a release from the CHRO, and an action is brought when it is served on the defendant. As noted, the CHRO released jurisdiction on March 8, 2017, and the second attempt of service on Cockayne Lamarre was not made until October 3, 2017–well over the ninety days set forth in Section 46a-101(e). Further, the Plaintiff cannot invoke the savings statute, Conn. Gen. Stat Sec. 52-593, for timely delivery to the state marshal because that statute requires service within thirty days of delivery to the marshal; the second attempt at service on Cockayne Lamarre was made by a different marshal and took place more than thirty days after delivery of the original summons to the first marshal.

It is unsettled in Connecticut whether failure to comply with the 90-day limit in Conn. Gen. Stat. Sec. 46a-101(e) is a jurisdictional defect, although recent Connecticut trial court decisions have held that it is not and that it is subject to equitable tolling. *See e.g.* *Scott v. State Dept. of Transp.*, 2016 WL 3912470, *5–8 (Conn. Super. Ct. June 13, 2016) (in light of a lack of controlling appellate decisions, the court held that "§ 46a-101(e) should not be construed as a jurisdictional bar, but should be construed as a mandatory requirement that is subject to consent, waiver, and equitable tolling."); *see also* *Sirica v. Connecticut Water Co.*, 2015 WL 897735 (Conn. Super. Ct. Feb. 13, 2015) (holding that "the 90-day time limitation prescribed by § 46a–101(e) was not subject matter jurisdictional and, thus, was subject to waiver and equitable tolling."); *but see* *Roma v. Urgent Care of Brookfield, LLC*, 2014 WL 660747 (Conn. Super. Ct. January 27, 2014); *Spignolio v. Stark Carpet Corp.*, 2013 WL 6989429 (December 19, 2013); *Lloyd v. Connection, Inc.*, 2011 WL 7029772 (Conn. Super. Ct. December 21, 2011). Because I conclude that equitable tolling does not apply here in any event, I will assume for purposes of this decision that the ninety-day deadline in Section 46a-101(e) is not a jurisdictional bar.

Equitable tolling is a narrow doctrine. *See* *Williams v. CHRO*, 67 Conn. App. 316, 329, 786 A.2d 1283 (2001) (noting that "[t]here is a strong tendency not to apply the doctrine of equitable tolling when a party is represented by an attorney" and that "usually, in employment discrimination cases, time limits will not be tolled absent some behavior of the employer designed to delay the filing of the complaint or fraud."). Federal case law on equitable tolling in employment cases—to which Connecticut courts often look when interpreting their own anti-discrimination laws—similarly treats the doctrine as an "extraordinary" exception to statutory time limits. *See*

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

*Williams*, 257 Conn. at 278, 777 A.2d 645 ("The Second Circuit's case law on equitable tolling makes clear ... that for equitable tolling to apply, the employer must prevent the employee in some extraordinary way from exercising her rights, or the employee must be actively misled by his employer and that conduct must be responsible for making the employee unaware of her [statutory] rights."); *see also Veltri v. Bldg. Serv. 32b-J Pension Fund*, 393 F.3d 318 (2d. Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 558, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (equitable tolling where plaintiff filed and served defective papers before the expiration of the statutory period.); *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 235, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (plaintiff was induced to file later papers due to defendant's deception); *Pearl v. City of Long Beach*, 269 F.3d 76, 80 n.3 (2d. Cir. 2002) (defendant concealed existence of plaintiff's cause of action.).

**\*9** The circumstances in the present case are not so "extraordinary" as to warrant equitable tolling of the 90-day deadline set by Conn. Gen. Stat. Sec. 46a-101(e). First, the record contains no evidence that Defendants acted in any way to prevent Plaintiff from exercising her rights. Second, Plaintiff was represented by counsel at all times throughout the proceedings. Further, the record indicates that Plaintiff's counsel was slow to correct the initial defective service made on June 6, 2017, and was not prevented from acting more promptly by extraordinary circumstances. It is true that the initial failure to serve Cockayne Lamarre properly appears to have been the fault of the state marshal—because the original state court summons properly identified Cockayne Lamarre's service address as her home address and yet the state marshal purported to serve her by leaving the summons and complaint at the Bristol city hall. That error, however, should have been apparent to Plaintiff's counsel shortly after June 6—the date of the state marshal's original return—and could have been corrected in a matter of a few days instead of the four months it took here. Worse, even after Defendants pointed out the error in their August 25 motion to dismiss, Plaintiff's counsel still did not correct it—instead acknowledging in her September 18 objection that service was improper and that Count 17 should be dismissed. It was not until two weeks after filing her objection, on October 3, that plaintiff's counsel sought again to serve Cockayne Lamarre. And even then counsel failed to do so properly;

the October 3 service involved a defective summons that had not been issued by the clerk's office or stamped with the Court's seal. Equitable tolling is not warranted in this case because, rather than exercising a reasonable level of diligence, Plaintiff's counsel has engaged in a slow-moving and ultimately defective effort to correct improper service. Accordingly, the Motion to Dismiss is granted as to Count 17 because service upon Cockayne Lamarre was untimely under Conn. Gen. Stat. § 46a-101(e).

### C. Counts Challenged Under 12(b)(6) for Failure to State a Claim Upon Which Relief Can be Granted: Counts 1, 3, and 4 Were Timely Filed

The complaint alleges that Cockayne engaged in discriminatory and sexually harassing conduct within the time period required by statute and therefore the Defendants' motion to dismiss with regard to Counts 1, 3 and 4 is denied. Conn. Gen. Stat. Sec. 46a-82(f) requires that a discrimination complaint be filed with the CHRO within 180 days of the alleged discriminatory act. Counts 1 and 3 charge the City and Cockayne with sexual discrimination in violation of Conn. Gen. Stat. Sec. 46a-60(a)(1) and (8), respectively. (ECF No. 1-1 at 29 and 31). Count 4 charges the City with creating a hostile work environment in violation of Title VII. (ECF No. 1-1 at 32).

The Connecticut Supreme Court has held that sexually harassing conduct under Conn. Gen. Stat. Secs. 46a-60(a)(1) and (8) includes: (1) vulgar comments about a plaintiff's physical attributes; (2) statements about a plaintiff's sexual relations; and (3) sexually provocative comments made about a plaintiff to others. *Feliciano v. AutoZone, Inc.*, 316 Conn. 65, 88, 111 A.3d 453 (2015). Further, under CFEPA's continuing violation exception to the statute of limitations, "a discriminatory incident occurring within the charging period may implicate and thereby render timely incidents otherwise outside of the charging period." *Demoss v. Norwalk Bd. Of Educ.*, 2007 WL 3432986, at *4 (D. Conn. Nov. 14, 2007). "A continuing violation occurs where there is proof of specific ongoing discriminatory policies or practices, or where related and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* at *11; *see also Ravenscroft v. Williams Scotsman, Inc.*, 2015 WL 1311332 at *3 (D. Conn. Mar. 23, 2015)

Bates v. City of Bristol, Not Reported in Fed. Supp. (2018)

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

(noting, in a discussion of hostile work environment claim, that "a series of separate acts that collectively constitute one unlawful employment practice can qualify as a continuing violation.").

With respect to Counts 1 and 3, Defendants assert that the most recent sexually harassing conduct alleged in the complaint occurred in December of 2013, and that Bates did not file her original complaint with the CHRO until June 9, 2016, thereby rendering it untimely. In addition to the December 2013 conduct, however, Plaintiff's CHRO complaint also describes conduct that occurred from December 2015 through August 2016. Drawing all inferences in Bates' favor, I conclude that this additional conduct qualifies as sexual harassment under the description in *Feliciano* because it included sexual comments about Bates to others. (*See* ECF No. 1-1 at ¶¶ 52, 78, 83, and 87). Since Bates filed her original complaint with the CHRO on June 9, 2016, her complaint was filed within 180 days of the alleged discriminatory act as required by 📄 Conn. Gen. Stat. Sec. 46a-82(f). Further, specific instances of the Defendants' conduct that predated the 180-day period fall within the statute's reach because, under the continuing violation exception, they comprise part of ongoing discriminatory policies or practices. Therefore, I find that Bates filed her original complaint with the CHRO in a timely manner and Defendants' motion to dismiss as to Counts 1 and 3 is denied.

**\*10** For similar reasons, Bates' Title VII claim against the City is also timely. Under 📄 42 U.S.C. Sec. 2000e-5(e)(1) a party:

> that has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such [discriminatory employment] practice ... such charge shall be

> filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred...

📄 42 U.S.C. Sec. 2000e-5(e)(1). Title VII is violated when a workplace is permeated with discrimination that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." 📄 *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546–48 (2d Cir. 2010). Drawing all reasonable inferences in Bates' favor, I find that her complaint describes conduct that meets this standard and, as shown above, includes discriminatory and retaliatory acts falling within the 300-day window. Thus, for reasons similar to those set forth in the discussion of Counts 1 and 3 above, Bates' complaint was filed with the CHRO within three hundred days of conduct prohibited by Title VII. Accordingly, Defendants' motion to dismiss is denied as to Counts 1, 3, and 4.

### V. Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss is GRANTED as to Counts 5, 6, 7, 9, 10, 11, 12, 13, 15, and 17. Defendants' Motion to Dismiss is DENIED as to Counts 1, 2, 3, 4, 8, 14, and 16.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

### Footnotes

[1]   As discussed in more detail in Section (IV)(B)(i) of this opinion, it is unsettled in Connecticut whether a failure to comply with the 90-day time limit in Conn. Gen. Stat. Sec. 46a-101(e) affects the court's subject matter jurisdiction or whether that limit is simply a "mandatory" requirement subject to waiver and tolling. Because both parties discuss this issue with respect to Counts 1, 2, 3, 8, 13, 14, and 16 under the rubric of Fed. R. Civ. P. 12(b)(1), however, and because the proper procedural characterization of a failure to comply with the 90-day limit is immaterial for my disposition of those counts, I follow the parties' lead and discuss this issue under Rule 12(b)(1).

[2]   Defendants also argue that the addition of the phrase "in the superior court" after "bring an action" in

2018 WL 1472523, 2018 Fair Empl.Prac.Cas. (BNA) 103,362

46a-100 supports their position that "bringing" an action means filing it rather than serving it. (*See* Conn. Gen. Stat. Sec. 46a-100: "... may bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred, the judicial district in which the respondent transacts business or the judicial district in which the complainant resides."). This is not persuasive either. The "in the superior court" language in Section 46a-100 amounts to a venue provision specifying the judicial districts in which the action may be brought. It does not suggest that the General Assembly intended to alter Connecticut's well-established rule that actions are brought when they are served on the defendant.

[3]     This Court has treated the failure to exhaust administrative remedies under the CFEPA as a jurisdictional defect even though it has treated the failure to exhaust federal discrimination claims as a non-jurisdictional defect. *See Anderson v. Derby Bd. of Ed.*, 718 F. Supp. 2d 285, 272 (D. Conn. 2010). I thus consider this issue under Fed. R. Civ. P. 12(b)(1).

[4]     Technically, this means the claim fails as a matter of law rather than for insufficient service of process.

---

                                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 8731549
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Roland CENAC, Plaintiff,
v.
The DEPARTMENT OF MENTAL HEALTH AND
ADDICTION SERVICES for the State of
Connecticut, Defendant.

Civil No. 3:17-cv-683(AWT)
|
Signed 02/28/2018

**Attorneys and Law Firms**

W. Martyn Philpot, Jr., Law Offices of W. Martyn
Philpot, Jr., LLC, New Haven, CT, for Plaintiff.

Colleen B. Valentine, Office of the Attorney General,
Hartford, CT, for Defendant.

**RULING ON MOTION TO DISMISS**

Alvin W. Thompson, United States District Judge

**\*1** The defendant moved under Federal Rule of Civil
Procedure 12(b)(1) to dismiss both counts of the
plaintiff's complaint. For the reasons set forth below, the
court is granting the defendant's motion and dismissing
the plaintiff's complaint with prejudice as to the Title VII
claim (Count One) and without prejudice as to the
wrongful termination claim (Count Two).[1]

**I. FACTUAL BACKGROUND**
The plaintiff Roland Cenac had been employed as a
mental health assistant by defendant Department of
Mental Health and Addiction Services for the State of
Connecticut ("DMHAS") since 2008. On August 3, 2015,
DMHAS notified the plaintiff that effective August 7,
2015, it was terminating his employment due to an
incident in which he allegedly abused a patient.

Believing that DMHAS had actually terminated his
employment on account of his race (African-American)
and national origin (St. Lucian), the plaintiff filed a
charge with the United States Equal Employment
Opportunities Commission ("EEOC") on May 31, 2016,
which was 302 days after the plaintiff was notified of the
termination of his employment and 298 days after the
termination took effect. It is undisputed that the plaintiff
never filed a separate complaint with the Connecticut
Commission on Human Rights and Opportunities
("CHRO").

After the EEOC dismissed his charge in January 2017, the
plaintiff filed this action. In the first count, the plaintiff
brings a claim pursuant to 42 U.S.C. § 2000e (Title
VII of the Civil Rights Act of 1964), alleging that
DMHAS terminated his employment because of his
national origin and race. In the second count, the plaintiff
brings a claim for "wrongful termination," citing Article
First, §§ 1 and 20 of the Connecticut State Constitution.

**II. LEGAL STANDARD**
A claim is properly dismissed for lack of subject matter
jurisdiction under Fed. R. Civ. P. 12(b)(1) when the court
lacks the statutory or constitutional power to adjudicate
the claim. Nowak v. Ironworkers Local 6 Pension
Fund, 81 F.3d 1182, 1187 (2d Cir. 1996). On a Rule
12(b)(1) motion to dismiss, the party asserting subject
matter jurisdiction "bears the burden of proving subject
matter jurisdiction by a preponderance of the evidence."
Aurecchione v. Schoolman Transp. Sys., Inc., 426
F.3d 635, 638 (2d Cir. 2005). When reviewing a motion
to dismiss for lack of subject matter jurisdiction, the court
may consider evidence outside the pleadings. See
Makarova v. United States, 201 F.3d 110, 113 (2d Cir.
2000).

**III. DISCUSSION**
Before a plaintiff can file a Title VII claim in federal
court, he must exhaust his administrative remedies by
filing a timely charge with the EEOC. See 42 U.S.C. §
2000e-5(e)(1); Fowlkes v. Ironworkers Local 40, 790

F.3d 378, 384 (2d Cir. 2015) ("It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court."); Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies...."). For the charge to be timely, it must be filed "within 180 days of the alleged discriminatory act ... or within 300 days if the complainant initially began the proceedings in a state or local fair employment practices agency." Lorquet v. Loehmann's Dep't Store, 354 F. App'x 480, 481 (2d Cir. 2009); § 2000e-5(e)(1). A plaintiff may also receive the benefit of the 300-day limitation when the plaintiff has "dual-filed," i.e., when there is a worksharing agreement between the EEOC and the state's employment practices agency specifying that the filing of a charge with the EEOC also counts as a filing with that agency, here the CHRO.[3]

**\*2** The defendant contends (a) that the plaintiff's charge was untimely because he filed it with the EEOC 302 days after he received notice of the termination, well past the 180-day limitation; and (b) that because the plaintiff failed to file a charge with the CHRO and the EEOC did not defer the charge to the CHRO, the 300-day limitation is inapplicable.

The plaintiff does not contest that the EEOC filing was made outside the 180-day limitation. He argues, however, that (a) because the EEOC and the CHRO have a worksharing agreement, his EEOC filing constitutes a filing with the CHRO as well, thereby triggering the 300-day limitation, and (b) he met the 300-day deadline by filing his charge within 298 days of the day the termination took effect.

As the defendant points out, the case law does not support either of the plaintiff's contentions. Although the plaintiff cites cases involving worksharing agreements between the New York State Department of Human Rights (NYSDHR) and the EEOC, he has not produced any worksharing agreement between the CHRO and the EEOC, nor has he demonstrated that the alleged CHRO worksharing agreement incorporated "dual-filing" language similar to that found in the NYSDHR agreement. See Aukstolis v. AHEPA 58/Nathan Hale Senior Ctr., No. 3:07-cv-51 (JCH), 2007 WL 1341235, at *4 (D. Conn. May 4, 2007) ("At the very least, a plaintiff seeking to establish a 'dual filing' must show that a work-sharing agreement was in effect between the CHRO and EEOC when the plaintiff filed their original administrative charge, and that, under the agreement, the CHRO would deem a filing with the EEOC to be a dual filing with the CHRO.").

The plaintiff urges the court to take judicial notice of cases analyzing prior CHRO-EEOC worksharing agreements, arguing that this shows that a CHRO-EEOC worksharing agreement necessarily existed at the time he filed his EEOC charge. But taking judicial notice of past worksharing agreements is insufficient to show that a CHRO-EEOC worksharing agreement existed on May 31, 2016, the day he filed his EEOC charge, or that under the terms of such an agreement an EEOC charge counted as dual-filed with the CHRO. See Bogle-Assegai v. Connecticut, 470 F.3d 498, 505-06 (2d Cir. 2006)(noting that taking judicial notice of an older worksharing agreement did not "show that such an agreement existed at the time pertinent to [the plaintiff].")

Moreover, the cases relied upon by the plaintiff involve plaintiffs who filed with the CHRO and sought to preserve their EEOC claims. See Ortiz v. Prudential Ins. Co., 94 F. Supp. 2d 225, 230 (D. Conn. 2000) (plaintiff filed a charge with the CHRO); Pruitt v. Mailroom Tech., Inc., No. 3:06CV1530(WWE), 2007 WL 2302285, at *2 (D. Conn. Aug. 9, 2007) (same); Lennon v. Dolce Vida Med. Spa, No. AANCV146017172S, 2015 WL 897764, at *1 (Conn. Super. Ct. Feb. 10, 2015) (same). The plaintiff cites no case in which the filing of an EEOC charge constituted a filing with the CHRO as well. Indeed, prior cases in this district stand for the proposition that under past CHRO-EEOC worksharing agreements, the filing of an EEOC charge does not constitute the filing of a charge with the CHRO as well. See Aukstolis, 2007 WL 1341235, at *4; see generally Garcia v. Saint Mary's Hosp., 46 F. Supp. 2d 140, 142-43 (D. Conn. 1999); Brewer v. Wilcox Trucking, Inc., No. CV 970479546S, 1997 WL 688778, at *3 (D. Conn. Sept. 26, 1997). In the absence of specific language from the CHRO worksharing agreement to show otherwise, the plaintiff has not sufficiently alleged that his EEOC charge should be considered dual filed with the CHRO.

**\*3** Moreover, even if a worksharing agreement extended the limitations period in this case, "the 300-day period ... starts running on the date when the employee receives a definite notice of the termination, not upon his discharge." Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir. 1985) (citations omitted); see also Delaware State College v. Ricks, 449 U.S. 250 (1980); Jordan v. Bates USA, 4 F. App'x 73, 76-77 (2d Cir. 2001) ("[I]t is well settled that 'the proper focus [in an employment discrimination case] is on the time of the discriminatory act, not the point at which the consequences of the act

become painful,' and therefore that 'the timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory decision, not from the date the decision takes effect.' " (second alteration in original)(citations omitted)); *Affrunti v. Long Island Univ.*, 136 F. App'x 402, 403 (2d Cir. 2005) ("The time period in which to file a charge with the EEOC begins on the date the employee has definite notice of the termination, not the date of actual discharge." (citing *Miller*, 755 F.2d at 23)).

The plaintiff argues that here the effective date of termination is the date on which the limitations period began to run because of the "continuing violation" doctrine, under which the clock starts running on the last day that a discriminatory act takes place. The plaintiff asserts that the defendant maintained a "discriminatory policy" that "continued until the moment of his termination," thereby making his date of termination the date the limitations clock began to run. (Mem. in Opp. to Mot. to Dismiss, Doc. No. 22, at 9-10.)

However, accepting the factual allegations in the complaint as true, the plaintiff presents only a conclusory assertion of a "discriminatory policy" with no supporting factual allegations as to such a policy. Moreover, the plaintiff has not alleged that the defendant took any other

action, discriminatory or otherwise, in the intervening time between the notice of termination and the effective date of the termination. Thus, all the plaintiff has plausibly alleged is that termination of his employment was the result of the notice of termination, and that the last discriminatory act, i.e., the notice of termination, happened more than 300 days before he filed his EEOC charge. Therefore, the plaintiff's suit is time barred.

**IV. CONCLUSION**
For the reasons set forth above, the Defendant's Motion to Dismiss (Doc. No. 17) is GRANTED. Count One is dismissed with prejudice, and Count Two is dismissed without prejudice.

It is so ordered.

**All Citations**

Slip Copy, 2018 WL 8731549

---

**Footnotes**

1       The plaintiff agrees with the defendant that Count Two, because it "raise[s] novel issues of Connecticut state law," should be dismissed. (Mem. in Opp. to Mot. to Dismiss, Doc. No. 22, at 1, 11-12.)

2       Additionally, "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Francis v. City of New York*, 235 F.3d 763, 767 (2d Cir. 2000) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). The plaintiff does not argue that waiver, estoppel or equitable tolling is applicable in this case.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1240435

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Waterbury at Waterbury.

Cathryn DENAULT
v.
COMMUNITY MENTAL HEALTH AFFILIATES et
al.

Docket Number:CV166030713S
|
January 25, 2017

Hon. Rupal Shah

I

BACKGROUND

**\*1** The defendants, Community Mental Health Affiliates
("CMHA") and Raymond Gorman, move to strike the
plaintiff Cathryn Denault's complaint in its entirety on the
ground that each count fails to state a claim upon which
relief can be granted. The plaintiff opposes the motion to
strike and claims her allegations are legally sufficient to
support each cause of action in her complaint.
Specifically, the defendants claim each count must be
stricken for the following reasons:

1. Count one, alleging a violation of General Statutes
§ 46a–60(a)(8), does not establish a claim of sexual
harassment against either of the defendants. The plaintiff
has not set forth a prima facie case of a hostile work
environment or constructive discharge. The individual
claim against Gorman should fail as a matter of law
because he was not the plaintiff's employer, and §
46a–60 (a)(8) does not provide a remedy for individual
supervisory employees.

2. Count two, alleging a violation of General Statutes
§ 46a–60(a)(1), fails to establish a prima facie case of
discriminatory harassment on the basis of the plaintiff's
gender. Gorman's alleged conduct was not severe or
pervasive enough to alter the plaintiff's work conditions.
Furthermore, the plaintiff was not constructively
discharged because her work conditions were not
intolerable.

3. Count three, alleging a violation of General Statutes
§ 46a–60(a)(4) against both defendants, fails to establish a
prima facie case of retaliation. The plaintiff did not
engage in a protected activity of which CMHA was
aware. In addition, there are insufficient allegations to
show that she suffered any adverse employment action.

4. Count four, alleging a violation of General Statutes
§ 46a–60(a)(5), fails because CMHA has not engaged in
any form of discrimination. Gorman thus cannot be liable
for aiding and abetting CMHA when CMHA has not
participated in any illegal discriminatory conduct.
Moreover, even if sufficient facts were pleaded to allege
that Gorman engaged in sexual harassment, Gorman
cannot be liable for aiding and abetting himself.

In her complaint, the plaintiff alleges the following
pertinent facts:

1. The plaintiff began working for CMHA in April 2012,
and continued her employment until May 29, 2015, when
she felt she was forced to resign from her position as vice
president of human resources.

2. The defendant, Raymond Gorman, worked as the
plaintiff's direct supervisor while she was employed by
CMHA.

3. In her position as vice president of human resources for
CMHA, the plaintiff was charged with implementing and
enforcing CMHA's employment policies, including, but
not limited, to its anti-sexual harassment policy.

4. In November 2012, the plaintiff became the target of,
and a witness to, Gorman's pervasive and ongoing sexual
harassment of herself and other CMHA female
employees. That ongoing and pervasive sexual
harassment continued unabated until the plaintiff's
resignation in May 2015, despite the plaintiff's protests of
such conduct on multiple occasions to Gorman.

**\*2** 5. The plaintiff alleges a series of occasions when

Gorman engaged in inappropriate and offensive conduct. Beginning in November 2012, Gorman offered the plaintiff a ride to a coworker's wedding. After the plaintiff declined, Gorman refused to talk to the plaintiff for two weeks. His refusal to talk to the plaintiff was his intimidating and manipulative way of letting the plaintiff know that he was not happy that the plaintiff declined his offer, and it was also a way of letting the plaintiff know that in the future she should be more willing to spend non-work hours with him. This type of conduct became a pattern for Gorman throughout the plaintiff's employment.

6. Gorman continually and regularly made comments about women who worked at CMHA, including stating that he liked "the brown ones" in reference to women of color. Gorman tried to befriend women CMHA employees outside of work that he found attractive. He would also friend his women coworkers on Facebook and made comments to them that he wanted to see more pictures of his coworkers in bikini bathing suits.

7. In one incident, at a Mexican restaurant, when coworker Laura Hurlbirt spilled salad on her blouse, Gorman commented in front of coworkers and vendors that Hurlbirt should lay down on the bar so that the group could scoop the salad off of her chest. He made this comment again at the annual meeting while Hurlbirt was greeting CMHA guests.

8. In December 2014, Gorman commented that Hurlbirt must have received flowers at work because "you sleep around a lot." He also suggested that Hurlbirt may have received the flowers from a female coworker, Jillian, because they were white roses and "white roses means they are from a lesbian." After Jillian learned of his comments, she wanted to make a formal complaint about Gorman.

9. The plaintiff indicates that Gorman's behavior was addressed by the plaintiff and other members of senior management at that time. The behavior did not stop, however.

10. The plaintiff alleges that Gorman was most active in his harassment of the plaintiff, sending inappropriate and suggestive emails and making sexually charged comments.

11. By late April 2015, the plaintiff indicates that Gorman relayed a story to the plaintiff about how he was looking at a website known as Match.com, and he stated to the plaintiff that he was a "tit man" and that he "liked a good rack." This type of conversation was so commonplace

that it was unremarkable, except for the fact that, despite the plaintiff's past protestations, he was continuing to make inappropriate and unprofessional comments to her in the workplace.

12. In May 2015, a temporary employee, Ivory Scinto, reported to the plaintiff that Gorman was staring at her breasts and making her feel uncomfortable. She also complained that he was always talking about his personal life and looking to find women to date. Scinto was having attendance issues on the job, and the plaintiff determined that this was related to Gorman's conduct. The plaintiff confronted Gorman about the allegations and his response was that Scinto should have her office moved.

13. Despite the plaintiff's continued opposition to Gorman's requests for a personal relationship, Gorman continued his intimidating and manipulative behavior until the plaintiff determined that she could no longer continue working for CMHA. The plaintiff verbally resigned on May 13, 2015. The plaintiff put in her formal resignation on May 18, 2015, providing a clear explanation to Gorman as to why she was leaving.

14. The plaintiff has alleged that each of the defendants created and maintained a sexually hostile work environment and the plaintiff's sex was the basis for the behavior. By Gorman's behavior and CMHA's inaction, the defendants left the plaintiff with no alternative but to resign her employment in order to escape the sexually harassing atmosphere.

**\*3** The court heard the matter at short calendar on December 12, 2016. After consideration, the court finds that the plaintiff has properly and sufficiently pleaded counts one, two, and three against CMHA. The plaintiff has not sufficiently pleaded her claims in count one against Gorman. The plaintiff also has not sufficiently pleaded her claims in count four against Gorman. Accordingly, the defendants' motion to strike counts one, two and three is denied. The court grants the motion to strike counts one and four against Gorman.

II

DISCUSSION

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court." *Bernhard–Thomas Building Systems, LLC v. Dunican,* 286 Conn. 548, 552, 944 A.2d 329 (2008). "The allegations of the pleading involved are entitled to the same favorable construction a trier would be required to give in admitting evidence under them and if the facts provable under its allegations would support a defense or a cause of action, the motion to strike must fail." *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108–09, 491 A.2d 368 (1985).

A

Sexual Harassment

With respect to count one against CMHA, the plaintiff has adequately pleaded a prima facie case of sexual harassment hostile work environment.

Section 46a–60(a) provides in relevant part: "It shall be a discriminatory practice in violation of this section ... [for an employer, by the employer or the employer's agent ... to harass any employee, person seeking employment or member on the basis of sex ... 'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when ... such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment ..." "Sexual harassment actions fall generally into one of two categories, depending on the nature of the harassment alleged ... Quid pro quo sexual harassment ... conditions employment on the return of sexual favors; hostile environment sexual harassment is conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (Citations omitted; internal quotation marks omitted.) *Griffin v. Yankee Silversmith, Ltd.,* 109 Conn.App. 9, 12–13, 951 A.2d 1, cert. denied, 289 Conn. 925, 958 A.2d 151(2008). The plaintiff's claim of sexual harassment sounds in hostile work environment. As such, the plaintiff must show "the workplace ... permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ..." (Internal quotations marks omitted.) *Brittell v. Dept. of Correction,* 247 Conn. 148, 166–67, 717 A.2d 1254 (1998). "[I]n order to be actionable ... a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so ... Whether an environment is objectively hostile is determined by looking at the record as a whole and at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (Internal quotation marks omitted.) *Feliciano v. Autozone, Inc.,* 316 Conn. 65, 85, 111 A.3d 453 (2015). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive ... Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." (Citation omitted; internal quotation marks omitted.) *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002). "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." (Internal quotation marks omitted.) *Id.* "For an action against an employer for sexual harassment under General Statutes § 46a–60 to be successful, the plaintiff must show that the employer provided no reasonable avenue for complaint, or ... the employer knew (or should have known) of the harassment but unreasonably failed to stop it." (Internal quotation marks omitted.) *Boyles v. Preston,* 68 Conn.App. 596, 608 n.7, 792 A.2d 878, cert. denied, 261 Conn. 901, 802 A.2d 853 (2002).

**\*4** Based on the allegations made in the plaintiff's complaint, which include a course of conduct and series of events that could be found to be sexually charged and offensive, the court cannot find that the allegations, if true, would not meet a proper and legal claim for sexual harassment against CMHA under § 46a–60. Additionally, the complaint sufficiently alleges that CMHA was aware of the alleged offensive conduct and allowed the offensive conduct to continue despite numerous complaints by the plaintiff and other employees, causing the plaintiff to resign. Accordingly, the court denies the defendants' motion to strike count one alleged against CMHA.

63 Conn. L. Rptr. 771

With respect to count one against Gormnan, the plaintiff cannot maintain its claim against him individually, given that there is no individual liability created by § 46a–60(a)(8). See *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 203 (D.Conn. 2000) ("The legislature, by failing to extend liability expressly to 'persons' in sections 46a–60(a)(1) and (8) and instead limiting liability in that section, did not intend to hold employees, whether supervisory or not, individually liable.") Accordingly, the court grants the defendants' motion to strike count one alleged against Gorman.

## B

## Sex Discrimination

With respect to count two against CMHA, the plaintiff has sufficiently pleaded a claim for sex discrimination.

"In order to set forth a prima facie case of discrimination under the pretext model, a plaintiff must establish that she: (1) is a member of a protected class; (2) applied for and was qualified for the benefit of the position; (3) suffered an adverse action by the defendant; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities v. Hartford,* 138 Conn.App. 141, 154–55, 50 A.3d 917, cert. denied, 307 Conn. 929, 55 A.3d 570 (2012). When an employee is compelled to resign in order to escape intolerable and illegal employment conditions, the law recognizes such circumstances as a dismissal by an employer and considers it a constructive discharge. *Brittell v. Dept. of Correction, supra*, 247 Conn. 178–79.

In her complaint, the plaintiff has pleaded that she is a female, was qualified for her position, and was compelled to resign from her position due to the sexually-harassing environment she was made to endure because of her sex. Accordingly, the defendants' motion to strike count two against CMHA is denied.

## Retaliation

With respect to count three, the plaintiff has sufficiently pleaded a claim for retaliation. The plaintiff has properly pleaded each element of retaliation, specifically, that: (1) the plaintiff was engaged in a protected activity; (2) the defendants knew of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. The plaintiff alleges that she engaged in protected activity when she addressed complaints of sexual harassment to Gorman as president of CMHA, and thus addressed her complaints to CMHA also; the defendants therefore knew of the protected activity; and the plaintiff experienced adverse employment action when she ultimately felt compelled to resign as a result of her complaints. See Complaint, Count Three, paragraphs 18–21. Although the defendants' claim that the adverse treatment alleged by the plaintiff is not material and thus does not meet the elements required for retaliation, the alleged loss of employment as a result of discriminatory conduct would rise to the level of a material adverse action by the employer. See *Hicks v. Baines,* 593 F.3d 159, 169 (2d Cir. 2010) ("the proper inquiry [to determine whether employer conduct constituted adverse employment action] ... is whether the employer's actions [were] harmful to the point they could well dissuade a reasonable worker from making or supporting a charge of discrimination" [internal quotation marks omitted] ). Accordingly, the court denies the defendants' motion to strike count three of the plaintiff's complaint.

## D

## Aiding and Abetting

**\*5** With respect to the last count of aiding and abetting against Gorman, the plaintiff has not sufficiently pleaded discriminatory practices against CMHA that Gorman could have aided and abetted. The only allegations regarding CMHA's conduct concerns specific actions Gorman engaged in. Since Gorman is the alleged perpetrator of the discriminatory acts, he cannot aid and abet himself. See *Bolick v. Alea Group Holdings, Ltd.,* 278 F.Supp.2d 278, 282–83 (D.Conn. 2003) (supervisor of

woman marketing executive was not liable for aiding and abetting gender discrimination and sexual harassment by employer under CFEPA when supervisor was the only alleged perpetrator). Accordingly, the court grants the defendants' motion to strike count four of the plaintiff's complaint.

III

CONCLUSION

For the reasons provided herein, the motion to strike count one against CMHA is denied. The motion to strike counts two and three is also denied. The motion to strike counts one and four against Gorman is granted.

So ordered.

**All Citations**

Not Reported in A.3d, 2017 WL 1240435, 63 Conn. L. Rptr. 771

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Edwards v. William Raveis Real Estate, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 1407233
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Tracy EDWARDS, Plaintiff,
v.
WILLIAM RAVEIS REAL ESTATE, INC.,
Defendant.

Civil Action No. 08–cv–1907 (JCH).
|
May 19, 2009.

West KeySummary

1    **Civil Rights**⚖️Employment practices

EEOC right to sue letter for age discrimination
was not sufficient to satisfy the exhaustion
requirements of the state fair employment act
even where commissions had a work-sharing
agreement. State commission and EEOC had a
work-sharing agreement where the state
commission was authorized to accept charges
for the EEOC, but court held that the inverse
was not true. Employee obtained a right to sue
letter from the EEOC, but failed to show that the
letter contained both EEOC and state
commission case numbers. C.G.S.A. §§
46a–100, 46a–58; Age Discrimination in
Employment Act of 1967, § 2, 29 U.S.C.A. §
621.

4 Cases that cite this headnote

Attorneys and Law Firms

H.P. Sean Dweck, The Dweck Law Firm LLP, New York,
NY, for Plaintiff.

Austin D. Kim, Courtney A. George, Cohen & Wolf P.C.,
Bridgeport, CT, for Defendant.

**RULING ON DEFENDANT'S MOTION TO
DISMISS [DOC. NO. 7]**

JANET C. HALL, District Judge.

**I. INTRODUCTION**
*1 The plaintiff, Tracy Edwards, brings this action against
defendant William Raveis Real Estate, Inc ("William
Raveis"), alleging statutory violations of the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C.
§ 621 et seq. and violations of the Connecticut Fair
Employment Practices Act ("CFEPA"), Conn. Gen.Stat. §
46a–58 et seq. William Raveis has moved to dismiss
Count Two of the Complaint (Doc. No. 1) for lack of
subject matter jurisdiction, pursuant to Federal Rule of
Civil Procedure 12(b)(1). For the following reasons,
William Raveis' Motion to Dismiss (Doc. No. 7) is
granted.

**I. STANDARDS FOR REVIEW**
In deciding a motion to dismiss, the court accepts the
allegations in the complaint as true and construes them in
a manner favorable to the pleader. Hoover v. Ronwin,
466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590
(1984); Grandon v. Merrill Lynch & Co., 147 F.3d
184, 188 (2d Cir.1998). The court must draw all
reasonable inferences in the plaintiff's favor. See, e.g.,
Lunney v. United States, 319 F.3d 550, 554 (2d
Cir.2003) (discussing Rule 12(b)(1) motion to dismiss).

A case is properly dismissed for lack of subject matter
jurisdiction under Fed.R.Civ.P. 12(b)(1) when the district
court lacks the statutory or constitutional power to
adjudicate it. Makarova v. United States, 201 F.3d
110, 113 (2d Cir.2000). In assessing a motion to dismiss
for lack of subject matter jurisdiction, the court "accept[s]
as true all material factual allegations in the complaint."
Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129,
131 (2d Cir.1998) (citing Scheuer v. Rhodes, 416 U.S.,

232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). The court, however, refrains from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]." *Id.* (citing *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)). On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff must establish by a preponderance of the evidence that the court has subject matter jurisdiction over the complaint. *Makarova,* 201 F.3d at 113; *see also Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996); *In re Joint E. & So. Dist. Asbestos Litig.,* 14 F.3d 726, 730 (2d Cir.1993). Courts evaluating Rule 12(b)(1) motions "may resolve the disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000).

## III. FACTS

Edwards is a fifty-one year old resident of Connecticut. William Raveis is a domestic real estate corporation with its principal place of business in Shelton, Connecticut. Edwards was an employee of William Raveis for three and one half years. She was hired in June 2004 for the position of Director of Purchasing and was later promoted to the position of Vice President of Facilities and Purchasing in 2006. During her tenure at William Raveis, Edwards' work performance met the legitimate expectations of the company. She received full bonuses for the years 2006 and 2007. In late 2007, William Raveis instructed Edwards to help train a younger, less experienced, newly appointed Vice President in the area of facilities and purchasing.

**\*2** At the end of 2007, Edwards' turned fifty years old. Around the time of her birthday, several employees referred to Edwards as "over the hill." On or about April 18, 2008, William Raveis terminated Edwards' employment citing "downsizing" as the reason for termination. Immediately after terminating her, William Raveis replaced Edwards with the younger, less experienced employee that Edwards had trained. Edwards alleges that her termination was motivated by age discrimination.

On October 8, 2008, Edwards filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On November 18, 2008, the EEOC issued Edwards a Notice of Right to Sue Letter. Edwards commenced this action on December 16, 2008.

## IV. DISCUSSION

William Raveis argues that Edwards' claims under the CFEPA should be dismissed for lack of subject matter jurisdiction because Edwards did not exhaust her administrative remedies. Specifically, it claims that because Edwards did not receive a right to sue letter from the Commission on Human Rights and Opportunities ("CHRO") this court does not have jurisdiction over her claims under the CFEPA. Indeed, "[b]efore bringing a CFEPA claim in federal court, a plaintiff must first exhaust her administrative remedies." *Ghaly v. Simsarian,* 3:04CV01779(AWT), 2009 U.S. Dist. LEXIS 23762 *13, 2009 WL 801636 (D.Conn.2009). The CFEPA states that an individual who has "timely filed a complaint with the ["CHRO"] ... and who has obtained a release from the commission ... may also bring an action in the superior court...." Conn. Gen.Stat. § 46a–100. Edwards concedes that she did not file a complaint with the CHRO, Mem. in Opp. at 3, nor did she receive a release of jurisdiction from them. Instead, she asserts that because she filed a charge with the EEOC, she satisfied her obligations under CFEPA because the EEOC and CHRO have a work-sharing agreement. The court disagrees.

Edwards is correct in asserting that the CHRO has a work-sharing agreement with the EEOC, "whereby it is authorized to accept charges for the EEOC and that charges may be dual-filed." *Ghaly,* 2009 U.S. Dist. LEXIS 23762 at *15, 13, 2009 WL 801636 (quoting *Ortiz v. Prudential Ins. Co.,* 94 F.Supp.2d 225, 231 (D.Conn.2000)). However, whether that work-sharing agreement allows an EEOC right to sue letter to serve as exhaustion of administrative remedies pursuant to CFEPA is disputed by the parties.

The language in the work-sharing agreement is confusing at best. *See* Mem. in Opp. Exh. 1. Paragraph A of Section II states in pertinent part:

> In order to facilitate the assertion of employment rights, the EEOC and the FEPA each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges. The

> EEOC's receipt of charges on the FEPA's behalf will automatically initiate the proceedings of both the EEOC and the FEPA for the purpose of Section 706(c) and (e)(1) of Title VII....

**\*3** *Id.* The first sentence of this paragraph appears to support plaintiff's claim that a filing with one agency is deemed a filing with the other agency. However, the second sentence limits that first sentence to include only filings related to Title VII claims. This reading, that the automatic dual-filing is limited to Title VII claims, can only be understood in the context of the remaining paragraphs of Section II of the agreement. Paragraph B instructs CFEPA to "take all charges alleging a violation of Title VII, the ADEA, the EPA or the ADA where both the FEPA and the EEOC have mutual jurisdiction...." *Id.* Thus, paragraph B suggests that the CHRO may receive ADEA claims on behalf of the EEOC but it does not read that the EEOC may accept ADEA claims on behalf of the CHRO, as the plaintiff suggests. Furthermore, paragraph E states that "[w]ithin ten calendar days of receipt, each Agency agrees that it will notify both the Charging Party and the Respondent of the dual filed nature of each such charge it receives...." *Id.* There is no evidence that either party here received this notice. The court reads the second sentence of Paragraph A to limit automatic initiation of a CHRO claim upon filing with the EEOC to Title VII claims, and it reads the first sentence to relate to cross-filing only as specifically addressed in that and other paragraphs of section II.

The caselaw also supports this reading of the work-sharing agreement. Edwards cites *Ortiz* in which case the plaintiff filed a complaint with the CHRO alleging discrimination on the basis of his national origin. The CHRO subsequently issued him a right to sue letter. The plaintiff in *Ortiz* did not file a complaint with the EEOC. The *Ortiz* court determined that the "failure to obtain a right to sue notice from the EEOC is not a fatal jurisdictional bar to suit." *Ortiz,* F.Supp.2d at 231. In arriving at this decision, the court noted the work-sharing relationship between the CHRO and EEOC and stated that "the plaintiff's CHRO complaint included an EEOC charge form" and "the EEOC normally adopts the finding of the state agency as its own." *Id.* Similarly, in *Burke v. Cornerstone,* the court held that the lack of a right to sue letter from the EEOC did not bar the plaintiff's claim because a release provided by the CHRO was sufficient in light of the work-sharing agreement. 3:07CV889 (MRK), 2007 U.S. Dist. LEXIS 76662 \*5 (D.Conn.2007). Moreover, the fact that the CHRO release of jurisdiction

cited both the CHRO and EEOC case numbers evidenced the need to only file with the CHRO to commence a complaint with the EEOC. *Id.* Thus, in both *Ortiz* and *Burke,* the courts found that a plaintiff need only demonstrate that it received a right to sue letter from the CHRO, not the EEOC, before commencing a lawsuit.

However, Edwards cites no cases in which a court has held that the inverse is true (*e.g.,* that an EEOC right-to-sue letter is sufficient to satisfy the exhaustion requirements of the CFEPA). In fact, a sister court in this district recently held the opposite. *Ghaly,* 2009 U.S. Dist. LEXIS at \*15 ("the issue [in this case] is whether a plaintiff can satisfy the requirement that she obtain a release of jurisdiction from the CHRO by obtaining a right-to-sue letter from the EEOC. She cannot."). Other courts have held on the facts before them that a filing with the EEOC does not preserve a claim with the CHRO. *See Meehan v. Davita,* 3:08–cv–0877 (WWE), 2008 U.S. Dist. LEXIS \*2–3, 2008 WL 4831417 (D.Conn.2008) ("the filing of a claim with the EEOC does not necessarily serve as the administrative prerequisite to a court's exercising jurisdiction over a CFEPA claim ."); *Sebold v. City of Middletown,* 3:05CV1205 (AHN), 2007 U.S. Dist. LEXIS 70081 \*58–59, 2007 WL 2782527 (D.Conn.2007) ("A right to sue letter from the EEOC does not permit a person to file a claim with the Superior Court on an employment discrimination cause of action without a release of jurisdiction from the CHRO because the right to sue from the EEOC has no legal significance under the CFEPA.") (internal quotations and citations omitted); *Aukstolis v. AHEPA 58/Nathan Hale Senior Center,* 3:07–cv–51 (JCH), 2007 U.S. Dist. LEXIS 32984 \*13 (D.Conn.2007), 2007 WL 1183083 (same). Thus, though Edwards demonstrated that a work-sharing agreement was in effect between the CHRO and EEOC when she filed her original administrative charge, *see* Mem. in Opp. Exhs. 2 and 3, she has not demonstrated that, under the agreement, the CHRO would deem a filing with the EEOC to be a release of jurisdiction by the CHRO. *See Aukstolis,* 2007 U.S. Dist. LEXIS 32984 at \*13, 2007 WL 1183083 (D.Conn.2007) (citing *Bogle–Assegai v. State of Connecticut,* 470 F.3d 498, 505 (2d Cir.2006)).

**\*4** The court therefore grants William Raveis' Motion to Dismiss Edwards' CFEPA claim in Count Two for lack of personal jurisdiction. The court's granting of the Motion is without prejudice to Edwards to re-plead the CFEPA claim if she can demonstrate compliance with section 46a–100, by demonstrating that the right to sue letter from the EEOC satisfies the requirements under CHRO, either by showing that the letter contained both EEOC and CHRO case numbers, *see, e.g., Burke,* 2007 U.S. Dist.

Edwards v. William Raveis Real Estate, Inc., Not Reported in F.Supp.2d (2009)

LEXIS 76662 at *5, or otherwise.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1407233

**V. CONCLUSION**

For the foregoing reasons, William Raveis' Motion to Dismiss Count Two of the Complaint (Doc. No. 7) is GRANTED.

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Glasser v. Group W Satellite Communications, Not Reported in F.Supp. (1990)

1990 WL 128563
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Barry GLASSER, Plaintiff
v.
GROUP W SATELLITE COMMUNICATIONS,
Defendant.

CIV. No. B–89–664 (WWE).
|
July 11, 1990.

**Attorneys and Law Firms**

William Laviano, Ridgefield, Conn., for plaintiff.

Barry J. Waters, Murtha, Cullina, Richter & Pinney, New Haven, Conn., for defendant.

*RULING ON DEFENDANT'S MOTION TO DISMISS*

EGINTON, District Judge.

**\*1** Plaintiff, Barry Glasser ("Glasser"), brought this action for monetary damages against the defendant, Group W Satellite Communications, ("GWSC"), for unlawful discharge pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. § 626 et seq. In the Second Count of his complaint plaintiff alleges that he suffered damages and emotional distress due to the defendant's breach of his employment contract. GWSC has moved to dismiss the breach of contract claim pursuant to Fed.R.Civ.P. 12(b)(1) asserting that it would be inappropriate for the Court to exercise pendent jurisdiction over this claim.

For the reasons set forth below, the defendant's motion to dismiss the Second Count will be granted.

*FACTS*

From December, 1986 through January 31, 1989 Glasser was employed by GWSC as the manager of playback operations. GWSC asserts that Glasser was terminated because his department was eliminated. Glasser maintains that his termination represents a violation of the ADEA and constitutes a breach of his employment contract.[1]

*DISCUSSION*

Pursuant to 28 U.S.C. § 1301, the Court is vested with original jurisdiction to entertain plaintiff's ADEA claim. The only basis for the Court to exercise jurisdiction over the claims alleged in the Second Count of the complaint is through pendent jurisdiction. Hence, the only issue to be resolved is whether the Court will exercise pendent jurisdiction over the Second Count of the complaint.

Federal Courts may exercise pendent jurisdiction over state law claims when the state and federal claims derive from a common nucleus of operative facts and are sufficiently related that a party would ordinarily expect to litigate them in one forum. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). However, a court need not exercise pendent jurisdiction over state claims since pendent jurisdiction is a doctrine of discretion, not of right. Id. at 726. In electing to exercise pendent jurisdiction, a court must weigh considerations of policy, convenience, judicial economy and fairness. Id.; See also Brokke v. Stauffer Chemical Co., 703 F.Supp. 215 (D.Conn.1988).

GWSC asserts that the ADEA claim and the breach of contract claim do not arise out of the same operative facts and therefore, the Court should not exercise pendent jurisdiction. In opposition the plaintiff asserts that the federal and state claims arise out of a common nucleus of operative facts and argues that Miller v. Lovett, 879 F.2d 1066 (2d Cir.1989) mandates that the Court exercise pendent jurisdiction over plaintiff's state law claims. In Miller the Second Circuit, in a 42 U.S.C. § 1983 action, held that the district court should have exercised pendent jurisdiction over state law negligence and assault and battery claims. 879 F.2d 1071–1073.

The Court finds that this case is distinguishable from *Miller* and declines to exercise pendent jurisdiction over the Second Count of the complaint. *Miller* involved a single incident in which the defendant police officers allegedly used excessive force in making an arrest. The Second Circuit held that the exercise of pendent jurisdiction over the state law claims was appropriate because "Miller's state and federal claims derive from a common nucleus of operative fact" and because, given the "interrelationship between state law and federal policy ... in police brutality cases, ... resolution of [Miller's] federal claim necessarily required the court to draw on common law principles of tort doctrine." 🚩 879 F.2d at 1072.

**\*2** None of the factors deemed dispositive in *Miller* are present in this case. Plaintiff's claim is based upon an alleged violation of the ADEA. If the Court were to exercise pendent jurisdiction over the breach of contract claim it would involve inquiry into facts having nothing to do with the age discrimination claim and into areas of state law which are best left to state judicial authorities. In *Gibbs,* the Supreme Court advised that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726.

Courts have been reluctant to exercise pendent jurisdiction in ADEA cases over claims based upon an alleged breach of contract and claims alleging tortious conduct. *Ritter v. Colorado Interstate Gas Company,* 593 F.Supp. 1279 (D.Colo.1984); *Douglas v. American Cyanamid Company,* 472 F.Supp. 298 (D.Conn.1979); *Kurowski v. People's Bank,* Civil No. B–89–344 (WWE) (D.Conn. November 6, 1989). The Court concludes that this reluctance is well advised and declines to exercise pendent jurisdiction over the Second Count of the complaint.

*CONCLUSION*

For the foregoing reasons, the defendant's motion to dismiss the Second Count of the complaint is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1990 WL 128563

**Footnotes**

1    Glasser alleges that the employment contract declares that notice would be given prior to a termination without cause.

End of Document                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 70815
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

John GRANDE, Plaintiff,
v.
HARTFORD BOARD OF EDUCATION, Jay
Mihalko, City of Hartford, Defendants.

19-cv-00184 (KAD)
|
Signed 01/07/2020

**Attorneys and Law Firms**

Paul A. Keily, Keily Mira Law, West Hartford, CT, for
Plaintiff.

Channez M. Rogers, David S. Monastersky, Howd &
Ludorf, LLC, Hartford, CT, for Defendants.

**MEMORANDUM OF DECISION RE:
DEFENDANTS' MOTION TO DISMISS (ECF NO.
18)**

Kari A. Dooley, United States District Judge:

**\*1** Plaintiff John Grande ("Grande" or the "Plaintiff")
filed this action in Connecticut Superior Court on January
7, 2019 against the Hartford Board of Education (the
"Board"), Jay Mihalko ("Mihalko"), and the City of
Hartford (the "City," and, collectively, the "Defendants").
The Defendants removed the case to this Court on
February 6, 2019. (ECF No. 1.) The Plaintiff, a physical
education teacher for the Hartford school system, brings
*inter alia*, claims pursuant to the Connecticut Fair
Employment Practices Act ("CFEPA"), Conn. Gen.
Stat. §§ 46a-60 *et seq.* (Counts One, Two, Five, and Six),
and a claim for negligent infliction of emotional distress
(Count Eight).[1] On March 15, 2019, Defendants filed a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as
to Counts One, Two, Five, Six, and Eight of Grande's
complaint. (ECF No. 18.) Grande filed an opposition to
the motion to dismiss on April 29, 2019 (ECF No. 27),

Defendants filed a reply brief in support of their motion
on June 3, 2019 (ECF No. 30), and Grande filed a
sur-reply with the Court's permission on August 7, 2019.
(ECF No. 37.) For the reasons that follow, Defendants'
motion is GRANTED.

**Allegations**

Grande was at all relevant times employed by the Board
as a physical education teacher at Noah Webster
MicroSociety Magnet School in Hartford ("Noah
Webster"), where Mihalko served as Principal. (Compl.
¶¶ 1, 3, ECF No. 43.) Grande alleges that he needs to
wear headphones at work for protection because he
suffers from tinnitus. He alleges that the Defendants
discriminated against him by creating a hostile work
environment in the face of his disability and by ultimately
eliminating his teaching position without justification.

Specifically, the Plaintiff alleges that he was wearing
headphones for his tinnitus while on cafeteria duty on
October 10, 2016. (Compl. ¶ 7.) Mihalko asked him for a
doctor's note but Grande had not obtained one. (*Id.* ¶ 8.)
Following this incident, Grande alleges that Mihalko
began threatening to discipline Grande for
insubordination if he continued wearing the headphones
and instructed Noah Webster's Vice Principal, Richard
Skowronski ("Skowronski"), to tell Grande that he was
not permitted to wear the headphones to work. (*Id.* ¶¶ 8,
10.) Grande emailed both Mihalko and Skowronski to
inform them that he believed their conduct constituted
workplace harassment (*id.* ¶¶ 9, 13) and thereafter
obtained a doctor's note "stating that it is medically
necessary for Plaintiff to wear ear protection for loud
noises." (*Id.* ¶ 14.) Grande alleges that Mihalko continued
to mock him by turning the music down in Grande's class
on three separate occasions, even though it was not loud
or bothersome. (*Id.* ¶¶ 15–19.) On December 14, 2016,
Mihalko allegedly conducted a review of Grande's class
as part of an annual evaluation in which he wrote negative
comments about Grande and indicated that Grande "needs
improvement" in one of the relevant categories. (*Id.* ¶¶
21–22.) Prior to that time, Grande had always received
evaluation scores that rated him "effective" to "highly
effective." (*Id.* ¶ 23.)

**\*2** On February 2, 2017, Grande filed a complaint with
the Connecticut Commission for Human Rights and
Opportunities ("CHRO"). (*Id.* ¶ 25.) Grande alleges that
approximately three weeks later, on February 24, he was
called to Mihalko's office and informed that his position

was being eliminated at Noah Webster. (*Id.* ¶ 27.) When asked to provide an explanation Mihalko allegedly stated, "[t]hese are decisions that I have to make to move the school forward." (*Id.* ¶ 28.) Grande emailed Mihalko following that meeting and reiterated his belief that he was being harassed. (*Id.* ¶ 30.) The next day, Grande needed to resolve an issue between two students and Mihalko allegedly complimented Grande for the way that he handled the situation. (*Id.* ¶¶ 31–32.) A few days later, however, Grande alleges that Mihalko called Grande to his office with Skowronski present and accused Grande of threatening him at the February 24 meeting, which Grande denied. (*Id.* ¶¶ 33–34.) Grande alleges that Mihalko followed up with a letter memorializing his accusation, which was forwarded to various administrators, including Mihalko's supervisors, and which included a recommendation that Grande participate in harassment training. (*Id.* ¶¶ 35–36.) Grande responded by sending an email to Mihalko and all those copied on Mihalko's letter and thereafter filed an amended CHRO complaint. (*Id.* ¶¶ 37, 39.) He alleges that individual(s) from the Board tampered with Grande's evaluation for the 2016-2017 school year after he filed his CHRO complaint in order to cover up the Defendants' hostile treatment, and that witnesses for the Board gave false statements and manipulated the facts at a February 2018 CHRO fact-finding conference. (*Id.* ¶¶ 44–45.)

Grande claims that he has suffered severe emotional and mental distress from Defendants' actions resulting in sleeplessness, post-traumatic stress disorder, and anxiety. (*Id.* ¶ 48.) He also alleges that he hesitated to intervene in a physical altercation between two students because he was aware that he was being video recorded and because of his ongoing concern regarding his hostile work environment. (*Id.* ¶¶ 40–42.) Because he did not allow himself to engage physically in the altercation, Grande claims that he injured his knee, was placed on worker's compensation for seven weeks, and was unable to perform his part-time work as a stage hand for concerts. (*Id.* ¶¶ 42–43.)

Although not alleged in the complaint, the parties acknowledge that the CHRO issued a "Finding of No Reasonable Cause" on the Plaintiff's CHRO complaint on August 7, 2018, in which it "conclude[d] that there is **no reasonable cause** for believing that a discriminatory practice has been or is being committed as alleged in the complaint." (Defs.' Mot. Ex. C at 5, ECF No. 18-4; Pl.'s Opp. Ex. A at 5, ECF No. 27-1.) Thereafter, the Plaintiff filed this action in the superior court on January 7, 2019.

Grande brings hostile work environment, disparate treatment, and retaliation claims against the Board,

Mihalko, and the City under the CFEPA and a claim for negligent infliction of emotional distress against the Board and the City. Defendants have moved to dismiss the CFEPA claims because Grande did not obtain a release of jurisdiction from the CHRO and because he failed to exhaust his administrative remedies against Mihalko and the City.[2] The Board and the City also move to dismiss the claim for negligent infliction of emotional distress pursuant to Fed. R. Civ. P. 12(b)(6).

**Standard of Review**

With respect to the CFEPA claims, although styled as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Defendants acknowledge that the failure to obtain a release of jurisdiction from the CHRO implicates this Court's subject matter jurisdiction. (*See* Defs.' Mem. at 6–7.) "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 712 (2d Cir. 2019) (*per curiam*) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Mercer v. Schriro*, 337 F. Supp. 3d 109, 122 (D. Conn. 2018) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). "In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015). "[T]he party asserting subject matter jurisdiction 'bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.' " *P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 45–46 (D. Conn. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).

**\*3** With respect to the motion to dismiss the negligent infliction of emotional distress claim under Rule 12(b)(6), the Court must similarly accept the complaint's factual allegations as true and draw inferences in the plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). "In addition to the allegations of the complaint, the Court may also consider matters of which judicial notice may be taken," which "include the decisions of an administrative agency." *Hohmann v.*

*GTECH Corp.*, 910 F. Supp. 2d 400, 405 (D. Conn. 2012). The "complaint must 'state a claim to relief that is plausible on its face,' " setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678) (brackets omitted).

## Discussion

### The CFEPA Claims – Counts One, Two, Five, and Six

Employees who believe that an employer has violated the CFEPA must, by statute, first pursue administrative remedies with the CHRO. *See Sullivan v. Bd. of Police Comm'rs of City of Waterbury*, 196 Conn. 208, 215–16, 491 A.2d 1096 (1985) (explaining that "CFEPA not only defines important rights designed to rid the workplace of discrimination, but also vests first-order administrative oversight and enforcement of these rights in the CHRO."). Under certain circumstances, such an employee can also pursue CFEPA claims in the superior court. *See, e.g.*, *Hinde v. Specialized Educ. of Connecticut, Inc.*, 147 Conn. App. 730, 746, 84 A.3d 895 (App. Ct. 2014) (explaining the processes for either appealing a final order of the CHRO or for filing a direct action in superior court upon obtaining a release of jurisdiction). In this vein, section 46a-100 of the Connecticut General Statutes provides in relevant part that "[a]ny person who has filed a complaint with the [CHRO] ... and who has obtained a release of jurisdiction in accordance with section ... 46a-101, may bring an action in the superior court...." Section 46a-101(a) in turn provides that "[n]o action may be brought in accordance with section 46a-100 unless the complainant has received a release from the [CHRO] in accordance with the provisions of this section." A release of jurisdiction may be jointly requested by the complainant and the respondent "at any time from the date of filing the complaint," or by the complainant alone "if the complaint is still pending after the expiration of one hundred eighty days from the date of its filing or after a case assessment review ... whichever is earlier." *Id.* §

46a-101(b). The release of jurisdiction triggers administrative dismissal or disposal of the complaint, and the complainant has 90 days from the date of receipt of the release to file an action in court. *Id.* § 46a-101(d)-(e).

Here, the Defendants assert and the Plaintiff concedes that he did not obtain a release of jurisdiction from the CHRO prior to bringing this lawsuit. Accordingly, the Defendants assert that this Court is without jurisdiction to hear the Plaintiff's CFEPA claims.

The Connecticut Supreme Court has made clear that the failure to exhaust administrative remedies or to obtain a release of jurisdiction from the CHRO implicates the Court's subject matter jurisdiction to hear CFEPA claims. *See Sullivan*, 196 Conn. at 217–18 ("[T]his plaintiff had available to him administrative remedies that could have afforded him meaningful relief under the federal and state statutes that govern his claim of age discrimination. His failure to ... bring his complaint to the CHRO forecloses his access to judicial relief, because it deprived the trial court of jurisdiction to hear his complaint."). Not surprisingly therefore, "[t]he courts of this District have consistently applied the exhaustion provisions of the CFEPA to dismiss discrimination claims, finding a lack of subject matter jurisdiction where the plaintiff failed to obtain the requisite release prior to pursuing a private cause of action in court." *Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 272 (D. Conn. 2010) (citing cases); *see also, e.g.*, *Fried v. LVI Servs., Inc.*, 557 Fed. App'x 61, 63 (2d Cir. 2014) (summary order) ("It is undisputed that CFEPA claims must initially go through the CHRO, and may not be sued upon until the CHRO grants a release of jurisdiction.") (citing *Sullivan*, 196 Conn. at 215–17).

**\*4** Notwithstanding this precedent, the Plaintiff argues that because the CHRO issued a final decision, he exhausted his administrative remedies and was not required to obtain a release of jurisdiction in order to bring the instant case. He relies upon the language of the statute that speaks only to requests for a release "if the complaint is still pending after" 180 days, Conn. Gen. Stat. § 46a-101(b), but does not address at all the issuance a release after the CHRO has rendered a decision. In an email exchange between Grande and an employee of the CHRO on August 24, 2018, Grande, who was *pro se* during the administrative proceedings, indicated that he was "awaiting my release of jurisdiction letter," to which the employee responded that "you cannot request for a release of jurisdiction on a closed case." (Pl.'s Sur-Reply Ex. B, ECF No. 37-1.)[3] Indeed, there does not appear to be either a statutory or regulatory procedure for obtaining a release of jurisdiction once the agency has issued a final

decision. From this, the Plaintiff argues that by negative implication, no release is required. The Court disagrees.

In *Catalano v. Bedford Assocs., Inc.*, 9 F. Supp. 2d 133, 135 (D. Conn. 1998), the plaintiff argued "that a release is not required because his complaint to the CHRO was dismissed." The District Court rejected this position, noting that "[s]ubject matter jurisdiction does not exist where a plaintiff has not obtained a release from the CHRO, and has therefore failed to comply with the clear and unambiguous statutory prerequisite embodied in General Statutes § 46a-101." *Id.* (quotation marks and citation omitted).[4] *See also Ghaly v. Simsarian*, No. 3:04-CV-01779 (AWT), 2009 WL 801636, at *1, *6 (D. Conn. Mar. 26, 2009) (concluding that court lacked jurisdiction over claims asserted in plaintiff's second CHRO complaint, which was dismissed by the CHRO upon "finding no reasonable possibility of discrimination" and which was not followed by the issuance of a release of jurisdiction); *White v. Martin*, 23 F. Supp. 2d 203, 204–06 & n.3 (D. Conn. 1998) (dismissing CFEPA claims for lack of jurisdiction where CHRO "issued a 'Notice of Final Agency Action' " dismissing the plaintiff's case on the merits and where plaintiff failed to substantiate his claim that he requested but did not receive a release from the CHRO), *aff'd sub nom. White v. Comm'n of Human Rights, Opportunities*, 198 F.3d 235, 1999 WL 973622, at *2 (2d Cir. 1999) (unpublished) (observing that "the plaintiff has provided an inadequate basis for his conclusion that the CHRO must provide a release when it dismisses a complaint.").

In addition, upon receiving the final decision from the CHRO, the Plaintiff was not without recourse. He could have sought reconsideration of the ruling. *See Regs. Conn. State Agencies § 46a-54-61a(b)* ("A copy of the final finding shall be transmitted to the complainant and the respondent by certified mail or other mail service that confirms receipt, with copies to counsel appearing in behalf of parties by first-class mail. The complainant shall simultaneously be notified of the complainant's right to request reconsideration of the investigator's finding.") The Plaintiff also had the option of bringing an administrative appeal to seek judicial review of the decision. *See, e.g., Gur v. Nemeth-Martin Personnel Consulting, Inc.*, No. CV-980331118S, 2001 WL 357356, *4 (Conn. Sup. Ct. March 20, 2001) ("[T]he Plaintiff's only available avenue to the Superior Court, other than filing an administrative appeal pursuant to § 46a-94a, was to request a release to sue pursuant to § 46a-101."); *see also Anderson*, 718 F. Supp. 2d at 271 (explaining that "[o]nce the CHRO issues a final order or dismisses the complaint, the complainant may then appeal to the

Connecticut Superior Court."). Given this alternative path to judicial review of the CFEPA claims, it is logical that the legislature would not provide a procedure to obtain a release of jurisdiction for purposes of pursuing a *de novo* hearing of those claims after they had received a full hearing on the merits. *See Gur*, 2001 WL 357356, at *5 (The plaintiff, "having invoked the procedures of CHRO and having not sought a release to sue de novo in Superior Court when she could have, is bound to seek her remedies and relief for her statutory discrimination claims pursuant to the administrative appeals procedure set forth in § 46a-94. To hold otherwise would allow persons to invoke the full administrative processes of CHRO as set forth in the CFEPA resulting in a complete merits review and determination of their statutory discrimination claims, blithely ignore the results of that process, and subsequently, initiate a *de novo* judicial proceeding on the same claims. As in this case, that seriatim process would inevitably take several years or more and is not what the Connecticut legislature intended.").

**\*5** Thus, the Plaintiff's argument that a release is not required if the CHRO renders a final decision is against the weight of logic, the statutory framework of the CFEPA, and the available authority. Indeed, the Plaintiff provides no authority for his argument or for the proposition that a final decision by the CHRO renders the clear and unambiguous language of the statute, that "**no action may be brought** in accordance with section 46a-100 unless the complainant has **received a release from the [CHRO] in accordance with the provisions of this section**" somehow inapplicable. Conn. Gen. Stat. § 46a-101(a) (emphasis added).

Perhaps in light of the authority cited by the Defendants, in his sur-reply, Grande appears to change tack. He acknowledges the viability of Defendants' position by accepting that it "would be correct" were he not *pro se*. (Pl.'s Sur-Reply at 2.) He urges the Court to countenance his good faith belief that he followed the proper procedure, and, in essence, create a good faith exception to the requirement that he obtain the release of jurisdiction. The Court accepts that Grande, as a self-represented complainant, mistakenly believed that he needed to await a final CHRO decision before requesting a release of jurisdiction and further that he discovered the appropriate procedure at a time when the opportunity to invoke it had already passed. But as discussed above, the pre-suit release requirement is unambiguous and unbending. And this Court cannot confer subject matter jurisdiction upon itself through a judicially created exception to the statutory release requirement. *See Hinde*, 147 Conn. App. at 747–48 (rejecting plaintiff's argument that the court should treat her failure to exhaust

Grande v. Hartford Board of Education, Slip Copy (2020)

her administrative remedies with the CHRO as a waivable precondition to suit rather a jurisdictional prerequisite when the Connecticut Supreme Court has clearly determined that such a defect is jurisdictional); *see also Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996) ("It is elementary that a federal court cannot create jurisdiction where none exists."). Further, "[a]bsent ambiguity, courts cannot read into statutes by construction, provision[s] that are not clearly stated." *Silver v. Holtman*, 149 Conn. App. 239, 254, 90 A.3d 203 (App. Ct. 2014) (quotation marks and citation omitted). The Court therefore concludes that it lacks subject matter jurisdiction over Grande's CFEPA claims. Counts One, Two, and Six against the Board and the City and Count Five against Mihalko are dismissed.[5]

**Negligent Infliction of Emotional Distress**
A plaintiff seeking to recover for negligent infliction of emotional distress must demonstrate that: " '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress is foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.' " *Vega v. Sacred Heart Univ., Inc.*, 871 F. Supp. 2d 81, 85 (D. Conn. 2012) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003)). A plaintiff, however, cannot bring such a claim for acts occurring during an ongoing employment relationship, because "[n]egligent infliction of emotional distress in the employment context arises only when it is based upon unreasonable conduct of the defendant in the termination process." *Grasso v. Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771, 54 A.3d 221 (App. Ct. 2012) (quoting *Perodeau v. Hartford*, 259 Conn. 729, 750, 792 A.2d 752 (2002)). "The Connecticut Supreme Court has not specifically ruled on the temporal boundaries of the termination process. However, the reasoning in *Perodeau* makes clear that this process does not begin ... at the action that causes the employer-employee relationship to deteriorate." *Tomick v. United Parcel Serv., Inc.*, 511 F. Supp. 2d 235, 238 (D. Conn. 2007) (quotation marks and citation omitted).

**6** Defendants assert that Grande cannot state a claim for negligent infliction of emotional distress because he was not terminated and in fact, remains an employee of the District. And Grande acknowledges that he was ultimately assigned to another school within the District and was not actually terminated. (*See* Pl.'s Opp. Ex. A ¶ 21 (stating

that Grande was reassigned to another school on May 22, 2017).) Notwithstanding, he argues that he can recover for negligent infliction of emotional distress for acts taken during the "termination process," which he argues commenced on February 24, 2017—when Grande alleges that he was first informed that his position was being eliminated. (Pl.'s Opp. at 14.) Specifically, Grande relies on the allegations that: Mihalko convened the disciplinary meeting and accused Grande of threatening him (Compl. ¶¶ 33–34); Mihalko made the same accusation in a letter which was forwarded to other District administrators (*id.* ¶¶ 35–36); and that Defendants tampered with his personnel file and made representations to the CHRO. (*Id.* ¶¶ 44–45.) These allegations concern acts undertaken by the Defendants after Grande was apprised that his position was being eliminated but before Grande was allegedly aware that he would be reassigned. Taking the facts alleged as true and drawing the inferences in Grande's favor, for a period of nearly three months Grande labored under the impression that he was being terminated and he thus maintains that Defendants can be liable for the negligent infliction of emotional distress during this "termination process."[6]

Grande does not cite any authority supporting the proposition that an employer can be found liable for negligent infliction of emotional distress based upon a notice or plan of termination that was never implemented. In *Perodeau*, the Connecticut Supreme Court, in concluding that such claims may only be pursued in the context of a termination from employment, recognized that the line it drew between actionable and non-actionable claims was "somewhat arbitrary." *Perodeau*, 259 Conn. at 758. But the Court explained that the policy underlying its decision was one which sought to avoid chilling productivity and healthy business development by foreclosing liability (and the threat of litigation) for events that are incident to "the inherently competitive and stressful nature of the workplace." *Id.* at 758–59. Since *Perodeau*, a number of courts have concluded that a termination in fact is a necessary prerequisite to an employment-based negligent infliction of emotional distress claim under Connecticut law.

In *Grasso*, 138 Conn. App. at 771–73, the Connecticut Appellate Court construed *Perodeau* narrowly and held that a plaintiff may not recover for negligent infliction of emotional distressed based upon circumstances giving rise to a constructive discharge. The Appellate Court agreed with a superior court decision observing:

> The language of *Perodeau* itself is restrictive. The holding is phrased narrowly: the tort is maintainable only for 'conduct occurring in the termination of

employment.' Language such as conduct in the 'discharge process' is not used; such language perhaps would contemplate a more expansive time frame. Conduct justifying the termination, or, on the other hand, compelling the resignation, is not itself the actual termination. Termination means ending, not the conduct which causes the ending.

*Id.* at 772 (quoting *Michaud v. Farmington Community Ins. Agency*, No. CV-010806951S, 2002 WL 31415478, at *3 (Conn. Sup. Ct. September 25, 2002) (brackets omitted)). The Appellate Court further concluded that "the language used in *Perodeau* is supported by policy rationales that buttress the finding that **termination must be a condition precedent** to a negligent infliction of emotional distress claim in the employment context." *Id.* (emphasis added); *see also Rickard v. Nat'l Vision, Inc.*, No. 3:05-CV-1886 (JBA), 2007 WL 9757657, at *6 (D. Conn. July 30, 2007), *report and recommendation adopted on other grounds*, 514 F. Supp. 2d 339 (D. Conn. 2007) ("In this case, plaintiff testified that she was never terminated by National Vision ..., and without a termination in employment, plaintiff's claim for negligent infliction of emotional distress *ipso facto* fails under *Perodeau*."); *Dembinski v. Pfizer, Inc.*, 628 F. Supp. 2d 267, 274 (D. Conn. 2009) ("Absent any allegation of any wrongful conduct during the course of the Plaintiff's termination, or absent any allegation that the Defendant even terminated the Plaintiff at all, the negligent infliction of emotional distress claim fails as a matter of law."); *accord Groth v. Grove Hill Med. Ctr., P.C.*, No. 3:14-CV-01563 RNC, 2015 WL 4393020, at *8 (D. Conn. July 15, 2015) (explaining that the Supreme Court's decision in *Perodeau* "explicitly distinguishes termination (in some circumstances, actionable) from 'disciplinary or

investigatory action arising from actual or alleged employee misconduct' (never actionable)" and that "Connecticut courts have relied on this language to hold that disciplinary actions short of termination (but arguably leading up to termination) cannot form the basis of an NIED claim") (quoting *Perodeau*, 259 Conn. at 769).

**\*7** Given both the unequivocally restrictive language of *Perodeau* and its policy rationale, Plaintiff's allegations regarding the Defendants' conduct undertaken in anticipation of "termination," where no termination ever occurred, cannot support a claim for negligent infliction of emotional distress. The motion to dismiss Count Eight is granted.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Counts One, Two, Five, and Six for lack of subject matter jurisdiction and GRANTED as to Count Eight for failure to state a claim to relief.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of January 2020.

**All Citations**

Slip Copy, 2020 WL 70815

**Footnotes**

1    The Plaintiff also brings claims under the Americans with Disabilities Act (Counts Three, Four, and Seven), a slander and libel claim against Mihalko (Count Nine), an intentional infliction of emotional distress claim (Count Ten), and a claim pursuant to 42 U.S.C. § 1983 (Count Eleven.)

2    Defendants alternatively move to dismiss Counts One and Two against Mihalko on the grounds that he is not the Plaintiff's employer, even though Mihalko is not expressly named in Counts One and Two of the complaint. The Court does not address this argument.

3    Grande represents that his counsel also contacted the CHRO investigator, who confirmed that a release of jurisdiction is not issued after a "Finding of No Reasonable Cause." (Pl.'s Opp. at 6 n.2.) Counsel has not included an affidavit to this effect, though Grande has included a copy of an email from the CHRO Legal Division to counsel dated April 24, 2019, in which the CHRO confirmed that Grande's "complaint was no longer pending" once Grande received the "final determination of No Reasonable Cause." (Pl.'s Opp. Ex. B, ECF No. 27-2.) The Plaintiff also points to a relevant CHRO regulation, which sets forth the circumstances under which the CHRO is required to issue a

release of jurisdiction—for example, where the complaint is dismissed following an initial case assessment review, *see* Regs. Conn. State Agencies § 46a-54-66a(c) (citing Conn. Gen. Stat. § 46a-83(c)), but which says nothing about the issuance of a release after a "Finding of No Reasonable Cause" has been rendered.

[4]     While the statute has been amended three times since it was enacted, it has always stated that "no action may be brought in accordance with section 1 [*i.e.,* Section 46a-100] of this act unless the complainant has received a release from the [CHRO] in accordance with the provisions of this section." S.B. 292, 1991 Gen. Assemb., Reg. Sess. (Conn. 1991). Any amendments to the statute have no bearing on the issue presented here.

[5]     The Court does not therefore reach the alternative arguments for dismissal of these claims.

[6]     According to the CHRO Findings of Fact, however, Grande was informed that his position was being eliminated "for the following school year, 2017-2018." (Defs.' Mot. Ex. C ¶ 16.) While this suggests that Grande understood that his job was secure for at least the remainder of the current school year, the Court will nonetheless credit Grande's statement that he believed he was in the process of being terminated as early as February 24, 2017.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3581230
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Bennie GRAY, Plaintiff,
v.
Scott ERFE, et al., Defendants.

No. 3:13−cv−39 (JBA).
|
Signed June 5, 2015.

**Attorneys and Law Firms**

Bennie Gray, Enfield, CT, pro se.

Robert S. Dearington, Attorney General's Office–Sherman St., Hartford, CT, for Defendants.

*RULING ON DEFENDANT'S MOTION TO DISMISS*
*[Doc. # 17]*

JANET BOND ARTERTON, District Judge.

**\*1** The plaintiff, incarcerated and *pro se,* has filed this action under 42 U.S.C. § 1983 against defendants Warden Scott Erfe, Commissioner Leo Arnone and Correctional Officer Yother, to challenge disciplinary actions taken against him as a result of finding cocaine in his inmate property. By Initial Review Order filed March 21, 2013, the Court dismissed all claims against defendants Erfe and Arnone and the claim for issuance of a prison disciplinary report. Defendant Yother, the only remaining defendant, now moves to dismiss the remaining claims for malicious prosecution and violation of Eighth Amendment rights. For the reasons that follow, defendant Yother's motion to dismiss is granted.

I. *Standard of Review*
When considering a motion to dismiss filed pursuant to Rule 12(b)(6), Fed.R.Civ.P., the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003). The court considers not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted so that he should be entitled to offer evidence to support his claim. *See York v. Association of Bar of City of New York,* 286 F.3d 122, 125 (2d Cir.), *cert. denied,* 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002).

In reviewing the complaint in response to a motion to dismiss, the court applies "a 'plausibility standard,' which is guided by two working principles." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). First, the requirement that the court accept as true the allegations in the complaint " 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Iqbal,* 556 U.S. at 678). Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. Determining whether the complaint states a plausible claim for relief is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679). Even under this standard, however, the court liberally construes a *pro se* complaint. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Boykin v. KeyCorp,* 521 F.3d 202, 213–14, 216 (2d Cir.2008).

II. *Facts*
The incident underlying the complaint took place at the Corrigan–Radgowski Correctional Institution. On May 9, 2012, defendant Yother stated that he found cocaine hidden in a sock in the plaintiff's property. The plaintiff received prison disciplinary charges as well as outside state charges for possession of narcotics. The state charges were dismissed on December 12, 2012. Defendant Yother was discharged from state employment about this time.

III. *Discussion*

**\*2** Defendant Yother moves to dismiss the remaining claims in the amended complaint on the ground that the plaintiff fails to state a cognizable claim under section 1983. Defendant Yother also urges the Court to decline to exercise supplemental jurisdiction over the plaintiff's state law claim for malicious prosecution.

A. *Malicious Prosecution Claim*
The plaintiff contends that he was maliciously prosecuted in state court on charges of possession of narcotics. To assert a constitutional claim for malicious prosecution under section 1983, the plaintiff must demonstrate conduct that is tortious under state law and injuries that resulted from the deprivation of liberty guaranteed by the Fourth Amendment. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995). Within this circuit, the law is clear that "[a] plaintiff does not have a claim for false arrest or malicious prosecution under section 1983 if, at the time of his arrest and prosecution, he already is in custody on other charges, because there is no deprivation of liberty interests." *Arnold v. Geary,* No. 09 Civ. 7299(GWG), 2013 WL 4269388, at \*4 (S.D.N.Y. Aug.16, 2013) (internal quotation marks and citation omitted) (citing cases); *see also Leniart v. Bundy,* 2011 WL 4452186, at \*7 (D.Conn. Sept.26, 2011).

At the time of his arrest and prosecution, the plaintiff was incarcerated on other charges. He had been imprisoned since November 1997 and was serving a twenty-three year sentence for sale of hallucinogenic or narcotic substances.[1]                                    See http://www.ctinmateinfo.state.ct.us/detailssupv.asp? idinmtnum=259596 (last visited Apr. 8, 2015). Thus, the plaintiff cannot establish the required deprivation of liberty. The motion to dismiss is granted as to the section 1983 claim for malicious prosecution.

B. *Eighth Amendment Claim*
The Eighth Amendment proscribes "the unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S.

312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)(internal quotation marks and citation omitted). The proscription encompasses both "the treatment a prisoner receives in prison and the conditions of his confinement." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). To rise to the level of a constitutional injury, however, the alleged Eighth Amendment violation must be sufficiently serious. The prisoner must not be denied the "minimal civilized measure of life's necessities" and his conditions must be more than "restrictive [or] even harsh." *Farmer v. Brennan,* 511 U.S. 825, 833–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In addition, the prison official must have acted with a "sufficiently culpable state of mind"; negligence is not sufficient. *Id.* at 834.

The only claim against defendant Yother other than malicious prosecution or false arrest is a false accusation claim based on defendant Yother's statement that he found cocaine in the plaintiff's property. False accusations, however, are not cognizable under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."). An inmate's protection against false accusations lies in the procedural due process requirements afforded in disciplinary hearings or court proceedings. *See Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994) (fair hearing conforming to due process standards will cure constitutional violation otherwise resulting from false accusation). The plaintiff was afforded a trial in state court and was found not guilty of the charges. Thus, he was afforded due process.

**\*3** The plaintiff includes no other allegations suggesting that he was denied any of life's necessities, such as food, clothing, shelter or safety, as a result of defendant Yother's actions. The motion to dismiss is granted as to any Eighth Amendment claim.

C. *State Law Claims*
Defendant Yother asks the court to decline to take supplemental jurisdiction over the plaintiff's state law claim for malicious prosecution.

Supplemental jurisdiction is a matter of discretion. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 715–16, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). If the federal court has dismissed all federal claims, it should decline to

exercise jurisdiction over the supplemental state law claims. 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (collecting cases).

As all federal claims have been dismissed, defendant Yother's request that the court decline to exercise supplemental jurisdiction over any state law claims is granted.

IV. *Conclusion*

Defendant Yother's motion to dismiss [**Doc. # 17**] is **GRANTED.** The Clerk is directed to enter judgment in favor of the defendants and close this case.

**It is so ordered.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3581230

## Footnotes

1     The court may take judicial notice of prison records. *See Martinez v. New York State Dep't of Corrections,* No. 12 Civ. 1499(RWS), 2013 WL 5194054, at *2 n. 1 (S.D.N.Y. Sept.16, 2013).

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3704806
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Donna MILLER, et al., Plaintiff,
v.
ETHAN ALLEN GLOBAL, INC., Defendant.

Civil No. 3:10–CV–1701 (JCH).
|
Aug. 23, 2011.

**Attorneys and Law Firms**

William Sylvester Palmieri, Law Offices of William S. Palmieri, LLC, New Haven, CT, for Plaintiff.

Jennifer L. Schancupp, Joan C. Luu, Michael J. Soltis, Jackson Lewis LLP, Stamford, CT, for Defendant.

**RULING ON DEFENDANT'S MOTION TO DISMISS [Doc. No. 17]**

JANET C. HALL, District Judge.

**I. INTRODUCTION**

*1 On September 30, 2010, plaintiff Donna Miller filed a Complaint against defendant, Ethan Allen Global, Inc. ("Ethan Allen"), in Connecticut Superior Court alleging violation of the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U .S.C.A. § 2000e, and the Connecticut Fair Employment Practices Act, § 46a–58(a) et seq. ("CFEPA"). Miller further alleges negligent supervision, intentional infliction of emotional distress, and assault and battery. Miller removed the action from state court and invoked the jurisdiction of this court under 28 U.S.C. §§ 1331 and 1367.

Ethan Allen filed a Motion to Dismiss Miller's Complaint in its entirety. Mot. to Dismiss (Doc. No. 17). Ethan Allen argues that Miller failed to state a facially plausible claim upon which relief may be granted. See Mot. to Dismiss at 2. Miller subsequently filed an Objection to the Motion to Dismiss, and Ethan Allen then filed a reply memorandum.

For the reasons that follow, the court grants in part and denies in part Ethan Allen's Motion to Dismiss.

**II. STANDARD OF REVIEW**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by making allegations that, if true, would show he is entitled to relief. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief' "). The court takes the factual allegations of the complaint to be true, Hemi Group, LLC v. City of N. Y., 559 U.S. 1, ——– ——, 130 S.Ct. 983, 986–87, 175 L.Ed.2d 943 (2010), and from those allegations, draws all reasonable inferences in the plaintiff's favor, Fulton v. Goord, 591 F.3d 37, 43 (2d Cir.2009).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp., 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 556).

The plausibility standard does not impose an across-the-board, heightened fact pleading standard. Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir.2008.) The plausibility standard does not "require[ ] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8."

*LLC v. Doe* 3, 604 F.3d 110, 119 (2d Cir.2010); *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (holding that dismissal was inconsistent with the "liberal pleading standards set forth by Rule 8(a)(2)"). However, the plausibility standard does impose some burden to make factual allegations supporting a claim for relief. As the *Iqbal* court explained, it "does not require detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 129 S.Ct. at 1949 (citations and internal quotations omitted). Under the Second Circuit's gloss, the plausibility standard is "flexible," obliging the plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin,* 521 F.3d at 213 (citations omitted); *accord Arista Records,* 604 F.3d at 120.

## III. FACTUAL BACKGROUND[1]

**\*2** Miller was an employee of Ethan Allen from September 2006 until August 2009. Compl. at ¶ 4. During her employment, Miller held the position of Customer Service Representative before being promoted to Upholstery Supervisor on account of her excellent performance, evidenced by her receipt of eleven client services awards. *Id.* at ¶¶ 3, 8.

At the time Miller accepted her promotion, she was promised a raise and training for her new position; however, she never received either. *Id.* at ¶¶ 14–6. Milller's new position consisted of more responsibilities, and she was expected to make the department more efficient than it had been previously. *Id.* at ¶ 15. Ethan Allen had reduced the staff of Miller's new department by half at the time she accepted her new position. *Id.*

During the course of Miller's employment, Paula Mandeville functioned as her supervisor. *Id.* at ¶ 9. On July 31, 2009, Mandeville approached Miller's desk, pushed her shoulder, removed her hand from her telephone, and then proceeded to disconnect her telephone and forbid her from receiving work-related calls. *Id.* at ¶ 20. Ethan Allen did not address this incident. *Id.* at ¶ 21.

During the course of Miller's employment with Ethan Allen, Barbara Legendre was a fellow employee. *Id.* at ¶

17. At some point in time after Miller received her new position, Legendre approached Miller's desk, grabbed her by the neck and held on. *Id* . at ¶¶ 18. On a subsequent occasion, Legendre slammed papers on Miller's desk and proceeded to deride Miller and her colleagues. *Id.* Miller complained of one of the incidents to Mandeville who told her to tell Legendre to "fuck off." *Id.* at ¶ 19.

Miller asserts that, at some point in time, Ethan Allen commenced a campaign to get rid of her, and other similarly situated employees, because of their age, and succeeded in systematically getting rid of older aged employees. *Id.* at ¶¶ 11–3.

Ethan Allen conducted a performance review of Miller in her new position, comparing her to prior supervisors, which "revealed low results." *Id.* at ¶¶ 22–3. Ethan Allen then imposed certain conditions on Miller that were not imposed on employees similarly situated to her, and who had never complained about the work environment. *Id.* at ¶ 24. Ethan Allen threatened to fire Miller if she did not meet these conditions. *Id.* at ¶ 25. Miller then complained to Ethan Allen that the demands placed on her were unfair and not required of other similarly situated employees. However, Ethan Allen did not address these complaints. *Id.* at ¶ 26. Thereafter, Ethan Allen forced Miller to sign the performance review, which Miller signed after stating on the review that she was doing so under duress. *Id.* at ¶ 27.

At some later point in time, Ethan Allen demanded Miller prepare a letter of resignation. *Id.* at ¶ 28. Miller prepared the letter although she did not want to leave her employment. *Id.* at ¶¶ 28–30. After Miller submitted the resignation letter, Ethan Allen searched two boxes of her personal belongings and escorted her off the premises. *Id.* at ¶ 30.

**\*3** Subsequent to her resignation, Miller filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC"), and she received a Release of Jurisdiction and a Right to Sue, respectively. *Id.* at ¶ 35.

## IV. DISCUSSION

A. *Count Two: Claim for Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964*
Title VII of the Civil Rights Act of 1964 states: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a).

Ethan Allen contends that Miller's Complaint lacks sufficient factual allegations to support her gender discrimination claim. *See* Mot. to Dismiss at 9–14. Although Miller fails to specifically allege within Count Two her exact claims, in response to Ethan Allen's Motion to Dismiss Miller states that her Complaint includes a disparate treatment claim, a hostile work environment claim, and a claim of retaliation. The court will review the Complaint to determine the adequacy of each claimed cause of action.

1. Disparate Treatment Claim in Violation of Title VII
Analyzing whether Ethan Allen subjected Miller to disparate treatment must be done under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See O'Reilly v. Marina–Dodge, Inc.,* No. 102977CV, 2011 WL 1897489, at *1 (2d Cir. May 19, 2011.)* A plaintiff is first required to establish a prima facie case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 249–52 (1981). A prima facie case for disparate treatment is made out by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff performed her job adequately; (3) the plaintiff suffered an adverse employment action; and (4) that the adverse employment action occurred under conditions giving rise to an inference of discrimination. *Id.* at 1094. "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. *Stratton v. Dep't for the Aging for New York,* 132 F.3d 869, 878 (2d Cir.1997). Miller has sufficiently plead facts to satisfy the first three steps, but has failed to failed to satisfy the fourth step of the prima facie case.

Miller argues that the adverse employment actions she suffered include receiving an unfair employment review,

being requested to perform in her new position without necessary training or staff, being assaulted by two different employees on separate occasions, being threatened with termination, and ultimately being constructively discharged. *See* Objection to Mot. to Dismiss at 11. The Supreme Court pronounced that an adverse employment action must be "materially adverse," in that it would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. V. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms." *Id.* Second Circuit precedent, which has found prototypical examples of adverse employment actions to include termination; demotion via a reduced wage, salary or job title; a material loss of benefits; or significantly reduced responsibilities, appears entirely consistent with *Burlington. See Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006).

**\*4** In the instant case, the court finds only Miller's assault allegations and her constructive discharge claim to be adverse within the meaning of Second Circuit case law. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). A constructive discharge occurs when "the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (internal citations omitted). "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004). For constructive discharge claims based on discrimination or harassment, the conditions must be "harsh enough to justify diverting from the supposition that the underlying policies of Title VII 'will be best served if, whenever possible, unlawful discrimination is attacked within the context of the existing employment relationship.' " *Ternullo v. Reno,* 8 F.Supp.2d 186, 192 (N.D.N.Y.1998) (internal citations omitted).

Because the standard for constructive discharge requires an evaluation of how a reasonable employee would behave " 'in the employee's shoes," the issue should generally be left to the trier of fact.

*Reichhold Chemicals, Inc.,* 735 F.Supp. 121, 125 (S.D.N.Y.1990) (quoting *Pena,* 702 F.2d at 325). Even if certain factors, standing alone, are "legally insufficient to support constructive discharge," *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 90 (2d Cir.1996), the various conditions should not be treated as "separate and distinct rather than additive," since "a reasonable person encounters life's circumstances cumulatively and not individually." *Id.* On the other hand, the "reasonable person" standard is an objective standard that "does not depend on such traditionally triable issues as the subjective reaction of any particular employee to changed working conditions." *Halbrook,* 735 F.Supp. at 126.

In this case, the allegations are sufficient as a matter of law to establish constructive discharge. Miller's constructive discharge claim is based on her receipt of an unsatisfactory performance appraisal, non-receipt of promised training, increased demands upon her work, being told she would be fired if she did not meet certain job conditions, and two incidents of alleged physical assaults that were not addressed by Ethan Allen. *See* Compl. at ¶¶ 14–19, 22–25. Of these incidents, all but the two assaults do not legally suffice to sustain an inference that a reasonable person would have been "compelled" to resign. *See Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993) ("Nor is it sufficient [for a constructive discharge claim] that the employee feels that the quality of work had been unfairly criticized.... Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant."); *see also Nobler v. Beth Israel Medical Center,* 702 F.Supp. 1023, 1030 (S.D.N.Y.1988) ("Subjective feelings held by an employee as to the intolerable nature of his or her position are not sufficient to lead to a finding of constructive discharge.")

**\*5** On the other hand, Miller's allegations as to the two assaults she suffered are sufficient to plausibly establish a constructive discharge, and thus an adverse employment action. *See Pa. State Police v. Suders,* 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (holding that Title VII encompasses constructive discharge as a tangible employment action). Taking Miller's allegations as true, an assault is an intentional act that can make a work environment intolerable thus changing the terms and conditions of a plaintiff's employment. *See Petrosino,* 385 F.3d at 229 (stating that, if a plaintiff suing for constructive discharge cannot show specific intent, "he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective' ") (internal citations omitted).

While having concluded that Miller has alleged sufficient factual matter to plead an adverse employment action, she has failed to allege sufficient facts to support an inference of discrimination as required by the fourth step of a prima facie case. To show that the adverse actions Miller endured took place under conditions giving rise to an inference of discrimination, she must set forth allegations that plausibly support the conclusion that Ethan Allen "treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000). Miller must specifically show herself to be "similarly situated in all material respects" to the individuals with whom she compares herself. *Shumway v. United Parcel Serv. Inc.,* 118 F.3d 60, 64 (2d Cir.1997). The test for materiality asks whether Miller and the individuals against whom she compares herself were subjected to the same workplace standards and whether the conduct at issue was of comparable severity. *Graham,* 230 F.3d at 40 (citing *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir.1999)).

Nowhere in her Complaint does Miller allege to have been treated differently than male employees in the same position. For example, she does not claim to have been subject to disparaging remarks against women. *See Harris v. Forklift,* 510 U.S. 17, 22–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Plaintiff also fails to include any allegations of "gender stereotyping," or discrimination against an individual "who fail[s] or refuse[s] to comply with socially accepted gender roles" from which to plausibly infer gender discrimination. *Dawson v. Bumble & Bumble,* 398 F.3d 211, 218 (2d Cir.2005).[3] Miller's allegations are therefore insufficient from which to plausibly infer a rebuttable presumption of discrimination. Thus, Miller has failed to set forth a plausible claim for disparate treatment.

2. Hostile Work Environment Claim in Violation of Title VII

In order to allege a sex-based hostile work environment claim, Miller must include facts sufficient to make plausible the claim that Ethan Allen discriminated against Miller "because of [her] sex ." 42 U.S.C. § 2000e–2(a)(1). This requires the Miller to plausibly establish two elements in her allegations, the first relating to the workplace environment and the conditions of her employment, and the second relating to the basis on

Miller v. Ethan Allen Global, Inc., Not Reported in F.Supp.2d (2011)

which Ethan Allen may be held liable. *See* *Petrosino,* 385 F.3d at 221.)

**\*6** As to the first element, "[A] plaintiff must provide evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores,* Inc., 202 F.3d 560, 570 (2d Cir.2000) (internal citations and quotation marks omitted). A victim must also subjectively perceive the environment to be abusive. *See* *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003). Whether or not a work environment is hostile must be determined by the totality of the circumstances. *Id.* at 148. The Supreme Court and Second Circuit have identified the factors that courts are to consider in determining whether a hostile work environment exists:

> Among the factors to consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ... "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."

*Terry,* 336 F.3d at 148 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002)).

While "[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness ... even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002). Thus, in order for Miller to sufficiently allege a hostile work environment, she must show that a single incident was "extraordinarily severe," or that a series of events were "continuous and concerted" to have altered the conditions of her employment. *See id.*

As to the second element of a hostile work environment claim, Miller must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir.2000) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). Where an employee attributes the hostile work environment to a non-supervisory co-worker, she must show that the

employer knew, or reasonably should have known, about the harassment in order to impute liability. *See* *Petrosino,* 385 F.3d at 225. As for the actionable conduct of a supervisor, an employer is automatically liable if the harassment resulted in a tangible employment action to the employee. *See id.*

Miller's allegations relating to the two instances of assault she experienced at work are sufficient to plausibly impute liability to Ethan Allen. The assault perpetrated by her co-worker Legendre was reported to her supervisor Mandeville, who is an agent of Ethan Allen and in a capacity to receive this report on behalf of Ethan Allen. *See* Compl. at ¶¶ 17–19. Further, the alleged assault by Mandeville on Miller is automatically imputed on Ethan Allen because Mandeville was Miller's supervisor.

**\*7** There is limited precedent upon which to assess whether Miller's conditions of employment were altered on the basis of her allegations at the motion to dismiss stage. *See* *Mathirampuzha v. Potter,* 548 F.3d 70 (2d Cir.2008) (a postal employee having been charged, hit in his chest and shoulder, and shoved onto a railing by a co-worker, who then held on to him tightly for three to five minutes and poked his eye, did not state a claim for hostile work environment based on this one act of physical assault because the act was not so severe as to materially alter his working conditions); *cf.* *Howley,* 217 F.3d at 154 (a female firefighter having been the victim of one instance of verbal harassment that was directed at her in front of a large group of male co-workers stated enough for a hostile work environment claim because it was severe enough to possibly alter the terms of her employment). However, at this stage of the case, it is plausible that Miller can prove facts consistent with the two alleged incidents of physical assault that were severe enough to alter the terms and conditions of her employment.

However, relying on the same facts for her hostile work environment claim as those articulated for her disparate treatment claim, none of Miller's allegations plausibly suggest that the conduct complained of occurred because of her sex. *See, supra,* at 6–10. In order to sufficiently plead a hostile work environment, Miller must link the harassment to her claim of gender discrimination. *See* *Brown v. Henderson,* 257 F.3d 246, 252 ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment ... is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."). Thus, the court grants Ethan Allen's Motion to Dismiss as to any hostile work environment claim under Title VII or CEPA.

3. Unlawful Retaliation Claim in Violation of Title VII
and CFEPA

Miller claims that her complaints with regards to her treatment and the hostile work environment were motivating factors in unlawful retaliation against her, thus violating her rights under Title VII and CEPA. *See* Compl. ¶ 34. A prima facie case of retaliation under Title VII requires sufficient evidence to permit a rational trier of fact to find that: (1) Miller engaged in a protected activity; (2) Ethan Allen was aware of the stated activity; (3) Ethan Allen took a materially adverse action against Miller; and (4) a causal connection exists between the protected activity and the adverse action. *Kessler v. Westchester County Dep't of Soc. Servs. ., 461 F.3d 199, 205–6 (2d Cir.2006)*; *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir.2005)*; *Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir.2001)*. Miller's Complaint sets forth allegations to plausibly show that her assault complaint constitutes a protected activity, that Ethan Allen became, or should have become, aware of the activity, and that her constructive discharge is a materially adverse action.

**\*8** Turning to the fourth element, a plaintiff seeking redress under Title VII may satisfy the causation requirement either (1) directly, through evidence of retaliatory animus directed against Miller by Ethan Allen; or (2) indirectly, by showing that the protected activity in question was closely followed in time by the adverse action. *See Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir.2001)* ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir.2000)*. Furthermore, a prima facie case of retaliation under Title VII requires the employer to be aware of the protected activity. *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir.1998)*. "Implicit in [this] requirement ... is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.* Without awareness by a decision-maker, it will be hard to find any causal connection between the protected activity and the adverse action. *Id.*

Miller refers to Ethan Allen's retaliation in three parts of

her Complaint, see Compl. ¶ ¶ 19, 24, 32, 34. However, these allegations fail to set forth when or to whom she made her complaints, or the content of the complaints. Further, Miller does not provide the court with the timing of her constructive discharge. These allegations are insufficient to plausibly support the inference of a causal connection between Miller's complaint and her constructive discharge. Therefore, these allegations are insufficient to sustain a plausible claim for retaliation.

B. *Count One: Claim for Violation of the Connecticut Fair Employment Practices Act ("CFEPA")*

Assuming that Miller can replead facts to establish a violation of Title VII, thus making the case proper under federal jurisdiction, the court considers the adequacy of her CFEPA claim.

1. Violation of Section 46a–58(a)

Miller alleges that Ethan Allen's conduct violated the CFEPA, section 46a–58(a) of the Connecticut General Statutes. *See* Compl. at % 36. Ethan Allen moves to dismiss this claim to the extent that Miller relies on section 46a–58(a), arguing that this section does not encompass claims for discriminatory employment practices. *See* Mot. to Dismiss at 15–6.

Section 46a–58(a) generally prohibits discriminatory conduct in the context of employment. In *Comm'n on Human Rights v. Truelove and Maclean, Inc., 238 Conn. 337, 345–46, 680 A.2d 1261 (1996)*, the Connecticut Supreme Court addressed the issue of whether 46a–58(a) encompasses claims of discriminatory employment practices, and concluded that it does not. *Id. at 346, 680 A.2d 1261* ("[T]he specific, narrowly tailored cause of action embodied in, section 46a–60 supersedes the general cause of action embodied in section 46a58(a)."). Thus, Miller's employment discrimination claims, including disparate treatment, hostile work environment, and retaliation, are not encompassed by section 46a–58(a).

**\*9** The court therefore grants Ethan Allen's Motion to Dismiss with respect to Count One to the extent that Miller seeks to allege a cause of action pursuant to section 46a58(a).

Miller v. Ethan Allen Global, Inc., Not Reported in F.Supp.2d (2011)

2. Violation of Section 46a–60

Ethan Allen argues that all of Miller's CFEPA claims under section 46a–60, other than the constructive discharge claim, are time-barred according to section 46a–82. *See* Mot. to Dismiss at 14. Miller has failed to address this issue in her objection to the Motion to Dismiss.

The statute and case law are quite clear that, in order for a complaint with the CCHRO to be timely, it "must be filed within one hundred and eighty days after the alleged act of discrimination." Conn. Gen.Stat. § **46a**–**82**(f); *see also State v. Comm'n on Human Rights and Opportunities,* 211 Conn. 464, 471–73, 559 A.2d 1120 (1989) (employee cannot recover for employer's acts that occurred more than **180** days prior to filing). Miller's complaint with the CCHRO was filed on February 23, 2010, which consequently excludes any claims relating to acts sustained prior to August 27, 2009. *See* Mot. to **Dismiss**, Ex. A. Miller's Complaint is void of specific dates, other than the July 31, 2009 date marking the alleged assault on her by Mandeville, which is outside the one hundred and eighty day time limit. *See* Compl. at ¶ 20.

While "the 180 day time requirement for filing a discrimination petition pursuant to section 46a–82(e) is not jurisdictional, but rather, is subject to waiver and equitable tolling," *Williams v. Comm'n on Human Rights and Opportunities,* 257 Conn. 258, 264, 777 A.2d 645 (2001), neither waiver nor equitable tolling appears to apply in the instant case. Ethan Allen has not waived the defense. Further, Miller has not alleged any actions by Ethan Allen that might result in tolling of the statute of limitations.

The court thus finds that, absent a repleaded amended complaint containing temporal allegations to indicate otherwise, Miller's claims pursuant to the CFEPA, other than that for retaliation and constructive discharge, are time-barred.

C. *Count Five: Claim for Violation of the Age*
*Discrimination in Employment Act of 1967 ("ADEA")*
Miller claims that the alleged adverse employment actions she suffered violated the ADEA because Ethan Allen

acted on the basis of her age. *See* Compl. ¶¶ 32–4. Ethan Allen argues that Miller failed to allege facts demonstrating that any alleged actions were conducted on the basis of her age, thus failing to state a claim upon which relief can be granted. See Mot. to Dismiss at 16–17.

The ADEA prohibits employers from taking an adverse action against an employee "because of such individual's age." 29 U.S.C. § 623(a). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that the age was the 'reason' that the employer decided to act." *Gross v. Financial Servs., Inc.,* 557 U.S. 167, ——, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009). To survive a motion to dismiss, a plaintiff must meet the plausibility standard articulated by the Supreme Court in *Iqbal,* 129 S.Ct at 1949, in establishing a prima facie case. A prima facie case requires showing that: (1) a plaintiff was within the protected age group at the time of the discrimination; (2) a plaintiff was qualified for the position; (3) a plaintiff suffered an adverse employment action; and (4) said action occurred under circumstances giving rise to an inference of discrimination. *O'Reilly,* 2011 WL 1897489, at *1.

**\*10** The Second Circuit employs the burden shifting analysis specified in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to assess age discrimination claims. *See O'Reilly v. Marina–Dodge, Inc.,* No. 102977CV, 2011 WL 1897489, at *1 (2d Cir. May 19, 2011.) Under this three-step analysis, Miller must establish a prima facie case of discrimination; Ethan Allen then must articulate a legitimate nondiscriminatory reason for the action; and in turn the burden shifts back to Miller to prove by a preponderance of the evidence that age was the "but for" cause of Ethan Allen's conduct. *Id.*

Miller failed to plead any facts establishing an inference of discrimination to satisfy the fourth element of the prima facie case. The Complaint lacks any factual allegations of how Ethan Allen "systematically got rid of older employees," Compl. ¶ 13, subjected Miller to "an ongoing pattern of harassment, discrimination and disparate treatment *based upon her age,*" Compl. ¶ 5 (emphasis added), and "disparately and selectively set out to, and did, terminate or force to quit employees *based upon their age,*" Compl. ¶ 12. (emphasis added). Miller states that Mandeville is "significantly younger than the plaintiff," Compl. ¶ 10, but does not allege any further facts to allow for an inference of discrimination considering that Mandeville's position was not the same

as Miller's position, and Mandeville was her supervisor throughout her employment with Ethan Allen. *See* Compl. ¶ 9. Further, stating that she never received a raise she was promised, was required to work with inadequate resources, was never given promised training, was forced to resign, and was given "unfairly low performance reviews," do not alone give rise to an inference of discrimination based upon her age. *See* Compl. ¶ ¶ 14–6, 23, 28. Although Miller states that Ethan Allen "imposed further conditions upon [her] which it did not place upon others of her age, gender and who had not made complaints about the hostile and abusive work environment," Compl. % 24, she does not allege these conditions. In sum all of her age allegations are conclusory.

That Miller was a member of a protected class, was qualified for the position, and suffered an adverse employment action are inadequate factual allegations to make out a claim that rises above the speculative level. The court grants Ethan Allen's Motion to Dismiss as to Miller's ADEA claim.

### D. *Count Three: Claim for Negligent Supervision and Negligent Hiring*

Miller brought a claim against Ethan Allen for negligent supervision and negligent hiring, alleging that she informed Ethan Allen of the assault made on her by Legendre, but Ethan Allen failed to take any action. *See* Compl. ¶ ¶ 19, 36. Ethan Allen argues that Miller failed to state a claim upon which relief can be granted. *See* Mot. to Dismiss at 18.

Connecticut courts have recognized causes of action against an employer for negligence in hiring, or supervision of an employee, in the situation where the employee tortiously injures a third party. *See* 🔖 *Seguro v. Cummiskey,* 82 Conn.App. 186, 191–96, 844 A.2d 224 (2004). A claim of negligent employment, like all negligence claims, requires allegations of a duty to Miller, a breach by Ethan Allen of that duty, and that the breach caused damages to Miller. *Chylinski v. Bank of America,* 630 F.Supp.2d 218, 221 (D.Conn.2009).

#### 1. Negligent Hiring

**\*11** A negligent hiring claim "exists in any situation where a third party is injured by an employer's own

negligence in failing to select an employee fit or competent to perform the services of employment." *Maisano v. Congregation Or Shalom,* No. NHCV074027175S, 2009 WL 415696, at *6 (Conn.Super.Ct. Jan.26, 2009.) In order to state a claim for negligence, Miller cannot simply allege that Ethan Allen acted negligently. Rather, she must allege facts, which if proven, would support her claim. *See Fletcher v. City of New Haven Dept. of Police Serv.,* No. 10CV558(RNC), 2011 WL 1302247, at *3 (D.Conn. Mar.31, 2011) (motion to dismiss was granted where the plaintiff did not include in his complaint any facts regarding the identity of the person negligently hired, or of the person doing the hiring, facts describing why the employee was unfit for the position, facts showing the person doing the hiring was negligent, facts describing the time and manner that the negligently hired employee caused the harm, or facts showing a causal link between the harm suffered and the hiring decision).

Similarly to *Fletcher,* Miller has not alleged any facts identifying the individual responsible for the alleged negligent hiring. Miller alleges that both Legendre and Mendeville are responsible for causing her harm, but she does not identify what harm is attributable to each individual, nor does she identify why each individual was unfit for their respective positions. Miller fails to give facts regarding the date or time that the alleged harm took place. And finally, Miller has failed to allege any facts describing how the individual doing the hiring was negligent. The court grants Ethan Allen's Motion to Dismiss as to Miller's negligent hiring claim.

#### 2. Negligent Supervision

A negligent supervision claim requires a plaintiff to plead and prove that she suffered an injury "due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise." 🔖 *Abate v. Circuit–Wise, Inc.,* 130 F.Supp.2d 341, 344 (D.Conn.2001). In order to state a claim, a plaintiff must allege that a defendant knew or should have known of another employee's propensity to engage in the alleged tortious behavior. *Shanks v. Walker,* 116 F.Supp.2d 311, 314 (D.Conn.2000).

With regard to the conduct of Legendre, Miller alleges that she complained of the assault to Ethan Allen, which would put Ethan Allen on notice that Legendre was capable of engaging in such tortious conduct. *See* Compl. at ¶ 19. However, there are no facts from which to infer

that, at the time the tortious conduct was committed, Ethan Allen should have been or was aware of Legendre's propensity to act in such a manner. Miller also alleges that Mandeville assaulted Miller on July 31, 2009. Compl. at ¶ 20. However, on the facts alleged by Miller, a jury could not find that Ethan Allen knew or should have known that Mandeville had the propensity to assault or inflict emotional distress on people with whom she worked. Therefore, the court grants Ethan Allen's Motion to Dismiss as to Miller's negligent supervision claim.

E. *Count Four: Claim for Intentional Infliction of Emotional Distress (IIED)*
**\*12** A claim for Intentional Infliction of Emotional Distress ("IIED") may be brought for –21–conduct occurring during an ongoing employment relationship. *See Benton v. Simpson,* 78 Conn.App. 746, 756, 829 A.2d 68 (2003). In order to state a claim for IIED, a plaintiff must prove: (1) the actor inflicting the emotional harm intended to do so, or was, or should have been, aware that his conduct would result in such harm; (2) the conduct inflicting emotional harm was "extreme and outrageous;" (3) the conduct was the source of the emotional harm to the plaintiff; and (4) the emotional harm suffered was severe. *See Appleton v. Bd. of Ed.,* 254 Conn. 205, 210, 757 A.2d 1059 (2000).

As to whether conduct is extreme and outrageous, the Connecticut Supreme Court has noted:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member for the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Id.* at 210–11, 757 A.2d 1059. "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court

to determine." *Id.* at 210, 757 A.2d 1059. However, if reasonable minds could differ as to whether the conduct alleged was extreme and outrageous, the claim must be submitted to a jury. *Id.*

Ethan Allen asserts that Miller has failed to state a claim upon which relief can be granted because the facts as alleged do not constitute extreme and outrageous conduct. *See* Mot. to Dismiss at 21–24. Miller, however, maintains she has satisfied the standard for extreme and outrageous conduct, with more than a mere recitation of conclusory statements. *See* Objection to Mot. to Dismiss at 33.

This court has held that a "routine employment action, even if made with improper motivations, does not constitute extreme or outrageous behavior." *Adams,* No. Civ. 3–03CV–0477(JCH), 2004 WL 1091728, at \* 4 (D.Conn. May 14, 2004); *see also Javier v. Engelhard Corp.,* 2001 U.S. DIST. LEXIS 17341, at \*14, 2001 WL 1268619 (D.Conn.2001); *Parsons v. United Techs. Corp.,* 243 Conn. 66, 88, 700 A.2d 655 (1997). Connecticut courts have also held that "insults, verbal taunts, threats, indignities, annoyances, petty oppressions, or conduct that displays bad manners or results in hurt feelings, do not support a claim for intentional infliction of emotional distress ." *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 195 (D.Conn.2000); *cf. Perodeau v. City of Hartford,* 259 Conn. 729, 757, 792 A.2d 752 (2002) (in rejecting claim for negligent infliction of emotional distress, observing that individuals in the workplace should expect to be subject to "workplace gossip, rivalry, personality conflicts and the like"). Further, individuals in the workplace should expect to experience some level of emotional distress. *Id.* Thus, most of Miller's allegations fail to raise a plausible basis for a claim of IIED.

**\*13** However, persons in the workplace may not intentionally engage in "extreme and outrageous" conduct that inflicts severe emotional harm on co-workers. *See Benton,* 78 Conn.App. at 753–57, 829 A.2d 68. A court in this district has found that a claim for intentional infliction of emotional distress survives where there is an allegation of physical assault or battery. *See Javier v. Deringer–Hey, Inc.,* 578 F.Supp.2d 368, 374 (D.Conn.2008) (Bryant, J.) (stating that an employee alleging he was verbally and physically assaulted by a co-worker could prove facts consistent with these allegations that would be extreme and outrageous). The Connecticut Appellate Court has held that two female employees stated a claim for IIED based on a series of alleged incidents involving their male manager physically banging on objects that caused them to suffer emotional

distress. *Benton,* 78 Conn.App. at 758, 829 A.2d 68.

Miller's emotional distress claim arises out of the same facts as her previous claims, that is, she alleges that she was physically assaulted by Legendre who "grabbed the plaintiff's neck with great force, and held on" and also "slammed papers on the plaintiff's desk." *See* Compl. ¶ 18. Furthermore, Miller alleges that Mandeville "pushed her shoulder and removed her hand from the phone ." *See* Compl. ¶ 20. If Miller can prove facts consistent with these allegations, such proof could be found by a jury to be extreme and outrageous conduct. At this stage, therefore, the court concludes that Miller has stated a claim for IIED with regard to her assault allegations. *See* Compl. ¶¶ 17–18, 20. The court denies Ethan Allen's Motion to Dismiss Miller's IIED claim in that respect.

### F. Count Six: Claim for Assault and Battery
Ethan Allen argues that Miller's assault and battery claim is insufficiently plead, and is furthermore preempted by the Workers' Compensation Act ("WCA"). *See* Mot. to Dismiss at 25. With certain exceptions, the WCA is the exclusive remedy for personal injuries arising out of and in the course of the injured party's employment. *See* Conn. Gen.Stat. § 31–284(a). The WCA covers only claims that: (1) arise out of the plaintiff's employment and (2) occur "in the course of the employment within the meaning of [Conn. Gen.Stat.] § 31–275(1)." *Herman v. Sherwood Indus., Inc.,* 244 Conn. 502, 505, 710 A.2d 1338 (1998). "The former requirement relates to the origin and cause of the accident, while the latter requirement relates to the time, place and circumstances of the accident." *Id.*

The Connecticut Supreme Court has recognized an exception to the WCA exclusivity provision for intentional torts committed by individuals "of such rank in the corporation that [they] may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity." *Jett v. Dunlap,* 179 Conn. 215, 218, 425 A.2d 1263 (1979); *Suarez v. Dickmont Plastics Corp.,* 242 Conn. 255, 274, 698 A.2d 838 (1997). In articulating this exception, the Supreme Court noted that an employee should not be treated as the alter ego of a corporation where she or he is merely a supervisor or foreman. *See* Jett, 179 Conn. at 219, 425 A.2d 1263. Unless the defendant employer directed or authorized the assault, "the employer has a right to view the incident as an injury arising out of and in the course of

employment." *Id.* at 218, 425 A.2d 1263.

**\*14** Miller has failed to allege anywhere in the Complaint that Ethan Allen "directed" or "authorized" any assault against her by Legendre or Mandeville, or that either individual can be deemed Ethan Allen's alter ego. Consequently, Miller's claim for any physical assault and battery is preempted by the WCA.

However, the Connecticut legislature amended the WCA in 1993 to exclude from the definition of "personal injury" purely psychological injuries, *i.e.,* a "mental or emotional impairment, unless such impairment arises from a physical injury or occupational disease." Conn. Gen.Stat. § 31–275(16)(B)(ii). Thus, the WCA does not preempt actions to recover for emotional distress-type claims. *See* Perodeau, 259 Conn. at 747, 792 A.2d 752 (holding that WCA did not bar common law tort claim of negligent infliction of emotional distress). Miller's emotional distress claim arising out of the assault and battery alleged in her complaint is not preempted by the WCA. See Compl. ¶¶ 17–20.

Therefore the court grants Ethan Allen's Motion to Dismiss Miller's claim for assault and battery as to any claim for physical injury and denies it as to any claim for emotional distress.

### IV. CONCLUSION
For the reasons discussed above, the court **grants in part and denies in part** Ethan Allen's Motion to Dismiss [**Doc. No. 17**] as follows: the Motion to Dismiss is granted as Counts One, Two, Three, Five, and Six (in part); the Motion to Dismiss is denied as to Count Four and Count Six (in part). Plaintiff may move within **21 days** for leave to amend her Complaint to replead, if she has a factual and legal basis to do so. A proposed amended complaint must be attached to any motion for leave to replead.

As to Count Four and Count Six (in part), the court denies the Motion to Dismiss on substantive grounds. However, if the plaintiff does not move for leave to amend her Complaint, then the state claims will be remanded to state court, in keeping with Second Circuit precedent. *See* Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir.2003) (where federal claims are "dismissed at a relatively early stage," the court should generally not exercise supplemental jurisdiction over remaining state law claims).

Not Reported in F.Supp.2d, 2011 WL 3704806

**SO ORDERED.**

**All Citations**

**Footnotes**

[1]    Taking the factual allegations in the Complaint as true, and drawing all reasonable inferences in favor of the plaintiff, the court assumes the following facts for the purposes of the Motion to Dismiss.

[2]    Such a claim would require Miller to allege that she failed to conform "(1) through behavior or (2) through appearance" to female stereotypes.   *Dawson,* 398 F.3d at 218.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 908155
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Darrell MORRIS, Plaintiff,
v.
YALE UNIVERSITY SCHOOL OF MEDICINE,
Defendant.

No. 05CV848 (JBA).
|
April 4, 2006.

**Attorneys and Law Firms**

Dawne Westbrook, Middletown, CT, for Plaintiff.

Patrick M. Noonan, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, for Defendant.

RULING ON DEFENDANT'S MOTION TO DISMISS
[DOC. # 20]

ARTERTON, J.

**\*1** Plaintiff, an African American male and former medical student at the Yale University School of Medicine ("Yale" or "the School"), brings this action against Yale in connection with his dismissal from the School, asserting a claim under the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 (Count I), and common law claims for breach of contract, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and promissory estoppel (Counts II–V). *See* Amended Complaint [Doc. # 19]. Defendant moves to dismiss Counts II–V pursuant to Fed.R.Civ.P. 12(b)(1) and 28 U.S.C. § 1367 for lack of jurisdiction, and pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief can be granted, arguing that "Connecticut permits a student to challenge his dismissal from an educational program only in very limited circumstances." *See* Def. Motion [Doc. # 20]; Def. Mem. [Doc. # 21] at 19. For the reasons that follow, defendant's Motion will

be denied.

**I. FACTUAL BACKGROUND**
The Court accepts as true the following facts as alleged in plaintiff's Amended Complaint [Doc. # 19]. Plaintiff is an African American male who matriculated at the School as a medical student in 2000. At the time of plaintiff's matriculation, the School maintained a student handbook containing policies, procedures and requirements, including that all students take and pass Step 1 of the United States Medical Licensing Examination ("USMLE") administered by the National Board of Medical Examiners ("NBME"). The student handbook provided that students are allowed three opportunities to pass the examination, and that they are expected to pass all phases of the USMLE within six years.

By 2003, plaintiff had successfully completed and passed the basic science courses required by the School, but in October 2003, after two unsuccessful attempts at passing Step 1 of the USMLE, the School informed plaintiff that he was being dismissed. Plaintiff appealed this decision, on the basis that the Dean of Student Affairs had not informed him that failure on his second attempt would result in dismissal, and prevailed. The plaintiff subsequently enrolled in two review courses to prepare for taking the examination a third time, and set a testing date with the NBME of June 30, 2004. Thereafter, plaintiff requested a 30 day extension. After learning that plaintiff did not take the examination on June 30, 2004, the School dismissed plaintiff for the second time.

In March 2005, the plaintiff took and passed Step 1 of the USMLE on his third attempt. Upon receiving his results, plaintiff notified the School in hopes that he could return, given that he had passed the examination within three attempts in accordance with the requirement in the student handbook; the School maintained plaintiff's dismissal. Plaintiff alleges that other similarly situated Caucasian students have been permitted to take the examination three times before dismissal and have not been dismissed for requesting extensions of time to take the examination.[1]

**II. RULE 12(B)(1)**
**\*2** Pursuant to 28 U.S.C. § 1367(a), a district court may in certain circumstances exercise supplemental

jurisdiction over a party or claim, even where the court otherwise lacks original federal jurisdiction over that party or claim. Section 1367(a) states, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). As the Second Circuit has observed, supplemental jurisdiction has its origins in the doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–29, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and provides that a district court has jurisdiction " 'over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." ' *Valencia v. Lee,* 316 F.3d 299, 304–05 (2d Cir.2003) (citing *Gibbs,* 383 U .S. at 725).

However, the district court may exercise "considerable discretion over what state law claims it will include within its supplemental jurisdiction in a particular case," *see Cushing v. Moore,* 970 F.2d 1103, 1110 (2d Cir.1992), and may decline to exercise its supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). "In exercising its discretion with respect to retaining supplemental jurisdiction, the district court must balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *See Correspondent Serv. Corp. v. First Equities Corp. of Fla.,* 338 F.3d 119, 126 (2d Cir.2003). Additionally, "[w]here a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of government, principles of federalism and comity may dictate that these questions be left for decision by the state courts." *Valencia,* 316 F.3d at 306; *see also Gibbs,* 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

**\*3** Notwithstanding defendant's contentions to the contrary, it appears that plaintiff's state law claims derive from the same "nucleus of operative fact" as plaintiff's Section 1981 claim, and thus that supplemental jurisdiction exists under 28 U.S.C. § 1367(a). All of plaintiff's claims arise out of his dismissal from the School's medical program, purportedly in a manner inconsistent with the policy in the student handbook providing each student 3 opportunities to pass the USMLE. Additionally, adjudication of each claim will involve substantially similar proof; indeed, the facts recited by defendant in its memorandum related to plaintiff's poor performance in medical school, and allegedly forming the basis for defendant's dismissal of plaintiff, are relevant to plaintiff's Section 1981 claim as well as his state law claims because in defending against plaintiff's Section 1981 claim that similarly situated Caucasian students were treated differently than plaintiff, defendant will presumably offer evidence in an attempt to distinguish plaintiff from other students and thus explain or justify its dismissal of plaintiff.[5] Thus, it can fairly be said that one would expect plaintiff to try all of his claims in the same proceeding.[3]

Having determined that supplemental jurisdiction exists, the Court finds it appropriate to exercise such jurisdiction, none of the Section 1367(c) factors providing compelling reasons to decline to exercise such jurisdiction in this case. First, defendant argues that supplemental jurisdiction should be declined because plaintiff's state law claims predominate over his federal claim. While

plaintiff asserts only one federal claim and several state law claims, a predominance determination requires "an interest-sensitive analysis rather than a 'numerical count' of state and federal claims." *See Luongo,* 1996 WL 44365, at *5 (citing Borough of West Mifflin v. Lancaster, 45 F.3d 780, 789 (3d Cir.1995)). The analysis therefore centers on, *inter alia,* the scope of proof for each claim and the scope of issues raised. *See id.;* Gibbs, 383 U.S. at 726. As discussed above, it appears that the proof involved in all of plaintiff's claims will be substantially similar; likewise the issues raised by plaintiff's claims all center around whether defendant justifiably dismissed plaintiff. Thus, other than the sheer numerical dominance of plaintiff's state law claims, it does not appear that plaintiff's state law claims "predominate" for supplemental jurisdiction purposes under Section 1367(c).

Further, plaintiff's state law claims do not raise sufficiently novel or complex issues of state law to justify declining to exercise supplemental jurisdiction. Indeed, the area of Connecticut law of student claims against educational institutions, while still developing, is neither as unsettled as defendant believes nor as unresolved as the areas of law discussed in the cases cited by defendant (*see infra* note 4). While defendant is correct that Connecticut courts have resisted a tort of "educational malpractice" in light of the principle of according educational institutions deference in their academic decisions, the Connecticut Supreme Court has nevertheless quite clearly recognized "at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services." *Gutpa v. New Britain General Hosp.,* 239 Conn. 574, 590–92, 687 A.2d 111 (Conn.1996).

**\*4** The first of these exceptions "would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* at 592–93, 687 A.2d 111; *see also, e.g., Faigel v. Fairfield Univ.,* 75 Conn.App. 37, 815 A.2d 140 (Conn.App.Ct.2003) (considering whether alleged contract constituted a "specific contractual promise" satisfying the second *Gutpa* exception). Indeed, this Court has previously adjudicated a similar breach of contract claim against Yale University, denying a motion to dismiss plaintiff's claim where plaintiff had "alleged specific promises by Yale which, if supported by the evidence, are capable of objective assessment by the

Court and therefore do not involve the Court in academic decision-making," thus satisfying the second *Gutpa* exception. *See Johnson v. Schmitz,* 119 F.Supp.2d 90, 92–97 (D.Conn.2000).[4]

Thus, because plaintiff's state law claims arise out of the same nucleus of operative fact as plaintiff's federal claim, and because the state law claims neither predominate in this action nor raise particularly novel or unsettled issues of Connecticut law, the Court shall exercise its supplemental jurisdiction over plaintiff's state law claims (Counts II–V), and defendant's motion to dismiss these claims for lack of jurisdiction is denied.[5]

III. RULE 12(B)(6)

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Allen v. Westpoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 44, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); Jahgory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Defendant argues that plaintiff's breach of contract claim (Count II) should be dismissed because "Connecticut permits a student to challenge his dismissal from an educational program only in very limited circumstances," none of which are present here. Def. Mem. at 19–20 (citing, *inter alia, Gutpa,* 239 Conn. 574, 687 A.2d 111). Defendant contends that the same policy considerations underlying the rule articulated by the Supreme Court in *Gutpa* compel dismissal of plaintiff's other state law claims (Counts III–V). *Id.* at 24–25, 687 A.2d 111 ("[W]hether the cause of action sounds in tort or contract, the Connecticut courts will not permit educational decisions to be reviewed in court except in the two limited situations contemplated by *Gutpa."* ).

**\*5** While plaintiff's state law claims do not fall within the first *Gutpa* exception, they do fall within the second exception because plaintiff has alleged that "[t]he provision of the student handbook granting a student 3 opportunities to pass the examination before dismissal is a distinct contractual promise independent of the defendant's obligation to offer a reasonable educational program ." Amended Complaint ¶ 34.[6] As this Court found in *Johnson, supra,* plaintiff has presented a claim that defendant "failed to deliver on its express ... contractual duties" to afford each student three opportunities to pass the USMLE before dismissal, and this "alleged promise[ ][is] based on Yale's own representations and procedures related to conduct peripheral or ancillary to the central educational process." *Johnson,* 119 F.Supp.2d at 96. Thus, like the plaintiff's claim in *Johnson* that Yale had breached its promise "to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures," plaintiff's claim here for breach of contract does "not implicate the jurisprudential considerations associated with the rejected tort of educational malpractice, as the Court or fact finder will not be required to evaluate subjective aspects of the quality of Yale's ... academic program or otherwise make judgments on purely academic issues, but instead will determine whether or

not Yale had a contractual duty ... and, if so, whether that duty was breached." *Id.*[7]

Because plaintiff's breach of contract claim as pleaded satisfies the second *Gutpa* exception, that claim will not be dismissed. Because, as noted above, defendant's argument as to plaintiff's other state law claim hinges upon failure to satisfy this exception, defendant's motion as to plaintiff's other state law claims will also be denied.

## IV. CONCLUSION
For the foregoing reasons, defendant's Motion to Dismiss [Doc. # 20] is DENIED.

IT IS SO ORDERED.

Dated at New Haven, Connecticut this 3rd day of April 2006.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 908155

### Footnotes

[1] In its memorandum in support of its Motion to Dismiss, defendant offers its own version of the relevant circumstances and events surrounding plaintiff's dismissal from the School, acknowledging that plaintiff's allegations are taken as true upon a motion to dismiss, but noting "it may be helpful for the Court to understand the type of evidence which may be offered when evaluating whether to exercise its pendent jurisdiction over the state law claims." Def. Mem. at 6 n. 2. Specifically, defendant alleges that plaintiff performed poorly in his classes, was put on probation, and was given specific conditions as to when he was required to take the USMLE. Defendant contends that "the reason for the plaintiff's dismissal was not simply his twice having failed the USMLE; rather, it was a pattern of failure and lack of effort, culminating in the plaintiff's refusal to take the exam by the agreed-upon date." *Id* . at 5–6, 687 A.2d 111.

[2] *See, e.g., Luongo v. Nationwide Mut. Ins. Co.,* 95civ3190 (MBM), 1996 WL 445365 (S.D.N.Y. Aug. 7, 1996) (denying Rule 12(b)(1) motion where state law claims "derive[d] from the same set of facts" as plaintiff's Title VII claim, were "based on essentially the same conduct," and where "[e]ven though the standards of [individual defendant's] liability [would] differ from the standards for [the employer's] liability, the claims still ... require[d] *many of the same witnesses, much of the same evidence, and determination of many of the same facts"* ) (emphasis added).

[3] Because plaintiff's state law claims arise out of the same conduct by defendant as does plaintiff's Section 1981 claim—namely plaintiff's dismissal from medical school allegedly in violation of the student handbook policy—and because proof of such claims will be substantially similar to that for his Section 1981 claim, this case can be

distinguished from the cases cited by defendant. *See, e.g.,* *James v. Sun Glass Hut of Cal., Inc.,* 799 F.Supp. 1083 (D.Col.1992) (granting motion to dismiss state law claims for lack of jurisdiction where plaintiff's state law claims for breach of contract, promissory estoppel, fraud, negligent misrepresentation, bad faith, and outrageous conduct "clearly predominate[d]" over plaintiff's age discrimination claim and would "substantially expand the scope of th[e] case" by requiring "elements of proof that [were] distinct and foreign" to her federal age discrimination claim); *Glasser v. Group W Satellite Commc'ns.,* 89civ664 (WWE), 1990 WL 128563 (D.Conn. July 11, 1990) (concluding that plaintiff's federal age discrimination claim did not arise out of the same operative facts as plaintiff's breach of employment contract claim and thus declining to exercise supplemental jurisdiction over the latter, distinguishing case from one where all of plaintiff's claims arose out of the same event); *Brokke v. Stauffer Chem. Co.,* 703 F.Supp. 215 (D.Conn.1988) (declining to exercise supplemental jurisdiction over plaintiff's state law claims—premised on an alleged oral agreement that he would not be terminated without cause—finding that "[t]he scope of issues" raised by plaintiff's state law claims was "significantly more expansive" than those raised by plaintiff's federal age discrimination and ERISA claims "given the length of the plaintiff's employment and the relatively brief period of time relevant to his federal claims" and where "plaintiff would be required to present a greater quantum of proof in order to establish a basis for recovery on his [state law] claims than would be necessary for his federal claims]"); *Koehler v. Chesebrough–Ponds, Inc.,* 705 F.Supp. 721 (D.Conn.1988) (dismissing plaintiff's state law claims for breach of contract, promissory estoppel and detrimental reliance, intentional infliction of emotional distress, and abusive discharge, noting, *inter alia,* the difference in the "issues presented and the proof required" between plaintiff's state law claims and plaintiff's federal age discrimination claim, finding that much of the state law claim evidence was irrelevant to plaintiff's federal claim and would "complicate and obscure the issues concerning such claim").

[4]  As noted above, this case can be distinguished from the cases cited by defendant in which truly novel or unsettled theories of recovery and/or issues of law were presented. *See Lopez v. Smiley,* 375 F.Supp.2d 19, 25–26 (D.Conn.2005) (declining to exercise supplemental jurisdiction where plaintiff wanted the court "to recognize an entire suite of novel Connecticut constitutional tort causes of actions ... in the absence of any guidance from (and in some instances, in express defiance of) Connecticut decisional law"); *DeLoreto v. Ment,* 944 F.Supp. 1023, 1035–36 (D.Conn.1996) (declining to exercise supplemental jurisdiction over plaintiff's intentional infliction of emotional distress claim, noting "the availability of an intentional infliction of emotional distress claim in the employment context has been a subject of recent dispute in Connecticut" and where the Connecticut Supreme Court had "not yet defined the threshold standard for 'extreme and outrageous' conduct in the employment context"); *Lajoie v. Conn. State Bd. of Labor Relations,* 871 F.Supp. 550, 554 (D.Conn.1994) (declining to exercise supplemental jurisdiction over defendant's state law counterclaims where such claims raised novel, complex and "hotly-disputed" state law issues involving "important questions concerning the policy of the state's attorney general" where the court was "unable to find any Connecticut state court decisions, or any Connecticut authority whatsoever, ... directly on point"); *Koehler v. Chesebrough–Ponds, Inc.,* 705 F.Supp. 721, 722–25 (D.Conn.1988) (declining to exercise supplemental jurisdiction over plaintiff's claim of intentional infliction of emotional distress, noting "the availability of such a claim in the employment context has been a subject of recent dispute in Connecticut"); *Kelsey v. Sheraton Corp.,* 662 F.Supp. 10, 12–13 (D.Conn.1986) (declining to exercise supplemental jurisdiction over plaintiff's claims of intentional infliction of emotional distress and "outrageous discharge" where the availability of the former claim in Connecticut was unresolved in state courts, and where the parties had not brought to the attention of the court any Connecticut case sustaining the latter cause of action).

[5]  Contrary to plaintiff's contention, no diversity jurisdiction exists over his state law claims as the Amended Complaint contains no allegation that plaintiff is a non-Connecticut resident and "[i]n an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced." *Universal Licensing Corp. v. Paola del Lungo S.P.A.,* 293 F.3d 579, 581 (2d Cir.2002).

[6]  This case can thus be distinguished from *Faigel,* where the Connecticut Appellate Court ruled that defendant's alleged vague promise to give plaintiff student "many credits" for her studies abroad was insufficiently specific to meet the second *Gutpa* exception of a "specific contractual promise." 76 Conn.App. at 42–43, 818 A.2d 799 ("We

have searched Connecticut case law to ascertain whether cases decided since *Gutpa* have moved away from the requirement that a claim of breach of contract by an educational institution must be based on the breach of a 'specific contractual promise.' We have found none that does so.").

[7]    Because plaintiff's claim is not about a promise to provide academic services (for example, the failure to provide a promised tutor, as was the case in *Ross v. Creighton Univ.,* 957 F.2d 410, 417 (7th Cir.1992)), his claim is even more distinct from the educational malpractice type claims that have been disallowed in Connecticut. *See also Johnson,* 119 F.Supp.2d at 96 (maintaining plaintiff's breach of contract claim not for breach of a promise to provide educational services, but for failure "to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures").

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 4902812
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Fairfield.

Stephen M. NELSON
v.
CITY OF BRIDGEPORT et al.

No. CV065001428S.
|
Sept. 27, 2012.

**Opinion**

GILARDI, J.T.R.

**\*1** The plaintiff, Stephen Nelson, commenced this action against the defendants, the city of Bridgeport and the Bridgeport board of education, on March 1, 2006, by service of summons and a five-count complaint sounding in discrimination, harassment, retaliation, intentional infliction of emotional distress and negligent infliction of emotional distress, respectively.

The complaint alleges the following facts. The plaintiff, an African American, has worked as a police officer in various roles within the Bridgeport school district since November 15, 1982. In October 2003, the plaintiff applied for a coaching position for a varsity girls basketball team at one of Bridgeport's high schools, in addition to the two school sports that he was currently coaching. He was denied the position in favor of a white male with no coaching experience.

The plaintiff informed Alan Wallack, Director of City Wide Athletics that he intended to challenge the hiring decision, and did so on October 31, 2003, by filing a complaint with Dr. Tolbert, Wallack's superior. Wallack then complained to the same superior that the plaintiff had verbally threatened him during a phone conversation regarding the coaching position.

The plaintiff attended a disciplinary hearing on November 10, 2003, as a result of the alleged threat, at which time the plaintiff was ordered to attend a second disciplinary hearing on November 17, 2003 regarding the alleged use of derogatory language against a white co-worker earlier that year. At the November 17 hearing, the plaintiff was ordered to attend a third hearing on November 21, 2003, regarding his alleged failure to respond to a reported break-in at a school on November 8, 2003. Aside from continued hearings on other grounds, the results or actions taken by the plaintiff's supervisors after the first two hearings are unknown. During the November 21st hearing, the plaintiff had to be excused because of illness related to asthma, which kept him from work until February 4, 2004. On February 6, 2004, the Executive Director of Human Resources, Carole Pannozzo, informed the plaintiff that he needed to be evaluated by a psychiatrist before returning to work.

The plaintiff did not get permission from the psychologist to return to work until April 6, 2004, and in the interim the plaintiff's two previously existing coaching positions were reassigned. Upon his return on April 6, the plaintiff was suspended for ninety days without pay as a result of his failure to respond to the November 8, 2003 dispatch call.

During the suspension, the plaintiff received two letters from his supervisor, Carmen Otero, ordering him to pay the charges for private phone calls made to and from the plaintiff's work issued cell phone. The plaintiff offered to pay less than the total bill presented to him, which his supervisor refused. The plaintiff was then ordered to attend a disciplinary hearing on July 20, 2004. The hearing lasted only ten seconds, and the result was the plaintiff's receipt of a letter of termination on August 12, 2004, which cited as reasons for termination the plaintiff's insubordination at disciplinary hearings and failure to follow written rules (his failure to respond to a dispatch call) and spoken orders (his failure to pay the phone charges).

**\*2** The plaintiff first challenged the termination through his union, which brought the case before a three-member arbitration panel. The arbitration panel conducted hearings nine times between January 2005 and October 2005, and presented its award in July 2006. The award found that the city did not have just cause to terminate the plaintiff, and commuted the termination down to a 180–day suspension, after which the plaintiff would be reinstated. Prior to the award, however, the plaintiff brought a complaint before the Commission on Human Rights and Opportunities (CHRO) alleging discriminatory practice. The plaintiff filed the complaint with the CHRO on February 7, 2005, which returned its review on August 30, 2005 dismissing the complaint as it found no

reasonable possibility that investigation into the allegations would find evidence of discriminatory practice. The plaintiff requested a release of jurisdiction from the CHRO on November 23, 2005, and was provided with the release on December 1, 2005. The plaintiff filed the present action in Superior Court on March 1, 2006.

The defendants filed an answer and special defense on November 20, 2006 and filed the present motion for summary judgment on May 10, 2012. The plaintiff filed an objection June 21, 2012.

"Practice Book § 17–49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Brooks v. Sweeney,* 299 Conn. 196, 210, 9 A.3d 347 (2010).

"[T]he 'genuine issue' aspect of summary judgment requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred ... A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." (Citation omitted; internal quotation marks omitted.) *Buell Industries, Inc. v. Greater New York Mutual Ins. Co.,* 259 Conn. 527, 556, 791 A.2d 489 (2002). "A genuine issue has been variously described as a triable, substantial or real issue of fact ..., and has been defined as one which can be maintained by substantial evidence." (Citation omitted; internal quotation marks omitted.) *United Oil Co. v. Urban Development Commission,* 158 Conn. 364, 378, 260 A.2d 596 (1969).

" 'Issue of fact' encompasses not only evidentiary facts in issue but also questions as to how the trier would characterize such evidentiary facts and what inferences and conclusions it would draw from them." *United Oil Co. v. Urban Development Commission, supra,* 158 Conn. 379. "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Internal quotation marks omitted.) *Maltas v. Maltas,* 298 Conn. 354, 365, 2 A.3d 902 (2010).

**\*3** "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue

of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substitutive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent ... When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue ... Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17–45]." (Internal quotation marks omitted.) *Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 10–11, 938 A.2d 576 (2008).

"Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Internal quotation marks omitted.) *Weiss v. Weiss,* 297 Conn. 446, 471, 998 A.2d 766 (2010). "Such assertions are insufficient regardless of whether they are contained in a complaint or a brief." *Romprey v. Safeco Ins. Co. of America,* 129 Conn.App. 481, 497, 21 A.3d 889 (2011); accord *Shukis v. Board of Education,* 122 Conn.App. 555, 565, 1 A.3d 137 (2010).

"Summary judgment may be granted where the claim is barred by the statute of limitations." *Doty v. Mucci,* 238 Conn. 800, 806, 679 A.2d 945 (1996). Summary judgment is appropriate on statute of limitation grounds when the "material facts concerning the statute of limitations [are] not in dispute ..." *Burns v. Hartford Hospital,* 192 Conn. 451, 452, 472 A.2d 1257 (1984).

The defendants argue (1) that summary judgment should be granted on any incidents which occurred prior to August 2004, because such occurrences are time barred by the statute of limitations on discrimination claims under General Statutes § 46a–82(e); (2) that summary

judgment should be granted as to count one because the plaintiff has failed to establish proper comparitors as required for a prima facie discrimination claim under General Statutes § 46a–60(a)(1) and because there is no genuine issue as to the defendants' legitimate, nondiscriminatory basis for the termination; (3) that summary judgment should be granted as to count two because the plaintiff has not provided any evidence to support a claim of harassment; (4) that summary judgment should be granted as to count three because the plaintiff has not provided any evidence to support a claim of retaliatory termination; (5) that summary judgment should be granted as to count four because the defendants' conduct could not be considered extreme and outrageous as required for claims of intentional infliction of emotional distress and because the plaintiff has not alleged that the defendants' conduct caused him sufficiently severe distress to satisfy the distress element of that claim; and (6) that summary judgment should be granted as to count five because the defendants' conduct could not be considered unreasonable as required for claims of negligent infliction of emotional distress.

**\*4** The plaintiff objects, arguing (1) that none of the alleged incidences of discrimination are time barred because they represent a continuous violation, which equitably tolls the statute of limitations proscribed by General Statutes § 46a–82(e); (2) that he has set forth sufficient evidence to establish a prima facie case of discrimination as to count one because he supplies sufficient comparitors and the defendants' legitimate reason for the termination was merely a pretext for impermissible discrimination; (3) that he has presented sufficient evidence to support a claim of harassment as alleged in count two; (4) that he has satisfied at least two of the elements of the retaliation claim of count three, which creates a genuine issue of material fact; (5) that the defendants' conduct could be considered extreme and outrageous and that the plaintiff's distress was severe enough to support the claim for intentional infliction of emotional distress alleged in count four; and (6) that the defendants' conduct was sufficiently unreasonable to support a claim for negligent infliction of emotional distress as alleged in count five.

The first argument before the court is to what extent General Statutes § 46a–82(e) acts as a statute of limitations for discrimination claims. General Statutes § 46a–82 governs the filing of a discrimination claim with the CHRO, and subsection (e) of that statute states in relevant part: "complaints filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination ..."

"[T]he failure to meet the 180 day time limit in § 46a–82(e) is [not] without consequence ... [I]f a time requirement is deemed to be mandatory, it must be complied with, absent such factors as consent, waiver or equitable tolling. Thus, a complaint that is not filed within the mandatory time requirement is dismissable unless waiver, consent, or some other compelling equitable tolling doctrine applies. We conclude that the time limit of § 46a–82(e) is mandatory, and thus the commission could properly dismiss the plaintiff's complaint if it was not filed within 180 days of the alleged act of discrimination." *Williams v. Commission on Human Rights & Opportunities,* 257 Conn. 258, 284, 777 A.2d 645 (2001).

Connecticut courts "review federal precedent concerning employment discrimination for guidance in enforcing [Connecticut's] own anti-discrimination statutes." (Internal quotation marks omitted.) *CHRO v. Savin Rock Condominium Assn., Inc.,* 273 Conn. 373, 386, 870 A.2d 457 (2005). Accordingly, Connecticut has recognized the doctrine of continuing violation for purposes of tolling the statute of limitations for claims falling under the Connecticut Fair Employment Practices Act. See *State v. Connecticut Commission on Human Rights & Opportunities,* 211 Conn. 464, 472, 559 A.2d 1120 (1989). Under the doctrine, all events alleged in a plaintiff's complaint may be actionable, regardless of timing, if the incidents relate to a de facto policy or practice arising from "specific and related" acts of discrimination that an employer continues to tolerate. *Id.,* 361.

**\*5** However, "discrete discriminatory acts are not actionable if time barred, even though they are related to alleged acts alleged in timely filed charges ... The existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." (Internal quotation marks omitted.) *United Technologies v. Commission on Human Rights and Opportunities,* 72 Conn.App. 212, 229–30, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002).

Even if incidences of alleged discrimination are time-barred, they can still be used in conjunction with non-limited events as circumstantial evidence to help prove a case of discrimination. *Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir.1981).

Nelson v. City of Bridgeport, Not Reported in A.3d (2012)

In their motion for summary judgment the defendants argue that, upon the plaintiff filing his complaint with the CHRO on February 7, 2005, he was barred under § 46a–82(e) from bringing discrimination claims arising from events which took place over 180 days prior. Such a limitation would bar any alleged event prior to August 12, 2004. This includes all of the events alleged in the plaintiff's complaint except his termination, which took place on August 12, 2004. The plaintiff responds that a pattern of discrimination began after the plaintiff complained about the decision to hire another applicant for the coaching position, the goal of which was to prevent the plaintiff from "moving up the ladder." Each subsequent event, the plaintiff argues, can be seen as a continuous violation relating back to that first discriminatory hiring decision because of the limited time the plaintiff was allowed to work afterward and the short time between his complaint and eventual termination. The plaintiff concludes therefore the 180–day time limitation should not apply to those events which would otherwise be barred.

The court must determine at the outset whether the defendant's complaint was brought within the 180 day limits of the individual allegations.[1] The parties do not debate that, absent the plaintiff's claim that the events constitute a continuous violation, all of the events, save the plaintiff's termination, would be barred by § 46a–82(e). Therefore, the court must examine the requirements of a claim of continuous violation to determine if the present allegations merit such an equitable remedy. The plaintiff suggests that the brief time between his first complaint and his termination, roughly ten months, is sufficient proof of the "de facto policy or practice" required for continuous violations. However, the plaintiff has not suggested how any of these events meet the statutory requirement of "specific and related." The original decision to reject the plaintiff's application for basketball coach was allegedly made by the department of citywide athletics, while the decision to keep the plaintiff from work for two and a half months until he could be examined by a psychiatrist was made by the department of human resources, and finally the disciplinary actions and eventual termination for the plaintiff's failure to respond to a work call and failure to pay for personal phone use were undertaken by the Executive Director of School Police and Security.

**\*6** The plaintiff has not argued that these departments acted in conjunction with each other, or that the actions undertaken by the individual departments were related or specific to each other in any way. The plaintiff also fails to suggest how the apparently discreet acts arise to a "de

facto policy or procedure" by his supervisors. The mere assertion of the temporal proximity of the disciplinary actions alone is insufficient to affirmatively demonstrate that his supervisors had a policy of discrimination against the plaintiff.

Therefore, the court does not construe the events outlined above as a continuous violation, and any claims based on events which took place prior to August 12, 2004 are to be considered distinct and separate events and thus barred from recovery under § 46a–82(e). The court should note that it may still use the events as circumstantial evidence of discrimination when considering the plaintiff's termination, which remains the only timely filed allegation.

Before the court considers whether the plaintiff has met the minimal burden of establishing a prima facie discrimination claim, the court must consider first whether it has subject matter jurisdiction over the claim given that the plaintiff's rehiring may make the claim moot. "The subject matter jurisdiction requirement may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) *Bateson v. Weddle,* 306 Conn. 1, 8–9 (2012).

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates this court's subject matter jurisdiction ... Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute ... (2) that the interests of the parties be adverse ... (3) that the matter in controversy be capable of being adjudicated by judicial power ... and (4) that the determination of the controversy will result in practical relief to the complainant ..." (Citations omitted; internal quotation marks omitted.) *Lyon v. Jones,* 291 Conn. 384, 392–93, 968 A.2d 416 (2009). "In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Id.,* 394.

The court must consider the issue of whether the plaintiff's claim of discrimination is moot sua sponte, as the complaint includes reinstatement in his former position as part of the relief the plaintiff is seeking. However, the defendants, although not raising the issue of mootness, report in their memorandum that as part of the arbitration award in the claim brought by the plaintiff's union, his termination was commuted to a 180–day

suspension after which he was reinstated, and has since remained employed by the defendants. The defendants have provided a copy of the arbitration award as evidence of this fact, and the plaintiff, although only admitting that he filed a complaint through his union, does not dispute his reinstatement. Therefore the court could not grant the reinstatement that the plaintiff prays for, which renders his discrimination claim moot, at least to some extent.

**\*7** Connecticut courts, when faced with this issue, have followed federal precedent and have also examined the statutory intent § 46a–60(a)(1) to determine that, where a plaintiff was later rehired into the same position from which he or she was initially terminated, his or her discrimination claims are not wholly moot because a jury could still award damages for the humiliation the plaintiff suffered. *Commission on Human Rights & Opportunities v. Board of Education,* 270 Conn. 665, 694, 855 A.2d 212 (2004), rev'd on other grounds, *Hummel v. Marten Transport, Ltd.,* 282 Conn. 477, 923 A.2d 657 (2007). This is in keeping with a policy of discouraging future discrimination inherent in Connecticut antidiscrimination laws. *Id.,* 695. See also *DeLoreto v. Ment,* 944 F.Supp. 1023 (D.Conn.1996) ("While [the plaintiff's] rehiring would obviously moot their demands for reinstatement ... it does not moot their claim for damages").

Accordingly, the portion of the prayer for relief in which the plaintiff seeks reinstatement is moot and is subsequently dismissed by the court, but the remainder of the prayer for relief, wherein the plaintiff seeks damages, is a valid claim over which this court has subject matter jurisdiction.

The court must next consider whether a genuine issue of material fact exists as to count one of the plaintiff's complaint, which alleges discrimination. The plaintiff claims racial discrimination under the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (Title VII) and General Statutes § 46a–60(a)(1). General Statutes § 46a–60 begins: "(a) It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, privileges or conditions of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical disability ..." The language of the Civil Rights Act is analogous and substantially

similar, and our Supreme Court has concluded that the two statutes were intended to be coextensive. See *Brittell v. Dept. of Correction,* 247 Conn. 148, 164, 717 A.2d 1254 (1998). "Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws." *Curry v. Allan S. Goodman, Inc.,* 286 Conn. 390, 407, 944 A.2d 925 (2008).

"When a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." *Craine v. Trinity College,* 259 Conn. 625, 636–37, 791 A.2d 518 (2002).

**\*8** "In order to establish a prima facie case [of discrimination], the complainant must prove that: (1) he was in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination." *Jackson v. Water Pollution Control Authority,* 278 Conn. 692, 705–06, 900 A.2d 498 (2006). "The establishment of a prima facie case creates a rebuttable presumption of discriminatory intent." *Lieberman v. Grant,* 630 F.2d 60, 60 (2d Cir.1980). "The burden of establishing a prima facie case is a burden of production, not a burden of proof, and therefore involves no credibility assessment by the fact finder ... The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor." (Citation omitted; internal quotation mark omitted.) *Craine v. Trinity College, supra,* 259 Conn. 638.

"To establish the [fourth] prong, a litigant may present circumstantial evidence from which an inference may be drawn that similarly situated individuals were treated more favorably than she was ... To be probative, this evidence must establish that the plaintiff and the individuals to whom she seeks to compare herself were similarly situated in all material respects ... An employee offered for comparison will be deemed to be similarly situated in all material respects if (1) ... the plaintiff and

those he maintains were similarly situated were subject to the same workplace standards and (2) ... the conduct for which the employer imposed discipline was of comparable seriousness." (Citations omitted; internal quotation marks omitted.) *Perez–Dickson v. Bridgeport,* 304 Conn. 483, 514, 43 A.3d 69 (2012).

Connecticut courts have remained "particularly cautions about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." (Internal quotation marks omitted.) *Schwapp v. Avon,* 118 F.3d 106, 110 (2d Cir.1997). Yet, our courts have reasoned that "the summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." (Internal quotation marks omitted.) *Chadha v. Charlotte Hungerford Hospital,* 97 Conn.App. 527, 539, 906 A.2d 14 (2006). Thus, in order to be entitled to an inference of discriminatory intent, "the party opposing summary judgment must present a factual predicate for his argument in order to raise a genuine issue of fact ." *Wadia Enterprises, Inc. v. Hirschfeld,* 224 Conn. 240, 250, 618 A.2d 506 (1992).

"[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Perez–Dickson v. Bridgeport, supra,* 304 Conn. 516.

**\*9** The defendants argue that the plaintiff has not supplied any appropriate comparitors to satisfy the elements of a prima facie claim of discrimination. As proof that his comparitor is insufficiently similarly situated, the defendants cite the plaintiff's deposition transcript, in which he stated that while the result of his failure to respond was a break-in at the school, he did not know the result, if any, for another officer who the plaintiff claims similarly failed to respond. The defendants next argue that the plaintiff's failure to respond to the November 8, 2003 call and his continued insubordination at disciplinary hearings constitute legitimate, nondiscriminatory reasons for his termination, in satisfaction of their burden of proof for the *McDonnell Douglas* test.

The plaintiff responds that he is entitled to an inference of discrimination because his comparitors are sufficient to make a prima facie case of discrimination. The plaintiff correctly states that the level of proof required to make out a prima facie claim of discrimination is minimal, and argues that he has met that minimal burden. To satisfy his prima facie claim, he offers three comparitors: the first is the Caucasian basketball coach with less coaching experience who was awarded the position over him in October 2003; the second is an officer who similarly failed to respond to a dispatch call the day before the plaintiff and was not subject to discipline; and the third was "at least one white officer" who failed to pay his unauthorized phone charges. The plaintiff then argues that the defendants have not satisfied the shifted burden of providing a legitimate, nondiscriminatory reason for failing to assign the plaintiff to the coaching position and disciplining him for his unpaid phone charges. He asserts that the reason the defendants gave for his termination is merely a pretext for their impermissible discrimination. The pretext masks the actual discrimination, the plaintiff suggests, which is rebutted by the same evidence he has given to state his prima facie case.

Whether the plaintiff has established a prima facie case of discrimination, and therefore, whether this court even needs to invoke the burden shifting analysis from *McDonnell Douglas,* is dependent upon whether the plaintiff has proffered sufficiently similar comparitors as examples of disparate treatment. The plaintiff clearly meets the other elements of a prima facie claim; he is an African–American; there is no argument that he was unqualified for his position (indeed, he had retained the position for over twenty years prior to his termination); and he was terminated (even if that termination was later rescinded, as discussed in Part IIA of this memorandum).

Although the plaintiff's untimely filing of his complaint with the CHRO precludes him from recovering for discrimination for any event save his termination (see Part I of this memorandum) the court may still consider the precluded events as circumstantial evidence of discrimination in order to satisfy the burden of proving a prima facie case. Therefore, each of the three comparitors the plaintiff suggests can be considered, even though the similar actions that are attributed to them are barred: the Caucasian basketball coach who was awarded the position over the plaintiff; the officer who went undisciplined for failing to answer to a dispatch call; and the white officer who had outstanding personal phone charges.[2]

**\*10** To establish the extent to which these comparitors are similarly situated to the plaintiff, however, no evidence has been offered by affidavit or document detailing the comparitors' circumstances. The only affidavit before the

court is the plaintiff's complaint to the CHRO, which does not mention the first comparitor, who was chosen as basketball coach over the plaintiff. As to the comparitor who failed to respond to the dispatch call, the affidavit does not name the officer, but states that he is a "highly favored Caucasian gentleman" who received the dispatch call, but told the operator he would not respond to the alarm. Finally, the affidavit is also silent as to any officers with outstanding phone charges. The only other evidence of comparitors before the court are the portions of transcript from depositions of the plaintiff taken in conjunction with this case on December 16, 2009 and with the union arbitration on an unknown date, which the court may consider at its discretion. *Barlow v. Palmer,* 96 Conn.App. 88, 92, 898 A.2d 835 (2006). Exercising the court's discretion, an examination of the transcripts reveal that the plaintiff knew of two officers with outstanding phone bills, but did not know if the officers had agreed to pay for the outstanding minutes. The submitted portions of the deposition transcript reveal nothing else about the first two comparitors.

Similarly situated comparitors must be subject to the same workplace standards and must have committed violations of the same level of seriousness. *Perez–Dickson v. Bridgeport, supra,* 304 Conn. 514. However, the court is incapable of determining either of these criteria based on the evidence the plaintiff has presented. As to the basketball coach, neither the affidavit to the CHRO nor the deposition transcripts mention him. The plaintiff relies on the allegations of his complaint and the arguments of his motion alone, but "[m]ere assertions of fact ... are insufficient to establish the existence of a material fact ..." *Weiss v. Weiss, supra,* 297 Conn. 471. Therefore, the plaintiff has produced no evidence to suggest the coach would be a proper comparitor.

As to the non-responsive officer, the plaintiff attested in his CHRO complaint that the officer in question received the call and told the dispatcher he would not respond. CHRO complaint, ¶ 48. In the deposition of December 16, 2009, the plaintiff attests to an Officer Vitka, who failed to respond to a call from Kennedy School, but the plaintiff admits that he does not know whether that failure to respond resulted in a break-in. Nelson Tr. December 16, 2009, p. 181. Construing these facts in the light most favorable to the plaintiff, the court cannot say that the officer was similarly situated. Since the surrounding pages of transcript were not submitted, it is only by inference that the court can assume that this is the officer the plaintiff intends to use as a comparitor, as the CHRO complaint did not mention him by name. Although the plaintiff does attest that Officer Vitka was not disciplined by Mr. Otero, there is no mention anywhere that he was

employed in the same capacity as the plaintiff, and the court must assume that Mr. Otero is, in fact, this officer's supervisor. The record is silent as to whether this officer and the plaintiff shared the same workplace standards, and thus fails the first prong of the test for similarly situated employees.

**\*11** Further, the requirements for a comparitor state that the employee must have committed conduct of comparable seriousness. The plaintiff's failure to respond to a dispatch call which in turn led to a school break-in seems more serious than an answer to a call informing the dispatcher that the officer would not respond, which is not followed by a break-in or vandalism. Without further details, the other officer cannot be considered a similarly situated employee for the purposes of comparison.

Finally, the testimony given at the plaintiff's deposition that other officers had outstanding phone bills is not sufficient to determine whether those officers were similarly insubordinate about repayment, as the defendants found the plaintiff to be. The reason for the plaintiff's disciplinary action and eventual termination included insubordination and failure to pay the phone bill, not the existence of the phone bill itself. The fact that other officers had outstanding bills cannot alone be considered conduct of comparable seriousness. The plaintiff attests that he does not know whether the officers were subject to discipline, or agreed to pay the bills. Therefore, any officers with outstanding phone bills cannot be considered sufficient comparitors.

Although the standard of proof for a prima facie case of discrimination is a minimal one, the plaintiff must still show that his comparitors are sufficiently similar to his own situation to be eligible for a discriminatory inference. Both parties have submitted as evidence the merit assessment review performed by the CHRO, in which it dismissed the plaintiff's complaint, reasoning in part: "[T]he Complainant failed to compare himself to otherwise similarly situated individuals to establish that he was subject to discriminatory treatment." After undertaking a separate review and examining the additional evidence offered in the light most favorable to the nonmoving party, the conclusion is the same. The plaintiff has not satisfied the requirement of showing sufficiently similar comparitors, and therefore cannot meet the elements of a prima facie case of discrimination. Thus the court need not consider whether the defendants have shown a legitimate, nondiscriminatory reason for the plaintiff's termination. See *Perez–Dickson v. Bridgeport, supra,* 304 Conn. 522. For the foregoing reasons, the court grants the defendants' motion for summary judgment as to count one of the plaintiff's complaint.

Next, the court must determine whether a genuine issue of material fact exists as to count two of the plaintiff's complaint, which alleges harassment under General Statutes 46a–60(a)(1). Although 46a–60(a)(1) does not govern civil suits for harassment, the courts have construed such allegations to properly fall under a claim for hostile work environment. *Kassner v.2d Ave. Delicatessen, Inc.,* 496 F.3d 229, 240 (2d Cir.2007) ("Although the complaint does not allege discrimination based on hostile work environment, the complaint alleges 'continued harassment' of [the plaintiff] and alleges facts from which we may infer pleading of hostile work environment claims ..."). To support a claim of hostile work environment, "the workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ..." (Internal quotation marks omitted.) *Brittell v. Department of Correction, supra,* 247 Conn. 166–67. "[T]he legislature intended to create a cause of action for hostile work environment claims by prohibiting employers from discriminating in terms, conditions or privileges of employment under § 46a–60(a)(1) ..." (Internal quotation marks omitted.) *Patino v. Birken Mfg. Co.,* 304 Conn 679, 691, 41 A.3d 1013 (2012).

**\*12** "To prove a workplace is actionably hostile under Title VII, a plaintiff must demonstrate that: (1) she subjectively perceived the environment to be abusive; (2) the conduct was so severe or pervasive that it created an objectively hostile work environment, meaning an environment that a reasonable person would find hostile or abusive; and (3) the conduct created an environment abusive to employees because of their race, gender, religion or national origin ...

"The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim. These include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with the plaintiff's work; ... whether it unreasonably interferes with the employee's work performance; and the effect on the employee's psychological well-being.

"To determine whether an environment may be considered sufficiently hostile or abusive to support a Title VII claim, courts must consider the totality of the circumstances ... The factors outlined above must be considered cumulatively so that the court can obtain a realistic view of the work environment ... This includes evaluating the quantity, frequency and severity of the discriminatory incidents ... In order to meet her burden, the plaintiff must show more than a few isolated incidents of racial enmity ... Instead, the plaintiff must establish that her workplace was permeated with instances of racially discriminatory conduct such as discriminatory intimidation, ridicule and insult." (Citations omitted; internal quotation marks omitted.) *Martinez v. State Library of Connecticut,* 817 F.Supp.2d 28, 40–41 (D.Conn.2011).

The defendants argue that the plaintiff neither alleges nor produces any evidence of any insults or ridicule that he suffered based on his race. The plaintiff argues in retort that the defendants blatantly disregarded the events that he alleged in his complaint, which indicate a continuous pattern of harassment. He explains that the multiple disciplinary actions and subsequent suspension and psychiatric evaluation interfered with his ability to work.

The plaintiff's two months unpaid leave while he waited for a psychiatric evaluation and his later unpaid suspension undoubtedly interfered with his work performance. The court must now determine whether such interference was unreasonable. The plaintiff could succeed on a claim of hostile work environment if he produced proof that showed that the aforementioned forced absences were the result of racial animus. However, the plaintiff has produced no evidence which tends to show that his suspensions were due to his race. In the plaintiff's deposition testimony, he admits that the head of human resources had never said, inferred, or repeated to anyone else any statement that could be a basis for suggesting she discriminated against the plaintiff based on his race, but that he thinks he "reminded her of a past nightmare or something." Nelson Tr., December 16, 2009, p. 190. This assertion of fact alone is insufficient to show that the plaintiff's suspension was the result of severe or pervasive hostility due to his race. The plaintiff never attested to the fact that he was subjected to physical threats or intimidation, offensive utterances, ridicule or insults based on his race. Therefore, the court does not conclude that the disciplinary actions unreasonably interfered with the plaintiff's work. No genuine issue of material fact exists as to whether the plaintiff suffered a hostile work environment and therefore, grants the defendants' motion for summary judgment as to count two.

**\*13** The court must next consider the motion for summary judgment as to count three, wherein the plaintiff alleges a claim of retaliation. Although the plaintiff attempts to

bring this claim under General Statutes § 46a–60(a)(1), which governs discrimination claims, a claim for retaliation is properly governed by § 46a–60(a)(4). That statute reads in relevant part: "It shall be discriminatory practice in violation of this section ... [f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding ..." *Id.* Connecticut has adopted the burden shifting analysis of *McDonnell Douglas* for examining retaliation claims, whereby the plaintiff must first show the elements of a prima facie case of retaliation, then the defendants have an opportunity to show a legitimate, nonretaliatory reason for the adverse action, which shifts the burden of proof back to the plaintiff to show that the defendants' reason is a mere pretext to retaliation. *Beizer v. Department of Labor,* 56 Conn.App. 347, 355–56, 742 A.2d 821, cert. denied, 252 Conn. 937, 747 A.2d 1 (2000).

"To establish a prima facie case of retaliation, a plaintiff must show four elements: (1) that he participated in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action against him; and (4) a causal connection between the protected activity and the adverse employment action." *Ayantola v. Board of Trustees of Technical Colleges,* 116 Conn.App. 531, 536, 976 A.2d 784 (2009). At issue here are elements two and four of the plaintiff's prima facie case, those of protected activity and causal connection. "Protected activity is action taken to protest or oppose statutorily prohibited discrimination ... Plaintiff need not show that the conduct she opposed actually violated anti-discrimination law, only that she possessed a good-faith, reasonable belief that it did." (Citation omitted; internal quotation marks.) *Smith v. AFSCME Council 4,* United States District Court, Docket No. 1735 (D.Conn. August 7, 2012).

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. A causal connection can be established indirectly by showing that the protected activity was followed close in time by adverse action, ... but the inquiry into whether temporal proximity establishes causation is factual in nature. There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship between protected activity and an allegedly retaliatory action." (Citation omitted; internal quotation marks omitted.) *Ayantola v. Board of Trustees of Technical Colleges, supra,* 116 Conn.App. 539.

**\*14** The defendants argue that they are entitled to judgment as a matter of law because the plaintiff has not satisfied the elements of a prima facie case. For this reason, they do not suggest a nonretaliatory reason for the plaintiff's termination. Instead, they claim that the plaintiff has not alleged that he engaged in any protected activity, and that he has not produced any evidence to show that his termination was causally connected to his race.

The plaintiff objects, asserting that he satisfied the element of protected activity by submitting a complaint to his supervisors after not receiving the coaching position. He argues that his eventual termination was indirectly causally connected to that first complaint as evidenced by the disciplinary actions occurring soon after that event. The plaintiff suggests that the ten months between his complaint and eventual termination is sufficiently close in time to show that the events were linked without evidence of a direct causal connection. He further argues that, to the extent that his complaint failed to mention discrimination, it should be considered in conjunction with his CHRO complaint to show a totality of the circumstances favoring his engagement in protected activity.

The plaintiff cites case law suggesting that four months between complaint and adverse action can be considered sufficiently close in time to constitute indirect evidence of retaliatory action, despite the time difference in his own case being more than double that. "Within the time period of one year, there is no firm rule. In some cases, time periods ranging from twelve days to eight months have been found to show the necessary temporal proximity ... In other cases, time periods ranging from two-and-a-half months to eight months have been deemed insufficient to show the necessary temporal proximity." *Zboray v. Wal–Mart Stores East, L.P.,* 650 F.Supp.2d 174, 182 (D.Conn.2009). Therefore, the time period between the plaintiff's complaint and his eventual termination could be considered indirect evidence of retaliatory action, provided that the plaintiff's complaint to his superiors satisfies the element of "protected activity."

Although the plaintiff alleges that he filed a complaint after being informed that he was not hired for the coach position, he has not produced a copy of that complaint, nor does he allege that the complaint alleged racial discrimination. "Unfair treatment ... is not actionable

under the civil rights laws and a complaint about it does not constitute protected activity. To be actionable, the unfair treatment must be due to one's membership in a protected class and the complaint must make that point sufficiently clear." (Internal quotation marks omitted.) *Sank v. City University of New York,* United States District Court, Docket No. 4975 (S.D.N.Y.2011). While the plaintiff correctly states that all of a plaintiff's activities must be considered in a broader context to determine whether it meets the standard of protected activity, the plaintiff errs when he suggests that his complaint to the CHRO should be considered in addition to his previous complaint to his supervisors to show protected activity. The CHRO complaint in itself could not be considered protected activity, of course, because the plaintiff filed it after his termination. See *Zboray v. Walmart Stores East, L.P., supra,* 650 F.Sup.2d 182. Furthermore, if the court considered the original internal complaint and the CHRO complaint together as evidence that the plaintiff was engaging in protected activity, it would allow the plaintiff to retroactively turn a non-discriminatory complaint into one under which a retaliation claim could be brought after he suffered the adverse action. Finally, the mere assertion that the plaintiff lodged a complaint, without proof of that complaint or its contents, cannot suffice to show the existence of a genuine issue of material fact. See *Weiss v. Weiss, supra,* 297 Conn. 471. Therefore, the plaintiff has not shown that he engaged in protected activity, and thus fails to show a prima facie case of retaliation. Therefore, the court grants the defendants' motion for summary judgment as to count three of the plaintiff's complaint.

**\*15** The court must next consider the motion for summary judgment as to count four, which alleges intentional infliction of emotional distress. "In order for the plaintiff to prevail in a case for liability under ... [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe ... Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society ... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment

against the actor, and lead him to exclaim, Outrageous! ... Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 442–43, 815 A.2d 119 (2003).

In the context of employment, the bar for what could be considered extreme and outrageous conduct is higher: "[I]t is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." *Perodeau v. Hartford,* 259 Conn. 729, 757, 792 A.2d 752 (2002). "Plaintiffs have ... been successful in establishing claims for intentional infliction of emotional distress where they have alleged that they were forced to suffer public ridicule ... subjected to a hostile work environment involving repeatedly racially motivated statements ... repeatedly taunted about a medical disability ... or terminated for exercising a statutorily protected right." (Citations omitted.) *Knight v. Southeastern Council on Alcoholism & Drug Dependency,* Superior Court, judicial district of New London, Docket No. 557182 (September 21, 2001, Hurley, J.T.R.).

"In assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the allegations of a complaint ... set forth behaviors that a reasonable fact finder could find to be extreme and outrageous." (Internal quotation marks omitted.) *Cassotto v. Aeschliman,* 130 Conn.App. 230, 235, 22 A.3d 697 (2011).

**\*16** The defendants first argue that no conduct on their behalf could reasonably be considered extreme and outrageous. They analogize the present case to *Appleton v. Board of Education,* 254 Conn. 205, 211, 757 A.2d 1059 (2000), where our Supreme Court held that it was not considered extreme and outrageous when conduct by an employer included sending a psychologist to the plaintiff's classroom after a colleague reported her acting strangely, making condescending comments in front of her colleagues, questioning her ability to read, calling her daughter to urge her to tell the plaintiff to take a few days off, and finally calling the police to escort her from the building. Presently, the defendants note, the only evidence that the plaintiff has presented to support a claim of extreme and outrageous conduct on behalf of the defendants is his deposition transcript, stating he was

embarrassed about being terminated. Nelson Tr., December 16, 2009, p. 228–29. The defendants also argue that the plaintiff cannot satisfy the element of severe distress because he has only alleged that he suffered humiliation, weight gain, smoking, and exacerbation of his pre-existing asthma. Nelson Tr., December 16, 2009, p. 229.

The plaintiff responds that the defendants' conduct must be considered extreme and outrageous, and analogizes the present case to *Craig v. Yale University School of Medicine*, United States District Court, Docket No. 1600 (D.Conn., May 4, 2011), wherein the plaintiff was dismissed from his residency program, and after he filed a grievance was reinstated, but was given exclusively high-risk patients, was isolated from other students, was frequently told to leave, and was given failing grades in classes for which he was not enrolled. Here, the plaintiff argues, he was interrogated repeatedly, humiliated, suspended, and required to be evaluated by a psychiatrist. The plaintiff further argues that his deposition testimony regarding his symptoms is sufficient to satisfy the element of severe distress, especially given the disciplinary hearing of November 23, 2003, which had to be terminated because of the plaintiff's severe asthma attack.

The plaintiff is correct when he argues that his symptoms could be considered sufficiently severe to satisfy that element of a claim of intentional infliction of emotional distress. Connecticut courts have previously found symptoms such as sleeplessness, headaches, inability to concentrate and post-traumatic stress to satisfy this requirement, see, e.g., *Witt v. Yale–New Haven Hospital,* 51 Conn .Sup. 155, 182, 977 A.2d 779 (2008) [46 Conn. L. Rptr. 486], and the plaintiff's complaints, while different, are of a similarly serious nature. However, the defendants are correct in arguing that their conduct could not be considered extreme and outrageous. Conduct including a supervisor conspiring to discipline, intimidate and harass an employee has been found insufficient to rise to the standard of extreme and outrageous. *Tracy v. New Milford Public Schools,* 101 Conn.App. 560, 567–70, 922 A.2d 280, cert. denied, 284 Conn. 910, 931 A.2d 935 (2007). Concerted effort between supervisors to force a plaintiff to resign which included intense supervision, public scrutiny and involuntary transfer has similarly failed to constitute extreme and outrageous conduct. *Dollard v. Board of Education,* 63 Conn.App. 550, 552–55, 777 A.2d 714 (2001). Finally, the act of terminating the plaintiff's employment, even if wrongfully motivated, is not considered outside the bounds of common decency. *Parsons v. United Technologies Corp.,* 243 Conn. 66, 89, 700 A.2d 655 (1997). Therefore, even if the defendants colluded amongst department supervisors to intimidate, harass and eventually terminate the plaintiff, it could not be considered extreme and outrageous conduct sufficient to satisfy a claim for intentional infliction of emotional distress. Construing the facts in the light most favorable to the nonmoving party, the defendants' conduct as alleged fails to constitute extreme and outrageous conduct. Therefore, the court grants the defendants' motion for summary judgment as to count four of the plaintiff's complaint.

**\*17** The final consideration before the court is the motion for summary judgment as to count five of the plaintiff's complaint, which alleges negligent infliction of emotional distress. To prevail on a claim of negligent infliction of emotional distress, a plaintiff must prove: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co., supra,* 262 Conn. 444.

"[I]n order to state ... a claim [for negligent infliction of emotional distress], the plaintiff has the burden of pleading that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm ... [N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process ... The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Citations omitted; internal quotation marks omitted.) *Parsons v. United Technologies Corp., supra,* 243 Conn. 88–89.

"[W]here the employee has been terminated, a finding of a wrongful termination is neither a necessary nor a sufficient predicate for a claim of negligent infliction of emotional distress. The dispositive issue ... [is] whether the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Perodeau v. Hartford, supra,* 259 Conn. 751.

The plaintiff must produce "evidence that the manner of the plaintiff's termination from employment was different ... from the usual termination of employment or that it was done in any way that would cause anything more than the normal upset that would result from any termination of employment." *Chieffalo v. Norden Systems, Inc.,* 49 Conn.App. 474, 480–81, 714 A.2d 1261 (1998).

The defendants argue that they are entitled to judgment as a matter of law because the plaintiff has neither made any allegation nor produced any evidence that he was treated in an unreasonable manner during his termination. They point out that the plaintiff was terminated in writing via mail, and include the termination letter as evidence that nothing unreasonable was contained therein. The plaintiff argues that by examining the totality of the circumstances, the termination was more distressing than usual because it precluded his response to the disciplinary charges that the defendants listed as the basis for the termination.

**\*18** Our Supreme Court has restricted claims for negligent infliction of emotional distress in the employment context to matters arising out of the termination of a plaintiff's employment. See *Parsons v. United Technologies Corp., supra,* 243 Conn. 88–89. The circumstances surrounding the plaintiff's termination are undoubtedly distressing to him, but no action was taken by the defendants during the termination which could be considered unreasonable, or which the defendants reasonably should have known may lead to illness or bodily harm in the plaintiff.

The letter of termination itself cites as reasons for termination his failure to respond to the break-in call, his insubordination at disciplinary hearings and his failure to follow written and oral instructions regarding his work cell phone, but it does not contain any additional

objectionable language. The defendants' liability cannot extend, as the plaintiff suggests, to the manner in which they executed disciplinary hearings. "Our Supreme Court has considered the normal expectations of individuals in the context of an ongoing employment relationship. It is clear that such individuals reasonably should expect to be subject to routine employment related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like.

"Thus, it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." (Internal quotation mark omitted.) *Tracy v. New Milford Public Schools, supra,* 101 Conn.App. 572–73. Therefore, there is no genuine issue of material fact as to whether the defendants' conduct during the plaintiff's termination was unreasonable. The court grants the defendants' motion for summary judgment as to count five of the plaintiff's complaint.

**All Citations**

Not Reported in A.3d, 2012 WL 4902812

**Footnotes**

1       The court should first note that the statute of limitations governed by § 46a–82(e) applies only to the first three counts of the plaintiff's complaint, namely discrimination, harassment and retaliatory termination, over which General Statutes § 46a–100 gives CHRO jurisdiction, and not over counts four and five, namely intentional and negligent infliction of emotional distress, which fall under the jurisdiction of this court.

2       In addition to these comparitors, the plaintiff, in the affidavit submitted to the CHRO, draws comparisons between himself and a cafeteria manager caught exposing himself to minors and also a school officer accused of using racial slurs. At his deposition, he also compared himself to a Bridgeport police officer who engaged in an unauthorized police pursuit that resulted in property damage and a school custodian who had been stealing cleaning products. None of these individuals could be considered similarly situated comparitors because they answer to different work standards and have committed substantially different violations. Therefore, the court should only consider the three

**Nelson v. City of Bridgeport, Not Reported in A.3d (2012)**

comparitors that the plaintiff offers in his objection.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2019 WL 959680
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Rosemary REYES, et al., Plaintiffs,
v.
Officer Richard GALPIN, et al., Defendants.

Civil No. 3:18cv831 (JBA)
|
Signed 02/27/2019

**Attorneys and Law Firms**

Kevin Murray Smith, Norman A. Pattis, The Pattis Law Firm, LLC, New Haven, CT, for Plaintiffs.

David C. Yale, Elliot B. Spector, Hassett & George, P.C., Simsbury, CT, for Defendants.

**RULING ON DEFENDANTS' MOTION TO DISMISS**

Janet Bond Arterton, U.S.D.J.

**\*1** Rosemary Reyes, individually and in her capacity as executrix of the Estate of Daniel Reyes, brings suit against Defendants Officer Richard Galpin, Officer Keith Koval, Chief James Campbell, the Town of Thomaston, Connecticut, and the Thomaston Police Department for claims related to the death of her son, Daniel Reyes. Defendants move jointly to dismiss all counts of Plaintiff's complaint. For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part.

**I. Facts Alleged**

Plaintiff alleges that her son, Daniel Reyes, "was a young man with a well-documented history of serious, chronic mental-health issues." (Compl. [Doc. # 1] ¶ 10.) Mr. Reyes was "well-known to the Thomaston Police

Department, and had had numerous interactions with" that department. (*Id.*)

On the night of June 26, 2016, Mr. Reyes "called 911 at approximately 7 p.m. and reported that lives were in danger at ... the home he shared with his mother." (*Id.* ¶ 12.) "Following this call, Mr. Reyes gave his mother a kiss, told her he loved her, and exited the apartment. On his way out the door, he left a handwritten note on a table by the front door and picked up a black-handled kitchen knife." (*Id.*)

The 911 dispatcher then called back and spoke to Ms. Reyes, who reported "that there was no problem at the residence." (*Id.* ¶ 13.) Patrol officers were then dispatched to Plaintiff's address "to perform a safety check" (*Id.*)

Officer Keith Koval arrived first and "[h]aving observed the knife, ... remained in his cruiser and made contact with [Daniel] Reyes, who challenged Koval to exit his cruiser and draw his weapon. Recognizing the danger of the situation and hoping to deescalate it, Koval declined to exit his vehicle and instead asked Mr. Reyes what was going on. Mr. Reyes responded that he would not talk to Koval until he exited his cruiser and drew his weapon. Koval responded by backing his cruiser up in order to create distance between himself and Reyes." (*Id.* ¶ 14.)

Officer Richard Galpin arrived on the scene "[w]hile Koval was in the process of deescalating the situation with Mr. Reyes." (*Id.* ¶ 15.) "Galpin exited his cruiser, and then locked it with a key fob that he tucked into his belt. He then heard Officer Koval report over his radio that Reyes was armed with a knife. Galpin saw the knife in Mr. Reyes's right hand and drew his firearm while commanding Reyes to stop and put the knife down." (*Id.*) Officer Galpin attempted to retreat into his police cruiser, but he was "unable to open the doors he had locked because the key fob was tucked into his belt." (*Id.* ¶ 16.) Officer Galpin again commanded Mr. Reyes to "stop and drop the knife, but Reyes appeared not to comply and told [Officer Galpin] to shoot him." (*Id.*) Officer Galpin "circled" his vehicle and "retreat[ed] to the front passenger side while Reyes continued to follow him." (*Id.*) Then, "[w]hile standing at the front passenger door" of his police vehicle, "Galpin fired a single shot from his .45 caliber handgun and felled Reyes where he stood near the rear passenger side of the vehicle. Mr. Reyes died shortly after being shot." (*Id.*)

**\*2** Plaintiff Ms. Reyes was "inside her home while her son was slain" and was "helpless either to stop the shooting or to assist her son as he lay dying." (*Id.* ¶ 17.)

Plaintiff was "unable to say goodbye or that she loved him before [her son's] death." (*Id.*)

## II. Discussion

Count One of the Complaint claims that the officers used unreasonable force in killing Mr. Reyes, in violation of the Fourth Amendment and 42 U.S.C. 1983. (Compl. ¶¶ 18-26.) Count Two brings claims for failure to adequately train officers regarding the use of deadly force against individuals suspected of suffering from mental illness. (*Id.* ¶¶ 27-32.) Count Three brings claims under the Americans with Disabilities Act for failure to train regarding "how to make reasonable accommodations for persons suffering, or perceived to be suffering from, mental illness or disabilities when these persons are either arrested, taken into custody, or detained...." (*Id.* ¶ 35.) Count Four alleges wrongful death under Connecticut state law. (*Id.* ¶¶ 39-40.) Count Six[1] brings claims for negligent infliction of emotional distress upon Ms. Reyes. (*Id.* ¶¶ 41-46.)

Defendants move to dismiss all claims of Plaintiff's complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Defendants argue that they are entitled to qualified immunity on all counts alleged in the Complaint and that the actions of the officers were objectively reasonable, entitling them to dismissal of Plaintiff's Complaint in its entirety. (Defs.' Mem. Supp. Mot. to Dismiss [Doc. # 22-1] at 5, 7.)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

### A. Claims against Officers Galpin and Koval

The doctrine of qualified immunity shields state officials

from civil suit and liability for civil damages in actions brought under 42 U.S.C. § 1983, so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, in order for a plaintiff to overcome qualified immunity: (1) the facts alleged must make out a violation of a statutory or constitutional right, and (2) that right must have been "clearly established" at the time of the defendants' alleged misconduct. *See id.*[2] The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012) ). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amove v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) ).

**\*3** A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). While there need not be a case directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court explained,

> We have repeatedly told courts ... not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted). "Although [courts] generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing

the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018) (citations omitted).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial.' ... Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery.' " *Pearson v. Callahan*, 555 U.S. 223, 231-232 (2009) (internal quotations omitted). The Supreme Court has therefore "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

However, the Second Circuit has noted that "motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road." *Garcia v. Does*, 779 F.3d 84, 96–97 (2d Cir. 2015). "Not only must the facts supporting the defense appear on the face of the complaint, but ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations omitted). "As a result of this standard of review, a defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful." *Barnett v. Mount Vernon Police Dept.*, 523 Fed. App'x 811, 813 (2d Cir. 2013) (internal quotation omitted).

Defendants argue that they are entitled to dismissal of the Complaint because the officers did not violate any clearly established law or constitutional protections and are therefore protected by qualified immunity. (Defs.' Mem. at 7.)

### i. Count One: Excessive Force

When an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

**\*4** The "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 308-309). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Id.* (quoting *Mullenix*, 136 S. Ct. at 312).

The sole issue at this stage therefore becomes whether Defendants can demonstrate, based only on the Complaint, that the officers did not violate any clearly established constitutional protections, even while drawing all reasonable inferences from the facts alleged in favor of Plaintiff. *See Graham*, 490 U.S. at 396-397. Defendants argue that several cases "pertaining to emotionally disturbed persons with knives" indicate that the officers' behavior was clearly within the scope of a reasonable officers' conduct, and therefore that their behavior did not violate any clearly established rights.

Defendants point especially to *Kisela*, in which the Supreme Court held that an officer was entitled to qualified immunity because his use of force did not violate clearly established law. In that case, officers responded to a report of a "woman engaging in erratic behavior with a knife" and, upon seeing a woman (Hughes) matching that description "walk[ ] toward" another individual (Chadwick) and "stop[ ] no more than six feet from her," three officers present drew their guns. 138 S. Ct. at 1150. The officers told Hughes to drop the knife "at least twice." *Id.* "Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife." One officer subsequently shot Hughes four times. *Id.* Officers had been on the scene "but a few minutes, perhaps just a minute" at the time of the shooting. *Id.* Hughes survived and sued the officer who

shot her, claiming excessive use of force under the Fourth Amendment and § 1983.

The Supreme Court held in that case that it "need not, and does not, decide whether [the officer] violated the Fourth Amendment when he used deadly force against Hughes. For even assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on these facts Kisela was at least entitled to qualified immunity." 138 S. Ct. at 1152 (holding that "this is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment"). The Supreme Court found no case(s) which would have made clear that the shooting violated any clearly established right, observing that "[i]n fact, the most analogous [Ninth] Circuit precedent favors" the officer, not Hughes. *Id.*

Defendants emphasize the similarities between the facts of *Kisela* and the circumstances of Mr. Reyes' death, such as the short duration of the officers' presence on the scene, the necessity of a quick response, the movement of an armed person towards another, and the subject's refusal to drop the knife following repeated police commands. Defendants argue that the Supreme Court's opinion in *Kisela* demonstrates that their similar behavior in a similar situation is also "at least entitled to qualified immunity."

Plaintiff argues that "at this stage, the Plaintiffs have pleaded sufficient facts to establish a plausible claim that it was objectively unreasonable for Officer Galpin to kill Reyes." (Pl.'s Opp. at 6.) Plaintiff cites Officer Koval's decision to remain inside his police vehicle as evidence that Officer Galpin's choice to exit the vehicle and engage with Mr. Reyes was objectively unreasonable. (*Id.*) Contrary to Plaintiff's assertion, that the two officers adopted a different approach does not clearly establish that one approach represented a constitutional violation. *See* Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ("an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." (internal quotation omitted) ). Moreover, in focusing broadly on whether she established a "plausible claim that it was objectively unreasonable for Officer Galpin to kill Reyes," Plaintiff's argument misses the mark with regard to qualified immunity, failing to plead facts or cite any case which " 'squarely governs' the specific facts at issue," Kisela, 138 S. Ct. at 1153, and which could arguably clearly establish a right which Officer Galpin violated in shooting Mr. Reyes. In the absence of any "precedent involving similar facts" which

could "help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful," Officers Koval and Galpin are entitled to the protections of qualified immunity on Count One. *Id.* (quoting Mullenix, 136 S. Ct. at 312).

### ii. Counts Four: Wrongful Death and Six: Negligent Infliction of Emotional Distress

**\*5** In the absence of any federal claim against Defendants Koval and Galpin which survives Defendants' Motion to Dismiss, the Court must first determine whether to exercise supplemental jurisdiction over the state law claims against them in Counts Four and Six, which claim wrongful death and negligent infliction of emotional distress.

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy," 28 U.S.C. § 1367, i.e., that "derive from a common nucleus of operative fact," City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997) (internal quotation omitted). When only "state-law claims remain[ ] after resolution of the federal question, the District Court [has] discretion, consistent with Article III, to retain jurisdiction" over those still-pending state law claims." Osborn v. Haley, 549 U.S. 225, 245 (2007). See 28 U.S.C. § 1367(c)(3). "In general, where [all] federal claims are dismissed before trial, the state claims should be dismissed as well," Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998), but the "district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). In exercising that discretion, district courts "must weigh various factors, such as judicial economy, convenience, fairness, and comity." Wright v. Musanti, 887 F.3d 577, 582 n.2 (2d Cir. 2018).

In light of those factors, the Court declines to exercise supplemental jurisdiction over the state law claims against Defendants Koval and Galpin in Counts Four and Six. This case is still in early stages of litigation, so there has not yet been the type of "substantial expenditure in time,

Reyes v. Galpin, Slip Copy (2019)

effort, and money in preparing the dependent claims" which would weigh in favor of an exercise of supplemental jurisdiction. *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994). *See Estate of Devine v. Fusaro*, 676 Fed. App'x 61, 64 (2d Cir. 2017) (affirming "district court's decision to decline to exercise jurisdiction over" state law claims after finding officers entitled to qualified immunity on § 1983 excessive force claim and entering summary judgment in their favor on federal claims); *Chapman v. Crane Co.*, 694 Fed. App'x 825, 829 (2d Cir. 2017) (affirming district court's declining to exercise supplemental jurisdiction where, among other factors, "it was still an early stage of the proceedings and discovery was not complete; [and] no dispositive motions had been decided"). All claims against Defendants Koval and Galpin are therefore dismissed.

## B. Claims against Chief James Campbell, the Town of Thomaston, and the Thomaston Police Department

The Complaint's failure to train claim (Count Two) and ADA violation claim (Count Three) bring claims against Chief James Campbell, the Town of Thomaston, and the Thomaston Police Department (together, the "Municipal Defendants").

### i. Thomaston Police Department as defendant

Defendants argue that the "claims against the Thomaston Police Department should be dismissed because, under clearly established law, a police department is not a legal entity." (Defs.' Mem. at 3.) Defendants cite no authority for this argument, and in the absence of such, the Thomaston Police Department will not be dismissed on those grounds. *See Soltis v. Kotenski*, 63 F. Supp. 2d 187, 189 (D. Conn. 1999) ("the Court will comment briefly on defendants' claims that a police department cannot be liable under § 1983. This is not an accurate statement of the law. A municipality may be held liable, as may a municipality's police department, when plaintiff's harm was caused by a constitutional violation and where the municipality or police department as a subdivision thereof is responsible for that violation." (citing *Collins v. City of Harker Heights*, 503 U.S. 115

(1992) ) ). *See also Thompson v. Mexico Const, LLC*, 2007 WL 763899, at *1 (D. Conn. March 9, 2007) (reviewing and finding no binding authority which clearly holds that police departments are improper defendants in Connecticut).

### ii. Count Two: Failure to Train

**\*6** "In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978) ).

The Supreme Court has interpreted § 1983's causation requirement as inconsistent with the imposition of vicarious or *respondeat superior* liability on a municipality for the torts of its employees, *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) (citing *Monell*, 436 U.S. at 691–94), and thus "[t]he fifth element—the 'official policy' element—can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort,' " *Roe*, 542 F.3d at 36 (quoting *Monell*, 436 U.S. at 691). " 'In other words, a municipality may not be found liable simply because one of its employees committed a tort' " and "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Id.* at 36–37 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). The Supreme Court has explained that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train" because municipal liability depends upon a showing of policymakers' "deliberate indifference" to citizens' rights

rather than negligence. *Id.* Therefore, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," because "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360.

To survive Defendants' Motion to Dismiss, Plaintiff must have pled facts which, if true, would state a claim for the Municipal Defendants' liability for failure to train: first, that Mr. Reyes suffered a constitutional violation, and second, that the Municipal Defendants' "deliberate indifference" and failure to train "caused" that violation.

First, though Plaintiff has not plausibly pled facts or cited any cases which suggest that Officers Koval and Galpin violated any *clearly established* constitutional rights, the Complaint does contain sufficient factual allegations which, in combination with all favorable inferences to which Plaintiff is entitled at this stage, render a claim of Fourth Amendment violation facially plausible. Though that alone is insufficient to defeat the officers' claim of qualified immunity, it does allow Plaintiff's failure to train claim against the Municipal Defendants to proceed at this stage.

Second, Plaintiff here contends that, in the Thomaston Police Department, "[o]fficers were not trained to apprehend those suffering from a current mental illness, or those perceived as disabled, and those for whom officers had a record of psychiatric impairment." (Compl. ¶ 29.) The Complaint also alleges that the Thomaston Police Department "responds regularly to calls for individuals who, based upon initial reports to officers, are believed to be seriously disturbed, either as a result of illness or intoxication. The department fails, refuses, and neglects to keep a centralized database of those reported to it as suspected of being mentally ill." (*Id.* ¶ 30.) Plaintiff also alleges that Chief Campbell "did not provide training necessary for officers faced with the challenge of bringing such people safely" into their custody, despite being "on notice ... that a significant number of individuals arrested or otherwise detained by officers ... are either mentally ill or appear to be so." (*Id.* ¶ 31.) Nonetheless, the Complaint alleges, "the Chief refused, failed and neglected to provide training on how safely, and without precipitous use of deadly force, to defuse a tense situation and place an agitated person in custody." (*Id.*)

**\*7** These allegations, if true, suggest that policymakers arguably had actual or constructive notice of the need for such training and that a policymaker demonstrated deliberate indifference to that need, and therefore Plaintiff states a facially plausible claim for relief for failure to train sufficient for Count Three to survive the motion to dismiss stage. *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) (plaintiff not required to "identify a specific deficiency" in training "at the motion to dismiss stage" but must do so to survive a motion for summary judgment).

### iii. Count Three: ADA Violation

Plaintiff also argues that Defendants[3] violated Mr. Reyes' rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., by their failure to offer training "on how to make reasonable accommodations for persons suffering, or perceived to be suffering from, mental illness or disabilities when these persons are" taken into custody.[4]

To establish a violation of the ADA, Plaintiff must demonstrate (1) that Mr. Reyes was a "qualified individual" with a disability; (2) that the Defendants are subject to the ADA; and (3) that Mr. Reyes was denied the opportunity to participate in or benefit from the Defendants' services, programs, or activities, or was otherwise discriminated against by Defendants by reason of his disability. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014) (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) ).

Defendants do not appear to contest that Mr. Reyes was a "qualified individual" or that they are generally subject to the ADA. (*See generally* Defs.' Mem.)

Defendants argue instead that "officers making an arrest are not required to first determine whether their actions would comply with the ADA before protecting themselves and others," (Defs.' Mem. at 16) (citing *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000) ), and therefore that Mr. Reyes suffered no underlying ADA violation which would support an ADA failure to train claim. The *Hainze* court determined that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior

to the officer's securing the scene and ensuring that there is no threat to human life," reasoning that to "require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to" ensuring the safety of those present "would pose an unnecessary risk to innocents." *Hainze*, 207 F.3d at 801.

However, that approach of the Fifth Circuit Court of Appeals has been adopted neither by the Second Circuit Court of Appeals nor by district courts within this circuit who have considered whether the ADA applies to interactions between law enforcement and disabled individuals. In *Williams v. City of New York*, 121 F. Supp. 3d 354, 364-365 (S.D.N.Y.), that district court held that the ADA does govern "on-the-street encounters" between police and covered individuals, concluding that "the City's crabbed interpretation of Title II's coverage of police activity simply does not comport with the language of Title II and its implementing regulations, particularly in light of the remedial purpose of the statute and the weight of authority that has considered the issue." The *Williams* court reasoned that

**\*8** 'Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights' and 'a pattern of unequal treatment' in a wide range of public services and activities 'in the administration of justice.' [*Tennessee v. Lane*, 541 U.S. 509, 524-525 (2004).] The Department of Justice's implementing regulations for the ADA make clear that, with exceptions not relevant here, Title II of the ADA 'applies to all services, programs, and activities provided or made available by public entities,' 28 C.F.R. § 35.102(a), and requires public entities to make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability,' unless the required modification would fundamentally alter the nature of the service, program, or activity, 28 C.F.R. § 35.130(b)(7). The phrase 'services, programs, or activities' is 'a catch-all phrase' that prohibits all discrimination by a public entity. *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d Cir. 2012) (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), recognized as superseded on other grounds, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001) ). As the Second Circuit has explained, the ADA should be 'broadly construed to effectuate its purpose of providing a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities.' *Id.* at 68 (quotation marks and citation omitted).

A number of courts have considered whether interactions between law enforcement and disabled individuals—whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under Title II of the ADA. Those courts have generally found that Title II applies, but the reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case.

*121 F. Supp. 3d at 365-366.*

That court went on to conclude that there are "at least two types of Title II claims applicable to arrests," including "(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 369 (quoting *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S.Ct. 1765 (2015) ("Whether the statutory language [of the ADA] applies to arrests is an important question that would benefit from briefing and an adversary presentation. But San Francisco, the United States as *amicus curiae*, and Sheehan all argue (or at least accept) that § 12132 applies to arrests. No one argues the contrary view. As a result, we do not think that it would be prudent to decide the question in this case.") ).

It is clear, at least, that the ADA can apply to police activity in some situations. Even *Hainze v. Richards*, the sole case cited by the Defendants in support of their proposition that Officers Koval and Galpin were not required to consider ADA compliance before acting, acknowledges that police actions must, at some point, begin to comply with ADA requirements. 207 F.3d at 802 ("Once the area was secure and there was no threat to human safety, the ... deputies would have been under a duty to reasonably accommodate Hainze's disability in handling and transporting him...."). *See Brunette v. City of Burlington, Vermont*, 2018 WL 4146598, at \* 34 (D. Vt. Aug. 30, 2018) (holding that "exigent circumstances" of

the police encounter must be considered in determining whether police provided ADA-compliant "reasonable accommodation" and citing cases taking similar approach).

Plaintiff further alleges that Chief Campbell was "on notice ... that a significant number of individuals arrested or otherwise detained by officers under [his] employ are either mentally ill or appear to be so" and that it "was foreseeable to the Chief that police officers would routinely confront" such individuals, (Compl. ¶ 31), but that the Defendants nonetheless "offer no training on how to make reasonable accommodations" for individuals protected by the ADA with whom officers come into contact, (Compl. ¶¶ 35-36.)

**\*9** Without yet deciding the precise scope of the ADA's requirements in this situation, the Court finds that Plaintiff has pled facts which render plausible her allegation that Mr. Reyes suffered a violation of his right to a reasonable accommodation of his disability because of an alleged failure to train and despite Defendants' knowledge of the need for such training. Therefore, Count Three states a claim of ADA violation sufficient to survive the motion to dismiss stage.

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 22] is GRANTED in part and DENIED in part. Counts One, Four, and Six of the Complaint are dismissed from this litigation, as are Defendants Officers Koval and Galpin. Counts Two and Three of the Complaint are not dismissed, nor are the Municipal Defendants.

IT IS SO ORDERED.

### All Citations

Slip Copy, 2019 WL 959680

### Footnotes

1     The Complaint does not include a Count Five.

2     The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to analyze first, depending on the circumstances of the case. *See* *Pearson*, 555 U.S. at 236.

3     Because Count Three of the Complaint identifies only the Town of Thomaston and the Thomaston Police Departments as responsible for the alleged ADA violation, (Compl. ¶¶ 35-37), the Court reads Count Three as brought only against those two defendants.

4     In her Opposition to the Motion to Dismiss, Plaintiff analyzes Count Three's claims both under the ADA and under *Monell* and § 1983. (Pl.'s Opp. at 10-12.) However, on the face of the Complaint, Count Three brings only a claim of violation of the ADA and makes no reference to § 1983. (Compl. ¶¶ 33-38.) Therefore, the Court treats Count Three as only a claim for violation of the ADA.

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2001244
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Lorene F. SCHAEFER, individually and on behalf
of a class of similarly-situated female employees,
Plaintiff,
v.

GENERAL ELECTRIC COMPANY, Jeffrey R.
Immelt, Brackett B. Denniston III, John G. Rice,
John M. Dineen, John F. Lynch, John Loomis, Bill
Fisher, Greg Capito, Claudio X. Gonzalez, Andrea
Jung, Ralph S. Larsen, Sam Nunn, and Douglas A.
Warner III, Defendants.

No. 3:07–cv–858 (PCD).
|
May 8, 2008.

Attorneys and Law Firms

David W. Sanford, Sanford, Wittels & Heisler,
Washington, DC, Jeremy Heisler, Steven L. Wittels,
Sanford, Wittels & Heisler, LLP, New York, N.Y.
Victoria De Toledo, Casper & De Toledo, Stamford, CT,
for Plaintiff.

Alison B. Marshall, Glen D. Nager, Jones Day, Barbara
Berish Brown, Paul, Hastings, Janofsky & Walker,
Washington, DC, Amy E. Dias, Dana Baiocco, Laura E.
Ellsworth, Jones Day, Pittsburgh, PA, Anthony M.
Fitzgerald, Howard K. Levine, Carmody & Torrance,
New Haven, CT, Cheryl R. Saban, Jenny L. Stewart,
Patrick W. Shea, Paul, Hastings, Janofsky & Walker,
LLP, New York, NY, Raymond W. Bertrand, Paul,
Hastings, Janofsky & Walker, San Diego, CA, for
Defendants.

*RULING ON INDIVIDUAL DEFENDANTS' MOTION
TO DISMISS*

PETER C. DORSEY, District Judge.

**\*1** Lorene F. Schaefer, individually and on behalf of a
purported class of similarly situated female employees,

brings this employment discrimination action against her
employer, General Electric Company ("GE"), and several
individually named defendants: Jeffrey Immelt; Brackett
Denniston III; John Rice; John Dineen; John Lynch; John
Loomis; Bill Fisher; Greg Capito; Claudio Gonzalez;
Andrea Jung; Ralph Larsen; Sam Nunn; and Douglas
Warner III (the "Individual Defendants"). The Individual
Defendants have moved to dismiss Counts Three and Six
of the First Amended Complaint, which allege violations
of the Connecticut Fair Employment Practices Act
("CFEPA"), Conn. Gen.Stat. § 46a–60(a)(4) and (5),
for aiding and abetting the discriminatory and retaliatory
actions of GE and the other Individual Defendants and for
retaliating against Ms. Schaefer for her discrimination
complaints. For the reasons stated below, Defendants'
Motion to Dismiss [Doc. No. 84] is **denied**.

**I. BACKGROUND**
Plaintiff Lorene Schaefer, an attorney employed by GE,
filed this lawsuit individually and on behalf of a purported
class claiming that GE and the thirteen individual
defendants have: failed to pay female executive-level
employees and attorneys on par with the pay of
similarly-situated male employees; failed to promote
female executives and attorneys to senior leadership
positions at GE; used subjective pay and promotion
practices and policies which negatively and disparately
affect female employees at GE; and failed to enforce
procedures and policies prohibiting gender discrimination.
(First.Am .Compl.¶ 14.) The thirteen individual named
defendants include the GE Directors who comprise the
Board's Management Development and Compensation
Committee, Defendants Gonzalez, Jung, Larsen, Nunn,
and Warner (collectively the "Director Defendants"), and
the following GE Executives: GE CEO Jeffrey Immelt;
GE General Counsel Brackett Denniston; GE Vice
Chairman John Rice; GE Transportation CEO John
Dineen; GE Senior Vice President of Corporate Human
Resources John Lynch; Vice President of Human
Resources for GE Transportation John Loomis; Senior
Human Resources Manager for GE Legal Bill Fisher; and
Senior Human Resources Manager for GE Transportation
Greg Capito (collectively the "Executive Defendants").

The following facts are taken as true for purposes of the
instant motion.[1] Plaintiff alleges that each of the
Individual Defendants engineered, approved, ratified,
and/or assisted in the wrongful acts alleged, including the
discriminatory treatment of Ms. Schaefer and the class.

(*See* First Am. Compl. ¶ ¶ 52, 57, 62, 65, 68, 71, 73, 76, 80–84.) All Individual Defendants allegedly chaired and/or participated in meetings at which the promotional and compensational opportunities for Plaintiff and/or the purported class members were decided. (*Id.* at ¶¶ 44–50, 52–55, 58–59, 61, 64, 69, 74, 77–78, 81–85, 103–112.) As members of the Management Development Compensation Committee, Defendants Gonzalez, Jung, Larsen, Nunn, and Warner established, reviewed, and/or ratified the company policies pertaining to the compensation and promotional opportunities for Plaintiff and the purported class members. (*Id.* at ¶¶ 77–78, 81–84.) All promotional and compensation decisions are ultimately ratified through the main GE corporate office in Fairfield, Connecticut, and those Individual Defendants who did not reside or work in Connecticut on a daily basis during the class period were in constant contact with senior management there via telephone, email, and in-person meetings regarding promotional and compensation decisions affecting Schaefer and the purported class members. (*Id.* at ¶¶ 40, 55–58–59, 61, 64, 75.) Plaintiff also alleges, upon information and belief, that Defendant Rice, in his capacity as Vice Chairman of GE, has an office in Connecticut and spends substantial time working there. Defendant Rice participated in the February 2007 Corporate Executive Council (CEC) meeting held in Fairfield, Connecticut, which gave rise to Ms. Schaefer's discrimination complaint and GE's alleged retaliation, and in Ms. Schaefer's performance review in which she was officially demoted. (*Id.* at ¶¶ 64, 103–109, 112.)

**\*2** The Individual Defendants move to dismiss on several grounds. The Defendants first argue that they, as individuals, cannot be held liable under the CFEPA. Defendants also argue that the claim against the GE Director Defendants (Count III) must be dismissed because Plaintiff fails to allege any conduct by the Directors that aided and abetted discrimination against Plaintiff or a single action taken by the Director Defendants with respect to Plaintiff, and they contend the claim for aiding and abetting against the GE Executives (Count III) does not contain "the required factual allegation that any specific GE Executive coerced and assisted another individual to commit an act of discrimination." Finally, Defendants argue that all claims against Defendant Rice (Counts III and VI) must be dismissed because Plaintiff does not allege that he took any actions against her in Connecticut and therefore CFEPA does not apply to his conduct.

## II. STANDARD OF REVIEW

Under the liberal notice pleading standard of the Federal Rules of Civil Procedure, a complaint need only include "a short and plain statement of the grounds upon which the court's jurisdiction depends ...; a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought[.]" Fed.R.Civ.P. 8(a). To meet this requirement, a plaintiff must allege only enough facts "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1960, 167 L.Ed.2d 929 (2007); *see also Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir.2007) ("requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible"). Although detailed factual allegations are not required, a plaintiff must provide the grounds of her entitlement to relief beyond mere "labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1964–65. Contrary to Defendants' assertions, the Supreme Court's recent decision in *Twombly* does "not requir [e] a universal standard of heightened fact pleading," *Iqbal,* 490 F.3d at 157–58, and the Supreme Court has made it clear that there is no heightened pleading requirement with respect to employment discrimination claims. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

## III. DISCUSSION

### A. Individual Defendants' Liability under the CFEPA

Count Three of Plaintiff's First Amended Complaint claims that each Individual Defendant aided and abetted GE and the other Individual Defendants in discriminating against Plaintiff and other members of the purported class, in violation of the CFEPA, Conn. Gen.Stat. §§ 46a–60 *et seq.* The Individual Defendants move to dismiss this count first on the ground that individuals cannot be held liable under the CFEPA. The Defendants also argue that Plaintiff has failed to adequately plead individual discriminatory conduct on the part of the GE Director Defendants and failed to adequately plead that any of the Individual Defendants aided and abetted

another individual rather than just directly participating in the discriminatory treatment.

**\*3** Defendants' argument that individuals cannot be held liable under the CFEPA, which relies on a misreading of the relevant case law and an apparent failure to read the text of the statute itself, is patently meritless. The CFEPA specifically provides that "It shall be a discriminatory practice in violation of this section: ... For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so." Conn. Gen.Stat. § 46a–60(a)(5). Case law interpreting this statute raises no question as to the applicability of this provision of the CFEPA to individuals. *See, e.g., Spiotti v. Town of Wolcott,* No. 3:04–cv–01442 (CFD), 2008 WL 596175, at \*1 n. 1 (D.Conn. Feb. 20, 2008) ("Individual liability remains possible under Conn. Gen.Stat. § 46a–60(a)(5) (aiding and abetting) [.]"); *Edwards v. New Opportunities Inc.,* No. 3:05–cv–1238 (JCH), 2006 WL 1668020, at \*2 (D. Conn. June 16, 2006) ("individual defendants, even if not employers, may be liable for violations of Connecticut General Statutes section[ ] 46a–60(a)(5)."); *Kanios v. UST, Inc.,* No. 3:03–cv–369 (DJS), 2005 WL 3579161, at \*8 (D.Conn. Dec. 39, 2005); *Bolick v. Alea Group Holdings, Ltd.,* 278 F.Supp.2d 278, 281 (D .Conn.2003) ("Individual liability, however, does exist under [ § 46a–60(a) ](5)." (citing *Tyszka v. Edward McMahon Agency,* 188 F.Supp.2d 186, 195 (D.Conn.2001))); *Wasik v. Stevens Lincoln–Mercury, Inc.,* No. 3:98–cv–1083 (DJS), 2000 WL 306048, at \*6 (D.Conn. March 20, 2000) (noting that while § 46a–60(a)(1) is limited to employers, "other CFEPA provisions expressly extend liability for discriminatory acts to individual persons, regardless of whether they are employers.").

Defendants have invented an argument denying individual liability under CFEPA by misreading a Connecticut Supreme Court decision, *Perodeau v. City of Hartford,* 259 Conn. 729, 792 A.2d 752 (2002). In *Perodeau,* the court prohibited holding an individual employee liable for a violation of Section 46a–60(a)(1), a provision which, by its terms, restricts liability in that subsection to "employers." However, the *Perodeau* court went on to explicitly distinguish Section 46a–60(a)(1) from Section 46a–60(a)(5), the aiding and abetting provision of CFEPA, noting that the Connecticut Legislature specifically referred to "persons" in addition to "employers" in Section 46a–60(a)(5), showing that it intended the provision to

apply to individuals other than employers. 259 Conn. at 737–38.

Defendants' reliance on this Court's ruling in *Bolick v. Alea* is also misplaced. In *Bolick,* a plaintiff employee brought sex discrimination and sexual harassment claims against her employer corporation and a CFEPA aiding and abetting claim against her supervisor. 278 F.Supp.2d at 279. Bolick's supervisor moved to dismiss the individual claims against him because, as primary perpetrator of the alleged sexual harassment, he could not be considered to "aid and abet" his own conduct. *Id.* at 281. The Court concluded that applying the aiding and abetting provision of CFEPA against an employee who was the sole perpetrator of the alleged harassment would produce an illogical result; accordingly, it held that a sole perpetrator cannot be held liable under the aiding and abetting provision. *Id.* at 282. The Court's *Bolick* ruling is inapposite to this case, however, where Plaintiff has alleged that multiple parties—namely, all thirteen individual defendants—have aided and abetted GE's discriminatory practices of failing to promote and pay female executives and attorneys at the same rates as similarly situated males. Where more than one person is allegedly involved in an employer's discriminatory practices, a plaintiff may be able to show that an individual defendant aided the employer's discriminatory practices by colluding with other employees to perpetuate the alleged discrimination. *Kanios,* 2005 WL 3579161, at \*8. Therefore, so long as a complaint alleges a situation other than one in which a single perpetrator engages in discriminatory conduct, individual persons may be held liable for aiding and abetting under CFEPA. Because Plaintiff has clearly alleged that numerous individuals have aided and abetted GE's and the other Individual Defendants' discriminatory conduct (*see* First Am. Compl. ¶ 170), Defendants' argument that they cannot be liable under the CFEPA is without merit.

**\*4** Defendants also argue that the First Amended Complaint fails to state the necessary elements of an aiding and abetting claim due to the following deficiencies: failure to allege the requisite intent for aiding and abetting; failure to allege that the Executive Defendants aided and abetted other individuals rather than just directly discriminating against Schaefer; and failure to allege that the Director Defendants took any direct action with respect to Plaintiff Schaefer. None of these arguments persuades the Court that Plaintiff has failed to state a claim upon which relief can be granted. In addition to alleging numerous specific acts on the Individual Defendants' parts in her 52–page First Amended Complaint, Plaintiff explicitly states:

By aiding, abetting, inciting, compelling, and/or ratifying GE's discriminatory pay and promotion practices and decisions, each Individual Defendant has aided and abetted both the Corporate Defendant's and each of the other Individual Defendant's discrimination against the Plaintiff and the Class of female Executive Band employees and female attorneys, in violation of the CFEPA. Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Class Representative's and the Class's rights and has damaged Class Representative and the Class.

(First.Am.Compl.¶¶ 170–71.) Under the liberal pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, these allegations sufficiently state a claim against all Individual Defendants under Section 46a–60(a)(5), which "contemplate[s] liability towards a party who in some way helps or compels another to act in a discriminatory manner." *Wasik,* 2000 WL 306048, at \*7 (*citing Bogdahn v. Hamilton Standard Space Sys. Int'l Inc.,* 46 Conn. Supp. 153, 159, 741 A.2d 1003 (Conn.Super.Ct.1999) (recognizing as a cognizable claim for aiding and abetting conduct whereby an employer and other employees' actions "ratified, endorsed and perpetrated" another employee's harassing conduct.)). Defendants' arguments that Plaintiff insufficiently alleged aiding and abetting on the part of the Individual Defendants or that she fails to allege the requisite intent are therefore without merit. Plaintiff also adequately pleads that the Director Defendants aided and abetted the discriminatory practices alleged. The First Amended Complaint clearly alleges that the Director Defendants served as members of the Management Development Committee of the GE Board of Directors, which, among other things, develops and evaluates potential candidates for executive positions and reviews all compensation actions for other GE officers (Compl.¶¶ 78–79), and that they each approved, ratified, and/or assisted in the wrongful acts described in the Complaint. (*Id.* at ¶¶ 80–84, 167–69.) For all these reasons, Plaintiff has sufficiently stated a CFEPA aiding and abetting claim against each of the Individual Defendants, and Defendants' motion to dismiss Count III for failure to state a claim is denied.

### B. Defendant John Rice and the CFEPA

**\*5** Defendants also move to dismiss Counts III and IV as to Defendant John Rice. According to Defendants, CFEPA does not apply to Defendant Rice's alleged conduct because he resides outside of Connecticut, he is employed outside of Connecticut, and any decision he is alleged to have made with respect to Plaintiff Schaefer occurred outside of Connecticut. Defendants also contend that Plaintiff has not alleged that Rice engaged in any discriminatory conduct in Connecticut and therefore CFEPA should not apply to his alleged actions. (Defs.' Mot. to Dismiss 8.) To succeed with this argument, Defendants ignore passages of the First Amended Complaint which specifically allege conduct performed by Defendant Rice in the State of Connecticut which aided and abetted the alleged discrimination and which retaliated against Plaintiff Schaefer for her complaints of discrimination. Plaintiff has alleged in the First Amended Complaint that Defendant Rice maintains and spends a substantial amount of time in an office at GE headquarters in Fairfield, Connecticut (First.Am.Compl.¶ 64), and that Defendant Rice decided to discriminatorily demote Ms. Schaefer in retaliation for her complaints at a meeting held in Fairfield, Connecticut, in February 2007. (*Id.* at ¶ 109). Defendants have cited no law which suggests that these allegations somehow do not suffice for CFEPA to cover Mr. Rice's alleged conduct. Accordingly, Defendants' motion to dismiss the claims against Defendant Rice is also dismissed.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the claims against the Individual Defendants [Doc. No. 84] is **denied.**

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 2001244

Schaefer v. General Elec. Co., Not Reported in F.Supp.2d (2008)

### Footnotes

1    A district court ruling on a motion to dismiss for failure to state a claim should accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1925882
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Danbury.

Vanessa SILVA
v.
Frank WARECKE, Jr. et al.

No. CV040351625S.
|
July 23, 2004.

**Attorneys and Law Firms**

Collins Hannafin Garamella Jaber, Danbury, for Vanessa
Silva.

Frank E. Warecke, Jr., Cheshire, pro se.

Mager & Mager, Milford, for Christine Warecke.

**Opinion**

RICHARDS, J.

**\*1** The plaintiff seeks a prejudgment remedy to secure
tort claims against her former high school teacher/high
school basketball coach and his wife. The plaintiff alleges
claims for negligent infliction of emotional distress,[1]
intentional sexual assault and battery, negligent
supervision, invasion of privacy and fraudulent
conveyance. In her prejudgment remedy application, the
plaintiff seeks to attach real property located at 27
Sachem Road, Seymour, Connecticut. For the reasons
stated below, the court agrees with the plaintiff as to her
claims of negligent infliction of emotional distress,
intentional sexual assault and battery, negligent
supervision, invasion of privacy claim, and fraudulent
conveyance. The plaintiff is authorized to secure a claim
in the amount of $150,000.[2]

The plaintiff, Vanessa Silva, attended Henry Abbott
Technical High School. The defendant, Frank Warecke,
Jr., was the plaintiff's drafting teacher and high school
basketball coach. During the plaintiff's senior year of
high school, her relationship with the defendant became

sexual. On May 23, 2003, the defendant was arrested on
sexual assault charges against the plaintiff, and ultimately
pled guilty to those charges. On September 15, 2003, the
defendant quitclaimed his one-half interest in a piece of
real property to Christine Warecke, his wife and
co-defendant.

On May 24, 2004, this court held a hearing on the
prejudgment remedy application. At that hearing, the
plaintiff testified that the defendant persuaded her into
sexual relations by stating that he had cancer and no
longer had a relationship with his wife. The plaintiff
testified that these sexual relations occurred in and out of
the classroom. These relations resulted in: kissing,
fondling of the plaintiff's breasts and vagina, manual
penetration of the vagina, oral sex and intercourse. The
plaintiff further testified that the defendant was in
complete control because he knew that she would do
anything for him. The plaintiff asserts that the defendant's
actions have caused her, *inter alia,* psychological trauma,
suffering, embarrassment, depression, emotional distress
and a strained relationship with her parents.

At that hearing, co-defendant, Mrs. Warecke, testified that
on September 15, 2003, the defendant quitclaimed his
one-half interest in the marital home to her. The deed
reflects that Mrs. Warecke gave valuable, but not
monetary, consideration for the defendant's interest in the
marital home. Mrs. Warecke also testified that to her
knowledge the marital home was the only asset the
defendant possessed, and believed the house to be worth
$300,000. Mrs. Warecke further testified that the
defendant continued to reside at the marital home after he
quitclaimed his interest.

Both defendants argue that the plaintiff's complaint is
devoid of factual allegations that, if proven, would satisfy
the elements of each of her counts, and, thus, the
application for prejudgment remedy must be denied.

*Standard*

**\*2** "Pursuant to our prejudgment remedy statutes ... the
trial court's function is to determine whether there is
probable cause to believe that a judgment will be rendered
in favor of the plaintiff in a trial on the merits ... The
hearing in probable cause for the issuance of a
prejudgment remedy is not contemplated to be a full scale
trial on the merits of the plaintiff's claim. The plaintiff

does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim ... The court's role in such a hearing is to determine probable success by weighing probabilities." (Internal quotation marks omitted.) *J.K. Scanlan Co. v. Construction Group, Inc.,* 80 Conn.App. 345, 349-50 (2003). "Moreover, this weighing process applies to both legal and factual issues ... It is the [court] that must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim." (Internal quotation marks omitted.) *Blakeslee Arpaia Chapman v. El Constructors,* 32 Conn.App. 118, 126 (1993).

### Negligent Infliction of Emotional Distress

The elements for negligent infliction of emotional distress are: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444 (2003).

This court concludes that the plaintiff has established probable cause with respect to a cause of action for negligent infliction of emotional distress. The defendant's sexual advances created a foreseeable risk of causing the plaintiff emotional distress, which was unreasonable in light of the teacher-student relationship. At trial the plaintiff will produce an expert who will testify to the affect the emotional distress has had upon her well-being. This distress is the result of the defendant's conduct.

### Intentional Sexual Assault and Battery

"The elements of the intentional tort of sexual assault for which [the defendant may be] found liable are [a] harmful or offensive contact with a person, intended to cause the plaintiff ... to suffer such a contact, resulting from an act ..." (Internal quotation marks omitted.) *Fernandez v. Standard Fire Ins. Co.,* 44 Conn.App. 220, 224 n. 4 (1997). Determinations of causation and intent are

necessary to a finding of intentional sexual assault. *Id., at* 223-24.

The defendant argues that the sexual relations were consensual, and as such, the intent element cannot be established. Furthermore, the defendant argues that the plaintiff was seventeen years old at the time of these relations, which is an age where an individual can give consent. As a result, the defendant then argues that the plaintiff cannot establish probable cause for a claim of intentional sexual assault.

**\*3** The plaintiff argues that the present situation is akin to the scenario where a teacher engages in sexual relations with a student who is a minor. In that situation, the minor cannot give valid consent to engage in such relations. The plaintiff then couples this argument with the fact that the plaintiff is a member of a protected class as demonstrated in Connecticut General Statutes § 53a-71(a)(8).[3] Finally, the plaintiff argues that the defendant was in a position of power because he was her teacher/coach, and that he had the knowledge that the plaintiff would do anything for him.

The court agrees with the plaintiff because it feels that this situation is more akin to the scenario where the sexually assaulted individual is a minor. As her teacher and coach, the defendant was in a position of power, and abused that power. Because of the teacher-student relationship, the defendant had a duty to refrain from engaging the plaintiff to participate in any sexual activities. As such, the court concludes that there exists probable cause to establish the plaintiff's claim of intentional sexual assault.

### Negligent Supervision

"Negligence occurs where one under a duty to exercise a certain degree of care to avoid injury to others fails to do so ... The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury ." (Citation omitted; internal quotation marks omitted.) *Stokes v. Lyddy,* 75 Conn.App. 252, 257 (2003). "[T]he determination of whether a duty exists between individuals is a question of law ... Only if a duty is found to exist does the trier of fact go on to determine whether the defendant has violated that duty." (Citations omitted.) *Jaworski v. Kiernan,* 241 Conn. 399, 404-05 (1997).

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) *Perodeau v. Hartford,* 259 Conn. 729, 754 (2002). "A duty to act with reasonable care to prevent harm to a plaintiff which, if violated, may give rise to tort liability is based on a 'special relationship' between the plaintiff and the defendant." (Internal quotation marks omitted.) *Burns v. Board of Education,* 228 Conn. 640, 646 (1994). "[S]chool children attending public schools during school hours are intended to be the beneficiaries of certain duties of care." *Id.,* at 648.

As the plaintiff's teacher and school basketball coach, the defendant had a duty to supervise and protect her from harm. The defendant breached this duty by engaging in sexual relations with the plaintiff. There are sufficient allegations that establish the plaintiff has suffered several injuries. These alleged injuries were a foreseeable consequence of the defendant's breach of duty. Therefore, for prejudgment remedy purposes, there exists probable cause for the plaintiff to assert a claim for negligent supervision.

### Invasion of Privacy

**\*4** In *Goodrich v. Waterbury Republican-American, Inc.,* 188 Conn. 107, 126-28 (1982), the Supreme Court established a cause of action for invasion of privacy and adopted the four categories as defined in § 652A of the Restatement (Second) of Torts. The four categories are: "(a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public." *Id.,* at 128. The court explained these four categories to have "not developed as a single tort, but as a complex of four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone." (Internal quotation marks omitted.) *Id.,* at 127-28.

The plaintiff argues that the defendant's actions fit within the first category, an unreasonable intrusion upon the seclusion of another. Neither defendant addresses the plaintiff's argument, but rather, they argue that the only potentially applicable category is publicity that unreasonably places the other in a false light before the public. For the following reasons, the court agrees with the plaintiff's argument.

"The Connecticut Appellate Courts have not yet set forth the necessary elements of a claim for unreasonable intrusion upon seclusion." *Gallagher v. Rapoport,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 96 0149891 (May 6, 1997, D'Andrea, J.) (19 Conn. L. Rptr. 474). However, an unreasonable intrusion claim is defined as "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person." (Internal quotation marks omitted.) *Id.,* citing 3 Restatement (Second), Torts § 652B (1977). Other trial courts have held that "allegations of sexual assault constitute an actionable unreasonable intrusion claim" because, that conduct intrudes upon the solitude of a person in a highly offensive manner. *Fields v. Kichar,* Superior Court, judicial district of Tolland at Rockville, Docket No. CV 94 54868 (May 2, 1995, Klaczak, J.) (14 Conn. L. Rptr. 230); see also *Blair v. LaFrance,* Superior Court, judicial district of Waterbury, Docket No. CV 98 0149622 (September 27, 2000, Rodgers, J.); *Gallagher v. Rapoport, supra,* Superior Court, Docket No. CV 960149891.

This court agrees with those courts that have held that sexual assault fits within an unreasonable intrusion, which then forms the basis for an invasion of privacy claim. Because this court previously found that there exists probable cause for intentional sexual assault, the court also finds that there exists probable cause for the plaintiff to establish an invasion of privacy premised upon an unreasonable intrusion upon the seclusion of another.

### Fraudulent Conveyance

**\*5** "Property fraudulently conveyed may, as to the creditors of the grantor, be treated as if no conveyance of it had been made ... True, the fraudulent grantor could not

Silva v. Warecke, Not Reported in A.2d (2004)

invoke the power of the courts to secure a reconveyance to him, because his own fraud has shut the door of the courts against him ... Nevertheless, he still has an interest in the property which can be reached by his creditors." (Citations omitted.) 🚩 *Murphy v. Dantowitz,* 142 Conn. 320, 325-26 (1955). When the property is jointly owned, an attachment by one of the owner's creditors only affects that owner's interest in the property. See 2 R. Bollier & S. Busby, Stephenson's Connecticut Civil Procedure (3d Ed.1997) § 110(d), p. 61-62.

In this application for a prejudgment remedy, the plaintiff must prove that there is probable cause to believe that at trial they can establish by clear and convincing evidence that the defendant fraudulently conveyed the property. See *Polan v. Hunting Ridge Co ., Inc.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 960153713 (September 26, 1997, D'Andrea, J.); *SMS Financial II, LLC, v. Kodsy,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 94 0141600 (April 12, 1995, Lewis, J.).

The plaintiff argues that under the Uniform Fraudulent Conveyance Act, Connecticut General Statutes § 52-552a et seq., they have established probable cause that they will succeed at trial on their claim of fraudulent conveyance. Specifically, the plaintiff asserts that they have established probable cause under both §§ 52-552e[4] and 52-552f.[5]

In response, the defendants argue that the plaintiff has failed to provide evidence which would establish probable cause that they will succeed at trial. In their briefs, the defendants state that the plaintiff failed to provide sufficient evidence on the following facts: "the transfer was in any way concealed; that the [plaintiff commenced or threatened commencement of suit prior to the transfer; that the transfer was of all or substantially all of [the defendant's] assets; that [the defendant] subsequently absconded; that [the defendant] in any way concealed or removed any of his other assets; that [the defendant] became insolvent as a result of this transfer; or that [the defendant] made the transfer to [Mrs.] Warecke shortly after his incurring a substantial debt." The court rejects the defendants' argument.

Within the meaning of Connecticut General Statutes § 52-552b(3),[6] the plaintiff's claim arose before the transfer of the property. On May 23, 2003, the defendant was

arrested on sexual assault charges, and on September 15, 2003, he quitclaimed his interest in the marital home to Mrs. Warecke. These facts establish that the sexual assault incidents occurred prior to the transfer, and that the plaintiff has a claim within the meaning of the statute.

Mrs. Warecke testified that her consideration for this transfer was not monetary. Even though the deed states that valuable consideration was given in exchange for the defendant's interest in the property, there is nothing to suggest what that consideration consisted of. The court feels that probable cause exists that the defendant did not receive equivalent value in exchange for the transfer. Furthermore, the court feels that the defendant believed or reasonably should have believed that a subsequent civil suit premised upon his sexual assault of the plaintiff was forthcoming, and therefore, he would incur debts beyond his ability to pay. As such, probable cause exists that a fraudulent conveyance occurred within the meaning of Connecticut General Statutes § 52-552e.[7]

**\*6** Mrs. Warecke also testified that to her knowledge this house was the defendant's only asset. This is sufficient evidence for the court to conclude that probable cause exists that the defendant was insolvent at the time of the transfer or became insolvent as a result of the transfer. In light of the previous finding, the court also finds that there exists probable cause for a fraudulent conveyance under Connecticut General Statutes § 52-557f(a).[8]

*Damages*

In conclusion, this court finds there is probable cause to believe that a judgment will be rendered in favor of the plaintiff, Vanessa Silva, at a trial on the merits. This court further finds that the plaintiff should be authorized to secure a claim for $150,000.

**All Citations**

Not Reported in A.2d, 2004 WL 1925882

**Footnotes**

[1]   The plaintiff states in her brief that she will amend the complaint in order to assert a claim for intentional infliction

of emotional distress, but for purposes of her prejudgment remedy, the court will not address that cause of action.

[2]     On July 14, 2004, the court received the defendant, Mr. Warecke's supplemental memorandum of law in opposition to the plaintiff's motion for prejudgment remedy. This memorandum is in regard to an article published in the August 2004 issue of *Cosmo Girl,* in which the plaintiff gave an interview about the relationship between her and the defendant. For prejudgment remedy purposes, the court finds that this magazine article and accompanying memorandum of law unpersuasive, and more appropriate to be addressed at the time of trial.

[3]     Connecticut General Statutes § 53a-71(a)(8) provides: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and ... the actor is a school employee and such other person is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor ..."

[4]     Connecticut General Statutes § 52-552e provides in relevant part: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation ... (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor ... (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

[5]     Connecticut General Statutes § 52-552f provides:
        (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
        (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

[6]     Connecticut General Statutes § 52-552b(3) provides: " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

[7]     See, *supra,* footnote 4.

[8]     See, *supra,* footnote 5.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2007 WL 969392
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Fairfield.

Josephine TOSADO
v.
STATE of Connecticut, Judicial Branch.

No. CV030402149S.
|
March 15, 2007.

**Attorneys and Law Firms**

Sheila K. Rosenstein, Attorney at Law, Fairfield, for
Josephine Tosado.

Nancy Brouillet, David Nelson, Maria Santos,
AG-Employment Rights, Hartford, for State of
Connecticut.

**Opinion**

GILARDI, J.

**\*1** The plaintiff, Josephine Tosado, commenced this
action against the defendant, the judicial branch of the
state of Connecticut, in 2003. She alleges the following
facts in the complaint that she filed on March 30, 2006.[1]
The plaintiff, a Hispanic female, is employed by the
judicial branch as an interpreter for various trial courts. In
1997, the plaintiff filed a charge of discrimination with
the Commission On Human Rights and Opportunities
(CHRO) alleging that the chief interpreter discriminated
against her because of her sex, race and nationality. The
CHRO dismissed the charge in 1999, and although the
agency issued a notice of right to sue to the plaintiff, she
did not seek a remedy in the Superior Court.

The plaintiff filed a second charge of discrimination with
the CHRO on August 12, 2002, in which she alleged that
employees of the judicial branch harassed her on the basis
of her race, sex and her ancestry and retaliated against her
because she had filed her previous charge of
discrimination. The CHRO dismissed the plaintiff's

charge and issued her a notice of right to sue, which she
received on January 14, 2003.

The plaintiff then commenced the present action on April
10, 2003. In the operative complaint, she alleges that the
conduct that the defendant's employees engaged in
before, during and after she filed her charges of
discrimination constitutes harassment on the basis of her
race, sex and ancestry and retaliation for her opposition to
the defendant's discriminatory conduct. She presumably
seeks redress under the Connecticut Fair Employment
Practices Act (CFEPA), General Statutes § 46a-51 et
seq.[2]

The defendant filed a summary judgment motion on July
12, 2006, and supporting memoranda on that date and on
July 31, 2006. The plaintiff filed a revised memorandum
opposing the motion on November 6, 2006. The
defendant filed a reply, and the motion was heard on the
short calendar on November 20, 2006.

"Practice Book [§ 17-49] provides that summary
judgment shall be rendered forthwith if the pleadings,
affidavits and any other proof submitted show that there is
no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law ...
In deciding a motion for summary judgment, the trial
court must view the evidence in the light most favorable
to the nonmoving party ... The party seeking summary
judgment has the burden of showing the absence of any
genuine issue [of] material facts, which, under applicable
principles of substantive law, entitle him to a judgment as
a matter of law ... and the party opposing such a motion
must provide an evidentiary foundation to demonstrate
the existence of a genuine issue of material fact." (Internal
quotation marks omitted.) Deming v. Nationwide
Mutual Ins. Co., 279 Conn. 745, 756-57, 905 A.2d 623
(2006).

The defendant argues that it is entitled to summary
judgment on the following grounds: the court lacks
subject matter jurisdiction over the action because the
plaintiff did not file it within ninety days of the date that
she received a notice of right to sue from the CHRO; the
court lacks subject matter jurisdiction over the allegations
that pertain to events that occurred before February 22,
2002, and after August 22, 2002, because the plaintiff did
not exhaust her remedies pertaining to these events with
the CHRO; and the plaintiff's remaining allegations do
not state claims upon which relief can be granted.[3]

**\*2** As to the defendant's first argument, under General
Statutes § 46a-101(e), when the CHRO releases a

complaint and issues a notice of right to sue to the complainant, the complainant may bring an action to the Superior Court, provided that the action "shall be brought within ninety days of receipt of the release from the commission." Here, the plaintiff concedes that she did not file an action after she received a notice of right to sue from the CHRO regarding her 1997 charge of discrimination. Therefore, the court lacks subject matter jurisdiction over the conduct that formed the basis for that charge. As to the plaintiff's August 2002 charge, she alleges that she received the notice of right to sue on January 14, 2003. The marshal's return provides evidence that she commenced this action by serving the writ of summons and complaint on the defendant eighty-six days later, on April 10, 2003. See *Hillman v. Greenwich,* 217 Conn. 520, 527, 587 A.2d 99 (1991) (action commences on date writ is served on defendant). Therefore, the court does not lack jurisdiction over this action on this ground.

The defendant next argues that the court lacks subject matter jurisdiction over incidents of alleged discrimination that occurred before February 22, 2002, or more than 180 days before the plaintiff filed her charge of discrimination on August 22, 2002. General Statutes § 46a-100 provides that "[a]ny person who has *timely* filed a complaint with the Commission ... in accordance with section 46a-82 and who has obtained a release from the commission ... may also bring an action in the superior court ..." (Emphasis added.) In turn, § 46a-82(e) requires that "[a]ny complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination ..."

According to our Supreme Court, while compliance with § 46a-82(e) is "mandatory," a complainant's failure to do so does not deprive the commission of subject matter jurisdiction. *Williams v. Commission on Human Rights & Opportunities,* 257 Conn. 258, 284, 777 A.2d 645 (2001). The court explained that "if a time requirement is deemed to be mandatory, it must be complied with, absent such factors as consent, waiver or equitable tolling ... [T]hus the commission *could* properly dismiss [a complaint] if it was not filed within 180 days of the alleged act of discrimination." (Emphasis in original.) *Id.* The trial courts in this and the federal arena have extended this conclusion to judicial actions premised on CFEPA, that is, they have determined that courts also can properly decline to consider allegations that occurred more than 180 days before the date that the plaintiff filed a complaint with the CHRO. See *Vollemans v. Wallingford,* Superior Court, judicial district of New Haven at Meriden, Docket No. CV 04 0286311 (January 10, 2006, Tanzer, J.) (40 Conn. L. Rptr. 600), and

*Kahn v. Fairfield University,* 357 F.Supp.2d 496, 503 (D.Conn.2005).

**\*3** Here, the plaintiff does not argue that the defendant waived the 180 day requirement or consented to the court's consideration of the allegations that occurred prior to that date. Instead, she contends that the court can consider all the conduct that preceded her August 2002 charge because that defendant engaged in a continuing course of conduct that created a hostile work environment such that all of its conduct constituted one unlawful employment practice. Our Supreme Court has recognized that the limitations period of § 46a-82(e) may be equitably tolled where an employer engages in continuing acts of discrimination. *State v. Commission on Human Rights & Opportunities,* 211 Conn. 464, 473, 559 A.2d 1120 (1989).

Nevertheless, the United States Supreme Court recently determined that the applicability of such a tolling provision depends on the nature of the alleged discrimination. *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Because our courts "have often looked to federal discrimination law for guidance in enforcing our own anti-discrimination statute"; (internal quotation marks omitted) *Williams v. Commission on Human Rights & Opportunities, supra,* 257 Conn. at 278, 777 A.2d 645; the court considers this precedent.

As to the plaintiff's retaliation claim, in *National Railroad Passenger Corp. v. Morgan, supra,* 536 U.S. at 113, the court clarified that, as a general rule, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act." Pursuant to this rule, each of the plaintiff's allegations of retaliation is a discrete act, and the court is precluded from considering the allegations regarding conduct that occurred prior to February 22, 2002.[4]

According to other federal precedent, however, the court is not necessarily precluded from considering incidents of alleged retaliation that occurred after the plaintiff filed her charge on August 22, 2002, despite the fact that she did not amend her charge or file a new one pertaining to this conduct. As the Second Circuit Court of Appeals explained, "[t]he issuance of a 'right to sue' letter, although not constituting an open license to litigate any claim of discrimination against an employer, does permit a court to consider claims of discrimination reasonably related to the allegations in the complaint filed wit the

EEOC, including new acts occurring during the pendency of the charge before the EEOC." (Internal quotation marks omitted.) *Kirkland v. Buffalo Board of Education,* 622 F.2d 1066, 1068 (2d Cir.1980).[5] Because the plaintiff's allegations of retaliatory conduct that occurred after she filed her 2002 charge are reasonably related to the allegations in her CHRO complaint, the court can consider these allegations in ruling on the defendant's motion.

**\*4** As to the plaintiff's claim of unlawful harassment, in *National Railroad Passenger Corp. v. Morgan, supra,* 536 U.S. at 122, the court expressly excepted claims for hostile work environment from the general rule precluding the court from considering conduct that occurred more than the prescribed number of days before the plaintiff filed the charge of discrimination. As the court stated, "a charge alleging a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same employment practice and at least one act falls within the time period." *Id.,* at 122.[6] Although it is not clear that the plaintiff's claim for unlawful harassment is a hostile workplace environment claim, as opposed to disparate treatment claim, the court will assume that it is for the purposes of this motion. The plaintiff has alleged two acts of discrimination based on sex, race, national origin or ancestry that may have occurred after February 22, and before August 22, 2002. First, she alleges that in 1998, and "until his retirement in 2002 Mr. Rosa [the plaintiff's supervisor] openly treated male interpreters better than female interpreters." According to the evidence, Rosa retired in July 2002. Second, she alleges that in "July or August 2002, Ms. Soto [the plaintiff's supervisor] accused Plaintiff of being unable to read English."[7]

Therefore, the plaintiff's claim of unlawful harassment is not time barred. Moreover, as explained above, the court is not precluded from considering either conduct that occurred prior to February 22, 2002, or conduct that occurred after August 22, 2002, as long as it is reasonably related to the conduct that the plaintiff alleged in her CHRO complaint.

The next consideration is the defendant's argument that the plaintiff's allegations are insufficient to support a cause of action for retaliation. Specifically, the defendant contends that the plaintiff cannot establish a prima facie case of discrimination in that she does not allege that she suffered any adverse employment action, and it has met its burden of providing nondiscriminatory reasons for its conduct.

Section 46a-60(a)(4) provides in relevant part that "[i]t

shall be a discriminatory practice in violation of this section ... [f]or any ... employer ... to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint ... under [General Statutes] section 46a-82, 46a-83 or 46a-84 ..." Under federal law, "[t]he McDonnell Douglas burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII."[8] *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003). Pursuant to this analysis, "a plaintiff can avoid dismissal by presenting the minimal prima facie case defined by the Supreme Court in *McDonnell Douglas* ... By making out this minimal prima facie case ... the plaintiff creates a presumption that the employer unlawfully discriminated, and thus places a burden of production on the employer to proffer a nondiscriminatory reason for its action ... [O]nce the employer articulates a non-discriminatory reason for its actions, the presumption completely drops out of the picture ... Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination. (Internal quotation marks omitted.) *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.2006).

**\*5** "To establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." (Internal quotation marks omitted.) *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003). The defendant contends that the plaintiff cannot establish the second element. It relies on the affidavit of Maria Kewer, a personnel manager, who attests that the defendant has not disciplined, demoted, suspended, involuntarily reassigned or transferred or terminated the plaintiff. The defendant also points out that the plaintiff admitted in both her deposition testimony and her discovery responses that she did not suffer any financial loss except for the sick time she used when she missed work or left early due to the conduct of other employees. As to the plaintiff's evidence that she received two written warnings, the defendant asserts that neither the warnings or the loss of sick time constitute discipline because they are not defined as such under the plaintiff's collective bargaining agreement.

The defendant does not, however, address the following additional allegations of retaliatory conduct, all of which appear to be properly before the court: the plaintiff was

falsely accused of spying on her supervisor, refusing to accept an assignment, taking an unauthorized leave, being absent, failing to report an absence, stealing, being unable to read English and failing to file paperwork on time; her requests for time off were denied without reason; she was required to bring in a note from a doctor regarding her need for an inhaler; she was denied permission to leave work when she became ill; the plaintiff's supervisor scolded her in public, told her to "shut up," threw a book at her; the supervisor said in front of others that if it were up to her, the plaintiff would "be out of there" and she arranged the schedule so that it was not possible for the plaintiff to do her job; the plaintiff's grievances and complaints to her superiors were denied; she was required to work over a holiday; she received an unsatisfactory evaluation; and the plaintiff was wrongfully denied another position.

The United States Supreme Court recently addressed the nature of the "adverse employment action" requirement of the Title VII retaliation provision in *Burlington Northern & Santa Fe Railway Co. v. White,* U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The court first rejected the argument that "the employer's actions prohibited by the anti-discrimination provision should ... be limited to conduct that affects the employee's compensation, terms, conditions, or privileges of employment." (Internal quotation marks omitted.) *Id., at 2411.* Instead, the court concluded, "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related acts and harm." *Id., at 2414.*

**\*6** The court then considered, "the level of seriousness to which this harm must rise before it becomes actionable retaliation." *Id., at 2415.* The court concluded that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Internal quotation marks omitted.) *Id.* The court noted that "[w]e phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters ... A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Id.* In the case before it, the court decided that the jury reasonably concluded that the following two actions by the employer were materially adverse: its reassignment of the plaintiff to a position that was less desirable, and its suspension of the plaintiff for thirty-seven days without pay, despite its later

reinstatement of her with back pay. *Id.,* at 2417-18.

Under these standards, the plaintiff has alleged conduct by the defendant that a reasonable fact-finder could find "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Internal quotation marks omitted.) *Id.,* at 2415. Thus she has alleged conduct by the defendant that, if true, is sufficiently materially adverse to constitute actionable retaliation.

The defendant next argues that, by virtue of Kewer's affidavit testimony, it has met its burden of establishing legitimate nondiscriminatory reasons for its conduct such that the burden shifts to the plaintiff to establish that its conduct was premised on unlawful retaliation, which, it contends, she has not done. In her affidavit, Kewer generally testifies that the plaintiff has never been disciplined, she explains why the plaintiff might have not been paid for sick time, and she explains that the written warning the defendant issued to the plaintiff was not a disciplinary action because it does not qualify as such under the plaintiff's collective bargaining agreement. Even assuming that Kewer's explanations establish legitimate nondiscriminatory reasons for these particular incidents, the defendant has not offered any explanation for the numerous other incidents that the plaintiff alleges in support of her retaliation claim. Until it does so, the presumption of retaliation remains, and the plaintiff is not required to meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against her] ... (Internal quotation marks omitted.) *Joseph v. Leavitt, supra,* 465 F.3d at 90. Accordingly, the defendant has not met its burden of establishing that it is entitled to summary judgment as to the plaintiff's claim of unlawful retaliation.

**\*7** The final question is whether the plaintiff has alleged conduct that is sufficient to support a claim of unlawful harassment. Assuming that the plaintiff is alleging a claim of hostile work environment, the defendant contends that the plaintiff has not alleged that it engaged in conduct that is sufficiently severe to support such a claim.

Under Title VII, a "hostile work environment claim ... is not limited to sexual advances or sexual behavior ... It also includes nonsexual behavior directed at an employee because of her gender"; *Evans v. Southern New England Telephone Co.,* United States District Court, Docket No. 3:00 CV 1124(WIG), 2006 U.S. Dist. LEXIS 71257, \*51 (D.Conn. October 2, 2006); and because of the plaintiff's race and membership in other protected classes. See *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999).[9] The plaintiff's

claim will be analyzed pursuant to the standards that apply to such claims.

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victims employment.' *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) ..." *Diggs v. Manchester,* 303 F.Sup.2d 163, 179 (D.Conn.2004). "[T]his test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive ... Among the factors to consider ... are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance ... In determining whether a hostile environment exists, we must look at the totality of the circumstances ... As a general rule, incidents must be more that episodic; they must be sufficiently continuous and concerted in order to deemed pervasive." (Citations omitted; internal quotation marks omitted.) *Terry v. Ashcroft, supra,* 336 F.3d at 147. Nevertheless, "a single act can create a hostile work environment if it in fact makes[s] a transformation of the plaintiff's workplace." (Internal quotation marks omitted.) *Feingold v. New York,* 366 F.3d 138, 150 (2004).

In this case, the plaintiff's claim of unlawful harassment is arguably based on the following allegations that occurred from 1999 to 2005: her supervisor treated male interpreters better than female interpreters in some unspecified manner; for some time, her supervisor required the plaintiff and other female interpreters, but not the male interpreters, to cover trials by themselves, he once falsely suggested that she disparaged the marshals assigned to the courthouse, and he once told a third party that he was going to kill her; a male employee whom the

plaintiff did not know "degraded" her by telling her that he would take her to a test site in his own car; on one occasion, a non-Hispanic employee denied the plaintiff's request for time off; a non-Hispanic human resources manager once declined to assist the plaintiff; the defendant imposed a time-keeping system on interpreters that discriminated against Hispanic women; and her supervisor once accused the plaintiff of being unable to read Spanish.

**\*8** The plaintiff's allegations do not rise to the level of creating an objectively hostile work environment because they do not demonstrate that the defendant engaged in a severe or pervasive pattern of harassment that was motivated by the plaintiff's gender, race, national origin or ancestry such that it created an objectively hostile or abusive work environment. Federal courts have consistently held that isolated, sporadic incidents of alleged harassment, such as those alleged by the plaintiff, do not constitute a hostile work environment as a matter of law. See *Diggs v. Manchester, supra,* 303 F.Sup.2d at 181 (few sporadic racially derogatory remarks not severe enough to constitute hostile work environment); *Sanchez v. University of Connecticut Health Care,* 292 F.Sup.2d 385, 396 (D.Conn.2003) (three derogatory comments about national origin not sufficiently severe or pervasive). Therefore, the defendant's motion for summary judgment should be granted as to the plaintiff's claim for unlawful discrimination.

For the foregoing reasons, the court grants the defendant's motion for summary judgment as to the plaintiff's claim for unlawful discrimination on the basis of sex, race, national origin and ancestry, and denies the motion as to her claim for unlawful retaliation.

**All Citations**

Not Reported in A.2d, 2007 WL 969392

**Footnotes**

[1]   The plaintiff filed a request to amend several paragraphs of the complaint after the defendant filed the motion for summary judgment. The defendant filed a timely objection to the request. The court denied the plaintiff's request and sustained the defendant's objection thereto.

[2]   This presumption is based on the following. Although the plaintiff does not refer to any statute in count one, the complaint initially contained a second count in which she referred to Title VII of the Civil Rights Act of 1964. The plaintiff withdrew count two on November 6, 2006.

3    The defendant also argues that the plaintiff's claim for punitive damages under Title VII is barred by the doctrine of sovereign immunity; the plaintiff's claim is barred by the applicable statute of limitations; and the plaintiff lacks standing to raise claims on behalf of other employees. The first argument is moot, as the plaintiff withdrew her Title VII claim. The defendant abandoned the second argument by not briefing it. As to the third argument, it is apparent that the plaintiff is not attempting to assert claims on behalf of others. Rather, she has included allegations of discriminatory conduct that was directed toward others, which is permissible in the context of a claim of hostile workplace harassment. See *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

4    Our courts have "on occasion ... interpreted our statutes even more broadly than their federal counterparts, to provide greater protections to our citizens, especially in the area of civil rights." *Commission on Human Rights & Opportunities v. Savin Rock Condominium Ass'n, Inc.,* 271 Conn. 373, 386 n. 11, 870 A.2d 457 (2005). The plaintiff has not, however, offered an argument as to why the court should do so in these circumstances.

5    As one court explained, "[t]o force an employee to return to the state agency every time he claims a new instance of discrimination in order to have ... the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier." *Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973).

6    The court explained that hostile environment claims are treated differently because they "are different in kind from discrete acts. Their very nature involves repeated conduct ... The unlawful employment practice ... occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." (Citations omitted; internal quotation marks omitted.) *National Railroad Passenger Corp. v. Morgan, supra,* 536 U.S. at 115.

7    Although the plaintiff characterizes this conduct as retaliatory, it could also conceivably be related to the plaintiff's race, national origin or ancestry.

8    Title VII's anti-retaliation provision provides in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

9    Unlike or our statute; see General Statutes § 46a-60(a)(8); Title VII does not contain a separate section prohibiting sexual harassment. Instead such claims are analyzed under the general provision that, like § 46a-60(a)(1), prohibits employers from discriminating against individuals in the terms, conditions and privileges of employment on the basis of the individual's sex, race, national origin or ancestry. See 42 U.S.C. § 2000e-2(a)(1).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 5313714
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

VERMONT MUTUAL INSURANCE CO., Plaintiff,
v.
Danielle LaCOURSE, et al., Defendants.

Civil No. 3:13cv664 (JBA).
|
Signed Oct. 16, 2014.

**Attorneys and Law Firms**

Stuart G. Blackburn, Blackburn & O'Hara, LLC, Windsor Locks, CT, for Plaintiff.

Eugene C. Cushman, New London, CT, John J. Carta, Jr., Essex, CT, for Defendants.

**RULING ON MOTION TO DISMISS CROSSCLAIMS**

JANET BOND ARTERTON, District Judge.

**\*1** Crossclaim Defendants Victor L. Ebersole, Jr. and Sumner & Sumner, Inc. ("Sumner & Sumner") move [Doc. # 51] to dismiss Defendant Danielle LaCourse's crossclaim filed against them on the basis that because they were improperly joined as parties and their joinder was untimely, the Court should decline to exercise supplemental jurisdiction over such claims. For the reasons that follow Crossclaim Defendants' motion is granted.[1]

**I. Background**
Plaintiff Vermont Mutual Insurance Company initiated this action on May 9, 2013, seeking a declaratory judgment that it does not owe insurance benefits to Defendant LaCourse for damages arising out of a fire that occurred on January 22, 2012 at 6 Prospect Street in

Putnam, Connecticut, because Defendant LaCourse provided false and misleading information to Vermont Mutual regarding her ownership interest in the property. (*See* Complaint [Doc. # 1].) Ms. LaCourse filed a counterclaim against Vermont Mutual for breach of contract and indemnification for damages arising from Vermont Mutual's denial of coverage. (*See* Answer and Counterclaims [Doc. # 12].)

On March 20, 2014, Defendant LaCourse moved [Doc. # 28] pursuant to Fed.R.Civ.P. 19(a) to join her insurance brokers Mr. Ebersole and Sumner & Sumner to this action as necessary parties, contending that Defendant provided accurate information to her brokers regarding the coverage sought and that any misrepresentation made to Vermont Mutual was the result of the intentional or negligent acts of Mr. Ebersole and Sumner & Sumner. This motion was granted [Doc. # 29] absent objection and Mr. Ebersole and Sumner & Sumner were served [Doc.33–34] with the Crossclaim Complaint [Doc. # 30] on April 25, 2014.

**II. Discussion**
Mr. Ebersole and Sumner & Sumner contend that the Court should decline to exercise supplemental jurisdiction over the crossclaims asserted against them on the basis that such claims were improperly asserted against them as necessary parties under Rule 19, instead of under Rule 20, governing permissive joinder.[2] This issue was not previously examined because Defendant's Motion for Joinder was granted absent objection and it does not appear that Movants received notice of the motion before it was granted.[3]

Although the Court may exercise supplemental jurisdiction over Defendant's claims against Movants, it may decline to exercise such jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C § 1367(c).

"[W]here at least one of the subsection 1367(c) factors is applicable, a district court" may decline to exercise supplemental jurisdiction but only if dismissing such claims would "promote the values articulated in

[ *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ]; economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.,* 358 F.3d 205, 214 (2d Cir.2004); *see also Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("Under *Gibbs,* a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.").[4]

**\*2** Movants contend that such factors weigh against exercising supplemental jurisdiction, because (1) Defendant LaCourse's Motion for Joinder was untimely, (2) exercising supplemental jurisdiction over the claims against Movants would require reopening discovery and would delay adjudication of the original claims, (3) the Crossclaim Complaint presents claims that are more complex than those in the original complaint; and (4) the claims raised in the Crossclaim Complaint are premature. (Reply at 2 n. 1.)

The Court agrees that these factors weigh in favor of the Court declining to exercise supplemental jurisdiction. First, Defendant had a deadline of September 1, 2013 to join parties or claims (*see* Report of Parties' Planning Mtg. [Doc. # 10] at 6) yet did not move to join Mr. Ebersole and Sumner & Sumner until over six months past this deadline and Movants were served with the crossclaims just five days before the scheduled close of discovery. The deadline for the filing of dispositive motions has now passed and neither Plaintiff nor Defendant has filed any such motions. Thus, exercising supplemental jurisdiction would require reopening discovery and delaying the adjudication of a case that is otherwise ready for trial and has a trial ready date of December 1, 2014. (*See id.* at 7, 9; Sept. 5, 2013 Scheduling Order.)

Further, Movants claim to have been prejudiced by this delay in that their depositions were taken before they were added as third-party defendants in this action and before they retained the counsel now representing them in this action. (*See* Mem. Supp. [Doc. # 52] at 10.) Defendant has not addressed these arguments nor provided any explanation for her delay, which appears unjustified given that the nature of the claims against Movants should have been known since the inception of this action.

In *Mariani v. D & H Mgmt. Servs., LLC,* No. 12cv930 (RNC), 2014 U.S. Dist. LEXIS 44491, at *5–6, 2014 WL 1289451 (D.Conn. Mar. 30, 2014), the court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(4) and dismissed a third-party complaint filed by the defendants in an underlying action, which sought indemnification for a potential judgment in the underlying action, on the basis of the defendants' delay in asserting such claims. *See id.* ("After careful consideration, the Court concludes that the age and status of the original case at the time the motion to implead Travelers was filed, and the probability that the existing deadlines in the scheduling order would have to be extended by a year or more in order to accommodate the third party claims, create exceptional circumstances that warrant declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(4).").

Likewise here the Court declines to exercise supplemental jurisdiction over Defendant's third-party claims against Movants pursuant to 28 U.S.C. § 1367(c)(4) on the basis that Defendant's delay in asserting such claims would delay the adjudication of this case and cause prejudice to Movants, and thus retaining jurisdiction would be inconsistent with the values of "economy, convenience, [and] fairness." *Jones,* 358 F.3d at 214.[5]

**III. Conclusion**
**\*3** For the reasons set forth above, the Motion [Doc. # 51] to Dismiss of Crossclaim Defendants Victor L. Ebersole, Jr. and Sumner & Sumner is GRANTED and the claims against them are dismissed without prejudice to refile in state court. *See Giordano v. City of New York,* 274 F.3d 740, 755 (2d Cir.2001) ( "We therefore vacate the district court's judgment dismissing with prejudice the state and municipal claims and instruct the court to dismiss them without prejudice so that the state courts may adjudicate those claims in their entirety if the plaintiff chooses to pursue them in those courts.").

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5313714

## Footnotes

1   In the absence of any indication from the parties that oral argument was requested, *see* Loc. Civ. R. 7(a)1 (requiring that all motions and opposition briefs indicate whether oral argument is requested), the Court's previously scheduled oral argument is canceled and this ruling will issue, *see id.* ("[T]he Judge may, in his or her discretion," rule on a motion without oral argument.).

2   Movants also contend that joinder under Rule 19(a)(1) was improper because it deprived the court of diversity subject-matter jurisdiction in that Defendant and Movants are not diverse from each other. (*See* Reply [Doc. # 54] at 1.) However, Plaintiff and Defendant are diverse and the Court could exercise supplemental jurisdiction over Defendant's third-party claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367(a); *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 558, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005), including claims asserted against a non-diverse party joined by a defendant under either Rule 19 or Rule 20, *see* *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 728 (2d Cir.2000).

3   The case docket indicates that Movants were not served with Defendant's Motion for Joinder by the Court's CM/ECF system, and the Certification of service accompanying this motion does not indicate whether Movants were served with the motion by other means. Thus, it is not clear that Movants had an opportunity to oppose joinder before it was granted and before they filed this Motion to Dismiss.

4   If Movants had been provided with an opportunity to object to a motion for permissive joinder, the Court would have considered similar factors. *See* *Barr Rubber Products Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1126–27 (2d Cir.1970) ("Rule 19, prescribes permissive, not necessary, joinder and specifically vests in the district court the discretionary power to make such orders as may be required to prevent delay or prejudice...."); *Travelers Indem. Co. of Connecticut v. Losco Grp., Inc.,* 150 F.Supp.2d 556, 565 (S.D.N.Y.2001) ("[T]he Court ... must determine if joinder 'will comport with the principles of fundamental fairness.' "). While the Court retains authority to vacate the Order granting Defendant's Motion for Joinder, *see* Fed.R.Civ.P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."), Movants have not sought such relief and thus the Court will instead focus only on the question of whether to decline to exercise supplemental jurisdiction, which will involve a consideration of similar values of judicial economy and fundamental fairness.

5   Although there is anticipated factual overlap between Plaintiff's claims against Defendant and the substance of Defendant's claims against Movants, Defendant's delay in asserting such claims undermines the potential for the exercise of supplemental jurisdiction to promote judicial economy.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2475178
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Oliver WELLINGTON, Plaintiff,
v.
NORWALK HOSPITAL, Defendant.

3:18-cv-02143-WWE
|
Signed 06/13/2019

**Attorneys and Law Firms**

Daniel H. Kryzanski, Law Offices of Daniel H. Kryzanski, Stratford, CT, for Plaintiff.

Kaelah M. Smith, Sarah R. Skubas, Jackson Lewis PC, Hartford, CT, for Defendant.

**MEMORANDUM OF DECISION ON
DEFENDANT'S MOTION TO DISMISS**

WARREN W. EGINTON, SENIOR UNITED STATES
DISTRICT JUDGE

**\*1** This is an employment discrimination action. Plaintiff Oliver Wellington alleges that defendant Norwalk Hospital discriminated against him based upon his age, religion, and gender in violation of federal and Connecticut law. In addition, Wellington alleges defamation and negligent infliction of emotional distress.

Norwalk Hospital has moved to dismiss the state law discrimination claims (Counts Four, Five, and Six) for failure to exhaust administrative remedies. The Hospital has also moved to dismiss Wellington's defamation and negligent infliction of emotional distress claims (Counts Seven and Eight) for failure to state a claim. For the following reasons, defendant's motion will be granted.

**DISCUSSION**

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King, 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff is obliged to amplify a claim with some factual allegations to allow the court to draw the reasonable inference that the defendant is liable for the alleged conduct. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**Exhaustion of Administrative Remedies**

Norwalk Hospital argues that Wellington's state discrimination claims are not legally sustainable, as Wellington failed to exhaust his administrative remedies and obtain a release of jurisdiction from the Commission on Human Rights and Opportunities ("CHRO"). Moreover, defendant asserts that any attempt to do so now would be untimely. Wellington acknowledges the exhaustion requirement, yet responds, without support, that an EEOC release "should be sufficient" to provide jurisdiction for state law claims even though no CHRO release has been filed.

> Under our exhaustion of administrative remedies doctrine, a trial court lacks subject matter jurisdiction over an action that seeks a remedy that could be provided through an administrative proceeding, unless and until that remedy has been sought in the administrative forum.... In the absence of exhaustion of that remedy, the action must be

Wellington v. Norwalk Hospital, Slip Copy (2019)

dismissed.

📑 Levine v. Town of Sterling, 300 Conn. 521, 528 (2011). In the instant case, Wellington's failure to bring his complaint to the CHRO forecloses his access to judicial relief, because it deprives this trial court of jurisdiction to hear his complaint. See Sullivan v. Board of Police Com'rs of City of Waterbury, 196 Conn. 208, 217-18 (1985) (finding that failure to bring complaint to the CHRO should have resulted in trial court's *sua sponte* dismissal of the cause of action); see also Fried v. LVI Services, Inc., 557 Fed. Appx. 61, 63 (2d Cir. 2014) (summary order) ("It is undisputed that CFEPA claims must initially go through the CHRO, and may not be sued upon until the CHRO grants a release of jurisdiction."). Moreover, an EEOC right-to-sue letter is not sufficient to satisfy the exhaustion requirements of the CFEPA. See Edwards v. William Raveis Real Estate, Inc., 2009 WL 1407233, at *3-4 (D. Conn. May 19, 2009) (holding that although release provided by the CHRO can be sufficient to satisfy EEOC exhaustion requirements, the inverse is not true). Accordingly, Wellington's state law discrimination claims will be dismissed for failure to exhaust administrative remedies.

**Defamation**

**\*2** Norwalk Hospital has moved to dismiss Wellington's defamation claim for failure to state a claim. The Hospital contends that Wellington has failed to adequately plead the details of any alleged defamatory conduct.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him ... To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." Graves v. Chronicle Printing Company, 2018 WL 6264070, at *9 (Conn. Nov. 7, 2018) (quoting 📑 Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627-28 (2009)).

"A complaint is insufficient to withstand dismissal for failure to state a cause of action where, other than the bare allegation that the defendant's actions caused injury to plaintiff's reputation, the complaint sets forth no facts of any kind indicating what defamatory statements, if any, were made, when they were made, or to whom they might have been made." 📑 Kloth v. Citibank (South Dakota), N.A., 33 F. Supp. 2d 115, 121 (D. Conn. 1998).

Wellington responds that his allegations of defamation "sufficiently apprise" Norwalk Hospital as to the defamatory statements. Nevertheless, Wellington's defamation claim, as pleaded, fails to identify who made statements, how they were made, to whom they were made, and when they were made. Moreover, plaintiff's complaint does not include the specific language of any statements, beyond that Wellington "had a serious work error." Accordingly, Wellington's defamation claim will be dismissed for failure to state a claim.

**Negligent Infliction of Emotional Distress**

Norwalk Hospital has moved to dismiss Wellington's negligent infliction of emotional distress claim for failure to state a claim. The Hospital argues, in part, that Wellington has failed to allege any unreasonable conduct occurring during the termination process. See 📑 Parsons v. United Technologies Corp., Sikorsky Aircraft Div., 243 Conn. 66, 88 (1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process.").

Wellington responds that he has alleged that "at least part of the reason for his termination was related to the accusation that he made a 'serious work error.' " Stripped of its labels and conclusions, Wellington's allegations do not describe any wrongful conduct aside from the basis for Wellington's termination: a serious work incident involving a "medication discrepancy." Nevertheless, allegations that the employer had a wrongful purpose are insufficient. See id. 234 Conn. at 88-89 ("The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress."). In other words, plaintiffs must allege conduct involving an unreasonable risk of causing emotional distress that might result in illness or bodily harm apart from the basis for the termination itself. See id. Wellington's allegations are insufficient to state a claim for negligent infliction of emotional distress because they merely describe an allegedly wrongful basis for his termination. Accordingly, this claim will be dismissed.

within 14 days of this ruling's filing date.

**All Citations**

**CONCLUSION**

Slip Copy, 2019 WL 2475178

**\*3** For the foregoing reasons, Norwalk Hospital's motion to dismiss is GRANTED. Plaintiff is instructed to file an amended complaint that is consistent with this ruling

**End of Document**                                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.