# EXHIBIT 1

 Positive
As of: June 17, 2020 5:06 PM Z

# Burgess v. Harris Beach PLLC

United States District Court for the Western District of New York

March 28, 2008, Decided; March 28, 2008, Filed

07-CV-6281-CJS

**Reporter**
2008 U.S. Dist. LEXIS 25166 *; 2008 WL 850336

SUSAN N. BURGESS, Esq., Plaintiff, -vs- HARRIS BEACH PLLC; RAYNE HAMMOND BENZ; PITTSFORD CENTRAL SCHOOL DISTRICT; BOARD OF EDUCATION OF THE PITTSFORD CENTRAL SCHOOL DISTRICT; JOHN P. SCHIESS, IN HIS PERSONAL AND OFFICIAL CAPACITIES; BARBARA SHAPIRO, HER PERSONAL AND OFFICIAL CAPACITIES; AND PITTSFORD DISTRICT TEACHERS ASSOCIATION, Defendants.

**Subsequent History:** Affirmed by Burgess v. Harris Beach PLLC, 2009 U.S. App. LEXIS 20837 (2d Cir., Sept. 21, 2009)

**Counsel:** **[*1]** For Plaintiff: Susan N. Burgess, Esq., Pro se, Brockport, NY.

For Defendants Harris Beach PLLC and Rayne Hammond Benz, Esq.: David Rothenberg, Esq., Geiger and Rothenberg, LLP, Rochester, NY.

For Defendants Pittsford Central School District; Board of Education of the Pittsford Central School District; and John P. Schiess, in His Personal and Official Capacities: Peter John Glennon, Esq., Nixon Peabody LLP, Rochester, NY.

For Defendants Barbara Shapiro, in Her Personal and Official Capacities and Pittsford District Teachers Association: Kevin H. Harren, Esq., New York State United Teachers Office of General Counsel, Latham, NY.

**Judges:** Charles J. Siragusa, United States District Judge.

**Opinion by:** Charles J. Siragusa

# Opinion

DECISION and ORDER

## INTRODUCTION

Plaintiff has alleged that Defendants engaged in "a calculated scheme . . . to frame plaintiff before this Court and before an attorney grievance committee and to conceal their actions from plaintiff and the Court." (Compl. P 1.) Her complaint raises ten causes of action under State and Federal law. Now before the Court are Defendants' motions (Docket Nos. 9, 13 & 14) to dismiss the complaint. For the reasons stated below, Defendants' motions are granted in part, the **[*2]** federal question claims are dismissed, and the Court declines to exercise jurisdiction over the remaining state law claims.

## BACKGROUND

This lawsuit is before the Court on Federal Question, 28 U.S.C. § 1331, and Civil Rights, 28 U.S.C. § 1343, jurisdiction. The complaint also contains causes of action plead under New York law, for which the Court has supplemental jurisdiction. 28 U.S.C. § 1367. With regard to the municipal defendants, Plaintiff alleges that she "timely served Notices of Claim upon the District and the Board." (Compl. P 23.) She also states that she was "deposed pursuant to New York General Municipal Law § 50-h on November 13, 2006, and this action is timely pursuant to New York General Municipal Law § 50-i(1)(c)." (*Id.*) Paragraphs 24 through 73 allege the facts underlying all the causes of action and are reproduced here for convenience:

24. Plaintiff commenced in U.S. District Court, Western District of New York, on behalf of a client, 03-cv-6541 in 2003. At all times relevant to this complaint, Judge Michael A. Telesca was the federal judge assigned to 03-CV-6541.

25. Upon information and belief, prior to going to work for Harris Beach in 2003, defendant Benz worked [*3] as a law clerk to Judge Telesca.

26. During discovery in 03-cv-6541 it was necessary for plaintiff to file three motions to compel relevant District employment records because of Benz's and the District's failure to produce such records voluntarily or completely.

27. After obtaining some employment records following these motions, and in the course of investigating her case, on February 22, 2006, plaintiff showed a female teacher at the District (hereafter "Doe" [1]), her employment files, which plaintiff had obtained in discovery and which she had permission to show Doe. Doe was flabbergasted by memoranda and e-mails in an "investigation" file on her of which she was unaware. The memos and e-mails were by and between her building principal and defendant Schiess.

28. Doe was unaware that the District had any problems with her performance and expressed to plaintiff that, based on what she saw in her files, she believed the District was fabricating a disciplinary case against her.

29. Thus, Doe was a particularly relevant witness for plaintiff in 03-cv-6541 because of similarities between her employment and the claims plaintiff's client was asserting in 03-cv-6541, including the client's claim [*4] that the District and Schiess had fabricated the reason for her termination.

30. Doe was distraught and asked plaintiff for legal advice. Plaintiff advised her briefly that if she could do nothing and see what happened, go to the union, or hire an attorney. Plaintiff stated that, if she were the attorney, she would not sue the District because no employment action had been taken but, rather, she would write a letter to the District about the contents of Doe's employment files. After a brief discussion with her boyfriend, Doe decided to wait and see what happened.

31. On March 2, 2006, Doe's union president, defendant Shapiro, called Doe and told her she was required to meet with her building principal the following Monday

and was to bring a union representative with her. Doe construed this directive to mean that she was going to be disciplined in some way. She told Shapiro that plaintiff had shown her her employment records, that there were things in them that were not true, and that if the District continued trying to discipline her she was going to get a lawyer.

32. Upon information and belief, that same day, Shapiro, acting as an agent for the District rather than as an advocate for members [*5] of the teachers union, disclosed the substance of her call to Doe with Schiess and/or Benz. Upon information and belief, Schiess instructed Shapiro to call Doe back and cancel the directive that Doe meet with her principal.

33. Upon information and belief, thereafter, still on March 2, 2006, Schiess and/or Shapiro disclosed to Benz that Doe learned from Burgess the contents of the investigatory file and thus the disciplinary charges the District was building against Doe and that Doe was upset by what she had seen.

34. Soon after, that same day, Benz accused plaintiff of improperly soliciting multiple District employees, without mentioning Doe. Benz accused plaintiff of using District records obtained in discovery for her "own personal rainmaking efforts." Benz alleged that plaintiff was trying to convince District employees to retain her and sue the District. Benz claimed she learned of the alleged solicitation of multiple employees from a "confidential source" whom she did not name. Benz made these allegations with knowledge that plaintiff had a right and obligation to interview District employees who might be witnesses in 03-cv-6541, and with knowledge that she had given plaintiff [*6] written permission to show employment files obtained in discovery to the District employees to whom they pertained.

35. Plaintiff denied these unsupported and outrageous allegations. To prevent plaintiff from speaking to Doe again or from speaking to any other District employee, and to interfere with plaintiff's ability to investigate and pursue her client's case in 03-cv-6541, on March 3, 2006 Benz faxed a letter to Judge Feldman making the same vague and unsubstantiated accusations, again based on a "confidential" phone call from a District employee on March 2, 2006. Judge Feldman gave Benz until March 10, 2006 to file a motion for injunctive relief establishing her claims, and plaintiff challenged Benz emphatically to include affidavits from allegedly solicited employees.

36. Knowing Benz could not substantiate her accusations of solicitation and abuse of discovery, defendants or

---

[1] The name of the teacher is known to plaintiff all defendants in this case by virtue of their involvement in 03-CV-6541. Certain documents filed in 03-cv-6541 that contain the teacher's name have been redacted as to her name and have substituted "Ms. Doe" for the teacher's name.

some of them, specifically Benz, Schiess, and Shapiro, devised a plan to frame plaintiff with the court and to interfere with her ability to investigate her case further. Defendants' plan was designed not only to prevent plaintiff from having further contact with Doe, who was upset with the District and had **[*7]** expressed that she might sue the District, but to prevent plaintiff from speaking to any other District employee who might either have information that would further plaintiff's case in 03-cv-6541 or who might have claims of their own against the District.

37. To further this scheme, Shapiro, Benz, and Schiess acted in concert to convince Doe that plaintiff had upset her wrongfully by misrepresenting to her that she had a problem with her employment, that plaintiff deliberately had misinterpreted to Doe the contents of her employment files for the purpose of soliciting Doe to sue the District, that plaintiff was not allowed to show Doe her files or even talk to her and was wrong to have done so, and that plaintiff had wrongfully and unlawfully misused Doe's employment records and wrongfully and unlawfully tried to solicit business from Doe.

38. To carry out their scheme, Shapiro and Benz engaged in five conversations with Doe in which they disparaged plaintiff to Doe and, at the same time, assured Doe that she had nothing to fear with respect to the status of her employment, blaming plaintiff for having misrepresented her employment status to Doe. The contents of Doe's files showed, **[*8]** however, that Schiess and Doe's building principal were compiling evidence against Doe for the purpose of bringing disciplinary charges against her under Education Law § 3020-a.

39. Shapiro, Benz, and Schiess knew that Doe trusted Shapiro not only as Doe's union representative but as a personal friend.

40. Specifically, on March 7, 2006, Shapiro said to Doe, among other things, that plaintiff "really has overstepped her bounds;" that Shapiro was "very angry" because plaintiff "implied things" and "the things she said were very inflammatory, very upsetting to you, and certainly in my view was inappropriate;" that plaintiff "should never even have had access to, to any of your information;" that Shapiro had "had registered a complaint with the bar association" about plaintiff; that Shapiro had received "tons" of "calls from other [union] members" who were "very upset;" that the District (Doe's employer) felt that plaintiff had "really overstepped her bounds by actually calling people" and that plaintiff 'was never supposed to contact' employees or show them their employment records; and that the District was "trying to ascertain whether or not they have

legal grounds against" plaintiff **[*9]** because "she's overstepped her bounds."

41. Shapiro told Doe that Schiess had "implied to me how grateful he would be if you would cooperate" and that if Doe cooperated with the District it might be a way to "turn around" how the District had been treating her.

42. Shapiro said again that plaintiff "really did overstep her bounds and she really did say some things to you that caused you a lot [of] unnecessary upset." Shapiro told Doe that what plaintiff had shown her was not her personnel file but some "private notes" and that those notes either were not in Doe's files or would be removed.

43. When Doe expressed hesitancy about assisting the District after the way the District had treated her, Shapiro continued to ensure her that if she cooperated with the District her negative employment situation would improve and the District might "view [Doe] in an entirely different light."

44. When Doe asked Shapiro whether she really believed that her speaking to Benz to assist the District really would "make a difference," Shapiro responded, "I do, I really do, otherwise I wouldn't have called you. There's somebody else I could call -- You're not the only one she's [plaintiff] done this to," thereby **[*10]** continuing to assert to Doe that plaintiff had done something wrong by interviewing Doe and showing Doe her employment records.

45. When Doe asked Shapiro whether the District would be willing to "do any negotiations," Shapiro responded, "Well I think his [Schiess's] words were he'd be very, very grateful. I think you just have to leave it at that. I mean, I'm not, listen, I can't promise you a castle."

46. Still hesitant, Doe said she would get back to Shapiro by Friday (March 10) or Monday (March 13), and Shapiro responded, "Maybe by Thursday (March 9)." Shapiro thus knew that Benz was required to file a motion by March 10, 2006.

47. When Doe had not called Shapiro back by March 10, 2006, Shapiro called Doe on that day and told her that if she was going to speak to Benz, it was "today or never." She told Doe that she had spoken to Schiess again the night before and that Schiess said "for the first time" that he agreed with Shapiro about how difficult Doe's employment circumstances had been. Thus Shapiro sought to intensify the connection between Doe's employment situation improving and her speaking to Benz to assist the District in legal action against Burgess. Shapiro tied Doe's ability **[*11]** to look at and correct inaccurate information in her employment records to Doe's cooperation with the District in regard to an action against Burgess.

48. Shapiro then promised Doe that, after she spoke to Benz, she and Doe would meet with Schiess, review Doe's files, and "I think, you know, I think things might get better if we handle this thing right." Shapiro told Doe that if it were her (Shapiro), she would "do it" too, because it could only help Doe and not hurt her. When Doe responded that that was what she was hoping, Shapiro said, "It will. Trust me."

49. Having been set up by Shapiro to believe that plaintiff had somehow wronged her, and believing that her employment would improve if she met with Benz, Doe met with Benz the afternoon of March 10, 2006. Benz, too, tried valiantly to influence Doe to believe that plaintiff had lied to her and had solicited her.

50. At the outset of this meeting, Benz told Doe that a confidentiality order in place in 03-cv-6541 prevented plaintiff from talking about certain documents or sharing them. Benz did not disclose to Doe that she (Benz) already had agreed to [sic] plaintiff that the confidentiality order was not implicated by plaintiff's **[*12]** interviewing District employees or showing them their employment files. She told Doe that she and the District had been "concerned from the beginning" based on "some prior history with" plaintiff that plaintiff would be "sharing information that she shouldn't and misrepresenting that information to people." She told Doe that it was her "understanding that some of the things that [plaintiff] may have told you and that's why I'm what I'm here to do is just to find out what she really did tell you and whether there are some things we need to be concerned about" and that plaintiff "may have implied things to you to try to scare you."

51. Benz questioned Doe thoroughly about plaintiff's investigatory interview with her, which is contrary to federal law governing discovery and contrary to attorney ethics rules pertaining to attorney work product. Doe clearly stated that she, not plaintiff, had concluded that the District was setting her up to be disciplined. Doe told Benz that she had been upset by what she saw in her employment files and that she asked plaintiff for legal advice. At no time did Doe state that plaintiff made any representations as to what was in the files.

52. During Benz's **[*13]** interview of Doe, Benz asked questions to determine whether plaintiff had solicited Doe. Doe told Benz that she had asked plaintiff for legal advice and that plaintiff had given her a range of options in response to that inquiry. Five times during this conversation, Doe denied that she had been solicited, pressured, or advised to sue the District:

Benz: Did [plaintiff] suggest herself as a possible representative?

Doe : She said you know, anybody such as herself, yes -- but she didn't, she didn't push or anything, I mean she wanted --

* * *

Benz: [T]here are certain circumstances in which an attorney can solicit clients and certain circumstances in which they are not permitted to do so, so I'm just asking for my --

Doe : No, I don't think, I don't think she was, uh, looking to solicit, um, I think she wanted to make me aware of some of the stuff and, um --

Benz: Did she say why she wanted to make you aware?

Doe: Well she's also working on this other case and um she said there's a lot of parallels, I think, she didn't say that exactly but, you know she did ask me questions on the phone and stuff to help out with her case, I guess.

Benz: [D]id she advise you that you had claims against the district **[*14]** that you should sue them for something --

Doe: No, not at any time.

53. Benz continued to press Doe with questions about everything plaintiff discussed with Doe during their interview and asked Doe what plaintiff's "version" of plaintiff's client's story was. When Doe explained that, Benz proceeded to argue against plaintiff's client's claims, misrepresenting record evidence in the process.

54. Benz then asked Doe how her conversation with plaintiff ended, and Doe told Benz that plaintiff specifically had stated to Doe that, if plaintiff were her lawyer, she would not sue the District but would write a letter to the District.

55. Benz then asked Doe why plaintiff would write a letter when the issues with Doe's employment "been taken care of," implying that plaintiff had misrepresented to Doe that there were issues with her employment. She stated that she "just wondered why she [plaintiff] would write a letter if all the issues have been resolved." Doe responded that the issues have not been resolved.

56. Despite Doe's having exculpated plaintiff several times with respect to the issue about which Benz purportedly was interviewing her, *i.e.,* plaintiff's solicitation of Doe, Benz persisted **[*15]** in assuring Doe that she need not worry about what she saw in her employment files, she persisted in disparaging plaintiff to Doe, and she even advised Doe to get "a couple" of second legal opinions, more than implying that plaintiff was an untrustworthy lawyer who did not care about her clients but cared only about money.

Benz: Because, yeah, again, my worry is that [plaintiff] is a lawyer, this is how she makes her money, and I, it bothers me to think that she would be meeting with

people and scaring them into thinking that something terrible is going to happen to them, um, when really, you know, she's looking at those people and seeing dollar signs and not necessarily sticking up for those people.

* * *

Benz: [B]ut get some second opinions, because I -- I'm just worried that what [plaintiff] has done is taken documents that we gave so she can see that the district wasn't pursuing things like she thought they were and instead she's turned around and tried to use them to, to get clients.

57. When Doe asked Benz whether plaintiff had contacted other people, Benz responded,

> My understanding is that she has. I haven't talked to anyone else that she has talked to, but I've heard from people [*16] who've heard from people…and so now I'm just worried that is she out there calling people and you know, we were not there to say hey wait a minute that's not what that says, that's not why that was written here so, so those are my concerns.

58. Thus, Doe was the only person Benz spoke to about solicitation. Upon information and belief, that is because Doe had learned about and was upset by the District's machinations to set up her to be disciplined, making Doe the perfect candidate to unwittingly assist the District in framing plaintiff because she stood to benefit from having the offending employment records expunged or otherwise cleared up in exchange for her testimony. Benz and Shapiro planned to convince Doe of an alternate truth about plaintiff, to which Doe then unwittingly would testify.

59. Benz also told Doe that she had clerked for a federal judge and that judge had suggested that she apply at defendant Harris Beach because he "knew all the attorneys there." The federal judge for whom Benz had clerked was Honorable Michael A. Telesca, who was the judge in 03-cv-6541.

60. Shortly after this interview, still on March 10, 2006, Benz phoned Doe, told her she had reviewed her [*17] employment files, and tried again to convince Doe that there was nothing negative in her employment file and that plaintiff had misrepresented to Doe what was in her file.

61. Benz drafted an affidavit for Doe's signature for use in supporting the motion Judge Feldman had instructed her to file. Benz's draft excluded all five of Doe's exculpatory statements in which Doe had exonerated plaintiff of any solicitation, pressure, or advice to sue the District.

62. Benz and Shapiro failed to disclose to Doe that the

motion the District intended to bring against plaintiff would accuse plaintiff of wrongfully soliciting Doe and others and that Doe's affidavit would be used to support such an accusation, so Doe had no reason to question the exclusion of these statements from her affidavit. Benz told Doe only that her affidavit would be used in a motion to "clarify" the terms of an existing confidentiality order.

63. Benz knew or should have known that Doers statements, which Benz excluded from Doe's affidavit, were directly relevant to any claims of solicitation and that including them in Doe's affidavit would have ensured that Benz's motion seeking sanctions against plaintiff would be denied.

64. [*18] Doe tape recorded the five conversations she had with Shapiro and Benz on March 7 and 10, 2006 and gave copies of the recordings to plaintiff. Plaintiff listened to the recordings on March 11 and 12, 2006. Thus, plaintiff knew of Shapiro's and Benz's disparaging remarks to Doe about her and she knew that Doe had exonerated her from any solicitation.

65. On March 13, 2006, Benz filed a motion with the court alleging that plaintiff had solicited multiple employees using confidential District employment records and thus had violated ethics rules and abused discovery documents. Benz attached to her motion Doe's innocuous affidavit (which omitted the evidence that plaintiff had not solicited Doe) and an affidavit from Schiess that contained no evidence or mention of solicitation. There were no other affidavits and no evidence of solicitation submitted with the motion. Benz alleged again that the "confidential" source, whom she did not name in the motion, had said that plaintiff had solicited multiple employees.

66. Having failed to convince Doe that plaintiff had solicited her, on March 13, 2006, Shapiro mailed a grievance against plaintiff to the bar association. The grievance was dated [*19] March 8, 2006 - the day after Shapiro told Doe she already had filed a grievance based on "tons" of complaints about plaintiff from other teachers.

67. Upon information and belief, Shapiro's grievance, which subsequently was dismissed and closed for lack of evidence, was Benz's, Shapiro's, and Schiess's "back-up" plan in the event Doe would not buy, and thus testify to, their attempts to convince her that plaintiff had misled her about her employment and employment records and had solicited her.

68. Because Benz had filed her fraudulent motion under seal, plaintiff needed Benz's permission to show Doe the motion in order to prepare a defense to it. Plaintiff asked

Benz for such permission, knowing that if Doe saw how her affidavit had been used, she would protest that she had told Benz that plaintiff had not solicited or pressured her.

69. Benz, who did not know about the tapes, refused to consent to plaintiff's showing Doe the motion, representing to plaintiff that it was not necessary to do so because everything she and Doe had discussed was set forth in Doe's affidavit. Plaintiff knew this representation to be a lie.

70. Benz's motion and Shapiro's grievance were designed to accomplish **[*20]** sanction against plaintiff to stop her from speaking to Doe further, to stop her from interviewing any other District employees who might have facts, as Doe did, that would advance plaintiff's claims in 03-cv-6541, and to remove plaintiff from representation in 03-cv-6541 if possible. Benz then lied to plaintiff about what she had discussed with Doe to prevent plaintiff from being able to defend herself against Benz's unfounded and fraudulent accusations and to prevent the court from knowing about her fraudulent conduct.

71. When plaintiff tried to speak to Doe without revealing the contents of the motion, Doe refused on the ground that she feared retaliation in her employment. Doe's boyfriend, who was familiar with the facts, also refused to speak to plaintiff out of fear of retaliation against Doe.

72. At the May 4, 2006 oral argument of Benz's motion, Benz's supervising partner at defendant Harris Beach, Brian Laudadio, appeared and stated to the court that Harris Beach made a 'determination that there was no misconduct" and that it "believe[d] that Ms. Benz acted appropriately and that there was simply a - an unfounded accusation [by plaintiff]." Thus, Harris Beach acquiesced in **[*21]** and condoned Benz and its client's conduct when that conduct was brought to its attention.

73. In January 2006, after plaintiff had contacted some District employees asking them to contact her if they had certain information plaintiff sought with respect to 03-cv-6541, Shapiro sent District employees a letter in which she implied that plaintiff was "bothering" employees.

## STANDARDS OF LAW

In *Bell Atl. Corp. v. Twombly,* -- U.S. --, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court clarified the standard to be applied to a 12(b)(6) motion to dismiss:

Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation **[*22]** to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964-65 (citations and internal quotations omitted). *See also, ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty,* 490 F.3d 143, 2007 WL 1717803 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.) When applying this standard, a district court must accept the allegations contained in the complaint **[*23]** as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers,* 192 F.3d 52, 56 (1999), *cert. denied,* 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 560 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995)(*citing In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)).

## ANALYSIS OF FEDERAL CLAIMS

The Court will first analyze the motions with regard to Plaintiff's Federal claims. In paragraphs 92 through 104 of the complaint, Plaintiff raises four causes of action based on Federal law:

    Count VIII -- First Amendment;

    Count IX -- Retaliation under Section 504 of the Rehabilitation Act;

    Count X -- Retaliation under Title IX of the Education Amendments; and

    Count XI -- Civil Rights Act (Defendants "have violated, and conspired to violate, Section 504, Title IX, and plaintiff's right to free speech as guaranteed by the U.S.

Constitution, First Amendment, all in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983").

### First Amendment Claims

The First Amendment does  **[*24]** not directly provide a basis for awarding damages to a plaintiff, but is usually enforced against a state actor through 42 U.S.C. § 1983. Consequently, the Court considers Count VIII and Count XI to raise one claim under § 1983. [2] To raise a claim under that statute, a plaintiff must allege the following:

> (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.

*Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir. 1993). In order to act under color of state law, a person must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson,* 454 U.S. 312, 317-18, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)). Similarly, as is the case in the context of the Fourteenth Amendment's state action requirement, a deprivation of a federal or constitutional right is actionable pursuant to § 1983 when the deprivation was caused "by the exercise of some right or privilege created by the  **[*25]** State … or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). "Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West,* 487 U.S. 42, 50, 108 S. Ct. 2250, 101 L. Ed. 2d 40.

> "It is well settled in . . . [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted). Personal involvement of a supervisory official may be established "by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under

which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (3) the [official[ was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing  **[*26]** to act on information indicating at constitutional acts were occurring." *Id.*

*Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir. 2001).

### Benz & Harris Beach, PLLC

Benz, an attorney, and Harris Beach, a law firm, represented the Pittsford Central School District and Pittsford's Board of Education in the prior action. An attorney who represents a public client in litigation does not thereby become a state actor. *O'Bradovich v. Village of Tuckahoe,* 325 F. Supp. 2d. 413, 419 (S.D.N.Y. 2004). The complaint alleges nothing more than that Benz and her firm in the capacity of counsel for their clients in an employment discrimination lawsuit. Thus, neither is alleged to be a state actor.

### Pittsford Central School District, Board of Education of the Pittsford Central School District, & Schiess

These defendants argue that the First Amendment does not by itself provide a basis for a cause of action, and even if this claim were analyzed as a § 1983 claim, there is no basis for alleging liability against the District and Board of Education. The Court has already determined that the First Amendment claim is,  **[*27]** in reality, a claim under § 1983. In that regard, Plaintiff, as indicated above, may not rely on the doctrine of *respondeat superior* to establish liability under § 1983. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691-96, 98 S. Ct. 2018, 56 L. Ed. 2d 611, but must show that a defendant was personally involved in a constitutional deprivation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997).

Here it is clear that the complaint does not allege a basis for liability against the school board or the school district. Neither is alleged to have: participated directly in the alleged constitutional deprivation; failed to remedy the violation after being informed of its occurrence; created a policy or custom under which the violation occurred; been grossly negligent in the supervision of subordinates who committed the violation or exhibited deliberate indifference to Plaintiff's rights. Turning now to Schiess, Director of Human Resources for the District, he appears to concede that he is a state actor, liable to suit under § 1983. (*See* Pittsford Central School District, Board of Education of the Pittsford Central School District, &

---

[2] During oral argument, Plaintiff conceded that Counts VIII and XI were the same.

Schiess Mem. of Law at 18.) As to Scheiss, Plaintiff alleges that correspondence [*28] was found in Doe's file between Doe's building principal and Schiess (Compl. P 27.), and that Scheiss directed Shapiro to call Doe and cancel the conference scheduled between her and her building principal. (Compl. P 32.) Schiess is also alleged to have disclosed to Benz, then the attorney for the District and Board, what Doe learned from the personnel file Plaintiff showed her. (Compl. P 33.) Further, Schiess is alleged to have implied, at least from Shapiro's viewpoint, that he would be grateful for Doe's cooperation, which impression Shapiro allegedly shared with Doe. (Compl. P 41.)

The Court determines that these allegations do not raise a plausible First Amendment claim against Schiess. Although they are attributed to a state actor, Schiess, they do not allege "that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." The allegations essentially show that Schiess was corresponding with Doe's building principal to build a case against Doe, and that once Schiess knew the correspondence had been shown to Doe, he expressed to Shapiro that he would be grateful for Doe's cooperation. They do not, however, implicate [*29] Plaintiff's First Amendment rights.

Now, therefore, all the First Amendment § 1983 claims against Pittsford Central School District, Board of Education of the Pittsford Central School District, and Schiess are dismissed.

### PDTA & Shapiro

Defendants Pittsford District Teacher's Association ("PDTA") and Shapiro also argue that Plaintiff's First Amendment claim must be dismissed against them, since the First Amendment does not permit monetary awards, and further, because the complaint does not allege that their actions actually deprived her of any rights. With regard to the § 1983 claim, Defendants argue that the complaint does not sufficiently plead they acted under color of state law.

Repeatedly mentioned above, as the Court has already determined, the First Amendment claim is actually one arising under § 1983. Generally, unions are not state actors pursuant to § 1983, although a "union may be alleged to have acted under the color of state law where it conspired with state officials in the challenged action." *Mehrhoff v. William Floyd Union Free Sch. Dist.,* No. 04-CV-3850 (JS) (MLO), 2007 U.S. Dist. LEXIS 94938 (E.D.N.Y. Dec. 28, 2007) (citations omitted). In the present complaint, Plaintiff [*30] alleges that Shapiro and Benz conspired to prevent Plaintiff from speaking to Doe again, or from speaking to any other District employee, and to interfere with plaintiff's ability to investigate

and pursue her client's case in 03-cv-6541. Specifically, Plaintiff alleges that

> Benz's motion and Shapiro's grievance were designed to accomplish sanction against plaintiff to stop her from speaking to Doe further, to stop her from interviewing any other District employees who might have facts, as Doe did, that would advance plaintiff's claims in 03-cv-6541, and to remove plaintiff from representation in 03-cv-6541 if possible.
>
> When plaintiff tried to speak to Doe without revealing the contents of the motion, Doe refused on the ground that she feared retaliation in her employment. Doe's boyfriend, who was familiar with the facts, also refused to speak to plaintiff out of fear of retaliation against Doe.

(Compl. PP 70-71.) Plaintiff has alleged specific acts leading to difficulty in conducting discovery for the underlying case in which she was representing a school employee suing the school district. However, even taking all the allegations as true, Plaintiff does not plead a constitutional claim [*31] under the First Amendment. The complaint does not show that she was prevented from speaking with potential witnesses for her client, only that Defendants' alleged acts made gathering evidence more difficult. Significantly, there is no allegation, that as a result of the discovery issue, Plaintiff was unable to effectively represent her client. Therefore, the Court concludes that the complaint does not raise a constitutional claim against either Shapiro or the Union.

### Rehabilitation Act § 504 & Title IX of the Education Amendments

Plaintiff also brings retaliation claims against all the defendants pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (entitled "Nondiscrimination Under Federal Grants and Programs), and Title IX of the Education Amendments, 20 U.S.C. § 1681 (entitled "Discrimination Based on Sex or Blindness"). She alleges that

> Defendants' conduct as described herein was intended to retaliate against plaintiff because of her assistance to and advocacy for a person who asserted her Section 504 rights had been violated and to prevent plaintiff from assisting and advocating for such rights in the future (Compl. P 98)….
>
> Defendants' conduct as described herein was intended [*32] to retaliate against plaintiff because of her assistance to and advocacy for a person who asserted her Title IX rights had been violated and to prevent plaintiff for assisting and advocating for such rights in the future (Compl. P 102).

(Compl. PP 98, 102.) Both statutes require that the aggrieved party allege he or she was subjected to an adverse

employment action. *AB v. Rhinebeck Cent. Sch. Dist.,* 224 F.R.D. 144, 153 (S.D.N.Y. 2004) (adverse employment action an element of retaliation claim under Title IX); *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002) (discussing elements of retaliation claim under Rehabilitation Act and Americans With Disabilities Act). Since Plaintiff has not plead that she suffered an adverse employment action as part of her retaliation claims as to any defendants, all such claims must be dismissed. Amendment of the complaint would be futile, since the factual allegations in the complaint make it clear that Plaintiff was not employed by any of the named defendants in this case.

Moreover, with respect to Harris Beach and Benz, the Court determines that an attorney's defense of a lawsuit on behalf of a client, alleged to have engaged in employment [*33] discrimination, does not constitute retaliation as a matter of law. Although it has been held that the bad faith filing of a lawsuit motivated by retaliation can be a basis for a retaliation claim under Title VII, *see Urquiola v. Linen Supermarket, Inc.,* No. 94-14-CIV-ORL-19, 1995 U.S. Dist. LEXIS 9902, 1995 WL 266582 *1 (M.D. Fla. March 23, 1995); *EEOC v. Levi Strauss & Co.,* 515 F. Supp. 640, 643-44 (N.D. Ill. 1981); *EEOC v. Virginia Carolina Veneer Corp.,* 495 F. Supp. 775, 778 (W.D. Va. 1980), *appeal dismissed,* 652 F.2d 380 (4th Cir. 1981), the Court can find no authority to support Plaintiff's contention that she may sue the law firm that, or individual attorney who, defended the 03-cv-6541 action under the circumstances as they are alleged in the complaint. For example, even the presentation of a frivolous affirmative defense will not support a retaliation claim. *Baker v. Summit Unlimited, Inc.,* 855 F. Supp. 375, 376-77 (N.D. Ga. 1994); *see also Maloney v. Rice,* No. 86 C 6026, 1988 U.S. Dist. LEXIS 4663, 1988 WL 53175 *3 (N.D. Ill. May 16, 1988) (denying dismissal of affirmative defense that investigative actions were not First Amendment retaliation because done as pretrial preparation in plaintiff's discrimination action).

**STATE LAW [*34] CLAIMS**

Harris Beach and Benz argue in favor of the Court retaining supplemental jurisdiction over the state law claims even if, as is the situation here, the Court dismisses all the federal law claims. Although the Court might be able to render a decision in the claims against those defendants, the same is not as easily said with regard to the remaining defendants. No party has presented any authority for the Court to pick and choose over which litigants it will continue to exercise supplemental jurisdiction, while declining not to do so for other litigants. Furthermore, the state law claims predominate, and the action is still in its early stages. Consequently, it does not appear to

the Court that judicial economy would be served by continuing to retain jurisdiction over the state law claims. Therefore, the Court, pursuant to 28 U.S.C. § 1367(c)(3), exercises its discretion to decline jurisdiction over the remaining state law claims.

**CONCLUSION**

Defendants' motions (Docket Nos. 9, 13 and 14) to dismiss the federal law claims against them are granted and the Court declines to exercise jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367. The Clerk is directed to [*35] close this case.

IT IS SO ORDERED.

Dated: March 28, 2008

Rochester, New York

/s/ Charles J. Siragusa

CHARLES J. SIRAGUSA

United States District Judge

**End of Document**

 Warning
As of: June 17, 2020 4:57 PM Z

# Carter v. City of Syracuse Sch. Dist.

United States District Court for the Northern District of New York

March 19, 2012, Decided; March 19, 2012, Filed

5:10-CV-690 (FJS/TWD)

**Reporter**
2012 U.S. Dist. LEXIS 36612 *; 2012 WL 930798

CORENE D. CARTER a/k/a/ CORENE BROWN, Plaintiff, v. CITY OF SYRACUSE SCHOOL DISTRICT, DANIEL LOWENGARD, JOHN DITTMAN, JILL STEWART, JOHN DOE(S), and JANE DOE(S), Defendants.

**Subsequent History:** Motion to strike granted by, in part, Motion to strike denied by, in part Carter v. City of Syracuse Sch. Dist., 2013 U.S. Dist. LEXIS 37066 (N.D.N.Y, Mar. 15, 2013)

Summary judgment granted by, Motion denied by, Judgment entered by Carter v. City of Syracuse Sch. Dist., 2015 U.S. Dist. LEXIS 82313 (N.D.N.Y, June 25, 2015)

Vacated by, in part, Remanded by Carter v. Syracuse City Sch. Dist., 2016 U.S. App. LEXIS 12870 (2d Cir. N.Y., July 11, 2016)

Vacated by, in part, Remanded by Carter v. Syracuse City Sch. Dist., 2016 U.S. App. LEXIS 14753 (2d Cir. N.Y., Aug. 8, 2016)

## Case Summary

### Overview

Plaintiff former teacher's race and gender discrimination suit against a school district, its superintendent, and others was dismissed in part because she failed to provide pre-suit notice to the school district, as required by N.Y. Educ. Law § 3813, for certain state law claims, and she failed to allege that she suffered any adverse employment action for purposes of a Title VII discrimination or retaliation claim.

**Outcome**
Motion granted in part.

**Counsel:** [*1] For Plaintiff: A.J. BOSMAN, ESQ., OF COUNSEL, BOSMAN LAW OFFICE, Rome, New York.

For Defendants: ERIC J. WILSON, ESQ., MILES G. LAWLOR, ESQ., OF COUNSEL, FERRARA, FIORENZA, LARRISON, BARRETT & REITZ, P.C., East Syracuse, New York.

**Judges:** Frederick J. Scullin, Jr., Senior United States District Court Judge.

**Opinion by:** Frederick J. Scullin, Jr.

## Opinion

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

### I. INTRODUCTION

Plaintiff Corene D. Carter, an employee of Defendant City of Syracuse School District ("Defendant School District") as an

2012 U.S. Dist. LEXIS 36612, *1

English teacher since 1988, asserts eighteen causes of action against Defendants arising from their allegedly discriminatory conduct in the workplace on the basis of her race and gender.

## II. BACKGROUND[1]

In 2007, Plaintiff sought and was granted a transfer to a high school level teaching position at Defendant School District's Institute of Technology ("Institute of Technology"). She taught ninth grade English at the Institute of Technology for the 2007-2008 school year and tenth grade English for the 2008-2009 school year.

Plaintiff alleges that her coworkers would regularly interrupt her class; and, when Plaintiff informed Defendant John Dittman, the Principal of the Institute of Technology at the time, of the interruptions, he agreed that such conduct was motivated by her race and gender but refused to take any corrective action. *See* Proposed Amended **[*3]** Complaint at ¶¶ 23-24. Plaintiff also complained to Defendant Daniel Lowengard, Defendant School District's Superintendent, about various other acts of alleged racial and gender discrimination in the workplace.

In March of 2009, Defendant Jill Stewart, Defendant School District's Coordinator of Health Careers Program, observed Plaintiff teaching a tenth grade class. Plaintiff alleges that Defendant Stewart performed a "sham evaluation" of her performance. *See id.* at ¶ 33. Plaintiff was thereafter placed on an "Assistance Plan for Improvement" ("Assistance Plan"); and, as a result, she "became ineligible to participate in such programs as 'Master Teacher,' causing her a loss of income." *See id.* at ¶ 35. Later, on April 27, 2009, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"),[2] alleging unlawful discrimination on

the basis of race stemming from Defendants' issuance of the Assistance Plan.

Although Plaintiff returned to teach at the Institute of Technology at the start of the 2009-2010 school year, she soon commenced an extended leave of absence due to work-related stress from which she has not returned. In August 2010, Plaintiff alleges that her psychiatrist authorized her to return to work, but she refused to do so because Defendant School District would only allow her to return to her formerly-held teaching position at the Institute of Technology, rather than a different teaching position at another school, as her psychiatrist had recommended. *See id.* at ¶¶ 39-41.

Plaintiff's proposed amended complaint[3] alleges eighteen causes of action, pursuant to (1) Title VII against Defendant School District for racial discrimination; (2) the New York State Human Rights Law ("NYSHRL") against Defendants School District and Lowengard for racial and gender discrimination; (3) the NYSHRL against Defendants Dittman and Stewart for racial and gender discrimination; (4) Title VII against Defendant School District for unlawful retaliation; (5) the NYSHRL against Defendants School District and Lowengard for unlawful retaliation; **[*5]** (6) the NYSHRL against Defendants Dittman and Stewart for unlawful retaliation; (7) 42 U.S.C. § 1983 against Defendants for subjecting Plaintiff to a hostile work environment and discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment; (8) 42 U.S.C. § 1983 against Defendant School District for an unlawful custom, practice or policy and a failure to train; (9) 42 U.S.C. § 1983 against Defendants for unlawful retaliation in violation of the First Amendment and against Defendant School District for an custom, policy or practice and for a failure to train; (10) 42 U.S.C. § 1983 against Defendant School District for an unlawful custom, practice or policy and for discriminatory hiring, discipline, lack of promotion, retaliation, and disparate treatment of women and minorities; (11) breach of contract; (12) 42 U.S.C. § 1981 against Defendants for subjecting Plaintiff to a hostile work environment because of her race;

---

[1] With respect to Plaintiff's cross-motion for discovery, to the extent that the Court treats Defendants' motion as one for summary judgment, Plaintiff requests that the Court grant her the opportunity for further discovery pursuant to Federal Rule of Civil Procedure 56(f) prior to ruling on such claims. *See* Dkt. No. 24-6 at 2. On September 9, 2011, Defendants requested a stay of discovery pending the Court's determination of the current motions. *See* Minute Entry dated September 9, 2011. **[*2]** Magistrate Judge Lowe granted Defendants' request. *See* Text Order dated September 28, 2011. Given the early stage of the proceedings, the Court will treat Defendants' dispositive motion as one for judgment on the pleadings, rather than one for summary judgment. Accordingly, the Court denies Plaintiff's request for discovery as moot. Moreover, because it is treating Defendants' motion as one for judgment on the pleadings, the Court has drawn the Background facts from Plaintiff's proposed amended complaint and documents attached thereto.

---

[2] Plaintiff dually filed a charge of discrimination with the NYSDHR and the EEOC. On September 9, 2009, at Plaintiff's request, the NYSDHR dismissed her administrative complaint so that she could pursue her **[*4]** claim in federal court. See Proposed Amended Complaint at ¶¶ 6-7.

[3] Plaintiff filed her initial complaint on June 14, 2010. Defendants then filed the instant motion for judgment on the pleadings on April 29, 2011. On June 21, 2011, Plaintiff filed papers in opposition thereto, which included a motion to amend her complaint and for discovery pursuant to Rule 56(f). For the reasons discussed below, the Court grants Plaintiff leave to file and serve her proposed amended complaint.

(13) 42 U.S.C. § 1981 against Defendants for subjecting Plaintiff to disparate treatment because of her race; (14) 42 U.S.C. § 1981 against Defendants for unlawful retaliation because of her race; (15) common law tortious interference with a contractual **[*6]** relationship against Defendants; (16) Title VI of the Civil Rights Act of 1964 against Defendant School District for racial discrimination; (17) Title IX of the Education Act Amendments of 1972 against Defendant School District for gender discrimination; and (18) the Rehabilitation Act against Defendant School District for failure to provide a reasonable accommodation.

Currently before the Court are two motions: Defendants' motion for judgment on the pleadings or for summary judgment and Plaintiff's cross-motion to amend her complaint and for discovery pursuant to Federal Rule of Civil Procedure ("Rule") 56(f).

## III. DISCUSSION

### A. Plaintiff's cross-motion for leave to amend the complaint

Pursuant to Rule 15(a), which governs a party's ability to amend its pleadings after responsive **[*7]** pleadings have been served but before trial, a court should liberally grant a party leave to amend its pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court should only deny leave to amend "for such reasons as 'undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'" *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (quotation omitted). The party opposing the requested relief has the burden of establishing that the amendment would be futile or unduly prejudicial. *See Manigaulte v. C.W. Post of Long Island Univ.*, 659 F. Supp. 2d 367, 377 (E.D.N.Y. 2009) (citations omitted). Where leave to amend is opposed on the grounds of futility, a court should analyze the proposed amendments under Rule 12(b)(6). *See id.* (quotation omitted).

Here, Defendants oppose Plaintiff's motion to amend because, they argue, her amendments would be futile.[4] Plaintiff's proposed amended complaint adds three new causes of action: (1) for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") (sixteenth cause of action); (2) for violations of Title IX of the Education Act Amendments of 1972, **[*8]** 20 U.S.C. § 1681 ("Title IX") (seventeenth cause of action); and (3) for violations of the Rehabilitation Act ("RA") (eighteenth cause of action), as well as several factual allegations related to these causes of action as well as the ones contained in her original complaint.

### 1. Proposed cause of action sixteen: Title VI against Defendant School District **[*9]** for racial discrimination

Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In order to state an actionable claim under Title VI, a plaintiff must establish the following: "(1) the defendant received federal financial assistance, (2) the plaintiff was an intended beneficiary of the program or activity receiving the assistance, and (3) the defendant discriminated against the plaintiff on the basis of race, color, or national origin in connection with that program or activity." *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 233 (E.D.N.Y. 2010) (citations omitted); *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (quotations and other citations omitted). Furthermore, a plaintiff cannot maintain an employment discrimination claim under Title VI unless "a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3; *see Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) **[*10]** (quotation omitted).

Plaintiff's proposed amended complaint alleges that Defendant School District "is a recipient of Federal funding which uses said funding to operate its programs and activities" and that she was "denied the benefits of and subjected to discrimination on account of her race by [Defendant School District]." *See* Proposed Amended Complaint at ¶¶ 103-104. Even accepting these allegations as true, Plaintiff has not alleged that Defendant School District was receiving federal funds in connection with any specific program or activity for which she was an "intended

---

[4] Accordingly, the Court has analyzed the viability of Plaintiff's proposed causes of action under Rule 12(b)(6). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544,] 570, 127 S. Ct. 1955, 167 L. Ed.

2d 929). The complaint must tender more than mere "'naked assertion[s] devoid of 'further factual enhancement.'" *Id.* (quotation omitted). In applying this standard, the court must accept as true all allegations of fact contained in the complaint and draw all reasonable inferences in favor of the nonmoving party. *See ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

beneficiary" nor has she "alleged facts tending to show that any such program discriminated against her on the basis of her race in connection therewith." *Kelly v. Rice*, 375 F. Supp. 2d 203, 209 (S.D.N.Y. 2005) (citation omitted). The Court finds that this pleading deficiency is fatal to her Title VI claim. Accordingly, the Court denies Plaintiff's motion to amend her complaint to add a sixteenth cause of action under Title VI because it would be futile to bring this claim. *See id.* at 208-09 (citations omitted).

### 2. [*11] Proposed cause of action seventeen: Title IX against Defendant School District for gender discrimination

Title IX is parallel to Title VI, except that it prohibits sex discrimination, not race discrimination. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) (citations omitted). The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

"'The Second Circuit "has not ruled whether an employee of a federally-funded educational institution can use Title IX to seek redress for employment discrimination on the basis of sex."'" *Summa v. Hofstra Univ.*, No. CV 08-0361, 2011 U.S. Dist. LEXIS 37975, 2011 WL 1343058, *17 (E.D.N.Y. Apr. 7, 2011) (quotation omitted). District courts in this circuit are likewise divided on the issue. *See* 2011 U.S. Dist. LEXIS 37975, [WL] at *18 (dismissing the plaintiff's Title IX discrimination claim because "the better argument is to limit an employee's avenue of redress to Title VII" (citations omitted)); *George v. Liverpool Cent. Sch. Dist.*, No. 97-CV-1232, 2000 U.S. Dist. LEXIS 14793, 2000 WL 1499342, *13 (N.D.N.Y. Sept. 29, 2000) [*12] (agreeing "with the holdings of . . . district court decisions which have likewise declined to entertain sex discrimination cases under Title IX where the plaintiff is an employee with recourse under Title VII" (citations omitted)); *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004) (dismissing Plaintiff's private claims for employment discrimination under Title IX because "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII" (citations omitted)). *But see Kohlhausen v. Suny Rockland Cmty. College.*, No. 7:10-CV-3168, 2011 U.S. Dist. LEXIS 42055, 2011 WL 1404934, *9 (S.D.N.Y. Feb. 9, 2011) (holding that "Title IX provides a private right of action against gender discrimination to employees of federally-funded educational institutions, and . . . this Title IX right of action is not preempted although a remedy under Title VII is

also available").

The weight of authority in this circuit outside of the Southern District supports a finding that Title VII provides the exclusive means under which a plaintiff may recover for employment discrimination on the basis of sex. Accordingly, the Court [*13] denies Plaintiff's motion to amend insofar as she seeks to add a seventeenth cause of action pursuant to Title IX because it would be futile to do so.

### 3. Proposed cause of action eighteen: Rehabilitation Act against Defendant School District for failure to provide a reasonable accommodation[5]

The RA prohibits discrimination on the basis of disability in any program or institution that receives federal financial assistance. *See* 29 U.S.C. § 794. To establish a prima facie case of disability discrimination premised on an employer's failure to accommodate, a plaintiff must show that (1) she is an individual with a disability within the meaning of the RA; (2) her employer had notice [*14] of the disability; (3) she could perform the essential functions of the job sought with reasonable accommodation; and (4) her employer failed to make such accommodation. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997) (citation omitted). Courts analyze claims of discrimination under the RA according to the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and the plaintiff bears the initial burden of establishing a prima facie case. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted). Thus, to be entitled to the protections of the RA, the plaintiff must qualify as "disabled" under the statute.[6]

---

[5] In the papers she submitted in support of her motion to amend, Plaintiff refers to her eighteenth cause of action as one for disability discrimination pursuant to the RA. *See* Dkt. No. 24-1 at ¶ 8. Plaintiff's proposed amended complaint only refers to Defendant School District's failure to provide a reasonable accommodation. See Proposed Amended Complaint at ¶¶ 109-113. Resolving all ambiguities in Plaintiff's favor, the Court construes this proposed cause of action as a failure to accommodate claim under the RA.

[6] The ADA Amendments Act (the "ADAAA") of 2008, effective as of January 1, 2009, broadened the definition of a disability under the ADA and, by express inclusion, the RA. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325 (2008). Here, the ADAAA applies to the Court's analysis of Plaintiff's proposed RA claim because Defendants' allegedly discriminatory conduct occurred after January 1, 2009, the effective date of the ADAAA. *See Rumbin v. Ass'n of Am. Med. Colls.*, 803 F. Supp. 2d 83, 92 n.4 (D. Conn. 2011). [*15] The ADAAA substantially broadened the definition of "disability" under the ADA. See ADA Amendments Act of 2008,

The RA defines "disability" by reference to the Americans with Disabilities Act ("ADA"), *see* 29 U.S.C. §§ 705(20)(B), 794(d), and the standards for maintaining an employment discrimination claim under the RA are "effectively the same" as those under the ADA. *See Civic Ass'n of Deaf of New York City, Inc. v. City of New York*, No. 95 Civ. 8591, 2011 U.S. Dist. LEXIS 90645, 2011 WL 5995182, *10 (S.D.N.Y. Nov. 29, 2011) (citation omitted). Accordingly, references herein to the ADA should be read to include the RA. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;" "(B) a record of such an **[*16]** impairment;" or "(C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).

Here, Plaintiff apparently alleges that her work-related stress condition renders her "actually disabled" within the meaning of the RA, which would require her to establish that (1) she suffers from a physical or mental impairment; (2) the impairment affects a major life activity; and (3) the impairment substantially limits that major life activity. *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (citing [*Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998)], *superseded by statute on other grounds by* 42 U.S.C. § 12102(3)(A)) (other citation omitted).

Plaintiff alleges that her "work related stress condition renders her disabled within the meaning of the [RA]," that "she can perform the essential functions of the job with a reasonable accommodation," and that she "requested and was denied a reasonable accommodation." *See* Proposed Amended Complaint at ¶¶ 110-112. Plaintiff further asserts that she "began treatment with a psychiatrist and was placed on medication for work related stress" and that she "was taken out of work by her treating psychiatrist **[*17]** on or about October 26, 2009 due to work related stress." *See id.* at ¶¶ 35, 39. On August 24, 2010, following an extended absence from work, Plaintiff alleges that her psychiatrist "authorized" her to return to a school; yet, he recommended that Defendants transfer her to a school other than the Institute of Technology. *See id.* at ¶ 40. She alleges that "Defendants refused [her] doctor's requested accommodation and, to date, she has not been returned to work." *See id.* at ¶ 41. In essence, Plaintiff alleges that Defendants have denied her request for reasonable accommodation in the form of reassignment to another position away from the school and staff that allegedly caused her disability.

Plaintiff's allegations fail to even suggest that her work-related stress condition limited or impaired — substantially or otherwise — her ability to engage in any major life activity. Plaintiff's bare and conclusory allegation that her "work related stress condition renders her disabled" is insufficient to meet the pleading requirements discussed above. Accordingly, even under the ADAAA's substantially-broadened definition of disability, see ADA Amendments Act of 2008, Pub. L. No. 110-325 (2008), the **[*18]** Court finds that Plaintiff has failed to allege facts tending to show that she was or is disabled within the meaning of the RA. *See Cusack v. Delphi Corp.*, 686 F. Supp. 2d 254, 257-58 (W.D.N.Y. 2010) (citation omitted); *Lee v. Sony BMG Music Entm't, Inc.*, 557 F. Supp. 2d 418, 424-25 (S.D.N.Y. 2008) (citations omitted). Thus, the Court denies Plaintiff's motion to amend insofar as she seeks to add an eighteenth cause of action pursuant to the RA because it would be futile to do so.[7]

In sum, therefore, the Court denies Plaintiff's motion to amend with respect to her sixteenth (Title VI), seventeenth (Title **[*19]** IX), and eighteenth (RA) causes of action because it would be futile to bring these claims. However, given the early stage of this litigation and the fact that neither bad faith nor undue prejudice has been shown, the Court grants Plaintiff leave to amend her complaint in all other respects.

**B. Defendants' motion for judgment on the pleadings[8]**

Viewed in the light most favorable to the nonmoving party, "[j]udgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is

---

Pub. L. No. 110-325 (2008). Among other things, it provides a more expansive interpretation of the term "substantially limited" so as to expand the class of individuals entitled to protection under the ADA. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325 (2008). Unlike the former standards for interpreting ADA claims, the ADAAA rejects an interpretation of "substantially limited" to mean "significantly restricted." *See id.*

---

[7] Even if the Court were to find that Plaintiff qualifies as disabled at this stage, which it does not, Plaintiff has insufficiently alleged that her request for a reasonable accommodation in the form of job relocation was reasonable. As such, the Court could deny Plaintiff's motion to amend her complaint to add this claim on this ground as well. *See Theilig v. United Tech Corp.*, 415 Fed. Appx. 331, 333 (2d Cir. 2011). Finally, because the Court finds that Plaintiff has insufficiently alleged that she is disabled, it need not address the other prima facie elements of a claim under the RA.

[8] Defendants' papers in support of their dispositive motion divide Plaintiff's causes of action into six groups: disparate treatment claims; retaliation claims; hostile work environment claims; custom, practice, or policy claims; 42 U.S.C. § 1983 claims; and breach-of-contract claims. *See* Dkt. No. 17-3. Many of Defendants' arguments apply to multiple claims. The Court has grouped Plaintiff's claims differently.

possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted); *see also Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994) (quotation and other citation omitted). Courts apply the **[\*20]** "same standard as that applicable to a motion under Rule 12(b)(6)" and thus "accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant . . . ." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citations omitted). Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). This pleading standard does not require "detailed factual allegations," but it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). Finally, in deciding a motion for judgment on the pleadings, a court may consider the pleadings, documents attached thereto as exhibits, documents incorporated by reference, documents that are integral to the complaint, and matters upon which the court may take judicial notice. *See Holland v. City of New York*, No. 10 Civ. 2525, 2011 U.S. Dist. LEXIS 144941, 2011 WL 6306727, \*3 (S.D.N.Y. Dec. 16, 2011) (quotations and other citations omitted).

### 1. Notice-of-claim requirements

New York Education Law § 3813 provides **[\*21]** that a plaintiff must comply with certain notice-of-claim requirements prior to bringing suit against a school district. *See* N.Y. Educ. Law § 3813(1) & (2); *see Saunders v. NYC Dep't of Educ.*, No. 07 CV 2725, 2010 U.S. Dist. LEXIS 71500, 2010 WL 2816321, \*22 (E.D.N.Y. July 15, 2010) (quotation and other citations omitted). New York Education Law § 3813(1) applies to Plaintiff's NYSHRL and breach-of-contract claims and § 3813(2) applies to her state-law tort claim. *See, e.g., Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 366-68 (W.D.N.Y. 2010).

Section 3813(1)'s notice-of-claim requirements apply to those claims brought against Defendant School District and its officers. *See Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F. Supp. 2d 115, 127 (W.D.N.Y. 2010) (citation omitted). Defendant Lowengard is covered by § 3813(1) as a "school officer" because he was the District Superintendent. *See* N.Y. Educ. Law § 2(13). Defendants Dittman and Stewart, however, who were at all relevant times the Institute of Technology's Principal and its Health Careers Program Coordinator, respectively, are not "officers" within the scope of § 3813(1). *See Lewinter v. New York City Dep't of Educ.*, No. 09 Civ. 0227, 2010 U.S. Dist. LEXIS 68493, 2010 WL

2746334, \*7 n.3 (S.D.N.Y. July 9, 2010) **[\*22]** (citations omitted); *Carlson*, 679 F. Supp. 2d at 367 (citations omitted). Accordingly, the Court finds that Plaintiff was required to comply with § 3813(1)'s notice-of-claim requirements with regard to her NYSHRL claims against Defendant School District and Defendant Lowengard (second and fifth) but not as against Defendants Dittman and Stewart (third and sixth).[9]

On November 23, 2009, Plaintiff's attorney mailed copies of her notice of claim to the individual Defendants. *See* Proposed Amended Complaint at ¶ 9; Dkt. No. 24-5 at ¶ 29; Dkt. No. 17-1, Exh. "C" attached thereto. Plaintiff's attorney also apparently mailed a copy of the notice of claim to Defendant Lowengard "for service upon the City of Syracuse School District[.]" *See* Dkt. No. 24-5, at ¶ 31. Plaintiff concedes in her response papers that she did not submit a notice of claim to the Board of Education as required, but she argues **[\*23]** that service on Defendant Lowengard should constitute sufficient notice in compliance with § 3813(1). *See* Dkt. No. 24-6 at 18. To the contrary, § 3813(1) is a statutory prerequisite mandating service on the proper governing body, i.e., the Board of Education. *See Brtalik v. South Huntington Union Free Sch. Dist.*, No. CV-10-0010, 2010 U.S. Dist. LEXIS 107373, 2010 WL 3958430, \*4 (E.D.N.Y. Oct. 6, 2010) (quotation and other citations omitted). Therefore, the Court finds that Plaintiff's failure to serve a notice of claim on the appropriate governing body is fatal to her second and fifth NYSHRL claims. *See Avgerinos*, 690 F. Supp. 2d at 127-28 (citation and footnote omitted); *Carlson*, 679 F. Supp. 2d at 368 (quotation omitted).

Accordingly, the Court dismisses Plaintiff's second and fifth causes of action against Defendants School District and Lowengard but denies Defendants' motion for judgment on the pleadings on this basis with regard to Plaintiff's third and sixth causes of action under the NYSHRL against Defendants Dittman and Stewart.[10]

As stated, § 3813(2) **[\*24]** provides that state-law tort claims against a school district and its employees are subject to certain notice-of-claim requirements. *See* N.Y. Educ. Law § 3813(2). Among other things, such claims must comply with New York General Municipal Law § 50-e, which requires a plaintiff to prepare and serve "a written, sworn claim,

---

[9] However, the Court dismisses Plaintiff's third cause of action under the NYSHRL insofar as she alleges gender discrimination because she failed to mention her gender or sex in her administrative complaint, and, thus, provided no notice of a possible discrimination claim on the basis of her gender.

[10] The Court notes that, although it is allowing these claims to go forward, Plaintiff's factual allegations barely satisfy Rule 12(b)(6)'s pleading requirements.

describing the nature of the claim, the time and date the claim arose, and the items of damage or injuries sustained" within ninety days after the claim arises. *See Avgerinos*, 690 F. Supp. 2d at 128 (quotation and other citation omitted). In the instant case, Plaintiff asserts a state-law tortious-interference-with-contract (fifteenth) claim. Neither Plaintiff's notice of claim nor her EEOC complaint included any mention of this claim; and, thus, the Court grants Defendants' motion and dismisses Plaintiff's fifteenth cause of action because she failed to include any factual allegations sufficient to enable Defendants to investigate this claim. *See Meyer v. William Floyd Union. Free Sch. Dist.*, No. 07-CV-2524, 2008 U.S. Dist. LEXIS 73296, 2008 WL 4415271, *8 (E.D.N.Y. Sept 24, 2008) (quotation omitted); *Avgerinos*, 690 F. Supp. 2d at 129 (citations omitted).

Finally, Plaintiff failed to provide **[*25]** any notice regarding her state-law breach-of-contract (eleventh) claim. Likewise, for the above-stated reasons, the Court dismisses Plaintiff's eleventh cause of action for breach of contract because she failed to comply with the notice-of-claim requirements of § 3813(1).[11] *See Lewinter*, 2010 U.S. Dist. LEXIS 68493, 2010 WL 2746334, at *3 (quotation omitted); N.Y. Educ. Law § 3813(1).

### 2. Administrative **[*26]** exhaustion of Plaintiff's Title VII claims

Plaintiff's proposed amended complaint asserts claims for racial discrimination (first) and retaliation (fourth) under Title VII. Before commencing a Title VII action in a federal district court, a plaintiff must first exhaust her available administrative remedies by filing a charge with the EEOC or corresponding state agency, i.e., the NYSDHR. *See Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (citation omitted). Even if a particular claim is not included in an administrative complaint, the court may nonetheless allow

---

[11] Although Plaintiff does not identify against whom she is asserting her breach-of-contract claim, Defendant School District is the only possible defendant for this claim. It is also unclear what act or acts allegedly amounted to an actionable breach and whether Plaintiff was or is a member of a union or other collective bargaining agreement with Defendant School District. If Plaintiff was a member of a collective bargaining unit, which is likely given her employment status, the Court could dismiss this claim on that ground as well. *See DiFilippo v. Special Metals Corp.*, No. 6:09-CV-760, 2011 U.S. Dist. LEXIS 112589, 2011 WL 4595204, *16 (N.D.N.Y. Sept. 30, 2011) (dismissing the plaintiff's breach-of-contract claim because she was a member of a collective bargaining unit and had a grievance procedure for addressing alleged violations of the agreement).

that claim to go forward if it is "'reasonably related'" to those claims specifically identified in the administrative complaint. *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993), *superseded by statute on other grounds* (citations omitted).

Here, Plaintiff filed her administrative complaint with the EEOC on April 27, 2009, alleging racial discrimination stemming from the Assistance Plan that Defendants imposed on her. Plaintiff did not specifically allege, as she does in the instant case, unlawful retaliation.[12] *See* Dkt. No. 17, Exh. "G" attached thereto. The question **[*27]** before the Court, then, is whether Plaintiff's administratively exhausted allegations of race discrimination provided sufficient notice of her retaliation claim for the Court to allow it to go forward.

A plaintiff is not barred from raising unexhausted claims that (1) "would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination'"; (2) "alleg[e] retaliation by an employer against an employee for filing an EEOC charge"; or (3) "allege[] further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1402-03 (quotation and other citations omitted). The Court will allow Plaintiff's Title VII retaliation claim to go forward because she alleges that she "was subjected to additional discrimination and was retaliated against" for filing her EEOC complaint, *see* Proposed Amended Complaint at ¶¶ 49-50; and, further, her **[*28]** claim for retaliation is reasonably related to the allegations contained in her administrative complaint as this claim would likely fall within the scope of the EEOC investigation which can reasonably be expected to grow out of her EEOC complaint alleging various acts of race discrimination. *See Cooper v. Sutherland Group, Ltd.*, No. 10-CV-6575, 2011 U.S. Dist. LEXIS 31216, 2011 WL 1118712, *2 (W.D.N.Y. Mar. 24, 2011) (citing *Butts*, 990 F.2d at 1402-1403 (2d Cir. 1993)).

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Title VII claims (first and fourth) on the ground that she failed to exhaust her administrative remedies.

### 3. Title VII (first and fourth) and NYSHRL (third and sixth) claims[13]

---

[12] In two letters dated May 20, 2009, and May 28, 2009, Plaintiff sent substantiated factual allegations of racial discrimination to the NYSDHR. *See* Dkt. No. 24-3. Again, however, Plaintiff did not specifically reference unlawful retaliation. *See id*.

[13] The Court will treat Plaintiff's Title VII and NYSHRL claims

*a. First cause of action: Title VII racial discrimination claim against Defendant School District*

Courts analyze Title VII claims for discrimination and retaliation under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). **[*29]** *See Ruiz*, 609 F.3d at 491 (citation omitted). Plaintiff must first establish a prima facie case of employment discrimination; and, to do so, she must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in a protected class.[14] *See id.* at 492 (citation omitted); *see also Croswell v. Triborough Bridge & Tunnel Auth.*, No. 03 Civ. 2990, 2007 U.S. Dist. LEXIS 58343, 2007 WL 2274252, *6 (S.D.N.Y. Aug. 7, 2007) (citation omitted).

Defendants contend that the Court should dismiss this claim because Plaintiff has not suffered any adverse employment action. The standard of proof for this third prima facie element is higher for an intentional discrimination claim than for a retaliation claim. *See Croswell*, 2007 U.S. Dist. LEXIS 58343, 2007 WL 2274252, at *7. "An adverse employment action in the intentional **[*30]** discrimination context is a 'materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *DeMoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005)). The plaintiff must have suffered a significant change in the context of her employment; everyday grievances, disappointments, and setbacks do not suffice. *See Cunningham v. New York State Dep't of Labor*, 326 Fed. Appx. 617, 619 (2d Cir. 2009) (citation omitted).

Plaintiff alleges the following in this regard: her "teaching responsibilities for all but five or six students [from her class] were taken from her"; by placing her on an Assistance Plan, Defendants caused her to lose potential income because it rendered her ineligible to participate in such programs as "Master Teacher"; she was subjected to unjustified intense scrutiny and criticism of her work while white teachers were not similarly scrutinized nor criticized; and that, although a faculty member's request for transfer was typically honored, Defendants denied her request for transfer. *See* Proposed Amended **[*31]** Complaint at ¶¶ 27, 35, 38, 41, 46-47.

"A negative job evaluation is not itself an adverse employment action." *Altieri v. Albany Pub. Library*, No. 1:05CV126, 2005 WL 1388905, *3 (N.D.N.Y. June 8, 2005) (citations omitted); *see also Waters v. Gen. Bd. of Global Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) (holding that "the issuance of a performance plan and the recommendation that [the plaintiff] attend . . . counseling sessions do not constitute adverse employment actions" (citations omitted)). Plaintiff's cursory allegation that Defendants impacted the terms and conditions of her employment by placing her on an Assistance Plan fails to set forth any factual basis to support such an inference as she has not demonstrated a tangible, adverse action. For that reason, the Court grants Defendants' motion for judgment on the pleadings with regard to Plaintiff's first cause of action for employment discrimination under Title VII.

*b. Fourth cause of action: Title VII retaliation against Defendant School District*

To make out a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that (1) she engaged in a protected activity; (2) her employer was aware of this activity; **[*32]** (3) her employer took adverse action against her; and (4) a causal connection exists between the protected activity and the adverse action. *See Croswell*, 2007 U.S. Dist. LEXIS 58343, 2007 WL 2274252, at *7 (citation omitted).

For the above-stated reasons, because the Court finds that Plaintiff's proposed amended complaint fails to sufficiently to allege that Defendants took an adverse employment action against her, the Court grants Defendants' motion for judgment on the pleadings with regard to Plaintiff's fourth cause of action for retaliation under Title VII.[15]

---

together because they are analytically identical and require proof of the same common elements. *See Lawson v. New York City Bd. of Educ.*, No. 05 Civ. 825, 2011 U.S. Dist. LEXIS 25202, 2011 WL 869282, *16 (S.D.N.Y. Feb. 25, 2011) (citations omitted).

[14] The Court will apply this same burden-shifting analysis applicable to Plaintiff's Title VII claims to her claims under the NYSHRL and 42 U.S.C. § 1983. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (citation omitted).

[15] Furthermore, Plaintiff does not clearly allege any specific retaliatory action by Defendants nor a causal connection between the protected activity and the purported retaliatory action. The closest Plaintiff comes to doing so is by alleging that, after she filed her administrative complaint with the EEOC on April 27, 2009, she "was subjected to additional discrimination and retaliated against for her complaint and protest of the Defendants' discriminatory acts and practices" and Defendants Dittman and Stewart "escalated their efforts to be critical of and find fault with [her] work performance . . . . [and] elevated the level of hostility and tension" **[*33]** at work. *See* Proposed Amended Complaint at ¶¶ 49-50. These conclusory

*c. NYSHRL racial discrimination claim against Defendants Dittman and Stewart (third) and NYSHRL retaliation claim against Defendants Dittman and Stewart (sixth)*

In order to bring a claim against an individual defendant under the NYSHRL, "a plaintiff must either show direct, personal involvement in discriminatory conduct, or that the defendant 'aided and abetted' the discrimination or retaliation at issue." *Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, No. 08-CV-3140, 2011 U.S. Dist. LEXIS 133863. 2011 WL 5856409, *10 (E.D.N.Y. Nov. 21, 2011) (citation omitted).

In her third cause of action, Plaintiff alleges that Defendants Dittman and Stewart violated her right to be free from racial (and gender) discrimination under the NYSHRL. *See* Proposed Amended Complaint at ¶ 61. In support of this claim, she alleges that her coworkers would regularly interrupt her class [*34] and that Defendant Dittman "agreed" that this conduct was motivated by her race and gender; Defendant Dittman "passed her over for an advanced English class and gave the assignment to one of Plaintiff's White co-workers who had no teaching credentials"; Defendant Stewart "deliberately selected a date that students were completing year end projects [to conduct Plaintiff's performance evaluation] because she wanted to find fault with Plaintiff" and "performed a sham evaluation"; Defendants Dittman and Stewart "targeted Plaintiff and intensely scrutinized her work performance and conduct," "monitored Plaintiff intensely and unfairly found fault with her job performance," and "mocked Plaintiff for matters pertaining to her personal life," all of which they did not similarly do to white and/or male teachers; Defendants Dittman and Stewart gave Plaintiff "unsatisfactory performance evaluations" and directed her "to participate in an unwarranted and discriminatory [Assistance Plan]," which they did not similarly do to white and/or male teachers. *See id.* at ¶¶ 15-16, 24, 26, 33, 46-48.

Taking these allegations together, the Court finds that Plaintiff alleges barely enough non-conclusory facts, [*35] which, if true, tend to show that Defendants Dittman and Stewart were personally involved in, or aided and abetted, discriminatory conduct against Plaintiff on the basis of her race. Accordingly, the Court denies Defendants' motion for judgment on the pleadings with regard to Plaintiff's third cause of action insofar as she alleges racial discrimination.

Turning now to Plaintiff's sixth cause of action, she alleges that Defendants Dittman and Stewart retaliated against her for opposing discrimination in violation of the NYSHRL. *See id.* at ¶ 70. In support of this claim, Plaintiff alleges that, after she filed her administrative complaint with the EEOC, Defendants Dittman and Stewart "continued to, and in fact, escalated their efforts to be critical of and find fault with the Plaintiff's work performance" and "elevated the level of hostility and tension in Plaintiff's work environment and have made Plaintiff's work environment virtually intolerable . . . ." *See id.* at ¶¶ 49-50. The Court finds that Plaintiff has not alleged facts that make out a plausible retaliation claim against Defendants Dittman or Stewart because she does not even indicate that they were personally involved in, [*36] or that they aided and abetted, unlawful retaliation. As such, the Court grants Defendants' motion on this ground and dismisses Plaintiff's sixth cause of action.

Therefore, the Court denies Defendants' motion for judgment on the pleadings with regard to Plaintiff's third cause of action for racial discrimination under the NYSHRL but grants Defendants' motion as to Plaintiff's sixth cause of action for retaliation under the NYSHRL and dismisses that claim.

**4. 42 U.S.C. § 1983 (seventh, eighth, ninth, and tenth) claims[16]**

*a. Seventh cause of action: 42 U.S.C. § 1983 hostile work environment and discrimination claims against Defendants Lowengard, Dittman, and Stewart in their individual capacities[17]*

_____

[16]Plaintiff asserts her seventh, eighth, and ninth causes of action against Defendant School District and Defendants Lowengard, Dittman, and Stewart in their individual and official capacities. The Court dismisses these claims against Defendants Lowengard, Dittman, and Stewart in their official capacities as duplicative of these same claims against Defendant School District. *See Zachary v. Clinton Cnty., N.Y.*, No. 1:01CV1281, 2003 U.S. Dist. LEXIS 26596, 2003 WL 24197685, *2 (N.D.N.Y. Jan. 10, 2003) (holding that "[c]laims [*37] against individual defendants in their official capacities 'are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant'" (quotation omitted)); *Miller v. City of Ithaca*, No. 3:10-cv-597, 2010 U.S. Dist. LEXIS 99531, 2010 WL 3809842, *9 (N.D.N.Y. Sept. 22, 2010) (quotation omitted).

[17]Plaintiff combines her seventh and eighth causes of action, and these claims are partially overlapping. The Court construes Plaintiff's seventh cause of action as against Defendants Lowengard, Dittman, and Stewart in their individual capacities only and her eighth cause of action as against Defendant School District only.

_____

allegations fail plausibly to indicate any causal connection, either directly or indirectly, between the protected activity and the allegedly adverse employment action; and, as such, the Court finds that Plaintiff's Title VII retaliation claim warrants dismissal on this ground as well.

Plaintiff asserts her § 1983 claims against the individual Defendants and the municipal Defendant. As for her claims against the individuals in their individual capacities, she must show that (1) the individual was acting under color of state law and that (2) his or her conduct deprived the plaintiff of a constitutional or federal statutory right. *See Washington v. Cnty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004) **[*38]** (citation omitted). Plaintiff must further establish the individual's "personal involvement in the discrimination at issue; there is no respondeat superior liability." *Zambrano-Lamhaouhi*, 2011 U.S. Dist. LEXIS 133863, 2011 WL 5856409, at *10 (citation omitted); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (setting forth several ways to show "personal involvement" under § 1983 (quotation omitted)).

To prevail on a hostile work environment claim under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff must show that her "'workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ronga v. New York City Dep't of Educ.*, No. 10 Civ. 03327, 2011 U.S. Dist. LEXIS 36013, 2011 WL 1327026, *5 (S.D.N.Y. Mar. 31, 2011) (quotation omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted). Plaintiff bases her hostile work environment claim on the same conduct that she alleges in support of her Title VII and NYSHRL claims.[18]

In order to demonstrate that Defendant Lowengard — the alleged policymaking official in his capacity as Superintendent — was personally involved in the discrimination at issue, Plaintiff alleges that, after she had complained to Defendant Lowengard about **[*40]** allegedly discriminatory treatment, "instead of taking [her] concerns

seriously, he complained to her that she was 'hard to get along with' and was not a 'team player.'" *See id.* at ¶ 32. She further alleges that Defendant Lowengard "personally participated in the discriminatory and/or retaliatory acts alleged herein" and that he was "deliberately indifferent" thereto. *See id.* at ¶¶ 13, 51. The Court finds that Plaintiff has alleged insufficient facts to show that Defendant Lowengard personally participated in the creation or maintenance of a hostile work environment. With regard to Defendants Dittman and Stewart in their individual capacities, however, the Court finds that Plaintiff sufficiently alleges, *see id.* at ¶¶ 15-16, 24, 26, 33, 46-48, that these individuals personally participated in the creation and/or maintenance of a hostile work environment on the basis of her race and gender. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and other citations omitted).

Accordingly, the Court denies Defendants' motion for judgment on the pleadings with regard to Plaintiff's seventh cause of action under § 1983 insofar as she alleges a hostile work environment against Defendants **[*41]** Dittman and Stewart in their individual capacities but grants Defendants' motion without prejudice with regard to Defendant Lowengard in his individual capacity.[19]

As for Plaintiff's § 1983 discrimination claim against Defendants Lowengard, Dittman, and Stewart in their individual capacities, to prevail on this claim, she must show that (1) she was treated differently than similarly situated individuals and that (2) this differential treatment was based on impermissible considerations such as race or gender. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quotation omitted). For the reasons discussed above, at this stage of the proceedings, the Court finds that Plaintiff has sufficiently alleged that she was discriminated against on the basis of her race and gender and that Defendants Dittman and Stewart, but not Defendant Lowengard, were personally involved in the alleged discriminatory treatment. **[*42]** Accordingly, as with her hostile work environment claim, the Court denies Defendants' motion for judgment on the pleadings with regard to Plaintiff's seventh cause of action under § 1983 insofar as she alleges racial and gender discrimination against Defendants Dittman and Stewart in their individual capacities but grants Defendants' motion without prejudice with regard to Defendant Lowengard in his individual capacity.

### b. Eighth cause of action: 42 U.S.C. § 1983 hostile work

---

[18] Additional **[*39]** allegations include the following: her coworkers "would regularly make racially disparaging comments to or regarding students," which were later reported to her, including one coworker telling his students "that then Presidential candidate Barack Obama would never be President because he is Black"; white coworkers "complained that [her] vehicle . . . was a 'drug dealers car'"; "numerous students reported to her that they were questioned about her by the school administration and were invited to complain"; after she complained about alleged acts of discrimination in the workplace, she was told "that the adverse treatment was due to her race and gender"; and, while she was away from work due to her work-related stress, "Defendants escalated their efforts to harm Plaintiff by constantly contacting her home knowing that she was out ill and sending her certified mail to her residence." *See* Proposed Amended Complaint at ¶¶ 25, 28-32, 34, 37.

---

[19] The Court dismisses this claim as against Defendant Lowengard without prejudice, allowing Plaintiff leave to amend to include specific factual allegations, if any, regarding Defendant Lowengard's personal involvement in the creation of a hostile work environment.

*environment and discrimination claims based on a discriminatory custom, practice or policy and failure to train against Defendant School District*

In order to recover under 42 U.S.C. § 1983 against a municipal defendant, the plaintiff must show that the alleged constitutional violation resulted from a municipal policy or custom. *See Davis v. City of New York*, 75 Fed. Appx. 827, 829 (2d Cir. 2003) (citations omitted). To do so, the plaintiff must show one of the following:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice **[*43]** so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 174 (S.D.N.Y. 2006) (citation omitted), *aff'd*, 232 Fed. Appx. 26 (2d Cir. 2007).

To establish municipal liability premised on an unlawful custom, practice, or policy in violation of 42 U.S.C. § 1983, "'the Second Circuit has held that "the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."'" *Coleman v. City of Syracuse*, No. 5:09-CV-1391, 2011 U.S. Dist. LEXIS 456, 2011 WL 13808, *8 (N.D.N.Y. Jan. 4, 2011) (quotation and other citations omitted). The plaintiff must, instead, allege facts tending to show actual conduct by a municipal policymaker. *See id.* (quotation omitted).

In this case, Plaintiff alleges that "the actions and omissions as aforementioned [in the proposed amended complaint] constitute **[*44]** unlawful municipal custom, practice or policy since they are the actions and omissions of policy making officials of [Defendant School District]"; and, further, Defendant School District "created, maintained and/or fostered a custom, policy or practice of intimidation and discrimination thereby causing Plaintiff injury and harm." *See* Proposed Amended Complaint at ¶ 74. Plaintiff alleges that Defendant Lowengard "is responsible for . . . the training, supervision, discipline and conduct of the other named Defendants" and "for enforcing the rules and regulations of" Defendant School District and that he "had authority and control over the other named individual Defendants." *See id.*

at ¶ 13.

Even construed in the light most favorable to Plaintiff, there are no factual allegations tending to show the existence of a discriminatory custom, practice, or policy of Defendant School District, and the mere assertion that such a custom or policy exists is insufficient to survive Defendants' motion. *See Coleman*, 2011 U.S. Dist. LEXIS 456, 2011 WL 13808, at *8 (quotation and other citations omitted); *Simms v. City of New York*, No. 10 CV 3420, 2011 U.S. Dist. LEXIS 106262, 2011 WL 4344215, *2 (E.D.N.Y. May 19, 2011) (quotation and other citations omitted). **[*45]** Accordingly, the Court grants Defendants' motion for judgment on the pleadings as to Plaintiff's eighth cause of action without prejudice insofar as she alleges a custom, practice, or policy of a hostile work environment and discrimination against Defendant School District.

Plaintiff also asserts a § 1983 failure to train claim against Defendant School District.[20] To establish municipal liability based on a failure to train, a plaintiff must show the municipal defendant's "'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 631 (E.D.N.Y. 2011) (quotation omitted). This is a stringent standard to meet. *See id.* (quotation omitted). The municipality must have been "'the "moving force" behind the alleged injury.'" *Id.* (quotation omitted). Furthermore, "'[a] pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quotation and footnote omitted). Accordingly, in this case, Plaintiff bears the difficult burden of showing that (1) a final policymaker for Defendant **[*46]** School District was deliberately indifferent to the need to train teachers and other employees and (2) that lack of training actually caused the alleged Equal Protection violation. *See id.* (quotation omitted).

Plaintiff alleges that Defendant School District "failed to adequately train or discipline employees and supervisors on the rights of employees to be free from hostile work environment, discrimination, and/or retaliation." *See* Proposed Amended Complaint at ¶ 74. The Court finds that Plaintiff has

---

[20] This claim is not unrelated to Plaintiff's policy, custom, or practice claim in that "[a] policy, custom, or practice of the municipal entity may be inferred where '"the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction."'" *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977, 2010 U.S. Dist. LEXIS 10076, 2010 WL 475203, *7 (E.D.N.Y. Feb. 5, 2010) (quotation omitted).

not set forth any non-conclusory allegations tending to show, circumstantially or otherwise, "deliberate indifference" on the part of Defendant School District; and, thus, the Court dismisses this claim.

For all of these reasons, the Court grants **[*47]** Defendants' motion for judgment on the pleadings without prejudice as to Plaintiff's eighth cause of action insofar as she alleges a custom, practice, or policy of a hostile work environment and discrimination against Defendant School District and grants Defendants' motion with prejudice insofar as she alleges discriminatory conduct based on a failure to train.

### c. Ninth cause of action: 42 U.S.C. § 1983 First Amendment retaliation claim against Defendants and custom, practice or policy and failure to train claims against Defendant School District

A public employee asserting a First Amendment retaliation claim under § 1983 "'"must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."'" *Negron v. City of New York*, No. 10 CV 2757, 2011 U.S. Dist. LEXIS 119463, 2011 WL 4737068, *16 (E.D.N.Y. Sept. 14, 2011) (quotation and other citations omitted). For a public employee's speech to be protected, she must have spoken "as a citizen upon matters of public concern," rather than "as an employee upon matters only of **[*48]** personal interest . . . ." *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (citation omitted).

In this case, Plaintiff apparently contends that Defendants' issuance of an Assistance Plan violated her First Amendment rights because it was issued in retaliation for an act that, she argues, was protected by the First Amendment as it involved a matter of public concern — namely, her administrative complaint (as well as her substantiated allegations on the matter) — whereas Defendants contend that Plaintiff has not shown that she had spoken on any matter of public concern and that no retaliatory action was taken against her. Plaintiff alleges that she "complained of race discrimination in public education, which . . . is a matter of public concern" and that, "[a]side from herself, Plaintiff complained of discriminatory treatment of African-American students and include [stet] her supplemental submissions to the [NYSDHR] dated May 20 and 28, 2009." *See* Proposed Amended Complaint at ¶ 44.

"A public employee's speech may be constitutionally protected only if the plaintiff has spoken out as a citizen, not as an employee, on matters of public concern, rather than on matters of personal interest, and **[*49]** the state lacks an adequate justification for treating the employee differently from any other member of the general public." *Miller v. City of Ithaca*, No. 3:10-cv-597, 2010 U.S. Dist. LEXIS 99531, 2010 WL 3809842, *10 (N.D.N.Y. Sept. 22, 2010) (citations omitted). This determination is a question of law for the Court to decide. *See id.* (quotation omitted). The Court finds that Plaintiff's administrative complaint sought to address her own personal grievance with Defendants regarding their alleged racially discriminatory conduct against her, rather than a matter of public concern, because her complaints "were motivated by and dealt with her individual employment situation." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (citation omitted); *see Bates v. Bigger*, 56 Fed. Appx. 527, 530 (2d Cir. 2002).

Even assuming, *arguendo*, that Plaintiff's administrative complaint addressed a matter of public concern, she would also be required to allege a connection between the protected activity and some adverse employment action. "'To establish causation, a plaintiff must show that the protected speech "was a substantial motivating factor in the adverse employment action."'" *Nagle v. Marron*, 663 F.3d 100, 109 (2d Cir. 2011) **[*50]** (quotation omitted); *see Dotson v. City of Syracuse*, No. 5:04-CV-1388, 2009 U.S. Dist. LEXIS 62174, 2009 WL 2176127, *24 (N.D.N.Y. July 21, 2009) (citations omitted). As previously discussed, the Court finds that Plaintiff fails to indicate any causal connection between the claimed protected activity (Plaintiff's filing of an administrative complaint) and the alleged adverse employment action (Defendants' implementation of an Assistance Plan). Accordingly, the Court grants Defendants' motion for judgment on the pleadings and dismisses Plaintiff's First Amendment retaliation claim.

Plaintiff's ninth cause of action also asserts retaliation claims against Defendant School District based on an unlawful custom, practice, or policy and a failure to train. Specifically, Plaintiff alleges that Defendant School District's "actions and omissions . . . constitute municipal policy of retaliation since they are the actions and omissions of final policy making officials of [Defendant School District]" and that it "created, maintained and/or fostered a custom, policy or practice of retaliation thereby causing Plaintiff injury and harm." *See* Proposed Amended Complaint at ¶ 78. In her failure to train claim, she alleges that Defendant **[*51]** School District "failed to adequately train and/or supervise employees and supervisors in the preservation and enforcement of rights of employees to be free from . . . retaliation." *See id.* at ¶ 79. In further support of these claims, to show that Defendant School District is aware of "numerous complaints of discrimination," Plaintiff alleges that "no investigation was conducted and/or discipline imposed on the Principal of the Dr. King School who told a teacher (Thomas Moore) that he

needed to tolerate being called 'Nigger' . . . ." *See id*. at ¶ 45. Plaintiff does not attribute this alleged incident to any supervisory official or policymaker related to this case; and, as such, the Court affords it little weight in determining whether a retaliatory custom, practice, or policy and/or a failure to train may be inferred as against Defendant School District.

Defendant School District can only be held liable under § 1983 if its "'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Back*, 365 F.3d at 128 (quotation and footnote omitted). Liability may also be inferred if the policymaking official **[*52]** "ha[d] final authority over significant matters involving the exercise of discretion . . . . [such that] his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health & Hosps. Corp*., 710 F.2d 41, 45 (2d Cir. 1983) (citations omitted).

The Court finds that Plaintiff fails to allege facts plausibly suggesting either a custom, practice, or policy of retaliation against employees for engaging in protected activities or a failure to train employees in this regard. Accordingly, the Court grants Defendants' motion and dismisses Plaintiff's ninth cause of action in its entirety.

### d. Tenth cause of action: 42 U.S.C. § 1983 custom, practice, or policy claim and discriminatory hiring, discipline, lack of promotion, retaliation, and disparate treatment claims against Defendant School District

In her tenth cause of action, Plaintiff alleges that "[t]he discriminatory hiring, discipline, lack of promotion, retaliation, and disparate treatment of women and minority employees of [Defendant School District] is so pervasive and widespread that it has the effect of a custom, practice and/or policy, harming the Plaintiff." *See* Proposed **[*53]** Amended Complaint at ¶ 82. Plaintiff further alleges that "Defendant Lowengard has final policymaking authority in which he failed to enforce and/or insure the enforcement of laws prohibiting such discriminatory and retaliatory treatment" and that he "and other policy making officials knew of the past and present discriminatory practices and policies of [Defendant School District] and did not and have not acted to correct same." *See id*. at ¶¶ 83-84. Finally, Plaintiff alleges that "these supervisory Defendants knew of the acts of the other Defendants in creating and subjecting Plaintiff to a hostile work environment and retaliation and did not act to prevent or correct same, thus violating Plaintiff's rights." *See id*. at ¶ 84.

The Court dismisses this claim as duplicative of Plaintiff's eighth and ninth causes of action.

### 5. 42 U.S.C. § 1981 (twelfth, thirteenth, and fourteenth) claims

The Civil Rights Act of 1991, 42 U.S.C. § 1981, protects an individual's right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," including "the making, **[*54]** performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a) & (b). In order to recover under § 1981, a plaintiff must show that (1) she is a member of a racial minority; (2) the defendant intentionally discriminated against her on the basis of her race; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *See Lauture v. Int'l Bus. Machs. Corp*., 216 F.3d 258, 261 (2d Cir. 2000) (citation omitted).

Plaintiff is presumably asserting that, by their alleged racially discriminatory actions, Defendants interfered with her employment contract in violation of § 1981. She asserts the following three § 1981 causes of action: a hostile work environment claim on the basis of her race against Defendants (twelfth); a disparate treatment claim on the basis of her race against Defendants (thirteenth); and a retaliation claim against Defendants (fourteenth).

"Section 1983 provides the exclusive remedy for violations of the rights guaranteed under § 1981 in a claim against a state actor." *Ragin v. Newburgh Enlarged City Sch. Dist*., No. 06 Civ. 2797, 2009 U.S. Dist. LEXIS 118704, 2009 WL 4906111, *5 (S.D.N.Y. Dec. 17, 2009) **[*55]** (citations omitted); *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist*., 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) (citation omitted). Here, Defendant School District and the individual Defendants are "state actors." *See Ragin*, 2009 U.S. Dist. LEXIS 118704, 2009 WL 4906111, at *5 (citation omitted); *Ya-Chen Chen v. City Univ. of N.Y*., No. 11 Civ. 0320, 2011 U.S. Dist. LEXIS 130094, 2011 WL 5419792, *5 (S.D.N.Y. Nov. 9, 2011) (quotations omitted). Accordingly, the Court finds that "'to the extent [Plaintiff] seeks to vindicate any independent rights under 42 U.S.C. § 1981, [s]he must do so via claims under § 1983.'" *Ya-Chen Chen*, 2011 U.S. Dist. LEXIS 130094, 2011 WL 5419792, at *5 (quotation omitted); *Negron*, 2011 U.S. Dist. LEXIS 119463, 2011 WL 4737068, at *14 (quotation and other citation omitted).

Therefore, the Court grants Defendants' motion for judgment on the pleadings and dismisses Plaintiff's twelfth, thirteenth, and fourteenth causes of action.

## IV. CONCLUSION

Accordingly, having reviewed the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for judgment on the pleadings is **DENIED** with regard to Plaintiff's third cause of action under the NYSHRL for racial discrimination against Defendants **[*56]** Dittman and Stewart; and the Court further

**ORDERS** that Defendants' motion for judgment on the pleadings is **DENIED** with regard to Plaintiff's seventh cause of action under 42 U.S.C. § 1983 insofar as she alleges a hostile work environment and discrimination on the basis of her race and gender against Defendants Dittman and Stewart in their individual capacities; and the Court further

**ORDERS** that Defendants' motion for judgment on the pleadings is **GRANTED WITHOUT PREJUDICE** with regard to Plaintiff's seventh cause of action under 42 U.S.C. § 1983 insofar as she alleges a hostile work environment and discrimination on the basis of her race and gender against Defendant Lowengard in his individual capacity.; and the Court further

**ORDERS** that Defendants' motion for judgment on the pleadings is **GRANTED WITHOUT PREJUDICE** with regard to Plaintiff's eighth cause of action under 42 U.S.C. § 1983 insofar as she alleges a custom, practice, or policy of a hostile work environment and discrimination against Defendant School District; and the Court further

**ORDERS** that Defendants' motion for judgment in the pleadings is **GRANTED WITH PREJUDICE** in all other respects; and the Court further

**ORDERS** that Plaintiff's **[*57]** motion to amend is **GRANTED** so as to allow her to include in her amended complaint the additional factual allegations set forth in her proposed amended complaint, but not to add the additional causes of action set forth therein because it would be futile to assert those claims, and to replead her two claims that are herein dismissed without prejudice in a manner consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that Plaintiff shall file any such amended complaint within **thirty days** of the date of this Memorandum-Decision and Order; and the Court further

**ORDERS** that this case shall be referred to Magistrate Judge Dancks for all further pretrial matters.

**IT IS SO ORDERED**.

Dated: March 19, 2012

Syracuse, New York

/s/ Frederick J. Scullin, Jr.

Frederick J. Scullin, Jr.

Senior United States District Court Judge

---

**End of Document**

 Positive
As of: June 17, 2020 5:03 PM Z

# Edwards v. Rochester Inst. of Tech.

United States District Court for the Western District of New York

March 28, 2018, Decided; March 29, 2018, Filed

Case # 10-CV-6553-FPG

**Reporter**
2018 U.S. Dist. LEXIS 53326 *; 2018 WL 1569357

SHARON EDWARDS, Plaintiff, v. ROCHESTER INSTITUTE OF TECHNOLOGY & DR. DONALD BOYD, Defendants.

**Subsequent History:** Reconsideration denied by Edwards v. Rochester Inst. of Tech., 2018 U.S. Dist. LEXIS 101619 (W.D.N.Y., June 18, 2018)

Affirmed by Edwards v. Rochester Inst. of Tech., 2019 U.S. App. LEXIS 37219 (2d Cir. N.Y., Dec. 17, 2019)

**Prior History:** Edwards v. Rochester Inst. of Tech., 2013 U.S. Dist. LEXIS 138423 (W.D.N.Y., Sept. 26, 2013)

**Counsel:** [*1] For Sharon Edwards, Plaintiff: Prathima C. Reddy, LEAD ATTORNEY, The Reddy Law Firm LLC, Buffalo, NY.

For Rochester Institute of Technology, Dr. Donald Boyd, Defendants: Victoria Schmidt Gleason, LEAD ATTORNEY, Mary E. Shepard, The Wolford Law Firm LLP, Rochester, NY.

**Judges:** HON. FRANK P. GERACI, JR., Chief United States District Judge.

**Opinion by:** FRANK P. GERACI, JR.

# Opinion

DECISION AND ORDER

## INTRODUCTION

Plaintiff Sharon Edwards commenced this action alleging racial discrimination against her former employer, Rochester Institute of Technology ("RIT") in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), and 42 U.S.C. § 1981.[1] She also alleges gender discrimination in violation of Title VII with respect to her termination only. ECF Nos. 1, 93.

Currently pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 132. Having considered the moving papers, the record evidence, and the applicable law, the Court grants Defendants' motion and dismisses the Amended Complaint in its entirety.

## PROCEDURAL HISTORY

Plaintiff commenced this action on September 27, 2010. ECF No. 1. Before Defendants filed an Answer, Plaintiff filed an Amended Complaint dated October 8, 2010. ECF No. [*2] 2. At the time this action was commenced, Plaintiff was represented by Christina Agola, Esq., but Ms. Agola withdrew as counsel in December 2011. ECF No. 15. Plaintiff proceeded *pro se* until December 4, 2012, when Plaintiff's current attorney, Prathima C. Reddy, Esq., entered a Notice of Appearance. ECF No. 58.

By that time, discovery was completed and the deadline to file

---

[1] Plaintiff advances the Section 1981 claims against Defendant Dr. Donald Boyd in his individual capacity.

dispositive motions was December 17, 2012. ECF No. 56. Defendants filed a summary judgment motion on December 17, 2012. ECF Nos. 59-60. Plaintiff opposed the motion and moved to amend the complaint and to reopen discovery. Plaintiff also filed a separate motion to stay the determination of the summary judgment motion pending further discovery regarding Plaintiff's termination. ECF Nos. 68, 72. By Order dated August 22, 2013, Magistrate Judge Marian W. Payson granted Plaintiff's motion to amend and permitted Plaintiff to add new claims for racial discrimination and retaliation based on her termination; permitted an additional claim for gender discrimination under Title VII based on her termination only; denied Plaintiff's request to add additional claims of gender discrimination under the NYSHRL; and permitted Plaintiff **[*3]** to conduct limited discovery regarding her termination. ECF No. 90.

Plaintiff filed her Second Amended Complaint on September 23, 2013 (ECF No. 93), which contains six separate causes of action: (1) the first cause of action, asserted against RIT and Dr. Boyd, alleges discrimination in the form of disparate treatment and unlawful termination based on race in violation of 42 U.S.C. § 1981; (2) the second cause of action, asserted against RIT under Title VII, alleges discrimination based on race in the form of disparate treatment and unlawful termination; and discrimination based on gender solely based on her termination; (3) the third cause of action, asserted against RIT, alleges discrimination based on race in the form of disparate treatment and unlawful termination in violation of the NYSHRL; (4) the fourth cause of action, asserted against RIT and Dr. Boyd, alleges retaliation in violation of 42 U.S.C. § 1981; (5) the fifth cause of action, asserted against RIT, alleges retaliation in violation of Title VII; and (6) the sixth cause of action, asserted against RIT, alleges retaliation in violation of the NYSHRL. *Id.*

In a Decision and Order dated September 26, 2013, this Court granted Plaintiff's motion to stay the **[*4]** summary judgment proceedings pending the completion of further discovery on Plaintiff's wrongful termination claims. ECF No. 94. Defendants withdrew their prior motion for summary judgment. ECF No. 130.

The current pending motion addresses all of the claims raised in Plaintiff's Second Amended Complaint. ECF No. 132. In support of their motion, Defendants submit a Statement of Undisputed Facts with Appendix Exhibits 1 through 28 ("Def. Appx. Ex."); Memorandum of Law ("Def. Mem."); Attorney Declaration ("Atty. Decl."); and Declaration of Tamara Gouger ("Gouger Decl.") with Supporting Exhibits 1 through 10. ECF Nos. 132-136.

Plaintiff submitted a Response to Defendants' Statement of Undisputed Facts; Memorandum in Opposition to Defendants' Motion; Attorney Declaration with Supporting Exhibits 1 through 29; and Plaintiff's Affidavit with Supporting Exhibits 1 through 100. ECF Nos. 153-180.

On April 28, 2017, the same day Defendants' Reply was due, Plaintiff filed additional Supporting Exhibits 101 through 105, which appears to be a corrected filing as those exhibits were cited in her Memorandum (ECF No. 177 at 33) but not included in her Opposition papers. ECF No. 183.

Following Defendants' **[*5]** Reply on April 28, 2017 (ECF No. 184), and after receiving permission from the Court to file a limited Sur-Reply (ECF No. 187), Plaintiff filed an Amended Affidavit by Plaintiff; an Attorney Declaration in Support of Sur-Reply with Supporting Exhibit 1; and Memorandum of Sur-Reply. ECF Nos. 188-190, 192.

The Court must point out the numerous deficiencies in Plaintiff's submissions. First, Plaintiff's Response to Defendants' Rule 56 Statement does not comply with the Local Rules of Civil Procedure, which require "correspondingly numbered paragraphs, and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried." Loc. R. Civ. P. 56(a)(2). Rather, Plaintiff "contests" the majority of the propounded facts in narrative form, often without citing evidence and/or without responding to or specifically controverting the facts asserted. In accordance with this District's Local Rules, the Court deems admitted any properly supported facts asserted against Plaintiff. Loc. R. Civ. P. 56(a)(2) ("Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically **[*6]** controverted by a correspondingly numbered paragraph in the opposing statement.").

Second, Plaintiff utilizes this submission to assert new claims. *E.g.*, Pl. Opp'n Stmt., ¶ 18. The Court therefore disregards any improperly raised new claims at this stage. *See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.").

Finally, the Court does not consider the paragraphs of Plaintiff's Affidavit (ECF Nos. 165, 188 (Amended)) that contradict her sworn deposition testimony, rely on documents not produced in discovery or inadmissible evidence, are unsupported by her evidentiary submissions, or that do not contain adequate citations to the record to support her contentions. *See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726, 2013 U.S. Dist. LEXIS 109298, 2013 WL 4409434, at *22 (E.D.N.Y. Aug. 2,

2013), *report and recommendation adopted as modified*, 2013 U.S. Dist. LEXIS 142121, 2013 WL 5502852 (E.D.N.Y. Oct. 1, 2013), *and report and recommendation adopted*, 2014 U.S. Dist. LEXIS 200610, 2014 WL 12769275 (E.D.N.Y. Sept. 17, 2014) ("If plaintiffs' counsel expects the Court to 'scour the record' to document the facts posited in their legal arguments, 'that is simply not our job, at least in a counseled case.'") (quoting *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002)); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227-28 (S.D.N.Y. 1999) ("counsel simply, in effect, pointed to virtually the entire body of extensive discovery in this case without any evidentiary affidavits or other meaningful identification [*7] of triable facts in the record, in effect, inviting this Court to peruse a haystack looking for needles. This invitation is not only inconsistent with the plain requirements of Local Civil Rule 56.1 but, if accepted, would eviscerate summary judgment as an efficient tool for distinguishing claims that should be tried from those that need not be tried.").

Therefore, unless otherwise noted, after reviewing the depositions, declarations, exhibits, and other evidence and pleadings, the Court has determined that the following facts are beyond genuine dispute and supported by admissible evidence.

## FACTUAL BACKGROUND

### I. Plaintiff's Employment with RIT

Plaintiff, an African-American female, began working at RIT in May of 2003. Before joining RIT, Plaintiff earned a Bachelor's Degree in Business Administration from RIT in 1996 and a Master's Degree in Management from Nazareth College in 2003 with a major in Accounting.

Plaintiff testified that she had been unemployed before 2003, but also that she was sporadically employed in various positions, performing mostly clerical and secretarial work, between February 1983 and April 2002, typically for only a few months at a time. Pl. Dep. 18-25; Gouger Ex. 1. Plaintiff states [*8] that her temporary positions were to accommodate her school schedule, and that her time off was spent caring for her children. Pl. Aff. ¶ 3-4, Ex. 2. After graduating high school, Plaintiff worked at Harter Secrest & Emery LLP in the collections department performing billing work. That position ended in 1992. Pl. Dep. 18-25.

RIT hired Plaintiff as an Operations Coordinator for Venture Creations. Venture Creations was created in 2001 as a new

business incubator to create an environment for the development of new, technologically innovative businesses. Venture Creations aids in the development of these new businesses by facilitating their design, development, construction, and operation, with the overall goal of promoting education and research. Various new business start-ups are located at the Venture Creations' facility, located off-campus from RIT, and RIT facilitates their development. In turn, RIT charges fees to the businesses for their use and occupancy of the Venture Creations' facility.

Defendants state that Plaintiff was responsible for various administrative tasks associated with Venture Creations, such as ensuring that office space was prepared for companies to move-in, ensuring [*9] that companies were invoiced for their licensing fees, making sure supplies were stocked, arranging for office keys to be made for new companies, ensuring that the facility was property maintained by coordinating with facilities management, assisting companies with internet technologies issues by coordinating with RIT's internet technologies services department, and arranging for the board meetings of Venture Creations. Def. Appx. Ex. 27 ("Boyd Aff.") ¶ 5; Pl. Dep. 65-70. Plaintiff, on the other hand, states that although she was hired as an "Incubator Operations Coordinator," her position involved far greater responsibilities than administrative tasks, and required a BS in Accounting with three to five years' experience. Pl. Aff. ¶¶ 8-14, Exs. 1, 4, 6.

During most of Plaintiff's employment, the Venture Creations staff primarily consisted of the Executive Director and Plaintiff. RIT also employed certain other individuals to serve Venture Creations as business consultants. Gouger Decl. ¶¶ 3-4. Plaintiff claims that in 2006, a woman named Anita Rohr was hired to take on the administrative roles, and that in 2007, William Jones was hired to help with operations. Pl. Aff. ¶¶ 4-6, Exs. [*10] 2, 16.

Plaintiff reported to the Director of Venture Creations. Boyd Aff. ¶¶ 4-6; Pl. Dep. 27-28. From 2004 to 2005, she reported to Lynn Kelly, and then to Mick Stadler in 2005 and 2006. Pl. Dep. 27-28. Plaintiff testified that she also reported to Dr. Don Boyd, RIT's Vice President of Research throughout her employment up to his retirement in 2011. *Id.*; Pl. Aff. ¶ 16.

From approximately September 2006 until mid-2007, the Venture Creations Director position was vacant, at which point Jerry Mahone was hired as Director of Venture Creations and served in that capacity until June 2010. Mr. Mahone is African-American. Plaintiff reported directly to Mr. Mahone during his tenure as Director of Venture Creations. Plaintiff states that Mahone also worked under Boyd. Pl. Aff. ¶¶ 16, 31-33.

As previously mentioned, Venture Creations employed Rohr, a Caucasian female, as an Operations Coordinator from approximately 2007 through her termination in February 2011. Plaintiff had repeated conflicts with Rohr. Plaintiff testified that initially their relationship was good, but later deteriorated because Plaintiff received tuition assistance from RIT for her doctoral studies conducted through the University [*11] of Phoenix, and Plaintiff was permitted by their then-supervisor, Mahone, to do her homework at work. Plaintiff testified that Rohr resented the fact that RIT and Mahone had assisted her in this manner. Pl. Dep. 127-35.

Plaintiff's conflicts with Rohr involved, for example, Plaintiff's belief that Rohr infringed on her job responsibilities by performing tasks such as requesting that the air conditioner be fixed or attempting to fix the copier . Pl. Dep. 136-39, 282-84.

Between April and August of 2009, Plaintiff was out of work on disability in connection with foot surgery. Pl. Dep. 35-36.

## II. Alleged Adverse Actions

Plaintiff claims that she suffered the following adverse employment actions based on her race: (1) beginning in 2006, a delay on RIT's part in changing her position's title in RIT's Human Resources Computer Software, Oracle, from Operations Coordinator to Operations Manager; (2) RIT's failure to promote Plaintiff; (3) the reclassification of Plaintiff's position from exempt to non-exempt under the Fair Labor Standards Act ("FLSA"); (4) generally, Plaintiff's job responsibilities performing only clerical and administrative work; (5) Plaintiff's attendance at a meeting on November [*12] 16, 2009, during which Plaintiff was accused of various deficiencies related to her work performance; (6) a negative performance appraisal ("PA") in September, 2011; (7) a September 2011 written warning; and (8) her temporary suspension with pay after an incident involving her then-supervisor, Jones; and (9) termination from RIT based on her race and/or gender.

## A. Delay in Updating Plaintiff's Title

In or around October 2006, shortly after Dr. Boyd began serving as Interim Director of Venture Creations, he informed Plaintiff that she would receive a three percent pay increase, and that her title would change from "Operations Coordinator" to "Operations Manager." Boyd Aff. ¶ 10, Boyd Ex. 22; Pl. Dep. 109-10. Plaintiff's title change was not implemented within RIT's Human Resources Computer Software, Oracle, until March 2009. Boyd Aff. ¶ 12; Pl. Dep. 110; Gouger Decl. ¶ 7. Nevertheless, Plaintiff began using the

"Operations Manager" title immediately. Boyd. Ex. 23; Pl. Dep. 110.

The delay in updating Plaintiff's title in Oracle was a processing error based on the inadvertent failure to submit the correct Employee Action Form for the changed to be processed. Gouger Decl. ¶ 8. Although Oracle [*13] did not reflect the title change, Plaintiff's pay increase was properly processed. Id. ¶ 9. Plaintiff notified RIT President Dr. William Destler of the error in February of 2009. Boyd Aff. ¶ 13; Pl. Aff. ¶ 60, Ex. 40; Reddy Decl., Ex. 8. Plaintiff testified that the title change had no practical impact on her day-to-day responsibilities and wages. Pl. Dep. 110-12.

## B. Failure to Promote

Plaintiff initially testified that while at RIT, she applied for 50 to 60 positions within RIT, but later changed her testimony, ultimately admitting to having applied for only four positions at RIT. Pl. Dep. 117, 227. Those positions were: (1) counselor position 5527 in the Higher Education Opportunity Program; (2) a managerial position, PC number 8458, in the HUB Crossroads facility; (3) a director of orientation position, PC number 1753; and (4) a business manager position in the Center for Arts and Sciences. Pl. Dep. 227-231, 247. With respect to the managerial position, Plaintiff testified that she did not possess the technical skills or meet the qualifications required for that position. Pl. Dep. 238-41. Plaintiff's applications for these positions date back to 2006 and 2007, and she did not apply for [*14] any other positions within RIT after August 2007—rather, she "networked." Pl. Dep. 253. She explained that "discrimination enters your surroundings when you are applying for positions and you are constantly declined," but acknowledged that she did not know who ultimately took those positions, and that RIT did not retaliate against her by not hiring her for those four positions. Pl. Dep. 242-49.

Plaintiff also alleges that she was treated differently than certain of her co-workers, purportedly because of her race, with respect to her inability to secure an unspecified promotion. ECF No. 93 ¶¶ 23-26. Specifically, Plaintiff's Second Amended Complaint cites to Kelly, a former supervisor, as a similarly situated Caucasian co-worker who was allegedly treated more favorably, id. ¶¶ 22-24, but Plaintiff never applied for Kelly's position. Pl. Dep. 170-71. During the relevant time period, Kelly was the Controller and Assistant Treasurer of RIT and RIT employed her for approximately 20 years. Kelly has an Executive Master's Degree and has held various positions within the Finance and Administration Division of RIT, including Manager of Accounting, Director of Accounting, Director of

Accounting [*15] and Payroll, Assistant Controller, Associate Controller, and Controller and Assistant Treasurer. Boyd Aff. ¶ 24.

Plaintiff also alleges that, following the departure of Mahone, who is also African-American, she was "never given an opportunity to apply" for the position of Executive Director of Venture Creations because the position was posted on May 24, 2011, when she was on vacation. ECF No. 93 ¶¶ 72-74; Pl. Dep. 41. At the time, Jones, who is Caucasian, had been serving as the Interim Director of Venture Creations and he ultimately took the permanent role in May of 2011. Jones Dep. 22-24.

Jones also temporarily served as the Interim Director of Venture Creations in 2007, prior to Mahone's hiring. Jones again worked for RIT in 2008 as a part-time consultant working with Venture Creations' businesses. He then served as a business development manager for the New York State Energy Research and Development Authority Clean Energy Incubator when it was established in December 2009. Jones has a Bachelor of Architecture degree from Syracuse University and additional graduate courses in finance and business administration from RIT. His experience included founding and managing FM Technologies [*16] (a facilities design and project management company), and working with organizations like Syracuse University, Catholic University, University of Maryland, Kodak, and Xerox. Boyd Aff. ¶ 26. Plaintiff characterizes this work experience as "spotty," that his education and skills were "dated," and he "did not have higher level education." Pl. Opp'n Stmt. ¶ 41.

Defendant states that Plaintiff has been enrolled in an online program at the University of Phoenix since 2007, with the goal of obtaining her doctorate degree, but did not complete it. Pl. Dep. 11-16. Further, Plaintiff provided conflicting testimony regarding her employment activities before RIT employed her in 2003, stating initially that she could not remember any of her employment after graduating from high school; then testifying that she was unemployed before working for RIT; and later testifying that she performed temporary "receptionist" or "clerical" work for Manpower. Pl. Dep. 18-26. Plaintiff also recalled that she worked at Harter Secrest & Emery after high school in the collections department for approximately nine years until 1992. Pl. Dep. 20-23. Plaintiff contends that she "complete[d] her doctorate studies in Educational [*17] Leadership," but does not specify when. Pl. Aff. ¶¶ 2-24.[2] She further notes that when the Executive Director position opened in 2011, Plaintiff had

been working with Venture Creations for over five years with a "proven track record." Id.

## C. Reclassification of Plaintiff's Position to Non-Exempt

In or around March of 2007, RIT settled threatened class action litigation related to alleged FLSA violations. This entailed a campus-wide review of RIT's employees' job functions, to ensure that the employees were properly classified as exempt or non-exempt. Effective April 16, 2007, more than 160 RIT employees were reclassified from exempt to non-exempt. Plaintiff's position was one of the reclassified positions. In connection with the reclassification, RIT sent Plaintiff a letter explaining that the reclassification was merely a "legal conclusion" and that it did "not indicate the importance of the position or its status within the University." Boyd Aff. ¶ 15, Ex. 24. She testified that she was aware that the reclassification occurred campus-wide and that other employees' positions also underwent the reclassification procedure. Without further explanation, Plaintiff states that she was disadvantaged [*18] by the reclassification while the Caucasian reclassified employees were not. Pl. Aff. ¶¶ 42-43, 56, Ex. 46; Pl. Dep. 99-100. She testified, however, that her duties remained the same, she made "about the same amount of money," and that she was entitled to overtime and received overtime pay when she worked over 40 hours. Id. 94-96.

According to Plaintiff, she functioned at a "Director level" before the reclassification. Defendant maintains that her work duties were secretarial and clerical in nature. Pl. Dep. 112; Pl. Aff. ¶¶ 3, 12, 32, 33, Exs. 1, 6-7. Plaintiff suggests that the reclassification "limited" her to clerical work and thus decreased her earning potential. Pl. Aff. 42, 43, 56, 170, Exs. 25-26. The reclassification of Plaintiff's position to non-exempt meant that Plaintiff was paid on an hourly basis rather than being paid a set salary. Pl. Dep. 94. Because of this change, Plaintiff was to be paid for any time worked over 40 hours. Boyd Aff. ¶ 16; Pl. Dep. 95-96. Plaintiff contends that the reclassification no longer allowed her a flexible work schedule such that she could not complete her doctoral coursework. Pl. Opp'n Stmt. ¶ 49.

In mid-2008, Plaintiff and Gouger discussed her FLSA [*19] classification. Gouger asked Plaintiff to fill out a detailed job description questionnaire that RIT used to determine which positions should be classified as exempt or non-exempt. Based on Plaintiff's responses to that questionnaire, Gouger confirmed that Plaintiff's position was correctly classified as non-exempt. Gouger Decl. ¶ 6, Ex. 2.

## D. Plaintiff's Job Duties

---

[2] Plaintiff's Exhibits 1-8, which she cites to for the assertion that she completed her doctorate degree, do not appear to support her contention. Pl. Ex. 1-8.

Plaintiff testified that her job with Venture Creations always involved primarily secretarial and clerical work, Pl. Dep. 65-69, 112, a statement that she now denies. Pl. Aff. ¶¶ 11, 13, Exs. 6-7. Even after Mahone became her supervisor, she claims that she "ran that facility." Pl. Dep. 151.

Plaintiff testified that in 2009 she requested a meeting with Boyd and Mahone to determine the responsibilities of her position. At the meeting, Boyd "asked her what did she want to do and what responsibilities did she have." Pl. Dep. 105-09. Plaintiff stated that she believed that, throughout her tenure at RIT, "there was a problem with our job responsibilities" and that one of the reasons for this was that the job responsibilities were "not defined." Pl. Dep. 140.

Plaintiff declined certain tasks because she believed they were not part [*20] of her job description. For example, Plaintiff was asked to maintain the Venture Creations' website. Plaintiff turned down the offer because she believed that it would not provide her the "opportunity to be creative and innovative." Def. Appx. Ex. 24-25.

### E. November 16, 2009 Meeting

Plaintiff testified that on November 12, 2009, Mahone informed her that a staff meeting would take place on November 16, 2009. Pl. Dep. 47. Plaintiff, Mahone, Boyd, and Gouger attended the meeting, which was intended to counsel Plaintiff regarding her work performance and her continued conflicts with her co-workers. Boyd Aff. ¶¶ 30-31; Gouger Decl. ¶ 12; Pl. Dep. 47. Plaintiff states that there is no documentation to support that the meeting was a "counseling" in accordance with RIT's Progressive Discipline Policy. Pl. Aff. ¶ 85, Ex. 51.

During that meeting, Plaintiff alleges that she was accused of having an unprofessional attitude, "hindering customers at Venture Creations," starting rumors about Mahone purportedly viewing inappropriate material on his computer, not recording her time properly, and not getting along with other individuals on campus. Pl. Dep. 47.

Plaintiff also states that she recorded the [*21] November 16, 2009 meeting, but the recording was damaged as a result of computer problems when her husband attempted to retrieve the audio file. Pl. Dep. 79-84, 254-59. Plaintiff testified that no further action was taken in connection with any of the purported allegations made at the November 16, 2009 meeting, and that nothing that was said at that meeting led her to believe that the meeting was related to her race. Id. at 48, 62-63. Plaintiff later filed discrimination and retaliation charges with the Equal Employment Opportunity Commission ("EEOC") in connection with the meeting.

Plaintiff testified that she experienced problems with approximately nine or ten different RIT employees. Pl. Dep. 56-58. According to Plaintiff, the problems were always the fault of her co-workers. Id. She conceded that she had a history of not working well with other women even before RIT employed her. Pl. Dep. 193-94.

At RIT, Plaintiff was involved in several incidents involving Rohr, her female co-worker. Boyd Aff. ¶¶ 18-19; Pl. Dep. 127-128, 133-135. Plaintiff testified that she yelled at Rohr in the workplace approximately four separate times. Pl. Dep. 149-50. One of the incidents led Plaintiff to tell Rohr: "be a [*22] professional and stop the child's play. You're too old to be acting like a two year old." Boyd Aff. ¶ 18, Ex. 25.

### F. Plaintiff's 2011 Performance Appraisal

In mid-2010, Jones became the Interim Director of Venture Creations, upon Mahone's departure. Boyd Aff. ¶ 26. Plaintiff testified that, until she received her PA in September of 2011, she and Jones had "a great employee-employer relationship." Pl. Dep. 262-64. Plaintiff states that the relationship deteriorated when Jones learned of her EEOC complaint and lawsuit. Pl. Aff. ¶ 102.

Between January and September of 2011, Jones, in consultation with Gouger, verbally counselled Plaintiff regarding her work performance on several occasions. See, e.g., Jones Dep. 95-102; Gouger Decl. ¶¶ 13-14; Bender Dep. 136-37; 164-65. For example, Plaintiff was verbally counselled regarding her failure to complete work assignments, her continued conflicts with Rohr, and her negative responses to her supervisor regarding work requests. Bender Dep. 150; Jones Dep. 95-102. Plaintiff claims that she received a verbal warning only on September 20, 2011, in addition to her PA, and that she was never disciplined under Boyd's supervision. Pl. Aff. ¶¶ 97, 105, [*23] Exs. 58, 67.

Plaintiff's September 2011 PA addressed various problems with Plaintiff's performance. Raffaelle Dep. 29-31. The assessment was made by Jones, who had not been the subject of a discrimination charge by Plaintiff until after the PA was issued. Def. Appx. Exs. 6-13. The PA indicated an overall rating of 1.8 out of 5. Pl. Dep. 262; Gouger Ex. 3. Plaintiff claims, however, that the PA came after Jones became aware of her lawsuit against RIT, which she filed in September of the previous year. Further, Plaintiff claims that her prior performance reviews were positive. Pl. Aff. ¶¶ 105-06, 115, Exs. 65, 71-73.

The PA in question addressed Plaintiff's persistent failure to arrive to work on time and to schedule time off in advance; inability to work cooperatively with co-workers and

involvement in verbal altercations at work; habit of working with her office door closed or cracked open, making it appear as though she was unavailable to assist others; unsatisfactory response to management direction and practice of working solely within the parameters of her written job description, which hindered her performance; and failure to maintain the Venture Creations' website even though it [*24] was her responsibility. Gouger Ex. 3; Pl. Dep. 267-70, 274-75.

Plaintiff testified that when Jones asked her to perform various tasks, she told him: "I know how to do my job." Pl. Dep. 270-71. She further testified that, despite the fact that Jones was her supervisor, she trained him and that she was "a major player" in the facility. *Id.* at 271-72. According to Plaintiff, Jones saw her as a threat to him because customers would seek out Plaintiff instead of Jones for assistance. *Id.* at 279-80.

After Plaintiff's September 20, 2011 Performance Appraisal, she failed to give Jones a status update on various issues, for example, outstanding space licenses and licensing fees, which he requested multiple times. Accordingly, Jones issued Plaintiff a written warning on September 27, 2011. Gouger Decl. ¶ 16, Ex. 4.

## G. Incident with William Jones and Subsequent Suspension

Shortly after receiving the Performance Appraisal, on October 6, 2011, Plaintiff and Jones were involved in a verbal altercation that resulted in their temporary suspension with pay, while RIT's Human Resources Department investigated. Pl. Dep. 289; Jones Dep. 30-33; Gouger Decl. ¶¶ 17-20, Exs. 5-6. Plaintiff states that during the incident, Jones was physically [*25] and verbally aggressive toward her, but does not specify what Jones allegedly did or said. Pl. Aff. ¶¶ 119, 163, Ex. 75.

Plaintiff and Jones were informed that they could return to work within one week. Jones returned to work, although he was reprimanded for his conduct in connection with the October 6th incident. Bender Dep. 173-74; Gouger Decl. ¶¶ 19-20, Ex. 7. Plaintiff did not immediately return to work, and instead notified RIT that she would be taking short-term disability leave for a foot surgery. Pl. Dep. 290, 448; Gouger Decl. ¶¶ 20-21. Plaintiff was out on disability between October 7, 2011 and April 3, 2012. *Id.*

## H. Plaintiff's Return to Work in April 2012 and Subsequent Termination

When Plaintiff returned to work on April 3, 2012, RIT facilitated a work arrangement whereby Plaintiff and Jones had very limited interaction during the workday to avoid further confrontation. To accomplish this, RIT scheduled Plaintiff to work at its main campus in the morning and at Venture Creations in the afternoon. Conversely, RIT scheduled Jones to work at Venture Creations in the morning and at the main campus in the afternoon. Thus, Plaintiff and Jones were only physically in the same place [*26] during weekly staff meetings. Bender Dep. 180-81; Def. Appx. Ex. 23. Plaintiff contends that her removal from the Venture Creations office placed her into a "filthy, dysfunctional office without immediate computer access," while Jones was permitted to work in Vice President of Research and Associate Provost Dr. Ryne Raffaelle's office or at home. Pl. Aff. ¶¶ 16, 159.

Plaintiff also began reporting directly to Raffaelle, who had taken over for Boyd upon his retirement. Raffaelle Dep. 25. Plaintiff states that Raffaelle did not supervise her, refused to meet with her, and asked Jones to write a status report regarding Plaintiff's work that ultimately resulted in her termination. Pl. Aff. ¶¶ 156, 167.

Upon her return, Raffaelle and Human Resources Representative Judy Bender met with Plaintiff and gave her a "Performance Expectations - Final Written Warning" memorandum on April 3, 2012. During the meeting and in the memorandum, Raffaelle detailed the prior similar warnings Plaintiff received and his expectations regarding areas in which she needed immediate, consistent, and sustained improvement. Raffaelle Dep. 29-30; Pl. Dep. 293-94; Def. Appx. Ex. 23. Plaintiff maintains that she never [*27] had performance issues. Pl. Aff. ¶¶ 174-75.

Further, because Plaintiff repeatedly complained that she was being asked to perform work outside of her job description and that her job was not properly defined, Raffaelle also provided her a detailed work plan so that her work expectations were clear. Plaintiff assured Raffaelle that she could accomplish the tasks on the work plan with no problem. Def. Appx. Ex. 25-26; Raffaelle Dep. 29-30, 65-66; Pl. Dep. 29-94, 394; Bender Dep. 74.

Soon after Plaintiff returned to work, she failed to comply with the expectations set forth in the Final Written Warning and the work plan. For example, Plaintiff: (1) failed to submit invoices to the Venture Creations' companies for certain payments due by May 1, 2012; (2) failed to notify all Venture Creations' companies of her return to work on April 3, 2012, instead only notifying approximately nine out of approximately 23 companies; (3) failed to obtain secure keys for two of the Venture Creations' companies; (4) failed to obtain updated certificates of insurance; and (5) only attended

one staff meeting at which she did not take minutes (despite instructions that she was expected to do so). Pl. Dep. 303-06, [*28] 368, 383; Def. Appx. Ex. 26 (noting that Plaintiff was responsible for resolving all issues with certificates of insurance).

Plaintiff was supposed to give Raffaelle reports concerning her work performance, but she failed to fulfill that obligation. Raffaelle Dep. 92-93. Plaintiff failed to complete almost all of the tasks in the work plan. Bender Dep. 261. Plaintiff conceded that she did not: invoice any of the companies within Venture Creations; provide keys to several of the companies that requested them; email the companies notifying them of her return; and work with at least one individual within the Ventures Creation facility who requested help connecting her computer to the printers. Pl. Dep. 303-307. She also continued to have difficulty dealing with co-workers. Raffaelle Dep. 143-44.

Raffaelle met with Plaintiff and Bender on May 1, 2012 to confirm whether Plaintiff accomplished the work plan tasks. Raffaelle Dep. 89, 137-39. Plaintiff admitted that she had not accomplished most of the tasks. Raffaelle Dep. 85-86, 159; Bender Dep. 261. As a result, Plaintiff was terminated effective May 1, 2012, failing to perform the essential functions of her job. Raffaelle Dep. 83-86; Bender [*29] Dep. 105-08; Pl. Dep. 22, 302. Plaintiff, relying on her sworn affidavit, contends that she completed her work assignments but had no opportunity to present her results to Raffaelle. Pl. Aff. ¶¶ 150-54, 162.

Raffaelle asked Jones to draft a status report dated April 30, 2012 that detailed Plaintiff's failure to carry out certain work plan duties. Raffaelle Dep. 109-11; Jones Dep. 222. Jones testified that he did not discuss Plaintiff's termination with Raffaelle. Jones Dep. 199.

Plaintiff's position as Operations Manager was not replaced. Rather, RIT engaged a part-time, temporary employee that it later employed to perform clerical and administrative duties for Venture Creations. Gouger Decl. ¶ 33.

## I. Claims against Boyd, Individually

Boyd retired as Vice President of Research on July 1, 2011. Boyd Aff. ¶ 1. Plaintiff asserts claims individually against Boyd based primarily upon his service as Interim Director of Venture Creations between December 2006 and mid-2007, which include: (1) that Boyd allegedly yelled at Plaintiff on January 24, 2007, regarding a conflict with another co-worker; (2) the delay in changing her title from Operations Coordinator to Operations Manager; (3) the FLSA [*30] reclassification from exempt to non-exempt in March 2007;

(4) Boyd's participation in the November 16, 2009 meeting regarding deficiencies in Plaintiff's work performance. Pl. Dep. 90-92.

Plaintiff's complaints about her PA, the October 6, 2011 incident with Jones, and the termination of her employment do not relate to Boyd, as he had retired from his position of Vice President of Research before those incidents occurred. Boyd Aff. ¶ 1; Pl. Dep. 50. Plaintiff testified that Boyd did not make comments to her related to her race. Pl. Dep. 99. Rather, Plaintiff contends that her claims against Boyd are supported by the fact that he allegedly said: "it would be difficult to find a qualified AALANA[3] female for his division." ECF No. 93 ¶ 38; Pl. Dep. 112-114. Plaintiff already worked in Boyd's division, and the comment was purportedly made during a discussion regarding Plaintiff's involvement in RIT's Functional Diversity Council Committee. Boyd appointed Plaintiff to this committee to ensure that there was minority representation in RIT's Research Division. Boyd Aff. ¶ 27; Pl. Dep. 112-13. Boyd does not recall making this comment to Plaintiff. Boyd Aff. ¶ 29.

## J. Complaints of Discrimination [*31]

Before the commencement of and during this litigation, Plaintiff filed nine separate charges alleging discrimination and/or retaliation with the EEOC on or about the following dates: August 11, October 27, and December 16, 2009; September 26, October 5, October 6, October 12, and October 14, 2011; and October 1, 2012. Def. Atty. Decl. ¶ 11; Def. Appx. Exs. 6-14. The EEOC charges alleged that Plaintiff had been the victim of racial discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1981, and the NYSHRL. Only Plaintiff's final charge alleges discrimination based on gender in connection with her termination. Def. Appx. Ex. 14. Some of the EEOC charges also allege that Plaintiff had been subjected to an alleged racially hostile work environment, but Plaintiff did not assert claims in her Second Amended Complaint of hostile work environment. ECF No. 93. All of Plaintiff's EEOC charges have been dismissed and notices of Plaintiff's right to sue have been issued with respect to each charge. Def. Appx. Exs. 15-19.

## DISCUSSION

---

[3] "AALANA" stands for African American Latin American Native American. Pl. Dep. 114.

2018 U.S. Dist. LEXIS 53326, *31

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, [*32] together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *see Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Regarding materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. More importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250.

As the Second Circuit observed in *Duse v. IBM*, 252 F.3d 151, 158 (2d Cir. 2001), "in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." 252 F.3d 151, 158 (citing [*33] *e.g., Anderson*, 477 U.S. at 255). However, "if the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Duse*, 252 F.3d at 158 (citing *e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied*, 508 U.S. 909, 113 S. Ct. 2338, 124 L. Ed. 2d 249 (1993); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion), *cert. denied*, 480 U.S. 932, 107 S. Ct. 1570, 94 L. Ed. 2d 762 (1987)).

## II. *McDonnell Douglas* Burden Shifting

### A. Intentional Discrimination

Plaintiff alleges intentional employment discrimination based on her race in violation of Title VII, Section 296 of the NYSHRL, and 42 U.S.C. § 1981. The Court considers these claims in tandem. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 32 (E.D.N.Y. 2015) (noting that Title VII and NYSHRL claims are analyzed using the same burden-shifting framework); *Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012) (analyzing Title VII and Section 1981 cases under the same burden-shifting framework).

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Claims brought under this provision are examined under [*34] the burden-shifting analysis the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *Collins v. N.Y.C. Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). The plaintiff's burden of proof at the prima facie stage is "*de minimis*." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell*, 411 U.S. at 802. In other words, "the defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate nondiscriminatory reason for its employment action, "the presumption of discrimination arising with the prima facie case drops from the picture . . . and the plaintiff [*35] must then establish that the defendant's proffered reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42

(citing *St. Mary's*, 509 U.S. at 510-11).

To demonstrate pretext, the plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (quotation marks and alterations omitted).

## B. Retaliation

Claims of discriminatory retaliation are also subject to the *McDonnell Douglas* burden-shifting analysis. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Hicks v. Baines*, 593 F.3d 159, 163-64 (2d Cir. 2010) (retaliation claims under the NYSHRL, Section 1981, and Title VII are analyzed under the *McDonnell Douglas* framework); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (analyzing Section 1981 and NYSHRL discrimination claims under *McDonnell Douglas*).

Under the familiar burden-shifting framework, the plaintiff must first make out a *prima facie* case of retaliation. *See Kwan*, 737 F.3d at 844. Plaintiff's burden is *de minimis*—she need only provide admissible evidence from which a reasonable jury could infer a retaliatory motive. *E.g., Hicks*, 593 F.3d at 164. Once the plaintiff makes out her *prima facie* case, she creates a presumption of retaliation, and the burden shifts to the defendant to provide "a legitimate non-retaliatory reason for the adverse employment action." [*36] *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010). If the defendant meets its burden of production, it defeats the presumption of retaliation that the plaintiff's *prima facie* case created. *Hicks*, 593 F.3d at 164. The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is merely pretextual. *Kwan*, 737 F.3d at 845.

## III. Analysis

Defendants argue that summary judgment is appropriate because: Plaintiff fails to establish discrimination and retaliation claims under Title VII; her individual claims against Boyd in his individual capacity fail as a matter of law; and some of her claims are time-barred.[4] Def. Mem. at 4-34.

---

[4] Because the Second Circuit has a "clearly expressed preference that litigation disputes be resolved on the merits," *Mejia v. Castle Hotel, Inc.*, 164 F.R.D. 343, 346 (S.D.N.Y. 1996), the Court will address the merits of Plaintiff's claims, despite the possibility that some of her claims are time-barred.

The parties do not appear to dispute the first two elements of Plaintiff's *prima facie* case, and therefore the only issue at this stage of the analysis is whether an adverse employment action occurred under circumstances giving rise to an inference of discrimination.

## A. Intentional Discrimination

### 1. Adverse Action

Defendant first contends that most of Plaintiff's complaints are not adverse employment actions for purposes of her discrimination claim. Def. Mem. 6-16.

To establish a *prima facie* case of discrimination a plaintiff must present evidence of an adverse employment action, which means that the "defendants must effect a materially [*37] adverse change in the terms and conditions of employment," which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (citations and quotations omitted). "Adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* Moreover, "actions that are 'trivial harms' - i.e., those petty slights or minor annoyances that often take place at work and that all employees experience - are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (internal quotations omitted).

The following actions are not adverse for purposes of the Title VII discrimination analysis: the delay in updating Plaintiff's title, the alleged failure to promote, the FLSA job reclassification, and the November 16, 2009 meeting. The Court briefly discusses those incidents.

In late 2006, Plaintiff's title was changed from Operations Coordinator to Operations Manager following a favorable PA. She received a three percent salary increase. Although Plaintiff began to use the new title immediately, [*38] the Human Resources software did not update her title until 2009. She does not dispute that the delay did not negatively impact her salary, benefits, or job responsibilities. Pl. Dep. 110112. The error impacted only Plaintiff's title. Otherwise, a career advancement, promotion, or salary increase cannot be considered "adverse" to Plaintiff. The error was therefore an

inconvenience at most, particularly in light of the fact that she used her new title immediately upon her promotion. *See, e.g., Leak v. United Techs. Corp.*, 81 F. Supp. 2d 373, 376 (D. Conn. 1999) ("In this instance, plaintiff's transfer, which resulted in promotion to a higher labor grade level, does not constitute an adverse employment action raising the inference of discrimination."); *see also, e.g., Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640-41 (2d Cir. 2000) (administrative mistakes including delay in reassignment and incorrect assignment were not adverse employment actions where there was no evidence of career impact).

With regard to her claim that RIT failed to promote her, RIT records indicate that Plaintiff applied for four positions outside of Venture Creations. Plaintiff testified that she applied for: a counselor position with RIT's Higher Education Opportunity Program; a managerial position in the HUB Crossroads facility; Director of [*39] Orientation; and Business Manager in the Center for Arts and Sciences. Pl. Dep. 226231. Plaintiff testified that she was not selected for the positions; did not know who was selected for the positions; did not feel she was not offered the positions in retaliation by RIT; but that "it could be possible" that RIT discriminated against her by not employing her in those positions if she were to "look at the nationality of the person sitting in the position." *Id.* at 23336, 238, 241, 245, 248, 249, 250. She acknowledged that there was "major retaliation coming from RIT around the board," but "not with these four positions." *Id.* at 24849. Plaintiff also testified that she did not have the requisite training and/or technical skills, and was unqualified for the positions for which she applied. Pl. Dep. 23334, 238, 24044. A plaintiff does not have a claim for a failure to promote where she was not qualified for the promotion. *Gutierrez v. City of N.Y.*, No. 086537, 2011 U.S. Dist. LEXIS 112925, 2011 WL 7832709, at *6 (S.D.N.Y. 2011). Nor can she raise an issue of fact based on her own speculation or opinion that the failure to hire was discriminatory in nature. *See generally, Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact") (citations omitted); *see also YaChen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74-75 (2d Cir. 2015) ("a plaintiff's feelings and perceptions [*40] of being discriminated against do not provide a basis on which a reasonable jury can ground a verdict") (internal quotation marks and citation omitted).

Likewise, the FLSA job reclassification did not constitute an adverse employment action. With respect to reclassification, courts have found that if an employer improperly categorized a plaintiff as exempt from the FLSA's overtime compensation requirements and the plaintiff was denied overtime, she could satisfy the adverse employment action standard. *Sethi v. Narod*, 12 F. Supp. 3d 505, 528 (E.D.N.Y. 2014) (collecting cases). In contrast, the transition from Plaintiff's position from exempt to nonexempt provided her the opportunity to earn compensation for overtime hours worked. Plaintiff testified that her compensation was essentially unchanged, and that she was paid for overtime hours that she worked. Pl. Dep. 9496. Although Plaintiff contends this was a demotion from a professional position to a clerical position, she does not proffer any admissible evidence in support of this claim. *Id.*; Pl. Aff. ¶ 42.

Finally, Plaintiff challenges the November 16, 2009 counseling meeting, during which she was accused of having an unprofessional attitude, hindering customers, starting rumors about Mahone [*41] (her thensupervisor), and not recording her time properly. ECF No. 93 ¶¶ 6567. Although she now contends that after the meeting she had a "negative record that would further derail her career progress," Pl. Mem. 16, she testified that no further action was taken in connection with the allegations RIT staff made against her. Pl. Dep. 62. Thus, Plaintiff alleges nothing more than criticism of her work performance, which is insufficient to meet her burden. "Excessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." *Opoku v. Brega*, No. 15CV2213, 2016 U.S. Dist. LEXIS 136038, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) (collecting cases) (citations omitted).

Plaintiff appears to argue that the September 20, 2011 negative PA, temporary suspension in October of 2011, written warning dated September 27, 2011, and ultimate termination on May 1, 2012, when considered together, constitute an adverse employment action. Pl. Mem. 17. "Negative performance evaluations, formal reprimands, and counseling memoranda are not adverse employment actions for purposes of a disparate treatment claim unless accompanied by [*42] negative repercussions such as reduction in pay or an injury to a plaintiff's ability to secure future employment." *Babarinsa v. Kaleida Health*, 58 F.Supp.3d 250, 260 (W.D.N.Y. 2014), *aff'd*, 622 F. App'x 36 (2d Cir. 2015) (summary order). Here, Plaintiff has alleged multiple consequences flowing from the September 20, 2011 PA, including her termination from RIT. Accordingly, for purposes of this motion, she has established an adverse employment action as part of her *prima facie* case. She must still show, however, that "the action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).

## 2. **Inference of Discrimination**

To that end, Plaintiff alleges that: she was the only AfricanAmerican female working at Venture Creations; she was treated less favorably than Kelly, a Caucasian female coworker; Boyd commented about "AALANA" professionals; she encountered pay disparities; and Jones treated her aggressively. Pl. Mem. 1923.

The fact that Plaintiff was the only AfricanAmerican female employed at Venture Creations, a new business incubator with approximately three fulltime employees between 2007 and 2011, is of little probative value. *See Pearson v. Lynch*, No. 10 CIV. 5119, 2012 U.S. Dist. LEXIS 39456, 2012 WL 983546 (S.D.N.Y. Mar. 22, 2012) (no inference of discrimination where terminated plaintiff was only male administrative assistant); *Anderson v. Hertz Corp.*, 507 F.Supp.2d 320, 329 (S.D.N.Y. 2007) ("The fact that Plaintiff [*43] was the only AfricanAmerican Station Manager" did not "supply evidence sufficient for Plaintiff to establish a *prima facie* case of discrimination.").

Kelly, Plaintiff's Caucasian coworker with whom she claims to be similarlysituated, is RIT's Controller and Assistant Treasurer. Plaintiff offers no proof that would establish that the two were similarly situated. Plaintiff never applied for her position and, although she claims that Kelly was promoted more frequently, Pl. Aff. ¶¶ 73, Kelly started working at RIT approximately 11 years before Plaintiff did. Boyd Aff. ¶¶ 2425. Plaintiff also claims that the two women received their master's degrees around the same time, Pl. Mem. 20, but the citation provided does not support this proposition, and the Court can find no such evidence in the record as to when Kelly completed her advanced degree. *See* Pl. Opp'n Stmt. ¶ 36; Pl. Aff. ¶ 73. This is insufficient to establish that Plaintiff was treated differently than similarly situated employees, and therefore fails to give rise to a reasonable inference of discrimination. *See Lapsley v. Columbia Univ.Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 518 (S.D.N.Y. 1998) (Plaintiff and comparator not similarly situated where "even a superficial comparison of the two employees' qualifications [*44] and duties reveals differences in virtually every material respect.").

Next, Plaintiff states that Boyd privately called her in April of 2008 regarding an RIT diversity committee,[5] and informed her that it would be very difficult to find "three qualified AALANA professional females" for his division. Pl. Mem. 21. Plaintiff fails to connect this comment in any way to the

aforementioned adverse employment actions, which are largely attributed to Jones and Raffaelle and occurred approximately three years after the alleged phone conversation occurred. "[V]erbal comments may raise an inference of discrimination, but not where they lack a 'causal nexus to the termination decision.'" *Luka v. Bard College*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) (quoting *Williams v. Victoria's Secret*, No. 15cv4715, 2017 U.S. Dist. LEXIS 45813, 2017 WL 1162908, at *8 (S.D.N.Y. Mar. 28, 2017)).

With respect to her allegation of "pay disparity," Plaintiff proffers no evidence to support her argument that she "performed the work of Interim Director for years but was never properly compensated for her efforts." Pl. Mem. 22. To the extent she seeks to compare herself to Jones as a similarlysituated employee, such an argument would necessarily fail. "When determining whether employees are similarly situated, courts consider characteristics including the [*45] employees' education, work experience, and specific work duties." *Wallen v. Teknavo Grp.*, No. 12CV6196, 2018 U.S. Dist. LEXIS 30764, 2018 WL 1278317, at *17 (E.D.N.Y. Feb. 22, 2018), *report and recommendation adopted sub nom., Wallen v. Teknavo Grp.*, 2018 U.S. Dist. LEXIS 40071, 2018 WL 1258782 (Mar. 12, 2018).

Here, Jones temporarily served as the Interim Director of Venture Creations in 2007, and later worked for RIT in 2008 as a parttime consultant. RIT ultimately hired him as the Executive Director of Venture Creations in May of 2011. Jones Dep. 2024. His work history included facilities management at Syracuse University, Catholic University, and University of Maryland. *Id.* at 1516. Upon returning to Rochester, Jones was a facilities supervisor at Harris Corporation, and then spent eight years as a project manager at Eastman Kodak. When Jones left Eastman Kodak, he was the Supervisor of Design and Drafting and managed a team of 30 to 40 people. *Id.* at 18. Jones then started his own facilities management company, which operated from 1987 to 2003 and had approximately 40 employees. *Id.* at 19. Jones had a Bachelor's in Architecture from Syracuse University, and took graduate courses in finance and operations at RIT over three years while he worked at Eastman Kodak. Although he did not receive an MBA at that time, he received extensive management training at Harris Corporation and Eastman Kodak. *Id.* at 1415. Plaintiff, [*46] in contrast, had previously worked at Harter Secrest & Emery LLP in the collections department until 1992, after which she took temporary and/or parttime jobs until RIT hired her in 2003. Pl. Dep. 1116, 1825. She had a Bachelor's degree in business administration (1996) and a Master's degree in management from Nazareth College (2003). Unlike Jones, Plaintiff did not have supervisory or entrepreneur experience, and Venture

---

[5] Plaintiff documented the details of the phone conversation an email with the subject: "Diversity Scorecard Information." Pl. Ex. 37.

Creations is a new business incubator. Thus, Plaintiff has not established that she is "similarly situated in all material respects" to Jones. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quotations omitted).

Finally, Plaintiff points to Jones's "aggressive" behavior to support an inference of discrimination:

> The aggressive treatment of Jones towards Plaintiff only grew over time, culminating in threats. Once Plaintiff made a complaint that he was harassing her as a Black Female, Jones began to stalk Plaintiff, take meticulous notes as suggested by Human Resources and look for an opportunity to fire her. Jones was treated far better than Plaintiff in every aspect including discipline. Jones was able to threaten a Black female (Plaintiff) and keep his job.

Pl. Mem. 23. Plaintiff does not specify what remarks, **[*47]** actions, or threats Jones made toward her.

Jones testified that on October 6, 2011, he and Plaintiff had an altercation regarding flooring contractors working noisily in the Venture Creations building. Jones Dep. 32. Plaintiff, who was responsible for coordinating contractors and work in the building, was not present at 9:00 a.m. when the contractors arrived. *Id.* Jones waited for her and asked her to "take action" when she arrived, but nothing happened. Jones went to Plaintiff's office but "her door was locked. [He] knocked. She did not open it. [He] went down to the contractor, asked him to stop the work and went back to [his] office." *Id.* at 33. When Jones finally met Plaintiff in the general office area, he "informed Plaintiff that [he] had taken the action to stop the contractors. She started yelling at [him] that this was harassment . . . . She was making the claim very loudly in a public area. So [he] turned around and left and went straight to HR." *Id.* at 39. During an interview with Gouger, Jones called Plaintiff "insubordinate" and "incompetent" and demanded that Gouger "transfer her somewhere else." *Id.* at 38. Jones stated: "If you fire me over this I will sue the hell out of this school." *Id.*

RIT suspended **[*48]** Plaintiff and Jones for one week with pay over the incident, and Jones was relieved of his supervisory duties with respect to Plaintiff. Plaintiff does not present admissible evidence of differential punishment. *See, e.g., Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 260 (E.D.N.Y. 2005) (at summary judgment stage, holding that plaintiff, whom employer terminated for engaging in workplace altercation, failed to offer evidence of discriminatory intent in part because coworker outside of protected class was also fired for engaging in same altercation). Plaintiff also does not allege that the altercation with Jones had racial overtones, or that it

was motivated by her race or gender. *See Mohawk v. William Floyd Sch. Dist.*, 13CV2518, 2014 U.S. Dist. LEXIS 27621, 2014 WL 838162, at *3 (E.D.N.Y. Mar. 3, 2014) (dismissing a claim where the plaintiff "failed to allege any facts, besides his own subjective belief, that plausibly suggest that the altercations . . . were in any way connected to his race, color, or national origin"); *Brodt v. City of N.Y.*, 4 F. Supp. 3d 562, 568 (S.D.N.Y.2014) ("A plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination.") (internal quotation marks omitted). On these facts, Plaintiff cannot establish that the circumstances of the adverse actions give rise to an inference of discrimination.

For all of the reasons **[*49]** stated, Plaintiff has failed to carry her burden to establish a *prima facie* case of discrimination by RIT.

### 3. Legitimate, Nondiscriminatory Reasons

Even assuming Plaintiff met her initial burden, RIT articulated legitimate, nondiscriminatory reasons for the adverse employment actions. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The adverse employment actions at issue here are Plaintiff's negative 2011 PA and written warning, her suspension with pay, and the final written warning and employment termination.

With respect to the 2011 PA and written warning, Plaintiff had numerous performance deficiencies including tardiness, failing to schedule vacations or time off in advance, conflicts with coworkers, failure or refusal to take direction from superiors, and failure or refusal to perform assigned tasks. Indeed, Plaintiff's own rebuttal to the PA indicated that she declined an offer to work on a project that was "mundane," and she believed it did not present an opportunity to be "creative or innovative." Def. Appx. Ex. 25 at 4. Likewise, she refused to retrieve office supplies for Jones on another occasion because he knew where they were located. Plaintiff stated: "Why is it my responsibility to deliver the folders to him? I **[*50]** am not his administrative assistant. I am the operations manager." *Id.* at 45. She stated that she did not "need instruction or guidance" from Jones on her job duties. *Id.* at 5. With regard to Plaintiff's failure to arrive at work on time, she admitted as much, but that this was the "first time anyone has complained about what time [she] arrived at the office." *Id.* She asserts that she required schedule flexibility because she was contemporaneously pursuing her higher education studies, and that RIT should have "been trying to leverage [her] educational accomplishment to their advantage." *Id.* Although Plaintiff clearly disagrees with the contents of the PA, the evidence is sufficient to satisfy Defendant's burden of production at this step. *See*

*WesleyDickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 404 (S.D.N.Y. 2013) (finding that "defendants have offered a legitimate, nondiscriminatory reason" for their adverse employment action against the plaintiff, noting "plaintiff's history of performance problems . . . with respect to her writing skills and attention to detail"); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 591 (S.D.N.Y. 2013) ("Poor work performance always constitutes a legitimate and nondiscriminatory reason for terminating employment.") (citation and internal quotation marks omitted).

Next, it is undisputed that an altercation **[*51]** occurred between Plaintiff and Jones on October 6, 2011. RIT suspended both of them with pay for the same amount of time while it investigated the incident. Plaintiff was permitted to return to work within one week. Where, as here, the evidence demonstrates that the employer suspended an employee pending an investigation into a confrontational incident between employees, it has provided a legitimate, nondiscriminatory reason for that suspension. *Jean v. Acme Bus Corp.*, No. CV 084885, 2012 U.S. Dist. LEXIS 134127, 2012 WL 4171226, at *12 (E.D.N.Y. Sept. 19, 2012) ("[T]he record shows that defendants suspended plaintiff for legitimate business reasons (pending an investigation by the Company's customer into complaints of inappropriate conduct between two of its employees) and not for any discriminatory or retaliatory animus.").

Finally, RIT had a legitimate, nondiscriminatory reason for giving Plaintiff a written warning and ultimately terminating her employment. She was counseled about her performance in November of 2009 and received a negative PA on September 20, 2011, in which she received an overall rating of 1.8 out of 5. Regardless of RIT's advisements, Plaintiff's work deficiencies and relationships with her coworkers did not improve. A written warning was issued September 27, 2011, noting various **[*52]** other recurring deficiencies in her performance. This satisfies Defendants' burden. *See Forrester v. Prison Health Servs., Inc.*, 651 F. App'x 27 (2d Cir. 2016) ("Misconduct, excessive lateness, and poor performance are legitimate, nondiscriminatory reasons for defendants' adverse actions."); *Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 544 (S.D.N.Y. 2004) (poor performance in carrying out duties and in relationships with supervisors and coworkers is a legitimate, nondiscriminatory reason for termination).

Later, after Plaintiff began reporting to Rafaelle, he and HR Representative Judy Bender developed a work plan to assist Plaintiff in understanding and successfully completing her job functions. Plaintiff met with Rafaelle and Bender to discuss the work plan, and expressed to them that she was fully capable of performing its functions. During a meeting on May 1, 2012, Plaintiff admitted that she did not perform all of the tasks expected of her from the work plan. RIT later terminated her employment. Defendant has presented legitimate, nondiscriminatory reasons for Plaintiff's warnings and termination. *See Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 460 (S.D.N.Y. 2012), *aff'd sub nom., Nolley v. Swiss Re Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013) (summary order) (failure to perform duties outlined in performance improvement plan was legitimate, nondiscriminatory reason for termination).

### 3. Pretext

Because Defendant proffered legitimate, nondiscriminatory **[*53]** reasons for the actions taken against Plaintiff, Plaintiff must show that these reasons are a pretext for wrongful discrimination under the *McDonnell Douglas* analysis. In doing so, she cannot merely demonstrate that the employer's proffered nondiscriminatory reason is untrue or incomplete; she must also show that discrimination was at least a substantial motivating factor for the employer's adverse action. *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156-57 (2d Cir. 2010). In considering evidence of discrimination, the Court is conscious that discrimination "will seldom manifest itself overtly" and that it must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (citations and alterations omitted).

Plaintiff attempts to establish pretext by maintaining that she "consistently met all expectations at work." Pl. Aff. ¶ 106. The record evidence, however, does not support Plaintiff's opinion of her work product and, more importantly, amounts to nothing more than a disagreement with her supervisors over the quality of her work, which does not create a triable issue of fact regarding pretext. *See, e.g., Wu v. MetroN. Commuter R.R. Co.*, No. 14CV7015, 2016 U.S. Dist. LEXIS 102683, 2016 WL 5793971, at *13 (S.D.N.Y. Aug. 4, 2016) ("[P]laintiff has pointed to no admissible **[*54]** evidence, other than his own disagreements with Defendants regarding the quality of his work performance, to support his assertion that this proffered rationale is actually pretext for discrimination."); *Paddock v. SUNY Brockport*, 418 F. Supp. 2d 288, 295 (W.D.N.Y. 2006) (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)).

Finally, Plaintiff's inability to get along with her coworkers cannot be disputed on this record, *see* Pl. Aff., Ex. 19 (email correspondence accusing coworker of "acting like a two year old"); Pl. Dep. 8587, 133155, 193 (testifying that one of her

work requirements was that she "would not have to work with a bunch of women"), nor can her suspension due to a workplace altercation. Thus, there is nothing to suggest that any of these reasons for her suspension, negative evaluations, and ultimate termination were untrue.

Significantly, none of Plaintiff's challenges to RIT's proffered reasons have anything to do with race. There is no evidence to rebut RIT's legitimate, nondiscriminatory reason for terminating her employment: Plaintiff's lengthy, documented history of performance issues and workplace conflict. Plaintiff has set forth no evidence to demonstrate that her race was a factor, much less a motivating factor, in RIT's determination to sanction her and terminate her employment. [*55] *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006) (affirming grant of summary judgment in discrimination case where plaintiff's claim of pretext was unsupported by any evidence other than her own speculation).[6]

**B. Retaliation**

As stated earlier, retaliation claims are analyzed under the *McDonnell Douglas* burdenshifting framework:

> Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she "participated in a protected activity," "suffered an adverse employment action," and "that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). This showing creates a "presumption of retaliation," which the defendant may rebut by "articulating a legitimate, nonretaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such an explanation, "the presumption of retaliation dissipates," *id.*, and the plaintiff must prove "that the desire to retaliate was the butfor cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, [570 U.S. 338, 352, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)].

*YaChen Chen*, 805 F.3d at 70 (2d Cir. 2015) (alteration

added).[7] To make out a *prima facie* case of retaliation, a plaintiff must show that: (1) "she was engaged in a protected activity;" (2) the employer "was aware of this activity;" [*56] (3) the employer "took adverse action against her;" and (4) "a causal connection existed between the protected activity and the adverse action." *Valleriani v. Route 390 Nissan LLC*, 41 F. Supp. 3d 307, 318 (W.D.N.Y. 2014) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006)).

**1. Protected Activity**

Although the parties do not appear to dispute that the first two elements of Plaintiff's *prima facie* case have been met, the Court identifies the following instances of protected activity to form the basis of Plaintiff's retaliation claim: commencement of this lawsuit in September of 2010; five separate EEOC charges in September and October of 2011; two internal complaints against Jones alleging harassment in September of 2011; a written rebuttal to the negative PA in September of 2011; and an EEOC charge in October of 2012. Pl. Mem. 26; Def. Stmt. ¶ 106.

**2. Adverse Action**

Although the standard for establishing an adverse action in the retaliation context is not as stringent as in the discrimination context, *Gelin v. Geithner*, No. 06CV10196, 2009 U.S. Dist. LEXIS 24865, 2009 WL 804144, at *20 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010) (summary order), the Court nonetheless finds that only incidents occurring in the Fall of 2011 through the Spring of 2012 suffice to support Plaintiff's claim.[8]

---

[6] Despite her voluminous submissions and additional briefing, little is mentioned of Plaintiff's purported gender discrimination claim based upon her termination. In the event Plaintiff has not abandoned this claim, there is nothing in the record to support such a claim and it would also be subject to dismissal for the same reasoning discussed above.

[7] The Court applies the "butfor" standard to Plaintiff's Section 1981 and NYSHRL claims as the parties do not dispute the appropriate standard. *See Alvarado v. Norstrom, Inc.*, 685 F. App'x 4 (2d Cir. 2017) (summary order) (noting that Section 1981 and NYSHRL claims are analyzed according to same principles as Title VII claims and affirming the dismissal of the Section 1981 and NYSHRL claims because the record lacked sufficient evidence to support plaintiff's argument under the butfor standard); *Varno v. Canfield*, 664 F. App'x 63, 66 (2d Cir. 2016) (summary order) (applying butfor standard, citing *Nassar*). In any event, Plaintiff's claims would fail under the lesser standard, which requires that the alleged retaliation was a "substantial or motivating factor" in her termination. *Kwan* 737 F.3d at 846 n.5 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)); *see also id.* at 845 n.7 (declining to reach question of whether *Nassar* applied to the NYSHRL "because the plaintiff's claims survive under the *Nassar* butfor standard").

[8] For purposes of a Title VII retaliation claim, an adverse employment action is one that is "materially adverse to a reasonable

The allegations regarding Plaintiff's title change, FLSA status change, and the November 2009 counseling meeting [*57] in which her performance was criticized, do not amount to materially adverse employment actions in the absence of any negative consequences.[9] Indeed, other courts in this Circuit have rejected similar complained of activities. *See Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 279 (N.D.N.Y. 2017) (stating that, even in the retaliation context, "[e]xcessive scrutiny, criticism, and negative evaluation of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss") (internal citations and quotation marks omitted); *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 235 (E.D.N.Y. 2016) ("[T]he caselaw does not support the conclusion that Principal Klomp's monitoring of Jaeger's attendance, even if it differed from the scrutiny given to his colleagues, is sufficient to constitute an adverse employment action."); *Verdi v. City of N.Y.*, No. 17CV1755, 306 F. Supp. 3d 532, 2018 U.S. Dist. LEXIS 10594, 2018 WL 557895, at *5 (S.D.N.Y. Jan. 22, 2018) (meeting and subsequent counseling memorandum did not support a Title VII retaliation claim). Plaintiff must next show a causal connection between her protected activity and the negative PA, written warning, temporary suspension, and termination.

### 3. Causation

Plaintiff urges the Court to find the temporal proximity between the protected activity and the adverse actions sufficient to establish [*58] a causal connection. Pl. Mem. 27-29.

> A plaintiff can show a sufficient causal connection between the protected activity and the adverse employment action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.

*Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 528 (S.D.N.Y. 2007), *aff'd sub nom., Woods v.*

*Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757 (2d Cir. 2008) (summary order) (quotations omitted).

Plaintiff received a negative PA on September 20, 2011, followed by a written warning on September 27, 2011; and she was suspended with pay on October 6, 2011, after the incident with Jones. A final written warning dated April 3, 2012, was issued upon her return to work after sick leave, and she was ultimately terminated on May 1, 2012. She filed five separate EEOC charges in September and October of 2011 (September 26, October 5, October 6, October 12, and October 14); two internal complaints against Jones alleging harassment on September 28, 2011; a written rebuttal to the negative PA on October 3, 2011; and an EEOC charge dated October 5, 2012.

The [*59] Court assumes that the close temporal proximity is enough to establish the required causal connection for a *prima facie* case of retaliation but concludes that, like Plaintiff's intentional discrimination claim, she cannot establish pretext. *See generally, Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship.").

### 4. Legitimate, Nondiscriminatory Reason, Pretext

Defendants set forth a multitude of legitimate, nondiscriminatory reasons for the actions taken against Plaintiff in late 2011 and early 2012. The burden thus returns to Plaintiff to establish that these reasons were pretextual by showing that the explanations Defendant offered were false and that retaliation was the "but for" cause of Defendant's actions. *Vosburgh v. Amer. Nat. Red Cross*, 08CV0653, 2014 U.S. Dist. LEXIS 137000, 2014 WL 4826688, at *9 (N.D.N.Y. Sept. 29, 2014) ("An employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false and that retaliation was the real reason.") (alterations omitted); *see also Nassar*, 570 U.S. at 352 (requiring the plaintiff to demonstrate that action would not have been taken but for retaliatory animus). The Second Circuit [*60] has held that temporal proximity alone is insufficient to demonstrate pretext. *Kwan*, 737 F.3d at 847.

Here, Plaintiff offers no evidence that would suggest the reasons for her negative PA, suspension, warning, and termination, were false. To the contrary, the record establishes that Plaintiff admitted to many of her shortcomings, had been the subject of scrutiny for several years, and failed to correct her performance deficiencies after being placed on informal and formal notice.

---

employee or job applicant," and actions are "materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 165 (quotations omitted).

[9] Plaintiff does not allege retaliation in connection with her previous claim that RIT failed to promote her when it did not hire her for the four positions for which she applied. Pl. Opp'n Stmt. ¶ 30.

The August 2007 PA that Boyd authored indicates that Plaintiff received a 3/5 performance rating, advising that she "need[ed] to work with [Mahone, incoming Executive Director] and be responsive to all of the functions and needs of the incubator." Pl. Ex. 47. Boyd acknowledged that Plaintiff had not "always received clear directions from these various managers," and that she was "not always . . . happy with [Venture Creations]." *Id.* The 3/5 or "average" rating was unchanged from Plaintiff's 2005 PA that Boyd also issued. Pl. Ex. 36. The evidence therefore belies her assertion that she had an "exceptional performance history" and an "excellent" record. Pl. Mem. 1415.

To the extent Plaintiff argues that her negative 2011 PA and resulting **[*61]** termination were pretextual because her performance was more sharply criticized under Jones's management than Boyd's, courts in this Circuit have recognized that "[a] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations," and "inconsistenc[ies]" in performance evaluations resulting from a change in management thus do "not support a finding of pretext." *Orisek v. Am. Inst. of Aeronautics & Astronautics,* 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Pergament v. Fed. Express Corp.,* 03cv1106, 2007 U.S. Dist. LEXIS 23732, 2007 WL 1016993, *12 (E.D.N.Y. Mar. 30, 2007) ("fact that [employee] had received generally positive evaluations from her previous . . . supervisor" did not support finding of pretext in defendant's decision to terminate plaintiff based new supervisor's negative assessments). Significantly, Jones, who had prepared the negative PA, was not the subject of any EEOC charge until *after* he issued the evaluation on September 19, 2011.

Throughout her Opposition papers, Plaintiff repeatedly expresses her dissatisfaction with her work assignments, which were largely administrative and clerical. Pl. Aff. ¶¶ 38, 5455, 61, 63, 65, 74, 81, 83, 10304, 16970. Yet, during her deposition, Plaintiff **[*62]** stated that she was responsible for various administrative tasks, and RIT's announcement of her appointment to Operations Coordinator in 2003 described her functions to include coordination of incubator activities and utilization of shared meeting rooms, arranging meetings, and serving as the pointofcontact for inquiries and building related matters. Pl. Dep. 6570, 112; Pl. Ex. 4. It further stated that her role would "grow over time to include marketing functions." *Id.* Plaintiff's subjective belief that her job duties were in "management/general business operations" and not clerical in nature is unsupported by the record and is also irrelevant as to whether RIT's adverse actions were motivated by retaliation.

Likewise, although Plaintiff claims that she wanted to

perform accounting work, for which she believed she was qualified to do, Pl. Aff. ¶ 38, RIT Controller Kelly wrote to Boyd in 2006: "in my estimation [Plaintiff] does not possess any accounting skills. She performs administrative tasks only . . . . I attempted to teach her certain basic accounting skills such as setting up receivables when billing customers, recording accruals at year end and reconciling accounts. It ended **[*63]** up being more of an effort than I would have thought." Pl. Ex. 12. Thus, Plaintiff's desire to perform unidentified "professional" tasks, *see* Pl. Aff. ¶ 14, does not establish pretext. Indeed, her own submissions undermine many of the assertions made in her affidavit concerning her job duties and qualifications, and her unwillingness to work outside of her (largely clerical) job description.

Plaintiff's conflict with her coworkers was longstanding. Plaintiff's Exhibits 1920 show email correspondence documenting disputes with coworker Rohr beginning in 2007, in which, among other things, she told Rohr to stop the "child's play." *Id.* Plaintiff further testified that Rohr "fabricated events" and was "resentful" of Plaintiff's pursuit of a doctoral degree and acknowledged yelling at Rohr in the workplace "maybe four times." Pl. Dep. 13337, 14950.

Plaintiff testified that she had "a problem" with another woman, Andrea Napoli, in 2008. *Id.* at 14142. The problem revolved around Plaintiff's disagreement with Napoli's "tone" after Plaintiff had "missed some invoices," which were admittedly Plaintiff's mistake. *Id.* at 146.

Plaintiff also "had problems" at RIT with other personnel beginning in 2004, and in 2006 accused **[*64]** Kelly of "interfering" with her career growth. *Id.* at 158.

Another coworker, Richard DiMartino, allegedly made a comment toward Plaintiff in 2007 "[in] a disrespectful way." *Id.* at 181. Plaintiff asserted that: "It was in the tone, as though, you know, he was better than me." *Id.* Finally, Plaintiff testified that there was "always a problem when a lot of women are around . . . the false accusations, the strife, the jealousy." *Id.* at 194. She claimed that she experienced those issues with women at RIT and two of her former jobs. *Id.*

Plaintiff's performance issues were also welldocumented. She conceded that: (1) she gave negative responses to Jones when he asked her to perform various tasks, such as, "I know how to do my job;" (2) she failed to arrive at work on time because she was not required to be on time; and (3) she had an altercation with Jones for which she was suspended. Pl. Dep. 267, 27071, 289. Additionally, Plaintiff refused certain work duties, failed to inform Jones of the status of workrelated issues, and, in response to an email to Plaintiff addressing her nonresponsiveness and other professional issues, Plaintiff accused Jones of "harassment." Def. Ex. 24; Pl. Aff. ¶ 104; Pl.

Ex. 70; Gouger Decl. Ex. [*65] 4.

Aside from temporal proximity, Plaintiff presents no evidence that her protective activity caused RIT's negative PA. *See, e.g., Kwan*, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.").

Even after Plaintiff was no longer reporting to Jones and scheduled for alternating office hours at Venture Creations, her performance under Raffaelle continued to suffer. Although she was given a work plan that outlined her work expectations more clearly, she complained that the job was not properly defined. Def. Appx. Ex. 25, Pl. Dep. 394. Despite her assurances that she would accomplish the tasks enumerated on the work plan, she ultimately did not do so. Pl. Dep. 30307, 34445, 350. Plaintiff's affidavit, in contrast, now states that the work plan was "unrealistic and impractical." Pl. Aff. ¶ 165. She contends that she could not perform the tasks assigned because she was only in the office for nine days in the month of April, yet she inexplicably took eight vacation days to work on her doctoral degree. Pl. Aff. ¶ 167. Plaintiff offers no evidence to show that RIT's purported reason for her ultimate termination—her failure to manage her time and perform the work [*66] plan duties—was false. There is simply no showing on this record that demonstrates "that the desire to retaliate was the butfor cause of the challenged employment action." *See YaChen Chen*, 805 F.3d at 73 (quotation omitted). Indeed, many of Plaintiff's performance issues arose before 2009, when she began to complain to RIT and the EEOC about the alleged discriminatory practices she encountered. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Plaintiff does not show that retaliation was a motivating factor or the butfor cause of any of her adverse employment actions.

#### 4. Cat's Paw Liability

Plaintiff also relies upon the socalled cat's paw theory of liability on the basis that "Jones had predetermined that he would terminate or give Plaintiff a negative review" and he was "pushed" by RIT for "more documentation related to poor performance whenever possible." Pl. Mem. 33 (citing Jones Dep. at 24445).

The Second Circuit explained in *Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267 (2d Cir. 2016), that the "cat's paw" theory of liability "refers to a situation in which an employee is fired or subjected to [*67] some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Id.* at 272. "[A]n employer may be liable for a supervisor's act that is (1) motivated by animus; (2) intended to cause an adverse employment action; and (3) a proximate cause of the ultimate employment action." *Kasiotakis v. Macy's Retail Holdings, Inc.*, No. 14 CIV. 462, 2015 U.S. Dist. LEXIS 141903, 2015 WL 6125356, at *12 (S.D.N.Y. Oct. 16, 2015).

Plaintiff's argument is unpersuasive. The only evidence Plaintiff offers to support her assertion that Jones's discriminatory animus influenced Rafaelle is that Jones was one of five individuals that Rafaelle contacted to confirm whether Plaintiff completed certain tasks from the work plan and that Jones had a previous history of workplace conflict with Plaintiff. Pl. Mem. 3334. This, however, does not support Plaintiff's claim that Rafaelle and/or RIT acted negligently in Plaintiff's termination. To the contrary, the evidence shows that Jones no longer had authority and supervision over Plaintiff, and, although Jones was consulted before the termination, Rafaelle also spoke with four other individuals, two tenants, and Plaintiff to garner information as to whether [*68] Plaintiff performed her assigned duties. Plaintiff admitted that she did not complete the assigned tasks.

Moreover, there is no evidence that describes or demonstrates what role Jones played with respect to Rafaelle and how this could have influenced Rafaelle's termination decision. Plaintiff needs at least some evidence, circumstantial or otherwise, of a causal connection between Jones's discriminatory animus towards Plaintiff and RIT's termination of Plaintiff's employment by Rafaelle.[10] Without that causal connection, discriminatory intent cannot be inferred and Plaintiff cannot establish a retaliation claim based upon the cat's paw theory.

#### C. Individual Claims against Boyd

An individual's personal liability under 42 U.S.C. § 1981 "must be predicated on the actor's personal involvement." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Section 296(6) of the NYSHRL similarly requires that the defendant "actually participated" in the discriminatory/retaliatory action. *Beattie v. Guilderland Cent. Sch. Dist.*, 124 F. Supp. 2d 802, 805 (N.D.N.Y. 2000) ("Individuals may be personally liable under the NYSHRL

---

[10] Plaintiff submits an exhibit purporting to evidence Jones's animus, but the 25page submission consists of unidentified and possibly unauthenticated documents. Pl. Ex. 99.

and § 1981 where the individual possessed power to do more than carry out personnel decisions made by others, or is shown to have actually participate[d] in the conduct giving rise to a discrimination claim."); *Karam v. Cnty. of Rensselaer*, 13CV1018, 2016 U.S. Dist. LEXIS 368, 2016 WL 51252, at *18 (N.D.N.Y. Jan. 4, 2016) (citations and internal **[*69]** quotation marks omitted); *accord Littlejohn v. City of N.Y.*, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under §§ 1981 and 1983 only if that individual is personally involved in the alleged deprivation.") (citations and internal quotation marks omitted); *Vosburgh*, 2014 U.S. Dist. LEXIS 137000, 2014 WL 4826688, at *13 ("To be found liable under [New York Executive Law § 296(6)], an individual need not have supervisory or hiring and firing power but still must have actually participated in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful, participation.").

Personal involvement may be established by evidence showing: (1) direct participation in the alleged constitutional violation; (2) defendant's failure to remedy the wrong after being informed of the violation through a report or appeal; (3) creation of a policy or custom under which unconstitutional practices occurred, or allowing such a policy or custom to continue, (4) gross negligence in supervising subordinates who committed the wrongful acts, or (5) deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *Littlejohn*, 795 F.3d at 314.

Courts in this Circuit have found personal involvement to exist where, for example, the individual defendant (1) signed a written notice that the plaintiff would not be reinstated, **[*70]** or (2) was involved in the decision to terminate the plaintiff. *See, e.g., Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 169 (E.D.N.Y. 2005) (finding defendant personally involved where the complaint alleged that defendant "was the individual that signed the letter that informed [plaintiff] that she would not be reinstated" and "was personally involved in the decision to terminate the Plaintiff").

Plaintiff vaguely argues that "Boyd was personally involved in the decision making of these adverse actions. He sanctioned the conduct despite Plaintiff complaining to him on many occasions. He failed to take any steps to correct the situation." Pl. Mem. 2930. Yet her lone piece of evidence in support of this contention is the alleged AALANA comment, which she characterizes as a "derogatory statement about professional minority women which set the tone of his extensive disparate treatment against Plaintiff." Pl. Mem. 29.

First, Plaintiff submits no evidence to support her contention

that Boyd was responsible for the delay in her title change, the FLSA reclassification of her position, and lack of promotions. To the contrary, the record indicates that the delay in her title change was an error attributable to RIT's Human Resources software, the FLSA reclassification **[*71]** was a campuswide Human Resources initiative, and the circumstances surrounding the alleged lack of promotional opportunities involved her application for four job positions at RIT, outside of Boyd's purview, for which she was not selected and admittedly unqualified for. The remaining adverse actions occurred after Boyd's retirement in 2001. The AALANA comment was, at most, a stray remark that does not show Boyd was motivated by discrimination, and has no demonstrable connection to the aforementioned adverse employment actions Plaintiff alleges. *White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) (summary order) (a "stray remark" is a comment that bears no direct causal connection to the adverse employment action). Accordingly, Plaintiff's claims against Boyd must be dismissed. *See, e.g., Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F. Supp. 2d 592, 597 (S.D.N.Y. 2004) (dismissing complaint upon Rule 12(b)(6) motion to dismiss where actions of individual defendants were not racially motivated).

Plaintiff's retaliation claim therefore fails as a matter of law.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF No. 132) is GRANTED, and the Amended Complaint (ECF No. 93) is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment and to close this case.

IT IS SO ORDERED.

Dated: March 28, 2018

Rochester, New **[*72]** York

/s/ Frank P. Geraci, JR.

HON. FRANK P. GERACI, JR.

Chief Judge

United States District Court

 Caution
As of: June 17, 2020 4:56 PM Z

# Gayle v. Children's Aid Coll. Prep Charter Sch.

United States District Court for the Southern District of New York

July 29, 2019, Decided; July 29, 2019, Filed

18 Civ. 9874 (GBD)

**Reporter**
2019 U.S. Dist. LEXIS 126997 *; 2019 WL 3759097

LA TASHIA GAYLE, Plaintiff, -against- CHILDREN'S AID COLLEGE PREP CHARTER SCHOOL, CHILDREN'S AID SOCIETY, CASEY VIER, in her individual and official capacities, and DEVON JACKSON, in his individual and official capacities, Defendants.

**Counsel:** [*1] For La Tashia Gayle, Plaintiff: Siobhan E. C. Klassen, Phillips & Associates, P.L.L.C., New York, NY; Gregory Calliste, Jr, Phillips & Associates at Law, PLLC, New York, NY.

For Children's Aid College Prep Charter School, Casey Vier, In Her Individual Capacity Defendants: Aaron Nathaniel Solomon, Kaufman Dolowich & Voluck LLP, Woodbury, NY.

For Casey Vier, In Her Official Capacity, Defendant: Aaron Nathaniel Solomon, Kaufman Dolowich & Voluck LLP, Woodbury, NY.

For Devon Jackson, In His Individual Capacity, Devon Jackson, In His Official Capacity Defendants: Yale Brett Pollack, LEAD ATTORNEY, Law Offices of Yale Pollack P.C., Syoset, NY.

For Children's Aid Society, Defendant: Elizabeth Erin Schlissel, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY.

**Judges:** GEORGE B. DANIELS, United States District Judge.

**Opinion by:** GEORGE B. DANIELS

# Opinion

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge:

Plaintiff La Tashia Gayle brings this sexual harassment and discrimination claim against Defendants the Children's Aid College Prep Charter School (the "School"), Defendant the Children's Aid Society (the "Society"), Casey Vier, and Devon Jackson. (First Am. Compl. ("FAC"), ECF No. 20.) She [*2] asserts claims of discrimination and retaliation against the School and the Society under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a)—(c) (Counts I and II), and New York State Human Rights Law ("NYSHRL"), New York Executive Law Section 296 (Counts III and IV). (*Id.* ¶¶ 184-247.) She also raises discrimination and retaliation claims against all Defendants under the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code, § 8-107(1), (6) (Counts V and VI). (*Id.* ¶¶ 248-82.) Finally, she raises claims for aiding and abetting discrimination and retaliation against the individual Defendants Casey Vier and Devon Jackson under the NYCHRL, New York City Administrative Code, § 8-107(7). (*Id.* ¶¶*283-89.*)

The School and the Society separately move to dismiss Plaintiff's Title IX claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Notice of Mot. to Dismiss Am. Compl. ("Society's MTD"), ECF No. 35; Notice of Mot. to Dismiss Pl.'s Am. Compl. ("School's MTD"), ECF No. 39.) These motions are GRANTED. Plaintiffs employment discrimination claims are not actionable under Title IX. This Court declines to exercise ancillary jurisdiction over Plaintiff's state and city law claims

against any Defendant. Accordingly, because this Court would only have original jurisdiction over Plaintiffs Title IX claims against the School **[*3]** and the Society, Plaintiff's amended complaint is dismissed in its entirety.

# I. FACTUAL AND PROCEDURAL BACKGROUND [1]

## A. Jackson Sexually Harassed and Assaulted Plaintiff from March 6, 2015 Until June 20, 2017.

Plaintiff alleges that she began working for the School on October 26, 2012 as a Community Associate and shortly thereafter as a Visual Arts Instructor. (FAC ¶ 26.) She alleges that Defendant Jackson, her supervisor, began making inappropriate comments to her on March 6, 2015, shortly after he was hired to be the Dean of Students and Culture. (*Id.* ¶¶ 31-35, 46, 114.) According to Plaintiff, in May 2015, the inappropriate comments escalated to sexual advances and inappropriate touching. (*Id.* ¶ 40.) He would touch and grab several of Plaintiff's body parts, including her shoulder, legs, and thighs. (*Id.* ¶ 41.) He also tried to hold her hand. (*Id.*) Soon Jackson became more aggressive, rubbing his middle finger in Plaintiffs palm when he grabbed her hands. (*Id.* ¶ 43.)

Towards the end of the 2014-15 academic school year, Jackson allegedly began to sexually assault Plaintiff in her "art room, in hallways, in their shared office and in other locations throughout the School." (*Id.* ¶ 50-54.) **[*4]** He would touch and grab her crotch and buttocks. (*Id.* ¶ 49.) Jackson coupled his assaults with sexually suggestive comments, asking Plaintiff to have sex with him and to let him feel her crotch. (*Id.*¶ 53.)

Plaintiff received a salary increase for the 2015-16 school year, which prompted further sexual advances from Jackson. (*Id.* ¶ 60.) He told Plaintiff that he helped her get that raise, that she owed him for it, and that she had to sleep with him "that very same week" to "repay him." (*Id.* ¶¶ 60-62.) Throughout the entire 2015-16 and 2016-17 academic school years Jackson subjected Plaintiff "to the same types of sexual comments, innuendo, propositions, sexual gestures and other inappropriate conduct on a daily basis." (*Id.* ¶ 65,86-87,92-97.) During this time, Jackson also began to send Plaintiff sexually inappropriate and explicit text messages from his

personal phone. (*Id.* ¶ 99.)

Plaintiff alleges that she categorically and repeatedly refused Jackson for the more than two years that he subjected her to his sexual harassment and assaults. (*Id.* ¶¶ 96-97.)

## B. School Administrators and Other Teachers Allegedly Witnessed Jackson Sexually Harassing Plaintiff.

In her amended complaint Plaintiff **[*5]** lists the names of twelve "staff members, including teachers, [who] have witnessed [Jackson's] inappropriate conduct toward Plaintiff" during the 2015-16 and 2016-17 school years. (*Id.* ¶¶ 98,108-111.) For example, in or around August 2016, Plaintiff alleges that Jackson forcefully backed her up against a wall in a hallway and started aggressively making sexual comments about her, namely, asking her when she would make time for him, and saying "you need to stop trying to avoid me." (*Id.* ¶ 74-76.) Plaintiff claims that she "was visibly uncomfortable and afraid." (*Id.* ¶¶ 77-78.) Both the School Dean and School Director, high-level administrators of the Society, witnessed this incident in the hallway and filed incident reports about it with the School and the Society. (*Id.*)

## C. Plaintiff Informally Complained About Jackson's Sexual Harassment to School Staff Members.

Plaintiff alleges that, starting in 2016, she complained about Jackson's harassment and abuse to several School staff members. At some point in 2016, she complained about it to a life coach employed by the Society. (*Id.* ¶ 67.) Plaintiff allegedly also complained about Jackson's conduct to the Dean of Instruction, to Principal **[*6]** Vier's executive assistants, and to the School's receptionist. (*Id.* ¶¶ 82-83, 103-106.) All of these individuals allegedly counseled Plaintiff to handle Jackson's abuse on her own.

## D. Plaintiff Formally Complained on June 20, 2017.

Jackson's abusive behavior lasted until July 20, 2017, when "Plaintiff finally got the courage to make a formal complaint to [Principal Vier] about Jackson's sexual harassment." (*Id.* ¶ 124.) She provided Principal Vier and a human resources manager details of Jackson's "ongoing and continuous groping, sexual touching, sexual inuendo, sexual comments, sexual gestures, and about his sexually explicit questions." (*Id.* ¶ 128.) She also provided them with documentary evidence to support her allegations. (*Id.* ¶ 129.)

## E. Jackson Resigned the Summer of 2017.

---

[1] The following factual allegations are taken from the amended complaint (as well as documents attached to it or incorporated by reference) and are deemed to be true for purposes of the City's motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

Jackson resigned after Plaintiff filed her formal complaint in the summer of 2017, before the start of the 2017-18 school year. (*Id.* ¶ 137.) Plaintiff maintains that, "upon information and belief, *no disciplinary action was taken* against Jackson after Defendants confirmed that he was sexually harassing Plaintiff" (*Id.* ¶ 136.) Plaintiff does not offer, however, any basis for her contention that Jackson "was allowed **[*7]** to resign without disciplinary action." (*Id.* ¶ 137.) Instead, she admits that Defendants "never discussed Plaintiff's complaint against Jackson with Plaintiff. . . [leaving her] in the dark about what, if any, actions were taken." (*Id.* ¶¶ 141-43.)

### F. Principal Vier Allegedly Retaliated Against Plaintiff for Complaining About Jackson's Harassment.

Plaintiff claims that Principal Vier retaliated against her and subjected her to a hostile work environment "due to her complaint of sexual harassment and discrimination." (*Id.* ¶¶ 144-45.) First, she alleges that Vier completely stopped communicating with her other than to reprimand her, leading Plaintiff to feel isolated. (*Id.* ¶¶ 147-51.) She also claims that Defendants altered her work schedule to make it harder for her to do her job. (*Id.* ¶ 152-60.)

Plaintiff also pleads that she has been written up twice after she complained about Jackson's abuse "for unreasonable reasons." (*Id.* ¶ 167.) The first time, she was allegedly written up for not saying "hi" to a parent. (*Id.* ¶ 168.) The second time, she was written up for supposedly raising her voice at her students. (*Id.* ¶ 169.)

The trauma of Jackson's alleged sexual harassment and assault, coupled **[*8]** with Principal Vier's alleged retaliation, caused Plaintiff to suffer from loss of sleep, anxiety, and major depression, leading her to seek a leave of absence from April 5,2018 to May 7,2018. (*Id.* ¶¶ 165, 171-72.) Plaintiff maintains that the retaliation against her is ongoing since she returned to the school in the fall of 2018. (*Id.* ¶ 173.)

In June 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 17.) On October 25, 2018, Plaintiff filed the instant action. (Compl., ECF No. 1.) She amended her complaint on January 29, 2019. (FAC.) The School, the Society, and Principal Vier moved to dismiss the amended complaint on February 28, 2019. (School's MTD; Society's MTD.) Jackson also moved to dismiss the amended complaint on April 1,2019. (Jackson's MTD.)

### II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted). **[*9]** While "the plausibility standard is not akin to a probability requirement," *id.* (internal quotation marks omitted), the plaintiff must "nudge[ ] [her] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. A court must take "factual allegations [in the complaint] to be true and draw [ ] all reasonable inferences in the plaintiffs favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). Legal conclusions, conversely, do not benefit from a presumption of truth. *See Iqbal*, 556 U.S. at 678.

A district court can first review a plaintiffs complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The court then considers whether the plaintiffs remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 U.S. Dist. LEXIS 164585, 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding a 12(b)(6) motion, the court also draws all reasonable inferences in the non-moving party's favor. *See Ni Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119-20 (2d Cir. 2013).

### III. PLAINTIFF'S TITLE IX CLAIMS ARE DISMISSED

Plaintiff alleges Title IX liability against the School and the Society on two grounds: first, that Jackson subjected her to workplace sexual harassment and a hostile work environment, and second, that the School and the Society subjected **[*10]** her to a further hostile work environment and adverse employment actions in retaliation for complaining about his abuse. Plaintiffs claims fail because employment discrimination claims are not actionable under Title IX.

### A. Employment Discrimination Claims Are Not Actionable Under Title IX.

The Society and the School argue that Plaintiff has no private right of action under Title IX because Title VII offers the exclusive remedy for employees of federally-funded employment institutions to assert employment discrimination claims. (Defs' Children's Aid College Prep Charter Sch. and

Casey Vier's Mem. of Law in Supp. of their Mot. to Dismiss Pl.'s Am. Compl., ECF No. 41, at 10-13; Def. the Children's Aid Soc.'s Mem. of Law in Supp. of its Mot. to Dismiss the Am. ECF No. 37. at

Title IX, in turn, provides that Inio person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute applies to a school's disparate provision of programs, aid, benefits, or services or the inequitable application of rules or sanctions on [*11] the basis of sex. *See Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 646-47, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999). It also prohibits a school's deliberate indifference to acts of sexual harassment committed against a student. *Id.*

Neither the Supreme Court nor the Second Circuit have addressed "whether there is a private right of action for employment discrimination under Title IX." *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013); *see also Bastian v. N. Y. City Dep't of Educ.*, 04 Civ. 7450 (PAC), 2008 U.S. Dist. LEXIS 57467, 2008 WL 2930529, at *6 (S.D.N.Y. July 29, 2008) ("While Title IX includes a private right of action, the Second Circuit has not ruled whether an employee of a federally-funded educational institution can use Title IX to seek redress for employment discrimination on the basis of sex." (citations omitted)); *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 235 (E.D.N.Y. 2010) (same). Other Circuit courts are divided on this question.[2]

---

[2] The First, Fifth, Sixth, and Seventh Circuits have found that there is no private right of action for employment discrimination for employees of federally-funded educational institutions under Title IX. *See Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995) ("Given the availability of a private remedy under Title VII for aggrieved employees, we are unwilling to [find] . . . an implied private right of action for damages under Title IX for employment discrimination. Doing so would disrupt a carefully balanced remedial scheme for redressing employment discrimination by [university] employers . . . ."); *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996), abrogated by *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) ("Therefore, Title VII preempted any of Waid's claims for equitable relief under § 1983 or Title IX"); *Junior Coll. Dist. of St. Louis Cty., Mo. v. Califano*, 597 F.2d 119, 121 (6th Cir. 1979) ("Such an examination of the plain language of the instant statute, however, indicates no intent to extend its commands so as to include employees of an educational institution in addition to students."); *Islesboro Sch. Comm. v. Califano*, 593 F.2d 424, 428 (1st Cir. 1979) (finding that prohibitions against sex discrimination in employment is "reserved for the amended Title VII and Equal Pay Act."). The Third and Fourth Circuits have found otherwise. *See Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) ("This

Plaintiff argues that the "Supreme Court specifically ruled that Title IX *does* provide a vehicle for Plaintiffs to bring gender-based discrimination claims" in *North Haven Board of Education v. Bell*. (Pl.'s Mem. of Law in Opp'n to Children's Aid College Prep Charter School's Defendants' Mot. to Dismiss the Am. Compl. ("Pl.'s Opp'n"), ECF No. 43, at 11 (citing 456 U.S. 512, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982)) (emphasis in original).) But in that case, the Supreme Court simply held that the Department of Health, Education and Welfare had the authority [*12] to withhold federal funds from schools that discriminated against employees and students of educational programs. *See Bell*, 456 U.S. at 546. "The Court did not address the availability of a private right of action for employees of such programs." *Burrell v. City Univ. of N. Y*, 995 F. Supp. 398,408 (S.D.N.Y. 1998).

Plaintiff also cites *Cannon v. University of Chicago* for the proposition that "there is an *implied* private right of action for gender-based discrimination under Title IX." (Pl.'s Opp' n at 12 (citing 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979)).) It is true that the Supreme Court in that case held that a *student* has a private right of action to sue a federally-funded educational institution for sex-based discrimination in its admissions. *Cannon*, 441 U.S. at 704-09. Nowhere in *Cannon*, however, does the Court create a private right of action for an *employee* of a federally-funded educational

Plaintiff further relies on inapposite cases preceding *Summa* to argue that "the Second Circuit confirms that 'the Supreme Court has held that Title IX implies a private cause of action which encompasses retaliation against a person because that person has complained of sex discrimination." (Pl.'s Opp'n at 12 (citing *Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 660 (2d Cir. 2009)).) *Burgess*, for example, is inapposite because in that case the panel held that a lawyer representing a teacher in an employment discrimination [*13] action *does not* have the right to bring a retaliation claim on the lawyer's own behalf under Title IX or the Rehabilitation Act "because she does not have a relationship with any of the defendants that would allow her to invoke the protections of these statutes." *Burgess*, 346 F. App'x at 660. *Weinstock v. Columbia University* simply notes in a footnote that the burden-shifting framework articulated by the Supreme Court

---

implied [right of action for enforcement of Title IX] extends to employment discrimination on the basis of gender by educational institutions receiving federal funds."); *Doe v. Mercy Catholic Med. Center*, 850 F.3d 545, 562 (3d Cir. 2017) ("[T]he provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students . ."); *Kazar v. Slippery Rock Univ. of Penn.*, 679 F. App'x 156, 166 (3d Cir. 2017) (Shwartz, Circuit J., concurring) ("Title IX provides an independent avenue that coexists with Title VII for pursuing claims of gender-based employment discrimination.").

for Title VII employment discrimination claims in *McDonnell Douglas Corp. v. Green* also applies to similar claims under Title IX. 224 F.3d 33, 42 n.1 (2d Cir. 2000). *O'Connor v. Davis* and *Murray v. New York University College of Dentistry* involve *students* claiming that they were subjected to sexual harassment in violation of Title IX while volunteering as interns or participating in school-sponsored clinics. *See O'Connor*, 126 F.3d 112, 116-17 (2d Cir. 1997); *Murray*, 57 F.3d 243, 248 (2d Cir. 1995). None of these cases address whether employees of a federally-funded educational institution have a private right of action for employment discrimination under Title IX.

An overwhelming majority of district courts in this Circuit have found that an implied private right of action *does not* exists under Title IX for employees alleging gender discrimination in the terms and conditions of their employment.[3] The small minority of district **[*14]** courts that have found otherwise argue that the Supreme Court's decisions in *Cannon* and *Bell*, read together, support the proposition that there is an additional *implied* cause of action

---

[3] *See e.g., Philpott v. New York*, 252 F. Supp. 3d 313, 318-19 (S.D.N.Y. 2017) ("I join many other courts in this district and hold that employment discrimination claims are not actionable under Title IX."); *Uyar v. Seli*, No. 16 Civ. 186, 2017 U.S. Dist. LEXIS 30853, 2017 WL 886934, at *6 (D. Conn. 2017) (dismissing plaintiffs Title IX claim because "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII." (citations omitted)); *Carter v. City of Syracuse Sch. Dist.*, No. 10 Civ. 690 (FJS), 2012 U.S. Dist. LEXIS 36612, 2012 WL 930798, at *3-4 (N.D.N.Y. Aug. 8, 2016) (". . . Title IX provides the exclusive means under which a plaintiff may recover for employment discrimination on the basis of sex."); *Summa v. Hofstra Univ.*, No. 08 Civ. 0361 (WDW), 2011 U.S. Dist. LEXIS 37975, 2011 WL 1343058, at *17-18 (E.D.N.Y. Apr. 7,2011) ("Based upon my review of the applicable case law, I am persuaded that the better argument is to limit an employee's avenue of redress to Title VII."); *Towers v. State Univ. of N.Y. at Stony Brook*, No. 04 Civ. 5243 (FB), 2007 U.S. Dist. LEXIS 37373, 2007 WL 1470152, at *3-4 (E.D.N.Y. May 21, 2007) ("The Court agrees with those courts that have held that Title IX cannot be used to circumvent the remedial scheme of Title VII."); *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97 (D. Conn. 2004) (agreeing with the majority view that "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII"); *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001) ("the court finds that no private right of action exists for employees of federally funded educational institutions who are the victims of employment discrimination."); *Vega v. State Univ. of N Y. Bd. of Trustees*, 97 Civ. 5767 (DLC), 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) ("This Court agrees with the Fifth Circuit and

for employment discrimination under Title IX for employees of educational institutions receiving federal funds. *See e.g., Henschke v. NY. Hospital-Cornell Med. Cetr*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993). However, as the Fifth Circuit explained in *Lakoski v. James*, when Title IX was enacted, Congress had recently amended Title VII to remove language exempting its application to educational institutions. *See Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 127-28 (N.D.N.Y. 2001) (citing 66 F.3d 751, 757 (5th Cir. 1995)). Relatedly, Congress omitted language from Title IX that would have amended Title VII in this way.[4] *Id.* This signals that Congress intended Title VII, and not Title IX, to cover employment discrimination claims by employees of educational institutions.

Moreover, courts in this circuit have identified two additional compelling reasons why Title VII offers the exclusive remedy for employment discrimination based on sex for employees of federally-funded educational institutions. First, when Congress passed Title VII, it intended it "to provide an *exclusive* avenue of relief except for remedies **[*15]** which were already in existence at its enactment." *Burrell v. City Univ. of N.Y*, 995 F. Supp. 398, 409-10 (citing *Storey v. Bd. of Regents*, 604 F. Supp. 1200, 1201 (W.D. Wis. 1985) (emphasis added)). Accordingly, courts should not assume that Congress intended to offer additional remedies for employment discrimination under Title IX, which is subsequent to Title VII. *See Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 97 Civ. 5767, 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) ("Title IX does not provide a private right of action for employment discrimination plaintiffs because, since Title VII predated Title IX, Congress intended Title VII to provide an exclusive avenue of relief except for remedies already in existence at the time of its enactment.").

---

numerous district courts that have held that Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex, and limiting money damages under Title IX to student plaintiffs."); *Burrell*, 995 F. Supp. at 408 ("[T]he remedies of Title IX are limited to student plaintiffs, and Title VII is meant to offer the exclusive remedy for employment discrimination based on sex.").

---

[4] The House Report accompanying the Education Amendments of 1972 explained that "Title VII . . . specifically excludes educational institutions from its terms. The title would remove that exemption and bring those in education under the equal employment provision." H.R. Rep. No. 554, 92d Cong., ls' Sess. (1971) *reprinted in* 1972 U.S.C.C.A.N. pp. 2462, 2512. However, the final Title IX bill enacted by both chambers of Congress omitted any language amending Title VII. In the interim, Congress passed "the Equal Employment Opportunity Act of 1972, which removed Title VII's exemption for educational institutions." *See Lakoski*, 66 F.3d at 757.

More importantly, unlike Title IX, Title VII requires plaintiffs to exhaust administrative remedies with the EEOC before they can sue for employment discrimination in federal court. *See e.g.* 42 U.S.C. § 2000e-5(e)(1) (requiring plaintiffs to file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred"); *see also Summa*, 708 F.3d at 131 ("Title VII provides an administrative procedure by which an individual claiming harassment or retaliation must first pursue administrative remedies before the EEOC prior to seeking judicial relief. . . while Title IX does not." (citations omitted)); *Philpott v. New York*, 252 F. Supp. 3d 313, 318 (S.D.N.Y. 2017) ("Title VII imposes an administrative exhaustion [*16] requirement that is absent from Title IX."). Therefore, "allowing employees to sue for discrimination under Title IX would enable many federal employees to bypass the remedial process that Congress established under Title VII." *Philpott*, 252 F. Supp. 3d at 318-19; *see also Vega*, 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 ("To hold that Title IX permits a private right of action for employment-related discrimination would be to offer employees of educational institutions receiving federal funds a mechanism for relief that differs significantly from the avenues available for other employees."); *Burrell*, 995 F. Supp. at 409 ("The concern that Title VII requirements remain intact for employment discrimination claims is persuasive. To hold otherwise would be to create an avenue of relief for employees of federally funded educational institutions which differs significantly from the path afforded to other employees."); *Lakoski*, 66 F.3d at 754 (holding that implying a private right of action for employment discrimination under Title IX "would disrupt a carefully balanced remedial scheme for redressing employment discrimination by employers" under Title VII).

Here, Plaintiff is an employee of a federally-funded educational institution attempting to bring quintessential Title VII claims of employment discrimination and workplace [*17] sexual harassment under Title IX. Title VII provides the exclusive remedy for such claims, therefore the School's and the Society's motions to dismiss Plaintiff's Title IX claims are GRANTED.

## IV. PLAINTIFF'S STATE LAW CLAIMS ARE DISMISSED

Having dismissed the only claims over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law and common law claims at this early stage in the litigation. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original

jurisdiction."); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court.").

## V. CONCLUSION

Defendants' motions to dismiss Plaintiff's Title IX claims, ECF Nos. 35 and 39, are GRANTED. This Court declines to exercise supplemental jurisdiction over Plaintiff's other state and city law claims against any Defendant. Accordingly, Plaintiffs amended complaint is dismissed in its entirety. The Clerk of Court is instructed to close the motions.

Dated: July 29, 2019

New York, New York

SO ORDERED.

/s/ George B. Daniels

GEORGE B. DANIELS

United [*18] States District Judge

---

*End of Document*

 Positive
As of: June 17, 2020 5:14 PM Z

# Harris v. S. Huntington Sch. Dist.

United States District Court for the Eastern District of New York

March 30, 2009, Decided; March 30, 2009, Filed

Civil Action No. 06-CV-3879 (DGT)

**Reporter**
2009 U.S. Dist. LEXIS 27392 *; 2009 WL 875538

MATT HARRIS, Plaintiff, - against - SOUTH HUNTINGTON SCHOOL DISTRICT; SOUTH HUNTINGTON SCHOOL BOARD OF EDUCATION, Defendants.

**Counsel:**  [*1] For Matt Harris, Plaintiff: Thomas Ricotta, LEAD ATTORNEY, Leeds Morelli & Brown, P.C., Carle Place, NY; Gregory A. Tsonis, Leeds, Morelli & Brown, Carle Place, NY.

For South Huntington School District, South Huntington School Board of Education, Defendants: Christopher F. Venator, Ingerman Smith, LLP, Northport, NY.

**Judges:** David G. Trager, United States District Judge.

**Opinion by:** David G. Trager

# Opinion

*MEMORANDUM AND ORDER*

Trager, J.:

Matt Harris ("plaintiff" or "Harris") filed the current action on August 10, 2006 against his employers, the South Huntington School District and the South Huntington School Board of Education (collectively "defendants" or the "School District." Plaintiff alleged that since 2001, defendants retaliated against

him for his engagement in constitutionally protected speech by creating a hostile work environment and taking adverse employment actions against him. [1] Plaintiff brings his claims for First Amendment retaliation under 42 U.S.C. § 1983, the New York State Human Rights Law, New York Executive Law § 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York ("NYCHRL"). Plaintiff also brings state law claims for negligent  [*2] infliction of emotional distress and violations of civil service law. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons stated below, defendants' motion is granted.

# Background

**(1)**

## Fasano

### (A) Plaintiff's First Complaint Against Fasano

Plaintiff began his employment with defendants in 1992 as an electronic technician in the Instructional Media Department ("IMC Dep't"). Pl.'s Compl. at P 10; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 1. From 1992 until 2002 he was directly supervised by Vincent Fasano ("Fasano"). Pl.'s Opp'n at 1. Plaintiff alleges that Fasano subjected him to abusive behavior from the very beginning of plaintiff's employment. *Id.* Although plaintiff complained about Fasano's conduct on one or two occasions in the early 1990s, he was told to simply "deal with it." 50-H Hearing of Matt Harris ("Harris 50-H") at 12. Heeding this advice, for the next few years, plaintiff lodged no further complaints against Fasano. Despite  [*3] finding it difficult getting along with his supervisor, plaintiff was able to work cooperatively and

---

[1] Plaintiff voluntarily withdrew his § 1983 Due Process claims, and his state law claims for defamation and intentional infliction of emotional distress. Pl.'s Opp'n at 1 n. 1.

productively with him. *Id*. In the Spring of 2001, however, plaintiff filed a complaint with Personnel Administrator Rosemary Ruk regarding Fasano's abusive conduct. [2] Harris Aff. at P 4.

### (B) Fasano's Retaliatory Behavior Following the Complaint

Plaintiff alleges that after complaining about Fasano's conduct, Fasano engaged in a series of retaliatory actions that created a hostile work environment. Pl.'s Compl. at P 15; Harris 50-H at 34-35. Fasano's inappropriate conduct included speaking to plaintiff in a demeaning manner, Harris 50-H at 34, threatening to start a "paper war" [3] against plaintiff, Pl.'s Opp'n at 2; Harris 50-H at 15, and assigning plaintiff more menial tasks than he previously received. Harris 50-H at 34-35. Fasano also placed a disciplinary memorandum into plaintiff's work file without plaintiff's knowledge or signature, which plaintiff claims was a violation of union rules. Pl.'s Compl. at P 14. Plaintiff requested that the disciplinary memorandum be discarded because it contained many false statements [*4] and he had not received an opportunity to review it, but his request was denied. *Id*.

On June 4, 2001, Fasano distributed a written document specifying certain new work rules that plaintiff and two other employees in the IMC Dep't were directed to abide by. Harris 50-H at 15-16. The rules required employees to keep a daily work log and prohibited them from leaving the boundaries of the school during work hours. Harris Aff. at P 4. Plaintiff believed these rules to be offensive, Harris 50-H at 16, and alleges that they were imposed in retaliation for his complaints against Fasano, [4] Harris Aff. at P 4. Plaintiff conveyed his concerns about the new work rules to his union representative, Randy Tillman ("Tillman"). Harris 50-H at 18. A meeting was then scheduled with Dr. Thomas Shea ("Shea"), the former Assistant Superintendent for Personnel and District Services, to discuss plaintiff's issues with the

rules. *Id*. Following the [*5] meeting certain modifications were made to the rules, but plaintiff nevertheless asked his union representative to file a formal grievance. *Id*. at 19. Tillman, however, refused, explaining that it was unnecessary to file a grievance at that time. *Id*. at 19-20.

Fasano continued engaging in harassing behavior directed at plaintiff, including: (1) destroying plaintiff's personal Compact Disc player by throwing it down a flight of stairs, (2) throwing a School District owned video player at a wall in front of plaintiff and (3) destroying a School District owned Olympus camera with a band saw [*6] in front of plaintiff in order to intimidate him. Pl.'s Opp'n at 3-4.

### (C) Plaintiff's Second Complaint Against Fasano

On December 8, 2001, plaintiff filed a written complaint against Fasano. *See generally* Affidavit of Dr. Thomas C. Shea ("Shea Aff.") Ex. C. Plaintiff reported, among other things, that Fasano used School District owned vehicles for personal use, ran a private business from work, failed to distribute ordered School District equipment and supplies, hung a nude calendar in a locker in their mutual work area, violently destroyed School District owned property and threw out plaintiff's personal CD player. Shea Aff. Ex. C; Pl.'s Compl. at P 30. Plaintiff also noted that Fasano berated him by calling plaintiff "'senior technician' knowing full well that he appointed Bob Carpenter to the lead position over [plaintiff] a year and a half earlier." Shea Aff. Ex. C at P 14. Plaintiff alleges that defendants did nothing to prevent this harassment by Fasano. Pl.'s Opp'n at 4.

Following his second complaint, plaintiff claims that he was subjected to an array of retaliatory actions including being assigned menial work tasks and being denied access to computers, equipment, email [5] and [*7] office space. Pl.'s Compl. at P 31. Plaintiff claims that such actions constituted "a form of de facto demotion." *Id*.

### (D) Meetings with Plaintiff

After the filing of his second complaint, on December 18, 2001, Ken Aldrich ("Aldrich"), the School District's Business Administrator, held an IMC Dep't team-building meeting attended by plaintiff, Fasano and plaintiff's co-workers, Robert Carpenter ("Carpenter") and Daniel Beach. Pl.'s Opp'n at 4. During the meeting, Carpenter opined that plaintiff was not a "team player." *Id*. Plaintiff responded by accusing

---

[2] Plaintiff never specifies whether this complaint was written or not.

[3] Although not entirely clear from the record, the term "paper war," as used by plaintiff, seems to refer to a tactic employed by Fasano where plaintiff would be required to deal with a substantial amount of paperwork, such as filling out daily or weekly work logs.

[4] In his complaint, plaintiff alleges that one of the types of abusive behavior that Fasano engaged in that led to plaintiff bringing a formal complaint against him was the presentation of the new work rules. Pl.'s Compl. at P 13. In his affidavit, on the other hand, plaintiff claims that the new work rules were instituted by Fasano in retaliation for his formal complaint. Harris Aff. at P 4. The second scenario seems more plausible as plaintiff's opposition memorandum states that the work rules were instituted immediately after plaintiff formally complained about Fasano's behavior. Pl.'s Opp'n at 2.

---

[5] From about February 2002 until June 2002, Harris alleges that the School District denied him access to its e-mail server. Harris 50-H at 56-57. Defendants claim that upon learning of this issue, they took immediate corrective action to restore plaintiff's access to the e-mail server. Shea Aff. at P 24.

Carpenter of concealing the fact that he had been promoted to Acting Lead IMC Technician. Harris 50-H at 48-49. According to plaintiff, Aldrich then requested plaintiff's resignation. Pl.'s Compl. at P 26; Harris 50-H at 49.

Defendants, on the other hand, deny that plaintiff was ever asked to resign from his position. Shea Aff. at P 12. Instead, **[*8]** as evidenced by a memorandum submitted by Aldrich following the team meeting, plaintiff informed Aldrich that he could no longer work with Carpenter or Fasano and demanded that he be given another job within the School District where he would not have to interact with either of them. *Id.*; Shea Aff. Ex. D at 1. Aldrich then informed plaintiff that there were no other jobs in the School District that were suitable for plaintiff. Shea Aff. Ex. D at 2. Plaintiff, however, continued demanding that he be reassigned. *Id.* Aldrich then told plaintiff that he would schedule a meeting between himself, plaintiff and Shea. *Id.* The meeting was scheduled to discuss plaintiff's problems with his supervisor in greater detail.

Later that day, plaintiff met with Aldrich, Shea, Roger Stollen, plaintiff's shop steward, and Tillman, plaintiff's union representative. Harris 50-H at 49-50. The meeting was called to obtain more information from plaintiff regarding his allegations of mistreatment by Fasano. *Id.* at 50. At the conclusion, plaintiff was instructed that if any other incidents were to transpire between himself and Fasano he should report them immediately. *Id.* at 52. The next day, plaintiff requested, **[*9]** and was granted, three weeks of paid sick leave. *Id.* at 52-53. Plaintiff explains that the problems he was experiencing at work, including the meetings he attended the previous day, contributed to his back pain and mental stress, forcing him to take the time off. Pl.'s Compl. at P 27.

**(E) Fasano's Continued Harassment**

Plaintiff returned to work on January 4, 2002 at which time he was told that he was no longer supervised by Fasano, and that he was instead to report to Dr. Jim Sullivan, Assistant Superintendent for Instruction at the Walt Whitman High School. Harris 50-H at 54-55. Plaintiff claims that during this period, the hostile work environment and retaliation against him continued and even got worse. Pl.'s Compl. at P 29.

Although he no longer had a working relationship with Fasano, according to plaintiff, his former supervisor continued harassing him after learning about plaintiff's second round of complaints. Specifically, plaintiff alleges that Fasano visited the Long Island School for the Gifted ("LISG"), which plaintiff's daughter attended, and took photographs of her classroom. Pl.'s Compl. at P 32; Harris 50-H at 59. Fasano explained that he was present at the school to investigate **[*10]** plaintiff's theft of computers from the LISG. Pl.'s Opp'n

at 5. Plaintiff claims that following an investigation, the theft accusations were held to be unfounded. Pl.'s Compl. at P 32. Plaintiff claims to have been subjected to further harassment from defendants' staff and administration while the investigation into his alleged criminal behavior was ongoing. Pl.'s Compl. at P 35.

In February 2002, plaintiff went to Fasano's office to retrieve audio equipment for a school play. Pl.'s Opp'n at 5. Plaintiff specifically went to his former supervisor's office in the evening, knowing that Fasano would not be present. Harris 50-H at 63. A night security guard, however, called Fasano at home, informing him of plaintiff's presence. *Id.* As he was leaving with the audio equipment, Fasano confronted plaintiff and pushed him against a wall, breaking a light switch. Pl.'s Compl. at P 33. According to Harris, James Kaden, the School Board President, was informed of the altercation and asked plaintiff not to file a police report. Pl.'s Opp'n at 5. Fearing further retaliation if he failed to do as he was told, plaintiff complied with the request, but did notify the district security force of Fasano's **[*11]** violent actions. *Id.*

Following the physical altercation and additional allegations against plaintiff concerning his involvement in alarm sabotage at defendants' middle school, the Superintendent of Schools, Timothy Brennan ("Brennan"), informed plaintiff that, except under certain limited circumstances, plaintiff was to obtain written authorization to access school property. *Id.*; Shea Aff. Ex. E. According to plaintiff, the new requirement prevented him from picking his daughter up from school and hindered his ability to obtain supplies necessary for his job. Pl.'s Opp'n at 5. Plaintiff claims that Fasano was not similarly disciplined. Harris Aff. at P 11. He, therefore, concludes that the disciplinary action was taken by Brennan in retaliation for his numerous complaints against Fasano.

**(F) Formal Investigation into Fasano's Activities**

Following plaintiff's second complaint against Fasano, the School District contracted with Joseph Conlon ("Conlon"), a former detective with the Suffolk County District Attorney's Office, to conduct an independent investigation into the various allegations. Shea Aff. at P 11. In June 2002, Conlon submitted a detailed report confirming many of plaintiff's **[*12]** accusations regarding Fasano's inappropriate work behavior. *Id.* at P 14; Shea Aff. Ex. F. In August 2002, based on Conlon's findings, defendants requested that Fasano take an early retirement. Shea Aff. at P 15.

**(2)**

**Carpenter**

**(A) Carpenter's Promotion**

On February 2, 2000, Carpenter, plaintiff's co-worker in the IMC Dep't, was internally promoted to Acting Lead IMC Technician by the Superintendent of Schools. Defs.' Statement of Undisputed Facts ("Defs.' 56.1") at P 2. In either January or February of 2001, not knowing about Carpenter's promotion, plaintiff responded to a posting for "Lead Technician," but never received an interview for the position. Pl.'s Compl. at P 17. When plaintiff inquired with Shea, the head of personnel, about the status of his application, he was told that the position was withdrawn for budgetary reasons. *Id.* at P 18-19. It was not until October 19, 2001, when plaintiff received a list of School District civil service positions, that plaintiff learned that Carpenter had been promoted to Acting Lead IMC Technician. *Id.* at P 16. Plaintiff asked defendants about Carpenter's promotion, but did not receive a response. Pl.'s Opp'n at 3. Plaintiff then wrote a letter **[*13]** to Shea, dated October 24, 2001, requesting that he confirm the accuracy of the civil service listing. Shea Aff. Ex. A. Shea replied to plaintiff's letter on October 31, 2001, informing plaintiff that he could not discuss another employee's personnel matters and reminded plaintiff that he should contact his union representative if he needed further clarification. Shea Aff. at P 8. Shea also admonished plaintiff for the abusive behavior he subjected the Personnel Department to on learning of Carpenter's promotion. Shea Aff. Ex. B. Plaintiff claims that Shea's comments were made in retaliation for plaintiff's inquiries into defendants' violations of civil service law. Harris Aff. at P 7.

It was not until a November 29, 2001 meeting attended by plaintiff and his union representative, that defendants admitted to plaintiff that Carpenter had indeed been appointed Acting Lead IMC Technician. Pl.'s Compl. at P 22; Harris 50-H at 32. Plaintiff claims that "nothing was done to alleviate the discrimination and/or retaliation to which [he] was subjected, and no one was punished for the unlawful conduct." Pl.'s Compl. at P 22. At the same time, however, plaintiff admits that neither he nor his **[*14]** union ever filed a grievance regarding his objections to Carpenter's promotion. Harris 50-H at 33-34. Plaintiff claims that filing a grievance would have been useless since the first steps of any grievance would have been determined by Fasano and Shea, the very people he would have been complaining about. Harris Aff. at P 8. Moreover, filing another complaint would have left him open to further retaliation by defendants. *Id.* Plaintiff believes that his fear of retaliation was substantiated by a subsequent meeting where Shea advised plaintiff to seek psychological help. Plaintiff perceived the suggestion as a threat to his employment, since Shea was essentially stating that plaintiff was mentally unfit to perform his duties. *Id.*

Plaintiff alleges that Carpenter's promotion was in violation of civil service law as the Lead IMC Technician position was not posted at the time Carpenter received the promotion. Pl.'s Opp'n at 3. Plaintiff also insists that he was more qualified for the position because he had seniority over Carpenter and was ranked number one on the civil service list for the position, whereas Carpenter had not even taken the applicable civil service exam. Pl.'s Compl. at **[*15]** P 20; Pl.'s Opp'n at 3. Moreover, plaintiff claims that defendants lied to him for a year about the status of the position, telling him that it had been withdrawn and denying that any promotion had been made to Carpenter. Harris Aff. at P 7. This was all done, according to plaintiff, in an effort to prevent him from obtaining the promotion himself. Pl.'s Opp'n at 3. Though Shea denies having had any knowledge of Carpenter's promotion at that time, Shea Aff. at P 7, Harris argues that as the head of personnel, Shea either knew or should have been aware of this information, Harris Aff. at P 7.

**(B) Carpenter's Harassment Of Plaintiff**

Plaintiff also claims that he was subjected to harassment by Carpenter. For example, in September 2002, ten months after plaintiff filed his December 8, 2001 complaint against Fasano, Carpenter, along with other employees, filed, what plaintiff alleges to be, an unjustified police report against him for stealing computer equipment. Pl.'s Compl. at P 39; Harris 50-H at 42-44. No criminal charges were filed in connection with the incident. Harris 50-H at 44. On March 11, 2004, Plaintiff also discovered two messages that Carpenter left for plaintiff's co-worker, **[*16]** James Brtalik ("Brtalik"), where Carpenter made inappropriate references to plaintiff. Affidavit of James Romanelli ("Romanelli Aff.") at P 7. On April 2, 2004, after it was determined that Carpenter had indeed left the derogatory messages, Carpenter received a "Memorandum of Counseling and Warning" explaining to Carpenter that "[t]his type of behavior is unprofessional and inflammatory" and that "[i]t boarders on harassment and *must cease immediately*." Romanelli Aff. Ex. A (emphasis in original). Plaintiff claims that he was never informed that the memorandum was issued. Pl.'s Counter Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1") at P 36.

**(3)**

**Brtalik**

Following Fasano's retirement in August 2002, defendants reorganized the IMC Dep't into two groups: (1) the Audio Visual ("AV") Department and (2) the Technology Department. Defs.' 56.1 at P 22. Carpenter was assigned to the Technology Department, while plaintiff was assigned to the AV Department where he shared a workspace with

Brtalik. *Id.* at P 23; Harris 50-H at 55-56. Defendants explain that the reason plaintiff was not assigned to the Technology Department was because he lacked the necessary skills required to work on computer **[*17]** hardware and software issues. Defs.' 56.1 at P 24. Plaintiff disputes this fact, and claims that in addition to possessing the requisite skills, his qualifications were superior to those possessed by Carpenter, who was transferred to the Technology Department. Pl.'s 56.1. at P 23-24.

Plaintiff claims that he had a good working relationship with Brtalik until his co-worker found out about plaintiff's prior complaints against Fasano. Pl.'s Opp'n at 4-5; Harris 50-H at 57. Brtalik then began engaging in harassing behavior towards him, including refusing to communicate with plaintiff and making false accusations that plaintiff was harassing him. Pl.'s Compl. at P 39. Specifically, Brtalik filed two harassment complaints against plaintiff, one on September 6, 2002, Shea Aff. Ex. G, and another on April 13, 2004, Shea Aff. Ex. K. Mem. of Law in Support of Defs.' Mot. for Sum. J. ("Defs.' Mem.") at 3-4. Following Brtalik's first complaint, defendants reassigned plaintiff to work the night shift and kept Brtalik working the day shift in an attempt to prevent future altercations between the two employees. *See* Shea Aff. Ex. H. In exchange for having to work a later shift, plaintiff was paid a **[*18]** differential equal to eight percent of his salary, in accordance with his union's collective bargaining agreement. Shea Aff. at P 22. Plaintiff alleges that the reason defendants moved his shift instead of Brtalik's was to retaliate against him for his numerous complaints. Plaintiff agreed to try the new arrangement for one year, despite the fact that it was retaliatory in nature, in order to avoid further harassment from Brtalik. Pl.'s 56.1 at P 26; Harris 50-H at 89. Plaintiff complains, however, that having to work the night shift denied him the opportunity to work overtime. *See* Harris 50-H at 119-20. Brtalik also filed a criminal harassment complaint against plaintiff around the time of his April 13th complaint. Shea Aff. Ex. M; Pl.'s Compl. at P 49. Plaintiff was arrested, but after a bench trial, the case was dismissed and costs were awarded to him. Pl.'s 56.1 at PP 37-38; Pl.'s Opp'n at 6 n.3. Following his acquittal, plaintiff filed a civil complaint against Brtalik for false arrest. Harris 50-H at 98.

Sometime during this period of harassment, Brtalik created a cartoon focusing on plaintiff called "hairball," which he displayed over a desk in their office. Harris 50-H at 80; **[*19]** Defs.' Mem. at 4. Plaintiff's current supervisor, Wayne Loper ("Loper"), removed the cartoon and gave the original to plaintiff. Harris 50-H at 80. On another occasion, Harris alleges that when he attempted to get a replacement identification card, he discovered that a card had been created with his name, but with a picture of a hairball in lieu of his photograph. Harris Aff. at P 9. It is unclear whether plaintiff believes that Brtalik was responsible for the prank.

In a further attempt to prevent altercations between plaintiff and Brtalik, plaintiff was told not to report to work until his shift began. Shea Aff. at P 32. On June 17, 2004, Brtalik filed his third complaint against plaintiff, claiming that plaintiff failed to follow the specific directions requiring him not to arrive at work prior to the start of his shift. *Id.* at P 33; Shea Aff. Ex. M. No employment action was taken with respect to this incident. Shea Aff. at P 33. Plaintiff, however, maintains that he abided by the directions he was given. Pl.'s 56.1 at P 40.

Plaintiff also alleges that in June 2004 Brtalik filed a false complaint with the business manager, Connie Robinson, alleging that plaintiff had been tailgating **[*20]** him and causing him to fear for his life. Harris 50-H at 102.

In July 2004, plaintiff requested, and was granted, a change to his employment status from a twelve-month employee to a ten-month employee. Romanelli Aff. at P 9; Romanelli Aff. Ex. B. Plaintiff claims this request was made in an effort to keep himself away from Brtalik since defendants were taking no action to prevent Brtalik from harassing him. Pl.'s 56.1 at P 41; Harris 50-H at 101. In November 2004, Brtalik was moved to another building in the School District at plaintiff's request. Pl.'s Opp'n at 7; Harris 50-H at 107. Plaintiff claims that Brtalik, who still had keys to plaintiff's office, continued to harass him by moving around and not returning audio visual equipment and making such equipment difficult to find or unavailable when plaintiff needed to use it to perform his job. Pl.'s Opp'n at 7.

**(4)**

**Loper**

Plaintiff also acknowledges that he does not have a good working relationship with Loper, his current supervisor. Harris 50-H at 92. Specifically, plaintiff complains that "[e]very time [Loper] sends [him] any kind of a directive, it's done in a very demeaning way." Harris 50-H at 118. Furthermore, in a grievance meeting, **[*21]** Loper threatened to sue plaintiff for slander. Harris 50-H. at 118; Pl.'s Opp'n at 7. Plaintiff, however, does not allege that Loper's actions are retaliatory in nature.

**(5)**

**Sexual Harassment Allegations Against Plaintiff**

In a letter dated October 1, 2003, Vic D'Amore ("D'Amore"),

a dance director who was renting the school facilities, complained to Shea about plaintiff entering the teenage girls' dressing area without adequate warning and seeing girls in various states of undress. Shea Aff. at PP 25-26; Shea Aff. Ex. I. As required by law and School District policy, a Title IX investigation was conducted to investigate the allegations. Shea Aff. at P 27. A November 25, 2003 summary report cleared plaintiff of all charges. *Id.* at P 28; Shea Aff. Ex. J; Pl.'s Compl. at P 46. During this time, however, plaintiff was placed on paid administrative leave and claims to have experienced great embarrassment. Harris 50-H at 79. Plaintiff alleges that D'Amore's lighting director is Fasano's business partner, and that Fasano had something to do with D'Amore making the false accusation. Pl.'s Opp'n at 6; Harris 50-H at 78.

**(6)**

### Offensive Internet Postings And Pictures

Beginning in 2003, plaintiff brought [*22] to defendants' attention internet postings that contained demeaning statements about him. Romanelli Aff. at P 6. Plaintiff claims that these postings were made by defendants' employees and that many of the posts originated from School District-owned computers. Pl.'s Compl. at P 48; Pl.'s Opp'n at 6. These postings referred to plaintiff by abusive names and accused plaintiff of being a sexual predator. Pl.'s Compl. at P 45, 47. Defendants maintain that once they became aware of the postings they took immediate corrective action to restrict access to the websites from School District-owned computers. Romanelli Aff. at P 6. Although not disputing that such action was taken, plaintiff emphasizes that the measures were not implemented until February 2004, despite the fact that he initiated the complaint in 2003. Pl.'s 56.1 at P 30. In addition, plaintiff alleges that there are still some breaches of the filter established by defendants that allow employees to access the content using "proxy websites." *Id.* According to plaintiff, the objectionable postings remain available on the internet.

On approximately January 26, 2004, a demeaning photograph of plaintiff was found on a School District-owned [*23] computer. Shea Aff. at P 29. Plaintiff claims that an independent contractor working for the School District, Chris Diaz, was responsible for placing certain photographs of plaintiff on defendants' server. Harris 50-H at 71-74. Upon investigation, the actual source of the photographs could not be determined, but a secretary who had one of these photographs on her computer was disciplined. Shea Aff. at P 29.

**(7)**

### Harassment By Plaintiff Of School District Board Members

On November 4, 2004, several board members of the School District complained that plaintiff was engaging in conduct that made them feel uncomfortable. Shea Aff. at P 34. Shea sent plaintiff a letter alleging that plaintiff had been: (1) following board members in his car; (2) making repeated telephone calls and sending emails to their homes and places of business; and (3) visiting their homes in attempts to speak with them concerning his working conditions. Shea Aff. Ex. N. Shea's letter reprimanded plaintiff for his inappropriate conduct and instructed him to cease contacting board members. Plaintiff denies that he followed board members in his car, and claims that the complaints are nothing more than added attempts by defendants [*24] to retaliate against him. Pl.'s Compl. at P 54; Pl.'s 56.1 at P 42.

### Discussion

**(1)**

### Statute of Limitations

Plaintiff's claims regarding retaliatory incidents occurring prior to August 10, 2003 are untimely under the three-year statute of limitations for Section 1983 actions arising in New York. Plaintiff argues that these claims, though more than three years old, are saved by the continuing violation doctrine, on the ground that all of the acts of retaliation constitute one unlawful employment action. This argument fails for two reasons. First, the continuing violation doctrine does not apply to discrete employment actions. Second, plaintiff cannot demonstrate either that the untimely incidents of harassment were linked to the timely actions of retaliation or that defendants tolerated such harassment by permitting it to continue without remedy.

### (A) Facially Timely Claims

Plaintiff's retaliation claim is, at the very least, timely with regard to retaliatory actions taken by defendants between August 10, 2003 and August 10, 2006. Defendants argue that plaintiff's First Amendment retaliation claim [6] is untimely

---

[6] Plaintiff makes [*26] clear that retaliation, not discrimination, was the sole motive behind defendants' abusive conduct towards him. However, to the extent that plaintiff's papers suggest a discrimination claim, such a cause of action must fail because he neither alleges that he was a member of a protected class nor that he was subjected to a

because the complaints which form the basis of the allegation were initiated in 2001, **[\*25]** five years before the filing of the complaint in the present action. Section 1983 claims arising in New York are governed by a three-year statute of limitations. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). Under federal law, a plaintiff's Section 1983 "claim accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (internal quotation marks and citation omitted). Although plaintiff's complaints which form the basis of his retaliation claim occurred more than three years prior to the expiration of the relevant statute of limitations period, the point of accrual is not when plaintiff utters the alleged protected speech, but rather when he suffers retaliatory action as a result of that speech. *See Washington v. County of Rockland*, 211 F. Supp. 2d 507, 511-12 (S.D.N.Y. 2001) (finding that "[b]ecause plaintiffs' First Amendment retaliation claims focus on the commencement of full disciplinary hearings, the date of the respective hearings is the date that a cause of action would accrue."). Accordingly, all action occurring within three years of August 10, 2006 are timely.

**(B) The Continuing Violation Doctrine**

Plaintiff attempts to defeat the statute of limitations defense, with regard to defendants' conduct before August 10, 2003, by arguing that such untimely retaliatory actions fall within the continuing violation exception. Under the continuing violation doctrine, "a plaintiff who files a timely . . . charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even **[\*27]** if those acts, standing alone, would have been barred by the statute of limitations." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

**(i) Discrete Employment Actions**

Some of the pre-August 10, 2003 incidents are not saved by the continuing violation doctrine because they are discrete employment actions. The continuing violation doctrine does not apply to discrete and easily identifiable employment actions such as "termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Such discrete "acts are not actionable if time

barred, even when they are related to acts alleged in timely filed charges," and "each discrete act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Plaintiff claims that defendants retaliated against him by: (1) asking him to resign in a December 18, 2001 meeting; (2) denying him a promotion to Lead IMC technician in 2001; (3) transferring him to the AV Department in 2002; and (4) reassigning him to work the night shift in September 2002, effectively denying him the opportunity to work overtime.

The continuing violation doctrine does not apply **[\*28]** to save these claims as each one is a discrete employment action taken by defendants more than three years before the filing of the complaint on August 10, 2006. *See Sundaram v. Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) (holding that the continuing violation doctrine "does not apply to discrete, completed employment actions such as transfers, failures to promote, demotions, or inadequate wages.").

**(ii) Hostile Work Environment**

Plaintiff cannot demonstrate that the remaining pre-August 10, 2003 incidents were part of a continuing violation because the alleged retaliation was comprised of isolated acts of harassment and because the evidence demonstrates that defendants attempted to remedy such harassment. A hostile work environment claim, unlike a discrete employment action, will be treated as a continuing violation where the claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117; *see also Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 134 (2d Cir. 2003). "[T]he continuing violation theory may be used where there have been specific and related instances of discrimination, and **[\*29]** the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001). Where such a showing is made, the hostile work environment claim will be "timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Patterson v. County of Oneida, New York*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Morgan*, 536 U.S. at 117).

**a. Link Between Untimely and Timely Acts of Harassment**

First, plaintiff fails to demonstrate that the specific acts of retaliation were in any way related. He simply concludes, without providing any evidence, that the harassment he was subjected to, starting in 2001, constituted an ongoing policy of retaliation. The untimely incidents of retaliation consist of

hostile work environment as a result of that membership. *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (confirming that to establish a discriminatory hostile work environment claim a plaintiff must demonstrate that she was subjected to hostility as a result of her membership in a protected class).

harassment from: (1) Fasano, who, between 2001 and 2002, spoke to plaintiff in a demeaning manner, threatened to start a "paper war" against him, instituted offensive work rules, placed a [*30] false disciplinary memorandum in plaintiff's work file, intimidated plaintiff by destroying school property in front of him, discarded plaintiff's CD player, berated plaintiff by calling him senior technician, took pictures of plaintiff's daughter's class room, accused plaintiff of computer theft and violently pushed plaintiff against a wall; (2) Shea, who in 2001, lied to plaintiff about the withdrawal of the Lead IMC Technician position and advised plaintiff to seek psychological help; (3) Carpenter, who in September 2002, filed an unjustified police report against plaintiff for stealing computer equipment; and (4) Brtalik, who in 2002, refused to communicate with plaintiff and filed a harassment complaint against him.

Plaintiff claims that the hostile work environment continued in 2003 and 2004 as demonstrated by the timely incidents of harassment. Specifically, (1) Brtalik filed a criminal and work-related harassment complaint against plaintiff in April 2004, filed an additional complaint against plaintiff for tailgating him in June 2004, posted an offensive cartoon about plaintiff over his desk and made it difficult for plaintiff to perform his job duties by intentionally hiding [*31] work equipment; (2) in 2003, defendants' employees participated in offensive internet postings, which referred to plaintiff by abusive names; (3) an independent contractor placed demeaning photographs of plaintiff on the School District server; (4) plaintiff was falsely accused of sexual harassment by a non-school employee in a letter dated October 1, 2003; (5) Shea accused plaintiff, on November 4, 2004, of following School Board members in his car and told plaintiff to cease such activity; and (6) Carpenter left inappropriate messages about plaintiff in March 2004.

With the exception of plaintiff's problems with Brtalik, [7] all of the untimely incidents of harassment are wholly unrelated to the timely acts of abuse. In order to fall within the continuing violation exception, the incidents of harassment "must not be 'isolated and sporadic outbreaks of discrimination,' but a 'dogged pattern.'" *Sunshine v. Long Island Univ.*, 862 F. Supp. 26, 29 (E.D.N.Y. 1994) (quoting *Bruno v. Western Elec. Co.*, 829 F.2d 957, 961 (10th Cir. 1987)). Many of the untimely incidents of harassment that plaintiff suffered resulted from actions taken by completely different employees from those

involved in [*32] plaintiff's timely harassment claims. [8] *See Wang v. New York City Dep't of Finance*, No. 96-CV-5170, 1999 U.S. Dist. LEXIS 11256, 1999 WL 529550, at *11 (E.D.N.Y. 1999) ("These alleged acts of discrimination do not amount to a continuing violation. They are neither similar nor clearly related to each other. The circumstances surrounding each, including the parties involved, vary significantly."). Moreover, the timely incidents, with the exception of plaintiff's problems with Brtalik, have nothing to do with the untimely acts of harassment, even assuming they were all motivated by retaliation. *See Falinski v. Kuntz*, 38 F. Supp. 2d 250, 258 (S.D.N.Y. 1999) (finding that the plaintiff's retaliation claim, which is based on two timely claims and a number of patently unrelated acts that occurred outside of the statutory period are wholly unrelated except in the plaintiff claiming that they resulted from the same improper retaliatory motive). "Plaintiff cannot now resurrect these stale claims by stating that dissimilar acts are related. To hold otherwise would turn the continuing violation doctrine into a 'boundless exception' to the statute of limitations." *Id.*

**b. Defendants' Response To Plaintiff's Harassment**

Moreover, even if the acts of harassment were somehow connected, in order to invoke the continuing violation doctrine, plaintiff must demonstrate that defendant "permitted [the harassment] to continue *unremedied* for so long that its *inaction* may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald*, 251 F.3d at 362 (emphasis added). Plaintiff, however, cannot establish that such a policy existed where defendants attempted to remedy each of plaintiff's numerous complaints of harassment. Specifically, defendants: (1) investigated Fasano and eventually forced him to retire in August 2002 as a result of plaintiff's allegations; (2) met with plaintiff to discuss the Lead IMC Technician job to clarify any misunderstandings [*34] as to the status of the position; (3) tried to separate plaintiff and Brtalik by both changing their shift times and eventually moving Brtalik to a new building; (4) reprimanded Carpenter for leaving inappropriate messages referencing plaintiff; (5) investigated the source of the demeaning pictures of plaintiff found on the School District server; and (6) prevented employees from accessing the offensive Internet posts referencing plaintiff. Defendants clearly did not leave plaintiff's harassment unremedied. Although the mutual problems between Brtalik and plaintiff span several years, there is no doubt that defendants took every step in their power to avoid further confrontations between the two employees. Thus, the harassment that plaintiff suffered at the hands of his supervisor and co-

---

[7] Although the numerous incidents of harassment that plaintiff [*33] suffered at the hands of Brtalik appear to be connected, as discussed further *infra*, plaintiff cannot demonstrate that such actions fall within the continuing violation doctrine since defendants attempted to remedy the situation on several occasions.

[8] There is no evidence regarding which employees were involved in posting offensive comments about plaintiff on the Internet.

workers could not constitute a single unlawful employment practice. Accordingly, all incidents of harassment and adverse employment actions suffered by plaintiff prior to August 10, 2003 cannot constitute a continuing violation, and therefore are untimely.

**(2)**

**Timely Filed Retaliation Claims**

Defendants next argue that they are entitled to summary judgment on plaintiff's timely claims for retaliation. [*35] A *prima facie* case of First Amendment retaliation requires the plaintiff to show that: (1) the speech at issue was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected speech and the adverse employment action, such that the speech was a substantial or motivating factor in the adverse employment action. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

**(A) Protected speech**

First, plaintiff cannot demonstrate that any of his numerous complaints constitute protected speech because they all center on his personal grievances as an employee and not on matters of public concern. The speech over which plaintiff claims to have suffered retaliation include his complaints about the School District's violation of civil service law, and his complaints concerning Fasano's abusive behavior, acts of theft, destruction and misuse of School District property and inappropriate and abusive conduct on School District premises. [9] Defendants, on the other hand, contend that plaintiff's speech was unprotected as it was motivated primarily by advancing plaintiff's personal interests, including trying to get back at Fasano for supporting [*36] Carpenter's promotion.

As a public employee, plaintiff's speech is constitutionally protected if it was "made as a citizen on matters of public concern rather than as an employee on matters of personal interest." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002). "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Connick v.*

*Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Whether an employee's speech addresses a matter of public concern is an issue of law, not fact, that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. In deciding whether speech addresses a matter of public concern, "the court should focus on the motive [*37] of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999). "If the speech . . . is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern." *Ganim*, 342 F.3d at 112. Thus, speech concerning purely private matters, such as an employee's dissatisfaction with the conditions of his employment, is usually unprotected. *Lewis*, 165 F.3d at 164. In performing its analysis, a court "must look behind pretextual 'public concern' rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." *Pappas v. Giuliani*, 118 F. Supp. 2d 433, 444 (S.D.N.Y. 2000). "The key inquiry is whether the statements were made by plaintiff in [his] role as a disgruntled employee or [his] role as a concerned citizen." *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005).

**(i) Civil Service Law Violations Complaint**

Plaintiff's complaint concerning defendants' [*38] civil service law violations is not protected speech because it focuses on purely private matters. Although plaintiff alleges that his complaint regarding Carpenter's promotion centered on defendants' alleged violations of civil service law, his October 24, 2001 letter to Shea, [10] which is filled with references to his desire and qualifications for the Lead IMC Technician position, demonstrates that plaintiff was more concerned with the fact that he was passed over for a promotion. Moreover, the letter fails to even explicitly mention defendants' violation of civil service law.

**(ii) Written Complaint Against Fasano**

The misconduct allegations against Fasano, contained in plaintiff's December 8, 2001 letter, are similarly focused on plaintiff's personal interests. In the December 2001 letter that plaintiff entitles "Job Performance review for Vincent Fasano," plaintiff complains, among other things, that: (1) he

---

[9] To the extent that plaintiff claims that defendants retaliated against him for his numerous complaints about the abusive behavior he suffered at the hands of his co-workers, such complaints cannot be considered protected speech as they concerned purely private matters. *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003).

[10] Although plaintiff claims that he made numerous complaints about defendants' civil service law violations, the only evidence presented concerning his complaints on this topic is the October 24, 2001 letter addressed to Shea.

had to help Fasano with his private business, including [*39] answering phone calls, accepting equipment for repair from Fasano's personal customers and once helping Fasano install a video projector; (2) Fasano had a problem with plaintiff bringing his own equipment into the office and discarded plaintiff's personal CD player on one occasion; (3) Fasano was very argumentative and refused to do things the way plaintiff suggested; (4) Fasano would not solve computer-related problems properly, forcing others employees, including plaintiff, to deal with the same issues later on; (5) Fasano refused to remove a pinup calendar despite plaintiff having voiced his objections to it; and (6) Fasano berated plaintiff by calling him "senior technician" even though Fasano knew that Carpenter had already been appointed Acting Lead IMC Technician.

These allegations clearly focus on plaintiff's personal grievances against Fasano. The only matter that plaintiff addresses which even remotely constitutes a matter of public concern is Fasano's engagement in a private business during work hours. However, plaintiff is more preoccupied with how such activity inconvenienced him. *See Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 531 (S.D.N.Y. 2007) [*40] ("In the present case, it is abundantly clear that plaintiff's complaints regarded her individual employment and the manner in which she was treated at the workplace. . . . Plaintiff's speech was not designed to reveal District-wide racism, or address the impact of racism on the school environment, but rather, she was attempting to alleviate her own personal situation in the workplace.").

Although the remaining complaints contained in the December 2001 letter appear to focus on matters of public concern, looking at the record as a whole makes clear that these allegations were incidental to plaintiff's actual motive, expressing his personal grievances. Specifically, plaintiff alleged that Fasano (1) used School District-owned vehicles for non-school business; (2) often disappeared during the work-day without letting anyone else know where he was going; (3) destroyed school-owned property because of his temper; (4) ordered equipment, which he used for himself instead of distributing to those for whom such equipment was ordered; and (5) was a danger to those around him as a result of his bad moods.

The fact that plaintiff spoke about Fasano stealing and destroying School District property [*41] and equipment, using School District property and equipment for his own personal use and acting inappropriately and violently in front of co-workers does not necessarily make his speech a matter of public concern. Plaintiff himself admitted that he perceived Fasano's violent destruction of school property as an attempt by Fasano to intimidate him. Similarly, plaintiff's complaints

about Fasano's moods are concentrated on how such behavior impacted him personally. *See* Shea Aff. Ex. C at P 11 ("When [Fasano] is in one of his 'moods' it is best to avoid him altogether, as in leaving the shop and him alone, If you do not it can be a very scary scenario."). Furthermore, plaintiff, despite admitting to having been abused and harassed by Fasano for numerous years, decided to lodge his first written complaint a mere ten days after being formally informed of Carpenter's promotion. This fact is particularly relevant with regard to plaintiff's motive for filing the complaint because the last accusation that plaintiff makes against Fasano in his December 2001 letter is that his former supervisor berated him by referring to him as senior technician despite being aware of Carpenter's promotion.

Plaintiff's [*42] numerous allegations concerning Fasano's misuse of school property and general unavailability as a result of Fasano being involved in working for his private business are the only complaints that are not entirely based on plaintiff's personal grievances. However, as demonstrated, looking at all of the complaints contained in the letter as a whole in addition to the content and context of the entire record, "[a]ny motivation [that plaintiff may have had] to advance [such] public interest was tenuous and incidental." *Hanig*, 384 F. Supp. 2d at 722 ("While plaintiff is correct that speech involving an employer's violation of state law will often be a matter of social and political concern, here the facts do not suggest that plaintiff was motivated either by a desire to protect the public welfare or a desire to bring the state's alleged wrongdoing to light. To the contrary, it is clear that plaintiff's speech related primarily if not exclusively to her desire to protect her job and/or her reputation as a school counselor.") (citing *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)).

### (iii) Harassment Complaint Against Fasano

Finally, plaintiff was also not involved [*43] in protected speech when, in Spring 2001, he complained about Fasano's abusive behavior. There is no evidence on exactly how the complaint was communicated, but it appears to have been made privately to a supervisor named Rosemary Ruk. *See Burns v. Cook*, 458 F. Supp. 2d 29, 40 (N.D.N.Y. 2006) (finding that the plaintiff's speech was not protected where "[p]laintiff communicated this speech in a private and direct manner with no apparent intention of voicing her discontent to the public at large."). There is also nothing to suggest that plaintiff complained to Ruk about anything other than Fasano's abusive behavior towards him. "When a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor . . . he or she is speaking as an employee and not as a citizen." *Weintraub v. Bd. of Educ. of City of New York*, 489 F. Supp.

2d 209, 219 (E.D.N.Y. 2007). It is clear, therefore, that on lodging his first complaint against Fasano in Spring 2001, plaintiff was speaking directly to a supervisor as an employee about his own welfare and job security. Thus, none of plaintiff's complaints can be deemed protected speech.

**(B) Materially Adverse  [\*44] Action under *Burlington Northern***

Even if plaintiff could establish that his complaints were protected speech, there is no evidence suggesting that the hostile work environment he was subjected to constituted a materially adverse action since it would not have prevented a reasonable worker from exercising their right to free speech. Furthermore, such harassment on the part of plaintiff's co-workers cannot be imputed on defendants who attempted to remedy such abuses. "In the context of a First Amendment retaliation claim, [The Second Circuit has] held that '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" *Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 225 (2d Cir. 2006) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d. Cir. 2004)). An adverse employment action refers not only to demotion, but includes refusal to hire or promote, reduction in pay and reprimand. *Zelnik*, 464 F.3d at 226. "This list of retaliatory conduct is certainly not exhaustive, however, and 'lesser actions may also be considered adverse employment actions.'" *Id*. (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  [\*45] "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." Id. (quotation marks omitted) (quoting *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006)).

In *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), the Supreme Court appeared to have changed the standard under which a court is to analyze whether an action is materially adverse in the context of a retaliation claim. The Court held that in order to prevail on a retaliation claim under Title VII "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington Northern*, 548 U.S. at 67-68 (quoting *Rochon v. Gonzales*, 370 U.S. App. D.C. 74, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); *see also Zelnik*, 464 F.3d at 227 ("[The Second Circuit's] standard for First Amendment retaliation claims has always been the equivalent to the standard s1et forth in *Burlington Northern*"). To meet this standard, a plaintiff need not demonstrate that he suffered a "material  [\*46] change in employment terms or conditions." *Zelnik*, 464 F.3d at 227. Although not entirely settled, several courts agree that *Burlington Northern* lowered the standard for finding an adverse employment action in the context of a retaliation claim. *See Thomas v. Atmos Energy Corp*., 223 Fed. Appx. 369, 2007 WL 866709, at *5 (5th Cir. 2007) ("acknowledging that "*Burlington Northern* set a lower threshold for finding an adverse employment action"); *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 734 (N.D. Ohio 2008) (same); *Ghent v. Moore*, 519 F. Supp. 2d 328, 335 n. 4 (W.D.N.Y. 2007) (noting that in *Burlington Northern*, "the Supreme Court held that a lower standard for 'adverse actions' applies to claims of unlawful retaliation than to claims of unlawful discrimination"); *Khan v. HIP Centralized Lab. Servs., Inc*., No. CV-03-2411, 2007 U.S. Dist. LEXIS 23721, 2007 WL 1011325, at *10 (E.D.N.Y. March 30, 2007) (finding that under *Burlington Northern*,"a lower standard for retaliatory hostile work environment claims may be appropriate."). What remains clear even after *Burlington Northern* is that "[a] plaintiff cannot support . . . a determination [that an action was adverse] unless he can show that an alleged act of  [\*47] retaliation is more than de minimis." *Zelnik*, 464 F.3d at 226. "Indeed, '[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .'" *Id*. (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

**(i) Hostile Work Environment**

Even a cursory glance at a majority of plaintiff's hostile work environment claims demonstrates that they fail to meet the more liberal *Burlington Northern* test. [11] With regard to the offensive internet postings by anonymous co-employees, demeaning pictures found on defendants' server, the complaint of sexual harassment from a non-employee and Carpenter's offensive messages about plaintiff, each action is "individually de minimis and, even together, insufficiently serious to be considered an actionably 'critical mass.'" *Rosenblatt v. City of New York*, No. 05 Civ. 5521, 2007 U.S. Dist. LEXIS 55853, 2007 WL 2197835, at *7 (S.D.N.Y. July 31, 2007). Such actions are thus not materially adverse under the *Burlington Northern* standard and would surely not be considered materially adverse under the old severe or pervasive standard.

_____

[11] Plaintiff  [\*48] fails to argue for the application of the *Burlington Northern* standard. Instead, plaintiff cites to the old standard that would have required him to show that the harassment he suffered was sufficiently severe or pervasive such that it altered the conditions of his employment. *See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Plaintiff is also unable to impute to defendants the harassment that he suffered at the hands of his co-workers either because they were unaware of the incidents or, when informed, because they took appropriate remedial action. *Burlington Northern* did not change the fact that to make out a claim for hostile work environment a plaintiff must also demonstrate "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citing *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir. 1997)). "[W]hen no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that [sic] (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff **[\*49]** employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Pilgrim v. McGraw-Hill Companies, Inc*., 599 F. Supp. 2d 462, 2009 U.S. Dist. LEXIS 17378, 2009 U.S. Dist. LEXIS 17378 (S.D.N.Y. Feb. 18, 2009) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). "An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be sufficiently calculated to end the harassment." *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 266 (E.D.N.Y. 2004) (quotation marks omitted) (quoting *Gonzalez v. Beth Israel Med. Ctr*., 262 F. Supp. 2d 342, 355 (S.D.N.Y. 2003)). The harassment that plaintiff allegedly suffered at the hands of Brtalik cannot be imputed to defendants, who instituted reasonable measures to prevent further mutual harassment between plaintiff and Brtalik, by both changing their shift hours and eventually transferring Brtalik to a new building. *See Rios v. Buffalo and Fort Erie Pub. Bridge Auth*., No. 04-CV-375A, 2008 U.S. Dist. LEXIS 17911, 2008 WL 657121, at *5 (W.D.N.Y. March 7, 2008) ("Where a hostile **[\*50]** work environment is created by non-supervisory co-workers, an employer's liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action" (citing *Petrosino v. Bell Atl*., 385 F.3d 210, 225 (2d Cir. 2004))). Moreover, even plaintiff admits that the offensive cartoon that Brtalik created was taken down by a supervisor, at plaintiff's request.

It is also undisputed that defendants remedied plaintiff's remaining allegations of harassment by: (1) restricting access to websites that referred to plaintiff by abusive names; (2) investigating the source of the demeaning pictures and disciplining the employee on whose computer one of the images was found; (3) investigating the complaint of sexual

harassment, clearing plaintiff of all charges and reinstating him to work; and (4) reprimanding Carpenter for leaving offensive recorded messages referencing plaintiff. *See Rios*, 2008 U.S. Dist. LEXIS 17911, 2008 WL 657121, at *7 (refusing to impute liability on the defendant employer where "the undisputed evidence shows that each time the [employer] learned of inappropriate or offensive conduct by non-supervisory employees, it **[\*51]** acted immediately by sending out memorandums reiterating its anti-harassment policy, conducting investigations to ascertain the perpetrator or perpetrators, and warning employees that such conduct will not be tolerated.").

Plaintiff fails to bring forth any evidence demonstrating that defendants' responses to his complaints were unreasonable. Plaintiff claims that defendants did not respond quickly enough to block access to the Internet sites containing posts about him. According to plaintiff, he informed defendants of the posts in 2003, but defendants did nothing to remedy the situation until February 2004. Plaintiff, however, does not provide the specific date on which he made his complaint. He also fails to allege why it was unreasonable for defendants not to have acted sooner. Without more, plaintiff cannot show that defendants' response was unreasonable. *See* Rios, 2008 U.S. Dist. LEXIS 17911, 2008 WL 657121, at *7 ("It is the plaintiff's burden to prove that the defendant acted unreasonably in responding to complaints of co-worker harassment."). Plaintiff also claims that employees were able to access the content of the offensive Internet posts through "proxy websites," but he never alleges that defendants **[\*52]** were even informed of this problem.

**(ii) Discrete Employment Actions**

Looking at the record in the light most favorable to plaintiff, the only timely actions that remotely constitute discrete employment actions are: (1) the Title IX investigation conducted into allegations that plaintiff walked in on female students while they were dressing; (2) plaintiff being placed on administrative leave during the pendency of the investigation; (3) Shea reprimanding plaintiff for allegedly harassing board members about his work-related problems; and (4) plaintiff changing his work status from a ten-month employee to a twelve-month employee. There is no need to address whether these employment actions are categorized as adverse under the more liberal standard established by *Burlington Northern* since plaintiff cannot establish that they were in any way connected to his complaints.

**(C) Causal Connection**

Plaintiff is unable to raise a genuine issue of material fact as to whether a causal connection existed between his free speech and the alleged materially adverse actions he suffered.

In conclusory fashion, plaintiff alleges that "[d]efendants' conduct, which occurred after Plaintiff's complaints, sufficiently **[*53]** shows a causal connection to Plaintiff's complaints and the adverse employment action." Pl.'s Opp'n at 17. In a retaliation action "[t]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action,, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). The causation element can be established either directly by bringing forth evidence of retaliatory animus or indirectly through circumstantial evidence, such as showing that the protected speech was closely followed by the adverse employment action. *Id.*

**(i) Discrete Employment Actions**

Plaintiff introduces no evidence suggesting that his complaints had anything to do with defendants' discrete employment actions other than that the employment actions took place after his complaints. Such bare allegations are insufficient, especially where the alleged retaliation occurred years later. For example, Shea's November 4, 2004 letter reprimanding plaintiff for harassing board members was sent almost three years after plaintiff's December 8, **[*54]** 2001 complaint against Fasano for engaging in improper conduct, and more than three years after his October 24, 2001 letter to Shea complaining about defendants' violation of civil service law. Similarly, the Title IX investigation was conducted in November 2003, approximately two years after plaintiff's complaints. Such gaps of time are far too long, as a matter of law, to establish a nexus between plaintiff's free speech and defendants' retaliatory action via their proximity to each other. *See Peres v. Oceanside Union Free Sch. Dist.*, No. 05 Civ. 1807, 2008 U.S. Dist. LEXIS 7403, 2008 WL 305342, at *14 (E.D.N.Y. Jan. 31, 2008) (finding that "the passage of over one year between the time of Plaintiff's last complaint and [the adverse employment action] is too long to raise a question of fact on causation."); *see also Ludwiczak v. Hitachi Capital Am. Corp.*, 528 F. Supp. 2d 48, 60 (D. Conn. 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship."). Additionally, the investigation was launched not because of allegations made by any of the defendants but because of allegations **[*55]** made by D'Amore, who plaintiff never alleges was even employed by defendants. Plaintiff attempts to draw a causal connection between his 2001 complaints against Fasano and the 2003 sexual harassment investigation by asserting that D'Amore's lighting director was business partners with Fasano at the time the accusations were made against him. Even assuming the truth of this assertion,

such a tenuous connection provides little support for plaintiff's claim that the allegations were motivated by his complaints against Fasano. Moreover, it fails to create a link to defendants, who had already forced Fasano to retire by August 2002.

**(ii) Hostile Work Environment**

Plaintiff similarly fails to draw a connection between the alleged hostile work environment he suffered and his exercise of free speech. All of the timely harassment allegations occurred between 2003 and 2004, approximately two to three years after plaintiff's complaints about Fasano and the civil service law violations. Plaintiff produces no evidence indicating that the names he was called on the Internet posts in 2003, the inappropriate messages that Carpenter made referencing plaintiff in March 2004 or the demeaning pictures of **[*56]** plaintiff that were placed on the defendants' server sometime in January 2004, had anything to do with his 2001 complaints.

With regard to the harassment he suffered at the hands of Brtalik, the only retaliatory connection drawn by plaintiff is that the abuse began after Brtalik found out about plaintiff's complaints against Fasano. Although "[a] close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation, . . . if temporal proximity alone is the basis for determining a causal connection, it must be *very* close." *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 268 (S.D.N.Y. 2003) (internal citation omitted) (emphasis added). Here, plaintiff fails to even allege the particular time period during which Brtalik found out about his complaints against Fasano.

Additionally, the evidence suggests that plaintiff's problems with Brtalik were personal in nature rather than being retaliation for plaintiff's protected speech. For example, in his September 6, 2002 letter, Brtalik complains that he was unable to tolerate plaintiff because of plaintiff's inappropriate and abusive conduct. *See* Shea Aff. **[*57]** Ex. G. Similarly, Brtalik's April 13, 2004 email to Shea complained of plaintiff's "violent, [and] very intimidating series of outbursts." Shea Aff. Ex. K. Furthermore, Brtalik's offensive cartoon does not appear to have been inspired in any way by plaintiff's alleged exercise of free speech. Instead, it appears to be a continuation in the series of mutually abusive actions between co-workers.

**(3)**

**Untimely Retaliation Claims**

2009 U.S. Dist. LEXIS 27392, *57

Even looking at plaintiff's time barred claims, it is clear that defendants consistently investigated plaintiff's complaints and took remedial action at every step, further demonstrating that the harassment plaintiff suffered was not the result of a policy of tolerating retaliation. [12] For example: (1) when Fasano instituted new work rules, defendants met with plaintiff to discuss his objections to the rules and reached certain compromises; (2) when plaintiff complained about Fasano's inappropriate work behavior, defendants met with plaintiff and later conducted a full investigation, which resulted in Fasano's early retirement; and (3) when plaintiff complained about Carpenter receiving the Acting Lead IMC Technician position over him, defendants met with plaintiff [*58] to discuss the status of the position. Plaintiff claims that during a December 18, 2001 meeting following his comments about not being able to work with Carpenter and Fasano, Aldrich asked that plaintiff resign. Although, as stated earlier, this claim is time barred, such a statement, assuming it was even made, cannot be deemed a materially adverse action where plaintiff never followed through with resigning. *See Pugni v. Reader's Digest Ass'n, Inc.*, No. 05 Civ. 8026, 2007 U.S. Dist. LEXIS 26284, 2007 WL 1087183, at *23 (S.D.N.Y. April 9, 2007) ("Under [the *Burlington Northern*] standard, it is clear that [a supervisor's] alleged 'threat' that plaintiff's days at Reader's Digest are numbered did not constitute a materially adverse action. The alleged threat, assuming it happened, was never carried out."). Moreover, shortly thereafter, defendants reassigned plaintiff to a new supervisor, where he no longer had to interact with either Fasano or Carpenter, as plaintiff had requested. Plaintiff presents no evidence demonstrating an issue of material fact as to whether any actions or statements made by defendants during the course of their dealings with him had anything to do with his various complaints. Accordingly, [*59] plaintiff's First Amendment retaliation claim is dismissed. [13]

_____

[12] Untimely incidents of harassment may be relevant in understanding and analyzing plaintiff's timely retaliation claims. *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 176-77 (2d Cir. 2005) (stating that "relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act.").

[13] A municipality can be held liable as a "person" under Section 1983 if "the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom." *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) (citing *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). In the present action, plaintiff merely asserts in conclusory fashion that "[he] has sufficiently alleged in the Complaint a claim for a 'Custom, Practice or Policy' violation under § 1983." Pl.'s Opp'n at 19. Plaintiff offers no evidence nor does he point to any specific facts demonstrating that the harassment he

(4)

**State Law Claims**

If a district court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102-03 (2d Cir. 1998). Plaintiff's claims for negligent infliction of emotional distress, violations of civil service law and violations of NYCHRL and NYSHRL all arise under state law. Consequently, because plaintiff's Section 1983 claim does not survive summary judgment, these state law claims are dismissed without prejudice.

**Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is granted on plaintiff's federal claim. Plaintiff's state law claims are dismissed without prejudice. The Clerk of the Court is directed to close this case.

Dated: Brooklyn, New York

March 30, 2009

SO ORDERED:

/s/

David G. Trager

United [*61] States District Judge

_____

suffered was implemented pursuant to School District policy or custom. In contrast, the School District [*60] seems to have done everything in its power to address each and every grievance made by plaintiff. Accordingly, even if plaintiff was retaliated against by his co-workers and former supervisor as a result of his complaints, the School District cannot be found vicariously liable for such actions.

 Positive
As of: June 17, 2020 5:07 PM Z

# Infante v. Ambac Fin. Group

United States District Court for the Southern District of New York

January 5, 2006, Decided

03 CV 8880 (KMW)

**Reporter**
2006 U.S. Dist. LEXIS 4310 *; 87 Empl. Prac. Dec. (CCH) P42,241

Maria Infante, Plaintiff, -v- Ambac Financial Group, Defendant.

**Subsequent History:** Affirmed by Infante v. Ambac Fin. Group, 2007 U.S. App. LEXIS 29099 (2d Cir. N.Y., Dec. 14, 2007)

anyone at the employer was discriminating against her either on the basis of her recent pregnancy or on the basis of any assumptions about how women with children structure their lives. The questions asked of the employee were perfectly reasonable inquiries into her plans and current professional goals, particularly given her repeated extensions of leave and on their own show no presumption by the employer's employees about how the employee or women or mothers in general would or should behave.

## Case Summary

**Procedural Posture**
Plaintiff former employee filed suit against defendant former employer alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq., and the New York City Human Rights Law, New York City, N.Y., Admin. Code § 8-102 et seq. The employer moved for summary judgment.

**Overview**
After taking a leave of absence for first a pregnancy and then for an allegedly pregnancy-related medical condition, the employee was not restored to her pre-leave position. The court found that the simple fact that the employer decided to replace the employee after she repeatedly extended her leave (well past her original maternity leave, and into a leave period covered by the short term disability provisions of the Family Medical Leave Act) did not give rise to an inference that the employer's decision was on the basis of the employee's pregnancy. The court also found that the statements offered by the employee were innocuous and did not suggest that

**Outcome**
The employer's motion was granted and the case was dismissed.

**Counsel:** [*1] For Maria Infante, Plaintiff: Jeffrey M. Bernbach, Bernbach Law Firm, White Plains, NY.

For AMBAC Financial Group, Defendant: Bettina Barasch Plevan, Proskauer Rose LLP (New York), New York, NY.

**Judges:** Kimba M. Wood, United States District Judge.

**Opinion by:** Kimba M. Wood

## Opinion

WOOD, U.S.D.J.:

### I. Overview

Maria Infante was employed by Ambac Financial Group ("Ambac"). After taking a leave of absence for first a pregnancy and then for an allegedly pregnancy-related medical condition, Infante was not restored to her pre-leave position. She filed suit alleging violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*("Title VII"), the New York State Human Rights Law, the New York Executive Law §§ 296, *et seq.*("NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-102, *et. seq.* Infante argues that Ambac discriminated against her on the basis of gender and pregnancy. Ambac moves for Summary Judgment arguing first that Infante fails to make a *prima facie* case and, in the alternative, that even if she makes a *prima facie* case of discrimination that she fails to **[*2]** provide any evidence to rebut Ambac's asserted non-discriminatory reasons for acting as it did. Because the Court agrees that Infante has failed to make a *prima facie*case of discrimination, the motion for summary judgment is granted and the case is hereby dismissed. [1]

### II. The Legal   **[*3]**    Standard

To prevail on a motion for summary judgment, the moving party must demonstrate that there are no genuine issues of material fact to be tried, and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Citizens Bank v. Hunt,* 927 F.2d 707, 710 (2d Cir. 1991). The moving party "bears the initial responsibility of informing the district court of the basis for its motion"; that responsibility includes identifying the materials in the record that the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.,*477 U.S. at 323. Once a motion for summary judgment is made and supported, the non-moving party must set forth specific facts to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is genuine if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003).

### II. Background  [2]  **[*4]**

In 1988, Maria Infante was hired as an administrative assistant by Ambac, a financial services company. Approximately two years later, she assumed the position of staff accountant. In 1996, Infante took maternity leave, which she extended by one month. She was restored to the same position of staff accountant upon her return.

Four years later, Infante was promoted to the position of Assistant Vice President. Infante informed her supervisors in early 2002 that she was pregnant, and took maternity leave beginning June 12, 2002. Ambac's maternity leave policy entitled Infante to twelve-weeks paid leave, plus an additional two weeks because Infante delivered her child by cesarean section. At the end of this leave period, Infante, on the advice of her doctors, extended her leave until October 7, 2002. Then, **[*5]** she further extended it to the end of October, and then later to December 2, 2002. Infante, by November, was under her primary physician's care for treatment of her hyperthyroidism--a condition she had long had, that was aggravated by her pregnancy. October 14, 2004 Dec. of Alex Racco PP 2-6. The employers at Ambac were unaware that Infante's condition was due to her pregnancy.

Until November, Ambac had held Infante's position for her. However, sometime in November, Ambac managers and Human Resources personnel began to seek a new permanent employee to fill Infante's position (under Infante's former title of staff accountant). Infante was scheduled to return December 2, 2002, but pursuant to her doctor's advice, Infante did not return. On December 4, 2002, an Ambac human resources employee informed Infante that Ambac was seeking a new staff accountant.

By mid-December, Ambac offered the position of staff accountant to an external, female (and not pregnant) candidate who accepted. She was scheduled to begin December 30, 2002, but sometime in December withdrew her acceptance. Ambac decided to re-open the interviewing process.

On December 11, 2002, Infante informed Ambac that she **[*6]** would be cleared to return to work on December 19, 2002, a date beyond the job protection period provided by the Family Medical Leave Act. But pursuant to Ambac's short

---

[1]Claims brought under the NYSHRL and the NYCHRL share the same standard of proof as Title VII claims. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296. This opinion addresses Infante's claims in the context of the federal law, but for the reasons stated the state claims fail and are also dismissed. *See Quaratino v. Tiffany and Co.,* 71 F.3d 58, 63-64 (2d Cir. 1995); *see also Weinstock v. Columbia Univ.,* 224 F.3d 33, 40, 50 (2d Cir. 2000) (analyzing claims under same standard and dismissing all).

[2]The following recitation is taken from the parties' 56.1 Statements, unless otherwise noted; where the parties accounts differ, the Court assumes for the purposes of this motion that Infante's version of facts is true.

term disability policy, employees on medical leave are reinstated to their former positions upon return, assuming those positions have not been filled.

Instead, Ambac offered to interview Infante for an Operations Specialist position. Infante rescheduled the interview, she says, because she had a conflicting commitment to attend a closing for the refinancing of her house. Infante also arrived late at the (rescheduled) interview, but she claims it was by only a few minutes and that she had called ahead to say she was stuck in traffic.

Ambac claims that the rescheduling, the tardiness, and Infante's failure to give a straight answer as to why she was interested in the job evinced a lack of enthusiasm and lead Ambac to not offer her the Operations Specialist position. Ambac instead hired a male candidate with a bachelor's degree in economics who, Ambac says, presented himself as a stronger candidate in the interview process. Infante lacks any formal accounting training, but says that she spoke with enthusiasm about **[*7]** the job and interviewed well. Ambac maintains that the male candidate was hired because of his superior interview and because he had formal accounting training, but Infante counters that his job experience was very limited, especially compared to her long history at the company.

Infante then interviewed for the Staff Accountant position. The Staff Accountant position was a job Infante had held previously, and, by Infante's account, was essentially the Assistant Vice President of Finance position she had held just before commencing her maternity leave, but with some reduced responsibilities. Infante maintains that she served in those positions with distinction; Ambac claims she was less than stellar. Reviews of her performance for 1997-1999 were strong. She was described as "exceptional", hard-working and committed. Additionally, Infante's supervisor noted that, although Infante did "not have much formal training in insurance accounting," she developed skills "through on-the-job training." Plaintiff's 56.1 Statement at P 76-77.

It is undisputed that in December 2001, a review of Infante by her superiors described her overall performance as "Exceeds/Meets Expectations"--the second **[*8]** highest rating possible out of four rating levels. However, the review described her work as "Acceptable Performance/Developmental Opportunity"--the second lowest level--in half of the specific categories. In their depositions, Infante's supervisors testified that reviews of employees always noted areas for improvement. Also, Infante claims that the several enumerated complaints in her review--including that she needed to develop her analytical skills, communication skills, and time management skills--were the

result of problems with another department and general disruptions due to the events of September 11th. Finally, Infante notes that she received "Exceeds/Meets Expectations" in all the areas of responsibility of the Staff Accountant position (and that her only low marks were in responsibilities unique to the vice president position).

Infante interviewed for this staff accountant position. During the interview, Infante was asked "How does this fit into the mix of you now being a mother of two living in New Jersey, is this really what you want to do? How does that fit into the mix?" Plaintiff's 56.1 Statement P 301. She was also asked "with [your] situation now, do [you] **[*9]** want to come back to Ambac, do [you] really want to come back, is this what [you] want?" *Id.* at P 302. During the interview, she was also asked whether she would be willing to work long hours, to which she replied that she had always worked long hours. *Id.* at PP 303-304.

Infante was not given the position. (One supervisor admitted that he did not really intend to hire her back at any point. *Id.* at PP 29, 298-99.) Instead, a male employee was hired. He had a degree in accounting, although his specific educational and work experience was not in insurance accounting (the focus of the position). Ambac maintains that he was more qualified for the position.

This lawsuit ensued.

## IV. Analysis

To determine whether summary judgment is appropriate in a Title VII case such as this, the Court applies the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Fisher v. Vassar College,* 114 F.3d 1332, 1335-36 (2d Cir.1997) ( *en banc*). The three-step framework is as follows: First, a plaintiff must first come forward with facts sufficient to establish a **[*10]** *prima facie* case of discrimination giving rise to an adverse employment action; then, if plaintiff meets this burden, the defendant must articulate, but not prove, a legitimate reason for its conduct; finally, plaintiff must them prove by a preponderance that the defendant's proffered explanation is pretextual and that the actual motivation for the contested employment action was discriminatory. *See Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Ambac argues that Infante fails to offer evidence sufficient to make a *prima facie* case. To establish a *prima facie* case, Infante must show "that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give

rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). The burden to establish a prima facie case of discrimination "is not onerous." *Quaratino*, 71 F.3d at 64. Direct evidence is not required. *Id.* Plaintiff simply must present enough "believable evidence for a jury to find that an adverse **[*11]** employment decision resulted because of discrimination." *Id.*

Ambac urges that Infante fails at two of the elements. First, Ambac believes that Infante cannot establish that she is a member of a protected class. Second, Ambac argues that the circumstances do not give rise to an inference of discrimination. The Court addresses each argument in turn.

### A. Protected Class

Title VII protects individuals from discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Ambac argues that because Infante did not experience an adverse employment action while pregnant, she cannot pursue a claim for pregnancy discrimination. Ambac disputes that Infante's thyroid condition was "related" to her pregnancy. [3] However, because Infante has come forward with evidence to the contrary, summary judgment on this ground is inappropriate. Ambac argues that because it was unaware that Infante's protracted absence was due to pregnancy, there can be no inference that any action it took was due to pregnancy or a condition related to pregnancy. Finally, Ambac claims that because any adverse action against Infante occurred **[*12]** after her being cleared to return to work, as a matter of law she was no longer suffering from any medical condition, pregnancy-related or otherwise.

Ambac's arguments on this point fail. Infante was pregnant, and her supervisors at Ambac knew it. She continued to be a member of a protected class even after her pregnancy ended. The adverse employment action based on Infante's pregnancy need not have occurred during her pregnancy or even during a period in which she suffered from a related medical condition in order to satisfy the first element of a prima facie case. Neither party has pointed the Court to a Second Circuit decision definitively **[*13]** resolving the parameters of what constitutes a protected class for the purposes of a pregnancy-related Title VII suit. The Court therefore looks to other legal authority and finds particularly persuasive the decision in *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d

466 (6th Cir. 2005).

The *Kocak* court was faced with the question of whether a woman, Kocak, who had been pregnant in the past could bring a Title VII suit for an adverse employment action taken after her pregnancy. The court reasoned as follows:

> Kocak was not pregnant at the time of her 2001 application; she did not bear any children during the period of her application (in fact, she had not done so for approximately two years); and no medical conditions related to pregnancy manifested themselves during the time of her application. The district court concluded from these facts that Kocak was not protected by the PDA at the time that Community Health did not hire her.
>
> This was error. The Supreme Court has held that the PDA prohibits an employer from discriminating against a woman "because of her capacity to become pregnant." *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S. Ct. 1196, 113 L. Ed. 2d 158 (1991); **[*14]** *see also Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150, 1160 (8th Cir. 2003) ("Plaintiff asserts that she was discriminated against . . . because she is a woman who had been pregnant, had taken a maternity leave, and might become pregnant again. 'Potential pregnancy . . . is a medical condition that is sex-related because only women can become pregnant.'") *(quoting Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 680 (8th Cir. 1996)).

*Id.* at 469-70.

The Court is convinced that *Kocak* represents the soundest interpretation of the statute, which prohibits discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions" and decrees that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k). Certainly such prohibited treatment "on the basis" of, or "because of," pregnancy could occur after the actual pregnancy. There is simply no requirement that discrimination because of pregnancy or related medical conditions occur while the woman is still experiencing those states of being. **[*15]** Infante successfully argues that she is a member of a protected class, and summary judgment on this ground is not appropriate.

In any event, Infante also makes claims that she was discriminated against on the basis of gender. Ambac correctly notes that Infante's general assertions that she was discriminated against on the basis of "motherhood" have no basis in law. However, allegations that Infante was discriminated against on the basis of presumed conformity to

---

[3] Ambac also argues that because the condition was treated by Infante's regular physician, as opposed to her obstetrician, the condition was thus not "related to" her pregnancy. The Court refuses to adopt such a view as a matter of law-although perhaps what doctor treated a given condition could be offered as evidence of whether or not such condition was "related" to pregnancy.

a gender stereotype that she would stay home with her children can be evidence in support of a so-called "sex plus" claim on the basis of gender discrimination under Title VII. *See Back v. Hastings on Hudson Union Free Sch. Dist.,*365 F.3d 107, 119-22 (2d Cir. 2004). Infante clearly meets the requirements to satisfy the first prong of her *prima facie* case.

## B. Circumstances suggesting discrimination

One could argue that this approach of generously construing the parameters of the protected class could allow too many frivolous lawsuits, but the required fourth element of a *prima facie* case still filters out meritless suits:

> [A] plaintiff must do more than show that she belonged [*16] to a protected group and that she suffered adversity at the workplace. Satisfaction of both the first and third elements of the prima facie case, without more, does not satisfy the fourth element. Rather, a plaintiff must provide facts that would allow a reasonable factfinder to conclude that her misfortunes occurred because of her membership in a protected class.

*Coraggio v. Time Magazine Co.,* 1996 U.S. Dist. LEXIS 3770, 1996 WL 139786, at *5 (S.D.N.Y. Mar. 28, 1996). The facts adduced by Infante are simply not enough to give rise to an inference of discrimination based on pregnancy or pregnancy related medical condition. In any event, Ambac has proffered several non-discriminatory reasons for its actions and Infante does not offer sufficient evidence to permit a jury to find by a preponderance that she was discriminated against. *Reeves,* 530 U.S. at 142.

Infante relies perhaps most heavily on the timing of Ambac's various hiring decisions to support her claim of discrimination on the basis of pregnancy or related condition. However, Infante's arguments in this regard are really just supposition upon supposition. She was permitted the full extent of her [*17] maternity leave. Ambac decided to replace her while she was on leave due to her thyroid condition, and it is undisputed that no one knew that leave was due to pregnancy. The simple fact that Ambac decided to replace Infante after she repeatedly extended her leave (well past her original maternity leave, and into a leave period covered by the short term disability provisions of the Family Medical Leave Act) does not give rise to an inference that Ambac's decision was on the basis of Infante's pregnancy. *See Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 82 (2d Cir. 2005) (In age-discrimination context, defendant must have knowledge of plaintiff's age relative to other applicants in order to give rise to inference of discrimination on that ground). Infante can still successfully claim to be a member of a protected class months after the end of her pregnancy. However, the distance of time

between her pregnancy and the adverse action against her diminishes the likelihood that timing alone warrants a finding of discrimination. *See Kocak,* 400 F.3d at 470-71.

Infante argues that Ambac's decision to begin interviewing for her replacement was illogical (and thus [*18] suggests discrimination) because Infante was supposed to return by December 2, and that date was sooner than the date by which Ambac would be able to hire someone new. This interpretation of events is strained-Infante had extended her leave multiple times; her employers at Ambac could have quite logically decided that she was unlikely to return at her next purported return date, and therefore that hiring a replacement who could start soon after that was a prudent course of action. These circumstances fail to give rise to the inference that Ambac began interviewing replacements for her due to her pregnancy. Rather, it is uncontroverted that Ambac began to interview potential replacements for Infante because Infante was absent well-past her maternity leave, and it was in no way contrary to law or company policy for Ambac to find a replacement for an employee on general medical leave.

However, Ambac's intended replacement for Infante fell through before Infante was in fact cleared to work. Infante therefore argues that because Ambac's practice was to return employees returning from medical leave to their prior positions if those positions were still available, the Court should infer [*19] discrimination from Ambac's failure to follow this practice. [4] This argument is Infante's strongest.

Infante cites to *Quarantino v. Tiffany & Co.,* 71 F.3d 58 (1995), for the proposition that "evidence concerning [defendant's] discriminatory animus" can include "the refusal to give [plaintiff] back her former position when she was ready to return [from leave], and on two subsequent occasions, when the position was vacant." *Id.* at 65. Certainly failure to follow policy can be some evidence of discriminatory animus. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 313 (2d Cir. 1998). However, the plaintiff in *Quarantino* adduced far greater evidence of discriminatory animus, including evidence of numerous instances of hostile comments and [*20] treatment from her supervisors, and evidence that the defendant had started interviewing for the plaintiff's permanent replacement before she even left for maternity leave (the fact upon which the Circuit placed the most emphasis).

_____

[4] Infante refers to this practice as "company policy" but she has presented no evidence that Ambac had any such formal policy, or that any other employee in similar circumstances was treated differently than she.

Infante essentially wants the Court to infer from her protected status and an adverse employment action, with nothing else, that she suffered a Title VII violation. This is not enough--she must adduce evidence that raises a question of fact as to whether the employment action was based on impermissible discrimination. The Court cannot infer discrimination based on the first and third elements of a prima facie case alone. *Corraggio,* 1996 U.S. Dist. LEXIS 3770, 1996 WL 139786 at *5; *see also Shumway v. UPS, Inc.,* 118 F.3d 60, 63 (2d Cir. 1997).

Infante also offers several statements by her superiors from which she asks the Court to infer discrimination. "Stereotypical remarks about the incompatibility of motherhood and employment can certainly be evidence that gender played a part in an employment decision." *See Back,* 365 F.3d at 122. However, "to say that the stereotyping here alleged can constitute sex-discrimination is not enough, **[*21]** " the Court "must also determine whether the plaintiff has adduced enough evidence to defeat summary judgment as regards her discrimination claim." *Id.* The statements offered by Infante are innocuous and do not suggest that anyone at Ambac was discriminating against her either on the basis of her recent pregnancy or on the basis of any assumptions about how women with children structure their lives. *See Weinstock,* 224 F.3d at 45.

Infante claims that at her interview, she was asked "How does this fit into the mix of you now being a mother of two and living in New Jersey, is this really what you want to do? How does that fit into the mix?" and "with [your] situation now, do [you] still want to come back to Ambac, do [you] really want to come back, is this really what [you] want?" Plaintiff's Brief in Opposition to Motion for Summary Judgment at 14. These statements do not rise to the level of comments that Courts have viewed as suggestive of discrimination. For example, in *Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107 (2d Cir. 2004), the Circuit reversed a district court conclusion that statements by the plaintiff's employer **[*22]** were innocuous. *Id.* at 117. In *Back,* the plaintiff's supervisors told her "that this was perhaps not the job or the school district for her if she had 'little ones,' and that it was 'not possible for [her] to be a good mother and have this job.'" *Id.* at 115. "The two also allegedly remarked that it would be harder to fire plaintiff if she had tenure, and wondered 'whether [her] apparent commitment to [her] job was an act. They stated that once [she] obtained tenure, [she] would not show the same level of commitment [she] had shown because [she] had little ones at home." *Id.*

The statements here show no assumptions that plaintiff would follow gender stereotypes and abandon her work responsibilities for her children. The questions asked of Infante were perfectly reasonable inquiries into her plans and current professional goals, particularly given her repeated extensions of leave, and on their own show no presumption by Ambac employees about how Infante or women or mothers in general will or should behave. An employer asking an employee who has taken repeated extensions of leave whether she really wants to come back cannot by itself **[*23]** give rise to an inference of discrimination.

*V. Conclusion*

If the facts adduced by Infante were sufficient to present a *prima facie* discrimination case, then any adverse employment action against a woman who had been recently pregnant would suffice to present a *prima facie* case of discrimination. The mission of Title VII is, in part, to assure that pregnant women are not treated any differently than other employees. However, were the Court to conclude that a *prima facie* case lay here, the Court would be essentially holding that pregnant women are entitled to far greater job protection than any other employees. This result is beyond the scope of the statute.

For the foregoing reasons, the Court concludes that summary judgment is appropriate. Defendant's motion is therefore granted and the case is thus dismissed.

SO ORDERED.

Dated: New York, New York

January 5, 2006

Kimba M. Wood

United States District Judge

**End of Document**

 Caution
As of: June 17, 2020 4:54 PM Z

# Loewen v. Grand Rapids Med. Educ. Partners

United States District Court for the Western District of Michigan, Southern Division

April 9, 2012, Decided; April 9, 2012, Filed

Case No. 1:10-CV-1284

**Reporter**
2012 U.S. Dist. LEXIS 49476 *

MARGARET J. LOEWEN, M.D., Plaintiff, v. GRAND RAPIDS MEDICAL EDUCATION PARTNERS, SPECTRUM HEALTH SYSTEM, TRINITY HEALTH CORPORATION, t/d/b/a SAINT MARY'S HEALTH CARE, MICHIGAN STATE UNIVERSITY, MARC SCHLATTER, and JOHN vanSCHAGEN, Defendants.

**Counsel:** **[*1]** For Margaret J. Loewen, M.D., plaintiff: James B. Lieber, Lieber & Hammer PC, Pittsburgh, PA; Stephen R. Drew, Drew Cooper & Anding, Grand Rapids, MI.

For Grand Rapids Medical Education Partners, a corporation, Spectrum Health System, a corporation, Marc Schlatter, an individual, John vanSchagen, an individual, defendants: Gary A. Chamberlin, Sara Grey Lachman, Thomas R. Wurst, Miller Johnson PLC (Grand Rapids), Grand Rapids, MI.

For Trinity Health Corporation, a corporation doing business as Saint Mary's Health Care, defendant: Cathrine F. Wenger, Trinity Health Services, Farmington Hills, MI; Daniel J. Bretz, Jeffrey Allan Steele, Clark Hill PLC (Detroit), Detroit, MI.

For Michigan State University, a corporation, defendant: Theresa Kelley, Office of the General Counsel, Michigan State University, East Lansing, MI.

**Judges:** HON. GORDON J. QUIST, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GORDON J. QUIST

# Opinion

## Table of Contents

Go to table1

## OPINION

Plaintiff, **[*2]** Margaret J. Loewen, M.D., was a medical resident in the Grand Rapids Medical Education Partners' (GRMEP) general surgery program between 2005 and 2009. GRMEP terminated her from the program. Loewen has sued GRMEP, as well as Spectrum Health System (Spectrum), Trinity Health Corporation, d/b/a St. Mary's Health Care (St. Mary's), Michigan State University (MSU), Marc Schlatter, and John vanSchagen. In her Amended Complaint, Loewen alleges claims for sex discrimination under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.*, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2101, *et seq.* (Counts I, II, and XV); age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.*, and ELCRA (Counts III and IV); hostile work environment on the basis of sex under Title IX, Title VII, and ELCRA (Counts V and XVI); hostile work environment on the basis of age under the ADEA and ELCRA (Count VI); retaliation in violation of Title IX, Title VII, and ELCRA (Counts VII-IX and XVII); breach of contract (Counts X-XIII); **[*3]** and unjust enrichment (Count XIV). [1]

---

[1] The Court has previously dismissed Loewen's unjust enrichment claim against GRMEP. (Dkt m no. 28.)

2012 U.S. Dist. LEXIS 49476, *3

Defendants MSU, and St. Mary's and Spectrum, jointly, move for dismissal of, or for summary judgment on, all of Loewen's claims against them. For the foregoing reasons, the Court will grant summary judgment to MSU, St. Mary's and Spectrum on all of Loewen's claims against them.

## I. BACKGROUND

### A. GRMEP's Organization and Programs

GRMEP is a member-based Michigan nonprofit educational corporation located in Grand Rapids, Michigan, that sponsors and operates various post-graduate resident medical training programs, as well as training programs for medical and other healthcare-related students. [2] (1st Am. Compl. ¶ 3.) GRMEP conducts its programs in collaboration with two acute care hospitals, Spectrum and St. Mary's (the Hospitals), and two degree-granting academic institutions, MSU's College of Human Medicine and Grand Valley State University (the Universities).

In 2003, GRMEP, the Hospitals, and the Universities entered into an Operating Agreement governing the operation of GRMEP's residency and other training programs. (Def. MSU's Br. Supp. Mot. Ex. 1.) The Operating Agreement specifies the roles and responsibilities of each of the participants. With regard to the residency program, the Operating Agreement provides, in part:

> [GRMEP] shall serve as the sponsor of the Programs for the Residents (the "Residency Programs") and shall employ the Residents. [GRMEP] will have overall responsibility for the recruitment, selection, employment and orientation of the Residents. [GRMEP] will supervise and evaluate the overall performance of the Residents and develop and maintain a curriculum for each Program that meets the requirements for the appropriate accreditation agencies.

(Id. § 2.1(a); Rogers Dep. at 119-20; Hern Aff. ¶ 4.) GRMEP is also responsible for scheduling rotations; providing health, dental, and workers compensation insurance to the residents; and withholding income and social security taxes from payments to residents. (Id. § 2.1(e)-(g); Loewen Dep. [*5] at 37, 39-40, 101-02.) GRMEP is responsible for disciplining any resident or student who violates a University or Hospital policy or rule. (2003 Operating Agreement § 3.1.)

The Hospitals provide funding, as well as infrastructure and certain services to GRMEP's hospital-based employees, including office space and furniture, on-site parking, access to the computer system, and access to the cafeterias at employee rates. (Id. § 2.2(a), (b).) The Hospitals are the major sources of funding for GRMEP, (Baumgartner Dep. at 14; Rogers Dep. at 40), although the Hospitals are not GRMEP's exclusive sources of funds. (GRMEP Budget, Spectrum Health's Supplemental Br. Ex. 15.) The Hospitals also accept, subject to their approval for qualifications, residents, medical students, and health professions students for placement and training. (Id. § 2.2(d).)

For their part, the Universities provide funding for the non-resident programs and, upon request, services and infrastructure. (Id. § 2.3(a), (b); Sousa Aff. ¶ 7.) Until July 2009, MSU made an annual $1 million contribution to GRMEP to pay for GRMEP's support of MSU's College of Human Medicine (CHM) medical students in Grand Rapids, who are not part [*6] of GRMEP's residency programs. [3] (Sousa Dep. at 40-41.) MSU serves as the "affiliated institution" for the residency programs, meaning that the educational departments of GRMEP and MSU work together to implement GRMEP's educational and training programs. (2003 Operating Agreement § 2.3(c).)

Pursuant to the Operating Agreement, GRMEP enters into annual Resident Agreements with graduate students participating in one of GRMEP's residency programs. (Defs. Spectrum and St. Mary's Br. Supp. Mot. Ex. 3.) The Resident Agreement sets forth the resident's and GRMEP's respective obligations and addresses related issues, such as the compensation and benefits GRMEP is obligated to provide. Finally, the Resident Agreement provides the procedures for termination of the residency, which allow GRMEP to terminate the residency [*7] "with or without cause by providing Resident written notice of termination." (Id. ¶ 6(b).)

A new Operating Agreement was signed in 2009, to which only GRMEP and the Hospitals are parties. The 2009 Operating Agreement is similar to the 2003 Operating Agreement, with the exception that the Universities are *ex officio* nonvoting members of GRMEP.

---

[2] GRMEP is the successor to the Grand Rapids Area Medical Education Consortium, Inc., d/b/a Grand Rapids Medical Education & Research Center for Health Professions. (1st Am. Compl. ¶ 3.) For purposes [*4] of the instant motions, the Court will refer to both GRMEP and its predecessor as GRMEP.

---

[3] As of July 2009, MSU no longer makes a yearly contribution to GRMEP. Instead, as a result of the expansion of CHM into Grand Rapids, CHM has assumed most of the responsibilities associated with its medical student programs. (Sousa Dep. at 15-20.) MSU does continue to receive some services from GRMEP, but it separately contracts with GRMEP directly for the specific services. (Id.)

## B. Loewen's Allegations Regarding Her Residency

While in her forties, Loewen decided to pursue her lifelong ambition of becoming a physician. After completing her undergraduate studies and medical school, Loewen accepted a residency position with GRMEP in the general surgery program. (1st Am. Compl. ¶ 20.) At the time, Loewen was 50 years old. (*Id.*) As part of her residency, Loewen signed a Resident Agreement with GRMEP. Loewen was supervised by Defendant Dr. Marc Schlatter, GRMEP's Program Director for General Surgery Residence Program. (*Id.* ¶ 48.)

Loewen alleges that she successfully completed the first three years of the five-year program, although during that time she was subjected to gender and sex-related harassment, discrimination, and abuse from her superiors and colleagues. (*Id.* ¶¶ 22-24.) Loewen further alleges that she received less desirable [*8] assignments, was given less support, and was required to work more hours than younger and/or male residents. (*Id.* ¶¶ 36, 38, 40.) Dr. Schlatter required Loewen to work an excessive number of hours, and in April 2009, he placed Dr. Loewen on a short term evaluation plan due to negative clinical evaluations and poor exam scores. (*Id.* ¶¶ 52, 53.)

In May 2009, toward the end of her fourth year, GRMEP informed Loewen that she would have to repeat her fourth year as part of a remediation program. (*Id.* ¶ 59.) On November 19, 2009, just four months into her twelve-month contract, Dr. Schlatter and Dr. Sherman, the Assistant Program Director for the General Surgery Program, notified Loewen that she was being dismissed from the general surgery program. (*Id.* ¶ 69.) Loewen alleges that younger male residents who were also required to repeat their fourth years in remediation were treated more favorably, as they were allowed to finish their repeat fourth years while Loewen was not. (*Id.* ¶ 68.)

Loewen claims that in the process of terminating her, GRMEP failed to comply with various provisions of the Resident Agreement. (*Id.* ¶¶ 84-90.) Loewen filed a grievance with GRMEP regarding her dismissal in [*9] February 2010, (Loewen Dep. at 174), and attempted to transfer to the family practice residency program. A short time later, Loewen filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and served it on GRMEP, MSU, Spectrum, and St. Mary's. Following a hearing, GRMEP denied Loewen's grievance, but she claims that GRMEP failed to afford her due process in connection with the hearing. (1st Am. Compl. ¶¶ 98, 103-111.) After GRMEP denied Loewen's grievance, Dr. John vanSchagen denied Loewen's request to transfer to the family practice program.

Thereafter, Loewen filed another charge with the EEOC alleging that the denial of due process at the grievance hearing and the rejection of her transfer request were retaliatory acts. (*Id.* ¶ 125.)

## C. Procedural History

On March 7, 2011, MSU filed a motion to dismiss or, in the alternative, motion for summary judgment. MSU argued, among other things, that it was not Loewen's employer and thus cannot be held liable on Loewen's claims under Title VII, the ADEA, and ELCRA. The same day, the Hospitals filed a joint motion to dismiss and for summary judgment in which they too argued that they were not Loewen's employers. [*10] Although Loewen essentially conceded that MSU and the Hospitals were not her formal employer, she argued in her responses to the motions that MSU and the hospitals can be held liable under the "joint employer" doctrine. The Court heard oral argument on the motions on May 18, 2011. Although Loewen did not allege a joint employer theory of liability against MSU and the Hospitals in her First Amended Complaint, the Court deferred ruling on the motions to allow Loewen to conduct discovery on her assertion that MSU and the Hospitals were joint employers with GRMEP, in addition to other issues pertaining to her claims against those Defendants, and granted the parties an opportunity to file supplemental briefs. The parties have now completed their discovery on those issues and have filed supplemental briefs.

## II. Motion Standard[4]

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any [*11] material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin.*

---

[4] Although MSU and the Hospitals moved for dismissal pursuant to Rule 12(b)(6) and for summary judgment under Rule 56, the Court treats the motions as motions for summary judgment because the parties rely on evidentiary materials outside of the pleadings. Fed. R. Civ. P. 12(d).

*Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

## III. DISCUSSION

### A. Title VII, ADEA and Elliott-Larsen

Generally, a defendant may be held liable under Title VII, the ADEA, and ELCRA only if the defendant was the plaintiff's employer. *See* 42 U.S.C. § 2000e-2(a) (Title VII); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 795 (6th Cir. 2000) (noting that "Congress chose to limit Title VII liability to employers only"); 29 U.S.C. § 623(a) (ADEA); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994) **[*12]** ("Section 630(b) restricts the application of the ADEA to those 'employers' who employ twenty or more workers."); M.C.L.A. § 37.2202(1) (ELCRA). A defendant that does not directly employ a plaintiff may still be held liable under the "joint employer" or "single employer" doctrines. *See, e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). Regarding the joint employer doctrine, the Sixth has observed that:

> The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment.

*Id.* at 993 n.4 (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982)). The joint employer doctrine "applies when separate legal entities have 'chosen to handle certain aspects of their employer-employee relationship jointly.'" *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) **[*13]** (quoting *Gore v. RBA Group, Inc.*, No. 03-CV-9442 (KMK) (JCF), 2008 U.S. Dist. LEXIS 25912, 2008 WL 857530, at *3 (S.D.N.Y. Mar. 31, 2008)). Whether two separate entities are joint employers "is a factual question depending largely on such factors as the supervision of the employees' day-today activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions." *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244,

247 (6th Cir. 1988); *see also DiMucci Constr. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994) (same).

The "single employer" doctrine provides for liability where "two nominally independent entities are so interrelated" that all of the employees of one entity are attributed to the other. *Swallows*, 128 F.3d at 993 n.4. In contrast, the joint employer doctrine applies only to those employees over whom the separate businesses maintain sufficient control. *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011). In determining whether two entities constitute a single employer, the Sixth Circuit applies the Supreme Court's four-part test from *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 85 S. Ct. 876, 13 L. Ed. 2d 789 (1965). **[*14]** *See Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983), *abrogated on other grounds by Arbaugh v. Y & H Corp*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). Under this test, courts must consider "the degree of (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Armbruster*, 711 F.2d at 1337 (citation and footnote omitted). No single factor is "conclusive" and "[a]ll four criteria need not be present in all cases." *Id.* at 1338. However, "control over labor relations is a central concern." *Swallows*, 128 F.3d at 994.

### 1. MSU

In her response to MSU's motion, Loewen argued that the following circumstances demonstrate MSU's joint employer status:

1. MSU is "jointly engaged" with GRMEP and the Hospitals in "residency training programs."
2. The surgery program was called thee "GRMEP/MSU General Surgery Residency Program."
3. Dr. Schlatter is a professor in the Department of Surgery at MSU-CHM, and he is alleged to have been involved in the discriminatory acts.
4. Dr. vanSchagen is a member of MSU's faculty as well as GRMEP's Program Director and is alleged to have retaliated against Loewen.

5. Every surgeon who was faculty in MSU-CHM **[*15]** supervised the residents' day-to-day activities and evaluated their performance.
6. MSU appointed Loewen as a Clinical Instructor Resident in the Department of Surgery and congratulated her on the appointment. MSU also provided Loewen malpractice insurance coverage in connection with her teaching appointment.

(Pl.'s Resp. Def. MSU's Mot. at 9.)

With the benefit of discovery, Loewen continues to rely on MSU faculty appointments -physicians, like herself, who supervised and reviewed her work and other residents' work in their residencies with GRMEP - to show that MSU jointly controlled the terms and conditions of her residency with GRMEP. Neither Loewen's own faculty appointment nor those of the physicians who contracted with GRMEP to teach, supervise, and evaluate Loewen in her residency suffice to render MSU a joint employer.

Loewen was appointed a Clinical Instructor Resident for MSU-CHM's Department of Surgery in 2005. The appointment was a voluntary, non-paid position that enabled Loewen to teach MSU's medical students in Grand Rapids. (Sousa Dep. at 25, 77.) In order to teach MSU medical students, a physician or resident must have an MSU faculty appointment. (*Id.* at 21-22.) An MSU **[\*16]** faculty appointment, such as the appointment Loewen received, entitles the appointee to use MSU resources, such as the library, participate in educational activities, and buy parking. (*Id.* at 77.) MSU has certain rules for faculty members. For example, they must teach CHM's curriculum. (*Id.* at 36-37.) MSU can and does revoke academic titles for egregious behavior by faculty members. (*Id.* at 26.) MSU did not supervise or evaluate Loewen in her role as Clinical Instructor, although CHM medical students do complete evaluations of clinical faculty. (*Id.* at 81-82.) MSU generally reviews the student evaluations only if things are not going well with the faculty member. In such cases, a review is performed to determine if improvements can be made or whether MSU would terminate the faculty appointment. (*Id.* at 82-83.) Thus, the review is intended to ensure that MSU's students are receiving appropriate instruction. MSU has given faculty appointments to approximately 900 physicians in Grand Rapids, most of whom are not associated with GRMEP. (MSU's Answers to Pl.'s 1st Set of Interrog. No. 14.)

Loewen's MSU faculty appointment does not suffice to render MSU her employer. All of Loewen's claims **[\*17]** stem from her treatment and dismissal during her residency, not from her activities as a Clinical Instructor for MSU. Loewen admits, and the record evidence confirms, that GRMEP was responsible for all material terms and conditions of her employment as a resident. Loewen alleges that she accepted a residency program with GRMEP (1st Am. Compl. ¶ 20); she signed a Resident Agreement with GRMEP (*id.* ¶ 82); she was supervised by GRMEP's employees (*id.* ¶¶ 42, 48); GRMEP employees made the decision to dismiss her (*id.* ¶ 69); and GRMEP heard and denied her grievance. (*Id.* ¶¶ 97-104, 108-116.) It is undisputed that MSU was the educational affiliate for GRMEP's residency programs and was not responsible for operating the residency programs or supervising the residents. MSU does not select, pay, or

discipline residents or remove them from their residencies. (Sousa Dep. at 31.) MSU was not involved in terminating Loewen's residency. (Loewen Dep. at 163-64.)

Similarly, the fact that the physicians who supervised and evaluated Loewen had MSU faculty appointments provides no basis for a finding that MSU had any control over the terms or conditions of Loewen's residency. The physicians who supervised **[\*18]** and evaluated Loewen and other residents did so not because of their MSU faculty appointments, but because of their agreements with GRMEP. (Rogers Dep. at 14-15 (noting that some physicians at Spectrum have interactions with GRMEP which arise out of their agreements with GRMEP); Sousa Dep. at 62 (noting that faculty evaluations of residents refers to faculty who work in the residency program and have an agreement with GRMEP).) In short, Loewen fails to show that MSU supervised her day-to-day activities as a resident, had authority to hire and fire residents, promulgated work rules for residents, or did anything else that affected Loewen's work as a resident. In that regard, the instant case is distinguishable on its facts from *EEOC v. Regency Windsor Management Co.*, 862 F. Supp. 189 (W.D. Mich. 1994), and other cases Loewen cites. In *Regency Windsor Management*, the court denied a defendant's motion for summary judgment because the two defendants "shared authority to control the compensation, terms, conditions and privileges of employment for workers at the apartment complex," creating an issue of fact. *Id.* at 191. There is no similar evidence in the instant case. Thus, MSU was not **[\*19]** Loewen's employer in any respect.

## 2. The Hospitals

In response to the Hospitals' motion, Loewen argues that the following circumstances render the Hospitals joint employers [5]:

> 1. The 2009 Operating Agreement states that "[GRMEP] is a membership-based nonprofit corporation" and its members include St. Mary's, Spectrum, and MSU.
> 2. The Operating Agreement states that St. Mary's, Spectrum, and MSU are "jointly engaged in certain Accreditation Council for Graduate Medical Education ("ACGME") residency training programs that [GRMEP] sponsors and other training programs for medical school and other health professions students ('Programs')."
>
> 3. Although he had the authority to hire, fire, and discipline residents, Dr. Schlatter was required to obtain

---

[5] These are only a summary of the numerous factors Loewen cited in her response, but the Court believes they fairly represent all of the relevant circumstances Loewen cited as supporting her argument.

the approval of the Surgical Education Committee, which consisted of all of the surgeons that taught in the general surgery residence program. Members of that committee, including Dr. Carlos Rodriguez and Dr. Jay LaBine, had part-time contracts with Spectrum and St. Mary's. Both of these members would have been consulted on the termination decision. In her affidavit, Loewen states that at the November 19, 2009, termination meeting, Dr. Schlatter told [*20] her that the surgical committee had approved the termination decision the preceding day. (Loewen Decl. ¶ 6.)

4. GRMEP's Associate Program Director, Dr. Stanley Sherman, is an Associate Clinical Professor at MSU, is associated/employed by St. Mary's Health Care, and was involved in the termination decision as well as the hostile environment.

5. GRMEP's Board of Directors, which is made up of employees of MSU, St. Mary's, and Spectrum, "determined compensation and employee benefits . . . for Residents."

(Pl.'s Resp. St. Mary's/Spectrum's Mot. at 5-6.)

As previously discussed, it is undisputed that GRMEP, not MSU or the Hospitals, was responsible for all of the material terms and conditions of the residents' employment. Loewen's joint employer argument essentially hinges on the fact that the GRMEP physicians who supervised and reviewed her work were employees of, or were affiliated in some way, with the Hospitals. But this line of argument fails for several reasons. First, the Hospitals have submitted [*21] evidence refuting Loewen's unsupported assertions that various physician-faculty at GRMEP, such as Drs. Schlatter, Sherman, Rodriguez, and LaBine, were employed either by Spectrum or St. Mary's. (Karel Decl. ¶¶ 3-4; Spectrum's Supplemental Information in Lieu of Dr. Ralph Rogers' Dep. Testimony.) Second, regardless of the physicians' employment by, or affiliation with, the Hospitals, Loewen's argument ignores the well-recognized legal principal that individuals may act in multiple capacities. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6, 106 S. Ct. 1326, 1332 n.6, 89 L. Ed. 2d 501 (1986) ("Acts performed by the same person in two different capacities are generally treated as the transactions of two different legal personages." (internal quotation marks omitted)). As the Court has already recognized, regardless of any relationship or affiliation that physicians may have had with the Hospitals, the physicians who supervised and evaluated Loewen in her residency did so on behalf of GRMEP through their agreements with GRMEP. Finally, as Loewen recognizes, all of the physicians who were involved in any adverse action against Loewen did so on behalf of GRMEP. In other words, Loewen has [*22] presented no evidence that Drs. Schlatter or Sherman, or any other faculty member, purported to act on behalf of any entity other than GRMEP when interacting with Loewen during her residency.

In her second brief following discovery, Loewen suggests that the Hospitals affected Loewen's employment relationship because the Hospitals pay the salaries of residents and the physicians who train and supervise them, and GRMEP's Board, which is comprised mostly of representatives of St. Mary's and Spectrum, determines the amount of residents' compensation and benefits. But this assertion is contrary to the record. Although the Hospitals contribute the major portion of the funding for GRMEP's residency programs, they do not pay the residents' and physician-faculty salaries. Rather, GRMEP pays the residents and the salaries. (Rogers Dep. at 40, 121; Hern Aff. ¶ 6.) Moreover, GRMEP's Board sets GRMEP's budget, but it does not set resident and faculty salaries. (Baumgartner Dep. at 98, 142.)

Loewen also argues that the Hospitals treated her like an employee in many ways, such as by controlling her daily start time, directing her to use Hospital scrubs, providing her on-site parking, and requiring [*23] her to sign confidentiality agreements in order to access confidential materials. Loewen testified, contrary to her assertion, that GRMEP's Chief Residents and Program Director set her work schedule. (Loewen Dep. at 101-02.) Moreover, the other circumstances Loewen cites do not reflect an employment relationship; those circumstances reflect the Hospitals' application of general rules and policies applicable not only to Hospital employees but to all who use or access the Hospitals' facilities. Similarly, Loewen contends that pursuant to the Operating Agreement, the Hospitals had the authority to reject residents if their performance was not up to the Hospitals' standards or if residents failed to comply with the Hospitals' policies. However, Dr. Rogers, Spectrum's Vice President of Medical Affairs, testified that the Hospitals had authority to reject a resident for health-related issues, such as lack of proof of TB testing, immunization, and the like—a policy that applies to all health professionals and vendors. (Rogers Dep. at 31-32, 123.) Rogers also said that residents could be removed for an incident involving "harm or potential harm to a patient or employees," (*id.* at 33-34), but [*24] again, that policy is not limited to residents. (*Id.* at 124.) Moreover, GRMEP, not the Hospitals, was responsible for screening residents and ensuring they had they were properly credentialed. (*Id.* at 32.)

Loewen also cites instances when residents reported that they were Hospital employees or when plaintiffs sued Spectrum or St. Mary's for malpractice involving a resident. Such evidence does not support Loewen's argument. The email Loewen cites from GRMEP's Human Resources Representative states that Program Coordinators should remind residents that "they are [GRMEP] Employees." (Email of 7/3/07 from Ferguson to

Program Coordinators.) Likewise, third party characterizations in unrelated lawsuits are irrelevant, and Loewen fails to show that the Hospitals ever conceded in those cases that the residents were Spectrum or St. Mary's employees. In short, Loewen cannot show that the Hospitals were joint employers.

In her second response to the Hospitals' motion following discovery, Loewen claimed, for the first time, that the Hospitals may be deemed employers under a single employer theory. Loewen did not raise her single employer theory in her second response to MSU's motion. Thus, the Court [*25] considers only whether the Hospitals and GRMEP constitute a single enterprise. Such a conclusion is warranted only if Loewen can show that the Hospitals "exercise[] a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity." *Armbruster*, 711 F.2d at 1338. Application of the four factors set forth above shows that Loewen cannot meet this burden.

**(a)** *interrelated operations*

In considering whether the operations of two entities are interrelated, courts look for indicia of shared operations, such as "'combined accounting records, bank accounts, lines of credit, payroll preparation, telephone numbers or offices.'" *Sears v. Magnolia Plumbing, Inc.*, 778 F. Supp. 2d 80, 83 (D.D.C. 2011) (quoting *Woodland v. Viacom, Inc.*, 569 F. Supp. 2d 83, 87 (D.D.C. 2008)); *see also Armbruster*, 711 F.2d at 1338 (noting that the parent corporation handled the subsidiary's accounts receivable, payroll and cash accounting, monitored its sales shipments, provided administrative backup, and the subsidiary's bank accounts were located at the parent's headquarters); *Wali v. Chelsea Plastics*, No. 07 Civ. 7549 (DAB) (THK), 2010 U.S. Dist. LEXIS 67829, 2010 WL 2710763, at *5 (S.D.N.Y. June 8, 2010) [*26] (related companies that made different products and sold them to different customers, operated in different office space and autonomously with their own employees, bank accounts, equipment, etc., purchased and used their own materials, and paid their own employees separately were not a single employer for purposes of Title VII). In this case, it is undisputed that GRMEP: (1) is a separate entity from the Hospitals; (2) has its own corporate offices located away from the Hospitals; (3) has its own bank accounts and keeps its own business and financial records; (4) has its own corporate executives; and (5) handles all of the employment and related administrative functions for residents without assistance or support from the Hospitals. (Hern. Aff. ¶¶ 3, 4, and 6.)

Loewen offers no evidence showing that the Hospitals

perform any operational functions for GRMEP. Instead, she notes that the one or both of the Hospitals: (1) are the major participating institutions and provide substantial resources for the residency program; (2) pay all of GRMEP's expenses (an erroneous claim, as noted above); (3) solicit and receive funding for the residency programs; (4) provide professional liability insurance [*27] for the residents; (5) charge third-party payers for professional services rendered by the residents (an inaccurate claim, as only the attending physician's services are billed (Rogers Dep. at 26-27)); and (6) provided GRMEP's General Surgery Program Director and Program Coordinator offices and email addresses. [6] Loewen also notes that Dr. Schlatter used letterhead containing the names Spectrum, St. Mary's, and MSU. Rather than showing an interrelation of operations, i.e., one entity performing operational services for the other, Loewen's evidence illustrates the collaborative nature of the residency program. In fact, Loewen's evidence simply shows that the parties acted according to the Operating Agreement, each performing its respective obligations. After all, hospital facilities would seem to be a desirable, if not necessary, aspect of a surgical residency.

**(b)** *common management*

Loewen contends that the common management factor weighs in favor of a single employer because the voting members of GRMEP control the Board and make all of the key decisions. Loewen notes that over the years, the Hospitals' representatives have acted as Board Chair, and as of 2009, the Hospitals have complete control of the Board. While this is some evidence of common management, "[t]his type of arrangement is not always enough by itself to meet the second factor." *Sanford*, 449 F. App'x at 494-95 (noting that the plaintiff's evidence that two church pastors served as the chairman and president of the board of directors for the plaintiff's employer was "some evidence of common management"). But Loewen's evidence shows nothing more than the extent of control normally exercised by a board of directors. *Armbruster*, 711 F.2d at 1338. It is undisputed that GRMEP had its own executives who ran GRMEP's day-to-day operations without interference from the Board. This limited involvement does not transform the Hospitals and

_____

[6] Spectrum provided offices to GRMEP's Program Director and Program Coordinator for the General Surgery Resident Program as a matter of convenience, since residents often perform surgery in the hospital's facilities and GRMEP's offices are located approximately a mile away. (Maas Aff. ¶ 2.) Spectrum also provides office space for [*28] others, including independent contractors and vendors. (*Id.* ¶ 2.)

GRMEP into a single employer. *See Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 646 (7th Cir. 2008) **[\*29]** (rejecting the plaintiff's suggestion that two municipalities were joint employers because municipal leaders sat on the board of directors of a jointly-created non-profit entity, and noting that such "fact alone cannot suffice to justify the extension of joint-employer liability"); *EEOC v. Con-Way, Inc.*, No. CV 06-1337-MO, 2007 U.S. Dist. LEXIS 66727, 2007 WL 2610367, at *5 (D. Ore. Sept. 4, 2007) (giving little weight to the common management factor because courts look not to "the form of common management . . . for purposes of this analysis . . . [but] to whether the common officers or managers exert regular control, i.e. day-to-day, over the operations of both entities"). Accordingly, the Court gives this factor little weight.

#### (c) *centralized control over labor relations*

Control over labor relations "is a central concern" in the single employer analysis, *Swallows*, 128 F. 3d at 994, yet, the record in this case is bereft of any evidence showing that the Hospitals had any control over Loewen's and other residents' employment relationships. As already discussed, GRMEP was responsible for all aspects of residents' employment, and Loewen has not offered any evidence to the contrary. Moreover, the Court has rejected **[\*30]** Loewen's reliance on the physician-faculty's relationships or affiliations to impute liability to the Hospitals. Finally, many of the circumstances Loewen cites evince nothing more than the Hospitals' exercise of control over their facilities.

#### (d) *common ownership*

The final factor, common ownership, is inapplicable. There is no evidence that any of the entities is a sham. *See id.* at 995 ("If neither of the entities is a sham then the fourth test is not met." (internal quotation marks omitted)).

Moreover, all of Loewen's factual allegations show that she was employed by GRMEP. In contrast, Loewen fails to allege a single fact showing that St. Mary's, Spectrum or MSU controlled her employment or participated in her employment decisions.

In light of the foregoing, Loewen fails to present any basis to support her claim that GRMEP and the Hospitals are a single employer.

#### B. Title IX Claims

Title IX provides, in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a). Educational **[\*31]** institutions include "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education." 20 U.S.C. § 1681(c); *see also* 45 C.F.R. § 86.31(a) (extending prohibition against sex discrimination to "any academic, extracurricular, research, occupational training, or other education program or activity").

Although Title IX does not provide an express right of action, the Supreme Court recognized an implied right of action in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979). In addition, in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992), the Court held that the relief available in an implied right of action recognized in *Cannon* includes money damages. The Court observed in *Franklin* that because Congress enacted Title IX under its Spending Clause authority, rendering the legislation contractual in nature, damages in an implied right of action may be imposed only where the recipient of federal funding is adequately notified that it could be held liable for a monetary award. *Id.* at 74-75, 112 S. Ct. at 1037. Because the alleged discrimination was intentional, however, the Court **[\*32]** had no need to address the scope of a recipient's liability. Subsequently, in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998), the Court considered whether a recipient could be held liable without notice of the discrimination. Noting that, unlike Title VII, Title IX does not refer to agency principals, *id.* at 283, 118 S. Ct. 1995-96, the Court rejected the application of principles such as *respondeat superior* and constructive notice to impose liability. *Id.* at 285, 118 S. Ct. at 1997. Instead, the Court held that a recipient could be held liable only where it had actual knowledge or acted with deliberate indifference:

Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy **[\*33]** of the recipient entity, we hold that a damages remedy will not

lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290, 118 S. Ct at 1999. *See also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643-44, 119 S. Ct. 1661, 1671-72, 143 L. Ed. 2d 839 (1999) (extending deliberate indifference standard to student-student sexual harassment).

### 1. The Hospitals

St. Mary's and Spectrum contend that they are entitled to summary judgment on Loewen's Title IX claims because they are not educational institutions and do not conduct an "education program or activity" as required for liability under Title IX. Although the Court tends to agree, it need not decide whether the Hospitals qualify as educational institutions because even if they did qualify as such, Loewen fails to present any evidence showing that they were deliberately indifferent to known acts of harassment or discrimination, as required under *Gebser, supra*. In other words, although the Court granted her the opportunity **[*34]** to obtain discovery on the issue, Loewen presents no evidence showing that she reported any acts of harassment or discrimination to Spectrum's or St. Mary's representatives. Therefore, the Hospitals are entitled to summary judgment on the Title IX claims.

### 2. MSU

MSU contends that it is entitled to dismissal of Loewen's Title IX claims because Loewen was not a student at MSU and MSU did not operate the residency program. Moreover, MSU notes that it may be held liable under Title IX only for its own acts and not the acts of others.

Loewen offers no evidence to show that she was an MSU student or that MSU operated the residency program. As the Court has noted, GRMEP, alone, operated the residency programs. Moreover, as is the case with the Hospitals, Loewen presents no evidence to show that MSU was deliberately indifferent to the alleged discrimination and harassment because Loewen failed to report such acts to MSU.

### C. Public Accommodation Claim

Although Loewen did not allege such a claim in her First Amended Complaint, she argued in her response to the

Hospitals' motion that the Hospitals could be liable under ELCRA's public accommodation provision. The Court disagrees. Loewen presents no **[*35]** evidence that the Hospitals took any action against her that could be construed as denying her access to their facilities. Instead, GRMEP, alone, discharged Loewen from the residency program—the means through which Loewen had access to the Hospitals' facilities. Therefore, even if Loewen had alleged such a claim, it would be subject to dismissal.

### D. Unjust Enrichment

In Count XIV, Loewen alleges a claim for unjust enrichment against the Hospitals seeking compensation for the extra hours that GRMEP required her to work in excess of the 80-hour limit imposed by regulations. The Hospitals contend that they are entitled to summary judgment on this claim because an unjust enrichment claim will not lie where an express contract governs the same subject matter. *See, e.g., Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 666 N.W.2d 271 (2003). The Hospitals note that Loewen acknowledges and relies on the Resident Agreement, which establishes the terms of her residency with GRMEP and addresses the issue of compensation. With regard to compensation, the Resident Agreement provides:

> It is understood and agreed that all compensation, in any form, paid to Resident is not payment for **[*36]** patient care services but is a grant to further the medical education of Resident. As the sole consideration to be received by Resident for the services to be provided hereunder, [GRMEP] agrees to provide Resident with an educational stipend in the amount of $40,000 for the Term, which [GRMEP] will disburse to Resident on a bi-weekly basis, less required withholding taxes.

(Resident Agreement ¶ 4.) In addition, the Resident Agreement provides: "No compensation of any kind or nature shall be paid to or accepted by Resident from patients or third parties." (*Id.*)

Citing *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 729 N.W.2d 898 (2006), Loewen argues that the Resident Agreement does not preclude her claim against the Hospitals because they were not parties to the Resident Agreement. Even so, in signing the Resident Agreement, Loewen specifically acknowledged that she would not accept compensation from any party other than GRMEP. Loewen's claim is thus barred because it would not be unjust to not require St. Mary's and Spectrum to compensate Loewen for the extra hours she worked.

Unjust enrichment is an equitable doctrine based on the

principle that a party should not be allowed **[*37]** to profit at the expense of another. *McCreary v. Shields* , 333 Mich. 290, 294, 52 N.W.2d 853, 855 (1952). In cases of unjust enrichment, the law implies a contract to prevent the inequity arising from a defendant's receipt of a benefit from the plaintiff. *Sweet Air Inv., inc. v. Kenney* , 275 Mich. App. 492, 504, 739 N.W.2d 656, 663 (2007). To establish unjust enrichment, a plaintiff must show: (1) the receipt of a benefit by the defendant from the plaintiff; and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Mich. Ed. Employees Mut. Ins. Co. v. Morris* , 460 Mich. 180, 198, 596 N.W.2d 142, 151 (1999). Moreover, "not all enrichment is necessarily unjust in nature." *Morris Pumps*, 273 Mich. App. at 196, 729 N.W.2d at 904. That is,

> [a] third party is not unjustly enriched when it receives a benefit from a contract between two other parties, where the party benefitted [sic] has not requested the benefit or misled the other parties . . . . Otherwise stated, the mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution. Moreover, **[*38]** where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person.

*Id.* (quoting 66 Am. Jur. 2d, *Restitution & Implied Contracts* § 32 at 628).

Since the Hospitals did not request Loewen to work the extra hours and she had no expectation of being compensated by them for her work, there is no basis for an unjust enrichment claim.


## IV. CONCLUSION

For the foregoing reasons, the Court will grant MSU's motion for summary judgment and the Hospitals' motion for summary judgment on all of Loewen's claims against them.

An Order consistent with this Opinion will be entered.

Dated: April 9, 2012

/s/ Gordon J. Quist

GORDON J. QUIST

UNITED          STATES          DISTRICT          JUDGE

2012 U.S. Dist. LEXIS 49476, *38

**Table1** ([Return to related document text](#))

I. BACKGROUND

A. GRMEP's Organization and Programs

B. Loewen's Allegations Regarding Her Residency

C. Procedural History

II. MOTION STANDARD

III. DISCUSSION

A. Title VII, ADEA and Elliott-Larsen

1. MSU

2. The Hospitals

(a) *interrelated operations*

(b) *common management*

(c) *centralized control over labor relations*

(d) *common ownership*

B. Title IX Claims

1. The Hospitals

2. MSU

C. Public Accommodation Claim

D. Unjust Enrichment

IV. CONCLUSION

**Table1** ([Return to related document text](#))

 Neutral

As of: June 17, 2020 5:02 PM Z

# Naumovski v. Binghamton Univ.

United States District Court for the Northern District of New York

April 17, 2018, Decided; April 17, 2018, Filed

3:11-CV-1097

**Reporter**

2018 U.S. Dist. LEXIS 229239 *; 2018 WL 9596943

ELIZABETH NAUMOVSKI, Plaintiff, -v- BINGHAMTON UNIVERSITY, THE STATE UNIVERSITY OF NEW YORK; THE STATE UNIVERSITY OF NEW YORK; JAMES NORRIS; and NICOLE SCHOLL, Defendants.

**Subsequent History:** Reconsideration denied by Naumovski v. Binghamton Univ., 2018 U.S. Dist. LEXIS 228930 (N.D.N.Y., Sept. 4, 2018)

Motion granted by, in part, Motion denied by, in part Naumovski v. Binghamton Univ., 2019 U.S. Dist. LEXIS 183753 (N.D.N.Y., Oct. 24, 2019)

**Counsel:** [*1] For Plaintiff: AJ BOSMAN, ESQ., OF COUNSEL, BOSMAN LAW FIRM, LLC AJ BOSMAN, ESQ., Rome, NY.

For Defendants: ADRIENNE J. KERWIN, ESQ., Ass't Attorney General, OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, NY.

**Judges:** DAVID N. HURD, United States District Judge.

**Opinion by:** DAVID N. HURD

# Opinion

## TABLE OF CONTENTS

Go to table1

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Elizabeth Naumovski ("plaintiff" or "Naumovski"), a former Women's Basketball Assistant Coach at Binghamton University, the State University of New York ("SUNY Binghamton"), alleges that she was subjected to discrimination and harassment on the basis of her sex and/or based upon sex stereotyping, national origin, marital status, and perceived sexual orientation, and that she suffered retaliation for engaging in activity protected by federal and state employment discrimination laws and the [*3] United States and New York Constitutions.

Naumovski brings claims against SUNY Binghamton; the State University of New York ("SUNY"); James Norris, SUNY Binghamton Athletic Director ("AD Norris"); and Nicole Scholl, SUNY Binghamton Women's Basketball Head Coach ("Coach Scholl") (collectively "defendants") under Title VII of the Civil Rights Act of 1964 ("Title VII"); Title IX of the Education Amendments of 1972 ("Title IX"); the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983; the New York State Constitution; and the New York State Human Rights Law.

Following the completion of discovery, defendants collectively moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment dismissing plaintiff's complaint in its entirety. Plaintiff opposed. No reply

was submitted. Oral argument was heard on September 8, 2016 in Utica, New York. Decision was reserved.

## II. BACKGROUND

The following facts are drawn from the parties' Local Rule 7.1 Statements and other submissions in connection with the instant motion, and are undisputed or taken in the light most favorable to Naumovski, unless otherwise noted.

### A. Plaintiff's Hiring

In June 2008, SUNY Binghamton hired plaintiff as a Women's Basketball Assistant Coach. She was hired by Coach Scholl and former SUNY Binghamton Athletic Director Joel Thirer ("Thirer").[1]

Naumovski [*4] was hired for a one year appointment. As a Canadian citizen, she required a work visa. SUNY Binghamton applied for and obtained a temporary H-1B work visa for her permitting her to work at the school from approximately August 2008 to August 2009. At the end of her first year of employment, the school petitioned for and was granted a renewal of her H-1B work visa for another one year period, for the 2009 to 2010 school year.

The parties dispute the classification of plaintiff's employment. She contends she was given a term appointment, while defendants argue she had a temporary appointment. Pursuant to school policies, if Naumovski's position was a *term* appointment, the school would be required to give 90 days notice of her termination and payout the remaining time on her contract. By contrast, if her position was a *temporary* appointment, the school would not be required to give any notice or pay for the remaining contract period.

Naumovski submits an offer letter she received from SUNY Binghamton, offering her a full-time, term appointment. Naumovski Affirm., Ex. A. That letter is dated June 10, 2008. She contends she accepted the offer, signed the acceptance portion of the letter, and [*5] returned same to SUNY Binghamton.

Defendants do not dispute that their first offer letter extended a term appointment but contend the letter was sent in error and that subsequent letters mailed and signed by plaintiff correctly classified her appointment as temporary. They submit the same offer letter dated June 10, 2008, classifying her employment as temporary, with a signature by Naumovski

dated November 6, 2008. Schultz Decl., Ex. A. An identical offer letter dated August 14, 2008, classifying her employment as temporary, includes a signature by plaintiff dated August 18, 2008. Id., Ex. C. Defendants submit four other pieces of correspondence to Naumovski or on her behalf between July 2008 to May 2009 classifying her employment as temporary. Id., Exs. B, D, F, G.

Naumovski contends that on August 18, 2008, she reported to SUNY Binghamton for her first day of work and there was a second offer letter waiting for her on her desk with a note asking her to sign, date, and return same to the Athletic Department office, which she did.[2] Because she did not start work in June as indicated in the previous letter, she believed the only change made was to her start date. She claims no one ever [*6] advised her there was any change or modification to the terms of her appointment. She argues she was initially hired as a term employee by way of the first offer letter she received, but contends she was then wrongfully given a temporary appointment because she is Canadian.

### B. The 2008 to 2009 Season

During the 2008 to 2009 Women's Basketball season, Coach Scholl had on staff three assistant coaches: Naumovski; Bernitha Johnson ("Asst. Coach Johnson"); and Denique Graves ("Graves").

#### 1. J.G. Complaint

In December 2008, allegations were first made that plaintiff was having an inappropriate relationship with student athlete J.W. Naumovski first learned of the allegations when student athlete A.H. came to she and Asst. Coach Johnson. A.H. informed the two assistant coaches that teammate J.G. sent a text to another teammate stating, "Don't you think it's strange how close B [Asst. Coach Johnson] and Andrea, and Jackie [J.W.] and Bet [Naumovski] are? I think it's disgusting."

#### 2. M.S. Parent Complaint

In January 2009, en route from an away game in Boston, Naumovski received a text message from Asst. Coach Johnson informing her that the Sadlers, parents of student athlete M.S., came to her complaining [*7] of their daughter's playing time and accused Naumovski of favoritism because she was having a "relationship" with J.W. Plaintiff contends she was completely stunned and angry, but did not think the

---

[1] AD Norris was named Interim Athletic Director in September 2009, replacing Thirer.

[2] This would be Exhibit C, with a signature date of August 18, 2008.

accusation would be believed. She soon thereafter heard from J.W., asking in a text message whether she too had heard the rumor of the two being involved in a "relationship."

Coach Scholl contends she was first made aware of allegations of favoritism by Naumovski toward J.W. in January 2009 (presumably after the same away game in Boston), when the parents of a student athlete (again, presumably the Sadlers) alleged that their daughter got less playing time in a game as a result of Naumovski's favoritism of J.W. Coach Scholl contends she did not believe plaintiff was exhibiting favoritism and did not think any action was required in response to the parents' allegation since the relationship that she witnessed between Naumovski and J.W. was that of coach and student athlete.

### 3. Coach Scholl Responds to Allegations

The day after the game, Coach Scholl called Naumovski and advised she heard allegations that she and J.W. were in a relationship, but assured her that she knew it was not true. According [*8] to plaintiff, Coach Scholl further told her it was not her fault, that she was "deeply sorry" that it was happening to her, and that these types of allegations have "ruined coaches' careers." Coach Scholl assured Naumovski she would "deal with it" when she met with the student athletes for mid-season meetings. Plaintiff contends Coach Scholl clearly understood that the allegation was sexual in nature; in fact, Coach Scholl told her that J.W. was gay and had dated women in the past. Naumovski was alarmed and also worried as the Sadler family was wealthy and donated to the SUNY Binghamton Athletic Department.

On January 16, 2009, a few days after the mid-season student athlete meetings, Coach Scholl called plaintiff and stated that it was brought to her attention that she had "patted" J.W. on the head and purchased a Christmas gift for her. Naumovski reiterated her disbelief that anyone would say that she was "screwing" a student. Coach Scholl stated that she was going to notify then Athletic Director Thirer. Asst. Coach Johnson later told plaintiff that Thirer did not believe the allegation either and thought it was "ridiculous." Regarding the gift, Naumovski explained that she gave [*9] t-shirts to two student athletes as a joke surrounding her Canadian heritage.

### 4. Staff Warnings

The following day, January 17, 2009, Coach Scholl convened her staff and advised them to be careful about "touching" student athletes. Male coaches however were never advised to be careful about touching student athletes nor were they told they could not meet with student athletes. Coach Scholl then led a team meeting where she made a general statement that the "drama" needs to stop but failed to mention the rumors about plaintiff. This was the only time any action was taken by defendants to address the rumors with the team while Naumovski was still employed by SUNY Binghamton.

### 5. Conclusion of 2008 to 2009 Season

Shortly before the 2008 to 2009 school year ended, Coach Scholl told Naumovski she was happy that she was able to successfully coach J.W. because she herself was not able to give J.W. the "attention" she needed and that J.W.'s performance noticeably improved due to plaintiff's guidance. Naumovski's performance evaluation for the 2008 to 2009 school year noted no deficiencies in her performance and her contract was renewed for the 2009 to 2010 school year. Coach Scholl now adds that [*10] she recommend to Thirer that plaintiff be given a "satisfactory" rating on her performance review, which was adopted and signed by Thirer on July 21, 2009.

Following the 2008 to 2009 season, Graves was not re-hired and Leah Truncale ("Asst. Coach Truncale") was hired to fill the open position.

### C. The 2009 to 2010 Season

Prior to being appointed as Interim Athletic Director, defendant Norris served as Senior Associate Athletic Director. Part of his duties included overseeing the Sports Medicine program.

### 1. J.G. Complaint

As the supervisor of the Sports Medicine program, AD Norris was approached on September 25, 2009 by former Women's Basketball student athlete J.G. and advised that an inappropriate relationship existed between plaintiff and student athlete J.W. as evidenced by excessive telephone calls and text messages, including text messages at odd hours, and the possible giving of rides. He insists that he did not interpret this to allege a sexual relationship. The same day, he advised Thirer of J.G.'s allegation. Thirer advised he had previously looked into similar allegations but found them to be untrue and created by disgruntled former members of the Athletic Department.

### 2. Further [*11]  Staff Warnings

Norris was appointed Interim Athletic Director on September

30, 2009. On the same day, Coach Scholl met with her coaching staff and advised them not to have student athletes in their offices anymore because AD Norris was concerned about "perception." She further advised staff to only text student athletes for academic and basketball purposes, again because of "perception." Naumovski contends that she began to experience a great deal of stress and anxiety because of the sudden heightened scrutiny on her.

### 3. Relaying of J.G. Complaint

On October 5, 2009, following the appointment to his new role, AD Norris shared J.G.'s September 2009 complaint with Coach Scholl and asked her to inform plaintiff of the allegation. Coach Scholl contends she assured AD Norris that there was no inappropriate relationship going on, and further that at no time did anyone ever inform her that Naumovski and J.W. had a romantic, intimate, or sexual relationship, or even that one was suspected, and at no time did she believe one existed. AD Norris asked Coach Scholl to make Naumovski aware of the allegation so that she could be sure to continue maintaining the proper separation and to avoid circumstances [*12] that could give the appearance of a lack of appropriate separation.

Following that meeting, Coach Scholl spoke with Naumovski, who was upset that allegations were being made about her. Coach Scholl assured her that she did not believe there was anything inappropriate about her relationship with J.W. Coach Scholl considered the issue "over" because she assured both AD Norris and plaintiff that the relationship was appropriate.

### 4. Plaintiff Meets with AD Norris

On October 5, 2009, to make certain that any "perception" was not held by AD Norris, Naumovski telephoned him and requested a meeting. AD Norris invited her to his office immediately. Upon arriving, she inquired whether he heard the allegations made against her last year and he advised that he heard them this year. She assured him the rumors were untrue and that she was not gay. She complained that the rumors were very upsetting and that she was scared. She contends that in response, AD Norris stated, "Your problem is that you're a single female in your mid-30s," in a tone that suggested "What do you expect?" and raised the palm of his hand up. Naumovski was offended by the statement and stated something to the effect that "Just [*13] because I have chosen to put my career first at this point in my life, doesn't mean I deserve these accusations."

By contrast, AD Norris contends that he did not make this comment, that he had no idea if people thought Naumovski

was gay or not, that he had no idea either way, and that this statement, in sum and substance, was actually made by plaintiff during her impassioned explanation to him that she was not gay. He submits that many coaches at SUNY Binghamton were unmarried, and many were in their thirties and he did not consider them to have a "problem." Asst. Coach Truncale and Coach Scholl both point out that neither themselves, Asst. Coach Johnson, nor plaintiff were married nor got married during plaintiff's employment at SUNY Binghamton.

AD Norris contends that during the meeting, Naumovski told him that she did feel like she had a close relationship with J.W. and that she was providing J.W. with grief counseling due to a death in her family. AD Norris reminded her that grief counseling was not within her job duties and that J.W. should seek counseling services from the school. He asserts that he told plaintiff he had no reason to believe there was any inappropriate relationship [*14] between her and J.W., but advised her nonetheless to avoid any situations that could give the appearance of the existence of any relationship other than that of coach and student athlete. He insists that he gives this caution to all coaches under his supervision. He further advised to concentrate on coaching the team and assured her he did not believe there to be an inappropriate relationship. He claims he was of the impression that Naumovski was satisfied with the meeting and the outcome because she never informed him otherwise.

### 5. Further Parent Complaints

The following day, Coach Scholl advised plaintiff that the Sadler family continued to make allegations of an inappropriate relationship and that the family also made the allegations to a different department at SUNY Binghamton.

On October 9, 2009, AD Norris received a call from the mother of student athlete M.S. The parent alleged that plaintiff and J.W. were in an inappropriate relationship, based on alleged excessive text messaging, the giving of rides, telephone calls at odd times, and plaintiff stroking J.W.'s ponytail and patting her on the behind during a game. She claimed that there were photos circulating and urged him to [*15] "put two and two together" when he asked whether it was sexual.

### 6. AD Norris Meets with J.W.

Following the call, on October 12, 2009, AD Norris contacted SUNY Binghamton Human Resources Director Joe Schultz about the allegations, who advised AD Norris to meet with J.W. and confirm the allegations were not true. On October

22, 2009, AD Norris met with J.W. to inquire if any coaches acted inappropriately toward her. J.W. responded that she was "tired of the BS," and that the allegations stemmed from M.S. and her parents (the Sadlers) being upset that M.S. lost playing time to J.W. during the prior season. She assured him that the relationship between she and Naumovski was that of coach and student athlete and that plaintiff was just trying to make her a better student athlete. Following this meeting, AD Norris felt confident the issue had been fully addressed.

### 7. Plaintiff Under Scrutiny

Naumovski, however, alleges that rumors continued to circulate. Thereafter, she began to observe Coach Scholl and AD Norris monitoring her during practices. She became constantly concerned with how her interactions with student athletes would be perceived. This interfered with her ability to do her job as [*16] she felt she had to avoid all contact with student athletes except in an open setting. Further, student athletes felt uncomfortable in her presence due to the increased scrutiny she faced. This caused her to endure additional stress and eventually develop depression.

### 8. Continued Student Athlete Complaints

In early December 2009, J.W. complained to Naumovski that student athlete E.C. started to pick on her, again suggesting that she and plaintiff were in a relationship. J.W. indicated that she had snapped back at E.C. and was "fed up with it." She also informed Naumovski that E.C. was telling others that Naumovski was fired twice before coming to SUNY Binghamton for having relationships with student athletes, a totally false accusation.

### 9. S.O. Complaint

According to AD Norris, he continued to receive complaints that student athletes felt plaintiff showed favoritism toward J.W. and treated other student athletes unfairly, including refusing to coach or speak to certain student athletes. On December 7, 2009, student athlete S.O. stopped by his office. During that meeting, S.O. inquired about transferring schools and reluctantly told AD Norris that the peer-like relationship between plaintiff [*17] and J.W. was causing her to not have a positive experience on the team. According to AD Norris, S.O. stated that the favoritism Naumovski exhibited toward J.W., and the unfair treatment that she and other members of the team received from plaintiff, was causing her to consider leaving the school. In response to AD Norris's inquiry about why she thought the relationship was inappropriate, S.O.

indicated the giving of rides, excessive phone calls and text messages, and the giving of gifts.

### 10. Plaintiff Addresses Team

On December 29, 2009, the entire team met during which time plaintiff addressed the team herself and stated she was aware of what was being said about her and that it was harassment and it needed to stop. Coach Scholl said nothing to support Naumovski.

### 11. E.C. Complaint

On February 4, 2010, AD Norris met with student athlete E.C. who expressed that she was disturbed by the excessive favoritism Naumovski showed toward J.W. and that Naumovski had stopped speaking to and coaching E.C. and several other student athletes. E.C. advised that she did not think there was a romantic or sexual relationship going on because she knew J.W. was in a relationship with someone else. E.C. told [*18] AD Norris that he could observe the favoritism and unfair treatment by observing practices.

According to plaintiff, coaches are each assigned individual student athletes; in the 2009 to 2010 season, she was assigned J.W., E.C., and V.R. She insists she had no problem with J.W. and E.C. and gave them equal attention during practices. As to V.R., she asserts she did not refuse to coach her but instead V.R. refused to take any direction from plaintiff. In fact, Naumovski complained to Coach Scholl multiple times about V.R.'s attitude; V.R. would defy plaintiff and would do the exact opposite of what she told her to do. Coach Scholl allegedly agreed this was not Naumovski's fault.

### 12. Continued Personality Conflicts

Coach Scholl contends she became increasingly aware between October 2009 and February 2010 that plaintiff's coaching style was not supportive of the program she was trying to run, and had become a distraction to the team and coaching staff. For example, Naumovski refused to coach certain student athletes and would, in fact, not even acknowledge or speak to certain student athletes. She contends that plaintiff consistently challenged her personal style of discipline, wanting her [*19] to be harder on the student athletes.

She asserts that on several occasions, she brought up the issue of all student athletes needing to be coached equally. During a February 9, 2010, staff meeting, Coach Scholl advised there was a concern by some student athletes that they were not

being coached equally. However, according to plaintiff, Coach Scholl never stated that she agreed with those concerns nor that she believed in the necessity of doing that.

Naumovski denies saying that she would not coach all student athletes and instead, Asst. Coach Johnson was the one who made a statement to that effect. Coach Scholl acknowledges that Asst. Coach Johnson echoed the sentiment that not all student athletes deserve to be coached equally, but that Asst. Coach Johnson's coaching did not illustrate this belief as she complied with the head coach's directive. By contrast, plaintiff exhibited this belief in her coaching despite Coach Scholl's direction to the contrary.

Asst. Coach Truncale echoed Coach Scholl's sentiments. According to her, plaintiff said during staff meetings that she would not coach all student athletes equally, and that on more than one occasion, Coach Scholl told the coaches [*20] that they needed to coach every student athlete on the team. Notwithstanding, Naumovski failed to do so. Asst. Coach Truncale contends that she observed practices where plaintiff would not even speak to some of the student athletes. She notes that as the 2009 to 2010 season progressed, plaintiff became noticeably increasingly unhappy. She testified that plaintiff did not agree with Coach Scholl's coaching philosophy and frequently became frustrated with her approach to disciplining student athletes; Naumovski had a very confrontational and forceful personality while Coach Scholl had a laid back and conciliatory personality.

This clash of personalities, and Naumovski's frequent disagreement with the coaching style, caused tension within the staff. Asst. Coach Truncale contends that it made Coach Scholl noticeably uncomfortable and eventually caused Coach Scholl to not trust Naumovski. Further, Naumovski's favoritism toward J.W. created a division within the team, and caused the team to resent J.W. because of the attention and favoritism plaintiff showed her. According to Asst. Coach Truncale, Asst. Coach Johnson offered Naumovski advice in an attempt to reconcile the coaching differences. [*21]

Asst. Coach Johnson similarly described the personality conflicts between plaintiff and Coach Scholl. She testified that the two conflicted openly about coaching philosophies and it was "a big struggle" over the two seasons that Naumovski was on the staff. She explained that the two

> really bumped heads a lot . . . Coach Bet [Naumovski] is a very—an A type personality. She's Type A. She's very strong, very passionate, a disciplinary [sic]. Nikki Scholl is the complete opposite of that, and at times, Nikki felt a little intimidated . . . I think there was a trust issue there with Nikki for Bet just trusting that Bet was loyal to her. I think Nikki couldn't get past that. I think that ultimately

hurt them to be able to work together.
Kerwin Aff., Ex. B, p.39.

Seeing plaintiff's continued unhappiness, both Asst. Coaches Truncale and Johnson suggested that Coach Scholl speak to Naumovski, which she did, but plaintiff continued to only coach certain student athletes and express her disagreement and frustration with the head coaching style.

Naumovski denies that she refused to coach all student athletes or refused to "do things" requested by Coach Scholl. She was never reprimanded or counseled [*22] for this alleged insubordination.[3] According to plaintiff, Coach Scholl never shared with her any specific complaints about not coaching student athletes equally.

### 13. Coach Scholl and AD Norris Confer RE: Plaintiff's Performance

Also on February 9, 2010, Coach Scholl spoke to AD Norris about her concerns with plaintiff's job performance. Prior to that day, both Asst. Coaches Johnson and Truncale asked Coach Scholl to speak to Naumovski because she was visibly unhappy and becoming a distraction and detriment to the team. During her conversation with AD Norris, Coach Scholl informed him that she and Naumovski were not getting along, their relationship was strained, and that their coaching styles and personalities were clashing, causing discomfort on the team and coaching staff. She also advised him about Naumovski's refusal to coach certain student athletes despite instruction to the contrary.

AD Norris responded that he had also received complaints about plaintiff's continued favoritism of J.W. and unfair treatment of other student athletes. He advised Coach Scholl to set up a meeting with plaintiff. Coach Scholl and AD Norris concluded by agreeing to re-visit the issue after the completion [*23] of the 2009 to 2010 season and that they would both watch for improvement in Naumovski's performance going forward.

### 14. Plaintiff Meets with Coach Scholl

Later that same day on February 9, 2010, at AD Norris's suggestion, Coach Scholl met with Naumovski privately and pointed out how she only coaches J.W. and E.C. Plaintiff expressed her view that she works with those two student

---

[3] Defendants contend that as a matter of practice and as a professional courtesy for a coach's future prospects, counseling memos were not placed in a coach's personnel file.

athletes regularly because she was assigned to guards and they were guards. According to Naumovski, Coach Scholl responded "Yeah, you're right" as though she reconsidered and changed her position. Plaintiff also informed Coach Scholl that student athletes have the same complaints about *her* favoring V.R. and O.O.

Coach Scholl did not further bring up the issue of student athletes' perception about coaching time. During this private meeting, the two also discussed the student athletes' attitudes and how the students were running the Women's Basketball program. According to Naumovski, Coach Scholl took responsibility for the poor state of the team because she is a "people pleaser" and acknowledged that her personality was a weakness.

Coach Scholl contends she discussed with plaintiff the need to support her coaching **[*24]** philosophy and decisions, even if she did not agree with them. Naumovski expressed her frustrations with how Coach Scholl coached and ran the team. The two also discussed Naumovski's unhappiness working at SUNY Binghamton and Coach Scholl asked if she could help in any way.

At the conclusion of the February 9, 2010 meeting, Naumovski told Coach Scholl that she was stressed and depressed. Coach Scholl admitted she noticed plaintiff's weight loss and that she appeared to be unhappy and acknowledged it was affecting her work. Naumovski asserts that during this saga, she was so upset about the allegations that she lost 25 to 30 pounds and was often unable to keep food down.

Plaintiff contends that she came away feeling positive after the February 9, 2010, meeting and her relationship with Coach Scholl improved. Coach Scholl characterized it as a "good meeting." Going forward, staff meetings were more relaxed, and the two were friendlier to each other, with Coach Scholl soliciting plaintiff's opinions more and embracing more of her ideas. Notably, Coach Scholl invited Naumovski to observe a game in Connecticut on March 5, 2010. Coach Scholl also approved plaintiff's travel to Rochester, New **[*25]** York on March 8, 2010, to scout a potential student athlete.

Coach Scholl on the other hand, contends nothing changed. She asserts she did not raise the issues again because she told Naumovski what she needed to change and she expected it would occur but it did not. Instead, Naumovski continued to coach only certain student athletes. The relationship between the two continued to be strained and plaintiff's coaching presence continued to be a distraction.

## 15. Coach Scholl and AD Norris Again Confer RE: Plaintiff's Performance

On February 21, 2010, Coach Scholl called AD Norris at home to share her concerns about plaintiff's continued presence on her staff given that the situation had not improved. She advised AD Norris that she felt she needed to replace Naumovski and he agreed. He informed her that he had received other complaints about her favoritism toward J.W. and that student athletes felt they were treated unfairly. The two agreed to make the change after the completion of the season in March 2010.

## 16. J.W.'s Parents Receive Anonymous Letter

On February 24, 2010, J.W. informed Naumovski that her parents received an anonymous, vulgar letter which included allegations of a sexual relationship **[*26]** between the two of them.

Around the same time, plaintiff was informed by student athlete D.P. that three or four other students approached AD Norris with similar allegations.

## 17. E.C. and O.O. Complaints

On February 26, 2010, and March 2, 2010, AD Norris again met with student athlete E.C. who reiterated her concerns about Naumovski.

On March 1, 2010, he met with student athlete O.O. who expressed her concerns about plaintiff's favoritism toward J.W.

## 18. J.W.'s Parents Phone AD Norris

On March 2, 2010, AD Norris received a call from J.W.'s mother, Linda Ward, asking to meet. AD Norris informed her of the policy not to meet parents without a student athlete's permission. They agreed to meet at the conclusion of the season. He maintains that he did not know what subject matter she wanted to discuss. By contrast, Linda contends that she told him she received an anonymous, disturbing letter in the mail and that she feared for the safety of her daughter, J.W.

The basketball season concluded on March 5, 2010.

## D. Plaintiff's Termination

On March 9, 2010, AD Norris scheduled a meeting with plaintiff.

### 1. Plaintiff Meets with Coach Scholl

After her arrival on campus that day, but before meeting with AD [*27] Norris, Naumovski met with Coach Scholl. Plaintiff contends she told her about the anonymous letter sent to J.W.'s family. By contrast, Coach Scholl testified that she first learned of the letter *from* AD Norris; she does not recall the date but knows that because she learned it from him, she necessarily must have learned about it *after* he did.

### 2. Plaintiff Meets with AD Norris

Later, during plaintiff's 2:00 p.m. meeting with AD Norris, he informed her of the decision not to renew her contract. When pressed for an explanation as to why she was being terminated, he stated "For performance reasons." Naumovski pleaded that it did not make sense as she had never been told she was doing a bad job; he allegedly responded that it was his decision based on "things [he] witnessed" himself. He offered her the opportunity to voluntarily resign, which she did. She later attempted to rescind her resignation on the basis that she felt she did not have a choice during their meeting.

Prior to the meeting, AD Norris had contacted Human Resources and learned that he did not have to provide plaintiff the typical lengthy notice because she had a temporary rather than a term appointment. Therefore, during [*28] the March 9, 2010, meeting, Naumovski was advised that her employment with SUNY Binghamton would be terminated as of March 23, 2010. As is standard procedure, AD Norris directed that she not have any contact with student athletes and to remove her belongings from campus by that date.

Later that day, AD Norris met briefly with the Women's Basketball team to inform them of her departure.

### 3. AD Norris Meets with J.W.'s Parents

On March 11, 2010, AD Norris met with J.W. and her parents. He contends that the in person meeting was the first time he learned of the anonymous letter sent to the Wards which stated that J.W. was "screwing" plaintiff and called J.W. and plaintiff a derogatory lesbian slur.

### 4. Coach Scholl Offers Plaintiff Recommendation

Finally, on the same day, while Naumovski was wrapping up

in her office, Coach Scholl asked to speak with her. She told plaintiff her termination was AD Norris's decision and that she would write a letter of recommendation and that plaintiff could use her as a reference as she would like to see her stay in the coaching field.

### III. LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and [*29] admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact [*30] to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotations omitted). Therefore, "an employment discrimination plaintiff faced with a properly supported

summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts, . . . [s]he must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotations and citation omitted).

A plaintiff's "[m]ere conclusory statements, conjecture or speculation" will not defeat summary judgment. Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). Instead, a plaintiff must offer "concrete particulars." Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding [*31] plaintiff's affidavit because it lacked concrete particulars); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

With this framework in mind, it bears noting that "direct evidence of . . . [discriminatory] intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Holcomb, 521 F.3d at 137 (internal quotations omitted). The Second Circuit "has long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)).

Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb, 521 F.3d at 137. This cautious attitude toward summary judgment in the employment discrimination context cannot excuse a court's obligation to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff, 196 F.3d at 448. "Ultimately, [*32] the test for summary judgment is whether a reasonable jury could return a verdict for the nonmoving party." Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 311 (E.D.N.Y. 2014) (internal quotations omitted).

## IV. DISCUSSION

### A. The Complaint

Plaintiff asserts that she was subjected to a hostile work environment and eventually terminated because (1) she is female; (2) she is Canadian; (3) she is single; (4) she was perceived to be gay; and (5) she complained about the unlawful treatment.

Naumovski's complaint enumerates fifteen causes of action for alleged violations of federal and state law. She does not delineate which causes of actions are asserted against which defendants. Each of the fifteen causes of action asserted in the complaint incorporate all of the factual allegations preceding it as well as adopt all of the allegations of each preceding count. "Consequently, it is virtually impossible to know which allegations of fact are intended to support which claims for relief." Croons v. N.Y. State Office of Mental Health, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014) (internal quotations omitted).

Plaintiff's fifteen causes of action against defendants based on federal and state law fall into three broad categories: discrimination, hostile work environment, and retaliation. She asserts claims under Title VII, Title IX, § 1983, the New York State Constitution, and the [*33] New York State Human Rights Law. The complaint sets forth the following claims:

> (First) Title VII discrimination on account of sex, based upon sex stereotyping, and/or national origin

> (Second) Title VII— hostile work environment on account of sex and/or based upon sex stereotyping

> (Third) Title VII— retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

> (Fourth) Title IX— discrimination on account of sex and/or based upon sex stereotyping

> (Fifth) Title IX— hostile work environment on account of sex and/or based upon sex stereotyping

> (Sixth) Title IX— retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

> (Seventh) Fourteenth Amendment— discrimination on account of sex, based upon sex stereotyping, and/or national origin

> (Eighth) Fourteenth Amendment— hostile work environment on account of sex and/or based upon sex stereotyping

(Ninth) First Amendment— retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

(Tenth) New York State Constitution, art. I, § 11[4] — discrimination on account of sex, based upon sex stereotyping, and/or national origin

(Eleventh) New York State Constitution, art. I, § 11— hostile work environment on account of sex and/or based [*34] upon sex stereotyping

(Twelfth) New York State Constitution, art. I, § 8— retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

(Thirteenth) New York State Human Rights Law— discrimination on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

(Fourteenth) New York State Human Rights Law— hostile work environment on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

(Fifteenth) New York State Human Rights Law— retaliation for complaining about and opposing discrimination on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

## B. Individual and Institutional Liability

Naumovski's complaint makes no attempt to distinguish whether, and to what extent, her fifteen causes of action are directed at AD Norris, Coach Scholl, SUNY, or SUNY Binghamton, the latter two being institutional entities. Rather, plaintiff's pleading elects instead to simply direct each of her fifteen causes of action at "defendants." This renders it virtually impossible to determine which allegations of fact [*35] are intended to support each of her particular claims for relief.

## 1. AD Norris and Coach Scholl

First, insofar as plaintiff's Title VII claims are directed at AD Norris or Coach Scholl, they cannot be maintained because individuals are not subject to liability under Title VII. Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 (2d Cir. 2006). Likewise, numerous district courts in the Second Circuit have found that Title IX does not provide for individual liability. See Miotto v. Yonkers Public Sch., 534 F. Supp. 2d 422, 426 (S.D.N.Y. 2008) (collecting cases); see also Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). Similarly, individuals generally escape liability under the New York State Human Rights Law's general discrimination provision, New York Executive Law section 296(1).[5]

Accordingly, plaintiff's Title VII (First, Second, Third), Title IX (Fourth, Fifth, Six), and New York State Human Rights Law (Thirteenth, Fourteenth, Fifteenth) causes of action against AD Norris and Coach Scholl will be dismissed.

## 2. SUNY and SUNY Binghamton

Second, insofar as Naumovski's § 1983 and New York State Human Rights Law claims are directed at SUNY and SUNY Binghamton, plaintiff's former employer and an instrumentality of the State of New York, they are precluded by the Eleventh Amendment's guarantee of sovereign immunity. "As a general rule, state governments and their agencies may not be sued in federal [*36] court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." Allessi v. N.Y. State Dep't of Corr. & Cmty. Supervision, 16 F. Supp. 3d 221, 225 (W.D.N.Y. 2014).

"For purposes of the Eleventh Amendment, [SUNY] Upstate, a division of the State University of New York, 'is an integral part of the government of the state of New York and when it is sued the State is a real party." Richman v. Pediatric Serv. Grp., LLP, 222 F. Supp. 2d 207, 209 (N.D.N.Y. 2002)

---

[4] Plaintiff's complaint cites Article 1, section 1 in the Tenth and Eleventh causes of action. Defendants point out there is no legal basis for plaintiff's claims as section 1 reads: "Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases." Based on subsequent briefing and oral argument, it is clear plaintiff intended to cite to section 11, "Equal protection of laws; discrimination in civil rights prohibited."

[5] Individual employees may be liable for aiding and abetting discriminatory practices under New York Executive Law § 296(6), but plaintiff has not made that argument. See Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (Sharpe, J). In support of their motion, defendants argue that there is no proof in this case that AD Norris or Coach Scholl ever participated in the alleged rumors or harassment such that liability under the New York State Human Rights Law could be imputed to then. Plaintiff has failed to respond to that argument.

(Munson, S.J.) (internal quotations omitted). Consequently, "SUNY Upstate, as a state instrumentality, is entitled to immunity absent a waiver or abrogation of its Eleventh Amendment Immunity." Idlisan v. SUNY Upstate Med. Univ., No. 5:12-CV-1790, 2013 U.S. Dist. LEXIS 17765, 2013 WL 495409, at *3 (N.D.N.Y. Jan. 16, 2013) (Dancks, M.J.) (Report & Recommendation), adopted by 2013 U.S. Dist. LEXIS 17764, 2013 WL 486279 (N.D.N.Y. Feb. 7, 2013) (D'Agostino, J.).

New York has not waived its sovereign immunity from § 1983 or New York State Human Rights Law claims in federal court. Quadir v. N.Y.S. Dep't of Labor, 39 F. Supp. 3d 528, 537-38, 2014 WL 4086296, at *4 (S.D.N.Y. 2014) (collecting cases). Nor has Congress validly abrogated state sovereign immunity from discrimination claims brought pursuant to § 1983. See Bogle-Assegai v. Connecticut, 470 F.3d 498, 509 (2d Cir. 2006) (affirming dismissal of § 1983 claims against state agency as barred by Eleventh Amendment).

However, "[i]n Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution." Brown v. New York, 975 F. Supp. 2d 209, 222 (N.D.N.Y. 2013) (D'Agostino, J). The doctrine [*37] permits a suit to nevertheless proceed against an otherwise immune entity if a plaintiff names a state official in his or her official capacity provided the plaintiff also "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." See In re Deposit Ins. Agency, 482 F.3d 612, 618 (2d Cir. 2007) (internal quotations omitted).

Even assuming Naumovski intended to name AD Norris and Coach Scholl in their official capacities, plaintiff still fails to allege any ongoing violation of federal law. Rather, her complaint details alleged violations of her rights at a specific time in the past when she was employed by, and eventually terminated from, SUNY Binghamton. Although her complaint suggests that she seeks prospective relief—specifically, an injunction "[r]estraining the Defendants from engaging in further discriminatory and/or retaliatory treatment"; "[r]equire the Defendants to review and correct all unconstitutional, discriminatory and retaliatory treatment and conduct within the Binghamton University"; "[p]rovide equal opportunities, terms, benefits, and pay to women employees in the Binghamton University"; "[m]andate training and educational programs for employees about discrimination and retaliation"; [*38] "[r]equire annual reports demonstrating efforts and success at compliance in providing a discrimination and retaliation-free workplace"; and a

declaration "that the Defendants violated the Plaintiff's rights under the law," these cannot be properly characterized as "prospective," since plaintiff does not seek reinstatement or otherwise allege how such relief would remedy a future violation directed at her. See Brown, 975 F. Supp. 2d at 226 (conducting same analysis and noting the Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past.).

Because Ex parte Young is inapplicable here, plaintiff's § 1983 (Seventh, Eighth, Ninth) and New York State Human Rights Law (Thirteenth, Fourteenth, Fifteenth) causes of action against SUNY and SUNY Binghamton will be dismissed.

As plaintiff cannot maintain New York State Human Rights Law claims against Coach Scholl, AD Norris, SUNY, or SUNY Binghamton, there is no need to consider those claims under any of the below substantive standards.[6]

## C. Discrimination Claims—Title VII, Title IX, and § 1983 (First, Fourth, Seventh)

Plaintiff alleges she was unlawfully discriminated against because she is a single Canadian female who was perceived to be gay.

Title VII makes it unlawful for an employer "(1) [*39] to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[7]

_____

[6] To the extent plaintiff could move forward on the New York State Human Rights Law claims, they would rise and fall for the same reasons as her Title VII claims. The New York State Human Rights Law makes it unlawful for an employer to discriminate against an employee because of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status. N.Y. Exec. Law § 296(1). The substantive standards applicable under Title VII are also generally applicable to claims of employment discrimination brought under the New York State Human Rights Law. Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).

[7] "Title IX has been construed to prohibit gender discrimination against both students enrolled in federally supported educational programs and employees involved in such programs." Murray v. New York Univ. Coll. of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995).

Section 1983, through its application of the Equal Protection Clause of the Fourteenth Amendment, "protect[s] public employees from various forms of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).

These types of discrimination claims are generally subject to the analytical framework first introduced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a three-part burden-shifting scheme laid out by the Supreme Court in an effort to "sharpen the inquiry into the elusive factual question of intentional discrimination." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128 (2d Cir. 2012).

"This framework places the initial burden of establishing a prima facie case of discrimination on the plaintiff, who must demonstrate that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position in question; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." Croons v. N.Y. State Office of Mental Health, 18 F. Supp. 3d 193, 202 (N.D.N.Y. 2014) (citing [*40] Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010)). "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson, 239 F.3d at 467.

Once the plaintiff clears this initial hurdle, "[t]he burden then shifts to the defendant to offer 'legitimate and non-discriminatory reasons for the adverse employment action demonstrate in plaintiff's prima facie case.'" Croons, 18 F. Supp. 3d at 202 (quoting Risco v. McHugh, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012)).

The burden at this stage is also "light," and "[t]he employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." Croons, 18 F. Supp. 3d at 202-03. In other words, "this burden is one of production, not persuasion; it can involve no credibility assessment." Id. (internal quotations omitted).

"If the defendant satisfies its burden of production, then the presumption raised by the prima facie case is rebutted and drops from the case." Bucalo, 691 F.3d at 129 (internal quotations omitted). "At the final stage, the plaintiff then has

'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision'—a burden that 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).[8]

"[I]n order to raise an issue of [*41] fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." Croons, 18 F. Supp. 3d at 203 (internal quotations omitted). In making this determination, a court may examine "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Bader, 985 F. Supp. 2d at 305.

The substantive standards applicable to claims of employment discrimination under Title VII are generally applicable to claims of gender discrimination under Title IX. See Murray, 57 F.3d at 248. Similarly, "[o]nce action under color of state law is established, the analysis for [§ 1983 employment discrimination] claims is similar to that used for employment discrimination claims brought under Title VII." Demoret, 451 F.3d at 149; see also Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) ("Once action under color of state law is established, Feingold's equal protection claim parallels his Title VII claim.").

### 1. Sex, Sex Stereotyping, and Sexual Orientation

Naumovski asserts sex-based discrimination claims in the [*42] First, Fourth, and Seventh causes of action. She alleges she was discriminated against based on her sex, sex stereotyping, and perceived sexual orientation. She namely relies on AD Norris's alleged statement about her being a single female in her 30s, but also makes reference in the complaint to being paid less than male coaches and alleges that the Women's Basketball program receives less resources than the Men's Basketball program. However, as plaintiff does not argue the pay or resources allegations in opposition to defendants' arguments on same, those allegations and any claims on that basis are deemed abandoned. Of course,

---

Defendants point out that the Second Circuit has not yet held that there is a private cause of action under Title IX, see Summa v. Hofstra Univ., 708 F.3d 115, 131 (2d Cir. 2013), and other Circuits have divided on this issue, see id. at 131 n.1 (collecting cases). Courts within this Circuit have suggested that such a cause of action may proceed. See, e.g., Campisi v. City Univ. of New York, No. 15-CV-4859, 2016 U.S. Dist. LEXIS 105078, 2016 WL 4203549, at *4 (S.D.N.Y. Aug. 9, 2016) (collecting cases).

---

[8] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Croons, 18 F. Supp. 3d at 203 (quoting Risco, 868 F. Supp. 2d at 99).

Naumovski also refers to the numerous allegations and rumors that she was engaged in an intimate relationship with another woman, hence the perceived sexual orientation basis.

"Title VII does not, by its express terms, prohibit all arbitrary employment practices. Rather, it is directed only at specific impermissible bases of discrimination such as race, color, religion, sex, or national origin." Dollinger v. State Ins. Fund, 44 F. Supp. 2d 467, 475 (N.D.N.Y. 1999) (McAvoy, C.J.). Quite obviously, the statute prohibits discrimination on the basis of sex. Title VII also protects against sex stereotyping by an employer. See Price Waterhouse v. Hopkins, 490 U.S. 228, 251-52, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) ("[A]n [*43] employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has [impermissibly] acted on the basis of gender.").

Under the gender stereotyping theory of Title VII liability, "individuals who fail or refuse to comply with socially accepted gender roles are members of a protected class." Dawson v. Bumble and Bumble, 398 F.3d 211, 218 (2d Cir. 2005), overruled by Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018). The theory is grounded in the premise that "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Price Waterhouse, 490 U.S. at 251. That is, an employee who faces an adverse employment action "as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim . . . ." Dawson, 398 F.3d at 218.

Similarly, discrimination based on nonconformity with sex stereotypes is a legally cognizable claim under Title IX. See Riccio v. New Haven Bd. of Educ., 467 F. Supp. 2d 219, 226 (D. Conn. 2006) ("[A] female student, subjected to pejorative, female homosexual names by other female students, can bring a claim of sexual harassment under Title IX.").

Defendants contend plaintiff cannot establish a prima facie case for any of her alleged sex-based discrimination claims. They argue she has failed to allege any facts that establish [*44] discrimination based on sex or based upon failing to conform to gender stereotypes and that her claims of gender stereotyping discrimination are intertwined with non-actionable sexual orientation discrimination.

While defendants acknowledge that Title VII forbids discrimination based on stereotyping, they argue that plaintiff has brought her sex and sex stereotyping claims merely in an attempt to "bootstrap non-actionable harassment based on sexual orientation." With regard to AD Norris's alleged statement, which he denies making, defendants contend that even taking plaintiff's allegation as true, a single isolated

statement may not form the basis for a Title VII (or other) claim.

Until recently, the law of the Second Circuit was that "sexual orientation is not included in the statutory protected class" under Title VII. Kiley v. American Soc. for Prevention of Cruelty to Animals, 296 F. App'x 107, 109 (2d Cir. 2008) (summary order); see also Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000) ("The law is well-settled in this circuit . . . that [the plaintiff] has no cause of action under Title VII because Title VII does not prohibit harassment or discrimination because of sexual orientation."). However, on February 26, 2018, the Second Circuit sitting en banc abrogated Simonton and held that Title VII prohibits discrimination based [*45] on sexual orientation. See Zarda, 883 F.3d at 112 (finding that sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination).[9]

In Zarda, the Second Circuit explained

> Looking first to the text of Title VII, the most natural reading of the statute's prohibition on discrimination "because of . . . sex" is that it extends to sexual orientation discrimination because sex is necessarily a factor in sexual orientation. This statutory reading is reinforced by considering the question from the perspective of sex stereotyping because sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions.

Zarda, 883 F.3d at 112. The Court went on to examine the issue "from the perspective of associational discrimination." Id.

Of course, defendants concede that Naumovski is a member of at least one protected class recognized by Title VII, Title IX, and § 1983, that is, she is a woman. However, they contend that she still cannot establish a prima facie case of either sex, sex stereotyping, or sexual orientation discrimination because a single isolated comment alleged to have been made by AD Norris is insufficient [*46] to give rise to an inference of discrimination. Further, they argue plaintiff has made no allegations that she was discriminated

---

[9] Though the parties did not fully brief the issue given the state of the law at the time of the motion's briefing and subsequent oral argument, a claim of discrimination (or hostile work environment or retaliation for that matter) based on sexual orientation or perceived sexual orientation should not catch any party off guard as discrimination on the basis of plaintiff's perceived sexual orientation is really the gravamen of the complaint.

against because she exhibited masculine qualities.

These arguments are rejected. First, "Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases); see also Bader, 985 F. Supp. 2d at 313 (adopting same approach in an effort to avoid redundancy).

Examining the merits of Naumovski's prima facie showing by viewing the evidence in the record in the light most favorable to her, she has satisfied the "minimal" burden that the first step of the McDonnell Douglas framework demands. Contrary to defendants' contention, a sex stereotyping claim does not always require a plaintiff to show that discrimination was motivated by the exhibition of masculine qualities. See Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 121 (2d Cir. 2004) (sex stereotyping based on the belief that a young mother cannot be devoted to her job). Plaintiff has established that she is a member of several protected classes including being [*47] a female and being perceived as gay. There has been no dispute that she was otherwise qualified for the position or that she suffered an adverse employment action when she was terminated.

Taking the facts in the light most favorable to Naumovski, a reasonable juror could find that her termination took place under circumstances giving rise to an inference of discrimination. According to plaintiff, AD Norris made the statement that her "problem" was that she was single and in her thirties. See e.g., Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("When, however . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."). Crediting all reasonable inferences to plaintiff, AD Norris learned about the anonymous, vulgar letter describing a sexual relationship between Naumovski and student athlete J.W. immediately prior to firing her. While defendants Coach Scholl and AD Norris contend they did not believe the allegations about plaintiff and J.W. to be sexually based, plaintiff's version of the facts suggests otherwise. Such inferences are enough to satisfy Naumovski's minimal burden on a prima facie case.

Turning [*48] to the second step of the McDonnell Douglas framework, defendants have carried their burden of identifying a legitimate, nondiscriminatory reason for Naumovski's termination which, taken as true, would permit the conclusion that her termination was nondiscriminatory. According to defendants, plaintiff was terminated because her

coaching style was not conducive to Coach Scholl's program, she challenged Coach Scholl's decisions, she refused to coach all the student athletes and showed favoritism, and her personality was not a good fit for the coaching staff.

Coach Scholl testified that she never knew or perceived plaintiff to be gay and she never believed the rumors to be true. Instead, she believed student athletes were jealous of the coaching attention plaintiff gave J.W. Coach Scholl maintains that she continued to give Naumovski her full support regarding the false rumors, however, she became increasingly unhappy with plaintiff as a coach on her staff. She contends that Naumovski showed favoritism despite being advised to coach all student athletes. She felt plaintiff challenged her coaching decisions and ultimately decided she was no longer a fit on her coaching staff. She informed [*49] AD Norris of her concerns and AD Norris again shared the ongoing complaints he was receiving regarding plaintiff's continued inappropriate favoritism toward J.W. and refusal to coach other student athletes. They decided they would inform plaintiff at the end of the season that her employment was terminated. Asst. Coaches Johnson and Truncale also testified that Coach Scholl and Naumovski bumped heads often.

However, plaintiff has offered evidence suggesting this was merely a pretext for her termination; she contends she was never disciplined for failing to coach all student athletes, she received only positive or satisfactory performance reviews, that her relationship with Coach Scholl actually began to improve in the latter part of the 2010 season, and that Coach Scholl in fact agreed with many of her points regarding coaching and her own style and personality. Naumovski has proffered evidence that, when viewed as a whole, is sufficient to permit a rational finder of fact to infer that defendants' decision to terminate her was more likely than not motivated in part by sex-based discrimination.

Therefore, defendants' motion for summary judgment dismissing the sex-based discrimination [*50] causes of action based on Title VII, Title IX to the extent it can be pleaded, and § 1983 will be denied. Accordingly, the First, Fourth, and Seventh causes of action alleging sex-based discrimination will proceed to trial.

## 2. National Origin

Naumovski asserts national origin discrimination claims in the First and Seventh causes of action. Aside from stating that she is Canadian and that her employment status was changed from term to temporary *because* she is Canadian, plaintiff has made absolutely no allegations to suggest she was discriminated against on the basis of her national origin. Nor has she provided any evidence of same.

Accordingly, defendants' motion for summary judgment dismissing the Title VII and § 1983 national origin discrimination claims will be granted and those portions of the First and Seventh causes of action will be dismissed.

### D. Hostile Work Environment Claims—Title VII, Title IX, and § 1983 (Second, Fifth, Eighth)

Naumovski asserts hostile work environment claims in the following causes of action: (2) Title VII; (5) Title IX; and (8) § 1983. She alleges she was subjected to a hostile work environment because defendants failed to stop students from gossiping and spreading rumors that she was gay and in a relationship with student [*51] athlete J.W.

Title VII prohibits the creation of a hostile work environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) ("Title VII is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"). Title IX prohibits the creation a hostile educational environment. See e.g., Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. Tech., 214 F. Supp. 2d 273, 281 (E.D.N.Y. 2002); Riccio, 467 F. Supp. 2d at 226 (holding that harassment based on nonconformity with sex stereotypes is a legally cognizable claim under Title IX). Section 1983, through its application of the Equal Protection Clause of the Fourteenth Amendment, also protects public employees from various forms of discrimination, including hostile work environments. Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014).

The test to determine whether a plaintiff was the victim of a hostile work environment "has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). The incidents of which a plaintiff complains "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Carrero v. N.Y.C. Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989).

A court must look at the totality of [*52] the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether such conduct unreasonably interferes with the plaintiff's work performance. See Harris, 510 U.S. at 23. The standard for showing a hostile work

environment under § 1983 and the Equal Protection Clause are essentially the same as under Title VII. Demoret, 451 F.3d at 149 ("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender. Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

A plaintiff alleging that her employer violated Title VII by creating a hostile work environment must show "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano, 294 F.3d at 373. With respect to non-employees such as the student athletes in this case, district courts in this Circuit have generally followed the standard for co-workers set forth [*53] in Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998) abrogated on other grounds by Cox v. Onondaga Cty. Sheriff's Dept., 760 F.3d 139 (2d Cir. 2014). The Quinn Court explained that an employer may be held liable for the conduct of a co-worker if there was no reasonable avenue for complaint or the employer knew of the conduct and did nothing about it. Quinn, 159 F.3d at 766.

In Peries v. New York City Board Of Education, No. 97 CV 7109, 2001 U.S. Dist. LEXIS 23393, 2001 WL 1328921, at *5-6 (E.D.N.Y. Aug. 6, 2001), the Court held that the co-worker standard articulated in Quinn "was appropriate in the context of student-on-teacher harassment, particularly because school districts can exercise authority over students in a way that is similar (if not greater) to the authority they have over their employees." Andersen v. Rochester City Sch. Dist., No. 09-CV-6259, 2011 U.S. Dist. LEXIS 41184, 2011 WL 1458068, at *4 (W.D.N.Y. Apr. 15, 2011), aff'd, 481 F. App'x 628 (2d Cir. 2012) (citing Peries, 2001 U.S. Dist. LEXIS 23393, 2001 WL 1328921 at *5-6). Therefore, like the teacher plaintiff in Anderson, plaintiff here may prevail on her hostile work environment claim for conduct of the student athletes if she can demonstrate (1) that a hostile environment existed and (2) that there was no reasonable avenue for complaint or that defendants knew of the harassment and did nothing about it.

In the present case, drawing all reasonable inferences in plaintiff's favor, she has put forth sufficient evidence to overcome summary judgment on her hostile work environment claims. Taking her allegations regarding the frequency and severity of the rumors, a reasonable juror could conclude that the [*54] harassment was severe or pervasive enough to create an objectively hostile or abusive work environment. She has testified that the rumors were more than

episodic; they began sometime in December 2008 and continued until her termination in March 2010. She contends that they were concerted and pervasive; they were made by numerous student athletes at different time periods and were repeated to other student athletes, AD Norris, and Coach Scholl. Looking at the totality of the circumstances, including plaintiff's testimony that the allegations were humiliating, caused her to be depressed, lose weight, and negatively impact her coaching ability, and the corroboration of those negative effects by Coach Scholl and the other assistant coaches, a factfinder could conclude that the conduct was physically threatening or humiliating, and unreasonably interfered with Naumovski's work performance. Notably, according to plaintiff, Coach Scholl acknowledged that rumors like this could ruin a coach's career.

Finally, disputed issues of fact exist as to whether defendants knew of the harassment and did nothing about it. While defendants contend that they did not believe the rumors to be sexually based, [*55] Naumovski refutes this. Moreover, according to her, the only time any action was taken by defendants to address the rumors with the team while she was still employed by SUNY Binghamton was on January 17, 2009, when Coach Scholl led a team meeting where she made a general statement that the "drama" needs to stop but failed to mention the rumors. Drawing reasonable inferences in plaintiff's favor and considering the totality of the circumstances, it cannot be said that no reasonable jury could find that she suffered a hostile work environment.

Accordingly, defendants' motion for summary judgment dismissing Naumovski's hostile work environment claims will be denied. Therefore, the Second, Fifth, and Eighth causes of action will proceed to trial.

## E. Retaliation Claims—Title VII, Title IX, and § 1983 (Third, Sixth, Ninth)

Naumovski asserts retaliation claims in the following causes of action: (3) Title VII; (6) Title IX; and (9) § 1983. She alleges she was retaliated against when she complained about discriminatory conduct to AD Norris and Coach Scholl and was later terminated.

Title VII prohibits retaliation for opposing discrimination. 42 U.S.C. § 2000e-3(a). Title IX also prohibits retaliation "against a person because that person has complained [*56] of sex discrimination." Jackson v. Birmingham Bd. of Ed., 544 U.S. 167, 173, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005). Section 1983, through its application of the First Amendment, provides that an employer cannot retaliate against an employee for complaining about discrimination. See e.g., Howard v. City of New York, 602 F. App'x 545, 548 (2d Cir.

Mar. 4, 2015) (summary order).

Title VII and § 1983 claims for retaliation are all "analyzed pursuant to Title VII principles." Hicks v. Baines, 593 F.3d 159, 162, 164 (2d Cir. 2010). Similarly, "Title VII and Title IX are governed by the same substantive standards for reviewing claims of . . . retaliation." Summa, 708 F.3d at 131. Retaliation claims under Title VII, Title IX, and § 1983 are evaluated under the three-step burden-shifting analysis from McDonnell Douglas. See Hicks, 593 F.3d at 164 (Title VII and § 1983 claims); see also Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 91-92 (2d Cir. 2011) (Title IX claims).

To make out a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012). "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Fraser v. MTA Long Island Rail Road, 307 F. Supp. 3d 105, 2018 WL 1582076, at *7 (E.D.N.Y. 2018) (internal quotations omitted).

Once [*57] a plaintiff has established a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory rationale for their actions. See Burdine, 450 U.S. at 254. The burden then shifts to plaintiff to demonstrate that the employer's stated rationale is merely a pretext for discrimination and that discriminatory animus is the true reason for the defendants' actions. See McDonnell Douglas, 411 U.S. at 802.

With respect to the first element, "[a]n employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14-15 (2d Cir. 2013) (quoting Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001)). "And not just any law—the plaintiff is 'required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'" Id. (quoting McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." Id. at 15 (internal quotations omitted). "A plaintiff's belief on this point is not reasonable simply because

he or she complains of something that appears to be discrimination in some form." Id.

In Kelly, the Second Circuit explained that "a black police [*58] officer who reported overhearing racial slurs made by other police officers against black citizens had not engaged in protected activity despite opposing discrimination by co-employees against non-employees because his opposition was not directed at an unlawful employment practice of his employer." Kelly, 716 F.3d at 15 (internal quotations omitted) (citing Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125, 134-35 (2d Cir. 1999)). In another Second Circuit case, "plaintiff's allegations that her supervisor 'berated' her and made other harsh comments . . . amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination." Drumm v. SUNY Geneseo Coll., 486 F. App'x 912, 914 (2d Cir. 2012) (summary order).

"As to the second element . . . implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

Plaintiff contends she was terminated in retaliation for making complaints about the hostile work environment she was subjected to; that is, for complaining about an environment permeated with rumors that she was gay and allegations of an inappropriate relationship [*59] between she and J.W. Although nothing in Second Circuit caselaw "requires a plaintiff to append to each allegation of harassment the conclusory declaration 'and this was done because of my sex,' the law does require the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of her sex." Kelly, 716 F.3d at 15 (internal quotations omitted). Naumovski alleges that her sex played a substantial role in the student athletes' behavior, that is, the rumors were based on the belief or allegation that plaintiff was gay and in a relationship with a female student athlete. Taking all reasonable inferences in Naumovski's favor, a reasonable juror could conclude that plaintiff herself had a good faith belief that the rumors constituted harassment which violated the law.

With respect to whether her employer was aware of that activity, disputed issues of fact exist as to whether Coach Scholl or AD Norris knew or should have known that she was complaining about or opposing an employment practice made unlawful by Title VII. According to plaintiff, defendants knew the allegations were sexually based and not merely allegations of favoritism. Coach Scholl [*60] commented that she knew student athlete J.W. to be gay and plaintiff has alleged that both she and Norris understood the nature of the allegations. Naumovski sought Coach Scholl's help in dispelling the rumors and getting the harassment to stop. She made clear that the rumors were the result of discrimination based on her perceived sexual orientation and/or sex. A reasonable factfinder could conclude that plaintiff's employer was aware she was complaining about a hostile work environment based on her perceived sexual orientation and/or sex.

It is undisputed that plaintiff suffered a materially adverse action when she was terminated. With respect to whether there was a causal connection between the protected activity and that adverse action, the same disputed issues of fact exist as to this claim as they do to Naumovski's sex-based discrimination claims. In the former, disputed facts exist as to whether or not plaintiff's termination took place under circumstances giving rise to an inference of discrimination. Those disputed facts include what AD Norris knew, and when, about the anonymous letter, and what both AD Norris and Coach Scholl said to plaintiff regarding the rumors. It cannot [*61] be said that there can be but one conclusion as to plaintiff's Title VII and Title IX retaliation claims.

Therefore, defendants' motion for summary judgment dismissing those claims will be denied. The Third and Sixth causes of action alleging retaliation will proceed to trial.

With respect to plaintiff's § 1983 retaliation claim, a plaintiff alleging retaliation must establish speech protected by the First Amendment. Weintraub v. Bd. of Educ., 593 F.3d 196, 200 (2d Cir. 2010). For speech by a public employee to be protected by the First Amendment, the employee must be speaking as a citizen on a matter of public concern. Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012). Whether speech addresses a matter of public concern is a question of law for the court to decide. Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008). To answer this question, a court must "evaluate whether the speech relates to any matter of political, social, or other concern to the community, and whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Norton v. Breslin, 565 F. App'x 31, 34 (2d Cir. 2014) (summary order).

"[M]ere employee grievances do not qualify as matters of public concern." Hoyt v. Andreucci, 433 F.3d 320, 330 (2d Cir. 2006). "There is no categorical approach, however, that places all speech aimed at redressing personal grievances in the employment context beyond the scope of the First Amendment." Norton, 565 F. App'x at 33-34 (internal quotations omitted). "Rather, whether an employee's [*62]

speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 34 (internal quotations omitted).

Naumovski alleges that she was terminated for complaining about being subjected to a hostile work environment on the basis of her sex and perceived sexual orientation. "This is a quintessential employee grievance that may well be protected by the Equal Protection Clause, but not by the First Amendment." Norton, 565 F. App'x at 34 (internal citation omitted). "[A] complaint of system-wide discrimination can raise a public concern, but where the complaint is personal in nature and generally related to the employee's own situation, it is unprotected by the First Amendment." Id. (internal quotations omitted). Naumovski's First Amendment retaliation claim fails because she has not demonstrated that she was retaliated against for engaging in speech that was a matter of public concern.

Accordingly, defendants' motion for summary judgment dismissing plaintiff's First Amendment retaliation claim will be granted and the Ninth cause of action will be dismissed.

## F. New York State Constitution Claims (Tenth, Eleventh, Twelfth)

The New York State Constitution guarantees equal protection of the laws and prohibits discrimination [*63] in civil rights. N.Y. CONST. art. 1, § 11. New York recognizes a private cause of action for violations of Article 1, section 11 of the New York State Constitution. Imperato v. Otsego Cty. Sheriff's Dep't, No. 13-CV-1594, 2016 WL 1466545, at *31 (N.D.N.Y. Apr. 14, 2016) (Sannes, J.) (citing Brown v. State, 89 N.Y.2d 172, 192, 674 N.E.2d 1129, 652 N.Y.S.2d 223 (1996)). That cause of action is only available where a plaintiff has no alternative remedies which would protect his or her interests. Id. (citing Vilkhu v. City of New York, No. 06-CV-2095, 2008 U.S. Dist. LEXIS 36454, 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008)). Thus, because plaintiff has a viable claim under § 1983, defendants' motion for summary judgment as to plaintiff's equal protection claims under the New York State Constitution will be granted and the Tenth and Eleventh causes of action will be dismissed.

The New York State Constitution's Bill of Rights guarantees freedom of speech and press. N.Y. CONST. art. 1, § 8. Plaintiff's free speech claim under Article I, section 8 of the New York State Constitution fails for the same reasons that her First Amendment claim fails. See, e.g., Novak v. Bd. of Educ. of Fayetteville-Manlius Cent. Sch. Dist., 05-CV-0199, 2007 U.S. Dist. LEXIS 17921, 2007 WL 804679, at *7 n.8 (N.D.N.Y. Mar. 14, 2007) (Scullin, J.) (noting that Article I,

section 8 "contains free speech protections that are analogous to those in the federal constitution, and the same legal standards apply"). Accordingly, defendants' motion for summary judgment as to plaintiff's free speech claim under Article I, section 8 of the New York State Constitution will be granted and the Twelfth cause of action will be dismissed.

## V. CONCLUSION

Defendants' motion for summary judgment will be granted in part and denied in part.

Therefore, it is

ORDERED that

1. Defendants' [*64] motion for summary judgment is GRANTED in part and DENIED in part;

2. Defendants' motion for summary judgment is GRANTED and the following claims are DISMISSED:

(a) All Title VII (First, Second, Third) and Title IX (Fourth, Fifth, Six) causes of action against defendants James Norris and Nicole Scholl;

(b) All § 1983 (Seventh, Eighth, Ninth) causes of action against defendants Binghamton University, the State University of New York and the State University of New York;

(c) All New York State Human Rights Law (Thirteenth, Fourteenth, Fifteenth) causes of action against all defendants;

(d) All national origin based causes of action (First, Ninth, Tenth, Thirteenth) against all defendants;

(e) All New York State Constitution (Tenth, Eleventh, Twelfth) causes of action against all defendants;

(f) The § 1983 First Amendment retaliation (Ninth) cause of action against all defendants; and

(g) Any and all claims asserted against John and/or Jane Does;

3. Defendants' motion for summary judgment is DENIED and the following claims REMAIN for trial:

(a) Title VII sex-based discrimination (First), hostile work environment (Second), and retaliation (Third) causes of action against defendants Binghamton University, the State University [*65] of New York and the State University of New York;

2018 U.S. Dist. LEXIS 229239, *65

(b) Title IX sex-based discrimination (<u>Fourth</u>), hostile work environment (<u>Fifth</u>), and retaliation (<u>Sixth</u>) causes of action against defendants Binghamton University, the State University of New York <u>and</u> the State University of New York;

(c) 42 U.S.C.§ 1983 sex-based discrimination (<u>Eighth</u>) and hostile work environment (<u>Ninth</u>) causes of action against defendants James Norris <u>and</u> Nicole Scholl; and

4. Trial is scheduled for September 10, 2018 in Utica, New York.

IT IS SO ORDERED.

/s/ David N. Hurd

United States District Judge

Dated: April 17, 2018

Utica,                              New                              York.

2018 U.S. Dist. LEXIS 229239, *65

**Table1 (**Return to related document text**)**

I. INTRODUCTION

II. BACKGROUND

A. Plaintiff's Hiring

B. The 2008 to 2009 Season
1. J.G. Complaint
2. M.S. Parent Complaint
3. Coach Scholl Responds to Allegations
4. Staff Warnings
5. Conclusion of 2008 to 2009 Season

C. The 2009 to 2010 Season
1. J.G. Complaint
2. Further Staff Warnings
3. Relaying of J.G. Complaint
4. Plaintiff Meets with AD Norris
5. Further Parent Complaints
6. AD Norris Meets with J.W.
7. Plaintiff Under Scrutiny
8. Continued Student Athlete Complaints
9. S.O. Complaint
10. Plaintiff Addresses Team
11. E.C. Complaint
12. Continued Personality Conflicts
13. Coach Scholl and AD Norris Confer
RE: Plaintiff's Performance
14. Plaintiff Meets with Coach Scholl
15. Coach Scholl and AD Norris Again
Confer RE: Plaintiff's Performance
16. J.W.'s Parents Receive Anonymous Letter
17. E.C. and O.O. Complaints
18. J.W.'s Parents Phone AD Norris

D. Plaintiff's Termination
1. Plaintiff Meets **[*2]** with Coach Scholl
2. Plaintiff Meets with AD Norris
3. AD Norris Meets with J.W.'s Parents
4. Coach Scholl Offers Plaintiff Recommendation

III. LEGAL STANDARD

2018 U.S. Dist. LEXIS 229239, *2

IV. DISCUSSION

A. The Complaint

B. Individual and Institutional Liability
1. AD Norris and Coach Scholl
2. SUNY and SUNY Binghamton

C. Discrimination Claims—Title VII, Title IX, and § 1983
(First, Fourth, Seventh)
1. Sex, Sex Stereotyping, and Sexual Orientation
2. National Origin

D. Hostile Work Environment Claims—Title
VII, Title IX, and § 1983
(Second, Fifth, Eighth)

E. Retaliation Claims—Title VII, Title IX, and § 1983
(Third, Sixth, Ninth)

F. New York State Constitution Claims
(Tenth, Eleventh, Twelfth)

V. CONCLUSION

**Table1** ([Return to related document text](#))

---

End of Document

 Neutral

As of: June 17, 2020 5:00 PM Z

# Othon v. Wesleyan Univ.

United States District Court for the District of Connecticut

March 27, 2020, Decided; March 27, 2020, Filed

3:18-CV-00958 (KAD)

**Reporter**

2020 U.S. Dist. LEXIS 53580 *

CHRISTINA OTHON, Plaintiff, v. WESLEYAN UNIVERSITY, Defendant.

**Prior History:** Othon v. Wesleyan Univ., 2019 U.S. Dist. LEXIS 93062 (D. Conn., June 4, 2019)

**Counsel: [*1]** For Christina Othon, Plaintiff: Heena Kapadia, LEAD ATTORNEY, Law Office of Heena Kapadia, Trumbull, CT; Carmen Chapman, Law Office of Heena Kapadia, Trumbull, CT.

For Wesleyan University, Defendant: Emily McDonough Souza, Murtha Cullina LLP, New Haven, CT; Martha McNamara Royston, Patricia E. Reilly, Murtha Cullina - NH, New Haven, CT; Matthew K. Curtin, Murtha Cullina LLP, Hartford, CT.

**Judges:** KARI A. DOOLEY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KARI A. DOOLEY

# Opinion

**MEMORANDUM OF DECISION RE: MOTION TO DISMISS**

Kari A. Dooley, United States District Judge

Through this action, Christina Othon ("Othon"), a former associate professor at Wesleyan University ("Wesleyan"), challenges the denial of her application for tenure and her subsequent termination. Pending before the Court is Wesleyan's motion to dismiss Counts Three and Four of the Amended Complaint, which assert claims for sex-based discrimination and retaliation under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). (ECF No. 59.) Wesleyan contends that Title IX affords no private remedy for employment discrimination claims and, therefore, these counts fail to state a claim upon which relief can be granted. For the reasons set forth below, the Court agrees with Wesleyan and the motion **[*2]** to dismiss is therefore GRANTED.

**Background**[1]

In July 2010, Othon began working as an associate professor in the Physics Department at Wesleyan. During the course of her employment, Othon experienced and observed a variety of sex-based discrimination. For example, Othon "faced combative and occasionally hostile treatment within the classroom from male students." (Amended Compl. at ¶ 28, ECF 57.) These students further provided negative teaching evaluations "which often were overtly biased and inaccurately portrayed what had actually occurred in class." (*Id.* at ¶ 30.) Notwithstanding this and other challenges, Othon continued to pursue a tenured teaching position at Wesleyan.

During her third year review, "the Advisory Committee, relying solely on the gender biased teaching evaluations, gave [Othon] an unfavorable evaluation." (*Id.* at ¶ 38.) The Advisory Committee further gave Othon only a two-year reappointment that was contingent upon strong student evaluations, which was an "unusual" decision and inconsistent

---

[1] For purposes of resolving the motion to dismiss, the Court accepts the allegations in the complaint as true.

with Wesleyan's policies and procedures. (*Id.* at ¶ 39.) In the fall of 2015, Othon underwent her fifth year review, after which the Advisory Committee "issued a decision essentially [*3] terminating [Othon's] contract with [Wesleyan] and striking her ability to apply for tenure." (*Id.* at ¶ 56.) The Advisory Committee again stated that its decision was based on Othon's teaching evaluations. (*Id.*) That decision was subsequently overturned, but the Advisory Committee stated that "going forward the teaching evaluations would continue to be 'central' to its decision in the teaching category" of Othon's tenure review. (*Id.* at ¶ 65.)

In June of 2016, Othon filed a sex-discrimination complaint with Wesleyan's Office of Diversity and Equity. (*Id.* at ¶ 70.) "[Othon] asked the Office of Diversity and Equity to address the dependence on student evaluations in faculty assessments because of the gender bias that permeates them and the impact they had on her in the third and fifth year review process." (*Id.*) On November 15, 2016, Othon was informed that the investigation into her complaint was complete and no further action was taken. (*Id.* at ¶¶ 79-81.) Three months later, on February 21, 2017, Othon learned that her tenure application had not been approved. (*Id.* at ¶¶ 100, 103-04.) Othon accuses the chair of the Physics Department of responding poorly to her Title IX claim and hindering [*4] her tenure application efforts. (*Id.* at ¶¶ 76-77, 87-99.) Othon also contends that Wesleyan engaged in other retaliatory conduct after her tenure application was not approved. (*Id.* at ¶¶ 128-137.)

Othon instituted this action on June 6, 2018. The operative complaint is the Amended Complaint. (ECF No. 57.) As relevant to the motion to dismiss, Othon asserts claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and Title IX. In Counts One and Three, respectively, she asserts claims for discrimination on the basis of sex and hostile work environment in violation of Title VII and Title IX. In Counts Two and Four, respectively, she asserts claims for retaliation in violation of Title VII and Title IX.[2]

─────────────

[2] In Count Four, Othon alleges only that Wesleyan "retaliated against [her] for expressing opposition to discriminatory conduct based on her sex and raising concerns regarding noncompliance with Title IX requirements." (Amended Compl., Count Three, at ¶ 138.) In her post-hearing opposition brief, however, Othon suggests that she could have a viable Title IX claim based on her allegation that the Office of Diversity and Equity at Wesleyan misunderstood her Title IX complaint to be about the culture of the Physics Department and its impact on female students. This theory of liability does not fall within the scope of Count Four as currently pleaded, and the Court takes no position of the viability of such a claim.

## Standard of Review

The standard of review for motions to dismiss is well settled. To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This case [*5] is unique in that it involves a purely legal question. That is, whether Title IX has an implied private right of action for employment discrimination claims. A motion made under Rule 12(b)(6) is the appropriate vehicle for testing the "legal feasibility" of such a cause of action. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).

## Discussion

Title IX provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a). Title IX contains a federal administrative enforcement provision, which authorizes the Department of Education to terminate or refuse to grant financial assistance to any program or activity that fails to comply with Title IX. 20 U.S.C. § 1682. Title IX does not expressly provide for a private right of action.

Nonetheless, it is well settled that Title IX includes an implied private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979). The question before the Court is scope of that implied remedy. Othon contends that Title IX affords a private remedy for employment discrimination claims, while Wesleyan contends that it does not. Neither the United States Supreme Court nor the Second Circuit [*6] Court of Appeals have addressed this issue, and the Circuit Court of Appeals and district courts that have are divided. The courts that have addressed this issue consistently look to the legislative history of Title IX and Title VII, Supreme Court precedent interpreting or discussing Title IX, and Supreme Court precedent discussing the scope and impact of Title VII. In this Court's view, the resolution of the issue presented here is found at the intersection of these authorities.

**Legislative History of Title IX and Title VII**

In the 1960s, Congress passed a series of laws aimed at ending employment discrimination and discrimination in federally funded programs. But many of these laws did not adequately address sex-based employment discrimination, particularly in the educational system. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523, 102 S. Ct. 1912, 72 L. Ed. 2d 299 & n.13 (1982) (summarizing history of Title IX) [hereinafter "*Bell*"]. For instance, although Title VII prohibited employment discrimination on the basis of sex, it contained an exemption for educational institutions. Pub. L. 88-352, Title VII, § 702, 78 Stat. 255 ("This act shall not apply . . . to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."). Similarly, [**7**] the Equal Pay Act of 1963 banned discrimination in wages on the basis of sex, but it exempted "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools)." 29 U.S.C. § 213(a)(1). Lastly, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, ("Title VI") while barring discrimination on the basis of "race, color, or national origin" in federally funded programs and activities, did not bar discrimination on the basis of sex. 42 U.S.C. § 2000d.

In 1972, Congress passed the Equal Employment Opportunity Act of 1972 ("1972 Amendments"), which removed most of Title VII's exemption for educational institutions, making them subject to Title VII's prohibitions, regardless of whether they receive federal funding.[3] *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995). That same year, "the provisions ultimately enacted as Title IX were introduced in the Senate by Senator Bayh during debate on the Education Amendments of 1972" (the "Education Amendments"). *Bell*, 456 U.S. at 524 (footnote omitted). As explained by Senator Bayh, his proposed amendment "basically . . . closes loopholes in existing legislation relating to general education programs and employment resulting from those programs." *Id.* (quoting [**8**] 188 Cong. Rec. 5803(1972)). "In addition to prohibiting gender discrimination in federally funded education programs and threatening termination of federal assistance for noncompliance, the [proposed] amendment included provisions extending the coverage of Title VII and the Equal Pay Act to educational institutions." *Bell*, 456 U.S.

at 524.

Eventually, in fact three months after passing the 1972 Amendments which removed Title VII's exemption for educational institutions, Congress passed the Education Amendments, to include Title IX. In addition to enacting Title IX, the Education Amendments amended the Equal Pay Act so that its minimum wage requirements applied to employees working in an executive, administrative, and professional capacity. Title VI, § 906, 86 Stat. 375; *see also* 29 U.S.C. § 213(a). And, because they were no longer necessary in light of the 1972 Amendments, the provisions regarding Title VII were removed from the Education Amendments prior to its passage. *Bell*, 456 U.S. at 529 n.18.

**Supreme Court Precedent Interpreting Title IX**

Shortly after the enactment of Title IX, litigation as to its scope began. One of the first issues raised was whether Title IX contains an implied private right of action. In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979), the Supreme Court, applying the factors set forth in *Cort v. Ash*, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975),[4] concluded that it did. As relevant to the instant discussion, the Supreme [**9**] Court determined that Title IX's legislative history indicated that Congress expected courts to recognize an implied private right of action, as federal courts had previously construed similar remedial statutes to have an implied private right of action. *Id.* at 694-703. For example, Title VI, on which Title IX was patterned, had been construed by several federal courts to include an implied private right of action. *Id.* at 696-97. The Supreme Court had also interpreted comparable language in the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, as authorizing an implied private remedy. *Id.* at 698-99; *Allen v. State Bd. of Elections*, 393 U.S. 544, 557, 89 S. Ct. 817, 22 L. Ed. 2d 1 (1969). Given the "unusually important" nature of these precedents, the Supreme Court concluded that it was "not only appropriate but also realistic to presume that Congress was thoroughly

_____

[3] Title VII continues to have a limited exemption for religious educational institutions with respect to the employment of individuals of a particular religion. 42 U.S.C. § 2000e-1(a).

_____

[4] "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort*, 422 U.S. at 78 (citations omitted; internal quotation marks omitted).

familiar with [them] . . . and that it expected [Title IX] to be interpreted in conformity with them." *Id.* at 699. The Supreme Court further determined that recognizing a private right of action would not frustrate the purpose of Title IX. *Id.* at 703-08. On the contrary, the Department of Health, Education, and Welfare ("HEW"), which preceded the Department of Education, took "the unequivocal position that the individual remedy will provide effective assistance to achieving the statutory purposes," [*10] admitting that "it does not have the resources necessary to enforce Title IX in a substantial number of circumstances." *Id.* at 706-08 & n.42.

Since *Cannon*, the Supreme Court has continued to sculpt the parameters of Title IX's private remedy. In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992), the Supreme Court held that monetary damages are available in private suits brought under Title IX. More recently, in *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005), the Supreme Court held that retaliation was a form of gender discrimination within the meaning of Title IX. *Id.* at 171. In that case, the plaintiff was removed from his position as the girls' basketball coach after complaining to his supervisors about the disparate treatment his team received. *Id.* at 171-72. He subsequently filed suit under Title IX, and the defendant moved to dismiss, arguing that Title IX's private remedy did not encompass retaliation claims. *Id.* at 172. The district court and Eleventh Circuit agreed with the defendant, but the Supreme Court reversed. *Id.* at 171. The Supreme Court reasoned that retaliation "is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." [*11] *Id.* at 174 (citations omitted). Therefore, retaliation claims fell within the scope of Title IX's private remedy.

The Supreme Court has also weighed in on HEW's regulatory authority under Title IX. In 1975, HEW "invoked its . . . authority to issue regulations governing the operation of federally funded education programs. . . . Interpreting the term 'person' in [Title IX] to encompass employees as well as students, HEW included among the regulations a series entitled 'Subpart E,' which deals with employment practices, ranging from job classifications to pregnancy leave." *Bell*, 456 U.S. at 515-16 (footnotes omitted). Subpart E was the subject of much controversy, and a split emerged among the Circuit Court of Appeals concerning whether HEW had authority to issue regulations prohibiting sex discrimination in employment. *Id.* at 519-20.

The Supreme Court addressed this Circuit split in *New Haven*

*Board of Education v. Bell*, 456 U.S. 512, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982) and held that HEW had the authority to issue Subpart E. *Id.* at 530. The court noted that Title IX contained a "broad directive" that "no person" be discriminated against on the basis of sex. *Id.* at 520. Employees, like students, are capable of being "excluded from participation in" or "denied the benefits of" education programs receiving federal financial support. *Id.* (internal [*12] quotation marks omitted). In addition, the statements of Senator Bayh, the amendment's sponsor, during the debate indicated that he and the Senate understood that Title IX would cover employment practices. *Id.* at 524-27. The House of Representatives acceptance of the Senate's omission of an amendment that would have carved employment discrimination out of Title IX was viewed as further evidence that Congress intended to prohibit sex discrimination in employment. *Id.* at 528. Finally, the Supreme Court noted that Congress was aware of HEW's interpretation of Title IX to encompass employment discrimination, and the controversy surrounding Subpart E, but had rejected legislation that would have amended Title IX to limit its coverage of employment discrimination. *Id.* at 531-35. This was significant because Congress had amended Title IX to address other regulations with which it disagreed. *Id.* at 534. All of these factors, the court concluded, weighed in favor of recognizing HEW's authority to issue regulations on employment discrimination.

**Supreme Court Precedent Interpreting Title VII**

Title VII provides, in pertinent part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any [*13] individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . .

42 U.S.C. § 2000e-2(a)(1). Title VII also contains an enforcement provision that subjects employment discrimination claims to "a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372-73, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979) [hereinafter "*Novotny*"]; *see also* 42 U.S.C. § 2000e-5 (setting forth enforcement provisions of Title VII).

Importantly, Congress' "comprehensive plan" for Title VII includes the requirement that the complainant exhaust administrative remedies before filing suit in federal court. *Novotny*, 442 U.S. at 373. If Title IX contains a private

remedy for employment discrimination, employees of federally funded educational programs or activities would be able to by-pass these mandatory administrative procedures and file a claim directly in federal court. Accordingly, courts also analyze the interplay between Title IX's implied private remedy and the scope and applicability of Title VII when determining whether Title IX affords a private right of action for employment discrimination.

The Supreme Court has previously [*14] held that statutes with comprehensive or elaborate remedial schemes foreclose alternative avenues of relief. *E.g., Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005) (holding that Telecommunications Act precluded claims under 42 U.S.C. § 1983 because allowing "[e]nforcement of [the Telecommunications Act] through § 1983 would distort the scheme of expedited judicial review and limited remedies created by [the Telecommunications Act]"); *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984) ("find[ing] it difficult to believe that Congress" intended to permit "handicapped child to go directly to court with an equal protection claim to a free appropriate public education" through a Section 1983 claim because of "the comprehensive nature of the procedures and guarantees set out in the [Education of the Handicapped Act] and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child")[5]; *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assn.*, 453 U.S. 1, 20-21, 101 S. Ct. 2615, 69 L. Ed. 2d 435 (1981) (holding that plaintiffs cannot use Section 1983 as a vehicle for redressing claims under the Federal Water Pollution Control Act and Marine Protection, Research, and Sanctuaries Act of 1972 because these statutes were sufficiently comprehensive to demonstrate Congressional intent to preclude suit under Section 1983); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252-55, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) (reviewing [*15] and analyzing this precedent).

Title VII, on the other hand, "was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination," and "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). As a result, the Supreme Court has permitted claimants to pursue claims under both Title VII and

civil rights statutes existing at the time Title VII was passed. For example, in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975), the Supreme Court held that Title VII does not foreclose claims brought under 42 U.S.C. § 1981. *Id.* at 461. In doing so, the Supreme Court noted that Congress had specifically indicated that Title VII would be coextensive with Section 1981 and "that the two procedures augment each other and are not mutually exclusive." *Id.* at 459 (quoting H.R. Rep. No. 92-238, p.19 (1971)).[6]

There are some cases, however, in which the Supreme Court and the Second Circuit have declined to recognize co-extensive rights. In *Brown v. General Services Administration*, 425 U.S. 820, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976), the Supreme Court held that federal employees could not bring employment discrimination claims under Section 1981 because it concluded that [*16] Title VII provides the exclusive remedy for employment discrimination claims made by federal employees. *Id.* at 835. The court distinguished *Johnson* in two respects. First, it noted that "there were no problems of sovereign immunity in the context of the Johnson case." *Id.* at 833. Second, *Johnson* relied upon the explicit legislative history of the 1964 Act which made clear that Title VII remedies are coextensive with those available under civil rights statutes enacted in the 19th Century, including Section 1981. *Id.* at 833-34. The 1972 Amendments, which brought federal employees within the reach of Title VII, had "no such legislative history." *Id.* at 834. To the contrary, Congress believed that federal employees had no effective judicial remedy and passed the 1972 Amendments to solve that problem. *Id.* at 827-28. Lastly, the court noted that "[i]n a variety of contexts the Court has held that a precisely drawn, detailed statute pre-empts more general remedies." *Id.* at 834.

Three years later, in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979), the Supreme Court held that Title VII precludes employment discrimination claims brought under

---

[5] *Superseded by statute as stated in Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 197 L. Ed. 2d 46 (2017).

[6] Othon relies heavily on *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974), which held that an individual does not forfeit his claims under Title VII by utilizing the grievance procedure provided for in a collective-bargaining agreement. *Id.* at 49. *Alexander* is inapposite. Therein, the court was addressing two distinct rights; one contractual, one statutory. As the Supreme Court explained, "a contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination. Both rights have legally independent origins and are equally available to the aggrieved employee." *Id.* at 52.

42 U.S.C. § 1985(3).[7] There, the court's decision was driven by the fact that "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id.* at 372; *see also id.* at 376 ("It is a [**17]** purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section."). As a result, the Supreme Court viewed *Novotny* as differing "markedly" from those involving substantive rights in two respects. *Id.* at 377. First, in cases like *Johnson*, the court was confronted with the issue of whether substantive rights conferred in the 19th Century were withdrawn, *sub silentio*, through the subsequent passage of modern statutes, like Title VII. *Id.* The later-passed Section 1985(3) did not raise any such concerns. Second, because Section 1985(3) does not confer any "independent" rights, the court could not justify the damage that would be done to the Title VII's comprehensive and well-balanced remedial scheme by permitting a claimant to proceed immediately to federal court with a suit under Section 1985(3). *Id.* at 378.

Finally, in *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134 (2d Cir. 1993), the Second Circuit held that Title VII forecloses claims asserted under 42 U.S.C. § 1983 unless the claim is "based on substantive rights distinct from Title VII." *Id.* at 143 (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 576 (2d Cir. 1989)); *accord Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984). After all, "[i]t would be anomalous to hold that when the only unlawful employment practice [**18]** consists of the violation of a right created by Title VII, the plaintiff can by-pass all of the administrative processes of Title VII and go directly into court under § 1983." *Day*, 749 F.2d at 1204; *accord Saulpaugh*, 4 F.3d at 143 ("A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, *see Day*, 749 F.2d at 1204. . . .").

**Other Circuit Court of Appeals Decisions**

It is against this legal backdrop that courts and parties have wrestled with the question of whether Title IX affords a private remedy for employment discrimination claims. The Third, Fifth, and Seventh Circuits have written the leading opinions on this issue.[8]

The Fifth Circuit took up this issue first in *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995) and concluded that Title VII provides the exclusive remedy for individuals seeking monetary damages[9] for sex-based employment discrimination in federally funded educational institutions. *Id.* at 753. The Fifth Circuit rejected the plaintiff's argument that, in combination, *Cannon, Bell*, and *Franklin* provide for "an implied private right of action for damages under Title IX for employment discrimination" because none of those cases "required the Court to address the relationship between Title VII and Title IX." *Id.* at 753-54. *Cannon* and *Franklin* [**19]** involved claims by prospective or current students, while *Bell* involved a challenge to administrative regulations. *Id.* at 754.

directly on appeal. First, in *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988), the First Circuit held that the Title VII standard for proving discriminatory treatment should apply to a medical resident's claim under Title IX that she was subjected to sex discrimination during her residency program, but the court did not separately analyze why there is a private remedy for employment discrimination claims under Title IX. *Id.* at 896-97.

Next, in *Preston v. Virginia ex rel. New River Community College*, 31 F.3d 203 (4th Cir. 1994), the Fourth Circuit cited *Bell* for the proposition that Title IX's implied private right of action "extends to employment discrimination on the basis of gender by educational institutions receiving federal funds." *Id.* at 206. But, as previously discussed, *Bell* addressed whether HEW could regulate employment practices under Title IX, not whether Title IX affords a private remedy for employment discrimination claims. *Bell*, 456 U.S. at 514. In addition, the only issue before the Fourth Circuit was whether the trial judge erred by not awarding the plaintiff damages under Title IX based on certain findings made by the jury at trial, not whether the plaintiff had a cause of action under Title IX, arguably rendering the court's statement about the existence of a private remedy *dicta*. *Preston*, 31 F.3d at 205, 208-09.

Lastly, in *Ivan v. Kent State University*, 92 F.3d 1185 (6th Cir. 1996), the Sixth Circuit proclaimed in a footnote of an unpublished *per curiam* opinion that Title VII does not preempt an individual's private remedy under Title IX. *Id.* at 1185 n.10. The Court provided no reasoning for this decision, and it is unclear whether the issue was raised and briefed by the parties. Instead, the impetus for the Sixth Circuit's pronouncement was *Wedding v. University of Toledo*, 862 F. Supp. 201, 203 (N.D. Ohio 1994), in which a different district court held that Title VII precludes a private right of action under Title IX for employment discrimination claims. *See Ivan*, 92 F.3d at 1185 n.10. *Wedding* was on appeal before the Sixth Circuit at the same time as *Ivan*, but no challenge was raised to the district court's Title IX holding. *Wedding v. Univ. of Toledo*, 89 F.3d 316, 317 (6th Cir. 1996). For these reasons, the Sixth Circuit's pronouncement in Footnote 10 is likely *dicta*.

---

[7] Section 1985(3) proscribes conspiracies to deprive other of federally guaranteed rights and privileges.

[8] Othon cites decisions from the First, Fourth, and Sixth Circuits which purportedly support her position, but the analysis in each of the relevant cases is spartan or is made in the context of an issue not

[9] The Fifth Circuit "express[ed] no opinion [as to] whether Title VII excludes suits seeking only declaratory or injunctive relief." *Id.* at 753.

"Given the availability of a private remedy under Title VII for aggrieved employees, [the Fifth Circuit was] unwilling to follow Dr. Lakoski's beguilingly simple syllogism that *Cannon*, *Bell*, and *Franklin* all add up to an implied private right of action for damages under Title IX for employment discrimination," particularly because it "would disrupt [the] carefully balanced remedial scheme" embodied in Title VII. *Id.*

The court further concluded that "Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination." *Id.* at 755. The court observed that precisely drawn, detailed statutes are ordinarily viewed as preempting more general remedies, and the Supreme Court in *Novotny* had refused to permit claimants to bypass Title VII's administrative process through a claim brought under Section 1985 for this reason. *Id.* The Fifth Circuit had reached a similar conclusion with respect to Section 1983. *Id.* The court recognized that Congress could and did permit certain pre-existing remedial schemes to remain intact after the passage of Title VII. *Id.* at 755-56. But the [*20] court thought it an "extraordinary proposition" that "Congress intended to create a bypass of Title VII's administrative procedures so soon after its extension to state and local governmental employees" and its removal of the exception for educational institutions. *Id.* at 756-57. Instead, the Fifth Circuit surmised that

> in enacting Title IX, Congress chose two remedies for the same right, not two rights addressing the same problem. Title VII provided *individuals* with administrative and judicial redress for employment discrimination, while Title IX empowered *federal agencies* that provided funds to educational institutions to terminate that funding upon the finding of employment discrimination.

*Id.* at 757. Accordingly, the Fifth Circuit held that there was no private remedy under Title IX for employment discrimination claims. *Id.* at 758.

The Seventh Circuit took up this issue next in *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996).[10] There, the Seventh Circuit reached the same conclusion as the *Lakoski* court but by a slightly different path. The chief issue identified by the Seventh Circuit was whether Title VII, as "a comprehensive statutory scheme for protecting rights against discrimination in employment," foreclosed employment discrimination claims brought under [*21] other statutes. *Id.* at 861-62. Citing *Lakoski* and *Middlesex County Sewerage*

Authority v. National Sea Clammers Association, 453 U.S. 1, 20-21, 101 S. Ct. 2615, 69 L. Ed. 2d 435 (1981), the Seventh Circuit concluded that it did without much independent analysis. *Waid*, 91 F.3d at 862.

Finally, three years ago, the Third Circuit took up this issue again in *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d Cir. 2017). Unlike its sister courts, the Third Circuit concluded that Title VII does not displace sex-based employment discrimination claims brought under Title IX. *Id.* at 560. Extrapolating from *Johnson*, *Brown*, *Cannon*, *Bell*, *Franklin*, and *Jackson*, the Third Circuit adduced several guiding principles. *Id.* at 560-62. "*First* private-sector employees aren't 'limited to Title VII' in their search for relief from workplace discrimination." *Id.* at 562 (quoting *Johnson*, 421 U.S. at 459). "*Second* it is a matter of 'policy' left for Congress's constitutional purview whether an alternative avenue of relief from employment discrimination might undesirably allow circumvention of Title VII's administrative requirements." *Doe*, 850 F.3d at 562 (citing *Bell*, 456 U.S. at 535 n.26). "*Third* the provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students." *Doe*, 850 F.3d at 562 (citing *Bell*, 456 U.S. at 520 and *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979)). "*Fourth* Title IX's implied private cause of action extends explicitly to *employees* of federally-funded education programs who allege sex-based *retaliation* claims under Title IX." *Doe*, 850 F.3d at 562 (*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 171, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005)). All of these principles, [*22] the Third Circuit reasoned, supported recognition of an implied private right of action in Title IX for employment discrimination claims.

The Second Circuit has not addressed this issue, and the district courts in this Circuit are currently divided. *Compare Gayle v. Children's Aid Coll. Prep Charter Sch.*, No. 18-cv-09874 (GBD), 2019 U.S. Dist. LEXIS 126997, 2019 WL 3759097, at *5-*6 (S.D.N.Y. July 29, 2019) (concluding there is no private remedy for employment discrimination claims under Title IX); *Uyar v. Seli*, No. 3:16-cv-00186, 2017 U.S. Dist. LEXIS 30853, 2017 WL 886934, at *6 (D. Conn. Mar. 6, 2017) (same); *Philpott v. New York*, 252 F. Supp. 3d 313, 319 (S.D.N.Y. 2017) (same); *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004) (same); *and Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 97-cv-05767 (DLC), 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) (same) *with Doe v. Cent. Conn. State Univ.*, No. 3:19-cv-00418 (MPS), 2020 U.S. Dist. LEXIS 42100, 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) (concluding Title IX provides a private remedy for employment discrimination claims); *Hauff v. State Univ. of N.Y.*, No. 18-cv-07256 (DRH) (ARL), 2019 U.S. Dist. LEXIS 208167,

---

[10] *Abrogated on other grounds in Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009).

2019 WL 6498256, at *8 (E.D.N.Y. Dec. 3, 2019) (same); *and Henschke v. N.Y. Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993) (same).

## Analysis

For the reasons that follow, this Court agrees with those courts that have concluded that there is no private remedy under Title IX for employment discrimination claims.

Turning first to the legislative history of Title IX, it is clear that Congress intended for the Department of Education (formerly, HEW) to be able to regulate workplace practices and withdraw federal funding for Title IX violations in the employment context. It is [*23] entirely unclear, however, whether Congress anticipated that claimants would use Title IX as a vehicle for asserting quintessential employment discrimination claims, rather than utilizing the comprehensive remedial scheme established by Title VII. Although it was initially proposed that the Education Amendments would be used to close the "loopholes" in Title VII, Congress ultimately chose to close those loopholes with the 1972 Amendments, which amended Title VII. As the Fifth Circuit aptly observed, the notion that Congress intended to create a bypass of Title VII's intricate administrative procedures a mere three months after extending Title VII to governmental employees and educational institutions "is an extraordinary proposition." *Lakoski*, 66 F.3d at 756. In this Court's view, the timing of the passage of the 1972 Amendments, followed by the removal from Title IX references to identical remedial provisions, and the subsequent passage of Title IX create a compelling inference that Congress did not intend Title IX to provide a private right of action for employment discrimination. Instead, the more reasonable interpretation of the legislative history, especially in light of *Bell*, is that "Congress chose two remedies for the [*24] same right, not two rights addressing the same problem"—a private remedy under Title VII and an administrative remedy under Title IX. *Id.* at 757.

The Supreme Court's precedent interpreting Title IX does not command a contrary conclusion. The Supreme Court has never addressed, in *dicta* or otherwise, how Title IX's implied private remedy will apply to employment claims or the relationship between Title VII and Title IX. Othon argues, and the *Doe* Court agreed, that *Jackson* significantly changed the legal landscape of Title IX in the employment context. This Court disagrees. Jackson's claim was based on the school board "retaliating against him for protesting the discrimination against the girls' basketball team," not discriminatory employment practices. *Jackson*, 544 U.S. at 172.

In fact, Jackson, as the district court held, had no actionable claim under Title VII. *Jackson v. Birmingham Bd. of Educ.*, No. 01-cv-01866 (TMP), 2002 U.S. Dist. LEXIS 27597, 2002 WL 32668124, at *2 (N.D. Ala. Feb. 25, 2002) ("Title VII prohibits retaliation only for complaints concerning or opposition to employment practices that are illegal under Title VII."). The same would be true were such a case brought in this Circuit. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs [*25] because of an employee's sex, or other protected characteristic. In determining whether an employee has been discriminated against because of *such individual's* . . . sex, the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." [citations omitted; internal quotation marks omitted]); *e.g., Price v. Wilton Pub. Sch. Dist.*, No. 3:97-cv-02218 (AVC), 1998 U.S. Dist. LEXIS 23138, 1998 WL 2027632, at *7 (D. Conn. Sept. 23, 1998) (holding that coach's employment discrimination claim which was based on gender of female athletes he coached "cannot be subsumed within Title IX because Title VII does not prohibit discrimination against teachers based on the gender of their students"). And without recourse under Title VII, Jackson may have been left with no remedy for his retaliatory removal as the girls' basketball coach if the Supreme Court did not recognize his claim under Title IX. *Jackson*, 544 U.S. at 180-81 ("[I]f Title IX's private right of action does not encompass retaliation claims, the teacher would have no recourse if he were subsequently fired for speaking out [about a principal sexually harassing a student]. Without protection from retaliation, individuals who [*26] witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied."). Accordingly, *Jackson* does not shed light on the impact of Title IX on the implied private remedies afforded by Title IX because the Supreme Court had no need to grapple with the issue presented here.

The only case in which the Supreme Court has addressed whether Title IX encompasses employment discrimination is *Bell*. But, as previously indicated, *Bell* was "a challenge to the validity of administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices. *Bell* was not a claim by an individual for money damages for discrimination. In *Bell*, unlike here, a private remedy for aggrieved employees under Title VII did not affect, much less undermine, the validity of regulations for terminating federal funding." *Lakoski*, 66 F.3d at 754. As a result, "this authority is a far cry from holding that Title IX also authorized, like Title VII, private causes of action in this court by the employee to remedy such discrimination." *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y.

2001).

That the Supreme Court has never had occasion to consider [*27] the interplay of Title IX and Title VII in the employment context is, in the Court's view, significant. In finding an implied right of action in *Cannon*, the Court appears to have been influenced by HEW's candid admission "that it does not have the resources necessary to enforce Title IX in a substantial number of circumstances." *Cannon*, 441 U.S. at 708 n.42. As a result, not recognizing a private remedy could have been "far more disruptive of HEW's efforts efficiently to allocate its enforcement resources under Title IX than a private suit against the recipient of federal aid could ever be." *Id.* at 706 n.41. This was because "if no private remedy exists, the complainant is relegated to a suit under the Administrative Procedure Act to compel the agency to investigate and cut off funds." *Id.* These concerns are not present in the employment context where claimants can seek relief under Title VII, as Othon has done in this case, or other remedial statutes that existed at the time Title VII was enacted.

Othon, relying on *Johnson*, contends that Title VII does not preclude her claims. As discussed above, the Supreme Court held in *Johnson* that Title VII is generally not a preclusive statute. *Johnson*, 421 U.S. at 461. But the Supreme Court has declined to recognize [*28] concurrent remedies where the statute at issue does not create independent, substantive rights and was enacted subsequent to Title VII. *E.g.*, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376-78, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834-35, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976).

The Court recognizes that Title IX does create substantive rights. But in the employment context those rights are indistinguishable from the rights conferred by Title VII. Both statutes protect individuals from sex-based employment discrimination, and nothing in the statutory language suggests that there is any material difference in the substantive rights conferred by these statutes.[11] *Lakoski*, 66 F.3d at 756. In fact, courts apply Title VII substantive standards to Title IX claims, reinforcing the parity of the statutes. *Doe v. Columbia*

*Univ.*, 831 F.3d 46, 55 (2d Cir. 2016) ("[Title VII and Title IX] claims have so much in common that, at least on certain sorts of facts, rules the Supreme Court established for Title VII litigation appear to apply also to such similar claims of sex discrimination under Title IX"); *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("Title VII and Title IX are governed by the same substantive standards for reviewing claims of both harassment and retaliation."); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI . . ., courts have interpreted Title IX by looking to the body [*29] of law developed under Title VI, as well as the caselaw interpreting Title VII." [citation omitted]).

Title IX was also enacted after Title VII. In *Novotny*, the Supreme Court seemed to draw a distinction between statutes that preceded Title VII and those that followed. *Novotny*, 442 U.S. at 376 (noting that the case did not present "a question of implied repeal" and "thus differs markedly from the cases recently decided by this Court that have related the substantive provisions of last century's Civil Rights Acts to contemporary legislation conferring similar substantive rights"). Given the elaborate and comprehensive nature of Title VII, "in enacting Title VII, Congress presumably intended to leave intact only pre-existing alternative remedies, not to permit future overlapping avenues of relief unless it explicitly announced, in the course of providing the subsequent remedy, that it was to be in addition to Title VII." *Storey v. Bd. of Regents of Univ. of Wis. Sys.*, 600 F. Supp. 838, 842 (W.D. Wis. 1985); *accord Gayle v. Children's Aid Coll. Prep Charter Sch.*, No. 18-cv-09874 (GBD), 2019 U.S. Dist. LEXIS 126997, 2019 WL 3759097, at *6 (S.D.N.Y. July 29, 2019); *Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 17-cv-05767, 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 410 (S.D.N.Y. 1998). As discussed above, there is no indication that Congress intended to create concurrent private remedies when passing Title IX. To the contrary, [*30] this Court believes that the legislative history of the 1972 Amendments, read in conjunction with the legislative history of the Educational Amendments, reflect Congress' selection of Title VII as the available private remedy for claims of employment discrimination. The disruption recognizing such a right would cause to Title VII further counsels against such recognition. *Storey v. Bd. of Regents of Univ. of Wis. Sys.*, 604 F. Supp. 1200, 1205 (W.D. Wis. 1985) ("Much stronger indicia than those noted in *Cannon* are required to persuade me Congress intended to imply remedies for employment-related discrimination, altering and disturbing the comprehensive and elaborate Title VII mechanism."); *Burrell*, 995 F. Supp. at 410 (same).

---

[11] *Compare* 42 U.S.C. § 2000e-2(a)(1) (providing that it shall be unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex") *with* 20 U.S.C. § 1681(a) (providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance").

Finally, citing *North Haven Board of Education v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980),[12] Othon argues that the Second Circuit will take a contrary view of this authority and agree that Title IX's private remedy encompasses employment discrimination claims. The Court disagrees that *Hufstedler* presages the Second Circuit's view on this issue. *Hufstedler* addressed only whether HEW had the authority to issue Subpart E. *Id.* at 774. In concluding that it did, the Second Circuit observed that the "[o]verlapping jurisdiction in the area of employment discrimination is well recognized." *Id.* at 784. It is this language on which Othon relies. In the following sentence, however, the Second Circuit **[*31]** explained:

> We visualize Congress as in effect saying that individual employees may exercise their rights under either Title VII or the Equal Pay Act, but that HEW may use its powers to threaten to withdraw federal funds or actually withdraw them if necessary when a recipient of federal financial assistance practices discrimination on the basis of sex.

*Id.* at 784-85. Later, the Second Circuit reiterated:

> [O]ur reading of the statutory scheme leads us to conclude that Congress intended HEW to have available the potent remedy of fund withdrawal to ensure compliance with the prohibition against sex discrimination in employment rather than rely solely on the important, but usually piecemeal, sanctions available to aggrieved employees under Title VII and the Equal Pay Act.

*Id.* at 785. Both of these observations are reminiscent of the Fifth Circuit's determination in *Lakoski* that "Title VII provided *individuals* with administrative and judicial redress for employment discrimination, while Title IX empowered *federal agencies* that provided funds to educational institutions to terminate that funding upon the finding of employment discrimination." *Lakoski*, 66 F.3d at 757.

***

The Supreme Court has instructed that "unless . . . congressional **[*32]** intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 94, 101 S. Ct. 1571, 67 L. Ed. 2d 750 (1981). In this case, there is insufficient evidence that Congress intended to create a private right of action for employment discrimination claims under Title IX, thereby

allowing a special subclass of claimants to bypass the prerequisites of Title VII. Nor is there any inference to be drawn that Congress intended to provide employees of federally funded programs with greater remedies than other employees. Accordingly, Wesleyan's motion to dismiss Counts Three and Four is granted.

## Conclusion

For the reasons set forth in this decision, Wesleyan's motion to dismiss [ECF No. 59] is GRANTED. Counts Three and Four of the Amended Complaint are dismissed with prejudice.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March 2020.

*/s/ Kari A. Dooley*

KARI A. DOOLEY

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[12] *Aff'd N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982).

 Caution
As of: June 17, 2020 4:59 PM Z

# Perry v. Pediatric Inpatient Critical Care Servs., P.A.

United States District Court for the Western District of Texas, San Antonio Division

March 16, 2020, Decided; March 16, 2020, Filed

Civil Action No. SA-18-CV-404-XR

**Reporter**
2020 U.S. Dist. LEXIS 44853 *

DR. MELVIN G. PERRY, JR., Plaintiff, v. PEDIATRIC INPATIENT CRITICAL CARE SERVICES, P.A., et al., Defendants.

**Subsequent History:** Appeal filed, 05/01/2020

**Counsel:** **[*1]** For Dr. Melvin G. Perry, Jr., Plaintiff: Colin Walsh, LEAD ATTORNEY, Wiley Walsh, P.C., Austin, TX.

For Pediatric Inpatient Critical Care Services, P.A., Defendant: Angella Hebert Myers, Janice S. Parker, Sharon S. Gilmore, LEAD ATTORNEYS, The Myers Law Group, L.L.P., Dallas, TX.

For VHS San Antonio Partners, LLC, doing business as, North Central Baptist Hospital, Defendant: Tiffany Cox Stacy, LEAD ATTORNEY, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., San Antonio, TX.

**Judges:** XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** XAVIER RODRIGUEZ

# Opinion

## ORDER

On this date, the Court considered Defendants' Motions for Summary Judgment on the threshold issues of whether Plaintiff had an employment relationship with Defendants for purposes of Title VII.

### Procedural Background

Plaintiff Melvin Perry filed this lawsuit on May 3, 2018 against Defendants Pediatric Inpatient Critical Care Services, P.A. ("PICCS") and VHS San Antonio Partners, LLC d/b/a North Central Baptist Hospital, alleging claims under Title VII and 42 U.S.C. § 1981 for race discrimination. Docket no. 1. Plaintiff filed a First Amended Complaint on December 26, 2018, alleging claims for hostile work environment, discrimination (termination) based on race and/or sex, **[*2]** and retaliation and a claim under § 1981 for race discrimination. Docket no. 28. Plaintiff alleges that PICCS was his employer and that PICCS and VHS were "joint employers" and/or constituted a "single integrated enterprise." *Id.* ¶ 7. Defendants answered and denied employer status. Docket nos. 31, 33.

On June 11, 2019, the Court granted Defendants' motion to bifurcate, allowing limited discovery and the filing of dispositive motions on the threshold issues of whether Plaintiff was an employee or an independent contractor and whether PICCS and VHS were his employers for purposes of Title VII. Defendants have now filed their dispositive motions, and VHS also moves for summary judgment on Plaintiff's § 1981 claim, arguing that there is no contract. Plaintiff has responded in opposition on all issues.

### Factual Background

Defendant PICCS is a professional association formed under Texas law in December 2014 for the practice of medicine and services ancillary thereto. Docket no. 59-1. PICCS has three directors/owners: Dr. Thomas Gowan, Dr. Hugo Carvajal, and

Dr. Nelson Pedro Chavez. PICCS, standing alone, does not employ more than 15 people.

Defendant VHS runs North Central Baptist Hospital ("the Hospital"), **[*3]** and the Hospital maintains a pediatric intensive care unit ("PICU") on its premises. Pediatric intensivists take care of patients in the PICU, and the PICU requires 24/7 physician coverage. The Hospital employs more than 15 people, including nurses and therapists, but does not directly enter into employment relationships with physicians. Waechter depo. at 15, 17.

On or about December 12, 2014, PICCS entered into an Agreement for Pediatric Intensive Care Department Coverage with VHS ("the PICCS-VHS Coverage Agreement") to furnish physicians for full-time coverage to the Hospital's PICU. Docket no. 59-2. PICCS had no other clients and did not provide services to any other Hospital or Hospital System. Chavez depo. at 19. As part of the PICCS-VHS Coverage Agreement, PICCS agreed to provide physicians for the Hospital's PICU "to assure physician coverage of such Services." *Id.* The Hospital engaged PICCS "on an exclusive basis for [PICCS] to provide to Hospital the Services and supervise the operation of the [PICU] in accordance with" the Agreement.

Each Physician was required to be duly licensed and qualified to practice medicine in Texas (and be Board Certified in Pediatrics or Board eligible), **[*4]** be a participating physician in Medicare and in Texas's Medicaid program, and be approved for membership and/or clinical privileges on the medical staff of the Hospital in accordance with the Hospital's Medical Staff Bylaws and Rules and Regulations. The Bylaws are a form of self-governance, created by the Medical Staff of Baptist Health System. Watkins Decl. They establish standards for Medical Staff membership and Clinical Privileges and provide means to enforce those standards. *Id.* Physicians apply for Medical Staff Membership and Clinical Privileges to admit and treat patients at the Hospital. *Id.* When membership and/or privileges are granted, the physician agrees to abide by the Bylaws and rules and Regulations, as well as the Professional Code of Conduct. *Id.*

PICCS physicians would (1) be the exclusive providers of services in the PICU; (2) provide call coverage for the PICU; (3) administer pediatric procedural sedation to Hospital inpatients and emergency room patients; (4) respond to pediatric emergencies for both inpatients and emergency room patients, when requested by either the attending physician or emergency room physician; (5) attend any and all meetings within the Hospital **[*5]** that Physicians are asked to attend by the Hospital's CEO except to the extent patient care responsibilities necessitates Physician's attention;

and (6) perform such other duties as may from time to time be requested by the Hospital, Hospital's Governing Board, Hospital's medical staff, and/or the CEO, and agreed to by PICCS. The Hospital was required to provide written reports of all examinations, treatments, and procedures performed pursuant to the Agreement for billing and healthcare operations. PICCS warranted that its Physicians would comply with all applicable bylaws, rules, regulations, procedures, and policies of the Hospital and its medical staff.

PICCS would also appoint, subject to the approval of the Hospital CEO, a Physician to serve as Director of the PICU while the Agreement was in effect, and the Director would (1) participate in the educational programs conducted by the Hospital and its medical staff to assure its overall compliance with accreditation and licensing requirements, and perform such other reasonable teaching functions as the Hospital may request; (2) direct non-physician PICU personnel in the performance of professional services for patients; (3) advise **[*6]** the Hospital with respect to the selection, retention, and termination of all personnel who may be required for the proper operation of the PICU, but the Hospital would retain ultimate decision-making authority; (4) establish schedules for all Services provided by Physicians in accordance with the terms of the Agreement; (5) supervise the development and implementation of Hospital quality assurance and quality improvement programs and procedures in the PICU; (6) assist the Hospital in the preparation and conduct of surveys by the Joint Commission and/or any other national, state, or local agency; (7) participate in the Hospital's Medicare Performance Improvement initiatives and other performance management and innovation initiatives; and (8) perform any other duties that Hospital, Hospital's Governing Board, medical staff and/or the CEO may request, as agreed to by the Director. PICCS appointed one of its director/owners, Dr. Chavez, to be the PICU Director.

The Coverage Agreement required PICCS to "cause each Physician who will provide Services under this Agreement to execute the Physician Agreement attached" to the Agreement as Exhibit A. PICCS would also ensure that each Physician **[*7]** maintained professional liability insurance coverage at specified limits. The Coverage Agreement also contains an Exhibit B outlining the Services that PICCS would provide. It states that "a minimum of 3 full time Physicians will be necessary" and PICCS would "provide Physicians for call coverage in the [PICU] on a 24 hour basis every day during the Term of this Agreement with in-house call coverage provided only when there is a pediatric inpatient in the [PICU] who meets the Critical Care criteria." "On or before the first day of each calendar month, [PICCS] shall provide to the Hospital CEO a schedule of Physicians assigned to provide call coverage in the Department during

the calendar month and such schedule shall be posted within the [PICU]."

The Coverage Agreement provides that PICCS and the Physicians it would provide to VHS would be acting as independent contractors of VHS, and would not be considered employees or agents of the Hospital. PICCS warranted to VHS that it would pay compensation to the Physicians based on fair market value and that it would "maintain a written agreement with each physician receiving compensation from [PICCS] that is not an employee of Group (e.g., [*8] each non-employed independent contractor), which written agreement is or will be signed by the parties, and does or will specify the services covered by the arrangement." PICCS would bill on the Physicians' behalf, and would have the exclusive right to collections therefrom. VHS agreed to pay PICCS a monthly guaranteed amount of $137,500 (offset by collections). PICCS had "sole responsibility to compensate Physicians, and Director" and reserved the right, in its sole discretion, to determine the compensation payable to each Physician working in the PICU.

The Coverage Agreement further provided that, at all times, "the CEO [of the Hospital] shall have the right to request removal of any such Physician if continued service by such Physician could jeopardize patient care or safety" and PICCS "agrees to immediately remove any such Physician in accordance with Hospital's Medical Staff Bylaws." Further, the Medical Staff membership and/or clinical privileges of each Physician were "based upon the Medical Staff Bylaws" and "the Medical Staff membership and/or clinical privileges of Director and each Physician at Hospital shall terminate in accordance with the Medical Staff Bylaws"; and 'the [*9] Medical Staff Bylaws shall control over this Agreement with respect to peer review."

The Coverage Agreement commenced on March 1, 2015 and was for a three-year term, with automatic extensions on a month-to-month basis for up to six months if not renewed and not advised of a party's intent not to renew. Docket no. 59-2.

PICCS sought physicians to fulfill its obligation to provide coverage to the PICU, and placed an advertisement, to which Perry responded. Docket no. 57-9. PICCS invited Plaintiff to meet with several individuals and groups in January 2015, before contracting with him. Docket no. 59-1. Perry met with several individuals who worked at the Hospital, including the PICU nursing staff and the Hospital President (Bill Waechter), toured the Hospital, and met with Dr. Carvajal and Dr. Gowan. Perry depo. at 23. Perry did not have any further conversations with anyone with the Hospital before contracting with PICCS. Perry depo. at 24.

PICCS eventually contracted services with four physicians:

Dr. Perry, Dr. Aviles, Dr. Fernandez, and Dr. Chavez (who was also a shareholder/director of PICCS and was selected as Director of the PICU). Docket no. 59-1 p.36.; Perry depo. at 78. Per the [*10] Coverage Agreement, Hospital approval was required for Chavez to be selected as Director.

On March 17, 2015, Dr. Perry entered into a Professional Services Agreement ("PSA") with PICCS. Docket no. 59-3. Plaintiff hired an attorney to negotiate the agreement. The PSA provides that PICCS "desires to contract with Physician to provide such professional medical services on behalf of Association in accordance with the terms and conditions of the this [sic] Agreement." The Agreement was to commence on the first day Perry provided Services under the Agreement after and subject to successful completion of all pre-employment processes, including background review, evidence of professional liability insurance coverage, and credentialing by the Hospital (anticipated to be completed on or around March 30, 2015). In a section entitled "Engagement and Scope of Practice; Relationship Between Parties," the PSA provides,

(a) Physician agrees to provide call coverage services and render professional medical services in the specialty of pediatric critical care medicine exclusively for, except with advance written consent of Association pursuant to Section 7 of this Agreement, and on behalf of Association within [*11] the scope of Physician's license at North Central Baptist Hospital in San Antonio, Texas ("NCBH") consistent with the terms and conditions set forth in this Agreement on a schedule as determined by Association (collectively referred to as "Services" under this Agreement). Such Services shall be rendered in a competent, professional and ethical manner, in accordance with prevailing standards of medical practice in the relevant community. Physician shall at all times act and deliver Services in a manner consistent with (i) applicable standards of the Joint Commission and any other relevant accrediting organizations; (ii) all applicable bylaws, rules regulations, procedures, and policies of NCBH and its medical staff; (iii) the Principles of Medical Ethics of the American Medical Association; and (iv) all applicable laws, regulations, rules, orders and directives of any and all applicable governmental and regulatory bodies having competent jurisdiction.

(b) Physician shall comply with the terms of this Agreement and cooperate with North Central Baptist Hospital in carrying out the provision of Services under this Agreement. As required by NCBH and this Agreement, Physician shall i) execute [*12] the Physician Agreement attached hereto as Exhibit A and ii)

provide to Association a list of Physician's existing directorship or administrative services arrangements, if any; and deliver such Physician Agreement and list of arrangements to Association contemporaneously with the execution of this Agreement. The obligation of Physician to provide and update the list of existing directorship or administrative services arrangements shall be ongoing while this Agreement is in effect.

(c) Physician agrees to comply with any administrative and clinical policies, rules, and procedures of Association (including, but not limited to, any utilization management, quality improvement program, peer review process, privacy practices, and compliance program), which may be implemented and/or amended in the Association's sole discretion from time to time. Further, Physician agrees to be bound by all of the standards, policies, rules, and regulations adopted or utilized by third party payors from time to time including Medicare and Medicaid ("Payors") which cover his Services.

(d) The relationship between Association and Physician is that of an independent contractor. Physician has no authority to enter [*13] into any contract binding Association or to create an obligation on behalf of Association without written authorization from Association. In the performance of the work, duties, and obligations specified in this Agreement, it is understood and agreed by the parties that Physician is at all times acting and performing as an independent contractor to Association. Association shall not withhold taxes, social security, unemployment insurance, workers' compensation, or any other withholding or payment established pursuant to any law or the requirements of any governmental body or make available to Physician any of the benefits afforded to employees of Association. All such payments, withholdings and benefits, if any, are the sole responsibility of Physician and Physician accepts responsibility for the payment of any such compensation for the performance of Services rendered under this Agreement.

Docket no. 59-3. Perry understood that the Agreement stated he was going to be an independent contractor, that he would not get a W-2 or have taxes withheld, and that PICCS would not provide benefits. Perry depo. at 96-97, 100-01. Section 7 states,

> 7. **Loyalty to Association**. During this Agreement and except [*14] to the [extent] written consent is given as stated herein, Physician shall devote Physician's full, entire and undivided professional time and attention to the practice of medicine for Association and in furtherance of Association's best interests. Physician shall not engage in professional work for pay,

compensation or other remuneration in Physician's individual capacity or in association with others not employed by Association, nor receive any compensation therefore, without the express written consent of the Board of Directors of Association; however, Section 7 is not intended to require Physician to obtain Association's consent for such activities of Physician during Physician's scheduled time off to include Physician's request to provide his professional services to an urgent care facility located outside of the state of Texas.

*Id.* The parties disagree as to whether section 7 precluded Perry from working anywhere else in Texas during his time off. Perry asserts he could only work in Texas with prior written consent, while PICCS asserts he could work wherever he wanted in his time off. Dr. Gowan states that the caveat was added to address Perry's concerns, but was not needed since he could already [*15] work wherever he wanted when he was not scheduled to be in-house or on call at the Hospital. It is undisputed that Perry also worked for various Kids Time Pediatrics locations in Georgia.

The PSA further provides,

> **Physician's Services**. The delivery of professional medical services by a physician requires the exercise of independent medical judgment that is not and cannot be within the right of control of any person or entity other than a licensed physician providing the direct hands on care to a patient. Association and Physician acknowledge that Association does not have the control or the right to control the manner, means, and details of Physician in such regard and shall take no action to do so. Rather, insofar as the healthcare decisions are made in providing medical or surgical services to a patient under this Agreement, Physician shall, at all times, be regarded as acting in his individual capacity as an independent contractor and not as an employee of Association as that term is utilized in Section 301.010 of the Texas Business Organizations Code.

PICCS agreed to pay Perry a fixed annual salary, and Perry was precluded from billing directly any patients or payors for services provided pursuant to the Agreement. PICCS was given exclusive [*16] authority to determine the amount and nature of all fees and the procedure for establishing the fees to be charged by patients, and all fees generated from services provided by Perry pursuant to the Agreement belonged to PICCS.

As to benefits, "Physician shall not be entitled to any benefits including those furnished to employees of Association." As to expenses, "Physician may incur ordinary, necessary, and reasonable expenses relating to automobile, auto insurance,

cell phone, subscriptions and fees, license and dues, educational expenses, and other similar items. Physician shall carry a cell phone to facilitate communication between Association and Physician. All of the foregoing expenses shall be borne solely by Physician."

The PSA required Perry to maintain, at his sole expense, a professional liability insurance policy and required Perry to report "adverse actions" to PICCS. The Agreement could be terminated by either PICCS or Perry without cause at any time after the expiration of the first twelve months following the commencement date upon 90-days prior written notice or a shorter period mutually agreed upon. The PSA further automatically terminated upon certain occurrences, such [*17] as cancellation of malpractice coverage, "Physician conducts himself in a manner that Association determines in good faith to be unethical, unprofessional, unlawful, or fraudulent, is detrimental to patient care, or impairs the reputation or operations of Association", "Upon NBCH's request in accordance with its Medical Staff Bylaws for the removal of Physician due to not meeting the standard of care for rendering patient care services, or that the health, safety, or welfare of patients could be jeopardized by continued services of Physician," and "Any termination or non-renewal of the Coverage Agreement, or the provision of Physician's services under the Coverage Agreement are suspended, or Physician is otherwise removed from providing services under the Coverage Agreement."

As required by the Coverage Agreement, Dr. Perry signed the Physician Agreement on March 26, 2015. Docket no. 59-3. The Physician Agreement states that the Physician understands he is bound by all terms and conditions of the Coverage Agreement and further states, "In consideration of my approval by Hospital to provide services at North Central Baptist Hospital, pursuant to the Agreement, I knowingly and voluntarily [*18] agree" that:

> (1) it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an exclusive provider and, upon expiration or termination of the Coverage Agreement, Hospital shall have the right to grant an exclusive contract to any person or entity; (2) the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges and unless and until such loss of membership occurs, he is bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff; and (3) if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision of

Services to any person or entity.

And on September 14, 2015, Dr. Perry signed a "Policy Acknowledgement" from Baptist Health System stating that he received and understands it is his responsibility to read, understand, become familiar with and comply with (1) Medical Staff By-Laws; (2) Medical Staff [*19] Rules and Regulations; and (3) Tenet Standards of Conduct. Docket no. 59-11.

PICCS paid Perry an annual salary, paid monthly by direct deposit. Perry depo. at 77. PICCS issued 1099s to Perry for each year he performed services under the PSA. Docket no. 59-1; Docket no. 59-6. No deductions or withholding from his pay were made for taxes, retirement, or other benefits. Perry was responsible for purchasing his own medical/health insurance; PICCS did not provide any medical benefits. Perry depo. at 68. PICCS did not have a leave policy and there was no annual leave provided.

Plaintiff alleges that in October 2016, "Dr. Aviles [of PICCS] joined a group of NCBH nurses in accusing Dr. Perry of racial bias or prejudice in favor of Blacks or African-Americans," and alleges that Dr. Aviles and Dr. Fernandez made racist comments about other African-American co-workers. Docket no. 28 at 8. Plaintiff complained in writing to the Hospital. In November 2016, several nurses threatened to quit if Dr. Perry was not removed from his position at the Hospital. Docket no. 28 at 10. The Hospital states it also received complaints about Plaintiff from patient families. On November 18, 2016, Dr. Kellis (Market [*20] Chief Medical Officer), Dr. Chavez, and Plaintiff met to discuss the complaints received from nursing staff and parents. Dr. Kellis told Plaintiff his behavior must change to ensure patient safety and the Hospital would not tolerate further complaints. On December 6, 2016, Dr. Aviles (of PICCS) wrote a letter expressing concerns and stating she would refuse to work with Plaintiff again if the situation did not improve. On December 20, 2016, the Hospital received a complaint from a pediatric patient's family about Plaintiff.

On January 9, 2017, Dr. Kellis, Dr. Chavez (PICCS, PICU Director), Dr. Gowan (PICCS), and Dr. Carvajal (PICCS) met to discuss Plaintiff and his continued assignment at the Hospital. Dr. Kellis sent an email to Bill Waechter stating, "we reached the decision to tell Dr. Perry that he is being terminated without cause, which invokes a 90 day out clause in the contract (he has to be gone within 90 days), and which also minimizes both our liability." Dr. Gowan states that Perry's conduct met the inappropriate behavior standard in the Medical Staff Rules & Regulations and could jeopardize patient care or safety. Gowan Decl. p. 40-41.

Dr. Gowan states that because the request [*21] from the Hospital complied with the medical staff rules & regulations,

2020 U.S. Dist. LEXIS 44853, *21

PICCS terminated Plaintiff's PSA. Gowan Decl. p. 41. Dr. Perry's relationship with PICCS was terminated by Dr. Carvajal (of PICCS) by letter dated January 12, 2017, informing him that the PSA was being terminated by the PICCS Board of Directors, without cause, effective in 90 days. Docket no. 57-6; Docket no. 60-2 (Pl. Ex. 2). Dr. Perry continued to work at the Hospital until about February 28, 2017. Docket no. 57-8. Waechter testified that Perry's staff membership and privileges with the System were revoked by the Medical Staff when he failed to renew his malpractice insurance. Waechter Decl.

### Analysis — Title VII Claims

To establish Title VII liability on the part of a particular defendant, the plaintiff must prove both that the defendant meets Title VII's definition of "employer," *i.e.*, "a person engaged in an industry affecting commerce who has fifteen or more employees," and that an employment relationship existed between him and that defendant. *Muhammad v. Dallas Cty. Cmty. Supervision & Corrs.*, 479 F.3d 377, 380 (5th Cir. 2007). Thus, the Court must follow a two-step inquiry: (1) did the defendant have at least 15 employees during the requisite time period? and, if so, (2) did an employment [*22] relationship exist between plaintiff and the defendant? *Id.*

Defendant PICCS moves for summary judgment on Plaintiff's Title VII claims on the following bases: (1) that PICCS is not an "employer" under Title VII because it does not have at least 15 employees and did not during the relevant period (2015 to 2017); (2) Dr. Perry was not an employee of PICCS, but was only an independent contractor; and (3) PICCS and VHS were not joint employers. VHS moves for summary judgment on Plaintiff's Title VII claims on the issue of employee status, arguing that it did not have an employment relationship with Plaintiff as a matter of law and it was not a joint employer.

### Whether PICCS is an employer under Title VII?

Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). This is an element of Plaintiff's claim for relief. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). PICCS provides evidence via the Affidavit of Thomas Gowan that it did not employ 15 or more employees during the relevant time period. PICCS has three directors/shareholders, contracted [*23] with two individuals

to do secretarial work, and entered into service agreements with Plaintiff and two other physicians during the relevant time. Even if all of those individuals were employees, they would not meet the 15-employee requirement.

Plaintiff provides no evidence or argument refuting PICCS's assertion that it has not had 15 or more employees during the relevant time period. And Plaintiff does not allege that any other persons were employees of PICCS other than those identified by PICCS in its motion, so as to increase the number above the threshold. In fact, Plaintiff does not even allege in his Complaint that PICCS employed 15 or more people; he alleges only that VHS employed more than 500 employees. Docket no. 28 para 8. Thus, standing alone, PICCS does not meet the statutory definition of "employer" under Title VII because the undisputed summary-judgment evidence is that it did not employ at least 15 employees during the relevant time.

Plaintiff contends that PICCS may nevertheless be liable under Title VII under either a joint employer or single integrated enterprise (also known as "single employer") theory. Plaintiff is seeking to hold PICCS liable as an employer by [*24] aggregating PICCS's employees with those of Defendant VHS, which does employ more than 15 people. Docket no. 28 para. 7. A single employer situation exists where two nominally separate entities are actually part of a single integrated enterprise (*e.g.*, parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management), whereas in a joint employer relationship, separate legal entities handle certain aspects of an employer-employee relationship jointly. *Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 198 (2d Cir. 2005) (quotation marks and citations omitted). "The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities; it has also been applied to contractors and subcontractors and other scenarios where two separate entities have control over an employee's employment." *Daniel v. T&M Protection Resources, Inc.*, 992 F. Supp. 2d 302, 314 (S.D.N.Y. 2014). The Second Circuit described the difference between the two tests in *Engelhardt v. S.P. Richards Co., Inc.*, 472 F.3d 1, 4 n.2 (2d Cir. 2006):

> The difference between the "joint employer" and the "integrated employer" tests turns on whether the plaintiff seeks to impose liability on her legal employer or another entity. Compare 29 C.F.R. § 825.106 with § 825.104(c)(2). The former [joint employer] looks to whether there are sufficient indicia of an employer/employee relationship to justify [*25] imposing liability on the plaintiff's non-legal employer. The latter [single integrated enterprise] applies where, as here, liability is sought to be imposed on the legal

employer by arguing that another entity is sufficiently related such that its actions, or in this case, size, can be attributable to the legal employer.

In *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761 (5th Cir. 1997), the Fifth Circuit held that "the hybrid test should be used as an initial inquiry to resolve, if need be, whether a plaintiff is an employee of the defendant (or one of the defendants, in a multi defendant case) for the purposes of Title VII" and "[i]f the plaintiff is found to be an employee of one of the defendants under the hybrid test, but questions remain whether a second (or additional) defendant is sufficiently connected to the employer-defendant so as to be considered a single employer, a *Trevino* analysis should be conducted." *Id.* at 764. The law is settled that, under the single integrated enterprise doctrine, where one putative employer does not meet the statutory numerosity requirement, it may nevertheless be liable under Title VII if it is part of a single integrated enterprise with another entity if their combined employees exceed the minimum. Numerous cases **[\*26]** allow aggregation under a single integrated enterprise (single employer) theory as set forth in *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) to expose to liability an entity who does not meet the numerosity requirement alone. *See, e.g., Guillory v. Rainbow Chrysler Dodge Jeep, LLC*, 158 F. App'x 536 (5th Cir. 2005) (applying *Trevino* single employer test to determine whether to aggregate one entity's employee with employees of another for purposes of Title VII); *Badii v. Rick's Cabaret Int'l, Inc.*, No. 3:12-CV-4541-B, 2013 WL 12124034, at \*6 (N.D. Tex. June 16, 2013) ("[T]he *Trevino* test has been utilized to aggregate the number of employees of multiple entities for the determination of whether an employer meets the statutory definition under Title VII.").

Unlike the single integrated enterprise doctrine, not all employees of two joint employers are aggregated for purposes of Title VII's numerosity requirement. Plaintiff misreads the EEOC Compliance Manual to argue that all employees of VHS can be attributed to PICCS. The Manual states, "To determine whether a respondent is covered, count the number of individuals employed by the respondent alone and the employees jointly employed by the respondent and other entities." EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(b). It does not state that all employees of both alleged joint employers may be counted. Rather, employees for which a defendant is a joint **[\*27]** employer may be counted in addition to the defendant's regular employees to reach the numerosity requirement, or a court may find that the two defendants jointly employ more than fifteen individuals. *See Arculeo v. On-Site Sales & Mktg.*, LLC, 425 F.3d 193, 198 (2d Cir. 2005) ("A joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another

who are jointly employed by the first, but such joint undertaking does not furnish logical justification for adding together all the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other."); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994) (joint employers together jointly employed more than fifteen employees). Thus, in order to hold PICCS liable under Title VII, Plaintiff must show that he was an employee of PICCS and that PICCS and the Hospital/VHS were a single integrated enterprise.

**Whether Perry was an employee of PICCS**?

To determine whether a person is an employee versus an independent contractor, the controlling standard is the "hybrid economic realities/common law control test." *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013). The economic-realities portion of the test asks whether a putative employee, as a matter of economic **[\*28]** reality, is dependent upon the business to which he renders service or is in business for himself. *Id.* at 434. This includes whether the worker's opportunity for profit or loss is determined by the alleged employer and whether the worker worked exclusively for the alleged employer, as well as "whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Muhammad*, 479 F.3d at 380.

The common-law control portion of the test, which courts should emphasize over the economic realities portion, assesses "the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed." *Juino*, 717 F.3d at 434. When examining the control component, courts have focused on whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee. *Muhammad*, 479 F.3d at 380. The Fifth Circuit has stated that the following factors are also pertinent to the analysis:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision;

(2) the skill required in the particular occupation; (3) whether the "employer" **[\*29]** or the individual in question furnishes the equipment used and the place of work;

(4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated [,] i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave

is afforded; (8) whether the work is an integral part of the business of the "employer"[,] (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 434-35. The "hybrid economic realities/common law control test" is necessarily a fact-specific inquiry. *Muhammad*, 479 F.3d at 383.

Viewing the facts in the light most favorable to Perry, the Court cannot conclude that Perry was an independent contractor as a matter of law. The economic realities cut both ways. Perry was required to devote full-time work to PICCS, and it is disputed whether he was permitted to work at other places in Texas during his time off. PICCS was Perry's primary source of income, and his relationship with PICCS (the requirement to work for PICCS full-time and PICCS having the exclusive right to charge [*30] and bill his patients at the Hospital) significantly limited his other opportunities for profit. In addition, PICCS paid Perry an annual salary, paid monthly by direct deposit, and Perry was not paid by the job. Perry depo. at 77. PICCS billed the patients for services provided by Perry at the Hospital, and Perry was prohibited from billing patients or from determining the amount and nature of all fees. Thus, Perry had no opportunities to increase his profits or income by working more hours or increasing billing rates at the Hospital. These factors weigh in favor of employment status. However, other factors, such as the fact that no benefits were provided, no leave was accrued, no taxes were withheld, Perry paid for his own insurance, licensing, and education costs, PICCS issued 1099s to Perry for each year he worked, and the agreement for an independent contractor arrangement weigh in favor of independent contractor status.[1] Perry has provided

---

[1] Plaintiff submits a letter from the IRS dated June 25, 2018 concerning IRS Form SS-8, "Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding," in which the IRS determined, based on information provided by Plaintiff, that he was an employee of PICCS for federal tax purposes. Docket no. 60-2. Defendants' objection to Plaintiff's use of the IRS Form SS-8 because it is not authenticated lacks merit. Since the 2010 amendment to Rule 56, "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original) (quoting FED. R. CIV. P. 56(c)(2)). Thus, "evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017). In detailing how Plaintiff should have authenticated the Form, Defendants essentially concede that the Form could be authenticated. Thus, this objection is overruled. However, the Court agrees that the Form is only

sufficient evidence to raise a fact issue as to whether, as a matter of economic reality, he was an employee of PICCS.

As to the control factors, PICCS had discretion to "hire" by contracting with qualified pediatric physicians who met [*31] the criteria in the Coverage Agreement and Medical Staff Bylaws. PICCS decided with whom it would contract as a Physician to provide services under the Coverage Agreement with VHS. PICCS says it had no right to control Plaintiff's termination because termination was governed by the PSA and the Coverage Agreement, which triggered the Medical Staff Bylaws. PICCS asserts that because Plaintiff violated the Bylaws and refused to modify his behavior despite numerous opportunities, Bill Waechter, the Hospital's President, was required to request his removal, and PICCS exercised its right under the Agreement to terminate its contractual relationship with Plaintiff. But whether PICCS felt contractually constrained to terminate the PSA overlooks the other ways in which PICCS had the ability to "fire" Plaintiff by terminating the PSA with or without cause, which would simultaneously terminate Plaintiff's work at the Hospital, since PICCS was the exclusive provider of PICU physicians at the Hospital.

As to control of Perry's schedule, the relevant contracts granted control of Plaintiff's work schedule to PICCS. The PSA states, "Physician agrees to provide call coverage services and render professional [*32] medical services in the specialty of pediatric critical care medicine exclusively for . . . and on behalf of PICCS within the scope of Physician's license at [the Hospital] . . . *on a schedule as determined by [PICCS]*." (Emphasis added.) The Coverage Agreement provided that the Director of the PICU (PICCS-appointed, VHS-approved Dr. Chavez) would establish schedules for all services provided by Physicians in accordance with the terms of the Agreement. The Coverage Agreement further provided that, on or before the first of the month, PICCS would provide to the Hospital CEO a schedule of Physicians arranged to provide call coverage during the calendar month. Consistent with the relevant contracts, Perry testified that Chavez set the work schedule. Perry depo. at 57, 73, 110.

PICCS contends that it did not unilaterally control Plaintiff's schedule, but instead the PICCS Physicians worked cooperatively to set the schedule. Dr. Chavez testified, "We get together, and we select the way to do the schedule, and then we try to attach to it as much as possible." *Id.* at 61. Chavez testified that changes to the schedule were agreed

---

applicable to PICCS, as it does not make a determination as to VHS. Further, because the Court finds that fact issues remain even without considering the form, the objections that the Form is incomplete, misleading, untrustworthy, and contains hearsay are dismissed as moot.

upon. *Id.* at 63. PICCS further contends that Perry had significant control over his **[\*33]** own schedule, demonstrated by the fact that he traveled extensively during his contract term, including taking a trip to Australia. Docket no. 58 at 24 & n.14; Perry depo. at 74 (Australia trip). But Perry testified that Chavez had issued a schedule on a 12-week cycle, and he was able to plan his trips around his scheduled shifts and rarely needed to change the schedule. Perry depo. at 74, 91-92. However, Perry was able to reject the proposed schedule that conflicted with his Australia trip, and took the trip without issue, and was able to get enough days (though not all he wanted) for a conference in Hawaii. Perry depo. at 74. Perry further contends that PICCS controlled where he could work in his time off from the Hospital, since under his interpretation of the PSA he could not work anywhere else in Texas without prior approval. Perry depo. at 76, 89. The parties agree that Plaintiff could work for, and did work for, Georgia Kids Time Pediatrics locations when not on call. Perry depo. at 76; PICCS Ex. O; PICCS Ex. P.[2] PICCS contends that "the intent of the parties was for Plaintiff to be at the [PICU] when he scheduled himself to provide services and not servicing any other entity **[\*34]** (medical or not) during those service times contemporaneously; however, Plaintiff was free to do what he wanted (whether work another job — medical or not, or otherwise) during the hours he was not scheduled to perform services under the Agreement." Docket no. 58 at 10. Material fact issues remain concerning the extent to which PICCS controlled Plaintiff's schedule at the Hospital and constrained Plaintiff's ability to work at other locations in Texas during his time off from the Hospital.

Concerning the right to supervise, PICCS and Perry agreed that PICCS does not control or have the right to control the manner, means, and details of his work with regard to healthcare and would take no action to do so. They further agreed that "Physician controls the quality and manner in which Physician's Services are rendered to patients." PICCS asserts that medical specialists usually work without supervision, and Plaintiff confirmed he did not need the assistance of other physicians to do his work. Perry depo. at 80. Perry testified that Dr. Chavez always supported his independent decisionmaking as a physician and let him make the final decision on his patients, and he was the only one making **[\*35]** decisions on his medical license. Perry depo. at 105. The fact that Plaintiff is a highly skilled medical specialist who typically works without supervision and exercises independent professional judgment weighs against

employment and in favor of independent contractor status.

While Perry exercised independent medical judgment and controlled the manner and means of caring for his patients without supervision, he was required to submit to certain supervision from PICCS. He agreed to "comply with any administrative and clinical policies, rules, and procedures of [PICCS] (including, but not limited to, any utilization management, quality improvement program, peer review process, privacy practices, and compliance program), which may be implemented and/or amended in [PICCS's] sole discretion." In addition, Perry agreed to monitoring for quality assurance and risk prevention programs instituted by PICCS. However, it was made clear that "[n]othing in this Agreement including Physician's participation in the Program shall be construed to interfere with or in any way affect Physician's obligation as a licensed physician to exercise his independent professional medical judgment when rendering **[\*36]** health care services to patients."

Perry was required to maintain a cell phone to facilitate communication with PICCS, at his expense. Perry was also required to report adverse actions to PICCS. Plaintiff further contends that PICCS exerted control by providing certain criteria to Dr. Perry through Dr. Chavez, without discussion, that he had to follow, requiring that certain medicines be used, requiring him to get medical malpractice insurance from a particular provider, and requiring him to accept all patients. Depo at 17, 19, 41-42, 62-63, 113-14. PICCS disputes these assertions, stating that Perry ignored some of these supposed examples of control, showing his independence, and that some of these were regulatory safety requirements that were not imposed by PICCS but by federal law (*e.g.*, the Emergency Medical Treatment & Labor Act of 1986). Material fact issues exist concerning the extent to which PICCS supervised Plaintiff.

The case law demonstrates that the conclusion of whether a worker is an employee or independent contractor is highly fact specific, and here material fact issues concerning some of the underlying facts preclude summary judgment on the issue of whether Plaintiff had an employment relationship with **[\*37]** PICCS. Thus, the Court must determine whether PICCS and VHS are a single business enterprise.

## Whether PICCS and VHS are a single integrated enterprise (single employer)?

According to the EEOC Compliance Manual, "If an employer does not have the minimum number of employees to meet the statutory requirement, it is still covered if it is part of an 'integrated enterprise' that, overall, meets the requirement. An integrated enterprise is one in which the operations of two or

---

[2] The evidence indicates that Perry maintained his primary residence in Georgia, and traveled to Texas when he was on-call at the Hospital. Perry depo. at 94.

more employers are considered so intertwined that they can be considered the single employer of the charging party. The separate entities that form an integrated enterprise are treated as a single employer for purposes of both coverage and liability." EEOC Compliance Manual 2-III(B)(1)(a)(iii)(a). According to the Manual, the following factors are relevant to the issue of centralized control of labor relations: Whether there is a centralized source of authority where personnel policy is developed and implemented. Whether one entity maintains personnel records and screens and tests applicants for employment. Whether the entities share a personnel department and whether inter-company transfers and promotions of personnel are [*38] common. Whether the same persons make the employment decisions for both entities.

The Fifth Circuit set forth the applicable test for single integrated enterprises in *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983). Factors considered in determining whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control, with centralized control of labor relations being the most important factor. *Id.* at 404. This criterion has been further refined to the point that "[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id.*

Defendants argue that the single employer test is limited to parent-subsidiary situations and does not apply here. Defendants argue that, when service contracts are involved, courts apply the joint employer test, not the single integrated enterprise test. Docket no. 66 at 16 (citing *EEOC v. Valero Refining-Texas L.P.*, Civil Action no. 3:10-CV-398, 2013 U.S. Dist. LEXIS 42776, 2013 WL 1168620, at *3 (S.D. Tex. 2013 Mar. 13, 2013) ("[T]he 'integrated-enterprise test is not a good fit for a case involving one company with a service [*39] contract with the other, as opposed to affiliated or related companies such as a parent and subsidiary'"). But the EEOC Compliance Manual states that "while this issue often arises where there is a parent-subsidiary relationship, a parent-subsidiary relationship is not required for two companies to be considered an integrated enterprise." EEOC Compliance Manual 2-III(B)(1)(a)(iii)(a). The *Trevino* case establishing the single integrated enterprise standard involved a worker employed by ABI, which provided maintenance and operating employees to Celanese, not a parent-subsidiary relationship. And in fact, this Court has previously applied the *Trevino* test in a similar factual scenario. *Johnson v. El Paso*

*Pathology Grp., P.A.*, 868 F. Supp. 852 (W.D. Tex. 1994).[3]

In *Johnson*, the plaintiff pathologist contracted with a physician group (which had fewer than 15 employees) and practiced at the System (which had more than 15 employees) and sought to hold both liable. The district court found the requisite control of labor relations because "the [Hospital] System was significantly involved and ultimately controlled the [Physician] Group's employment relations with its physicians." 868 F. Supp. at 860. Under the agreement between the Hospital System and the Physician Group, "the [*40] number of physicians retained by the Group was to be determined in consultation with and upon the written consent of the System," "the Group had to obtain the written approval of the System prior to replacing existing physicians or to engaging additional physicians, ... the System administered the compensation and benefits for the physicians," and "the Group and the System were a team, making joint decisions." *Id.* By contract and implementation, the System reserved for itself the ultimate decisions regarding physician employment matters for the Group, and was jointly involved in the plaintiff's termination. *Id.* Moreover, the System had complete control over the operations, management, and finances of the Physician Group. *Id.* The district court found the fact situation suited to an analysis under *Trevino*, and further found that, under the *Trevino* factors, the defendants were the single employer of the plaintiff. The scenario in *Johnson*, however, involves a much higher level of integrated control of labor relations than is present in this case.

---

[3] The Court applied the *Trevino* test, but referred to the defendants as joint employers. Confusingly, "[t]he single-employer test is often referred to as the . . . joint-employer test." *Patterson v. Yazoo City, Mss.*, 847 F. Supp. 2d 924, 932 n.20 (S.D. Miss. 2012). However, though sometimes muddled or conflated, the single integrated enterprise (single employer) theory and the joint employer theory of liability are generally recognized as distinct theories by the Fifth Circuit and other courts. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (affirming summary judgment on single employer theory and finding joint employer theory waived, but also lacking merit because the plaintiff made no showing that the alleged joint employer "retained for itself sufficient control of the terms and conditions of [plaintiff's] employment"); *National Labor Relations Board v. Browning-Ferris Industrs. of Penn., Inc.*, 691 F.2d 1117 (3d Cir. 1982) ("The 'joint employer' and 'single employer' concepts are distinct. Admittedly, there has been a blurring of these concepts at times by some courts and by the Board. However, as the Supreme Court itself has recognized, the two concepts approach the issue of 'who is the employer,' from two different viewpoints. As such, different standards are required for each-that enunciated in *Radio Union v. Broadcast Service of Mobile, Inc.*, *supra*, to apply in the 'single employer' context and that set out in *Boire v. Greyhound Corp.*, *supra*, to apply in the 'joint employer' context.").

In *Schweitzer*, 104 F.3d at 765, the Fifth Circuit also emphasized that we must focus on the control of the second company over the employment decisions of the first company, [*41] stating that evidence "central to finding a single employer relationship" would be "involvement in the daily employment decisions" of the first company. In *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997), it stated that "[s]ome nexus to the [first company's] daily employment decisions must be shown." The focus is on the core activities regulated by the anti-discrimination laws. *Id.* at 777. In *Trevino*, for example, many workers transferred from ABI to Celanese, Celanese managers and supervisors on numerous occasions authorized lay-offs, recalls, promotions and transfers of ABI employees to Celanese, and the record contained over one hundred personnel documents cataloguing the promotions and pay increases of ABI employees which bore the signatures of various Celanese managers purportedly acting as "General Foreman" or "Foreman" for ABI. 701 F.2d at 400.

In *Lusk*, the Fifth Circuit indicated that "[o]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary—domination similar to that which justifies piercing the corporate veil—is sufficient to rebut this presumption [of limited liability], and to permit an inference that the parent corporation was a final decision-maker in its subsidiary's employment [*42] decisions." *Lusk*, 129 F.3d at 778. Further, "The interrelation of operations element of the single employer test ultimately focuses on whether the parent corporation excessively influenced or interfered with the business operations of its subsidiary, that is, whether the parent actually exercised a degree of control beyond that found in the typical parent-subsidiary relationship." *Id.* "Attention to detail," not general oversight, is the hallmark of interrelated operations. *Id.* Relevant factors suggesting the existence of interrelated operations include evidence that the parent: (1) was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment with the subsidiary; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) maintained the subsidiary's books; (5) issued the subsidiary's paychecks; or (6) prepared and filed the subsidiary's tax returns. *Id.*

There is no such evidence of the type found in *Trevino* or discussed in *Lusk* in this case. Plaintiff's assertion that the fact that Dana Kellis and Bill Waechter of VHS made the decision to terminate Plaintiff's contract [*43] together with PICCS "shows the first three factors of the single enterprise" test is incorrect. Nevertheless, Plaintiff contends that he shows a single integrated enterprise based on the fact that VHS and PICCS jointly decided to terminate Perry, that VHS Medical

Staff Services had the power to discipline physicians, as well as the Hospital's retaining substantial involvement and supervisory authority over the people who worked for PICCS, including (1) being given approval over who could be selected as the Director of the PICU and requiring that the Director work exclusively for the Hospital, (2) requiring the PICCS physicians to be able to perform certain services, have certain qualifications, and submit certain records to the Hospital, which then became the exclusive property of the Hospital; (3) requiring PICCS to pay physicians "fair market value," (4) requiring PICCS physicians to be subject to all rules, regulations, and policies of the Hospital, and (5) retaining power and authority to demand that any PICCS physician be removed, with which PICCS had to comply. Docket no. 60 at 6. Further, it appears that the Hospital had some involvement in determining that a "a minimum of 3 [*44] full time Physicians will be necessary." Coverage Agreement Ex. B.

Although close, Fifth Circuit cases indicate the test is not met here. And most cases applying the single integrated employer test in other circuits have found that the test was not met. *Grace v. USCAR*, 521 F.3d 655, 664 (6th Cir. 2008) ("[O]ther circuits that have addressed the issue have generally found that the test was not met."). The Court finds that, even taken in the light most favorable to Plaintiff, he fails to show the requisite degree of interrelation in daily employment matters required for a single business enterprise. Although the Hospital retained the right to request Plaintiff's removal, and exercised that right, there is simply insufficient evidence for a reasonable factfinder to conclude that the Hospital was "so involved in the daily employment decisions of [PICCS] as to justify treating the two [entities] as a single employer."

Thus, Plaintiff cannot treat PICCS and VHS as a single employer, and cannot attribute VHS's employees to PICCS. Because they are not a single integrated enterprise, as a matter of law, PICCS does not have sufficient employees and is therefore not an employer for purposes of Title VII. However, questions remain whether PICCS [*45] and VHS were nevertheless joint employers of Perry and thus whether VHS can be liable as a joint employer even though PICCS is not an employer.

## Whether VHS retained sufficient control to be considered Perry's joint employer?

Plaintiff contends that VHS is his joint employer, relying on *Burton v Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015), in which the Fifth Circuit analyzed whether a client agency employed a worker supplied by a temporary staffing agency using the hybrid control test. In *Burton*, the

plaintiff worked for Freescale as a "temp" employee provided by Manpower. The Fifth Circuit found adequate evidence of an employment relationship where the control factors showed that (1) Freescale had the right to demand the plaintiff's termination from the assignment, (2) Freescale supervised her, (3) complaints against her were made by Freescale personnel, (4) her nominal Manpower supervisor worked primarily at a different Freescale location and never observed her while she worked, (5) Freescale employees delivered on-the-job corrections and admonishments, and (6) Freescale decided and insisted that the plaintiff be fired. *Id.* at 227. Thus, even though the economic realities inquiry favored Freescale insofar as it did not handle payroll, withhold [*46] taxes, provide benefits, or set the terms and conditions of employment for Manpower temps, the common-law control test was dispositive. *Id.* at 227-28.

Freescale involves the common situation where a staffing agency who employs the plaintiff provides the employee to a client, who is found to be a joint employer. EEOC regulations for the FMLA state, "[J]oint employment will ordinarily be found to exist when a temporary placement agency supplies employees to a second employer." 29 C.F.R. § 825.106. Other circuit courts have also held that workers provided by staffing companies are employees of the client when the client supervises their daily work. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 218-19 & n.10 (3d Cir. 2015) (citing cases from the Fourth Circuit). In those cases, it is not a question whether the plaintiff is an employee or independent contractor; the question is whether the plaintiff, who is clearly an employee of the staffing agency, is also an employee of the client agency.

In this case, however, Defendants argue that Perry is an independent contractor and that PICCS does not concede that it is his employer, and note that numerous courts have held that physicians with staff privileges at hospitals are not employees despite the hospital's exercise of some control to maintain [*47] standards of patient care and record keeping. As noted by the Fourth Circuit, this control exists for both employee doctors and for doctors merely enjoying practice privileges at a facility and is necessitated by the hospitals' need to avoid liability, and is thus not a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital. *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). The Fifth Circuit has held, "physician staff privileges, as a matter of law, do not create an employer-employee relationship for the purpose of maintaining an action under title VII." *Aziz v. Uvalde Cty. Hosp. Auth.*, 990 F.2d 626, at *2 (5th Cir. 1993) (unpublished). And courts have held that an on-call arrangement between a physician and a hospital does not render the doctor an employee. *Henry v. Adventist Health*

*Castle Med. Ctr.*, 363 F. Supp. 3d 1128, 1134 (D. Haw. 2019) (citing *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996)). "This is not a case in which [the Hospital] merely leased [physicians] from [PICCCS] and then treated them as its own employees." *Clinton's Ditch Co-op Co., Inc. v. N.L.R.B.*, 778 F.2d 132, 140 (2d Cir. 1985). Rather, to the extent control was exercised, it was done so by PICCS, and the Hospital treated Perry the same as it treated all physicians with staff privileges.

In *Diggs v. Harris Hospital-Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988), the Fifth Circuit considered whether a physician given staff privileges at a hospital had an employment relationship with the hospital. While the hospital supplied the tools, staff, and equipment [*48] utilized by the physician in delivering medical care at the hospital, and while it imposed standards upon those permitted to hold staff privileges, the hospital did not direct the manner or means by which the physician rendered medical care. The physician plaintiff treated her patients without direct supervision, and though she was required to have a sponsor present during surgical procedures, this was to have someone attest to her essential qualifications rather than directing the details of her work. The hospital was not under a duty to admit her patients and did not pay her for her services. The hospital did not provide salary or wages to physicians with staff privileges, nor did it pay their licensing fees, professional dues, insurances, taxes, or retirement benefits. Thus, there was not an employer-employee relationship.

VHS notes that, consistent with *Diggs*, other courts have consistently held that independent physicians with practice privileges at hospitals are not employees of the hospital. *See, e.g., Levitin v. Nw. Commty Hosp.*, 923 F.3d 499 (7th Cir. 2019) (finding no employment relationship using the "economic realities of the relationship and the degree of control the employer exercises over the alleged employee" test). In *Levitin* [*49], the plaintiff owned her own medical practice, billed her patients directly, and filed taxes as a self-employed physician, and the hospital did not provide employment benefits or pay her licensing dues. Moreover, she set her own hours, subject only to operating-room availability; she could obtain practice privileges at other hospitals and redirect her patients to those locations; and she could use her own staff in surgeries; "most importantly, she made the treatment decisions for her patients." *Id.* at 501-02. The restrictions placed on her by the hospital — on-call demands, medical-education standards, peer-review processes, and reporting requirements — were insufficient to create an employment relationship. *Id.* at 502.

It is true that those cases did not involve a doctor provided to work on a full-time basis to the hospital by a physician group

who had entered into a contractual relationship with the hospital to be an exclusive provider, as is the case here. *See Johnson v. El Paso Pathology Grp., P.A.*, 868 F. Supp. 852, 861 (W.D. Tex. 1994) (noting that the plaintiff in *Diggs* was not provided through an association or group performing exclusive services under contract with the hospital and could not go to other hospitals to earn a living because other hospitals also had exclusive providers [*50] of pathology services). However, those cases are not materially different when looking at the degree of control exercised by the hospitals over the physicians.

Regardless of whether the physician is an independent physician or part of a physicians group providing exclusive services to the Hospital, the requirement to comply with detailed hospital regulations and use of Hospital facilities does not indicate an employment relationship because all doctors, whether employees or simply those with privileges at the Hospital, must do so. As the Fourth Circuit reasoned,

> While Cilecek certainly retained a professional independence in performing professional services, he also shared a professional responsibility to cooperate with the hospitals to maintain standards of patient care, to keep appropriate records, and to follow established procedures. This shared control exists both for employee doctors and for doctors merely enjoying practice privileges at a facility. If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability. Because of the overarching demands of [*51] the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.
> Similarly, that Cilecek used instruments of the hospital emergency room that were supplied by the hospital is also inherent in the provision of emergency medical services and likewise is not a reliable indicator of employee status. Whether a doctor specializing in emergency medicine is an employee of the hospital or simply has privileges at the hospital, he must, in almost every case, use emergency room facilities provided by the hospital in order to render his services.

*Cilecek*, 115 F.3d at 262.

In *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799 (7th Cir. 1999), the plaintiff anesthesiologist was appointed to the medical staff of the Hospital (*i.e.*, given privileges), and was reappointed each year and her privileges increased. After her hospital privileges were terminated, the plaintiff sued the Hospital under Title VII and the ADEA. The Seventh Circuit concluded she was not an employee because, although she could not associate herself with other hospitals, she was treated as self-employed for tax purposes, paid her [*52] own malpractice insurance, and received no benefits from the Hospital. The governing agreement for anesthesiology department services also referred to anesthesiologists as independent contractors, not employees. The plaintiff did not point to evidence that the Hospital exercised "close control."

In *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002), the Seventh Circuit considered claims brought by a physician against her former employer Addus, a health care provider that contracted with the state Department of Corrections ("DOC"), and the court held she was not an employee of the DOC. Addus contracted with the DOC to supply health care services to inmates, and Hojnacki worked as medical director at a correctional facility. After Hojnacki provided a 7-Up to an inmate in violation of prison policies, the Warden sent a letter to Addus relating that Hojnacki had knowingly violated prison policies and recommending that appropriate disciplinary action be taken that would disallow her entrance into the correctional facility. Addus then discharged her because she was no longer allowed access to the correctional facility and no other similar positions existed within the company. The court found that the three-year duration of her employment [*53] through three health care provider contractors suggested an employment relationship, the kind of occupation and skill required and the source of payment and benefits tended to show she was not an employee of DOC, and the source of equipment supplies/maintenance of workplace/costs of operation was inconclusive.

Because control is the most important factor, the DOC's lack of control over the performance of Dr. Hojnacki's duties suggested she was not an employee. She was not supervised in her work by the DOC, and the manual setting out the policies and procedures of the health care unit provided that "[a]ll medical, psychiatric and dental matters involving clinical judgment are the sole province of the physician or dentist responsible for the care of inmates." Her duties, implementing "all clinical aspects of the health care program" and providing "primary health care services" would undoubtedly involve "clinical judgment" and would therefore be the "sole province" of Dr. Hojnacki.

Dr. Hojnacki argued that the DOC controlled her work through the various policies and procedures with which the DOC required her to comply, such as (1) completing some unspecified training, (2) serving on a quality [*54] improvement committee with specified duties and reporting to

the warden, (3) requiring her to perform a monthly review of mortality cases, (4) specifying what information should be included in admission and discharge forms, (5) specifying how often to perform physical exams of prisoners, and (6) specifying what kind of questions to ask the inmates and to observe an inmate's behavior, appearance, and mental status. She also argued that the DOC controlled her by setting her working hours and requiring her to be on call. The court found that these constraints did not amount to control of the details of her performance and were not "the discretionary control an employer daily exercises over its employees' conduct." *Id.* at 551-52. The court thus found Dr. Hojnacki was not an employee or a loaned employee.

With these examples in mind, the Court turns to the allegations in the present case. As in *Burton v. Freescale*, the economic realities weigh in favor of finding that the Hospital was not an employer: it did not pay Plaintiff's salary, withhold taxes, or provide benefits, or reimburse expenses, nor did it set the specific terms and conditions of Plaintiff's employment. Under the Coverage Agreement, VHS **[*55]** did require that PICCS Physicians be paid fair market value, but otherwise PICCS retained sole discretion in setting their compensation. PICCS set the rates for Plaintiff's work, handled all the billing for Plaintiff's work, and paid Plaintiff for his work; VHS did not.

For control, we look at whether (1) the alleged employer has the right to hire and fire the employee, (2) the right to supervise the employee, and (3) the right to set the employee's work schedule. VHS contends that the contractual agreement (PSA) governing the terms of Plaintiff's service at the Hospital was negotiated between and entered into by PICCS and Plaintiff. Waechter Decl. Perry argues that VHS "had the power to prevent [his] hiring" by requiring him to sign the Physician Agreement as a requirement of the PICCS-VHS Coverage Agreement. The Physician Agreement does not address the substantive terms and conditions of Plaintiff's work at the Hospital. Requiring Plaintiff and all Physicians who contract with PICCS to make acknowledgments through the Coverage Agreement is not the same as exercising hiring control. And Waechter (President of the Hospital and signatory to the Coverage Agreement) testified that, to **[*56]** the extent it referred to "approval" to provide services, it meant only credentialing and granting of staff privileges, not approval of PICCS's hiring decision. Waechter depo. at 24. VHS would accept whatever qualified Physicians (per the terms of the Coverage Agreement) that PICCS selected and provided to work in the PICU (other than the Director).

Plaintiff contends that VHS employees, including President Waechter, interviewed him. Perry depo. at 17. VHS asserts that Plaintiff was given a tour of the Hospital, met with Bill

Waechter, and had breakfast with the PICU nursing staff, wherein they discussed Plaintiff's preferences for being contacted while on call and his philosophy concerning recommendations from the nursing staff. PICCS contends this was only an informal attempt "to ascertain whether Dr. Perry could work well with the staff" and there was no formal evaluation or formal interview process. Docket no. 59-1 (Gowan Decl.); Gowan depo. at 21 (Waechter interviewed Plaintiff, but it was so the candidate would know he could talk to the Hospital CEO, and it was more of an introduction, not an assessment); Gowan Decl. p. 33 ("The purpose was to see if he would be compatible to **[*57]** work with the staff at North Central Baptist Hospital."). Waechter testified he did not recall interviewing Perry or even meeting with him, but that he likes to say "hi" and give a history of the hospital and information such as where to park. Waechter depo. at 66. Thus, there is no evidence that VHS played a significant role in hiring Plaintiff or that its approval was required for PICCS to hire him.

VHS did reserve the right for its CEO to request the removal of a PICCS physician from the Hospital if continued service by such physician could jeopardize patient care or safety, and PICCS agreed to immediately remove any such Physician in accordance with the Bylaws. Chavez testified that he insisted on the limitations that the request could only be for a reason contained within the Bylaws. Chavez depo. at 34-35. And VHS agrees that its right was limited to the "rare instance" of VHS concluding that continued service by a PICCS physician could jeopardize patient care or safety. VHS asserts that Waechter and Kellis felt that Plaintiff had created a hostile, non-workable environment that was placing patient care in jeopardy. VHS did not exercise its right to request removal as to any other **[*58]** PICCS Physician. VHS notes that its request did not preclude Plaintiff from admitting or treating patients at North Central Baptist or any other hospital in the Baptist Health System because Plaintiff continued to hold his Medical Staff membership and privileges (which can only be terminated in accordance with the Medical Staff Bylaws), and those were automatically revoked later only because Plaintiff failed to maintain his medical malpractice insurance.

In *Jones v. Norfolk Southern Co.*, 348 F. App'x 970, at *3 (5th Cir. 2009), the Fifth Circuit noted in an unpublished opinion that an alleged joint employer's absolute right to bar the staffing company's employees from the facility if, in its sole judgment, the employee posed a risk or threat to the safe and efficient operation of the facility was insufficient to transform it into an employer. Further, in *EEOC v. Valero Refining-Texas L.P.*, No. 3:10-CV-398, 2013 U.S. Dist. LEXIS 42776, 2013 WL 1168620, at *4 (S.D. Tex. Mar. 13, 2013), the district court considered the EEOC's position that because Valero made the decision to exclude the subcontractor's

employee from the refinery, and the subcontractor had no other work for him and he lost his job as a result, that Valero effectively fired him. The district court wrote,

> But the Fifth Circuit recently rejected the argument that **[*59]** the power of a company to exclude an independent contractor's employees from its premises renders it a joint employer. *See Jones [v. Norfolk S. Co.*], 348 F. App'x at 973 ("Norfolk's 'power' over TVM employees was limited to barring TVM employees from the Norfolk facility. This 'power' is insufficient to transform Norfolk into Jones's employer for Title VII purposes."). So did a recent, factually similar district court case, in which a plaintiff hired by an independent contractor to perform work at an Exxon Mobil chemical plant was excluded from the plant after she was discovered with contraband. *See Boutin [v. Exxon Mobil Corp.*], 730 F.Supp.2d [660,] 667, 680-81 [S.D. Tex. 2010] (declining to find that Exxon Mobil was a joint employer based on its authority to exclude the plaintiff from the plant).

2013 U.S. Dist. LEXIS 42776, [WL] at *4. Thus, the fact that Valero excluded the plaintiff from its premises, without more, did not amount to the control required; Valero did not have authority to discipline the plaintiff and did not directly supervise him beyond establishing the safety protocols to which he was required to adhere. 2013 U.S. Dist. LEXIS 42776, [WL] at *4-5. These cases, as well as *Hojnacki* from the Seventh Circuit, discussed *supra*, indicate that the fact that VHS exercised its contractual right to ask for Perry to be removed from the PICU **[*60]** contract does not make VHS his joint employer.

With regard to scheduling control, VHS contends that it did not dictate Plaintiff's work schedule or control when he worked. VHS asserts that PICCS created and maintained the work schedules for its physicians, including Plaintiff, for both on-call coverage and for administering pediatric procedural sedation. VHS states it had no oversight in or involvement in the scheduling process. VHS also did not require any sort of regular attendance by Plaintiff, and Plaintiff sometimes worked just one week a month. Although some VHS employees asked him about extended absences, it was "more of just a curiosity" and not like a "You're in trouble" kind of thing. Perry depo. at 76. VHS did not dictate that Plaintiff could not work at other facilities. Perry depo. at 76.

To demonstrate VHS's control of his schedule, Plaintiff asserts that VHS employee Shannon Herrod scheduled him for pediatric sedations at inappropriate times. Perry depo. at 59-60. Under the Coverage Agreement, PICCS would provide scheduled sedation Monday through Friday from 0700 to 1300 and emergency sedation coverage up to 1500, or as otherwise agreed by the parties in writing. Docket **[*61]** no. 59-2 at 13. Under the schedule, the night shift doctor was the sedation doctor the next morning, and was not supposed to be there past two, but Perry complained that Herrod was scheduling sedations too late in the day. Perry depo. at 60. But Dr. Chavez placed Perry on the schedule, including the sedation schedule, with Plaintiff's stated availability, and Herrod merely scheduled patients to be seen as an administrative function. Thus, she was scheduling procedures, not necessarily setting Plaintiff's schedule or procedures. Further, Plaintiff spoke with VHS administration and the process changed so that sedations were more regularly scheduled at times Plaintiff deemed appropriate. Thus, Plaintiff fails to demonstrate that VHS controlled Plaintiff's schedule in this regard.

Plaintiff further asserts that VHS required him to be present at the Hospital at certain times for in-house call coverage. 38. The Coverage Agreement provided that PICCS would provide "in-house call coverage" "only when there is a pediatric inpatient in the Department who meets the Critical Care criteria." Docket no. 59-2 at 12. Physicians were required to be at the Hospital (in-house) during the day per the Coverage **[*62]** Agreement according to Chavez. Perry depo. at 38. Several months after starting (May 9, 2015), Chavez emailed that "we" had developed criteria (Perry thought with the Hospital administration) that required that PICU Physicians stay in-house at night when certain criteria were met, rather than managing the patient remotely. Perry testified, "[T]hey came up with a set of criteria that came to use through PICCS for which we had to stay. There was not an option." Perry depo. at 38, 41. Perry disagreed with the criteria and voiced his disagreement to Chavez, but Chavez said it was part of the agreement that PICCS had with the Hospital and he had no choice but to stay. Perry depo. at 41. Chavez stated it was required by the Society of Critical Care Medicine Guidelines, which state which types of patients should be managed by pediatric intensivists, but Perry believed they did not require physicians to be in-house to manage them. Perry depo. at 43-44. As a result of the policy, there were at least some instances where Perry had to stay in-house overnight. Perry depo. at 45, 131. This fails to demonstrate that VHS controlled Plaintiff's schedule, however. Requiring Physicians to remain in-house **[*63]** when certain medical criteria were met pursuant to the Coverage Agreement is part of the duties that PICU Physicians must perform pursuant to the Coverage Agreement, regardless of whether Plaintiff agreed or disagreed that the Critical Care criteria required it. *Hojnacki*, 285 F.3d at 551 ("[O]ne can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-

time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct."). Further, Plaintiff fails to demonstrate beyond speculation that any change in policy came from VHS rather than PICCS.

With regard to supervision, VHS contends it did not supervise Plaintiff either contractually or as a matter of fact. The contractual provisions provide that the PICU would be supervised by the Director, Dr. Chavez, who was appointed by and is an owner/director of PICCS. The Director had to be approved by VHS, and acted as a liaison between the Hospital, PICCS, and the Physicians. Chavez depo. at 4. Dr. Chavez's duties including supervising the non-Physician staff, but there is nothing in the contract stating **[*64]** he would supervise the Physicians. Chavez testified that if "they [the Hospital] are filing a complaint that the nurses or the doctors were doing this or that, they will communicate to me. And if there's a part that we can fix, then we'll fix it." Chavez depo. at 4-5. Chavez testified that privilege suspensions would be done by the Medical Board pursuant to the Bylaws, not by the Hospital. *Id.* at 28.

VHS did not maintain personnel records or conduct any sort of performance review for Perry. Although Perry was twice peer reviewed for quality of care by the Hospital Medical Staff, the Medical Staff is its own, independent, self-governing body composed of physicians holding Medical Staff membership and privileges, and is distinct from VHS the Hospital. Peer review is conducted when the activities or professional conduct of any physician is brought into question. Watkins Decl. Peer review assesses whether there were any quality of care of patient safety concerns. *Id.* After an investigation, the Medical Executive Board may issue letters of reprimand or warning, may recommend terms of probation, recommend reduction, suspension or revocation of clinical privileges, recommend that staff membership be **[*65]** suspended or revoked, or take other appropriate actions. Certain scenarios also result in automatic suspension or limitation of privileges or membership, including failure to maintain professional liability insurance. Since both Plaintiff's peer reviews revealed no quality of care issues, there were no consequences from the reviews. *Id.* Courts have held that peer review is not the type of supervision establishing an employment relationship with the Hospital. All medical staff agree to abide by the Medical Staff Bylaws and Rules and Regulations, and they provide a form of self-governance. *Id.*; *see also* Gowan Decl. p.17. The Bylaws incorporate the Medical Staff Rules and Regulations, which govern how a physician must act. Gowan Decl. p. 17.

Plaintiff asserts that VHS supervised him and had the authority to discipline him because the PSA required him to subject himself to the Tenet Standards of Care in addition to the Bylaws, and the Tenet Standards of Care provide that failure to follow Tenet's policies and procedures will result in disciplinary action up to and including termination. The Tenet Standards of Conduct set forth Tenet's core values, such as quality, integrity, service, innovation, **[*66]** and transparency. They state that the standards "define what it means to be a Tenet employee, and you simply cannot work here without committing to them." Docket no. 60-2 at 25. But they also state that they apply "to contractors when they are acting on behalf of Tenet" and "[m]any of our contractors also are required to sign a certification" that they have read and understood the standards. *Id.* at 26. Requiring all workers to comply with general policies and procedures governing quality, safety, and compliance with regulatory standards does not create an employment relationship.

Perry contends Dr. Kellis, Chief Medical Officer at the Hospital supervised him. Perry's first interaction with Kellis was a few weeks after he hand-delivered his complaint to everyone in 2016. Perry depo. at 46. Kellis called in Drs. Chavez, Fernandez, Aviles, and Perry "to discuss work environment." Perry testified that Kellis said, "Until two weeks ago, I never heard your name before and now I'm getting calls or texts almost daily from the nurses complaining about you. I want it to stop and go back to the way it was when I didn't know who you were . . . basically, you know, I would be terminated or removed or whatever **[*67]** it was, to that effect." Perry depo. at 46. Plaintiff also points to the fact that the Hospital could prohibit him from treating patients, and in fact removed two patients from his care. Perry depo. at 54. Plaintiff testified that there were two instances where parents complained to Figueroa (PICU nursing director), who took the complaints to administration, and then he "had the directive that actually even came to me through the nurses that I was not allowed to take care of those two patients, per the hospital." *Id.* Instead, other doctors would see those patients. But these instances demonstrate only that the Hospital took appropriate steps to protect its relationship with its employee nurses and its customers in order to continue delivery quality care, as it would regarding the conduct of all persons operating or visiting its premises, employees or not.

Perry further contends that the Hospital's CEO Bill Waechter was directly involved in communicating with the nurses about issues involving Plaintiff, and thus supervised him indirectly through the nursing staff. He testified that he did not interact with Waechter very frequently and "had no conversations really with Bill." Perry depo. **[*68]** at 31, 34. Perry testified that Figueroa had a direct line to Waechter, and Waechter frequently communicated directly with the nurses about issues involving him, though he never heard these conversations or other conversations between Waechter and the nurses. Perry

depo. at 31, 35. VHS's objection to this testimony as lacking personal knowledge is sustained. Perry testified that Waechter would come through on rounds and sometimes would speak with the staff. Perry depo. at 34. Waechter also once had a pregnant patient transferred to the Hospital over his objection. Perry testified that this was a direct example of forcing a patient on him that he felt was inappropriate because she needed an OB intensivist. *Id.* at 36-37. But these examples do not demonstrate that Waechter supervised Plaintiff or interfered with his medical judgment in a meaningful way.

Perry testified that Figueroa also supervised him by attempting to interfere in medical management of patients, which Perry felt was beyond her education and training. Perry depo. at 35. She investigated his complaints about the staff, even when he asked for her not to because she was inappropriately close with the staff. Perry depo. at 36. But Plaintiff **[*69]** has not credibly demonstrated that Figueroa, a nurse, supervised him or exercised control over him.

Plaintiff also points to a directive from Baptist that the PICCS physicians would have to consult on every patient in the PICU. Perry depo. at 46-48. Perry thought this took away discretion from the admitting physician and the consulting PICU physician. *Id.* Perry stated that the directive came from Chavez, but he said "we are" part of this now, like the other ICUs in Baptist's system. *Id.* Perry thought he did not need to see the patients based on a directive by people who are not medically trained. *Id.* Again, this does not demonstrate any more than Baptist was implementing a consistent policy regarding ICU patients in its Hospital to ensure patient care and safety. Similarly, Perry's reliance on directives to keep drug spending within $ 70 per day, Perry depo. at 59, and the requirement to use computerized physician order entry in order to maintain staff privileges, Perry depo. at 49, demonstrates only consistent policy applied throughout the Hospital for all physicians.

To the extent Plaintiff relies on order sets for treatment, such as for ketoacidosis and asthma, he testified that none **[*70]** of the four PICCS doctors followed the ketoacidosis order set, and there were no repercussions that he was aware of. Perry depo. at 53. Perry also testified that the Hospital dictated certain medications be used or protocols followed. As an example, he stated that Chavez had the nurses combine two medications (Propofol and Ketamine) together as a flat policy, because they would treat each other's bad side effects, and Perry could not get them alone. Perry depo. at 63. But Chavez was a PICCS physician, and the decision to make certain medications available in certain ways is no different from the Hospital deciding to have certain equipment available and not others, and does not demonstrate the Hospital's control over Plaintiff. As to other "directives" that were issued, Perry

stated that he had "no idea where they came from" and "some magically appeared in the system." Perry depo. at 64.

Perry's examples fail to demonstrate meaningful control by VHS over him and his work to render it his joint employer. System-wide or Hospital-wide policies are simply conditions for operating within the System or the Hospital applicable to all physicians. Further, many of the requirements are necessary **[*71]** to the Hospital's attempt to fulfill its duties to patients to provide quality care and abide by federal rules and regulations. Although they demonstrate "control" in a general sense, it is not the type of control sufficient to create a joint employer relationship. If anyone employed Perry, it was only PICCS, but PICCS is too small to be an employer for Title VII purposes. Accordingly, neither PICCS nor VHS are employers under Title VII as a matter of law, and summary judgment is granted on all of Plaintiff's Title VII claims.

### Analysis — Section 1981 claims

PICCS does not move for summary judgment on Plaintiff's claims under § 1981, but VHS moves for summary judgment on the basis that there was no contractual agreement between them.

Perry alleges that he was subject to a hostile working environment, based upon his race, and that he was discharged because of his race and because he complained about the racist environment in which he was forced to work, in violation of 42 U.S.C. § 1981. Docket no. 28 at 11. Section 1981 prohibits discrimination on the grounds of race in the making and enforcing of contracts. 42 U.S.C. § 1981(a). *Jeffrey v. Columbia Med. Ctr. at Lancaster Subsidiary LP*, 48 F. App'x 103, at *5 (5th Cir. 2002). The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the **[*72]** enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

VHS contends that there is no contract here that was interfered with because the Physician Agreement is not a bilateral contract and is not signed by VHS. Further, "it is generally understood that rights promulgated by medical staff bylaws are considered incapable of creating an enforceable contract between the hospital and its physicians." *Van v. Anderson*, 199 F. Supp. 2d 550, 562 (N.D. Tex. 2002). In addition, Plaintiff's staff privileges were not revoked; they were terminated when he allowed his medical malpractice insurance to lapse.

In contrast, Perry contends that the Physician Agreement he signed is a contractual relationship for purposes of § 1981. The PICCS-VHS Coverage Agreement contains a section

called "Medical Staff Membership," in which PICCS agreed that medical staff membership and/or clinical privileges of Physician are based upon the Medical Staff Bylaws and that membership and privileges would terminate in accordance with the Medical Staff Bylaws, that the Medical Staff Bylaws would control with respect to peer review matters, and that PICCS would cause each Physician to execute the Physician Agreement attached as Exhibit A. Docket no. [*73] 59-2. The Physician Agreement states, "I . . . understand that I am bound by all terms and conditions of the" PICCS-VHS Coverage Agreement and, "In consideration of my approval by Hospital to provide services at North Central Baptist Hospital, pursuant to the Agreement, I knowingly and voluntarily agree" that (1) it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an exclusive provider and, upon expiration or termination of the Coverage Agreement, Hospital shall have the right to grant an exclusive contract to any person or entity; (2) the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges and unless and until such loss of membership occurs, I am bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff; and (3) if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision [*74] of Services to any person or entity. It then states that by his signature he acknowledges that he has carefully read and the Agreement and knowingly and voluntarily agrees to the terms. There is no signature line for VHS.

Plaintiff argues that the Physician Agreement is a contract insofar as it states exactly what Dr. Perry agrees to in exchange for working at VHS. Plaintiff notes that the Physician Agreement even has a severance clause that implies VHS intends the contract to be legally enforceable against the parties to it. Perry emphasizes that he does not allege that being subject to the Bylaws alone creates a contractual relationship between him and the Hospital.

For the same reasons that no employment relationship exists between Plaintiff and VHS, no enforceable contractual relationship exists between them. Although the language of the Physician Agreement implies bilateral consideration by stating that "in consideration for" his approval, Perry makes certain agreements, it creates no enforceable contract rights against VHS. Dr. Gowan testified that the "in consideration of" language means that Perry met privileging and credentialing requirements by the medical staff, not any formal [*75] approval by the Hospital. Gowan depo. at 24-

25. Further, it was PICCS, not VHS, who required Perry to sign the Physician Agreement, pursuant to its obligations under the Coverage Agreement. The Agreement simply states that Perry understands he is bound by the Coverage Agreement, and that he agrees that the Bylaws shall control any termination of membership and/or privileges, and that he is bound by them until they are terminated. Perry already agreed in the PSA to act consistently with all Bylaws of the medical staff. Thus, the Physician Agreement does no more than restate the fact that the Bylaws control membership and privileges and their termination. To the extent the Physician Agreement creates any additional rights or agreements, it is only that Perry agrees that the Hospital can enter into a new exclusive agreement with any entity or person even if he maintains membership or privileges; it does not give Perry any additional rights. Thus, this case is no different from other cases holding that staff membership under the medical staff bylaws does not create a contractual relationship with the Hospital. *See Obey v. Frisco Med. Ctr., L.L.P.*, No. 4:13-CV-656, 2015 U.S. Dist. LEXIS 10663, 2015 WL 417425, at *5 (E.D. Tex. Jan. 30, 2015); *Johnson v. [*76] Spohn*, No. C-06-138, 2008 U.S. Dist. LEXIS 10058, 2008 WL 375417, at *15 n.90 (S.D. Tex. Feb. 8, 2008) ("Courts in the Fifth Circuit consistently find that medical staff bylaws do not create a contract between a hospital and a doctor and thus do not give rise to contractual rights or contract-based causes of action."), aff'd 334 F. App'x 673 (5th Cir. 2009) ("In Texas, hospital bylaws can create contractual rights in favor of doctors, whereas medical staff bylaws generally do not.")[4] *Van v. Anderson*, 199 F. Supp. 2d at 562-64 (N.D. Tex. 2002) (dismissing physician's § 1981 claim because "it is generally understood that rights promulgated by medical staff bylaws are considered incapable of creating an enforceable contract between the hospital and its physicians," and "in the absence of a contract with the Defendant Hospital, Plaintiff has failed to satisfy a necessary element for maintaining his Section 1981 action."); *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 888 (Tex. App.—Dallas 2000, no pet.); *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp. 1022, 1029 n.5 (S.D. Tex. 1994). Further, Plaintiff's privileges ended only when his malpractice insurance lapsed, not when the Hospital CEO asked for Plaintiff to be removed from the PICCS contract, and thus he cannot show that the Hospital interfered with his

--------

[4] Medical staff bylaws that recognize that the medical staff is subject to the ultimate authority of the board and do not attempt to define or limit the Hospital's power to act through its board of trustees do not create contractual obligations for the hospital, even though the board may have approved and adopted the staff bylaws. *Johnson v. Spohn*, 334 F. App'x 673, 685 (5th Cir. 2009) (citing *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 887-80 (Tex. App.—Dallas 2000, no pet.)).

privileges. *See Van*, 199 F. Supp. 2d at 564 ("Moreover, the Plaintiff in this case cannot present any evidence of interference with his privilege to practice at the hospital, since it is unrebutted that Dr. Van's staff privileges were never revoked, but [*77] that his privileges were terminated on June 27, 2000 when he voluntarily allowed his privileges to lapse.").

In a footnote, Plaintiff asserts that, even if he did not have a contract with VHS, "the Fifth Circuit has held that 42 U.S.C. § 1981 permits claims against non-employer (and non-contracting) third parties if those third parties exercised control over the complained-of conduct" and "Dr. Perry was subject to control by VHS" insofar as the PSA required him to comply with the rules, regulations, and policies of the Hospital. Citing *Foley v. University of Houston Sys.*, 355 F.3d 333, 337-38 (5th Cir. 2003), he argues VHS may be held liable under Section 1981 for race discrimination and retaliation.

But VHS correctly points out that the Fifth Circuit did not so hold in *Foley*. Rather, the Court stated, "We recently noted in *Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002), that it has not yet been decided 'whether a § 1981 claim lies against an individual defendant not a party to the contract giving rise to a claim.' We have, however, accepted that § 1981 liability will lie against an individual defendant if that individual is 'essentially the same' as the State for the purposes of the complained-of conduct." *Foley*, 355 F.3d at 337 (citations omitted). The district court found genuine issues of material fact as to whether the individual Appellants exercised control [*78] over the faculty positions and titles held by the plaintiffs, and, if so, they were "essentially the same" as UHV for purposes of the retaliatory conduct alleged. The Court recognized a tension in its cases with respect to the liability of individual defendants who are not parties to the employment contract, but did "not believe that this is the proper case in which to decide the outer boundaries of § 1981 liability as it applies to individual non-employer defendants, nor to attempt to catalogue every fact situation which might subject an individual to such liability." Here, Perry is not attempting to hold accountable an individual non-employer defendant, and thus *Foley* is inapposite even if it had decided the issue. Perry's § 1981 claims against VHS are dismissed.

## Conclusion

PICCS's Motion for Summary Judgment (docket no. 58) is GRANTED and all Title VII claims against PICCS are dismissed. Perry's claims under § 1981 remain pending against PICCS.

VHS's Motion for Summary Judgment (docket no. 56) is

GRANTED and all claims against VHS are DISMISSED.

The motion to strike (docket no. 63) is GRANTED IN PART, DENIED IN PART, and DISMISSED AS MOOT IN PART.

The Agreed Motion to Stay Discovery and Pending Deadlines [*79] (docket no. 70) is GRANTED. PICCS and Perry shall confer and submit a new Scheduling Order to govern the remainder of the case within fourteen days of this Order.

SIGNED this 16th day of March, 2020.

/s/ Xavier Rodriguez

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE

End of Document

 Caution
As of: June 17, 2020 5:05 PM Z

# Quadir v. N.Y. State DOL

United States District Court for the Southern District of New York

June 29, 2016, Decided; June 29, 2016, Filed

13-CV-3327 (JPO)

**Reporter**
2016 U.S. Dist. LEXIS 84632 *; 17 Accom. Disabilities Dec. (CCH) P17-064

MOHAMMED QUADIR, Plaintiff, -v- NEW YORK STATE DEPARTMENT OF LABOR, Defendant.

**Subsequent History:** Affirmed by Quadir v. New York State Dep't of Labor, 2017 U.S. App. LEXIS 9755 (2d Cir. N.Y., June 2, 2017)

**Prior History:** Quadir v. New York State DOL, 39 F. Supp. 3d 528, 2014 U.S. Dist. LEXIS 115387 (S.D.N.Y., Aug. 19, 2014)

**Counsel:** **[\*1]** Mohammed Quadir, Plaintiff, Pro se, Bronx, NY.

For New York State Department of Labor, Defendant: Michael John Siudzinski, New York State Office of the Attorney General, New York, NY; Susan Anspach, New York State Office of the Attorney General (NYC), New York, NY.

**Judges:** J. PAUL OETKEN, United States District Judge.

**Opinion by:** J. PAUL OETKEN

# Opinion

## OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Mohammed Quadir brings this action against his employer, the New York State Department of Labor (the "Department"), alleging that the Department failed to make reasonable workplace accommodations for his disability, took adverse employment actions against him because of that disability, and retaliated against him for complaining about disability discrimination, all in violation of the Rehabilitation Act of 1973. The Department moves for summary judgment on all claims. (Dkt. No. 105.) For the reasons that follow, the Department's motion is granted.

## I. Background

The following facts are undisputed unless otherwise noted. The Department of Labor operates facilities in communities around New York State to assist job seekers with résumé writing, job matching, interview training, and other services. (Dkt. No. 129 ¶ 1.) **[\*2]** Quadir is employed by the Department as a Labor Services Representative—a person who works directly with customers, individually or in group settings—at the Department's Bronx Career Center. (*Id.* ¶¶ 1-2.)

In his role as a Labor Services Representative, Quadir regularly taught "workshops"—presentations to groups of customers.[1] On February 2, 2011, Quadir submitted a request for a reasonable accommodation asking that he be "exempt from duties requiring [him] to stand for any considerable length of time" because he was suffering from lightheadedness, fatigue, and other symptoms. (*Id.* ¶ 8.) Quadir asked for an exemption to last "for the time being while [he] tr[ied] to ascertain the nature of [the] illness." (*Id.*)

---

[1] The parties dispute whether all Labor Services Representatives at the Bronx Career Center were required to teach workshops, but the Court need not resolve this issue in order to decide the present motion. (*See* Dkt. No. 129 ¶¶ 5-6.)

2016 U.S. Dist. LEXIS 84632, *2

Because teaching workshops ordinarily requires prolonged standing, the Department temporarily exempted Quadir from workshop teaching duties as a result of his request. (*Id.* ¶ 9.)

As is detailed more fully below, Quadir continued to request extensions of his exemption [*3] from workshop teaching duties and the Department continued to grant these extensions until February 14, 2012, a little over a year following the initial request. (*Id.* ¶¶ 18-19.) On that date, the Department declined to offer Quadir the specific accommodation he requested—exemption from all workshop duties—but extended him an alternative accommodation. (*Id.* ¶ 18.) Specifically, the Department offered Quadir "suitable equipment (high chair and lectern/podium) and rooms to conduct workshop [sic] while sitting down," an accommodation designed to "address [Quadir's] need to not have prolonged standing work duties." (Dkt. No. 110-20 at 3-4.)

Following the Department's determination, Quadir filed a complaint with the New York State Division of Human Rights. (*See* Dkt. No. 2.) Although his request to be exempt from all workshop teaching duties was denied, the parties agree that Quadir has not taught any workshops since 2011. (Dkt. No. 129 ¶ 21.)

Quadir, acting *pro se*, initiated this action by filing the Complaint on May 16, 2013, and an Amended Complaint on May 31, 2013. (Dkt. Nos. 2, 5.) He contends that the failure to grant his sought-after accommodation gives rise to a claim for failure to [*4] make reasonable accommodations under the Rehabilitation Act. He also argues that, in the wake of his request to be exempt from workshop teaching duties, the Department discriminated against him on the basis of his disability and retaliated against him for exercising his rights.

The Department subsequently moved to dismiss the Amended Complaint. (Dkt. No. 14.) On August 19, 2014, the Court granted in part and denied in part the Department's motion to dismiss, determining that Quadir had plausibly stated claims for reasonable accommodation, discrimination, and retaliation under the Rehabilitation Act. (Dkt. No. 54.) On September 18, 2014, counsel appeared on Quadir's behalf and he ceased prosecuting this case *pro se*. (Dkt. Nos. 65, 66.)

The Department now moves for summary judgment on all of Quadir's remaining claims. (Dkt. No. 105.)

## II. Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the [*5] non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

### A. Reasonable Accommodation

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, these provisions purport to impose precisely the same requirements" as the Americans with Disabilities Act (ADA) and are analyzed under the same legal standards. *See Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167 (2d Cir. 1998). The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee], unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [its] business." 42 U.S.C. § 12112(b)(5)(A). Similarly, regulations promulgated under the Rehabilitation Act by the Department of Health and Human Services require recipients of federal funds to "'make *reasonable accommodation* to the [*6] known physical or mental limitations of an otherwise qualified handicapped . . . employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.'" *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995) (alteration in original) (quoting 45 C.F.R. § 84.12(a)).

An employee suing for failure to make reasonable accommodations must establish four elements to make a *prima facie* case: that "(1) [the] plaintiff is a person with a disability under the meaning of the [Act]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). After this *prima facie* case is established, an employer can defeat such a claim if it shows "(1) that making

2016 U.S. Dist. LEXIS 84632, *6

a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir.1995)). "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) (citing *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir.1995)).

Quadir contends that he informed the Department that he was unable to teach workshops—on [*7] account of a disability that prevented him from standing for a prolonged period of time, projecting his voice, or concentrating when dealing with more than one person at a time—and that the Department failed to accommodate this request. (Dkt. No. 140.) It is true that the Department did not grant Quadir's request to be exempt from all workshop responsibilities. However, the evidence demonstrates that Quadir only provided the Department with medical documentation supporting his need to be exempt from prolonged standing and "considerable physical exertion." The Department extended Quadir an accommodation that would have addressed these issues. In other words, the Department did not "refuse" to accommodate Quadir's documented disability. *Rodal*, 369 F.3d at 118. Rather, it adopted the only concrete accommodation suggested by Quadir's doctors: an exemption from prolonged standing. Because there is no genuine dispute that the Department extended Quadir the accommodation suggested by Quadir's doctors and thereby addressed his documented disability, Defendants are entitled to summary judgment on Quadir's failure to accommodate claim.[2]

A review of the evidence confirms that Quadir provided the Department with medical documentation outlining his need for an exemption from prolonged standing and "considerable physical exertion." (See Dkt. No. 110-18 at 2.) Quadir's February 2, 2011, request for an accommodation asked that he be "exempt from duties requiring [him] to stand for any considerable length of time." (Dkt. No. 110-9.) This request included a note from a Dr. Kini concluding that it "could be

medically necessary [for Quadir] to not stand for long periods of time to avoid falls." (*Id.* at 3.) Quadir contends that he also submitted a medical note dated January 28, 2011, from a Dr. Sindwhani requesting that Quadir "be excused from public speaking," but Quadir has not offered [*9] the note for the Court's review or cited any evidence to support his claim that such a note was forwarded to the Department. (*See* Dkt. No. 129 ¶ 7; Dkt. No. 140 at 2.) Following his February 2, 2011 request, the Department temporarily exempted Quadir from teaching workshops. (Dkt. No. 129 ¶ 9.)

In April 2011, Quadir requested an extension of this temporary accommodation. (Dkt. No. 110-10.) Specifically, Quadir asked "[t]o be exempt from all standing work duties" and assigned "only desk-bound/sedentary work . . . ." (*Id.* at 5.) The request included a note from a Dr. Gulati, who asked that Quadir be "excuse[d] . . . from prolonged standing." (*Id.* at 9.)

Subsequently, the Department requested additional medical documentation in support of Quadir's request to be exempt from all workshop duties. (Dkt. No. 110-11.) In response, he provided a doctor's note dated May 27, 2011, which asked that Quadir be excused from "prolonged standing for the next 3 months" because he was suffering from headaches, vertigo, and difficulty concentrating. (Dkt. No. 129 ¶ 12; *see* Dkt. No. 110-12.) On July 20, 2011, the Department informed Quadir that his temporary accommodation would be extended through August 27, 2011, at which time he would [*10] be expected to make a new request or submit medical information to support continued accommodation. (Dkt. No. 129 ¶ 13.)

On August 22, 2011, Quadir requested a second extension of his temporary accommodation and submitted in support of his request a doctor's note asking that he be excused from prolonged standing for four months. (*Id.* ¶ 14.) The next day, the Department informed Quadir that his accommodation was extended through December 29, 2011. (*Id.* ¶ 15.)

On December 20, 2011, Quadir requested a third extension of his temporary accommodation. (*Id.* ¶ 16.) A note from Dr. Naveed Iqbal accompanied the request. It stated that Quadir had been diagnosed with "Major Depressive Disorder" and asked that Quadir be excused from "prolonged standing work duties or any activity requiring considerable physical exertion . . . for at least four months." (*Id.* ¶ 17.)

On February 14, 2012, the Department informed Quadir that it was denying his request to be exempt from all workshop teaching duties, but that the Department would provide Quadir with an alternative accommodation tailored to his documented needs. (*Id.* ¶¶ 18, 19.) Specifically, the Department offered Quadir "suitable equipment (high

---

[2] There is an additional impediment to Quadir's claim. As Quadir concedes, he has [*8] not taught any workshops since his initial request for accommodation. (Dkt. No. 129 ¶ 21.) Indeed, the Department has not so much as asked Quadir to conduct a workshop in that time. (*Id.*; Dkt. No. 140 at 14.) In other words, Quadir has received his requested accommodation. *See Garvin v. Potter*, 367 F. Supp. 2d 548, 563 (S.D.N.Y. 2005) (defendant did not fail to reasonably accommodate plaintiff's need to be exempt from overtime duty where the "defendant never required the plaintiff to work overtime . . . .").

chair **[*11]** and lectern/podium) and rooms to conduct workshop [sic] while sitting down," an accommodation that would "address [Quadir's] need to not have prolonged standing work duties." (Dkt. No. 110-20 at 3-4.)

Because Quadir provided medical documentation asking only that he be excused from prolonged standing and activities involving "considerable physical exertion," and the Department granted an accommodation that would have addressed both issues, it cannot be said that the Department "refused" to accommodate Quadir's documented disability.[3] *Rodal*, 369 F.3d at 118. Quadir has failed to offer evidence showing any nexus between his desired accommodation—a total exemption from workshop teaching duties—and his documented needs. For instance, Quadir has not offered evidence that he submitted a January 28, 2011, from a Dr. Sindwhani asking that Quadir be exempt from public speaking.[4] Accordingly, the Department is entitled to summary judgment on Quadir's reasonable accommodation claim.

**B. Discrimination [*13]**

_____

[3] The Department was well within its rights when it asked for medical documentation of Quadir's disability in evaluating his request. "As a part of the interactive process, the [employer is] entitled to request that [the employee] provide documentation **[*12]** of his disability and the appropriate accommodations for that disability." *Zito v. Donahoe*, 915 F. Supp. 2d 440, 448 (S.D.N.Y. 2012); *see Gard v. United States Dep't of Educ.*, No. 11-5020, 2011 U.S. App. LEXIS 10799, 2011 WL 2148585, at *1 (D.C. Cir. May 25, 2011) (per curiam) ("[A]ppellant's failure to provide updated medical information when reasonably requested is fatal to his failure to accommodate claim."); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) ("An employee's provision of medical information is an indispensable aspect of that interactive process and where an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, 'ADA liability simply does not follow.'" (quoting *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996))).

[4] Similarly, Quadir, while proceeding *pro se* at an earlier stage of this litigation, attached to his complaint a doctor's note from Dr. Iqbal dated April 1, 2012, which stated that Quadir should be excused from "prolonged standing work duties as well as any activity requiring considerable exertion. This includes group instruction assignments standing or sitting without the use of a lectern." (*See* Dkt. No. 5-7 at 1.) However, Quadir does not argue that the note was submitted to the Department for its consideration or otherwise cite the note in support of his opposition to the Department's motion for summary judgment. Any argument based on the note is, accordingly, waived.

Quadir also contends that the Department intentionally discriminated against him because of his disability. Because intentional discrimination is rarely so open as to be reflected in direct proof, a plaintiff is required only to provide four circumstantial elements to make out a *prima facie* Rehabilitation Act discrimination claim: "(1) plaintiff's employer is subject to the [Rehabilitation Act]; (2) plaintiff was disabled within the meaning of the [Rehabilitation Act]; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (alterations and citation omitted). Once a plaintiff establishes these elements, the "burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for" its action. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *see Hodges v. Holder*, 518 Fed. Appx. 45, 47 (2d Cir. 2013) ("Intentional discrimination claims pursuant to the Rehabilitation Act are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas* . . . ."). To prevail, the "plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason **[*14]** is a pretext." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (citation and internal quotation marks omitted); *Hodges*, 518 Fed. Appx. at 47.

The Department does not quibble with the first three of elements of Quadir's *prima facie* case. Instead, it argues that Quadir has not shown that he suffered an adverse employment action because of his disability.

An "adverse employment action" entails a "materially adverse *change* in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). To show a materially adverse action, the relevant change in conditions of employment "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities . . . ." *Id.* at 755 (citations and internal quotation marks omitted).

Because Quadir did not suffer an adverse employment action, the Department is entitled to summary judgment on his discrimination claim. Quadir suggests that the Department took nine distinct actions against him that rise to the level of adverse employment actions, which he separates **[*15]** into

six categories: (1) counseling memos; (2) the annual evaluation; (3) the 2013-2014 evaluation; (4) a denial of pay for President's Day in 2014; (5) a denial of leave time; and (6) the placement of Quadir on "full restrictions." (Dkt. No. 140 at 16; 22-26.) It is beyond genuine dispute that none of these incidents constitutes an adverse employment action.

As the Court explained in a prior decision in this case, a "negative mark on [Quadir's] record indicating insubordination" is not, alone, "enough to constitute a materially adverse employment action." *Quadir v. New York State DOL*, 39 F. Supp. 3d 528, 541 (S.D.N.Y. 2014); *see Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. 2014) ("[T]he threat of disciplinary action, without more, does not constitute an adverse employment action."); *Honey v. Cty. of Rockland*, 200 F. Supp. 2d 311, 320-21 (S.D.N.Y. 2002) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."). As a result, Quadir cannot prevail on his claim that Department "counseling memos" that detailed negative performance by Quadir but "did not have any disciplinary sanction associated with [them]" constituted adverse employment actions.[5] (Dkt. No. 140 at 23.) For the same reason, Quadir's **[*16]** claim that an "annual evaluation" that included the "false information . . . that he had not monitored the Resource Room" is not an adverse employment action. (*Id.* at 24.) Nor is the issuance of an "unsatisfactory" evaluation, without an accompanying material change in the terms and conditions of Quadir's employment. (*Id.* at 24.)

Quadir's remaining arguments are equally without merit. Although he contends that he was discriminated against when he was denied pay for President's Day in 2014, he elsewhere concedes that he was not entitled to receive pay for that day under Department-wide policy. (Dkt. **[*17]** No. 129 ¶¶ 42, 43.) He argues that the Department discriminated against him when it denied his request to take leave in order to spend time prosecuting his case against the Department, but he has made no effort to show that he was entitled to take leave for this purpose. (Dkt. No. 140 at 25.)

Finally, he argues that the Department's decision to place him on "full restrictions" was an adverse employment action. (*Id.*) Effective April 22, 2014, the Department placed Quadir on full restrictions—an administrative regime that required him to provide medical documentation for all absences. (Dkt. No. 129 ¶ 51-51.) Quadir does not, however, argue that his placement on full restrictions resulted in his being denied leave to which he was entitled, or that any other material change in the conditions of his employment resulted. (Dkt. No. 140 at 25-26; *see* Dkt. No. 157 at 7.) Placement on full restrictions may have inconvenienced Quadir, but inconvenience and scrutiny from management are not, alone, sufficient to constitute an adverse employment action. *Honey*, 200 F. Supp. 2d at 320-21.

Because no rational fact finder could conclude that Quadir suffered an adverse employment action, the Department is entitled to summary judgment **[*18]** on his discrimination claim.

## C. Retaliation

Citing the same Department actions just discussed, Quadir also contends that the Department retaliated against him for asserting his rights under the Rehabilitation Act.

The ADA and Rehabilitation Act prohibit employer retaliation against employees who assert their rights under their terms. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter"). To make out a case for retaliation, a plaintiff must show that "(1) she engaged in an activity protected by the [Rehabilitation Act]; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity," that is, the employer acted with a retaliatory motive. *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (alterations omitted)); *see also Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148-49 (2d Cir. 2002). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant **[*19]** meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Treglia*, 313 F.3d at 721 (quoting *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

---

[5] Quadir mentions that his record of absences and tardiness is at issue in an ongoing "arbitration proceeding with the [Department] in which [the Department] used the counseling to support the notion that Mr. Quadir is not qualified or competent to continue his employment with [the Department]." (Dkt. No. 140 at 23.) Quadir does not argue that this arbitration proceeding is an adverse action taken against him and, as a result, the Court declines to consider it as such. Nor is any possible future adverse action resulting from that ongoing arbitration proceeding within the scope of the claims asserted in this case.

The standard for an "adverse employment action" in a retaliation claim, however, is not as demanding as it is in a discrimination claim. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). In the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (citation and internal quotation marks omitted). Thus, even actions that do not result in a material change in the terms and conditions of employment may be adverse actions for the purposes of a retaliation claim, so long as such actions might deter a reasonable employee from engaging in protected activity. *See Hicks*, 593 F.3d at 165.

Even under this less demanding standard, the Court concludes—for substantially the same reasons discussed above in the context of Quadir's discrimination claim—that Quadir has not presented evidence sufficient for a trier of fact to conclude that he suffered [*20] an adverse employment action. The complained-of counseling memos, for example, which note Quadir's absenteeism and tardiness issues, are concededly not disciplinary in nature and would not have deterred a reasonable employee from engaging in protected activity. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[W]e have held, in the context of the issuance of a 'counseling memo,' that 'criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.'" (citation omitted)); *Ulrich v. Moody's Corp.*, No. 13-CV-0008, 2014 U.S. Dist. LEXIS 138082, 2014 WL 4977562, at *13 (S.D.N.Y. Sept. 30, 2014) ("Constructive criticism and evaluation plans are generally not adverse actions for purposes of a discrimination or *retaliation* [claim]." (emphasis added)). Although the test is an objective one—whether a reasonable employee in Quadir's situation would have been deterred—"it is relevant that [Quadir] himself was not deterred from complaining" and pursuing his accommodation claim. *Tepperwien*, 663 F.3d at 572. Rather, the record reflects that Quadir continued to object to the conditions of his employment and assert his right to reasonable accommodations throughout the period in question. (*See e.g.*, Dkt. No. 129 ¶¶ 7, 20, 34, 48.)

In any event, even if Quadir could establish the elements of a [*21] *prima facie* case for retaliation, the Department has articulated legitimate, non-retaliatory reasons for each of the alleged adverse employment actions and Quadir has not offered evidence sufficient to support a finding that the Department's reasons are pretextual. For instance, the Department has a concededly legitimate interest in ensuring

that its employees attend work and arrive at work on time. It follows that the Department's requirement that Quadir present medical documentation in support of his absences furthered a legitimate goal, especially given his attendance record. (*See* Dkt. No. 129 ¶¶ 51-60.) Indeed, between April 15, 2013, and April 11, 2014, prior to his placement on "full restrictions," Quadir was absent 92 days and tardy 145 days. (Dkt. No. 108 ¶¶ 54-57; Dkt. No. 107 ¶¶ 26-27.) Quadir was the only employee in the Bronx Career Center to exhaust his accrued leave. (Dkt. No. 108 ¶ 58.) Moreover, the Department's efforts to counsel Quadir on problems with absence and tardiness *predate* his initial request for an accommodation, significantly undercutting his contention that he was subject to retaliation. (*See* Dkt. Nos. 110-2, 110-3, 110-4; Dkt. No. 129 ¶ 53.) Likewise, [*22] even if Quadir could show that he was entitled to take leave in order to pursue his *pro se* litigation, the Department has plausibly established that it rejected Quadir's request because its operational needs required his presence. (Dkt. No. 106 at 22; Dkt. No. 107 ¶¶ 87-91.)

Quadir argues that the deposition of his supervisor Atul Sheffey could permit a factfinder to conclude that the Department acted with retaliatory animus toward him in documenting his attendance and lateness issues. (Dkt. No. 140 at 18-19.) Sheffey testified that, following a conversation with Quadir in which he insisted that he would continue to arrive at work late because his tardiness related to his illness, Sheffey decided to begin documenting Quadir's lateness "by the book" whereas he had previously been lenient in documenting Quadir's tardiness. (Dkt. No. 140-20 at 139-142). But Sheffrey's effort to document Quadir's lateness according to protocol can hardly be characterized as proof of retaliatory animus, especially because Sheffrey testified that he documented virtually every employee's tardiness "by the book." (*Id.* at 142, 147.)

The testimony of Andrew Castillo, a colleague of Quadir, likewise fails to create a genuine [*23] issue of material fact as to pretext. (*See* Dkt. No. 140-20.) Castillo testified that, "at different times different people [have been] singled out" for scrutiny by management and that Quadir has at times been singled out for, among other things, writing notes that are "too long" or allowing customers to wait an excessive amount of time before attending to them. (*Id.* at 78, 86.) In Castillo's view, Quadir's supervisors act in this way because "they don't particularly like [Quadir]." (*Id.* at 87.) Such speculative and conclusory testimony is insufficient to create a genuine issue of material fact where the Department has, as here, offered fulsome, non-retaliatory reasons for the complained-of actions grounded in the evidence before the Court. As mentioned above, this conclusion is bolstered by the record evidence that the Department's efforts to counsel Quadir on problems with

absence and tardiness *predate* his initial request for an accommodation.

Accordingly, the Department is entitled to summary judgement on Quadir's retaliation claim.

## III. Conclusion

For the foregoing reasons, the Department's motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at docket number 105 and **[*24]** to close this case.

SO ORDERED.

Dated: June 29, 2016

New York, New York

/s/ J. Paul Oetken

J. PAUL OETKEN

United States District Judge

---

 Neutral
As of: June 17, 2020 5:08 PM Z

# Saliga v. Chemtura Corp.

United States District Court for the District of Connecticut

September 30, 2015, Decided; September 30, 2015, Filed

No. 12-cv-832 (VAB)

**Reporter**
2015 U.S. Dist. LEXIS 133135 *; 2015 WL 5797000

DIANE SALIGA, Plaintiff, v. CHEMTURA CORPORATION, Defendant.

**Subsequent History:** As Amended October 1, 2015.

**Prior History:** Saliga v. Chemtura Corp., 2013 U.S. Dist. LEXIS 164812 (D. Conn., Nov. 20, 2013)

**Counsel:  [\*1]** For Diane Saliga, Plaintiff: Mark Paul Carey, LEAD ATTORNEY, Mark P. Carey, P.C., Southport, CT.

For Chemtura Corp, Defendant: Ian T Clarke-Fisher, LEAD ATTORNEY, Robinson & Cole, LLP-NYC, New York, NY; Stephen W. Aronson, LEAD ATTORNEY, Robinson & Cole, Hartford, CT.

**Judges:** Victor A. Bolden, United States District Judge.

**Opinion by:** Victor A. Bolden

# Opinion

## AMENDED RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Diane Saliga, brought this action against her former employer, Chemtura Corporation ("Chemtura" or "Defendant"), asserting causes of action for race discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), discrimination on the basis of race, sex, and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), retaliation in violation of Title VII, discrimination on the basis of race, sex, and religion in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a) ("CFEPA"), retaliation in violation of CFEPA, common law intentional infliction of emotional distress, and common law defamation. For the reasons stated below, the motion is **GRANTED**.

## FACTUAL AND PROCEDURAL BACKGROUND

Chemtura Corporation hired Mrs. Saliga on October 18, 2010 as a Senior Auditor in **[\*2]** the Internal Audit Department, and terminated her on October 26, 2011. Second Amended Complaint ("Compl.") ¶ 8; Def. Ex. M. During Saliga's tenure at Chemtura, the Internal Audit Department consisted of four or five employees. *See* Saliga Dep. 24-27; Mosher Dep. 172. At first, Saliga directly reported to Denise Mosher, Chemtura's former Director, Internal Audit. Saliga Dep. 25. Mosher left the company on April 12, 2011, and was replaced by Ayesha Jagtiani. *See* Mosher Dep. 169; Khilnani Dep. 268; Saliga Dep. 25. In addition, Saliga reported to Jogita Khilnani, Chemtura's former Vice President, Internal Audit, who was also involved in both the decision to hire her and the decision to terminate her. Saliga Dep. 25, 88, 173-74, 269; Def. Ex. P; Peterson Dep. 41; Khilnani Dep. 82-89, 265-68. Prior to joining Chemtura, Saliga had worked at Hubbell Incorporated; Mosher and Khilnani were also employed by Hubbell Incorporated at that time. Saliga Dep. 117-19; Khilnani Dep. 80-81, 85-87.

A few days after Saliga was hired, Khilnani allegedly said in Saliga's presence, "Who would want to stick anything in that big fat hole, and what good would come out of it?" about

Chistine Peterson, Chemtura's **[\*3]** former Human Resources Generalist. Saliga interpreted that comment as Khilnani "hitting on me." Saliga Dep. 91.

During Saliga's time at Chemtura, Khilnani is alleged to have called her "whitey a couple times [*sic*]." Saliga Dep. 533. Khilnani also allegedly referred to another employee as "the cute white boy." Saiga Dep. 533-34. At some unspecified times, Khilnani and Jagtiani allegedly complained to Mosher about Saliga engaging in religious reading at work. Mosher Dep. 52-53.

In early 2011, Saliga requested a promotion to Lead Auditor, but was denied. Saliga Dep. 217. Also in early 2011, according to Saliga, Khilnani was selecting people to travel to conduct planning audits, which Saliga expressed interest in doing; Khilnani allegedly told her that she would not be selected because the audits included weekend work and Khilnani was worried about Saliga having to go to church. When Saliga complained that she would not let her religion stop her from doing her work, Khilnani allegedly would still not send her. Saliga Dep. 28-29.

Saliga further alleges that, in early 2011, Khilnani told her that she had only stayed married to her husband for so long because of her religion. Saliga Dep. 38. **[\*4]** Saliga testified that she recalled telling Peterson at some unspecified time that Khilnani "has no right bringing up my husband in the workplace," though she could not remember when she told her about Khilnani's alleged comment. Saliga Dep. 57-58.

Although the schedule of critical deliverables had been published and agreed to at the beginning of the year, Saliga missed a number of deadlines from mid-April through May 2011, and failed to complete various tasks in a timely manner. *See* Exs. B, C.

In or around May 2011, Khilnani allegedly loudly reprimanded Saliga for saying, "God bless you," after somebody in the office sneezed, and told Saliga not to "bring God into this place again." Saliga allegedly was reprimanded by Khilnani once again shortly thereafter for saying, "Bless you," after another sneeze. Saliga Dep. 36-41. Saliga alleges that she "probably said something" at the time to Khilnani to complain about this incident. Saliga Dep. 538. In addition, at some unspecified time, Saliga allegedly complained to Peterson that Khilnani had been offended by her saying those words. Peterson Dep. 85.

On an unspecified summer day in 2011, Saliga wore a "chi rho" religious charm to work, and **[\*5]** Khilnani allegedly said, "Why can't you wear a simple cross like normal people wear?" and "it's disgusting." Saliga Dep. 39.

On June 2, 2011, Khilnani sent an email to Mosher stating, "Diane is not someone you should trust and I tell you that because she is and has been two faced with you." Def. Ex. Q.

On July 28, 2011, after Saliga had been at Chemtura for about nine months, she was given a mid-year review. Def. Ex. B. Jagtiani and Khilnani noted many performance, communication, and interpersonal issues that needed to be addressed and improved, specifically: missed deadlines; trouble working independently on assignments without detailed direction and micro-management; time management skills; need to contribute to writing the audit report and recommendations and not just reviewing it after the fact; working collaboratively with team members without passing derogatory comments. Saliga asserts that her missing five deadlines from April through August was caused by other employees' failures. *See, e.g.*, Saliga Dep. 556; Pl. Ex. 17.

During a meeting in Khilnani's office on July 28, 2011, following the mid-year review, Saliga yelled at Khilnani. *See* Pl. Exs. E, F. She allegedly said that she **[\*6]** did not give a shit about the review. Def. Ex. E. She allegedly attempted to blame her performance deficiencies, falsely, on a co-worker. Def. Exs. E, G. In addition, at some point on July 28, 2011, Khilnani was meeting privately with Saliga to discuss the need for Saliga to stop being insensitive to other cultures and religions, and during the meeting, Khilnani referenced the fact that Saliga is "Caucasian," which upset and offended Saliga greatly. Saliga testified, "Thank goodness I didn't get into an accident driving home that night because "I was upset" that Khilnani was "calling me the 'C' word." Saliga Dep. 105-06.

On August 1, 2011, Peterson met with Khilnani and Mohsen Baccar—who, like Saliga, was a Senior Auditor, Internal Audit—to discuss his concerns about working with Saliga, as she allegedly made him feel uncomfortable by making comments on his ethnicity and questioning his ethics. Def. Ex. G.

Khilnani gave Saliga a written reprimand on August 4, 2011, noting her unsatisfactory job performance, for which she would be placed on a Performance Improvement Plan ("PIP"), and her "unacceptable" behavior as a member of the Audit team, which would subject her to discipline, up **[\*7]** to and including termination, if such conduct did not stop immediately. Def. Ex. H. The written reprimand clearly stated that Saliga was "hereby notified that unless immediate, sustained improvement is demonstrated to bring [her] performance up to a satisfactory level, [she] will be subject to additional discipline, up to and including termination of [her] employment with Chemtura." *Id.* It also stated that if Saliga's "extremely unprofessional" conduct toward her co-workers "does not stop immediately, . . . [she] will be subject to

discipline, up to and including termination of [her] employment with Chemtura." *Id.* At the reprimand meeting with Saliga on August 4, 2011, Saliga alleges that she brought up the "God bless you" comments. Peterson met with Baccar later that day, and he expressed concern that Chemtura had not addressed the issue of Saliga's allegedly slandering him concerning his work and his ethics. Def. Ex. J.

The PIP, which Saliga also received on August 4, 2011, set forth improvement goals and action steps, with target dates, and her progress was reviewed with her at meetings on an ongoing basis until her termination. Def. Ex. I. From the outset, the PIP set forth to Saliga **[*8]** the following information:

> If you do not show improved and sustained results within the specified time period, or you fail to maintain this level of performance going forward, your poor performance may result in further action including immediate termination of your employment.
>
> Chemtura is an at-will employer and, as such, you will remain an at-will employee . . . . As such, your employment may be terminated by you or by Chemtura at any time, with or without cause, and with or without advance notice." Five meetings were held over the nearly three-month course of the PIP.

*Id.* At the first PIP meeting, held on August 25, 2011, it was noted that a review she had been responsible for conducting was "not completed to expectations," and would have to be re-done. *Id.* It was noted that Saliga had made some progress, but still needed to step up to show additional improvement. *Id.*

At an unspecified time, Human Resources allegedly advised Khilnani that it is inappropriate to make comments around Saliga's religion. Peterson Dep. 87. Saliga informed Peterson of Khilnani's alleged comment about Peterson's "fat hole" on August 26, 2011. Pl. Ex. 25. There is no record evidence of any investigation by **[*9]** Chemtura into the "fat hole" comment. *See, e.g.*, Peterson Dep. 59.

On August 31, 2011, Khilnani allegedly put her hand on Saliga's left cheek and kissed her on the cheek "in a very romantic way." Saliga Dep. 328. Saliga testified that she "felt raped and violated." *Id.* at 327. Saliga informed Peterson on September 1, 2011 that "[t]he hug and kiss from Jogita at the end of our discussion does give me chills though." Pl. Ex. 27.

The second PIP meeting occurred one week after the first, on September 1, 2011, and Khilnani noted "significant progress in areas outlined" by the PIP, and acknowledged this to Saliga; the PIP form notes, "Overall moving in positive direction per Jogita [Khilnani] and Ayesha [Jagtiani]." Def. Ex. I.

In or around early September 2011, after Hurricane Irene had knocked out electricity, Khilnani allegedly made a comment to Saliga that Khilnani had gone to the store and it only had "Jesus candles" left in stock. Saliga Dep. 101-04. Saliga testified that this offended her. *See id.*

In mid-September, an email exchange between Saliga and Khilnani highlighted some deficiencies in Saliga's recent work product, as well as issues with her interpersonal working relationships. Def. Ex. N. Khilnani **[*10]** offered to further explain her guidance to Saliga in person when Saliga returned from her vacation. *Id.*

At the third PIP meeting, which occurred on October 7, 2011, it was noted that Saliga's "[q]uality of work [is] a concern," and identified issues with two specific projects. As a result, it was noted that the PIP meetings "will occur weekly moving forward. Def. Ex. I. Saliga later noted to Peterson that Khilnani "got me on quality which is what is expected." Pl. Ex. 32. After the PIP meeting ended, Khilnani allegedly "put her arm around" Saliga while walking back down the hall. Saliga Dep. 81-86, 567-68. Saliga informed Peterson of this incident in an electronic conversation later that day. Pl. Ex. 33 ("[S]he actually put her arm around me while walking down the hall on the way back[.] Who does she think she is[?]"). Saliga testified that Khilnani "was probably telling me something," but "I have no idea what she was telling me." Saliga Dep. 83. She further testified that Khilnani "might have said something to me. Did I respond to her? Whatever! I said: Whatever! And I threw her arm off." Saliga Dep. 84. Saliga testified that she felt the gesture was "condescending." Saliga Dep. 372.

Saliga sent **[*11]** an email to Susan Mullen, Chemtura's former Human Resources Director, and Peterson on October 9, 2011, complaining about the following inconsistent treatment from her supervisors: (1) being placed on the PIP on August 4; (2) the August 31 "hug and kiss in [Khilnani's] office; (3) the September 1 PIP meeting "where everything is nice"; and (4) the October 7 PIP meeting "which conveyed a lot of animosity," and after which Khilnani "puts her arm around me on my shoulder and said whatever."

No improvement was noted at the final two PIP meetings, which occurred on October 12 and 19, 2011. Def. Ex. I. Baccar met with Peterson and Saliga on October 17, 2011, to express his continued frustrations in working with Saliga. Def. Ex. L. Saliga's alleged mistreatment of Baccar allegedly prompted him to consider resigning. *See* Def. Ex. L; 56(a)(1) Stmt. ¶ 26; 56(a)(2) Stmt. ¶ 26.

As described above, Saliga made some improvements during the PIP process, but overall, her performance allegedly was not meeting expectations and she was terminated on October

26, 2011. *See* Def. Exs. I, M. On January 12, 2012, Saliga sent an email to Khilnani and Mullen, asking for her job back. Def. Ex. P. Saliga filed a [*12] complaint with the EEOC and CHRO on February 10, 2012. Compl. ¶ 5.

## DISCUSSION

## I. Statutory Claims

### A. Disparate Treatment

Saliga asserts claims for disparate treatment based on her race and religion[1] under Section 1981, Title VII, and CFEPA. The legal standard for finding disparate treatment liability under all three statutes is the same: a plaintiff's claims are subject to the three-step, burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See also Martin v. Citibank, N.A.*, 762 F.2d 212, 216-17 (2d Cir. 1983) (applying same standard to Section 1981 and Title VII claims); *White v. Conn. Dep't of Children and Families*, 330 F. App'x 7, 9 (2d Cir. 2009) (Title VII and CFEPA claims both employ same burden-shifting analysis).

To overcome a motion for summary judgment under the *McDonnell Douglas* burden-shifting framework, "a plaintiff must first satisfy an initial burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015). Establishment of the prima facie case creates a presumption that the employer unlawfully [*13] discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). "It is important to note, however, that although the *McDonnell Douglas* presumption shifts the

burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 450 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253).

> If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and drops from the case. The plaintiff then has the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that [protected class] was. He retains that ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination.

*St. Mary's Honor Ctr.*, 509 U.S. at 507-08 (internal quotation marks and citations omitted). The plaintiff's "burden [*14] now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256 (1981). She may succeed by showing "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

### 1. Disparate Treatment on the Basis of Race

#### a. Prima Facie Case

To satisfy the prima facie burden in a case of unlawful discrimination, the plaintiff must show: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). As the Second Circuit has noted, "the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is '*de minimis*.'" *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). However, while Saliga's burden to establish a prima facie case of discrimination is minimal, she "cannot meet this burden through reliance on unsupported assertions." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Saliga's racial discrimination claim fails because she has failed to meet even her *de minimis* burden with respect to the second and fourth prongs of the prima facie case.

#### i. Protected Class

---

[1] Although not entirely clear on this point, Saliga appears also to assert in her filings a claim for disparate treatment on the basis of sex. However, the Court cannot find any briefing or record evidence to support such a claim, and counsel for Saliga stated during oral argument on this motion that the sex discrimination claim is based solely on a theory of sexual harassment.

Saliga satisfies her **[\*15]** *de minimis* burden of showing she belongs to a protected class. It is undisputed that she is white.

### ii. Qualified for the Position

Although an employee need not show "even average performance" to satisfy the second prong of the prima facie case, *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir. 1978), "[i]n a discharge case the requirement that the plaintiff be qualified for the job in question requires some allegations demonstrating satisfactory performance at the time of the discharge," *Dugan v. Martin Marietta Aerospace*, 760 F.2d 397, 400 (2d Cir. 1985). "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publ.*, 104 F.3d 26, 29 (2d Cir. 1997). The rationale behind this criteria is that the employee must demonstrate that "his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him." *Powell*, 580 F.2d at 1155 (2d Cir. 1978) (internal quotation marks and citation omitted).

Here, Saliga was employed for a short period of time before being placed on a PIP for performance deficiencies. After nine months at Chemtura, Saliga was given a mid-year review on July 28, 2011. The review noted many performance, communication, and interpersonal issues that needed improvement. **[\*16]** Six days later, Saliga was placed on a written PIP, which addressed multiple performance and behavioral issues, set forth improvement objectives, action steps, and required results, and provided target dates for completing the action steps and required results. The PIP explicitly stated that, if Saliga did not show improved and sustained results within the specified time period, or failed to maintain that level of performance going forward, termination could result. Even prior to the mid-year review, Chemtura had expressed to Saliga its concern with her missing deadlines and her ability to handle her job responsibilities. *See* Def. Ex. D. During the PIP process, Saliga made some progress but Chemtura determined that she should be terminated for her ongoing poor performance. *See* Def. Exs. I, M.

Saliga argues that she was improving on the PIP, and that she therefore demonstrated satisfactory job performance. The improvement reflected in the record, however, is insufficient to create a triable issue of fact precluding summary judgment. The evidence reflects that there was one week during the nearly three-month PIP that Saliga performed well, meeting Chemtura's expectations. Saliga's subjective **[\*17]** perception of her performance is irrelevant; "the ultimate inquiry is whether [the employee's] performance meets his employer's legitimate expectations." *Harvey v. Mark*, 352 F. Supp. 2d 285, 289 (D. Conn. 2005) (quoting *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)) (internal quotation marks omitted).

Based on the record evidence, no reasonable jury could infer that Saliga's job performance was satisfactory at the time of her discharge, and thus the Court must find that she has failed to establish a prima facie case of discrimination on that basis. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134-37 (2d Cir. 1997) (affirming summary judgment where plaintiff had failed to establish satisfactory job performance prong of prima facie case).

### iii. Adverse Employment Actions

A plaintiff endures an adverse employment action when she experiences "a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)). Though economic loss is not prerequisite to a finding of material adversity, "there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges of employment.'" *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)). "An adverse employment action is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (internal quotation marks and citation omitted). In this case, Saliga **[\*18]** alleges seven adverse employment actions: hostile work environment, failure to promote, failure to transfer, defamation, negative reviews, termination, and failure to reinstate.

Saliga's termination, and her negative evaluations directly leading to her termination, constitute adverse employment actions sufficient to support a prima facie case of disparate treatment discrimination. *See Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("Examples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less important title, a loss of important benefits, or significantly reduced responsibilities."); *Siddiqi v. New York City Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action."). However, the Court finds that the remaining actions do not.

**(A) Failure to Promote**

In order to state a failure to promote claim, a plaintiff must show that she applied for a position and was rejected. *Petrosino v. Bell Atl.*, 385 F.3d 210, 226-27 (2d Cir. 2004) ("A specific application is required to ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, **[*19]** by the employer.") (internal quotation marks and citation omitted). Merely expressing an interest in a position is insufficient to support a failure to promote claim. *Id.* at 227 (holding "evidence that a plaintiff generally requested promotion consideration" insufficient to state a claim for discriminatory failure to promote).

In this case, according to Saliga, after working for a few months at Chemtura, she expressed interest to Khilnani in a promotion to the internal audit lead position that had opened; Khilnani allegedly laughed at her in response, and Saliga testified that she did not apply for the position as a result. Saliga Dep. 216-18. Because Saliga has not established that she applied for and was denied the position, she cannot show that she suffered a material adverse employment action when she was not promoted to the position.

**(B) Failure to Transfer**

Saliga argues that her inability to transfer to another department within Chemtura while she was on the PIP is an adverse employment action. The Court cannot find it to be an adverse employment action because there is no record evidence that she ever requested a transfer while on the PIP. Without having requested a transfer while on **[*20]** the PIP and been denied her request, Saliga's claim has no merit. *Cf. Beyer v. Cnty. of Nassau*, 524 F.3d 160, 166 (2d Cir. 2008) (holding that "employee has established the 'adverse employment action' necessary to make out a prima facie case when she has proffered evidence from which a reasonable trier of fact could conclude that the transfer sought and denied would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment."); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (noting that plaintiff "must establish that [defendant's] *denial* of her request for a transfer created a materially significant disadvantage in her working conditions").

**(C) Failure to Reinstate**

Failure to rehire may constitute an adverse employment

action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 799-800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) (reversing dismissal of former employee's claim of racial discrimination in failing to re-employ and remanding for trial). However, once again, there is no record evidence that Saliga applied for and was denied any open positions at Chemtura. The record merely reflects that she sent correspondence to Khilnani in January 2012, stating "I was wondering if you would consider hiring me back at Chemtura as Senior Auditor with the same annual base salary of $80,000." Pl. Ex. 39.

**(D) Defamation**

There is no case law **[*21]** standing for the proposition that defamation constitutes an adverse employment action. In this case, the alleged defamation certainly cannot be said to have caused a materially adverse change in the terms and conditions of Saliga's employment. Moreover, as discussed *infra*, the record evidence does not support a reasonable inference that Chemtura defamed Saliga.

**(E) Hostile Work Environment**

As discussed *infra*, the record evidence does not support a reasonable inference of a hostile work environment. Moreover, even if there were a viable hostile work environment claim, in the context of disparate treatment claims, the creation of a hostile work environment cannot constitute an adverse employment action for purposes of establishing a prima facie case of discrimination. *See Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) ("To state a separate gender discrimination claim, plaintiff must plead 'a separate and distinct prima facie case,' alleging an adverse action beyond the creation of a hostile work environment.") (quoting *Bethea v. City of New York*, No. 11-cv-2347, 2014 WL 2616897, at *6, 2014 U.S. Dist. LEXIS 80945, at *17 (E.D.N.Y. June 12, 2014). Whereas hostile work environment claims consider the "workplace environment as a whole," disparate treatment claims require a tangible, "discrete harm[ ] such as hiring **[*22]** or discharge." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).

**iv. Inference of Discriminatory Intent**

In addition to falling short on the second prong, Saliga has failed to establish her prima facie case of disparate treatment discrimination because she has not alleged sufficient facts to show that any adverse employment actions she suffered had occurred in circumstances giving rise to an inference of discrimination on the basis of her race.

**(A) Stray Comments**

Nearly all of Saliga's evidence offered to establish an inference of discriminatory intent constitute stray remarks, which the Second Circuit has "long held . . . do not create an inference of discrimination." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011); *see also Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (holding that, without more, "[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination"). Essentially, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

In determining whether a remark is probative, district courts in this Circuit generally consider four factors: (1) who made the remark (*i.e.*, a decision maker, a supervisor, or a low-level co-worker); (2) when the remark was [*23] made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Id.* at 150. While a number of the comments cited by Saliga were made by Khilnani, who was both a supervisor and decision maker, almost none are alleged to have been made close to the time of any alleged adverse employment decision or to have been related to the decision-making process.

For example, Saliga alleges that Khilnani called her "whitey a couple times," and allegedly referred to another employee as "the cute white boy" on occasion, over the course of their year working together at Chemtura. Saliga Dep. 533-34. "Such isolated events over an extended period of time have little intrinsic probative value." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004).

Saliga also alleges that an unspecified number of individuals at Chemtura made comments that only "foreigners" could work for Internal Audit. Such comments by non-decision makers, without more, are not evidence that can raise an inference of discrimination and defeat summary judgment. *Cf. Howard v. City of New York*, 602 F. App'x 545, 547 (2d Cir. 2015); [*24] *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-cv-554, 2013 WL 696424, at *6-7, 2013 U.S. Dist. LEXIS 25704, at *19-20 (D. Conn. Feb. 26, 2013); *Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Beyond these non-specific allegations of sporadic comments made at uncertain times, Saliga does allege one specific incident in which she felt disturbed by a comment that she perceived to exhibit racial animus. During a private meeting between Saliga and Khilnani on July 28, 2011, at which Saliga's alleged insensitivity to other cultures and religions was discussed, Khilnani referenced the fact that Saliga is "Caucasian." The use of the term "Caucasian" does not carry any associations of racial animus. *See, e.g., Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 492 (N.D. Tex. 2010) (using "the term 'Caucasian' to refer to the 2000 U.S. Census category for white persons who are neither Hispanic nor Latino"); *Benton v. Cousins Properties, Inc.*, 230 F. Supp. 2d 1351, 1354 (N.D. Ga. 2002) (using "the terms 'Caucasian' and 'white' . . . interchangeably to refer to individuals whose racial group is white"); *see also* Saliga Dep. 108 (Q. How do you describe yourself racially? A. When I fill out forms, I'm Caucasian.). A reasonable juror could not view Khilnani's use of the term "Caucasian" as discriminatory.

Finally, there is testimony that, at some time in 2010, long before Saliga's hiring, Khilnani allegedly told Mosher, "I do not want to hire a black person cause we don't want to travel with [*25] them. They're a different culture." Mosher Dep. 189. In addition to being far removed in time from any adverse employment actions taken against Saliga, this comment does not raise an inference that Khilnani was motivated by racial animus against Saliga's protected racial class, *i.e.*, white individuals.

**(B) Change in Composition of the Department**

In addition to the various stray remarks, Saliga alleges there is an inference of discrimination because, when Khilnani was hired, the majority of the Internal Audit department was comprised of white male employees, but by April 2011, Saliga was the only white employee in the department. However, nearly all of those employees are alleged to have been let go by Khilnani prior to the hiring of Saliga, who is white, to join the Internal Audit department, a decision made in part by Khilnani. Therefore, the fact that these other white employees were no longer with the department cannot raise an inference that Saliga's treatment was motivated by discriminatory intent.

**(C) Same Actor Inference**

Along the same lines, there is a presumption against discriminatory intent in age discrimination cases where the person who fires an employee is the same person [*26] that hired him. This is known as the "same actor inference," and

while the Second Circuit has not "pass[ed] judgment on the extent to which this inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied," *Feingold v. New York*, 366 F.3d 138, 155 n.15 (2d Cir. 2004), district courts in this Circuit have applied it in both the Section 1981 and Title VII contexts. *See, e.g., Collins v. Connecticut Job Corps*, 684 F. Supp. 2d 232, 250 (D. Conn. 2010); *Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 95 (D. Conn. 2011); *Dellaporte v. City Univ. of New York*, 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014).

As the Second Circuit explained,

> The premise underlying this inference is that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee. Such an inference is strong where the time elapsed between the events of hiring and firing is brief.

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000). While "the same-actor inference is permissive, not mandatory," *Collins*, 684 F. Supp. 2d at 251, it "applies with greatest force where the act of hiring and firing are not significantly separated in time," *Choate v. Transp. Logistics Corp.*, 234 F. Supp. 2d 125, 130-31 (D. Conn. 2002). Therefore, the inference is particularly strong here, where Khilnani hired Saliga in October 2010, and fired her one year later in October 2011. *See Dellaporte*, 998 F. Supp. 2d at 227 (noting that "the presumption against racial bias is difficult to overcome," especially where same individuals hired plaintiff "and fired him less than two **[*27]** years later").

**b. Legitimate Non-Discriminatory Reason**

Chemtura has provided a legitimate non-discriminatory reason for taking the adverse actions of giving Saliga negative evaluations and terminating her. There is ample, uncontradicted evidence in the record that Saliga missed important deadlines, did not work well with certain colleagues, required a greater degree of direction and supervision than was expected of someone in the position, had trouble understanding instructions, and submitted unsatisfactory work product that occasionally needed to be re-done by others. *See, e.g.*, Def. Exs. B, D, E, H, I, K, N. About one month before her mid-year review, Saliga herself acknowledged that there were issues with her "teaching style" and not being "as current as [she] should be on [her] SOX" assignment. Pl. Ex. 17. Furthermore, Saliga's own PIP notes indicate that she missed numerous target dates and deadlines during the PIP. Pl. Ex. 22.

**c. Pretext**

Even if she were to have established a prima facie case, Saliga has failed to demonstrate pretext, *i.e.*, that the legitimate, non-discriminatory reasons provided by Chemtura were false and that discrimination was the real reason. The record provides **[*28]** no basis for creating a genuine issue of fact as to the falsity of Chemtura's reasons or to race being the real reason for Saliga's negative evaluations and termination.

Saliga argues that the criticisms against her work performance were false, and that she never should have been placed on the PIP in the first place. Saliga Dep. 558. However, "[her] view of [her] performance is not at issue; what matters is the perception of the decision maker. The fact that an employee disagrees with an employer's evaluation of [her] does not prove pretext." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted), overruled in part on other grounds by *St. Mary's Honor Ctr.*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir. 1994) (submission of materials from coworker or supervisor indicating that employee's performance was satisfactory does not create issue of fact where employer was dissatisfied with employee's performance); *Hawkins v. City of New York*, No. 99-cv-11704, 2005 WL 1861855, at *10, 2005 U.S. Dist. LEXIS 15898, at *27 (S.D.N.Y. Aug. 4, 2005) (holding plaintiff's belief that negative performance evaluation was unfounded to be insufficient to meet his burden without some other indicia of discrimination at play).

In addition, Saliga has presented no evidence that she met the deadlines that Chemtura alleges she missed. Quite the contrary, Saliga admits that she missed those **[*29]** deadlines, but attempts to excuse her failures to meet Chemtura's expectations and to paint those expectations as unreasonable. Similarly, the primary rebuttal she offers to Chemtura's evidence regarding the unsatisfactory quality of her work product is her testimony that she was held to unreasonable standards.[2] However, "it is not the function of a fact-finder to

---

[2] Saliga also offers Mosher's testimony that during the period Mosher supervised her, which ended April 11, 2011, Mosher gave her positive feedback. Mosher Dep. 170, 175. However, Chemtura does not argue that Saliga's performance through April 2011 was a reason for adverse employment actions against Saliga. As the record reflects, **[*30]** the first missed deadline they recorded was April 18, 2011—a week after Mosher's departure—and the first email to Saliga highlighting performance deficiencies is dated June 21, 2011. Def. Exs. C, D. Moreover, Mosher herself testified that even while she was supervising Saliga, Saliga was timely "[f]or the most part," Mosher Dep. 171, and that she never actually conducted an audit

second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988); *see also Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("The laws prohibiting discrimination in employment were not intended to transform the courts into personnel managers. Federal courts do not have a roving commission to review business judgments, and they must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process.") (internal quotation marks and citations omitted) *aff'd sub nom. Shabat v. Billotti*, 108 F.3d 1370 (2d Cir. 1997).

Saliga similarly has failed to contradict the evidence showing her interpersonal problems at Chemtura. For example, rather than creating a dispute of fact regarding whether she had a problematic working relationship with Baccar at the time Chemtura began taking adverse employment actions against her, she has only introduced evidence showing that she had a good relationship with him prior to that time period, and in fact her testimony is consistent with Chemtura's explanation, confirming that at a certain point, the relationship was "ruined." *See, e.g.*, Saliga Dep. 113-15, 534; Mosher Dep. 216; Pl. Ex. 34. Mosher also testified that Saliga was never insubordinate with her while she was Saliga's supervisor. Mosher Dep. 174. However, again, this does nothing to contradict Chemtura's legitimate, **[*31]** non-discriminatory reasons, which involve Saliga's work and conduct post-dating Mosher's tenure there.

In addition to failing to show that Chemtura's non-discriminatory reasons were false, Saliga also fails to provide any evidence to demonstrate that race was the real reason she was negatively evaluated and terminated. Again, all she offers are a few stray comments and her subjective feelings of offense and hurt, which the Court already concluded *supra* were insufficient to establish a prima facie case, and are certainly not enough to meet the higher standard for meeting the plaintiff's burden of persuasion to establish pretext. *See Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 318 (W.D.N.Y. 1999) ("Feelings are not evidence. Without an objectively reasonable basis for those feelings, they are irrelevant.") (internal quotation marks and citation omitted); *Thomas v. Saint Francis Hosp. & Med. Ctr.*, 990 F. Supp. 81, 87 (D. Conn. 1998) (holding that to prevail on pretext at summary judgment stage, "plaintiff must provide more than conclusory allegations of discrimination.").

### 2. Disparate Treatment on the Basis of Religion

#### a. Prima Facie Case

##### i. Protected Class

Saliga satisfies her *de minimis* burden of showing she belongs to a protected class. It is undisputed that she is Roman Catholic.

##### ii. Qualified for the Position

As discussed *supra [*32]* , Saliga has failed to satisfy this prong of her prima facie case.

##### iii. Adverse Employment Actions

As discussed *supra*, Saliga's termination, and her negative evaluations directly leading to her termination, constitute adverse employment actions sufficient to support a prima facie case of disparate treatment discrimination. As discussed *infra*, the additional allegation in the context of the religious discrimination claim that Khilnani chose not to assign Saliga to audit assignments requiring travel and weekend work also does not constitute an adverse employment action.

##### iv. Inference of Discriminatory Intent

In addition to falling short on the second prong, Saliga has failed to establish her prima facie case of disparate treatment discrimination because she has not alleged sufficient facts to show that any adverse employment actions she suffered had occurred in circumstances giving rise to an inference of discrimination on the basis of her religion.

##### (A) Stray Comments

With respect to raising an inference that adverse employment actions were taken against Saliga on the basis of her religion, Saliga alleges a number of remarks by her supervisors that purportedly exhibit religious animus. For [*33] example, there is testimony that Khilnani and Jagtiani complained to Mosher about Saliga engaging in religious reading at work. Mosher Dep. 52-53. At some point, Khilnani is alleged to have reprimanded Saliga for saying, "God bless you," after somebody sneezed, allegedly telling Saliga not to bring God into the office. Khilnani also allegedly said to Saliga that

---

with Saliga, Mosher Dep. 179.

Saliga remained married to her husband only because of her religion. Khilnani allegedly once used the term "Jesus candles" to refer to religious candles she had seen in a store. On another occasion, Khilnani allegedly asked Saliga why she wore a particular religious charm instead of a simple cross. None of these comments are alleged to have occurred in temporal proximity to any adverse employment actions, nor can they be seen as related to the decision-making process. Therefore, the Court concludes that they are not sufficiently probative of religious discrimination that a jury could reasonably find that Saliga was terminated because of her religion.

Saliga also alleges that she was denied the opportunity to travel for work because Khilnani expressed concern that Saliga would have to go to church, which would potentially interfere [*34] with the weekend work that those projects required. Not being assigned to these projects is not an adverse employment action because there is no evidence that these assignments were materially different in quality than her other assignments or that being assigned to them would have had any material impact on her status or career advancement. *Cf. Galabya*, 202 F.3d at 641 (holding that a transfer is an adverse employment action only if it creates a "materially significant disadvantage," *e.g.*, it "was to an assignment that was materially less prestigious, materially less suited to [plaintiff's] skills and expertise, or materially less conducive to career advancement"). Therefore, this comment, too, is neither related nor temporally proximate to an adverse employment action.

**(B) Same Actor Inference**

As discussed *supra*, the same actor inference creates a presumption in this Circuit against finding discriminatory intent.

**b. Legitimate, Non-Discriminatory Reason**

As discussed *supra*, Chemtura has provided a legitimate, non-discriminatory reason for Saliga's negative evaluations and termination, and has thereby satisfied its burden at the second stage of the *McDonnell Douglas* analysis.

**c. Pretext**

Even if she were to have [*35] established a prima facie case with respect to religious discrimination, Saliga has once again failed to demonstrate pretext. As discussed *supra*, there is no genuine issue of fact as to the falsity of Chemtura's reasons for the adverse employment actions suffered by Saliga.

Moreover, there is no genuine issue as to religion being the real reason for these adverse actions having been taken. *See Meiri*, 759 F.2d at 998 (affirming summary judgment for employer because employee could not establish pretext by alleging that the employer conspired to terminate plaintiff, that the employer misconceived plaintiff's work habits due to the employer's religious discrimination, and that plaintiff heard others make disparaging remarks about plaintiff's religion).

**B. Hostile Work Environment**

Saliga also claims that Khilnani created a hostile work environment in violation of Section 1981, Title VII, and CFEPA. To establish a prima facie hostile work environment claim under Section 1981, Title VII, and CFEPA, "a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation marks and citation omitted); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (holding that [*36] "Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment" and applying the same analysis as under Title VII); *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 242 (D. Conn. 2008) ("Connecticut courts look to federal law for guidance when analyzing CFEPA hostile work environment claims"). "[A] plaintiff must demonstrate that: (1) she 'subjectively perceive[d] the environment to be abusive;' (2) the conduct was so 'severe or pervasive' that it created an 'objectively hostile or abusive work environment', meaning 'an environment that a reasonable person would find hostile or abusive'; and (3) the conduct created an environment abusive to employees 'because of their race, gender, religion or national origin.'" *Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 50 (D. Conn. 2011) (quoting *Harris*, 510 U.S. at 21-22).

"In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106, (2002). These factors must be "considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (internal quotation marks and citations omitted). [*37] Moreover, a single event cannot

support a hostile work environment claim unless "extraordinarily severe." *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir. 1995) ("isolated remarks or occasional episodes of harassment will not merit relief" for a hostile work environment claim).

### 1. Sex

Saliga's sex-based hostile work environment claim is predicated on the following allegations: Khilnani allegedly said, "Who would want to stick anything in that big fat hole, and what good would come out of it?" in Saliga's presence; Khilnani allegedly hugged Saliga and kissed her on the cheek "in a very romantic way" on August 31, 2011; and Khilnani allegedly put her arm around Saliga's shoulder on October 7, 2011. These three incidents do not rise to the level of severe or pervasive intimidation, ridicule, and insult. *See Cook v. New York City Dep't of Educ.*, 90 F. App'x 562, 563 (2d Cir. 2004) (holding that plaintiff whose supervisor attempted to kiss her on the mouth "cannot prevail on a hostile work environment theory" because "[o]nly one overtly sex-based act is alleged here (the kissing incident), and isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness") (internal quotation marks and citation omitted); *Carter v. State of New York*, 151 F. App'x 40, 41 (2d Cir. 2005) ("Three kisses on the cheek in a two-year period, in the absence of any other **[*38]** discriminatory or offensive treatment, do not meet the threshold this Court has established for hostile work environment claims.").

### 2. Race

Saliga's race-based hostile work environment claim is predicated on the following allegations: Khilnani once referred to Saliga as "Caucasian"; Khilnani called Saliga "whitey a couple times" (Saliga Dep. 533); and Khilnani allegedly referred to another employee as "the cute white boy" (Saliga Dep. 533-34). This conduct does not add up to a hostile work environment.

> As the Supreme Court has stated, mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered

cumulatively in order to obtain a realistic view of the work environment.

*Schwapp*, 118 F.3d at 110-11 (internal quotation **[*39]** marks and citations omitted). As discussed *supra*, the term "Caucasian" is not generally understood to be an epithet. *See* Saliga Dep. 108 (Q. How do you describe yourself racially? A. When I fill out forms, I'm Caucasian."). The remaining comments do not amount to "a steady barrage of opprobrious racial comments."

### 3. Religion

Saliga's religion-based hostile work environment claim is predicated on the following allegations: Khilnani allegedly made derogatory comments to Mosher "once or twice" about Saliga reading religious materials during lunch[3] (Mosher Dep. 52-53); Khilnani allegedly said to Saliga that Saliga only stayed married to her husband because of her religion; Khilnani allegedly once asked Saliga what gives her the right to bring God into every situation and told her not to bring God into the workplace again after she heard Saliga say "God bless you" to someone who had sneezed (Saliga Dep. 36); Khilnani allegedly asked Saliga what gives her the right to bless people after Saliga said to someone on another occasion, "Bless you," after that person had sneezed (Saliga Dep. 37); on one occasion, Khilnani allegedly called a chi rho charm Saliga wore around her neck "disgusting" and **[*40]** asked why Saliga did not wear a simple plain cross (Saliga Dep. 39, 59-60); after a hurricane had knocked out the electricity, Khilnani allegedly commented to Saliga that when Khilnani had gone to the store, they were out of all candles except "Jesus candles"; and on more than one occasion, Khilnani allegedly did not assign Saliga to conduct planning audits, which required travel and working through the weekend, because she was concerned about Saliga going to church (Saliga Dep. 28-32).

While these comments may be offensive, they are not severe or pervasive enough for a reasonable juror to infer that they altered the conditions of Saliga's employment. *See, e.g., Brodt v. City of New York*, 4 F. Supp. 3d 562, 571 (S.D.N.Y. 2014) (holding that allegations of a supervisor's comments concerning plaintiff's nine children, supervisor's request that plaintiff pray for him, and supervisor's constant touching and rubbing of plaintiff's yarmulke are "simple teasing, offhand comments, or isolated incidents of offensive conduct that do not give rise to an actionable hostile work environment

---

[3] Mosher's testimony on this point is contradicted by Saliga's testimony that she never read religious materials at work. Saliga Dep. 39-40.

claim") (internal quotation marks **[\*41]** and citation omitted); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 454-55 (S.D.N.Y. 2012) (holding that three incidents over the course of a year in which plaintiff was "chastised" or "berated" in front of his unit regarding his desire to take certain days off as religious observance, before ultimately being given the time off that he requested, at most represent episodic instances of mere offensive utterances"); *Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005) (holding as insufficient to support a hostile work environment claim the fact that chairman of the board's comment to plaintiff that "Orthodox Jews are intolerant and contemptuous of other Jews" and that during an office holiday party he "was subjected to laughter and ridicule" for stating that the historical figure he would most like to meet is Red Nachman of Breslov). As discussed *supra*, even Khilnani's alleged failure to assign Saliga to travel for planning audits on the basis of Saliga's religion cannot be found to have interfered with Saliga's work performance, as there is no record evidence that those assignments were materially more prestigious, materially more suited to her skills and expertise, or materially more conducive to career advancement. *Cf. Galabya*, 202 F.3d at 641.

## C. Retaliation Claims

Saliga claims that she was terminated in retaliation for **[\*42]** complaining about Khilnani's actions, in violation of Section 1981, Title VII, and CFEPA. Retaliation claims under all three statutes are analyzed under Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework. *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015); *DeMoss v. Norwalk Bd. of Ed.*, 21 F. Supp. 3d 154, 170 (D. Conn. 2014). "To establish a presumption of retaliation . . . a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315-16. "Even if a plaintiff sets forth a *prima facie* case, however, this establishes only a rebuttable presumption of retaliation, and where the defendant identifies a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for retaliation." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x. 107, 110 (2d Cir. 2011) (applying standard to Section 1981 and Title VII claims); *see also Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 341 (D. Conn. Mar. 19, 2013) (applying standard to Section 1981, Title VII, and CFEPA claims). "Although the presumption of discrimination drops out of the picture if the Defendant articulates a legitimate, non-discriminatory reason, the trier of

fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly **[\*43]** drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Rivera*, 933 F. Supp. 2d at 341 (internal quotation marks and citations omitted).

With respect to Title VII retaliation claims, "[i]f the defendant satisfies its burden of production" to articulate a legitimate, non-retaliatory reason for the adverse employment action, then "the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's protected activity was a but-for cause of the alleged adverse action by the employer." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (internal quotation marks and citations omitted); *see also Univ. Of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013) (claims of retaliation in violation of Title VII "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). Prior to *Nassar*, a plaintiff could satisfy the causation requirement at the third stage of the burden-shifting framework by showing that "retaliation was a substantial reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Now, the causation standards in Section 1981 and Title VII retaliation claims may differ. **[\*44]** *See Quarless v. Brooklyn Botanic Garden Corp.*, No. 11-cv-05684, 2014 WL 2767085, at \*5, 2014 U.S. Dist. LEXIS 83153, at \*14 (E.D.N.Y. June 18, 2014). Likewise, Connecticut courts have not yet adopted the *Nassar* standard of but-for causation for retaliation claims under CFEPA, and thus, CFEPA retaliation claims may also remain subject to the less-demanding "motivating factor" analysis. *See Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-00357, 2013 WL 5445258, at \*21, 2013 U.S. Dist. LEXIS 140983, at \*68-69 (D. Conn. Sept. 30, 2013). However, the distinction does not matter in this case, as Saliga cannot establish a retaliation claim under either standard.

### 1. Prima Facie Case

Saliga has not established a prima facie case because she cannot show a causal nexus between any possible protected activity in which she engaged and any adverse employment action she suffered.

### a. Plaintiff's Participation in a Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Saliga never registered her complaints through the formal channels that were provided at Chemtura. Rather, she communicated various complaints concerning Khilnani's behavior through informal electronic instant messages and verbal conversations with Peterson, as well as some alleged complaints directly to Khilnani.

"While a protected activity generally involves [**45] the filing of a formal complaint of discrimination with an administrative agency, the Second Circuit has recognized that protected activity includes informal protests of discriminatory employment practices, including making complaints to management." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110-11 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). Such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by law; generalized complaints about a supervisor's treatment are insufficient. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011). Complaints presenting general allegations of harassment unrelated to protected class are not protected activity under Title VII, Section 1981, or CFEPA. *See, e.g., Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (holding that complaints about supervisor's treatment, including that supervisor falsely accused plaintiff of sexually harassing a co-worker, could not form basis of retaliation claim), *aff'd*, 629 F.3d 276 (2d Cir. 2010); *Ruhling v. Tribune Co.*, No. 04-cv-2430, 2007 WL 28283, at *21, 2007 U.S. Dist. LEXIS 116, at *67-68 (E.D.N.Y. Jan. 3, 2007) (holding that an internal complaint of favoritism was not protected activity where plaintiff had not framed complaint as involving discriminatory conduct).

The Court finds that the only one of Saliga's alleged actions that constitutes protected activity is her alleged protest to Khilnani in early [**46] 2011 concerning work assignments. Specifically, in response to Khilnani's alleged refusal to assign Saliga to audit projects requiring travel and weekend work, Saliga allegedly said, "Do not let my religion stop me from doing my work." Saliga Dep. 28-29. This complaint is sufficiently specific to indicate Saliga had a "good faith, reasonable belief," *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996), that she was opposing unlawful religious discrimination.

The remaining activities Saliga alleges are, at best, informal, generalized complaints that do not make it clear she is complaining about discriminatory conduct (1) that was directed at a protected class or (2) that she had a good faith, reasonable belief was prohibited by law. However, even if these other actions were to constitute protected activity, they would still not support a prima facie case because, as

discussed *infra*, Saliga cannot establish a causal nexus between any of those actions and her negative evaluations and termination.

**i. "Fat Hole" Comment**

Saliga alleges that, when Khilnani made the "fat hole" comment, Saliga complained to her by shaking her head and walking away. Saliga Dep. 535-36. In the Second Circuit, if a plaintiff's opposition was not understood nor reasonably [**47] could have been understood to be directed at conduct prohibited by law, then it does not constitute protected activity. *See Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (plaintiff "did not engage in a protected activity because the letter simply requested additional training and reassignment without ever mentioning, or even alluding to, [plaintiff's] belief that [defendant's] failure to comply with his requests would constitute unlawful discrimination"); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (finding no protected activity where employee's "objections at the time neither pointed out discrimination against particular individuals nor discriminatory practices by" employer); *cf. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (requiring that the employer "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII" to establish a prima facie case of retaliation under Title VII). Saliga's reaction to Khilnani's alleged "fat hole" comment does not support an inference that she was opposing conduct prohibited by Title VII, Section 1981, or CFEPA. Therefore, it does not constitute protected activity.

Saliga also informed Peterson of the "fat hole" comment approximately ten months after it allegedly occurred. Saliga Dep. 560-61. This was in late August 2011, after Saliga had [**48] already been placed on the PIP. Peterson interpreted the comment as "directed at my daughter . . . referring to my daughter, me giving birth to my daughter." Peterson Dep. 59. She informed her supervisor, Mullen, about it. Pl. Ex. 25; Peterson Dep. 58-59. Thus, it appears that the target of the alleged comment did not perceive it to be about sex, race, or religion, but rather a general insult about her daughter. Such an insult is not prohibited by law, and therefore, Saliga's conduct in informing Peterson of it is not protected activity. *Cf. Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 108 (D.D.C. 2011) (finding that two emails plaintiff interpreted as sexually suggestive but were also susceptible to innocent interpretations, along with numerous other alleged incidents, including use of the phrases "Sexy Papa" and "Sexy Mama," to be neither frequent enough nor severe enough to meet the standard for a hostile work

environment under Title VII and that therefore plaintiff's complaints about them do not qualify as protected activity for purposes of Title VII's antiretaliation provision).

### ii. Marriage Comment

Saliga testified that she complained both to Khilnani and to Peterson about Khilnani's remark that Saliga remained married to her husband because **[*49]** of her religion. She told Khilnani that "I'm very proud to be married to my husband that long; and I am proud to be Catholic," Saliga Dep. 38, and she told Peterson that Khilnani "has no right bringing up my husband in the workplace," Saliga Dep. 57. These do not constitute protected activity, as there is no indication in these comments that Saliga was opposing prohibited conduct.

### iii. Admonishment for Blessings

Saliga testified that she "probably said something" to Khilnani after their first alleged "God bless you" interaction. Saliga Dep. 538. This is insufficient evidence to show Saliga was engaging in protected activity. Saliga testified that she also complained to Khilnani after their second "Bless you" interaction, Saliga Dep. 539-40, but there is no evidence of the specific content of this complaint. Therefore, there is insufficient evidence concerning this complaint to establish that it was protected activity.

Saliga also testified that she reported both of these incidents to Peterson. Saliga Dep. 540. Peterson testified, "During one of our conversations, Diane [Saliga] had mentioned that somebody had sneezed and it's customary to say God bless you which Diane did and Jogita took **[*50]** offense to that." Peterson Dep. 85-87. This evidence does not indicate that Saliga was opposing prohibited conduct.[4] Saliga also allegedly brought up the sneezing incidents again at an August 4 meeting discussing her allegedly poor job performance. Khilnani and Peterson were both in attendance, and Saliga alleges: "I brought up the 'God bless you' comment. I brought up the 'bless you' comment. I brought up the fact that she said the comment about my granddaughter's nose." Saliga Dep. 209. This evidence is insufficient to demonstrate opposition to prohibited conduct, as there was no indication she was pointing out discrimination on the basis of religion, sex, or race.

---

[4] Peterson testified that she believed Saliga's complaints were protected activity, but a finding of protected activity is a legal conclusion, and therefore this testimony is irrelevant.

### iv. Religious Charm Comment

When Khilnani allegedly insulted Saliga's chi rho charm, Saliga allegedly told Khilnani that she was very proud of it because she purchased it at the Vatican and the Pope blessed it. Saliga Dep. 39, 542. This response does not constitute protected activity. She also told Peterson about Khilnani's comment "just in **[*51]** a passing discussion," Peterson Dep. 81, and Peterson "did not perceive it as a complaint," Peterson Dep. 83. Saliga testified that Peterson responded to this information by stating that she thought Saliga's charm "was pretty" and that she would "wear her cross to work, too." Saliga Dep. 62. This conversation does not constitute protected activity.

### v. "Caucasian" Reference

Saliga complained about Khilnani's referring to her as Caucasian. As a matter of law, there can be no good faith, reasonable belief that Khilnani's conduct was prohibited discrimination.

### vi. Physical Contact

After Khilnani allegedly kissed Saliga on August 31, 2011, Saliga does not recall what she did in response. Saliga Dep. 76, 78. Thus, there is no evidence that she complained about the incident to Khilnani directly. Saliga told Peterson about what happened the next day. Saliga Dep. 79, 255-57; Pl. Ex. 27 ("The hug and kiss from Jogita at the end of our discussion does give me chills though"); Peterson Dep. 47-49. A reasonable juror could not infer simply from the record evidence of what was communicated that Saliga was pointing out conduct she reasonably and in good faith believed to be unlawful discrimination.

On **[*52]** October 7, Khilnani allegedly touched Khilnani's shoulder, and Saliga reacted by throwing up her left arm to push Khilnani away and saying, "Don't do that to me again." Saliga Dep. 81. This comment is not specific enough to constitute protected activity, as it does not clearly indicate Saliga believes she is protesting prohibited discriminatory conduct.

On October 9, Saliga sent an email to Mullen and Peterson stating the following:
  • First the PIP starts on 8/4.
  • Then on 8/31, Jogita [Khilnani] gives me a hug and kiss in her office.
  • We have the PIP meeting of 9/1 where everything is nice.

• Then, we have the PIP meeting on 10/7 which conveyed a lot of animosity. Also, while walking back to the department after the meeting on 10/7 in the hall, Jogita puts her arm around me on my shoulder and said whatever. Surprisingly though, it was very visible to anyone that may have been in the hall.

Pl. Ex. 34, at 1. This communication[5] does not constitute protected activity as it does not clearly indicate that Saliga is protesting conduct prohibited by law; these do not necessarily even appear to be complaints. There is no indication in this message that Saliga objected to the "hug and kiss," and [*53] the statement that Khilnani "puts her arm around me on my shoulder and said whatever" is unambiguously ambiguous.

**b. Defendant's Knowledge of the Protected Activity**

The only complaint that may constitute a protected activity was Saliga's alleged protest that Khilnani not let Saliga's religion stand in the way of Saliga being assigned certain audit projects that required weekend travel. If true, Khilnani would clearly have been aware of this activity. Therefore, the second prong is satisfied.

**c. Adverse Employment Action**

As discussed *supra*, the only adverse employment actions suffered by Saliga are her termination and the negative evaluations she received that directly led to her termination.[6]

---

[5] Placing this excerpt in the context of the entire email does nothing to make it more clearly indicate opposition to prohibited discriminatory conduct. The subject line of the email is "Meeting of 10/7," and it begins, "Sue and Christine, In summary of our meeting on 10/7, there is an inconsistent reading coming from Jogita and Ayesha." The email then lists the above-quoted bullet points, before continuing, "[Khilnani] and [Jagtiani] are so much in sync. The two of them are so rehearsed, including the eye rolling. If I played games, I too would come across differently. Since I do not rehearse or play games, I am writing this email to give you my side of the situation. I would not do this, but I am fighting for my job and my integrity. I believe we all have good qualities and not so good qualities. When a relationship works well, we tolerate the not so good and communicate with each other. Why this became so out of hand, I do not know but am wondering if I am being made an example of, or I do not fit into the new Internal Audit department, or whatever. I feel in the past few months, [*54] I have gone in so many circles; it is a total waste of my time, company time, and company money." None of this is specific enough to enable any reasonable factfinder to infer that this email clearly indicates opposition to prohibited discrimination.

**d. Causal Connection**

First, the Court notes that counsel for Saliga stated during oral argument on this motion that there was no decision to terminate Saliga's employment during the period of time Saliga made her alleged complaints of discrimination to Peterson, and the record is consistent with that assertion. This fact, however, would severely undermine the plausibility of a causal link between Saliga's complaints and her termination because, under this scenario, the PIP continued to proceed after these communications with Peterson occurred, and several more PIP meetings were held at which Saliga's performance was reviewed and she was given feedback before the ultimate decision to terminate was made based on her continued failure to satisfactorily address Chemtura's repeatedly expressed performance concerns. "In this Circuit, [*56] an inference of causation is defeated . . . if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).

**i. Assignment Protest**

Saliga's complaints concerning Khilnani's alleged refusal to assign her to projects requiring travel occurred during the first quarter of 2011. Saliga Dep. 29. The negative evaluations and termination occurred beginning at the end of July and through late October. Saliga has not alleged a factual nexus between her complaints regarding her lack of assignments requiring travel and her negative reviews and termination. The only possible nexus the Court can perceive for finding such a nexus is time.

Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship

---

[6] It is true that the lower standard for finding an adverse employment action in retaliation claims potentially could impact the analysis on whether the failure to assign Saliga to audit projects requiring travel was such an adverse action. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal quotation marks omitted). However, even if that denial were found to constitute an adverse employment action under [*55] *Burlington Northern*, a claim predicated on that denial would fail the fourth prong of the prima facie case because the denial occurred before the Saliga's objection to Khilnani, and in fact was the impetus for her protest. *See Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.") (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (courts in this Circuit "have consistently held that a passage of more than two or three months between the protected activity and the adverse employment action does not allow for an inference of causation," *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007). In this case, the protected activity took place between January and March. The negative evaluations leading to Saliga's [*57] termination did not come until the end of July, at least four months after Saliga had complained to Khilnani about not getting the assignments she wanted due to her religion. Her termination did not occur until three months after that.

The Court concludes that the temporal relationship between Saliga's protected activity and the adverse employment actions she suffered is too attenuated to establish the required causal nexus, and therefore she has failed to establish a prima facie case of retaliation.

### ii. "Fat Hole" Comment

Even if Saliga's responses to Khilnani's alleged "fat hole" comment could be considered protected activity, Saliga cannot show a causal nexus. Her immediate reaction upon hearing the comment occurred, according to her testimony, right at the start of her tenure at Chemtura. Her negative mid-year review came over eight months later. There is no temporal proximity to establish the fourth prong of the prima facie case with respect to her initial response that was allegedly directed at Khilnani.

With respect to her sharing the comment with Peterson in late August 2011, it is impossible to infer that it caused her negative mid-year review or caused her to be placed on the [*58] PIP because those events occurred prior to her action. It also cannot be said to have caused her further negative evaluations and termination because she received a very favorable evaluation at the next PIP meeting after she told Peterson of the comment. *Cf. Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (finding no prima facie case because the amount of time between plaintiff's complaint about conduct and negative review, "especially given his intervening positive review, defeats [plaintiff's] attempt to establish a causal connection between the two events").

### iii. Marriage Comment

Even if Saliga's response to Khilnani's alleged comment regarding Saliga's marriage constitutes a protected activity, Saliga alleges this incident occurred in early 2011, well before

any alleged adverse actions occurred.

### iv. Religious Charm Comment

If Saliga's response to Khilnani's alleged comment about Saliga's chi rho charm were to constitute protected activity, it could support a prima facie case of retaliation, as it allegedly occurred during the summer of 2011, and the negative evaluations and PIP occurred beginning at the end of July through late October. However, even were a prima facie case to exist with respect to a retaliation claim over Saliga's [*59] statement to Khilnani and exchange with Peterson about the charm, Saliga cannot establish that Chemtura's legitimate non-discriminatory reasons, as discussed *infra*, are pretext.

### v. Physical Contact

Saliga's reactions to the alleged physical contact from Khilnani occurred after Saliga was already on the PIP, so even if her reactions were protected activity, they would not support a prima facie case that her mid-year review or her being placed on the PIP were retaliation because they could not have caused those adverse events. Were Saliga's responses to the physical contact incidents to constitute protected activity, however, a reasonable inference could be drawn that they caused her later negative PIP evaluations and termination.

### 2. Legitimate, Non-Discriminatory Reason

As discussed *supra*, Chemtura has amply satisfied its burden of production with respect to the second step of the *McDonnell Douglas* analysis. Saliga's negative evaluations and termination resulted from Saliga's failure to perform her job satisfactorily.

### 3. Pretext

To establish pretext, a plaintiff could demonstrate

> weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory [*60] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason. . . . Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. . . . However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer

explanations, to defeat summary judgment at that stage."

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013). "Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (affirming summary judgment for employer where employee "produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual").

Here, Saliga only has temporal proximity to support some of her retaliation claims, but nothing more. It is undisputed that, at the time she began suffering adverse employment actions, she did not meet a number of Chemtura's deadlines, had problematic working relationships with certain coworkers, performed unsatisfactory work that occasionally had to be reassigned, and required a degree of management and direction Chemtura **[*61]** found excessive. Saliga has not demonstrated any "weaknesses, implausibilities, inconsistencies, or contradictions" in Chemtura's explanations for her negative evaluations and termination; the evidence she offered only goes to show her disagreement with the standards to which she was being held. *See, e.g., Gehringer v. St. Joseph's/Candler Health Sys., Inc.*, No. 4:12-cv-77, 2013 WL 1180920, at *16, 2013 U.S. Dist. LEXIS 38863, at *45 (S.D. Ga. Mar. 20, 2013) ("[I]t is not the Court's role to question the wisdom of an employer's decision. Whether [Plaintiff] was a good employee and whether Defendant made a bad decision is irrelevant as long as the termination was not made for discriminatory reasons."). Saliga has presented no evidence to rebut or undermine Chemtura's legitimate, non-discriminatory reasons, and thus has failed to satisfy the third stage of the *McDonnell Douglas* test, regardless of whether the Court applies a but-for or motivating factor standard.

## II. Common Law Claims

Saliga asserts common law claims for intentional infliction of emotional distress and defamation. For the reasons stated below, the motion is GRANTED.

### A. Intentional Infliction of Emotional Distress

Under Connecticut law, four elements must be established to prevail under a claim for intentional **[*62]** infliction of emotional distress: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff

was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (Conn. 2000) (internal quotation marks and citation omitted).

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Appleton*, 254 Conn. at 210 (citations omitted). "The general rule is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Golnik*, 299 F. Supp. 2d at 15 (internal quotation marks and citations omitted).

> 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized **[*63]** community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'

*Appleton*, 254 Conn. 205, 210-11, 757 A.2d 1059 (quoting 1 Restatement (Second), Torts § 46, cmt. (d), p. 73 (1965)). Connecticut courts have been reluctant to allow claims for intentional infliction of emotional distress, even in cases involving significant employment-related activities, and in applying Connecticut law, federal courts in this District have interpreted the extreme and outrageous requirement strictly. *See Golnik*, 299 F. Supp. 2d at 15-16 (collecting cases); *Lopez-Salerno v. Hartford Fire Ins. Co.*, No. 3:97-cv-273, 1997 WL 766890, at *7, 1997 U.S. Dist. LEXIS 19724, at *19-21 (D. Conn. Dec. 8, 1997) (same).

"There is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action as the court must look to the specific facts and circumstances of each case in making its decisions." *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001) (internal quotation marks and citation omitted). However, "[c]ertain principles have emerged in the context of employer/employee relationships which guide the analysis. A court evaluates whether '. . . the employer's conduct, not the motive behind the conduct, [is] extreme or outrageous.'" *Armstead v. Stop & Shop Cos., Inc.*, No. 3:01-cv-1489, 2003 WL 1343245, at *5, 2003 U.S. Dist. LEXIS 4107, at *14 (D. Conn. Mar. 17, 2003) (citations omitted) **[*64]** (alterations in original). Thus, claims of employer misconduct that challenge motive or intent are dismissed unless the manifesting conduct is itself outrageous or extreme. Furthermore, "[e]ven conduct which is unlawful may not be labeled 'extreme and outrageous' unless

it has a natural tendency to have an extraordinarily negative effect upon the emotional well-being of any person who is exposed or subject to it." *Hamilton v. Town of Hamden*, No. 3:08-cv-164, 2008 WL 4999301, at *10, 2008 U.S. Dist. LEXIS 94242, at *26 (D. Conn. Nov. 19, 2008) (internal quotation marks and citation omitted).

The Court concludes that no reasonable juror could conclude that the conduct alleged in this case can meet the high threshold of extreme and outrageous conduct. The alleged conduct certainly can be seen as offensive and inappropriate, but "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527, 43 A.3d 69 (Conn. 2012) (internal quotation marks and citation omitted). The rude comments, the unwanted kiss, and all the other alleged bad acts of Khilnani and others at Chemtura do not satisfy the well-established standard under Connecticut law. *See, e.g., Tracy v. New Milford Pub. Schs.*, 101 Conn. App. 560, 567-70, 922 A.2d 280 (Conn. App. Ct. 2007) (conduct **[*65]** not outrageous where supervisor conspired with superintendent in pattern of harassment including denial of position, initiating disciplinary actions without proper investigation, defamation of character, and intimidation); *Armstrong v. Chrysler Fin. Corp.*, No. 3:97-cv-1557, 1998 WL 342045, at *5, 1998 U.S. Dist. LEXIS 9357, at *16 (D. Conn. May 14, 1998) (conduct by supervisor who "criticized, insulted, demeaned, and embarrassed [plaintiff] on a daily basis, took away her authority, frequently declared her incompetent, and demeaned her professional ability in the presence of her superiors and subordinates . . . does not meet the required threshold of outrageousness"); *Valencia v. St. Francis Hosp. & Medical Ctr.*, 1996 WL 218760, at *8, 1996 Conn. Super. LEXIS 894, at *23 (Conn. Super. Ct. Apr. 2, 1996) ("allegations that [supervisor] 'grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her' . . . is insufficient to support" intentional infliction of emotional distress claim); *Lorenzi v. Connecticut Judicial Branch*, 620 F. Supp. 2d 348, 353 (D. Conn. 2009) ("Close supervision, the demeaning and unprofessional speech alleged by the plaintiff, unfair job appraisals, inferior office space, denial of pay raises and promotions, orders to limit interactions with certain other employees, insults about one's lunch, discrimination on the basis of race and/or national origin, and/or retaliating against an employee for complaining about **[*66]** such discrimination, do not meet the standard for finding that conduct was extreme and outrageous.").

Against this framework, Saliga must also attribute the alleged abuses of Khilnani to the defendant, Chemtura, in order for her intentional infliction of emotional distress claim to

survive. However, "a company is not liable for the intentional torts of its employees that are engaged in outside the scope of their employment." *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 331 (D. Conn. 2014). Therefore, even if any of Khilnani's alleged conduct did meet the extreme and outrageous standard, the Court concludes that such conduct could not be imputed to Chemtura.

To evaluate the degree to which an employee was acting within the scope of her employment, "courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Nathans v. Offerman*, 922 F. Supp. 2d 271, 275 (D. Conn. 2013) (internal quotation marks and citations omitted). "An employer is not liable for an employee's unforeseeable and misguided attempt to serve his employer." *Marini*, 64 F. Supp. 3d at 331-32. Although it is undisputed that Khilnani's conduct occurred during business hours, conduct **[*67]** of the type Saliga alleges was not part of Khilnani's job description and indeed Saliga argues that much of it was expressly prohibited by company policy.

Therefore, summary judgment must be granted as to Saliga's intentional infliction of emotional distress claims.

**B. Defamation**

"Under Connecticut law, to establish a prima facie case of defamation a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 364 (D. Conn. 2014) (internal quotation marks and citation omitted); *see also Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28, 969 A.2d 736 (Conn. 2009). Saliga's defamation claim fails, however, because the allegedly defamatory statements cannot be attributed to Chemtura.

Once again, the Court notes, as discussed *supra*, "a company is not liable for the intentional torts of its employees that are engaged in outside the scope of their employment." *Marini*, 64 F. Supp. 3d at 331 (D. Conn. 2014). Therefore, even if Khilnani's statement in an email message to Mosher that she should not trust Saliga because Saliga had been two-faced with her did constitute a defamatory statement, Chemtura **[*68]** could not be held responsible for it. As already explained, to evaluate the degree to which an employee was acting within the scope of her employment, courts look to whether the employee's conduct: (1) occurs

primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer. An employer is not liable for an employee's unforeseeable and misguided attempt to serve his employer." *Id.* at 331-32.

The email message was sent after business hours. *See* Pl. Ex. 14, at 1. The email discusses personal matters, such as family and relationship issues, and contains no work-related content. Finally, it cannot be inferred from any of the record evidence that the email message, or the allegedly defamatory statement therein, was motivated in any way by a purpose to serve the employer. Even Saliga's counsel asserted at oral argument on this motion that the statement served no legitimate business purpose. Therefore, the allegedly defamatory statement cannot be imputed to Chemtura and Saliga's defamation claim must fail.[7]

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Doc. No. 162] is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendant and to close **[*70]** this case.

SO ORDERED at Bridgeport, Connecticut, this 1st day of October, 2015.

/s/ Victor A. Bolden

Victor A. Bolden

United States District Judge

---

[7] Saliga testified that Mosher told her that Khilnani also made **[*69]** the same statement orally at the workplace on more than one occasion. Saliga Dep. 286, 288-89. This is inadmissible hearsay, which is generally "an insufficient basis for opposing a motion for summary judgment." *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005). There is no record evidence from anyone who directly witnessed Khilnani making such statements orally at the office, including a notable absence of any assertion in the excerpts of Mosher's deposition that have been submitted to the Court. Without any admissible evidence to support the assertion that Khilnani made this allegedly defamatory statement orally in the presence of other Chemtura employees at the workplace, the Court will not consider the allegation in deciding on the present motion for summary judgment. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.") (internal quotation marks and citations omitted).

End of Document

⚠ Caution
As of: June 17, 2020 4:58 PM Z

# Towers v. State Univ. of N.Y.

United States District Court for the Eastern District of New York

May 21, 2007, Decided ; May 23, 2007, Filed

Case No. CV-04-5243 (FB) (RML)

**Reporter**
2007 U.S. Dist. LEXIS 37373 *; 2007 WL 1470152

SHERRY TOWERS, Plaintiff, -against- STATE UNIVERSITY OF NEW YORK AT STONY BROOK, and THE RESEARCH FOUNDATION OF THE STATE UNIVERSITY OF NEW YORK AT STONY BROOK, Defendants.

could not be used to circumvent the remedial scheme of Title VII. Accordingly, Title IX claims were dismissed. 29 U.S.C.S. § 213(a)(1) exemption did not apply to cases of sex discrimination, so the FLSA claim survived dismissal. The NYHRL claims against the university were barred by the Eleventh Amendment, however the NYHRL claims against the foundation survived.

## Case Summary

### Procedural Posture
Plaintiff former research associate sued defendants, a university and a research foundation, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.; the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq.; Title IX of the Civil Rights Act of 1964, 20 U.S.C.S. § 1681 et seq.; the Family and Medical Leave Act (FLMA), 29 U.S.C.S. § 2615(a); and N.Y. Exec. Law (NYHRL) § 296. Defendants moved to dismiss.

### Overview
The associate claimed she was discriminated against because of her status as a pregnant woman and mother. Specifically, she alleged that she was given a poor recommendation, denied maternity leave, assigned an unmanageable workload and threatened with adverse consequences if she did not complete that work--i.e., she would be denied a recommendation for a tenure position and be subjected to a pay-cut--compelled to accept a pay-cut, and denied the renewal of her postdoctoral research contract. These allegations stated a claim for discrimination under Title VII, however the poor recommendation letter and the denial of maternity leave claims were untimely. The claims of an overwhelming workload and the threatened consequences of not completing that work described a hostile or abusive environment. Title IX

### Outcome
Defendants' motions to dismiss Title VII claims was granted as to the disparate-treatment claims involving the issuance of a poor recommendation and the denial of maternity leave, but was otherwise denied. Defendants' motions to dismiss the Title IX claims were granted. The university's motion to dismiss the NYHRL claims was granted, but the foundation's motion to dismiss those claims was denied, as was its motion to dismiss the FLSA claims.

**Counsel:  [*1]**  For the Plaintiff: ROBERT M. ROSEN, ESQ., JENNIFER ANN WYNNE, ESQ, MATTHEW SCOTT PORGES, ESQ., Leeds, Morrelli & Brown, P.C., Carle Place, NY.

For Defendant State University of New York at Stony Brook: CLEMENT J. COLUCCI, ESQ., Assistant Attorney General, New York, NY.

For Defendant Research Foundation of State University of New York at Stony Brook: MICHAEL J. D'ANGELO, ESQ., REBECCA R. EMBRY, ESQ., Landman, Corsi, Ballaine & Ford, P.C., New York, NY.

2007 U.S. Dist. LEXIS 37373, *1

**Judges:** FREDERIC BLOCK, Senior United States District Judge.

**Opinion by:** FREDERIC BLOCK

# Opinion

## MEMORANDUM AND ORDER

**BLOCK, Senior District Judge:**

Plaintiff Sherry Towers ("Towers"), a former postdoctoral research associate in physics, sues the State University of New York at Stony Brook ("SUNY") and the Research Foundation of SUNY ("Research Foundation") (collectively, "defendants") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"); Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681, *et seq.* ("Title IX"); the Family [*2] and Medical Leave Act, 29 U.S.C. § 2615(a) ("FLMA"); and New York State Executive Law § 296 ("NYHRL").[1] Both defendants move to dismiss the Title VII, Title IX, and state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6). SUNY also seeks dismissal of the state law claims pursuant to Rule 12(b)(1) on the grounds of Eleventh Amendment Immunity. The Research Foundation also seeks dismissal of the Title VII claim pursuant to Rule 12(b)(1) and the FLSA claim pursuant to Rule 12(b)(6).[2] For the reasons stated in open court on May

---

[1] Towers also brought a claim under the Illinois Human Rights Law § 1-102, which has been withdrawn. *See* Mem. of Law in Opp. to SUNY's Mot. to Dismiss, at 16 ("[P]laintiff has already consented to withdrawing her Illinois state law claims.").

[2] The Research Foundation also seeks dismissal of the entire complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for failure to serve the summons and complaint on the Research Foundation within 120 days of its filing as required under Federal Rule of Civil Procedure 4(m); since dismissal of the complaint would bar refiling because the statute of limitations has run, the motion is denied. *See Hollomon v. City of New York*, 2006 U.S. Dist. LEXIS 52424, 2006 WL 2135800, at *3 (E.D.N.Y. July 31, 2006) (in determining whether to extend the 120 day period, the district court may consider whether the applicable statute of limitations

16, 2007, and summarized below, the motion is granted in part and denied in part.

### [*3] Title VII

#### A.

Towers claims that she was discriminated against because of her status as a pregnant woman and mother, in violation of Title VII. Specifically, she alleges that she was given a poor recommendation, denied maternity leave, assigned an unmanageable workload and threatened with adverse consequences if she did not complete that work (namely, that she would be denied a recommendation for a tenure position and subjected to a pay-cut), compelled to accept a pay-cut, and denied the renewal of her postdoctoral research contract. These allegations state a claim for discrimination under Title VII. *See Back v. Hastings on Hudson Union Free School District,* 365 F. 3d 107, 113 (2d Cir. 2004) (adverse employment decisions based upon the gender-based stereotype about mothers is unlawful "gender-plus" discrimination.); *Infante v. Ambac Fin. Group*, 2006 U.S. Dist. LEXIS 4310, 2006 WL 44172, at *4--5 (S.D.N.Y. Jan. 5, 2006) (protected class includes women who suffer adverse action because they are pregnant.). That Towers' male supervisor may have had a short paternity leave does not, as SUNY's contends, defeat Towers' claim. *See Back,* 365 F. 3d at 121 [*4] (In determining whether an employee has been discriminated against on the basis of sex, "courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace.").

#### B.

With the exception of the poor recommendation letter and the denial of maternity leave, Towers' Title VII claims are timely: Title VII claims are barred by the statute of limitations if they are based on events that occurred more than 300 days prior to the filing of an EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1). Towers filed her EEOC charge on April 7, 2004. Unlawful discrimination acts that occurred earlier than 300 days before that date -- that is, prior to June 12, 2003 -- are therefore time-barred, unless they are part of a hostile work environment and at least one act contributing to the hostile work environment occurred within the limitations period. *AMTRAK v. Morgan,* 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)

---

would bar the refiled action).

2007 U.S. Dist. LEXIS 37373, *4

("Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period **[*5]** of the hostile environment may be considered by a court for the purposes of determining liability.").

The pay-cut and denial of Towers' contract extension occurred subsequent to June 12, 2003 -- September 2003 and March 2004 respectively -- and are thus timely. By contrast, the poor recommendation letter and the denial of maternity leave, which are discrete discriminatory acts, occurred prior to June 12, 2003 -- in February and May 2003, respectively-- and are thus untimely. *See Morgan,* 536 U.S. at 113 (each discrete "discriminatory act starts a new clock for filing charges alleging that act."); *see also Elmenayer v. ABF Freight System, Inc.,* 318 F.3d 130, 134-135 (2d Cir. 2003) (the denial of a scheduling accommodation "is a single completed [adverse employment] action when taken."); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc,* 183 F.3d 155 (2d Cir. 1999) (neutral recommendation leading to plaintiff not being hired is a single adverse employment action). However, this time-barred conduct may still be offered as evidence of discriminatory intent to support timely claims. *See Morgan,* 536 U.S. at 113 ("Nor does **[*6]** the statute bar an employee from using prior acts as background evidence to support a timely claim.").

The remaining alleged conduct -- the overwhelming workload and the threatened consequences of not completing that work (a pay-cut and a refusal to write a recommendation for a tenure position) -- occurred both inside and outside the limitations period. According to Towers, this conduct was based on her sex, and made her "work conditions unbearable in 2003 such that she had little choice but to consider leaving the field of physics." 2d Am. Compl. P 110. As such, Towers has described an environment that a reasonable person could find "hostile or abusive." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including whether the conduct "unreasonably interferes with an employee's work performance."); *see also, e.g., Raniola v. Bratton,* 243 F.3d 610, 622-623 (2d Cir. 2001) (reversing district court's dismissal of hostile work environment claim where circumstances surrounding "inordinately high work quotas" supported an inference of **[*7]** hostile work environment motivated by plaintiff's sex). Therefore, Towers has stated a hostile work environment claim. *See Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir. 2001) (the hostile work environment is one that a "reasonable person would find hostile or abusive.'"). Because some of the acts contributing to the hostile work environment occurred within the filing period (i.e., after June 12, 2003), "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan,* 536 U.S. at 117.

## C.

As for the the Research Foundation's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), [3] Towers exhausted her administrative remedies by presenting the factual underpinnings of her hostile work environment claim in her EEOC complaint. *See Williams v. New York City Housing Authority,* 458 F. 3d 67, 71 (2d Cir. 2006) ("[B]ecause the factual underpinnings of a gender discrimination claim were presented in a complaint made to the EEOC, it was error to dismiss [the] claim for failure to exhaust . . . administrative remedies. **[*8]** "); *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F. Supp. 2d 455, 458-459 (S.D.N.Y. 1998) ("[I]t is substance of the charge and not its label that controls."). Specifically, Towers alleged in her EEOC complaint that SUNY "has manufactured a scenario whereby it will be very difficult for [her] to continue in the field at a level commensurate with [her] skills and education level," through excessive "workload demands" that she was "habitually expected to perform," "threats of loss of a recommendation" if she took maternity leave, and exclusion from participation "in activities that would have aided in advancing [her] career." SUNY Decl. of Rebecca Embry, Ex. 2 (EEOC Compl.). Based on these experiences, Towers claimed that she was "systematically discriminated against." *Id.*

**[*9]** Moreover, these claims survive against the Research Foundation despite Towers' failure to name the Research Foundation in the EEOC complaint. Although "a prerequisite to commencing a Title VII action against a defendant is the filing with the EEOC or authorized state agency of a complaint naming the defendant," 42 U.S.C. § 2000e-5(e), courts allow an exception to this "prerequisite" where there is

---

[3] Although framed as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the motion is properly construed as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir. 2000) ("Presentation of a Title VII claim to the EEOC is not a jurisdictional prerequisite, but only a precondition to bringing a Title VII action." (citation and internal quotation marks omitted)); *Crespo v. N.Y. City Transit Auth.,* 2002 U.S. Dist. LEXIS 2977, 2002 WL 398805, at *5 (E.D.N.Y. Jan. 7, 2002) ("Failure to comply with [the exhaustion] requirement, . . .will not divest a federal court of subject matter jurisdiction over the unexhausted claim, [but] a defendant can insist on compliance with the exhaustion requirement by moving to dismiss the unexhausted claim pursuant to Rule 12(b)(6)." (citing *Francis)).*

an "identity of interest between the unnamed defendant and the party named in the administrative charge." *Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir. 1991) (citation omitted). Here, Towers alleges facts which, if true, support the conclusion that the "identity of interest" exception applies. *See Zhao v. State University of N.Y.,* 472 F. Supp. 2d 289, 305 -306 (E.D.N.Y. 2007) (finding that the "identity of interest" exception applied because of the "close, intertwined relationship between" SUNY and the Research Foundation."); *Fox v. City Univ. of New York,* 1998 U.S. Dist. LEXIS 7824, 1998 WL 273049, at *5 (S.D.N.Y. May 27, 1998) (in context of a summary judgment motion, whether CUNY and the Research Foundation shared an "identity [*10] of interest" was an issue of fact).

**D.**

In sum, Towers has stated Title VII claims under a disparate treatment theory for the pay-cut and the denial of her contract renewal; she has also stated a Title VII claim under a hostile work environment theory for the unreasonable workload she was assigned and accompanying threats of adverse consequences were she not to complete that work. Although untimely, the poor recommendation and denial of maternity leave may be considered with respect to both claims as background evidence of discriminatory intent.

**Title IX**

The Second Circuit has not decided whether a plaintiff who has a Title VII claim may also bring a private employment discrimination claim for money damages under Title IX. *See Torres v. Pisano,* 116 F.3d 625, 630 n. 3 (2d Cir. 1997). Many courts that have considered the issue, however, agree that Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII. *See, e.g., Waid v. Merrill Area Public Schools,* 91 F.3d 857, 861- 62 (7th Cir. 1996); *Lakoski v. James,* 66 F.3d 751, 753-54 (5th Cir. 1995); [*11] *Urie v. Yale University,* 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004); *Vega v. State Univ. of N.Y. Bd. of Trustees,* 2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 3, 2000). As the court in *Vega* stated:

> [C]ourts have . . . offered two rationales for refusing to imply a private right of action for an aggrieved employee under Title IX. First, courts have considered that an implied private right of action for damages under Title IX for employment discrimination would disrupt the carefully balanced remedial scheme of Title VII. In a related line of analysis, courts have reasoned that Title IX does not provide a private right of action for

employment discrimination plaintiffs because, since Title VII predated Title IX, Congress intended Title VII to provide an exclusive avenue of relief except for remedies already in existence at the time of its enactment.

2000 U.S. Dist. LEXIS 4749, 2000 WL 381430, at *3 (citing *Lakoski* and other cases).

Courts that hold otherwise urge that the Supreme Court's holdings in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979), *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982), [*12] and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992), compel the conclusion that employees of federally-funded educational institutions can sue for sex discrimination under Title IX. *See, e.g., Morris v. Fordham Univ.,* 2004 U.S. Dist. LEXIS 7310, 2004 WL 906248, *3 (S.D.N.Y. Apr. 28, 2004); *Henschke v. New York Hosp.-Cornell Med. Ctr.,* 821 F. Supp. 166, 172 (S.D.N.Y. Apr. 13, 1993). However, as the Fifth Circuit in *Lakoski* explained, this "jurisprudence calculus" is incorrect:

> [N]either *Cannon* nor *Bell* nor *Franklin* required the Court to address the relationship between Title VII and Title IX. Both *Cannon* and *Franklin* involved claims of prospective or current *students* at federally funded educational institutions; neither involved a claim of employment discrimination by an employee of those schools. *Bell* addressed Title IX's prohibition of employment discrimination in a challenge to the validity of administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices. *Bell* was not a claim by an individual for money damages [*13] for discrimination. In *Bell,* unlike here, a private remedy for aggrieved employees under Title VII did not affect, much less undermine, the validity of regulations for terminating federal funding.

*Lakoski,* 66 F.3d at 754.

The Court agrees with those courts that have held that Title IX cannot be used to circumvent the remedial scheme of Title VII. Accordingly, Towers' Title IX claims are dismissed.

**FLSA**

The Research Foundation's motion to dismiss the FLSA claim is denied. Section 213 of the FLSA exempts employees who work "in a professional capacity" from the minimum wage and maximum hour requirements of the Act, 29 U.S.C. § 213(a)(1); this exemption does not apply however to cases of

sex discrimination. *See id.* § 213(a) (exemptions covered by § 213 do not apply to § 206(d)(1), which provides that "no employer having employees subject to any provisions of this section shall discriminate . . . on the basis of sex.").

## NYHRL

SUNY's motion to dismiss the NYHRL claims as barred by the Eleventh Amendment is granted. *See In re 995 Fifth Ave. Associates,* L.P., 963 F.2d 503, 507 (2d Cir. 1992) (Under **[*14]** the Eleventh Amendment, a state or state agency may not be sued in federal court unless the state waives this immunity); *see also Jacobs v. SUNY at Buffalo School of Medicine,* 204 F. Supp. 2d 586, 593 (W.D.N.Y. 2002) (NYHRL claim against SUNY dismissed as barred by the Eleventh Amendment). However, the Research Foundation's motion to dismiss these claims is denied for the same reasons set forth in Subsection I (Title VII claims). *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 217 (2d Cir. 2005) (analyzing NYSHRL claims using the same analytic framework used in Title VII cases).

## CONCLUSION

The Court grants defendants' motions to dismiss Towers' Title VII claims with respect to the disparate-treatment claims involving the issuance of her poor recommendation and the denial of her maternity leave, but denies it in all other respects; accordingly, Towers may pursue disparate-treatment claims involving her pay-cut and the denial of her contract renewal, as well as a hostile-environment claim involving the unreasonable workload she was assigned and accompanying threats of adverse consequences.

Defendants' motions to dismiss the Title IX claims are **[*15]** granted. SUNY's motion to dismiss the NYHRL claims is granted, but the Research Foundation's motion to dismiss those claims is denied. The Research Foundation's motion to dismiss the FLSA claims is also denied.

## SO ORDERED.

FREDERIC BLOCK

Senior United States District Judge

Brooklyn, New York

May 21, 2007

 Positive
As of: June 17, 2020 5:00 PM Z

# Uyar v. Seli

United States District Court for the District of Connecticut

March 6, 2017, Decided; March 6, 2017, Filed

Case No. 3:16-cv-186

**Reporter**
2017 U.S. Dist. LEXIS 30853 *; 2017 WL 886934

ASLI UYAR, Plaintiff, v. EMRE SELI and YALE UNIVERSITY, Defendants.

**Subsequent History:** Request denied by, Motion denied by Uyar v. Seli, 2017 U.S. Dist. LEXIS 73347 (D. Conn., May 15, 2017)

Summary judgment granted, in part, summary judgment denied, in part by, Dismissed by, in part, Summary judgment granted by Uyar v. Seli, 2018 U.S. Dist. LEXIS 55149 (D. Conn., Mar. 31, 2018)

**Counsel:** **[*1]** For Asli Uyar, Plaintiff: Michael John Reilly, LEAD ATTORNEY, Cicchiello & Cicchiello, LLP, Hartford, CT;, Emanuele Robert Cicchiello, Cicchiello & Cicchiello, LLP, Hartford, CT.

For Emre Seli, McCarter & English, LLP, Defendant: Ethan A. Levin-Epstein, Garrison Levin-Epstein Fitzgerald & Pirrotti PC, New Haven, CT; Joseph D. Garrison, Garrison Levin-Epstein Fitzgerald & Pirrotti PC, New Haven, CT; Joshua R. Goodbaum, Garrison Levin-Epstein Fitzgerald & Pirrotti PC, New Haven, CT; Yale University, Pamela J. Moore:, Tiffany R Hubbard, McCarter & English, LLP, Hartford, Ct.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

# Opinion

**MEMORANDUM OF DECISION GRANTING EMRE SELI'S MOTION TO DISMISS [DKT. NO. 19] AND GRANTING-IN-PART AND DENYING-IN-PART YALE UNIVERSITY'S MOTION TO DISMISS [DKT. NO. 23]**

## I. Introduction

The Plaintiff Asli Uyar ("Uyar") brings this action alleging sexual harassment and sex discrimination in a ten-count Complaint against defendants Emre Seli ("Seli") and Yale University ("Yale") (collectively, "Defendants"). Seli has moved to dismiss Counts Five, Six, Seven, Eight, and Nine of the Complaint, and Yale has moved to dismiss Counts One, Two, Three, Four, and **[*2]** Ten of the Complaint, for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Seli's Motion to Dismiss [Dkt. No. 19] is GRANTED, and Yale's Motion to Dismiss [Dkt. No. 23] is GRANTED-IN-PART and DENIED-IN-PART.

## II. Background

Unless otherwise noted, the following facts are taken from the Plaintiff's complaint. Plaintiff is a Turkish national who was granted a visa to work in the United States as a post-doctoral fellow at the Yale School of Medicine's Department of Obstetrics, Gynecology and Reproductive Sciences doing research in the area of early embryo genetics. [Dkt. No. 1 ("Compl.") ¶¶ 4, 6.] Seli was a Professor of Obstetrics, Gynecology, and Reproductive Sciences at the Yale School of Medicine. Id. ¶ 7. He ran the laboratory where Uyar performed her fellowship work and he supervised her fellowship research. Id. Plaintiff's fellowship research was funded by, and her position was dependent on, grant money obtained by Seli, and Seli could at any time decide not to continue funding Plaintiff's position. Id. ¶ 8. Additionally, to

continue to advance in her field, Plaintiff was dependent on positive recommendations from Defendant Seli [*3] to obtain other positions or to publish in academic journals. *Id.* ¶ 9.

In the summer of 2012, Seli, who was married, began to pursue a romantic relationship with the Plaintiff. The Plaintiff initially rejected his advances, but Seli persisted and Uyar relented in September 2012. *Id.* ¶¶ 11-12. Plaintiff claims that she tried to end this relationship repeatedly, but each time, Seli coerced her into continuing the relationship by threatening that Plaintiff would lose her fellowship if she ended it. *Id.* ¶¶ 13-14. The Plaintiff continued the relationship in order to remain in the United States and pursue her career. *Id.* at 15.

On May 31, 2014, Seli's wife learned of the relationship. *Id.* ¶ 18. Plaintiff alleges that Seli sought to terminate her relationship with Yale to appease his wife. *Id.* at 19. On June 1, 2014, Seli sent an email to his department's business manager, claiming that Plaintiff's research "did not look promising for next year and I think we may not renew her appointment," and he forwarded this email to his wife, even though his wife had no professional involvement with the Plaintiff. *Id.* ¶ 20, 24. The same day, Seli cancelled Plaintiff's research project, and cancelled Plaintiff's flight to [*4] and registration at a professional conference she was scheduled to attend. *Id.* ¶ 21, 25. The cancellation of the Plaintiff's research project prevented her from producing and publishing a major research project during her fellowship. *Id.* ¶ 22. This cancellation would have been fatal to Plaintiff's academic career prospects. *Id.* Seli also told the Plaintiff that if she continued to come to work, Seli would tell her friends and family about the relationship in order to ruin her reputation. *Id.* ¶ 23, 28. He also threatened to ruin her academic career by telling others that she had falsified her curriculum vitae in order to obtain her fellowship at Yale. *Id.* ¶¶ 27, 28. Plaintiff initially complied with Seli's directive. *Id.*

On June 18, 2014, Yale emailed Seli that her position would expire on August 18, 2014. *Id.* ¶ 31. On June 24, 2014, Plaintiff reported the relationship and Seli's threats to the Department Chair, who returned Plaintiff to work. *Id.* ¶ 33. Once she returned to the laboratory, Seli became hostile and threatening when she interacted with Plaintiff, including by excluding her from meetings and preventing her from working on the laboratory's research projects. *Id.* ¶¶ 34-35

In [*5] order to preserve her professional reputation, Plaintiff succumbed to Seli's pressure, terminated her fellowship at Yale and accepted a position at a less prestigious academic institution. *Id.* ¶ 37-38. Subsequently, Seli threatened Plaintiff with litigation if she attempted to pursue a sexual harassment claim at Yale, and Yale published her research without

crediting her. *Id.* ¶¶ 39-41.

Plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on March 31, 2015, alleging that she was discriminated against in the terms and conditions of her employment, sexually harassed, constructively discharged, and retaliated against by the Defendants. [Dkt. No. 19-2]. She received a right to sue letter from the Equal Employment Opportunities Commission ("EEOC") on December 1, 2015. [Compl. ¶ 45, Exh. A].

Plaintiff filed the instant action on February 5, 2015, alleging as to Yale sex discrimination, sexual harassment, and retaliation in violation of Title VII, sexual harassment in violation of Title IX, and negligent supervision, and alleging as to Seli tortious interference with a business expectancy, defamation, negligent infliction of emotional [*6] distress, and invasion of privacy. [Compl. at 1]. Seli and Yale moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on April 4, 2016 [Dkt. No. 19] and April 15, 2016 [Dkt. No. 23], respectively.

III. <u>Legal Standard</u>

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (quotations and citations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged [*7] approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an

2017 U.S. Dist. LEXIS 30853, *7

entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider` "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005). Here, Plaintiffs attach the EEOC right to sue letter to her Complaint, and Seli attaches the CHRO complaints to his briefing. These documents are integral **[*8]** to the Complaint and may be considered.

IV. Discussion

A. Claims Against Yale

1. Title VII

Pursuant to Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "[S]exual harassment so 'severe or pervasive' as to 'alter the conditions of . . . employment and create an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). "[A] plaintiff seeking relief for sexual harassment may . . . proceed under two theories: (1)*quid pro quo*, and (2) hostile work environment." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994).

a. Count One: Sex Discrimination

Yale argues that the Plaintiff has failed to state a claim for "sex discrimination" because she failed to "allege in a nonconclusory fashion, that she suffered an employment action because of her gender." [Dkt. No. 24 at 8 (emphasis in original)]. This argument evinces a fundamental misunderstanding of the law. "[S]exual harassment *is a form of sex discrimination* that is actionable under Title VII."

*Meritor Sav. Bank*, 477 U.S. at 57 (expanding Title VII protections from quid pro quo harassment to hostile work environment harassment). **[*9]** By alleging facts consistent with sexual harassment, Plaintiff has stated a claim for sex discrimination under Title VII.

The Plaintiff does not allege in a separate count that she was subjected to a "hostile work environment" in violation of Title VII. However, she has alleged that Seli coerced the Plaintiff into commencing and continuing their sexual relationship over a long period of time and that he coerced her to leave Yale and accept a less prestigious position. Accepting those allegations as true they undoubtedly describe a workplace which was hostile. To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Id.* "The conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, **[*10]** one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.

The Plaintiff has alleged that she succumbed to Seli's pressure both in commencing and continuing a sexual relationship with him which she did not welcome; and further, that she reluctantly relinquished a highly prestigious fellowship at Yale in supplication to his pressures and accepted a less prestigious position to preserve her professional reputation. She has alleged ample facts constituting the subjective prong of the test. If the Plaintiff were to present persuasive evidence of these allegations, a reasonable jury could find that her work environment was hostile, satisfying the objective prong. Accepting the Plaintiff's allegations as true, Seli's behavior was both subjectively and objectively hostile.

b. Count Two: Quid Pro Quo Sexual Harassment

To establish a prima facie case of quid pro quo sexual harassment, a plaintiff must "present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis of decisions affecting the compensation, terms, conditions, or privileges of her employment." *Karibian*, 14 F.3d at 777 (citing *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir. 1988)). **[*11]** Actionable unwelcome sexual conduct includes

"[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Savings Bank*, 477 U.S. at 65.

Yale argues that "a quid pro [quo] claim that involves only unfulfilled threats, is insufficient to sustain a claim." [Dkt. 24 at 16]. In so doing, they ignore binding Second Circuit precedent regarding employees who submit to advances in order to avoid changes in their employment status. In *Karibian* the court held:

> [I]n the typical *quid pro quo* case, the employee who refuses to submit to her supervisor's advances can expect to suffer some job-related reprisal. Accordingly, in such "refusal" cases, evidence of some job-related penalty will often be available to prove *quid pro quo* harassment. But that is not to say that such evidence is always essential to the claim. In the nature of things, evidence of economic *harm* will not be available to support the claim of the employee who *submits* to the supervisor's demands. The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not. Under the district court's rationale, only the employee who successfully resisted the threat of sexual blackmail could state a *quid [*12] pro quo* claim. We do not read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence.

*Karibian*, 14 F.3d at 778 (emphasis in original). The court reaffirmed this holding in *Jin v. Metropolitan Life Ins. Co.*, stating:

> *Karibian*'s essential holding that an employer is liable in a *submission* case is sound even under the Supreme Court's new liability analysis . . . . [W]hen a victim is coerced into submitting to a supervisor's sexual mistreatment, the threatened detrimental economic tangible employment action may not take place. But that does not mean that use of the submission as the basis for other job decisions does not also constitute tangible employment action.

*Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 98 (2d Cir. 2002). The Plaintiff alleges that she endured myriad coercive acts affecting her employment and employment prospects in retaliation for her initial refusal to submit to and later capitulation to Seli's sexual demands. The Plaintiff has alleged that she first rejected and ultimately submitted to Seli's persistent advances in order to maintain her position; and further, that because she succumbed to his advances and his wife learned of his infidelity, [*13] her professional reputation, fellowship, professional prospects, personal relationships, and ability to remain in the United States were

threatened, forcing her to leave her fellowship and pursue her research at a less prestigious institution. While this is not the classic quid pro quo case, Plaintiff has stated a claim for quid pro quo sexual harassment.

c. Count Three: Retaliation

Title VII makes it unlawful for employers to retaliate against employees who oppose employment discrimination, or submit or support a complaint of employment discrimination. *See* 42 U.S.C. § 2000e-3(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532, 186 L. Ed. 2d 503 (2013). "'To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)). This causal connection "can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).

Plaintiff has alleged that she informed Yale of Seli's actions on June 24, 2014, and that immediately upon returning to work, Seli began to treat her in a hostile and threatening manner. This is sufficient [*14] to allege retaliation under Title VII. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) ("[T]he antiretaliation provision . . . covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."). The Court recognizes that the Plaintiff relies wholly on inference in asserting this claim. That having been said, the fact that Seli's behavior is alleged to have changed immediately after the Plaintiff reported the situation to Yale raises a sufficient specter of liability at the motion to dismiss state to cause the Court to decline to dismiss the claim.

d. Timeliness

Yale asks the Court to disregard any allegations relating to Seli's conduct before June 4, 2014, arguing that the only timely allegations of adverse actions are an email from Yale informing her that her fellowship would expire on August 18, 2014, and Plaintiff's constructive discharge. The Court disagrees.

A plaintiff must file a discrimination claim within 300 days of the occurrence of the allegedly unlawful employment [*15]

practice. 42 U.S.C. § 2000e-5(e)(1). Here, the Plaintiff filed her charge of discrimination with the CHRO on March 31, 2014. As a result, discrete incidents that occurred more than 300 days before that date, or before June 4, 2014 in this case, generally are time-barred. However, "under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & New Jersey*, 685 F.3d 135, 155-56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)). Moreover, "evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'" *Id.* at 150 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F. 3d 166, 176 (2d Cir. 2005)). "Such background evidence 'may be considered to assess liability on the timely alleged act.'" *Id.*

Hostile work environment claims are paradigmatic examples of continuing violations, because "[t]heir very nature involves repeated conduct," *AMTRAK v. Morgan*, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). While Plaintiff and Seli's sexual relationship ceased before June 4, 2014, his alleged discriminatory conduct continued beyond that date, and as alleged, represents a continuing course of conduct.

 **[*16]** 2. <u>Count Four: Title IX</u>

Plaintiff asserts that Yale's failure to protect her from Seli's harassment violates Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., because Yale is a recipient of federal education funds. However, Title VII is Plaintiff's exclusive remedy. Plaintiff did not allege that she was a student, and all of the allegations in the Complaint focus on Plaintiff's employment with Yale. "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII." *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004). Because all of the allegations in the Complaint relate to the Plaintiff's employment, Count Four must be DISMISSED.

3. <u>Count Ten: Negligent Supervision</u>

"A negligent supervision claim requires a plaintiff to plead and prove that she suffered an injury 'due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise.'" *Miller v. Ethan Allen Glob., Inc.*, No. 3:10-CV-1701 JCH, 2011 U.S. Dist. LEXIS 94662, 2011 WL 3704806, at *11 (D. Conn. Aug. 23, 2011) (quoting *Abate v. Circuit-Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn.

2001)). "In order to state a claim, a plaintiff must allege that a defendant knew or should have known of another employee's propensity to engage in the alleged tortious behavior." *Shanks v. Walker*, 116 F. Supp. 2d 311, 314 (D. Conn. 2000). Plaintiff's **[*17]** Complaint meets this standard. She has alleged (1) that she notified Yale of Seli's behavior; (2) that Yale returned her to the same lab to continue working with him; and (3) following her return, Seli treated her in a threatening manner. Yale's motion to dismiss is therefore DENIED with respect to Count Ten.

B. <u>Claims Against Seli</u>

Seli has moved to dismiss claims against him for (1) tortious interference with a business expectancy; (2) defamation; (3) negligent infliction of emotional distress; and (4) invasion of privacy.

Seli argues generally that the Court should disbelieve the Plaintiff because some of the statements she filed with her CHRO claim were contradictory. [Dkt. 19-1 at 5]. For example, in one complaint, she said that she had been constructively discharged, and in the other, she said that she was terminated on September 6, 2014. *Id.* However, some of these inconsistencies are less evidence that the Plaintiff is not credible, but rather that the Plaintiff, may not have understood what was legally significant about her experience when she filed her first CHRO complaint *pro se*, and that her attorney filed an amended complaint with this in mind. Moreover, the legal standard **[*18]** on a motion to dismiss requires the Court to accept the Complaint's allegations as true and to consider them in the light most favorable to the Plaintiff. The Court further notes that the Plaintiff is a Turkish national, residing in this country to pursue scientific research; not advanced research in the humanities or law. Therefore she is even less facile with legal terminology and is entitled to greater deference than a typical *pro se* litigant. As a consequence of the deference afforded in cases such as this, the Court declines to dismiss the claims on this basis.

1. <u>Count Five: Tortious Interference with a Business Expectancy</u>

Plaintiff alleges that Seli interfered with the business relationship between Plaintiff and Yale by making numerous false and defamatory statements about the Plaintiff and her work, and by threatening her and retaliating against her. These actions, she claimed, forced her to leave her position for a less prestigious and remunerative one, and damaged her professional reputation and career prospects. Seli argues that he could not interfere with the Plaintiff's business relationship with Yale, because he himself was an agent of Yale, and should not be liable for **[*19]** breaching his own contract. [Dkt. 19-1 at 6-7]. Seli also claims that Plaintiff did not suffer

2017 U.S. Dist. LEXIS 30853, *19

any professional injury, because Yale returned Plaintiff to work after she complained about Seli's behavior, and her allegations about being excluded from meetings were not sufficient to allege intimidation, molestation, or malice. *Id.* at 8-9.

"A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007) (citations omitted). "[N]ot every act that disturbs a contract or business expectancy is actionable . . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 502 n. 24, 656 A.2d 1009 (1995) (quotations and citations omitted).

"[I]t is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two other [*20] parties." *Wellington Sys., Inc. v. Redding Group, Inc.*, 49 Conn. App. 152, 168, 714 A.2d 21 (1998) (emphasis in original; quotations omitted). "[T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract. The general rule is that the agent may not be charged with having interfered with a contract of the agent's principal." *Appleton v. Bd. of Educ.*, 53 Conn. App. 252, 267, 730 A.2d 88 (1999), *rev'd in part on other grounds*, 254 Conn. 205, 757 A.2d 1059 (2000) (quotations and citations omitted). Here the Plaintiff alleges that Seli was more than a Yale employee who supervised her. She alleges that he was the awardee of the research grant which created her position and paid her salary, that he had the authority to cancel her major research project and the authority not to renew her employment. [Compl. ¶¶ 20-21] Even if Seli was just Yale's agent, "an agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract." *Wellington*, 49 Conn. App. at 168 (quotations and citations omitted).

However, an exception to the general rule applies if the agent "did not act legitimately within his scope of duty but [*21] used the corporate power improperly for personal gain." *Id.* (quotations and citations omitted). In an employment context, this personal gain must be something "beyond the mere

removal of the plaintiff from the position." *Tucker v. Eighth Utilities Dist.*, No. TTDCV054002448S, 2007 Conn. Super. LEXIS 1118, 2007 WL 1470602, at *5 (Conn. Super. Ct. Apr. 23, 2007). Plaintiff's allegations fit within this exception. As pleaded, Seli abused his position as Plaintiff's supervisor to damage her career—by constructive discharge and by disparaging the quality of her research—in order to appease his wife.

Nevertheless, Plaintiff has not alleged that she had anything other than an at-will employment relationship with Yale. Seli "cannot be liable for interfering with the rights of parties to a contract that is terminable at will." *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 7 F. Supp. 2d 119, 132 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999); *see also Windover v. Sprague Techs.*, 834 F. Supp. 560, 568 (D. Conn. 1993) (holding that no business expectancy existed in an at-will employee's promotion); *Estela v. Bristol Hosp., Inc.*, No. CV116013260, 2013 Conn. Super. LEXIS 1861, 2013 WL 4779574, at *10 (Conn. Super. Ct. Aug. 14, 2013) (holding that at-will contracts between a doctor and patients did not create a business expectancy). Count Five must therefore be DISMISSED.

### 2. Count Six: Defamation

Seli argues that his email stating the Plaintiff "did not look promising for next year and I think we may not renew her appointment" was a statement [*22] of opinion that cannot give rise to a cause of action for defamation. [Dkt. 19-1 at 10-11]. He also asserts that Seli's email fell within a privilege for employer communications. *Id.* at 11. Plaintiff counters that Seli's statement that Plaintiff's research "did not look promising" could be understood to mean that Plaintiff's research was poor or substandard according to some objective measure. [Dkt. No. 35-1 at 9-11]. Plaintiff also argues that where a statement was made with malice, the privilege for employer communications does not apply. *Id.*

Under Connecticut law, to establish a prima facie case of defamation a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 364 (D. Conn. 2014) (quotations omitted). "[A] defamation claim requires a statement that is an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 503 (D. Conn. 2009). However, where statements may "reasonably be read [*23] to imply that they are based on undisclosed defamatory facts," a defamation

claim may survive a motion to dismiss. *Id.* at 504-05. While "communications between managers regarding the review of an employee's job performance . . . are protected by a qualified privilege," this privilege fails where the declarant has "knowledge of [a statement's] falsity or reckless disregard as to its truth." *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 29, 662 A.2d 89 (1995)

In this case, Plaintiff has alleged that Seli maliciously criticized the quality of the Plaintiff's scientific research solely to retaliate against her. Seli published that he did not believe the Plaintiff's research was "promising," while implying that this assessment was based on some objective measure of scientific achievement. Plaintiff has therefore properly alleged that Seli's statement was defamatory. *Cf. Hutchinson v. Proxmire*, 443 U.S. 111, 116, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979) (suggesting that statements intimating that a scientist's research was "perhaps duplicative" and "transparent[ly] worthless[]" were defamatory).

The Plaintiff does not allege that any person to whom Seli made disparaging comments about the Plaintiff acted on or repeated them. She does not allege that she encountered anyone in the course of her job search or elsewhere who was aware of Seli's statements. Nor does she [*24] allege that she was compelled to disclose them herself. Even if she had, generally, Connecticut does not recognize self-publication as a basis for a defamation claim. *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). However she has not alleged any facts tending to show that she suffered reputational damage. Accordingly her defamation claim is denied. The complaint does not allege all of the essential elements of a defamation claim and therefore Count Six is DISMISSED without prejudice to refiling within 14 days of the date of this decision.

3. Count Seven: Negligent Infliction of Emotional Distress

Seli argues that Plaintiff's negligent infliction of emotional distress claim should be dismissed, because she did not allege that the conduct at issue occurred during the termination process. [Dkt. 19-1 at 12-13]. "Negligent infliction of emotional distress in the employment context arises only where it is 'based upon unreasonable conduct of the defendant in the termination process.'" *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) (quoting *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978)). Plaintiff does not allege that one or more specific events precipitated her constructive discharge. Rather, she alleges that Seli was generally hostile and threatening between late June 2014 and September 6, 2014, and coerced her into a sexual [*25] relationship for two years before that. The allegations in this case are consistent with those alleged in

*Pecoraro v. New Haven Register*, which dismissed a negligent infliction of emotional distress case based on "harassment and retaliation that allegedly occurred over the course of her entire employment relationship with defendant," 344 F. Supp. 2d 840, 847 (D. Conn. 2004). Count Seven must therefore be DISMISSED.

4. Counts Eight and Nine: Invasion of Privacy

Seli argues that Plaintiff did not specify what information was allegedly disseminated about her, or that such information is "highly offensive to a reasonable person." [Dkt 19-1 at 13-15]. The Complaint alleges in conclusory fashion that Seli shared "private details of [Plaintiff's] personal and professional life with others, including his wife." [Compl. ¶¶ 42]. It did not specify what this private information consisted of, or how many "others" learned of the information. Plaintiff's allegations are so vague and conclusory that they fail to put the Defendants on notice of her claims as required by Federal Rule of Civil Procedure 8. In addition, because Plaintiff offered no argument in support of these claims in her brief, the court assumes these counts have been abandoned. Accordingly, Counts Eight [*26] and Nine are DISMISSED without prejudice to refiling within 14 days of the date of this decision.

V. Conclusion

For the foregoing reasons, Seli's Motion to Dismiss [Dkt. No. 19] is GRANTED, and Yale's Motion to Dismiss [Dkt. No. 23] is GRANTED-IN-PART and DENIED-IN-PART. Plaintiff is directed to file an amended complaint consistent with this ruling within 14 days of the date of this decision.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 6, 2017

---

 Neutral

As of: June 17, 2020 4:55 PM Z

# Winfield v. Chi. State Univ.

United States District Court for the Northern District of Illinois, Eastern Division

August 30, 2006, Decided

No. 05 C 5224

**Reporter**
2006 U.S. Dist. LEXIS 61841 *; 2006 WL 2524137

VARNZIEL WINFIELD, Plaintiff, v. CHICAGO STATE UNIVERSITY, Defendant.

**Subsequent History:** Reconsideration denied by, Motion denied by Winfield v. Chi. State Univ., 2007 U.S. Dist. LEXIS 13575 (N.D. Ill., Feb. 28, 2007)

**Counsel:** [*1]  For Varnziel Winfield, Plaintiff: Denise M. Mercherson, Chicago, IL.

For Chicago State University, Defendant: Shirley Ruth Calloway, Roger Joseph Kiley, Illinois Attorney General's Office, Chicago, IL.

For Centers for New Horizons, Defendant: Jeffrey Irvine Cummings, Nancy L Maldonado, Miner Barnhill & Galland, Chicago, IL.

**Judges:** Samuel Der-Yeghiayan, United States District Court Judge.

**Opinion by:** Samuel Der-Yeghiayan

# Opinion

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Centers for New Horizons' ("New Horizons") and Defendant Chicago State University's ("CSU") motions to dismiss. For the reasons stated below, we grant both motions to dismiss.

## BACKGROUND

Plaintiff Varnziel Winfield ("Winfield") claims that he was admitted to CSU's Masters in Social Work program in 2001, which "requires each student to complete a field practicum in a community based organization . . . ." (A. Compl. Par. 6). According to Winfield, he was assigned by CSU to New Horizons for his practicum, where he claims his three female supervisors ("Supervisors") "refused to supervise" him because of his gender. (A. Compl. Par. 11). Winfield [*2] alleges that from October 2002 through December 2003, Winfield was subjected to "a hostile learning environment" because he was a male. (A. Compl. Par. 13). Winfield also alleges that he was required to complete an additional eighty hours of work for his practicum, that CSU's actions caused him "to lose his veteran educational benefits in 2003 and 2004," and that his graduation from CSU was delayed from May 2004 to May 2005, due to the actions of New Horizons and CSU. (A. Compl. Par. 14-16). Winfield was granted leave to file an amended complaint on June 20, 2006, and he included in the amended complaint one claim against New Horizons and CSU alleging a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") requires a court to dismiss an action when it lacks subject matter jurisdiction. *United Phosphorus, Ltd. v. Angus Chemical Co.,* 322 F.3d 942, 946 (7th Cir. 2003). If the concern of the court or party challenging subject matter

jurisdiction is that "subject matter jurisdiction [*3] is not evident on the face of the complaint, the motion to dismiss pursuant to Rule 12(b)(1) would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true." *Id.; see also Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir. 1995)(stating that when reviewing a motion to dismiss brought under Rule 12(b)(1), this court "must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff"). However, if the complaint appears on its face to indicate that the court has subject matter jurisdiction, "but the contention is that there is in fact no subject matter jurisdiction, the movant may use affidavits and other material to support the motion." *United Phosphorus, Ltd.,* 322 F.3d at 946 (emphasis in original). For the purpose of determining subject matter jurisdiction, this court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Ezekiel,* 66 F.3d at 897 (quoting *Capitol Leasing Co. v. Federal Deposit Insurance Corp.,* 999 F.2d 188, 191 (7th Cir. 1993)). [*4] The burden of proof in a Rule 12(b)(1) motion is "on the party asserting jurisdiction." *United Phosphorus, Ltd.,* 322 F.3d at 946.

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir. 2002); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991). The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir. 1998). Under the current [*5] notice pleading standard in federal courts, a plaintiff need not "plead facts that, if true, establish each element of a 'cause of action . . . .'" *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994)(stating that "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later"). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002); *Kyle,* 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimum notice of

claim," *id.,* and the plaintiff cannot satisfy federal pleading requirement merely "by attaching bare legal conclusions to narrated facts which fail to outline bases of [his] claims." *Perkins,* 939 F.2d at 466-67. The Seventh Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events." *Sanjuan,* 40 F.3d at 251.

**DISCUSSION**

Pursuant to 20 U.S.C. § 1681(a) [*6] of Title IX it is unlawful for an individual to be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" because of the individual's gender. 20 U.S.C. § 1681(a).

I. Centers for New Horizons

New Horizons argues that any claims against it should be dismissed for lack of subject matter jurisdiction because New Horizons is not an "education program or activity" covered by Title IX. 20 U.S.C. § 1681. New Horizons does not deny that it receives some federal funding, which is a prerequisite under Title IX. 20 U.S.C. § 1681. New Horizons also admits that it administers some "educational" programs. ( C Mot. Ex. 1, 8). New Horizons, however, argues that it is a "human services organization," rather than an educational institution, and that the only educational programs it administers, such as early education services, are incidental to its mission of serving families. ( C Mot. Ex. 1, 7-8).

In order for a defendant to fall under the purview of Title IX, "an entity must have features such that [*7] one could reasonably consider its mission to be, at least in part, educational." *O'Connor v. Davis,* 126 F.3d 112, 117 (2nd Cir. 1997). In the instant action, New Horizons clearly states in an affidavit attached to its motion to dismiss that its mission is "to help families develop the capacity to become self-sufficient, to improve the quality of their lives, and to encourage them to participate in the rebuilding of the Bronzeville[, Illinois] neighborhood." ( C Mot. Ex 1, 7). New Horizons also states that it is not a degree-conferring institution, that it has no affiliation with CSU, and that Winfield is the only CSU intern that New Horizons has had since at least 2001. *See O'Connor,* 126 F.3d at 118 (stating that "[w]e decline . . . to convert [the defendant's] willingness to accept volunteers into conduct analogous to administering an 'education program' as contemplated by Title IX"). Winfield does not dispute any of these statements, except to state that "Plaintiff s [sic] amended complaint contains a broad description of the services provided by the agency, [that

is] broad enough to suffice for Title IX educational program [sic] or activity [*8] receiving federal assistance." ( C Mot. Rep. 3-4). Such a vague response, however, is not sufficient to survive a motion under Rule 12(b)(1), when New Horizons has provided evidence showing that it does not fall under Title IX. *See United Phosphorus, Ltd.,* 322 F.3d at 946 (stating that the burden of proof in a Rule 12(b)(1) motion is "on the party asserting jurisdiction"). Accordingly, we find that New Horizons is not covered by Title IX in this case and we grant New Horizons' motion to dismiss.

## II. Chicago State University

CSU argues that Winfield has failed to adequately plead a Title IX claim against CSU because CSU cannot be held liable for the conduct of New Horizons. As is indicated above, New Horizons is not an entity that is covered by Title IX. Winfield brought a hostile learning environment claim and discrimination claim against CSU, but he has failed to present any allegations that would enable a reasonable jury to infer that CSU took any part in establishing the work environment at New Horizons for Winfield or took any part in the alleged discrimination by the Supervisors at New Horizons.

Winfield alleges in his amended complaint that CSU "requires [*9] each student to complete a field practicum in a community based organization under the supervision of a social work practitioner who has a MSW degree and a minimum of two years post MSW experience." (A. Compl. Par. 6). There are no other allegations in the amended complaint that indicate that CSU requirements were unlawful. Winfield also alleges that CSU assigned him to work at New Horizons. Again, Winfield does not indicate that such an assignment was unlawful. Winfield also alleges that the Supervisors were employees of New Horizons and that they "refused to supervise" him because he was a man. (A. Compl. Par. 2). There are no allegations in the amended complaint that indicate that any CSU employees ordered the Supervisors at New Horizons to act in that manner or that CSU had any involvement with or control over such Supervisors' conduct. There are no allegations that would indicate that CSU was even aware of the such Supervisors' alleged conduct. Winfield specifically alleges that he "complained to his three female supervisors at [New Horizons] that he was being treated differently due to his sex, male." (A. Compl. Par. 12). However, there is no allegation included in the amended [*10] complaint that indicates that he ever brought the matter to the attention of CSU employees. Winfield also alleges that, due to the refusal "to supervise him," he needed to complete an additional 80 hours of field work and his graduation was delayed. However, Winfield does not challenge the propriety of the hour requirements imposed by

CSU. Rather he objects to the conduct of the Supervisors at New Horizons that allegedly required him to perform additional hours to meet the CSU requirements. There is one isolated allegation in the complaint stating that Dr. Doris Perry ("Perry"), the Program Director at CSU, indicated that "men did not belong in the social work field." (A. Compl. Par. 8). However, there is no indication in the amended complaint that Perry had any control over or had knowledge of the work environment at New Horizons or the conduct of the Supervisors who worked for New Horizons. In order for a plaintiff to prevail on a Title IX claim, the plaintiff must show that "the behavior at issue denies a victim equal access to education" and the discrimination "must have a concrete, negative effect on the victim's education." *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163,* 315 F.3d 817, 823-29 (7th Cir. 2003) [*11] (citations omitted). There is no indication in the amended complaint that the alleged statements made by Perry had any concrete effect on Winfield's education or that Perry engaged in any conduct that could violate Title IX. *Id.* (stating that "[e]xamples of a negative impact on access to education may include dropping grades, . . . becoming homebound or hospitalized due to harassment, . . . , or physical violence").

CSU also argues that New Horizons cannot be deemed an agent of CSU. According to the allegations of the complaint, New Horizons is a separate entity from CSU and merely offers some practical on the job training for externs that are seeking credit from CSU. (A. Compl. Par. 4,6, 10). There are no facts alleged that would indicate that CSU controlled New Horizons' operations or that New Horizons could be deemed an agent of CSU. Thus, although CSU would qualify as an institution that is covered by Title IX, there are no allegations, even when viewing the allegations in the amended complaint in the light most favorable to Winfield, that would allow this court to reasonably infer that CSU discriminated against Winfield because of his gender in violation of Title IX.

CSU [*12] also argues that the allegations in the complaint do not indicate that CSU intentionally engaged in discrimination. In order to prevail on a Title IX claim, a plaintiff must show that the defendant engaged in intentional discrimination. *See Torrespico v. Columbia College,* 1998 U.S. Dist. LEXIS 15714, 1998 WL 703450, at *18 (N.D. Ill. 1998)(stating that for a Title IX claim a plaintiff must show that the defendant made an "intentional decision" to discriminate). There are no allegations in the complaint that would indicate that CSU took part in, had knowledge of, or condoned the alleged misconduct by the New Horizons employees. Based upon the allegations in the amended complaint, we cannot reasonably infer that CSU somehow could have anticipated that employees of New Horizons would not work well with Winfield and that CSU intended to

2006 U.S. Dist. LEXIS 61841, *12

send Winfield to New Horizons in order to subject him to discrimination because of his gender. Thus, the absence in the amended complaint of any indication that CSU engaged in intentional discrimination also defeats Winfield's claim against CSU. Therefore, we grant CSU's motion to dismiss.

**CONCLUSION**

Based on the foregoing analysis, we grant New Horizons' motion [**13**] to dismiss and we grant CSU's motion to dismiss.

Samuel Der-Yeghiayan

United States District Court Judge

Dated: August 30, 2006

**End of Document**

 Positive
As of: June 17, 2020 5:05 PM Z

# Yaa Asante-Addae v. Sodexo, Inc.

United States District Court for the District of Connecticut

March 31, 2015, Decided; March 31, 2015, Filed

CIVIL ACTION NO. 3:13-CV-00489 (VLB)

**Reporter**
2015 U.S. Dist. LEXIS 41367 *; 2015 WL 1471927

YAA ASANTE-ADDAE, Plaintiff, v. SODEXO, INC., Defendant.

**Subsequent History:** Affirmed by Asante-Addae v. Sodexo, Inc., 2016 U.S. App. LEXIS 1066 (2d Cir. Conn., Jan. 22, 2016)

**Prior History:** Yaa Asante-Addae v. Sodexo, Inc., 2014 U.S. Dist. LEXIS 67364 (D. Conn., May 16, 2014)

**Counsel: [*1]** For Yaa Asante-Addae, Plaintiff: Maria K. Tougas, LEAD ATTORNEY, Scott & Scott LLP - CT, Colchester, CT.

For Sodexo, Inc, Defendant: John Gerard Stretton, LEAD ATTORNEY, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.-CT, Stamford, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

# Opinion

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #60] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #63]**

## I. Introduction

The Plaintiff, Yaa Asante-Addae ("Asante"), brings this action alleging that the Defendant, Sodexo Inc., ("Sodexo"), discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("**ADEA**"), 29 U.S.C. § 621 *et seq.*; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a), *et seq.* Asante also brings claims under Connecticut state law for breach of contract and intentional and negligent infliction of emotional distress. Currently pending before the Court are the parties' motions for summary judgment. For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED, the Plaintiff's Motion for Summary Judgment is DENIED, and Plaintiff's **[*2]** complaint is DISMISSED.

## II. Factual Background

The following facts relevant to the parties' motions for summary judgment are undisputed unless otherwise noted.

Asante is an African-American female who was born in Ghana, Africa, in 1959, and has lived in the United States since 1986. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 1; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 1]. Sodexo is a provider of food services to clients in the corporate, education, government, senior living, and health care sectors. [Dkt. #61 at 1]. Sodexo offers its services primarily "on-site," meaning it assigns its employees to a client account and employees then work at the client's facilities. [*Id.*].

Asante was hired by Sodexo in September 2008 and was placed at Sodexo client AEGON USA, in Cedar Rapids, Iowa.

[Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 7; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 7]. In 2009, while working at AEGON, Asante received a strong performance review, a compensation increase, and multiple performance-based awards. [*Id.*]. In March 2010, after requesting a transfer, Asante was offered and accepted the position of Sodexo General Manager with Sodexo client ECHN Manchester [*3] Memorial Hospital and Rockville Health Network ("ECHN MMH") in Manchester, Connecticut. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 2; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 2]. To obtain this position, Asante interviewed with Elizabeth Butler ("Butler") of ECHN MMH, and Sodexo District Manager Thomas Farrell ("Farrell"). [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 10; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 10]. During this interview, Asante claims, and Sodexo denies, that Butler raised the issue of "cultural differences between [ ] Asante and the employees at [ECHN MMH]." [*Id.* at ¶ 12].[1] No particular culture or cultural difference was identified. *Id.* Asante never reported this comment to anyone at Sodexo, but the record indicates that Farrell was aware of and "paraphras[ed]" Butler's comment to someone other than Asante. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 55; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 55; Dkt. #68-3, Farrell Dep. at 125:25-126:7].

Among Asante's duties as General Manager at ECHN MMH was the implementation of a special dining program, known as "At [*4] Your Request" Dining. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 11; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 11]. Asante and her team successfully implemented this program within seven months of her arrival. [*Id.*].

While serving as General Manager at ECHN MMH, Asante was paid less money than her predecessor, Rick Krolick ("Krolick"). [*Id.* at ¶ 14]. However, Sodexo asserts, and Asante does not dispute, that at the time he was serving as General Manager at ECHN MMH, Krolick had been an employee at Sodexo for many more years than Asante. [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 14]. In addition, Asante's compensation was within the posted salary range for her position. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 61; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 61].

In June 2010, Asante and Farrell, who was her direct supervisor at Sodexo, had lunch together. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 6, 68; Dkt. #66, P's Local Rule

56(a)(2) Statement at ¶¶ 6, 68; Dkt. #68-3, Farrell Dep. at 146:3-6]. During this lunch, Asante alleges and Sodexo denies that Farrell told Asante a story about a "Jamaican woman" who worked at one of Sodexo's other client sites and whom the client wanted "removed." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 15; Dkt. #63-4, Asante Aff. at ¶ 12b; Dkt. #63-19, [*5] Asante Dep. at 110:17-22]. Farrell then allegedly told Asante that he advised the client that if they wanted to avoid a lawsuit, they should let Farrell "handle it." [*Id.*].[2] Asante does not assert the basis upon which a lawsuit might have been brought in that instance. *Id.* At that same lunch, Farrell told Asante about a documentary he had watched that involved a couple living in Alaska who tamed bears and were ultimately attacked and killed by the bears. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 16; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 16]. Asante claims, and Sodexo denies, that Farrell said the couple "worked really hard, but at the end of the man's hard work, the bears killed the man." [*Id.*]. Farrell also purportedly said that his wife, with whom he was watching the documentary, asked Farrell, "why would the bears let the man do all that hard work before they killed him instead of killing him before all the hard work was done." [*Id.*]. These two stories convinced Asante that Sodexo was going to try to "get rid of her" when she finished implementing the "At Your Request" program. [*Id.* at ¶ 17].

In or around July 2010, Farrell allegedly informed Asante that ECHN MMH "was shifting responsibilities around," and that Butler was going to become more involved in food service operations. [Dkt. #63-23, Farrell Dep. at 179:23; Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 19]. Farrell also allegedly stated that Asante's title of General Manager was going to be given to Butler. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #63-4, Asante Aff. at ¶ 12e; Dkt. #63-19, Asante Dep. at 117:17-118:09]. Right around this time, Asante claims that Farrell told her that he had "been in the business for [thirty] years and dirty politics can turn a hero into a zero in one day." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 18; Dkt. #63-4, Asante Aff. at ¶¶ 12d., 14; Dkt. #63-19, Asante Dep. at 104:17-105:1]. According to Asante, this was the first time Farrell commented on "dirty politics," but thereafter, he used this phrase "often." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 18]. Between this statement [*7] and Farrell's earlier statements about Butler's assumption of

---

[1] According to Asante, Butler said that she "would have to train the ECHN management about different cultures so that they can accommodate somebody like you." [Dkt. #63-4, Asante Aff. at ¶ 12a.].

---

[2] Asante further claims that, at the time she heard this story, she believed Farrell was referring to her instead [*6] of an actual person, because a lot of people in America think she is Jamaican. *See* [Dkt. #63-4, Asante Aff. at ¶ 13]. She does not allege that Ferrell, her immediate supervisor, thought she was Jamaican. *Id.*

some of Asante's responsibilities, and possibly even her title, Asante "realized something was up and that [her] job was [ ] at risk." [Dkt. #63-4, Asante Aff. at ¶ 14]. However, Butler ultimately did not take over Asante's job title. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 20; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 20].

In November 2010, after Asante requested a transfer from the ECHN MMH facility, Sodexo assigned her to a different ECHN facility, ECHN Woodlake. [*Id.* at ¶¶ 20, 22]. Asante was replaced at ECHN MMH by an interim General Manager, who was a white female between the age of 50 and 60, and later, by a permanent General Manager, who according to Plaintiff was a white male who was "younger," and who according to Defendant was a man in his 50s. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 20; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 20; Dkt. #68-5, Butler Dep. at 80:2-81:2].

Sodexo and ECHN Woodlake were parties to a "Management Agreement." [Dkt. #65-2]. Among other rights and obligations, the Management Agreement gave Sodexo "the exclusive right to manage and operate services for [ECHN Woodlake's] residents, employees, visitors, and guests." [*Id.* at ¶ [*8] 1.1]. Sodexo also agreed to provide the facility with two employees, a General Manager and a Clinical Nutrition Manager. [*Id.* at 10]. At the time of her transfer, Asante was to serve as the temporary General Manager, and her fellow Sodexo employee, Katie Lester ("Lester"), was working there as a Clinical Dietitian. [Dkt. #62-7, Lester Aff. at ¶ 4].

Asante asserts, and Sodexo denies, that Farrell and Karen Dutton ("Dutton"), a human resources senior manager at Sodexo, did not follow Sodexo's job posting protocols and procedures when Asante was transferred. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 22]. Asante further contends that her new position at ECHN Woodlake constituted a demotion to "a troubled account" whose contract "was in jeopardy"; that both Dutton and Farrell knew this at the time they assigned her to ECHN Woodlake, as they were aware of a January 2010 report which concluded that Sodexo owed ECHN Woodlake $350,000; and that they did not inform Asante of this prior to her transfer. [*Id.* at ¶¶ 22—24].

Asante began working at ECHN Woodlake as the temporary General Manager in December 2010. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 4; Dkt. #62-2, Asante Dep. at 151:2—6]. In this role, Asante was responsible [*9] for overseeing ECHN Woodlake's food and nutrition services department. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 5; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 5]. The following month, on January 1, 2011, Asante received a letter informing her that she was to receive a 3% raise that would

bring her base salary to $65,919.36, and that her overall job performance was rated as "Meets Expectations."[3] [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 25; Dkt. #63-15 at 2].

In September 2011, Asante became the permanent General Manager at ECHN Woodlake. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 27; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 27]. Upon accepting this position, Asante signed an offer letter stating that she would be receiving a significant pay raise of $6,000, bringing her annualized compensation to $71,919.36. [Dkt. #62-10]. The letter also stated that

> Sodexo does not offer employment on a fixed term basis, and the [*10] terms of this letter should not be construed in any manner as a proposed contract for any such term. Both you and Sodexo may terminate employment at any time, for any reason, and with or without cause.

[*Id.* at 2; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 10; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 10]. Above the signature line on Asante's offer letter was the statement, "I have read, understand and agree to the terms and conditions of the foregoing document. I understand that this is not an employment contract and that I am an employee at will." [Dkt. #62-10 at 3; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 11; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 11].

Each of the offer letters Asante signed with Sodexo, in 2008, 2010, and 2011, contained the quoted language above. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 10—11; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 10—11]. In addition, the March 2009 Sodexo Employee Handbook, which Asante acknowledged receiving, stated that the employment relationship between Sodexo and Asante was "terminable at time[,] by either you or us, with or without cause and with or without notice. The Handbook is not a contract of employment." [*Id.* at ¶ 12].

For approximately her first six months at ECHN Woodlake, from December 2010 through [*11] July 2011, Asante did not have any issues with her ECHN Woodlake employees. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 26; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 26]. Thereafter, Asante claims that ECHN Woodlake employees harassed her in two ways. First, several employees began to make a series

---

[3] Asante received two performance reviews from Sodexo in 2010, one from Randall McKinnis, who gave her a "meets expectations" review, and one from Farrell, who gave her a "above expectations" review. [Dkt. #68-2, Asante Dep. at 175:25-176:11]. The January 2011 compensation letter did not reference Farrell's more favorable review.

of animal sounds in succession, which included monkey, cow, rhinoceros, and elephant sounds. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 31—32; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 31-32]. When making the animal sounds, the employees would say, for example, "how does the cow cry? Moo, moo . . . How does the elephant cry? Bo, bo, bo." [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 32; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 32]. Asante does not allege that anyone made reference to her while making, or in reference to making, these sounds, or while naming the animals they signified. *Id.* However, Asante believed that the cow, elephant, and rhinoceros noises were intended to make fun of her weight, and the monkey noise was intended to make fun of her race and national origin. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 36].

The ECHN Woodlake employees also mimicked a popular Planet Fitness commercial, which [**12**] consisted of a very muscular and vapid Caucasian man with an Austrian accent, similar to Arnold Schwarzenegger's, who in response to anything said to or asked of him would intone the phrase, "I lift things up and put them down." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 28; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 30; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 30]. Asante felt that the employees were "using her accent to imitate the Planet Fitness commercial" and were teasing her because she was of a different race, from a different country and spoke with a distinct accent. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 41]. Asante does not allege that anyone made reference to her in relation to the commercial. In fact, the ECHN Woodlake employees made both the animal sounds and the Planet Fitness commercial imitations while they were on break, or when they were coming back from break or lunch, and Asante was in her office when she overheard them. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 33—34, 42—43; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 33—34, 42—43]. A divider partially separated Asante's office from the room in which the employees were making these sounds and imitations. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 42; Dkt. [**13**] #66, P's Local Rule 56(a)(2) Statement at ¶ 42].

None of the individuals who made these sounds or imitations were Sodexo employees, nor is there any evidence that Asante ever reported them to Farrell, Dutton, or any other Sodexo employee. [*Id.* at ¶¶ 37—38].[4] Asante did, however, report

some of these incidents to Diane Morey ("Morey"), ECHN's HR Personnel director. [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 29; Dkt. #62-20, P's Resps. & Objections to D's Interrog. No. 20, at 15—16; Dkt. #62-2, Asante Dep. at 192:22—193:4, 196:1—4, 203:8—14, 208:24—209:2].[5] The record also indicates that at the same time ECHN Woodlake employees were allegedly harassing Asante, they complained to Morey about Asante's management style, in particular Asante's requests that they not listen to music at certain times and that they not speak while preparing food plates. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 27—28; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 27—28; Dkt. #62-2, Asante Dep. at 204:5—206:14].

On November 9, 2011, Asante met with Morey and Belanger, who told Asante that she was making ECHN Woodlake employees feel insecure. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 29; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 29]. Asante also claims, and Sodexo denies, that at this meeting Asante again reported that ECHN Woodlake employees were teasing and making fun of her. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 29]. A few days later, Farrell gave Asante a letter, dated November 10, 2011, informing her that she was being removed from her position as General Manager at ECHN Woodlake, effective November 14, 2011. [Dkt. #62-14]. The letter stated that "Sodexo's contract at Woodlake will be ending by year end. During the course of this transition the client has requested your removal for not meeting her expectations." [*Id.* at 2]. The letter also stated that Asante would "remain a Sodexo employee through December 30, 2011" and that she may "actively post to other Sodexo positions" for which she was qualified. [*Id.*]. On the other hand, the letter referenced Asante's "termination" at multiple points and informed her that "any benefits" for which she was enrolled "will cease on the date of [he]r termination." [*Id. [**15**]* ].[6] When Farrell met with Asante to give her the letter, he told her that Belanger was the one who had requested her removal for failing to meet expectations. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 36]. According to Asante, Farrell also asked for the password to her computer, and following her departure from the facility that day, her remaining personal items were

---

[4] Asante contends that she "might" have told Farrell about the animal sounds, but was "not sure." [Dkt. #65-3, Asante Dep., at 208:10—23].

[5] Asante also maintains that she reported them to ECHN Woodlake Administrator, Ellen Belanger ("Belanger"). [Dkt. #63-2, [**14**] P's Local Rule 56(a)(1) Statement at ¶ 29].

[6] The substance of this letter was written by Dutton in a November 10, 2011 email. This email included the statement that "the client requested her removal for not meeting *his* expectations." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 31; Dkt. #68, D's Local Rule 56(a)(1) Statement at ¶ 31; Dkt. #63-5 at 2 (emphasis added)].

discarded. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 47—48]. Asante claims that she understood from "Farrell's tone" that she "was required to leave [the building] immediately." [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 48]. However, she does not assert that she was told that she could not retrieve her personal belongings before departing.

The ECHN Woodlake—Sodexo contract was terminated on December 15, 2011. [Dkt. #63-18 at 1].[7] As a result, Asante's colleague at ECHN Woodlake, Lester, lost her position and, like Asante, had to look [*16] for alternative positions within Sodexo. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 21; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 21]. Asante claims that she was treated differently than Lester, as Lester received assistance from Sodexo in obtaining a new placement. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 21]. By contrast, Asante was unable to secure another position within Sodexo by December 30, 2011, and she was officially terminated the following day, on December 31, 2011. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 49; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 49].

Following her termination, on April 23, 2012, Asante filed a discrimination [*17] charge with both the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50]. On March 11, 2013, she filed her initial complaint in this matter. [*Id.*]. The original complaint named both Sodexo and ECHN as defendants. *See* [Dkt. # 1, Compl. at 4—7]. However, on August 20, 2013, Asante dismissed the complaint as to ECHN, *see* [Dkt. #29], and on December 18, 2013, she filed an amended complaint. *See* [Dkt. #40]. On May 1, 2014, the parties submitted cross-motions for summary judgment. *See* [Dkts. # 60, 63].

III. <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611

---

[7] Asante contends that the contract "was terminated on November 15, 2011," but she does not cite to any evidence to support her claim. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 34]. This alone precludes consideration of her assertion. *See* Local Rule 56(a)(3). In addition, it appears Asante derived this incorrect date from the November 15, 2011 letter Belanger sent to Sodexo Division Vice President, John Hutsell. [Dkt. #63-18]. While the letter is dated November 15, 2011, it clearly states that its purpose was to provide Sodexo with a "30 day written notice of termination," which was to take effect "as of December 15, 2011." [*Id.*].

F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a [*18] jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315—16 (2d Cir. 2006) (internal quotation marks and citation omitted). In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury. *Hayes v. New York City Dep't of Corr.*, 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch—Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

IV. <u>Analysis</u>

a. <u>Sodexo is Entitled to Summary Judgment [*19] on Asante's Title VII Discrimination Claims</u>

Asante alleges that Sodexo unlawfully discriminated against her on the basis of her age, gender, race, and national origin, and in so doing, violated Title VII. Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are analyzed under the burden-shifting rules of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802—04, 93 S. Ct. 1817, 36 L. Ed. 2d 668,

(1973). *See, e.g., Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012). Under the *McDonnell Douglas* framework, a plaintiff must set out a *prima facie* case of discrimination by demonstrating that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *U.S. v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Once the plaintiff has met its initial burden of setting out a prima facie discrimination case, he "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the **[*20]** plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 73 (2d Cir 2014) (citation and internal quotation omitted).

1. Asante Advances One Timely Material Adverse Employment Action

In order to rise to the level of an adverse employment action under federal discrimination laws, the employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Materially adverse employment actions also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or materially adverse employment action. *See Ellerth*, 524 U.S. at 761.

Asante offers one timely adverse employment action upon which to base her *prima facie* case: Sodexo's decision not to reassign **[*21]** and to instead terminate her after she was removed from her position as General Manager at ECHN Woodlake. *See Brown v. Connecticut*, No. 3:08-cv-1478 (MRK), 2010 U.S. Dist. LEXIS 52871, 2010 WL 2220580, at *6 (D. Conn. May 27, 2010) (rejecting defendant's argument that its "failure to retain [the plaintiff] in some capacity" did not constitute an adverse employment action); *Khan v. Hilton Worldwide, Inc.*, No. 14 Civ. 1011 (ALC), 2015 U.S. Dist. LEXIS 20638, 2015 WL 738108, at *4 (S.D.N.Y. Feb. 20, 2015) ("It is clear that an employer's failure to rehire an employee qualifies as an adverse employment action under

Title VII.").

The other adverse employment actions Asante raises are either time-barred, legally insufficient, or both. For example, Asante claims she suffered an adverse employment action when she was transferred to a "troubled account" whose "contract was in jeopardy." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 23]. An assignment to a troubled account may rise to the level of an adverse employment action to the extent that it is "materially less conducive to career advancement." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). Given Sodexo's requirement that, following the termination of a contract with a client, the employees stationed at the client must apply for reassignment within Sodexo or suffer termination, a transfer to an account that Sodexo employees reasonably anticipated would end in the foreseeable future would likely constitute **[*22]** an adverse employment action.

However, Asante's transfer to ECHN Woodlake is not an actionable adverse employment action for at least two reasons. First, Asante may not rely upon the transfer to support her discrimination claim because it occurred more than 300 days before she filed her EEOC complaint. *Morgan v. Nat'l R.R. Passenger Corp.*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred . . . . Because each discrete discriminatory act starts a new clock for filing charges alleging that act, the charge must be filed within the 180— or 300—day time period after the discrete discriminatory act occurred."). *See also* [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50]. Second, and more importantly, Asante does not offer evidence that Farrell or Dutton were aware that ECHN Woodlake intended to terminate its contract with Sodexo in December 2010, when Asante began working there. At most, Farrell's deposition testimony, on which Asante relies, establishes that before she was transferred, Farrell (i) prepared an internal ethics report in January 2010 stating that Sodexo improperly retained $350,000 under its contract with ECHN Woodlake and (ii) directly informed the president of Sodexo's Health Care Division **[*23]** of this. *See* [Dkt. #63-23, Farrell Dep. at 106:21—108:25]. Farrell also testified that, at some point, he "informed the customer of the irregularity." [*Id.* at 109:8—9]. Thus, it is unclear when ECHN Woodlake became aware of the issue (*i.e.* whether it was before, after, or around the time of Asante's transfer), and neither Farrell's testimony nor any other evidence in the record establishes a link between this payment discrepancy (first raised in early 2010) and ECHN Woodlake's decision to cancel the parties' agreement in November 2011. In fact, Belanger, the ECHN Woodlake employee who made the decision to terminate the contract with Sodexo, testified that

the decision was not because Sodexo had not "done right by me . . . . It just wasn't something the building could afford anymore. That was all it was." [Dkt. #68-4, Belanger Dep. at 145:3—5].

Asante raises two other potential adverse employment actions, each of which is legally insufficient. First, Asante's alleged demotion when she was transferred to ECHN Woodlake from a GM-4 to a GM-3 is not a legally cognizable adverse employment action because, at most, it constituted a "demotion without change in pay, duties, or prestige." *Ellerth*, 524 U.S. at 761. Asante **[*24]** offers no facts establishing that this change in management level materially and adversely changed the terms and conditions of her employment. In fact, the record indicates that she was paid *more* when she was a GM-3 at ECHN Woodlake than when she was a GM-4 at ECHN MMH. *See* [Dkt. #63-15 at 2; Dkt. #62-10].

Similarly, Asante's disparate pay claim fails because she does not offer evidence showing that she and her predecessor, Krolick, were "similarly situated in all material respects." *Humphries v. City Univ. of New York*, No. 13 Civ. 2641, 2013 U.S. Dist. LEXIS 169086, 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2001)). Asante offers only the facts that she "held the same position with the same title" as Krolick. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 59; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 59]. This is plainly insufficient to establish a disparate pay claim. *See Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 312 (E.D.N.Y. 2014) (finding plaintiff failed to establish a *prima facie* case of discrimination when he asserted "only that the two comparators shared the same job title as him, but offer[ed] no additional evidence that they were similarly situated in terms of performance, evaluation or discipline standards, or that they engaged in comparable conduct."). Moreover, Sodexo asserts, and Asante does not dispute, that at the time Asante was hired as General Manager at ECHN MMH, Krolick had *over* **[*25]** *twenty more years* of seniority at Sodexo. [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 14]; *see Trotman v. CBS Radio Inc.*, No. 06 Civ. 3389 (FM), 2007 U.S. Dist. LEXIS 73641, 2007 WL 2827803, at *9 (S.D.N.Y. Sept. 27, 2007) ("Among the factors to be considered in determining whether employees are similarly situated are their specific duties, education, *seniority*, and performance history") (citations and quotations omitted) (emphasis added); *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234 (BMC), 2014 U.S. Dist. LEXIS 155565, 2014 WL 5587349, at *27 (E.D.N.Y. Nov. 3, 2014) (concluding that two workers were "not similarly situated in all respects because the parties agree that [the allegedly comparable worker] had *ten years* more seniority than [the plaintiff]") (emphasis in original). Based on the totality of

these facts, Asante and her comparator are not similarly situated.

**2. Asante Fails To Establish Circumstances Permitting For an Inference of Discrimination**

**i. The remarks, sounds, and imitations made by ECHN employees are insufficient to raise an inference of discriminatory intent.**

Asante principally relies on two sets of comments and remarks to support her discrimination claims: (i) comments made by Sodexo employees, or about which Sodexo employees had knowledge[8] and (ii) comments made by employees of ECHN and with no evidence that anyone at Sodexo was aware of them.

The first set of comments includes the statement by Butler during Asante's March 2010 interview that Butler "would have to train the ECHN management **[*27]** about different cultures so that they can accommodate somebody like [Asante]"; the stories Farrell told Asante at a lunch in June 2010 about the "Jamaican woman" and the bear documentary; Farrell's use of the phrase "dirty politics can turn a hero into a zero in one day"; and Farrell's statement to Asante that Butler would be taking Asante's job title and some of her job responsibilities. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶¶ 15—19].

As an initial matter, Sodexo, relying on *Morgan v. Nat'l R.R. Passenger Corp.*, argues that each of these statements is time-barred and should be disregarded in evaluating [Asante's] claims." [Dkt. #61 at 23]. Sodexo is correct that these

---

[8] As Sodexo acknowledges in **[*26]** the hostile work environment context [Dkt. #61 at 29—30], an employer may be liable for a non-employee's bad conduct when the employer "knew of the non-employee conduct, did nothing about it and the employer exerted control or had other legal responsibility over the non-employee." *Lewis v. Univ. of Conn. Health Ctr., Corr. Managed Health Care*, No. 3:11cv821 (VLB), 2011 U.S. Dist. LEXIS 126913, 2011 WL 5245423, at *4 (D. Conn. Nov. 2, 2011). The same is true with regard to discriminatory conduct in violation of Title VII. *See Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 386—87 (S.D.N.Y. 2012) (considering "[c]laims of employment discrimination under the NYSHRL and NYCHRL [which are analyzed under the same *McDonnell Douglas* [framework] applied to Title VII" and stating that "an employer may be found liable for the conduct of nonemployees in certain instances . . . . According to the EEOC Guidelines, an employer may be held responsible for the acts of non-employees with respect to discrimination in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and corrective action.") (citations and quotations omitted).

allegations occurred prior to June 28, 2011—300 days before Asante filed her EEOC claim. *See* [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50]. In response, Asante raises the continuing violations exception to support consideration of these untimely statements. *See* [Dkt. #65 at 12—13]. The continuing violations exception "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the **[*28]** statute of limitations." *Annis v. Cnty. of Westchester*, 136 F.3d 239, 246 (2d Cir. 1998). However, "[i]t is well-established that the 'continuing violation' doctrine cannot save untimely claims for discrete discriminatory acts, even where those acts are related to acts within the limitations period." *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234 (BMC), 2014 U.S. Dist. LEXIS 155565, 2014 WL 5587349, at *4 (E.D.N.Y. Nov. 3, 2014). The untimely remarks Asante seeks to rely on here bear no obvious relation to one another, and they therefore constitute discrete acts, rendering the exception inapplicable.

This does not, however, end the inquiry. While Sodexo is correct that these statements are time-barred, its conclusion that the Court must disregard them is not. The *Morgan* Court expressly held that an employee is not barred "from using prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Accordingly, the Court will consider the untimely acts Asante raises to the extent they provide background evidence in support of her timely claim of wrongful termination. *See, e.g., Brown v. AstraZeneca Pharms., L.P.*, No. CV-03-6166 (DGT), 2006 U.S. Dist. LEXIS 57377, 2006 WL 2376380, at *6 (E.D.N.Y. Aug. 16, 2006) (stating that plaintiff was "entitled to use untimely facts as background evidence in support [of] his timely Title VII claim").[9]

The first in time (and most serious) comment Asante raises is Butler's March 2010 statement.[10] Citing to her affidavit, Asante states:

_____

[9] In addition, the *Morgan* Court made clear "that the time bar does not apply to hostile workplace claims." *Robles v. Argonaut Rest. & Diner*, No. 05 CV 5553 (JSR), 2009 U.S. Dist. LEXIS 96949, 2009 WL 3320858, at *9 n. 8 (S.D.N.Y. Oct. 9, 2009) (citing **[*29]** and quoting *Morgan*). Accordingly, in assessing Asante's hostile work environment claim, the Court considers all of the otherwise time-barred comments and Asante's transfer to ECHN Woodlake.

[10] Asante contends, **[*31]** and offers evidence to support her claim, that Farrell was aware of Butler's comment. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 13; Dkt. #63-23, Farrell Dep. at 126:1—24].

During my initial one-on-one meeting with Elizabeth (Liz) Butler she told me that she 'would have to train the ECHN management about different cultures so that they can accommodate somebody like you" (referring to me) . . . Ms. Butler's statement . . . about my different 'culture' was discriminatory to me because I had just arrived at my new position, had not been given a chance to prove myself, and I felt I was already starting off on the wrong foot because of my African culture.

[Dkt. #63-4, Asante Aff. at ¶¶ 12-13]. Asante may well have viewed Butler's statement as discriminatory, and Butler's reference to "different cultures" *could* have concerned any or all of the protected classes to which Asante belongs, but without more, the statement is ambiguous. As Asante acknowledged, she had just left a Sodexo job site at AEGON USA Realty, which was located in Cedar Rapids, **[*30]** Iowa, and was interviewing for a position at a health services company in Manchester, Connecticut. Given the significant differences between the two positions in terms of both geography and industry, it is plausible that a reference to "different cultures" could have concerned these non-discriminatory differences. *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 316—17 (E.D.N.Y. 2012) (declining to find discriminatory animus based on national origin where the defendant had not "said anything about plaintiff's national origin," and where the allegedly discriminatory phrase lacked any obvious connection to the plaintiff's national origin); *see also Agrawal v. Monemagno*, 574 F. App'x 570, 576 (6th Cir. 2014) (affirming district court's conclusion that a "remark alluding to a 'cultural divide'" was insufficient to serve as evidence of national origin or race discrimination because "this statement could be interpreted several ways"); *Espinoza v. Dep't of Corr.*, 509 F. App'x 724, 734 (10th Cir. 2013) (finding defendant's "acknowledg[ment] that cultural differences existed" insufficient to establish discriminatory intent where the plaintiff "did not present evidence on what [the defendant] meant by this statement, develop a factual record to demonstrate what the differences were, or explain how this comment established a basis for his belief of discrimination in this instance").

In addition, while Asante's subjective belief that this statement was discriminatory is relevant, "[a] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) (internal quotations and citation omitted). Instead, her belief "must be reasonable and characterized by objective good faith." *Johnson v. City Univ. of N.Y.*, No. 14-CV-587 (VEC), 48 F. Supp. 3d 572, 2014 U.S. Dist. LEXIS 125027, 2014 WL 4412475, at *4 (S.D.N.Y. Sept. 8, 2014)

(quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 16 (2d Cir. 2013) (emphasis in original)). Asante simply offers no facts, other than the ambiguous statement itself, to support her subjective belief that the statement was discriminatory and was intended as such.

Like Butler's comment regarding cultural differences, none of Farrell's statements raise an inference of discriminatory intent, as their connection to any of the protected classes to which Asante belongs is "far too attenuated." *Nurse*, 854 F. Supp. 2d at 317. Farrell's story about the bear documentary, and his statements about dirty politics and Butler's alleged assumption of Asante's job title and responsibilities, are all facially neutral **[*32]** and "would require a chain of inferences, for which there is no support in the record, to conclude that the remark[s] reflected [discriminatory] animus." *Hayes v. Cablevision Sys. N.Y. City Corp.*, No. 07-CV-2438 (RRM), 2012 U.S. Dist. LEXIS 45622, 2012 WL 1106850, at *10 (E.D.N.Y. Mar. 31, 2012). Indeed, even the story regarding the "Jamaican woman," which does touch upon national origin, is insufficient, since Asante was not Jamaican. [Dkt. 63-4, Asante Aff. at ¶ 13]. *See, e.g., Ramirez v. United Parcel Serv.*, No. 06-1042, 2010 U.S. Dist. LEXIS 48351, 2010 WL 1994800, at *4 (D.N.J. May 17, 2010) (concluding that evidence of "discrimination against persons of different races or national origin than [p]laintiff will not be admissible" because "[t]here must be a causal nexus between the discriminatory conduct and [p]laintiff's . . . background"). Moreover, reference to the Jamaican heritage of the other employee was not ethnically derogatory. Asante claims that she was nevertheless "intimidated" by the story because she believed Farrell "was referring to [her] instead of an actual person because a lot of people in America think [Asante is] Jamaican," and because she viewed this story, in tandem with Farrell's story about the bear documentary, as "send[ing] [a] message that ECHN wanted to get rid of [her] but that [Farrell] would try to 'handle it.'" [Dkt. 63-4, Asante Aff. at ¶ 13]. However, without any additional facts or context, it would require a series of logical leaps to construe **[*33]** Farrell's statements in the manner Asante apparently has. The only evidence Asante offers to substantiate either of these interpretations fails to provide any support. Asante suggests that Sodexo's statement that it had no responsive documents "relating to, or in any way pertaining to the filing of [a] discrimination charge" by the Jamaican woman who was allegedly the subject of Farrell's story somehow proves Asante's conclusion that such a woman never existed. [Dkt. 63-1 at 15]. This is incorrect on a number of levels. Sodexo responded to this request years after Farrell allegedly told the "Jamaican woman" story, and the response does not concern any evidence available to Asante at the time she reached her entirely unsupported inference. Therefore, Sodexo's response

does not provide any support for the reasonableness of Asante's assumption at that time. Furthermore, the absence of documents relating to the filing of a discrimination charge years earlier in no way shows that Farrell conjured up a person out of thin air, as Asante asserts.

Finally, Butler's and Farrell's remarks are "too remote in time and context to support a reasonable inference" that Sodexo's decision not to reassign **[*34]** and to terminate Asante was the result of any discriminatory intent. *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-cv-554 (VLB), 2013 U.S. Dist. LEXIS 25704, 2013 WL 696424, at *8 (D. Conn. Feb. 26, 2013) (finding that "[i]n the absence of a nexus between time, place and context" of the allegedly discriminatory remark and the ultimate decision to terminate the plaintiff, a comment which could be construed as relating to the plaintiff's age was merely a non-actionable "stray remark"). The latest of these comments, made by Farrell regarding Butler's assumption of Asante's job title and some of her job responsibilities, allegedly occurred in July 2010. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 19]. Sodexo's removal of Asante from her position as General Manager at ECHN Woodlake was effective on November 14, 2011, nearly one-and-a-half years later. [Dkt. #62-14]. This significant gap in time between Farrell's statements and Sodexo's decision not to reassign and to terminate Asante renders them too remote in time to support a rational inference of discriminatory intent. *See Almonord v. Kingsbrook Jewish Med. Ctr.*, No. 04-CV-4071 (NGG), 2007 U.S. Dist. LEXIS 58529, 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (holding that comment made at least five months before plaintiff's termination was "not sufficient to create an inference of discrimination"); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by . **[*35]** . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.").

Asante's second set of comments and remarks, those made by ECHN Woodlake employees regarding a Planet Fitness commercial and animal noises within earshot of Asante, similarly fail to raise an inference of discriminatory intent.[11]

---

[11] Sodexo contends that these statements are legally insufficient because "there is no link between these incidents and either Farrell or Dutton, the decision-makers" at Sodexo. [Dkt. #61 at 22]. However, this argument overlooks the possibility of liability under a "cat's paw" theory of employment discrimination. *See Hasemann*, 2013 U.S. Dist. LEXIS 25704, 2013 WL 696424, at **10—11 (citing and discussing *Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011)). In a "cat's paw" case, a plaintiff typically seeks to hold her employer liable for the animus of a supervisor who

Asante asserts that following her first six months at ECHN Woodlake, the employees she managed began to make animal sounds, including those of a monkey, cow, rhinoceros and elephant, and they mimicked a popular Planet Fitness commercial, which consisted of a Caucasian male with an Austrian accent, like Arnold Schwarzenegger's, repeatedly saying, "I lift things up and put them down." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28]. Asante believed that some of these noises were intended to make fun of her weight, while the monkey noise concerned her race and national origin. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 36]. As an initial matter, while certainly unpleasant, comments or remarks regarding a person's weight are not actionable under Title VII. *See Bill v. City of North Lauderdale*, No. 12-61342-CIV, 2013 U.S. Dist. LEXIS 42464, 2013 WL 1289165, at *2 (S.D. Fla. Mar. 26, 2013) ("Obese individuals are not a protected class under Title VII.") (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 n. 19 (5th Cir. 1993) and *Taylor v. Small*, 350 F.3d 1286, 1292, 358 U.S. App. D.C. 439 (D.C. Cir. 2003)). Monkey noises directed at or about Asante, in light of her race and national origin, would be sufficient to support a *prima facie* case of discrimination. *See Jackson v. Health Res. of Rockville, Inc.*, 357 F. Supp. 2d 507, 515 (D. Conn. 2005). However, the context in which they were made here thoroughly undermines any inference of discriminatory intent, as Asante cites no facts **[*38]** to support her suspicion

_____

lacked decision-making authority by showing that the supervisor performed an act motivated by discriminatory animus that was intended by the supervisor to cause an adverse employment action, and the act was a proximate cause of the ultimate employment action. *Id.* at *10. Here, Asante claims that she reported the animal sounds and commercial imitations to ECHN **[*36]** Administrator Belanger on several occasions. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 29; Dkt. #63-4, Asante Aff. at ¶ 20]. Belanger was the ECHN Woodlake employee who requested Asante's removal from ECHN Woodlake for not meeting her expectations. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(1) Statement at ¶ 36]. If Asante were to prove that Belanger was aware of discriminatory conduct and did nothing about it, she may be able to establish that Belanger acted with discriminatory animus when she requested her removal. *See, e.g., Malcom v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 105—06 (W.D.N.Y. 2010) (finding plaintiff stated a Title VII discrimination claim where she alleged that "she made defendants aware of alleged discriminatory conduct" by third-party school district and the defendants subsequently provided her with fewer resources and less support than they did or would have done for non-minority members). To the extent that Belanger removed Asante with discriminatory animus and, based on this removal, Sodexo decided not to reassign and to terminate Asante, Sodexo would be liable. However, given Asante's failure to put forth sufficient evidence of discriminatory intent as to *either* the ECHN Woodlake employees or Belanger, no such liability attaches here. **[*37]**

that these comments were directed toward her. In the same vein, and for the same reasons, Asante's complaint about the Planet Fitness commercial imitations fails to raise such an inference.

As Asante acknowledges, neither the commercial imitations nor the animal sounds were ever made in her presence. *See Whethers*, 956 F. Supp. 2d at 380 (declining to infer racial animus "where the statement was not made to the plaintiff, but to her supervisor"). Instead, the ECHN Woodlake employees made these noises while they were on or returning from break and when Asante was in her office, which was partially partitioned off by a divider. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 33-34; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 33-34].

Moreover, the noises and words the employees used provide no indication that they concerned Asante, let alone a suggestion that they targeted any of the protected classes to which Asante belonged. *See Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459, 463 (S.D.N.Y. 1998) (discussing two Second Circuit decisions, *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir. 1994), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), and *Renz v. Grey Advertising, Inc.*, 135 F.3d 217 (2d Cir. 1997), which upheld grants of summary judgment where discriminatory comments were made, but in one case "the remarks were not made to the plaintiffs" and in the other there was "no evidence of remarks directed at the plaintiff **[*39]** or in connection with her discharge"); *Velez v. McHugh*, No. 09 Civ. 0925 (GAY), 2011 U.S. Dist. LEXIS 20710, 2011 WL 778693, at *5 (S.D.N.Y. Mar. 2, 2011) (finding that there was "an insufficient nexus between" a panel member's occasional racially offensive comments to a different person "and the adverse action [p]laintiff complains of" where the "comments were not made to [p]laintiff, were not in reference to [p]laintiff, and did not relate to the [adverse employment action]"). As Sodexo points out, the animal noises were all made at the same time, and Asante admitted that only the monkey noise could possibly have concerned any protected class. [Dkt. #62-2, Asante Dep. at 202:16-203:6]. Similarly, the accent the employees were mimicking was an Austrian accent modeled off of Arnold Schwarzenegger, a Caucasian male, and the phrase "I lift things up and put them down" is facially neutral and does not appear to have any relationship to Asante. The fact that both Asante and the character in the commercial both have *an* accent is not sufficient. Without more, Asante's inference that the employees were "using *her* accent to imitate the Planet Fitness commercial" is baseless. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 41 (emphasis added)].

Asante offers little evidence, direct or indirect, beyond her

own subjective belief and unsubstantiated inferences, [*40] that these noises and imitations were made to or about her, and no evidence that they concerned one or more of the protected classes to which Asante belonged, or that there was any nexus between these noises and the adverse employment action she suffered. Most telling is Asante's deposition testimony, in which she explained how she came to the conclusion that the imitations and noises were directed at her:

> Q: Why do you think [the imitations and noises were] directed at you versus just joking around?
> A: I called them. I called one of them one day.
> Q: Who?
> A: Saima Dode and I asked her what do you mean by that animal noises and that accent. She couldn't speak for a while because she didn't know what to say. Because they were making the noise . . .
> Q: [Y]ou said that you called Saima Dode over and you asked her what do you mean by those noises?
> A: Animals. And then she couldn't say anything. And then I said you have to answer me, otherwise I'm taking discipline action. Then she look[ed] at me and said oh, we were just trying to be silly. And I asked her, silly about what? Silly about what? She couldn't talk. Then she started shivering. But it was time for lunch and she needed to go prepare the lunch.

[Dkt. #62-2, [*41] Asante Dep. at 192:18-25, 193:11-21]. At most, the employee's silence and shivering allows for the inference that these noises and imitations were made to disparage Asante in some way.[12] However, nowhere in her description does Asante offer any evidence that they concerned her protected status. *See Hoey v. Potter*, No. 3:03-cv-00713 (AWT), 2005 U.S. Dist. LEXIS 4952, 2005 WL 734495, at **3—4 (D. Conn. 2005) (holding that "lewd and obscene gestures and disparaging comments" failed to "support a reasonable inference" that they were due to the plaintiff's disability where one statement *could* have concerned plaintiff's disability but this conclusion was "based solely upon the plaintiff's speculation" and the plaintiff failed to "link the other alleged incidents of harassment to her disability").[13] This absence of evidence is particularly striking

in light of the evidence that, at the same time these employees were making animal noises and imitations, they were lodging complaints with ECHN Human Resources Director Morey regarding Asante's management decisions. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 27-28; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 27-28]. This further suggests that, to the extent these noises and imitations were directed at Asante, their intent was to express frustration [*42] with Asante's management style; not to discriminate against or otherwise target her protected status.

In summary, Asante's evidence—consisting of racially and ethnically neutral stray remarks, most of which were made by subordinates, some of which were made long before her termination, and all but one of which were not objectively directed at her——is insufficient to support a rational inference that race or national origin discriminatory animus was a determinative factor in Sodexo's decision to remove Asante from her assignment, not reassign her to another client, or terminate her employment. *See, e.g., Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134 (2d. Cir. 2010); *Coudert v. Janney Montgomery Scott, LLC*, 171 Fed. App'x 881 (2d Cir. 2006).

ii. Asante's Evidence of Disparate Treatment [*43] is Also Insufficient to Raise an Inference of Discriminatory Intent.

Finally, Asante fails to raise an inference of discrimination based upon Sodexo's decision to reassign her younger colleague, Lester, because she has failed to put forth evidence showing that Lester was similarly situated or that Lester was treated more favorably than Asante. *See Adams-Martin v. Connecticut Dept. of Dev. Servs.*, No. 3:10-cv-00099 (VLB), 2012 U.S. Dist. LEXIS 34288, 2012 WL 878306, at **12—13 (D. Conn. Mar. 14, 2012). As Sodexo notes, Lester held a different, non-managerial position with different job responsibilities and was managed by Asante. *See* [Dkt. #61 at 38]. Other than the fact that Lester was also employed by Sodexo and was working at the same client site, Asante offers no evidence that she and Lester were similarly situated. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 19, 21]. This is plainly insufficient. *See, e.g., Leveen v. Stratford Hous. Auth.*, 629 F. Supp. 228, 233 (D. Conn. 1986). Asante also offers no evidence that Lester received any assistance with her internal job search. At most, the portions of her deposition to which Asante cites indicate that Farrell allegedly told Lester he would help her. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 21; Dkt. #65-3, Asante Dep. at 35:6-37:23, 212:20—214:2]. However, Asante puts forth no evidence that anyone, including Farrell, [*44] did anything to aid Lester in obtaining another job within Sodexo beyond providing Lester

---

[12] But even this inference is tenuous, as it is equally plausible that an employee who is being reprimanded by her manager for unprofessional conduct might well react in a similarly quiet and nervous manner.

[13] In addition, Asante fails to offer evidence of any connection between these animal noises and imitations, and Butler's and Farrell's earlier, untimely, comments. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77-78 (2d Cir. 2010) (finding that offensive comments plaintiff heard in a different department of her office a year apart were not sufficiently related to apply the continuing violation

---

doctrine).

with the same resources given to Asante.[14]

Consideration of untimely alleged acts of disparate treatment, namely, Asante's receipt of less pay than Krolick, her predecessor at ECHN MMH, and Asante's allegedly improper transfer to ECHN Woodlake, does not change this conclusion. As noted above, Asante fails to put forth any evidence that she and Krolick were similarly situated, or that the ethics complaint Farrell filed with regard to Sodexo's contract with ECHN Woodlake had anything to do with the termination [*45] of the contract, let alone that Farrell or Dutton knew that it did at the time they transferred her.

### 3. Asante Fails to Rebut Sodexo's Legitimate Non-discriminatory Explanations

Even if Asante had cleared the *de minimis* hurdle of setting forth a *prima facie* case of discrimination under Title VII, she does not come close to establishing that the legitimate non-discriminatory reasons Sodexo has proffered in response are pretextual.

"An employer's reason [for terminating an employee] cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Donovan v. Yale Univ.*, No. 3:12-cv-00549 (VLB), 2014 U.S. Dist. LEXIS 23005, 2014 WL 701511, at *10 (D. Conn. Feb. 24, 2014) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). For the reasons discussed above, neither the timely evidence offered by Asante in the form of the animal sounds, Planet Fitness commercial, and Lester's reassignment, nor the untimely evidence consisting of Butler's and Farrell's comments, Asante's transfer to ECHN Woodlake, and her eventual male replacement at ECHN MMH, demonstrate that discrimination was the real reason for Asante's termination. Moreover, Sodexo proffered three legitimate non-discriminatory reasons for its decision not [*46] to reassign and to terminate Asante: (i) ECHN Woodlake cancelled its contract with Sodexo; (ii) Asante was removed by ECHN Woodlake because of her management style; and (iii) Asante failed to find an alternative position within Sodexo prior to December 30, 2011. None of Asante's arguments challenging Sodexo's legitimate non-

discriminatory reasons are successful. *See* [Dkt. #65 at 6-11].

Asante attempts to undercut Sodexo's first reason by arguing that she was removed from ECHN Woodlake prior to the termination of the contract and had understood she was not to return to Sodexo. [*Id.* at 7]. However, this argument is flawed because it overlooks the fact that her employment at Sodexo continued over a month after she left ECHN Woodlake. Rather than immediately terminate her employment upon her removal, the November 2011 letter Asante received plainly stated that Asante would "remain a Sodexo employee through December 30, 2011," and before this time, Asante could "actively post to other Sodexo positions that [she was] qualified for." [Dkt. #63-6 at 1]. However, if by "the end of December 30, 2011 [Asante had] not secured another Sodexo position" she would "be separated from Sodexo for lack of work." [*47] [*Id.*]. In addition, Asante does not offer evidence that on the date she was given this letter, she was told to leave Sodexo for good, with no possibility of reassignment.[15]

Asante next asserts that it is "a material issue of fact in dispute as to whether Ellen Belanger even had the authority to . . . terminate[ ] the contract" between ECHN Woodlake and Sodexo. [Dkt. #65 at 7]. According to Asante, this is relevant because, if Belanger lacked this authority, it "means the Plaintiff could not have been terminated on the basis of Defendant's first stated reason." [*Id.* at 7—8]. This is a red herring, as Asante offers no evidence that anyone at either ECHN Woodlake or, more importantly, Sodexo, had even considered whether Belanger lacked such authority at any time prior to the termination of the contract, or otherwise

---

[14] Similarly off-base is Asante's reliance on "Sodexo's posting policies" to support her claim that Sodexo improperly refused to assist her in securing another position. [Dkt. #65 at 9]. The policy to which Asante cites clearly became "effective June 10, 2013" and superseded earlier policies. [Dkt. #63-10 at 1]. Since Asante was terminated in December 2011, this policy was not in effect at the time and is thus irrelevant. In addition, the only assistance the policy appears to require is that Sodexo managers post available positions and give sufficient notice of these positions and their requirements.

[15] In this regard, Asante offers her deposition testimony, which establishes only that Farrell asked for the password to her computer, ambiguously stated to Asante, "[y]ou got to go," and on some unspecified future date, Asante attempted to retrieve some belongings she left behind and was informed that they had been discarded. [Dkt. #63-5, Asante Dep. at 194:20—25; 214:21—215:23]. Asante also contends in her Rule 56(a)(1) Statement, without support, that "Farrell's tone when he gave [Asante] the Termination Letter indicated that [Asante] was required to leave immediately." [Dkt. #66, P's Rule 56(a)(1) Statement at ¶ 48]. This evidence is not only insufficient to support Asante's claim that she was permanently discharged from Sodexo on or around November 14, 2011, but also fails to establish that Asante was constructively discharged on this date. *See Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily [*48] . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (internal quotations and citations omitted).

questioned whether the contract was validly terminated. A later determination that Belanger lacked authority would have no bearing on Sodexo's state of mind at the time it terminated Asante.

Asante also offers a false dichotomy in arguing that Sodexo "has changed the [second] reason for termination." [*Id.* at 8 (emphasis in original)]. She first points to **[\*49]** language in the November 2011 letter stating that Belanger requested her removal for "not meeting her expectations," and then claims that Sodexo has offered a "new reason . . . issues with [Asante's] management style." [*Id.*]. First, this appears to be an argument of semantics, given that issues with Asante's management style may well have been the basis for Belanger's conclusion that Asante was not meeting expectations. Second, Asante's explanation for Sodexo's alleged need "to modify the original reason for termination" is not well-founded. [*Id.*]. Asante asserts that Belanger "denied that she ever told Farrell that [Asante] did not meet hers, or anyone at ECHN's, expectations," and cites to two questions and answers from Belanger's deposition testimony for support. [*Id.*]. However, this testimony does not support Asante's conclusion. Belanger testified only that she never told Farrell "to terminate Miss Asante for not meeting expectations." [*Id.* at 9 (emphasis added)]. This says nothing about whether Belanger ever told Farrell that Asante was not meeting her expectations, separate from any request that Asante be terminated. Far more significant is that this testimony does nothing to undermine **[\*50]** the position Sodexo has consistently taken throughout this litigation—that Belanger requested that Farrell "remove" Asante from the ECHN Woodlake facility because she failed to meet her expectations. The second colloquy Asante cites not only offers no support for her contention, but actually reinforces the conclusion that both sets of questions concern Sodexo's subsequent termination of Asante.[16] [*Id.*]. Indeed, Belanger plainly testified that *she* "requested" Asante's removal and that she made this request to Sodexo. [Dkt. #62-5, Belanger Dep. at 144:4—145:23]. Belanger also referenced Farrell in connection with her request. See [*id.* at 145:8-11 ("[T]he easiest thing for me to do . . . is to suggest to Tom [Farrell] I think we need to bring somebody else in and let them finish it out.")].[17]

Finally, Asante unsuccessfully attempts to undermine Sodexo's third reason for termination, that Asante failed to find another job within Sodexo by December 30, 2011. [Dkt. #65 at 9]. Asante points to portions of Sodexo's Employee Handbook, which she claims "specifically requires Constructive Counseling process to be used followed by written warnings and an investigatory suspension, prior to termination." [*Id.*]. However, these portions do not support any such progressive discipline requirement. The Handbook states:

> When employee performance does not meet Company standards, the Constructive Counseling process is used to ensure understanding of the expectations. Through our constructive counseling process, your manager will decide what action is appropriate by considering such factors as your work history, frequency of policy violations, conduct, past and present level of performance, and the seriousness of your offense. *Counseling actions may include coaching, written warning, and/or termination of your employment . . . . The use of any* **[\*52]** *or all of these options is up to the business judgment of the manager* in light of the severity of the offense and all circumstances surrounding the unsatisfactory performance or inappropriate behavior.

[Dkt. #65-4 at 45 (emphasis added)]. Contrary to Asante's assertion, the Handbook does not entitle Asante to every possible action encompassed by the Constructive Counseling process. Instead, the Handbook merely describes a framework through which a manager should decide upon an appropriate course of action, and empowers the manager to rely on his "business judgment" when choosing which of the constructive counseling actions, including termination, to employ. [*Id.*]. Asante offers no evidence that Farrell and Sodexo failed to exercise their business judgment or take into account the circumstances surrounding Asante's performance when they recalled and declined to reassign her. Indeed, as Sodexo explained, one of the legitimate non-discriminatory reasons for Sodexo's decision was Belanger's statement to Farrell that Asante had failed to meet expectations. The record also contains evidence of ECHN employee criticism of Asante's management decisions. While the Handbook does state that "the **[\*53]** Company hopes to correct most types of unsatisfactory performance or conduct through constructive counseling measures," and that "some types of performance and misconduct are so severe that they may warrant termination without any prior constructive counseling

---

[16] Belanger was asked the following question and gave the following answer:

Q: Okay, and did anybody tell you either before or after that Miss Asante was terminated because during the course of the transition ECHN had requested her removal for not meeting expectations?

A: No.

[Dkt. #63-21, Belanger Dep. at 97:7—11].

---

[17] Nevertheless, throughout her summary judgment briefing, Asante repeats the unsupported contention **[\*51]** that Belanger denied ever having told Farrell that she requested Asante's removal from ECHN Woodlake. *See* [Dkt. #63-1 at 9—11, 17—20; Dkt. #65 at 8—9].

options," this does not mean that Sodexo was precluded from terminating Asante in the absence of such "severe" circumstances, or that it was required to first attempt other constructive counseling options. [*Id.* at 46]. This is particularly true given that both the Handbook and Asante's offer letters clearly indicated that she was an at-will employee. *See infra* at Part IV.g.

b. Sodexo is Entitled to Summary Judgment on Asante's Title VII Retaliation Claim

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because that individual "opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). Title VII retaliation claims, like discrimination claims, are examined under *McDonnell Douglas. See Goins*, 555 F. App'x at 73—74. To prevail on a Title VII retaliation claim, a plaintiff must first set out a *prima facie* case of retaliation, at which point a presumption of retaliation arises, and the defendant must proffer a legitimate, [*54] nondiscriminatory reason for the adverse employment action. *Fincher*, 604 F.3d at 720. If the employer succeeds at the second stage, the plaintiff "must show that one of her complaints was a 'but-for' cause of her termination" to prove a retaliation claim. *Goins*, 555 F. App'x at 74. To set forth a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) the plaintiff suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and that adverse action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

Asante's retaliation claim is predicated on her complaints to two ECHN employees, Morey and Belanger, about the animal noises and commercial imitations, her employer Sodexo's knowledge of these complaints, and the conclusion that Sodexo retaliated against Asante by declining to reassign and terminating her shortly after learning of her complaints. *See* [Dkt. #63-1 at 19; Dkt. #65 at 14-16]. Asante fails to set forth a *prima facie* case of retaliation for several reasons.

First, for the reasons described in the analysis of Asante's discrimination claims, *see supra* at Part IV.a, she is unable to satisfy the first element because the animal [*55] noises and commercial imitations about which Asante complained do not constitute statutorily prohibited discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose *statutorily prohibited discrimination*.") (emphasis added). To the extent Asante believed that the actions about which she complained were discriminatory, such belief was not reasonable in light of their context and substance. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers,*

*P.C.*, 716 F.3d 10, 14—15 (2d Cir. 2013) (stating that a complaint qualifies as a protected activity only if "the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law . . . . A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form").

Second, Asante has not put forth any evidence that her employer, Sodexo, was aware of either the ECHN employees' conduct or Asante's complaints to Belanger and Morey at the time Sodexo terminated her. At most, there is evidence that Belanger told Farrell, Asante's supervisor at Sodexo, that Asante failed to meet her expectations. *See* [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 36]. As a result, [*56] Asante failed "to put [her] employer on notice of the specific conduct complained of so a reasonable opportunity to rectify the situation would be afforded." *Dinice-Allen v. Yale-New Haven Hosp.*, No. 3:06-cv-00675 (PCD), 2008 U.S. Dist. LEXIS 1802, 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008) ("To be a protected activity, complaints must alert the employer to the specific unlawful conduct complained of.").

Sodexo's lack of knowledge of Asante's reports to Belanger would also likely sever any possible causal connection between these reports and Sodexo's decision not to reassign and to terminate her. *See Gordon v. Marquis*, No. 3:03-cv-01244 (AWT), 2007 U.S. Dist. LEXIS 27811, 2007 WL 987553, at *10 (D. Conn. Mar. 31, 2007) (concluding in the First Amendment retaliation context that "a causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity") (citation and quotations omitted).[18]

Finally, even if Asante is found to have set forth a *prima facie* claim, she is unable to overcome Sodexo's legitimate, non-retaliatory reasons for her termination, as discussed above. *See supra* at Part IV.a.

c. Sodexo is Entitled to Summary Judgment on Asante's Title VII Hostile Work Environment Claim

Asante relies on the same conduct described elsewhere in

---

[18] While the Court is cognizant of the possibility of "cat's paw" liability, *see supra* at Part IV.a.2.i., n. 11, here, Asante has failed to set forth any evidence that Belanger's conclusion that Asante failed to meet expectations was based, in whole or in part, on Asante's reporting the discriminatory conduct of her ECHN subordinates. Such a conclusion does not naturally flow given the evidence in the record that Asante's [*57] colleagues separately complained to other members of ECHN management about some of Asante's management decisions.

support of her Title VII hostile work environment claim. To establish a claim for a hostile work environment under Title VII, a plaintiff must show that the complained-of conduct is "(1) objectively severe or pervasive; (2) creates an environment that the plaintiff herself subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's race" or membership in a different protected class. *Goins*, 555 F. App'x at 71—72. To determine whether an environment is objectively hostile or abusive, a court must "look[ ] at *all* the circumstances." *Kaytor*, 609 F.3d at 547 (citation and quotations omitted):

> These may include the *frequency* of the discriminatory conduct; its *severity*; whether it is *physically threatening or humiliating*, or **[*58]** a mere offensive utterance; and whether it *unreasonably interferes with an employee's work performance*. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, *no single factor is required*.

*Id.* (citation and quotations omitted). As a result, "[i]solated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe . . . [although] even a single episode of harassment, if severe enough, can establish a hostile work environment." *Id.* (citation and quotations omitted).

For many of the same reasons discussed in connection with her other Title VII claims, Asante's hostile work environment claim fails as a matter of law. While the Court considers both sets of timely and untimely remarks and other conduct, Asante's allegations simply fail to establish that this conduct was objectively severe or pervasive.

Applying the factors outlined in *Kaytor* and considering all other relevant facts, Butler and Farrell each made their comments one time, at Asante's job interview **[*59]** in March and at a lunch in June 2010, respectively.[19] The comments were ambiguous and, at most, constituted offensive utterances. *See Zayas v. Caring Cmty. of Connecticut*, No. 3:11-cv-442 (VLB), 2012 U.S. Dist. LEXIS 141698, 2012 WL 4512760, at *7 (D. Conn. Oct. 1, 2012) (distinguishing "offhand comments" and "isolated incidents (unless extremely serious)" from "discriminatory changes in the terms and conditions"). Given their one-off and ambiguous nature, it is difficult to see how such comments could reasonably have

───────────────

[19] Though Asante suggests that Farrell made his "dirty politics" comment more than once, the comment itself was facially neutral and not even objectively offensive in any manner.

interfered with Asante's job performance. *See id.* (granting defendant's motion for summary judgment on hostile work environment claim where the allegedly discriminatory statements were made thirteen times in a five-year period and citing other cases rejecting hostile work environment claims based on infrequent comments made over long periods of time).

Similarly, the animal noises and imitations fail to reach the level of objectively severe or pervasive. They too were, at most, ambiguous, offensive utterances, which lacked any direct connection to any of the protected classes to which **[*60]** Asante belongs. While the record indicates that they occurred often throughout a period of time, the duration is uncertain, and Asante acknowledged that the animal sounds ceased and the imitations lessened after she confronted one of the ECHN employees. *See* [Dkt. #62, D's Rule 56(a)(1) Statement at ¶ 56; Dkt. #66, P's Rule 56(a)(1) Statement at ¶ 56; Dkt. #65-3, Asante Dep. at 193:11—194:9]. To the extent that they did relate to Asante in some way, they were no doubt disruptive and offensive, but the fact that they occurred while the employees were on break or when returning from break or lunch and when Asante was in her partially separated office renders them unlikely to have unreasonably interfered with Asante's work performance. *See Jackson v. Health Resources of Rockville, Inc.*, 357 F. Supp. 2d 507, 520 (D. Conn. 2005) (granting defendant's motion for summary judgment as to plaintiff's hostile work environment claim despite evidence that plaintiff's "fellow employees made fun of her by calling her 'monkey' and laughing at her wig").

Finally, the facts underlying Asante's claims of disparate treatment, while relevant to a hostile work environment claim, are not objectively pervasive or severe. Asante has failed to establish that she was similarly situated to the individuals who were allegedly **[*61]** treated more favorably, and in some cases, she has failed to put forth evidence that these individuals actually received preferential treatment. In addition, the fact that these three instances span a period of years and involve individuals of different protected classes further cuts against a finding of pervasiveness.

d. <u>Sodexo is Entitled to Summary Judgment on Asante's Attempted Religious Discrimination Claim</u>

To the extent that Asante attempts to belatedly assert a religious discrimination claim under Title VII, this claim is also insufficient to survive summary judgment. In an attempt to support her claim, Asante offers her deposition testimony regarding comments Farrell allegedly made to her at some point, such as, "you think God have time for you. We all need prayers. And you always say God, why? You think you are the only person who cares about that — that kind of stuff?" [Dkt. #65 at 16—17]. These generic comments about "God,"

which "could have been intended as a crude joke or as a serious accusation" that everyone seeks and needs the help of God and Asante is no different, "offer[ ] no evidence that [Farrell] harbored anti-[Pentecostal] bias." *Lynch v. Pathmark Supermarkets*, 987 F. Supp. 236, 243 (S.D.N.Y. 1997) (holding that comments generally **[*62]** referencing "God" and criticizing and even threatening the plaintiff failed to support a *prima facie* case of religious discrimination, "even with all rational inferences drawn in the plaintiff's favor"); *Wooten-Francis v. City of New York*, No. 11-CV-2341 (FB) (MDG), 2013 U.S. Dist. LEXIS 178458, 2013 WL 6729851, at **3—5 (E.D.N.Y. Dec. 19, 2013) (granting defendant's motion for summary judgment on Title VII retaliation and hostile work environment claims based, in part, on the statement "[w]here is your God now?" and finding such statement did not "rise[ ] to the level of severity or pervasiveness the law requires").

### e. Sodexo is Entitled to Summary Judgment on Asante's Age Discrimination Claim Under the **ADEA**

Under the **ADEA**, "it shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims of discriminatory treatment under the **ADEA** are analyzed using the burden-shifting framework set forth in *McDonnell Douglas*, as modified by the Supreme Court's subsequent decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for **ADEA** cases **[*63]** that has been consistently employed in our Circuit").

Like in Title VII cases, after the plaintiff has met the initial burden of establishing his *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Brennan*, 650 F.3d at 93 (citing *McDonnell Douglas*, 411 U.S. at 802). "Once such a reason is provided, plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Gorzynski*, 596 F.3d at 106. However, at this step, "*Gross* makes clear that [unlike in Title VII claims] 'a plaintiff bringing a disparate-treatment claim pursuant to the **ADEA** must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 557 U.S. at 180).

The only facts Asante offers in support of her age discrimination claim are that (i) following her requested transfer from ECHN MMH, she was replaced by a younger male; and (ii) after ECHN Woodlake terminated its contract with Sodexo, her younger colleague, Lester, was reassigned (with assistance) within Sodexo, while Asante did not receive **[*64]** any assistance and was not reassigned.

Even accepting Asante's disputed assertion that she was ultimately replaced at ECHN MMH by a "younger white male employee," her **ADEA** claim is insufficient. First, and most importantly, her claim is untimely for the reasons stated *supra* in Part IV.a.1. *See Morgan*, 536 U.S. at 113. Second, as Sodexo asserts, and Asante does not deny, Asante was initially replaced by a female between 50 and 60 years old. *See, e.g., Lee v. Universal Printing Servs., Inc.*, No. 3:06-cv-961 (WWE), 2008 U.S. Dist. LEXIS 53292, 2008 WL 2740325, at *3 (D. Conn. Jul. 15, 2008) (holding that where "plaintiff was replaced by an employee who defendant claims was approximately the same age as plaintiff . . . plaintiff cannot establish the prima facie case of age discrimination under the **ADEA**").

At most, the facts Asante offers with regard to Sodexo's decision to reassign her younger colleague, Lester, are sufficient to set forth a *prima facie* case. *See, e.g., Toomer v. Dep't of Educ. of New York*, No. 09-CIV-9034, 2013 U.S. Dist. LEXIS 44952, at *27-29 (S.D.N.Y. Mar. 28, 2013) (finding that plaintiff had established a prima facie case of age discrimination where plaintiff asserted that her replacement was "young" without specifying the age range of the replacement and where defendant likely **[*65]** knew plaintiff's age). Asante does not, however, come close to overcoming Sodexo's legitimate, non-discriminatory reasons for its actions.

As Sodexo points out, the two were not similarly situated because Lester held a different, lower-level position at ECHN Woodlake and, unlike Asante, Lester had not been asked to leave by ECHN Woodlake before the end of her time there. Asante simply offers no facts that her age had anything to do with this decision.

### f. Asante's **CFEPA** Claims Fail For the Same Reasons

Asante brings parallel claims based on the same conduct under the CFEPA. Employment discrimination, retaliation, and hostile work environment claims arising under the CFEPA are analyzed under the same *McDonnell Douglas* burden-shifting analysis as those brought under Title VII. *See John v. Bridgeport Bd. of Educ.*, No. 09-cv-378 (VLB), 2011 U.S. Dist. LEXIS 29154, 2011 WL 1106708, at **9, 15, 17 (D. Conn. Mar. 22, 2011). Thus, for the same reasons discussed above, Sodexo is entitled to summary judgment as to each of these claims that Asante has brought under the

CFEPA.

While courts also analyze age discrimination claims brought pursuant to the CFEPA under *McDonnell Douglas*, to rebut an employer's proffered nondiscriminatory explanation under CFEPA a plaintiff need only show that her [*66] age was a "contributing or motivating factor" in bringing about the adverse employment action, as opposed to the but-for cause. *Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-00357 (VLB), 2013 U.S. Dist. LEXIS 140983, 2013 WL 5445258, at *20 (D. Conn. Sept. 30, 2013). However, even under this less onerous standard, Asante's threadbare assertions of age discrimination are unable to survive summary judgment. *See supra* at Part IV.e.

g. Asante's Breach of Contract Claim Fails as a Matter of Law

Asante further alleges that Sodexo breached her employment contract when it terminated her without cause. To establish a claim for breach of contract under Connecticut law, a plaintiff must demonstrate: (i) the existence of a contract or agreement; (2) breach of the contract or agreement; and (3) damages resulting from the breach. *Chem-Tek, Inc., v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993) (citing *O'Hara v. State*, 218 Conn. 628, 590 A.2d 948 (1991)).

"In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." *Joyner v. Simkins Indus., Inc.*, 111 Conn. App. 93, 97, 957 A.2d 882 (Conn. App. 2008) (citing and quoting *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 697—98, 802 A.2d 731 (2002). Two exceptions to this rule are where a "discharge involve[s] impropriety derived from some important violation of public policy," *id.*, or, where a plaintiff [*67] is able to establish "the existence of an implied agreement between the parties" in which the employer "agreed, either by words or action or conduct, to undertake some form of actual contract commitment to him under which he could not be terminated without just cause." *Morrissey-Manter v. St. Francis Hosp. & Med. Ctr.*, No. HHDCV126035162S, 2015 Conn. Super. LEXIS 42, 2015 WL 467256, at *5 (Conn. Super. Jan. 5, 2015) (quoting *Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 14—15, 662 A.2d 89 (1995)). "[R]epresentations contained in an employee handbook" or an offer letter may "give rise to an express or implied contract . . . under certain circumstances." *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 305 (D. Conn. 2000); *see also Naser v. Ravago Shared Servs., LLC*, No. 3:10-cv-573 (WWE), 2010 U.S. Dist. LEXIS 98103, 2010 WL 3829159, at *3 (D. Conn. Sept. 20, 2010) (reviewing offer letter to determine if it created an express or implied contract altering the default at will relationship). On the other hand, "by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." *Manning v. Cigna Corp.*, 807 F. Supp. 889, 895 (D. Conn. 1991) (citation and quotation omitted).

As an initial matter, for the reasons discussed above, none of the conduct Asante raises is sufficient to establish that her termination arose out of any violation of public policy. In addition, Sodexo has put forth considerable evidence that Asante was an at-will employee whom it [*68] could terminate without cause.

Each of Asante's offer letters, in 2008, 2010, and 2011 contained express language stating that she was "not offer[ed] employment on a fixed term basis," and that she and Sodexo "may terminate employment at any time, for any reason, and with or without cause." [Dkt. #62, D's Rule 56(a)(1) Statement at ¶ 10; Dkt. #66, P's Rule 56(a)(1) Statement at ¶ 10]. Asante also signed each of these letters, and above her signature was a statement affirming her understanding that "this is not an employment contract and that I am an employee at will." [*Id.* at ¶ 11].

In response, Asante points to language in her March 2, 2010 offer letter, stating: "This payment is contingent upon you remaining in this position for a one-year period of time." [Dkt. #65 at 20]. While Asante rightly contends that "merely putting the 'at will' language in a contract is not dispositive of the issue," [id.], she omits critical sentences immediately preceding and following the one she quotes. The complete relevant passage reads:

> In addition, for accepting the position, you will receive a one-time bonus payment of $5,000, subject to applicable taxes, to be paid after 30 days of employment. This payment is contingent upon you remaining [*69] in this position for a one-year period of time. If you voluntarily leave this position at any time prior to the one-year time period, you will be responsible for paying back a pro rata amount of this signing bonus . . . to Sodexo.

[Dkt. #62-9 at 1]. The full passage makes clear that the portion of her compensation contingent upon her remaining at Sodexo for a one-year period was a signing bonus, not her salary. Connecticut courts have stated that even "an annual salary term" does not "create a contract of employment for a determinative term." *Swihart v. Country Home Bakers*, No. CV 9706094S, 1999 Conn. Super. LEXIS 1861, 1999 WL 545385, at *1 (Conn. Super. Jul. 16, 1999); *see also Cruz v. Visual Perceptions, LLC*, 136 Conn. App. 330, 335, 46 A.3d 209 (Conn. App. 2012), *rev'd on other grounds*, 311 Conn.

93, 84 A.3d 828 (Conn. 2014) (citing several cases in support of proposition "that a contract provision expressing an employee's compensation in terms of an annual salary does not create a contract for employment of definite duration"). Not surprisingly, they have rejected the argument "that the promise of a bonus . . . by the employer somehow turns an at will employment contract into one only terminable for cause." *Swihart*, 1999 Conn. Super. LEXIS 1861, 1999 WL 545385, at *2.

In addition, Asante's suggestion that this provision is ambiguous is baseless. The plain language of the letter makes clear that in order for Asante to receive all of her signing [*70] bonus, she would need to remain employed at Sodexo for a year. Nothing in this provision, which imposes a requirement on Asante, imposes any reciprocal duty on Sodexo that it keep her employed for this or any period of time. Neither of the cases to which Asante cites, *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 84 A.3d 828 (Conn. 2014) and *Puglia v. Town of Westbrook*, No. CV 065000446, 2008 Conn. Super. LEXIS 1737, 2008 WL 2930345 (Conn. Super. Jul. 9, 2008), holds to the contrary.

The language of the contract in *Cruz* bears little resemblance to the language upon which Asante relies. There, the employment contract began with the sentence: "This will cover the thirty-six month period starting April 1, 2007 and ending March 31, 2010." *Cruz*, 311 Conn. at 97. No such sentence fixing any date range appears in any of Asante's offer letters.[20] By contrast, Asante's offer letters merely describe her salary as "$1,230.769 per week paid biweekly ($64,000 annualized)" and "$1,383.064 per week paid biweekly ($71,919.36 annually)" respectively. [Dkt. #63-11 at 1; Dkt. #63-14 at 1]. The *Cruz* court next focused on "the portion of the letter agreement providing that any increase in health insurance premiums would be absorbed by the defendant 'for the duration of the contract.'" *Id.* at 104. Once again, no provision in any of Asante's offer letters fixes any benefit to "the duration of the contract."[21] The court

then [*71] pointed out a "provision governing the paid personal days that the plaintiff would receive in each year during the thirty-six month period." *Id.* Based on these three provisions, the court found that the letter was ambiguous as to the "intent to create a definite term of employment or an intent to set the terms and conditions of an at-will employment contract." *Id.* (emphasis in original). Just as telling as the three provisions the *Cruz* court focused on are the ones that it did not. Like Asante's offer letter, the contract in *Cruz* described the plaintiff's compensation in terms of both weeks and "per year," health and dental insurance "per year," and a "potential monthly bonus." *Id.* at 97. Finally, there is no evidence that the employment contract in *Cruz* contained "disclaimers of the intention to contract," like the express language in Asante's offer letters. *Manning*, 807 F. Supp. at 895.

As Sodexo points out, the contract at issue in *Puglia*, the other case Asante cites, is also inapposite. There, the contract stated that the plaintiff would be paid "a salary of $52,899.00 for the school year beginning July 1, 2004 and ending June 30, 2005." *Puglia*, 2008 Conn. Super. LEXIS 1737, 2008 WL 2930345, at *2. Thus, this contract, like the one in *Cruz* and unlike Asante's, expressly set the plaintiff's salary to a fixed duration of time. Other provisions of the contract also referred back to "the above stated period," and a subsequent employment agreement described the plaintiff's salary for another set period of time. *Id.* Also, like the *Cruz* contract and unlike Asante's, absent from the employment agreements in *Puglia* was any language expressly disclaiming any intention to enter into a contract.[22]

h. Sodexo is Entitled to Summary Judgment on Asante's Intentional and Negligent Infliction of Emotional Distress Claims

Asante brings claims of intentional and negligent infliction of emotional distress, based on the conduct underlying her Title VII, **ADEA**, and CFEPA claims. To establish a claim for

---

[20] Indeed, the only reference to any dates in these letters is the date on which Asante's salary became effective and "*Sodexo's* current management performance planning year." [Dkt. #63-11 at 1; Dkt. #63-14 at 1 (emphasis added)].

[21] Asante vaguely refers the Court to her offer letters which she claims contain "terms regarding . . . benefit [*72] plans that are indicative of an express contract." [Dkt. #65 at 22]. However, no such terms are apparent. The only tangentially relevant comment regarding benefits states that "[a]ll benefits and medical coverage will remain the same." [Dkt. #63-11 at 1; Dkt. #63-14 at 1]. This, of course, says nothing about duration, nor does it otherwise suggest an intent to contract.

[22] The March 2009 Sodexo Employee Handbook also contained language clearly indicating [*73] an at-will relationship. The Handbook stated that the employment relationship between Sodexo and Asante was "terminable at any time[,] by either you or us, with or without cause and with or without notice. The Handbook is not a contract of employment." [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 12; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 12]. Asante acknowledges this language but refers generally to five pages of the Handbook regarding Sodexo's progressive disciplinary measures, up to and including termination. To the extent Asante is suggesting that language in the Handbook describing circumstances in which Sodexo may terminate an employee for cause somehow limits Sodexo's ability to terminate an at-will employee for any lawful reason, she is mistaken.

intentional infliction under Connecticut law, the plaintiff must show that: (1) the actors intended to inflict emotional distress or that the actor knew **[\*74]** or should have known that emotional distress was the likely result of the actor's conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff's distress; and (4) the emotional distress the plaintiff sustained was severe. *Oliver v. Waterbury Bd. of Educ.*, No. 3:12-cv-01285 (VLB), 2014 U.S. Dist. LEXIS 38555, 2014 WL 1246711, at \*19 (D. Conn. Mar. 24, 2014). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. *Id.* "Conduct . . . that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.*

As discussed above, taken separately or together, the conduct by the ECHN employees and comments by Asante's supervisor, Farrell, were not extreme or outrageous. The sounds and imitations were, at most, insulting and displays of bad manners, especially in light of the fact that they were not made in Asante's presence. Farrell's and Butler's comments and stories were ambiguous and hardly, if at all, offensive. *Cf. Pottie v. Atl. Packaging Grp. LLC*, No. 3:12-cv-773 (WIG), 2012 U.S. Dist. LEXIS 173070, 2012 WL 6087282, at \*1 (D. Conn. Dec. 6, 2012) **[\*75]** (finding plaintiff stated a claim for intentional infliction when she alleged "[s]he was subject to a course of verbal abuse and profanity, including being referred to by derogatory names and asked what banana boat she came off, a remark insulting her national origin and ethnicity . . . . She was ridiculed about her appearance in a sexually demeaning manner. She was physically struck in the head and face with a hand, box or other items"). Finally, any differences in pay or treatment with regard to reassignment, even if motivated by discriminatory intent (though Asante has failed to set forth evidence that they were so motivated), are not sufficient to support her intentional infliction claim. *See Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008) (dismissing plaintiff's intentional infliction claim based on disparate compensation and stating that "it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous . . . . An employer's adverse yet routine employment action does not constitute extreme and outrageous conduct even if based on race or other improper motives"); *see also Tomby v. Cmty. Renewal Team, Inc.*, 3:09-cv-1596, 2010 U.S. Dist. LEXIS 132571, 2010 WL 5174404, at \*8 (D. Conn. Dec. 15, 2010) ("[R]outine employment action, even if conducted in bad **[\*76]** faith, does not constitute extreme or outrageous behavior.") (citation omitted).

Under Connecticut law and "[i]n the employment context, a claim for negligent infliction of emotional distress is only recognized where it is based upon unreasonable conduct of the defendant in the termination process." *Oliver*, 2014 U.S. Dist. LEXIS 38555, 2014 WL 1246711, at \*21 (citation and quotation omitted). Accordingly, the dispositive issue is "whether the defendant's conduct during the termination process was *sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Id.* (citation and quotation omitted) (emphasis in original). "To rise to the requisite level, a plaintiff must allege more than mere termination. Rather . . . that the actual termination was . . . done in an inconsiderate, humiliating, or embarrassing manner." *Id.* (citation and quotation omitted).

At most, the evidence indicates that (i) ECHN Woodlake notified Sodexo that Asante failed to meet expectations; (ii) Farrell met with Asante, informed her of Belanger's request, and handed her the letter stating that if she did not obtain employment **[\*77]** within Sodexo by December 30, 2011, she would be terminated; and (iii) that Farrell used a tone which suggested to Asante that she leave the facility immediately and never return. [Dkt. #63-1 at 21]. Without more, these events do not come close to raising a viable negligent infliction claim.

## V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. Plaintiff's complaint is DISMISSED with prejudice. The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 31, 2015

No *Shepard's* Signal™
As of: June 17, 2020 5:11 PM Z

# Yarrington v. Candor Cent. Sch. Dist.

United States District Court for the Northern District of New York

March 27, 2020, Decided; March 27, 2020, Filed

3:18-CV-1250 (FJS/ML)

**Reporter**
2020 U.S. Dist. LEXIS 53465 *

AMANDA YARRINGTON, Plaintiff, v. CANDOR CENTRAL SCHOOL DISTRICT; JEFFREY J. KISLOSKI, individually and in his Official Capacity as Superintendent of Schools for the Candor Central School District; BERN SMITH, individually and in his Official Capacity as Director of Operations for the Candor Central School District; DAREN JENSEN, individually and in his Official Capacity as Transportation Supervisor for the Candor Central School District; and GREG NICHOLS, individually and in his Official Capacity as Mechanic for the Candor Central School District, Defendants.

**Counsel:** **[\*1]** For Plaintiff: RONALD R. BENJAMIN, ESQ., OF COUNSEL, LAW OFFICES OF RONALD R. BENJAMIN, Binghamton, New York.

For Defendants: CHARLES C. SPAGNOLI, ESQ., FRANK W. MILLER, ESQ., GIANCARLO FACCIPONTE, ESQ., OF COUNSEL, THE LAW FIRM OF FRANK W. MILLER, Syracuse, New York.

**Judges:** Frederick J. Scullin, Jr., Senior United States District Judge.

**Opinion by:** Frederick J. Scullin, Jr.

# Opinion

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Amanda Yarrington ("Plaintiff"), a bus driver for the Candor Central School District ("Defendant District"), brought this action based on gender discrimination against Defendant District, its Superintendent ("Defendant Kisloski"), its Director of Operations ("Defendant Smith"), its Transportation Supervisor ("Defendant Jensen"), and its former Chief Mechanic ("Defendant Nichols") seeking compensatory damages, punitive damages, and attorney's fees. *See generally* Dkt. No. 1, Compl. Pending before the Court are Defendants' motion for judgment on the pleadings, *see* Dkt. No. 13, and their motion for summary judgment, *see* Dkt. No. 58, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

## II. BACKGROUND

The majority of Plaintiff's gender-discrimination claims stem from issues with Defendant Nichols.[2] Plaintiff worked for

---

[1] Defendants filed the pending motion for judgment on the pleadings on February 25, 2019. The parties conducted discovery while awaiting the Court's decision on that motion, and Defendants later filed the pending motion for summary judgment on January 31, 2020. The Court addresses both motions in this Memorandum-Decision and Order.

[2] Although, in her complaint, Plaintiff also alleges that Defendant Smith engaged in gender-based discrimination for using the word "cunt" in the workplace, saying women bus drivers were "cancer" within Defendant District, and making a comment that women should be born without tongues so that they cannot talk but can still perform oral sex. *See id.* at P 24; *see also* **[\*3]** Dkt. No. 1 at PP 25-26. However, Plaintiff admits that she never reported Smith's remarks to anyone. *See* Dkt. No. 58-2, Defs' Stmt. of Facts, at P 24. She also never made any complaints about Defendants Jensen or Kisloski and admits that Defendant Kisloski never used any inappropriate language in the workplace. *See id.* at PP 29-30.

Defendant District **[\*2]** for four or five years before she began having issues with Defendant Nichols in 2005. *See* Dkt. No. 58-2, Defs' Stmt. of Facts, at PP 1, 8, 15.[3] Generally, those issues included Defendant Nichols being silent to her, leaving notes on her bus to clean it, giving her the finger once while they were driving past each other, swearing at her, raising his voice, slamming doors, and once throwing a ladder (though Plaintiff admits she was not at work when the ladder was supposedly thrown). *See id.* at PP 16-18, 20. Plaintiff complained of these issues to her first-level supervisor, Defendant Jensen, her second level supervisor, Defendant Smith, and later to Defendant Kisloski. *See id.* at PP 13, 16, 35-38. Plaintiff admits, however, that she never made any accusations against Defendant Nichols of gender-based discrimination. *See id.* at P 34. Plaintiff met with all three of her supervisors in February of 2016 about her issues with Defendant Nichols, in which Defendant Kisloski informed her that the two would learn to get along or one or both of them would be fired. *See id.* at P 44. After this meeting, Plaintiff tried to "avoid" Defendant Nichols, but there was no substantial change in their relationship, and they continued to have problems. *See id.* at PP 52, 58-59, 64-65.

Two events in particular ultimately led to Plaintiff's termination. First, sometime in October of 2016, Plaintiff deviated approximately four miles in total from her bus route while transporting children from TST BOCES in Ithaca back to Defendant District so that she could look for recycled glass bottles to use for crafts. *See id.* at PP 73, 83; Dkt. No. 60-1 at P 73. Plaintiff did not have permission to deviate from her route in that manner. *See* Dkt. No. 58-2 at P 80.

Second, on December 6, 2016, Plaintiff parked her bus in front of a garage bay door, thus blocking the entrance and exit; and Defendant Nichols told her she could not leave her bus there. *See id.* at P 86; Dkt. No. 60-1 at P 86. The parties argued, and Plaintiff testified that Defendant Nichols was "loud" and used profanity during the dispute. *See* Dkt. No. 60-1 at P 86. Plaintiff admits that she was aware that she was not supposed to leave her bus in front of the garage bay door in that manner and that Defendant Jensen eventually moved the bus for her during the incident in an attempt to diffuse the situation. *See* Dkt. No. 58-2 at PP 87-88. After Defendant Smith arrived at the bus garage, he directed Plaintiff to sit in her car; and she **[\*4]** refused before ultimately complying with his direction. *See id.* at P 96.

Plaintiff met with Defendants Kisloski and Smith on

December 8, 2016, to discuss her detour from her bus route in October and the incident on December 6th. *See id.* at P 105. At the meeting, Plaintiff admitted to the facts surrounding the October 2016 detour; and, as a result of her admission, she was placed on administrative leave. *See id.* at PP 105, 110. In late December of 2016, Defendant District notified Plaintiff that she was subject to disciplinary charges and would be provided a Civil Service Law Section 75 hearing. *See id.* at P 114.

Defendant District filed four disciplinary charges against Plaintiff on December 20, 2016, all stemming from her bus route deviation in October 2016 and her altercation with Defendants Nichols and Smith on December 6, 2016. *See id.* at P 115. The section 75 disciplinary hearing took place on January 20, 2017, before a hearing officer. *See id.* at P 123. During the hearing, Plaintiff was represented by counsel, had the ability to examine and cross-examine witnesses, and testified on her own behalf. *See id.* at PP 123-124, 126. On March 3, 2017, the hearing officer found that Plaintiff was guilty of misconduct because she (1) took an unauthorized detour in October of 2016, (2) acted "unprofessionally" **[\*5]** with Defendant Nichols on December 6, 2016, and (3) was insubordinate when she did not comply with Defendant Smith's first directive to leave the building on December 6, 2016. *See generally* Dkt. No. 58-20, Ex. N, Hearing Officer's Findings of Fact and Recommendation. On March 7, 2017, Defendant District's Board of Education adopted the hearing officer's findings of fact and terminated Plaintiff's employment. *See* Dkt. No. 58-2 at P 193.

During the course of these events, Plaintiff filed two complaints with the Equal Employment Opportunity Commission ("EEOC"), which were also filed with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and retaliation.[4] Plaintiff's retaliation claim stemmed from a report Defendant Kisloski received on January 25, 2017, that Plaintiff had carried a pistol in her purse while driving her bus in 2014 or 2015. *See* Dkt. No. 13-5, Ex. F. The NYSDHR found no probable cause for either claim. *See* Dkt. Nos. 13-6, Ex. F and 13-7, Ex. H. Plaintiff then filed her complaint in the instant action on October 23, 2018. *See generally* Dkt. No. 1.[5]

---

[4] There is some dispute regarding the dates on which Plaintiff filed these complaints. The Court addresses this issue later in the Memorandum-Decision and Order.

[5] Plaintiff's complaint is drafted so poorly that the Court cannot discern what causes of action she is alleging. Relying on the arguments set forth in the parties' submissions, the Court surmises that her causes of action are based on gender discrimination, retaliation, and a hostile work environment pursuant to Title VII and

---

[3] The Court references Plaintiff's Response to Defs' Stmt. of Material Facts, *see* Dkt. No. 60-1, when there are minor discrepancies, such as word-choice or conclusions of law; but the Court emphasizes that all of the facts in this section are undisputed.

## III. DISCUSSION

### A. Legal standards

"The standard for granting a Rule 12(c) motion for judgment on [*6] the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citations omitted). Thus, when considering such a motion, a court must "'construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quotation omitted). Although a plaintiff is not required to plead "detailed factual allegations," a plaintiff is required to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action..." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). Finally, in deciding a motion for judgment on the pleadings, a court may consider the pleadings, documents attached thereto as exhibits, documents incorporated by reference, documents that are integral to the complaint, and matters upon which the court may take judicial notice. *See Holland v. City of New York*, No. 10 Civ. 2525 (PKC) (RLE), 2011 U.S. Dist. LEXIS 144491, *9 (S.D.N.Y. Dec. 16, 2011) (quotations and other citations omitted).

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under this Rule, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, a court must resolve [*7] any ambiguities and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted).

### B. Defendants' motion for judgment on the pleadings

#### 1. Exhaustion of administrative remedies

individual and municipal liability based on gender discrimination brought pursuant to 42 U.S.C. § 1983. *See generally* Dkt. No. 1.

The only issue Defendants raised in their motion for judgment on the pleadings that they did not reargue in their motion for summary judgment was whether the Court should dismiss some of Plaintiff's claims for failure to exhaust her administrative remedies. Specifically, Defendants argue that Plaintiff did not include claims for disparate impact or pattern or practice discrimination in her EEOC complaint and that these claims are not reasonably related to the instances of discrimination that she alleged in Support of Mot. on Pleadings, at 8-9. Defendants also assert that Plaintiff is limited to the factual allegations of acts of discrimination included in her EEOC complaint. *See id.* at 9.

"A plaintiff may bring an employment discrimination action under Title VII ... only after filing a timely charge with the EEOC or with 'a State or local agency with authority to grant or seek relief from such practice.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)) (other citation omitted). "Exhaustion of remedies is a precondition [*8] to suit ... and a plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge." *Id.* at 83 (citations omitted). "A claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Butts [v. City of New York Dep't of Hous. Pres. & Dev.]*, 990 F.2d [1397,] 1402 [(2d Cir. 1993)] (internal quotation marks omitted)). The Second Circuit has "described this as 'essentially an allowance of loose pleading.'" *Id.* (citing [*Butts*, 990 F.2d at 1402]) (footnote omitted). The Supreme Court in *Patsy v. Bd. of Regents*, however, "held very broadly that exhaustion of administrative remedies is not required in a § 1983 action." *Branch v. Guilderland Cent. Sch. Dist.*, 239 F. Supp. 2d 242, 251 n.6 (N.D.N.Y. 2003) (Hurd, J.) (citing [*Patsy v. Bd. of Regents*,] 457 U.S. [496] 516, 102 S. Ct. 2557, 73 L. Ed. 2d 172, [(1982)]).

Thus, to avoid dismissal based on failure to exhaust administrative remedies, Plaintiff must have complained about gender-based discrimination, retaliation, and the alleged hostile work environment in her complaints to the NYSDHR and EEOC. However, Plaintiff was not required to allege facts supporting her individual or municipal liability [*9] claims against Defendants for gender discrimination brought pursuant to 42 U.S.C. § 1983.

In her first EEOC complaint, Plaintiff stated that she was a female and a qualified individual with a disability (a heart condition) who had worked as a bus driver for Defendant District since May 17, 2001. *See* Dkt. No. 13-4, Ex. E, at 4.

Plaintiff alleged that, beginning on or about 2006 and continuing to date, she was subjected to "unwelcome comments and actions because of [her] gender." *See id.* Plaintiff claimed that there was a "boy's club" atmosphere where profanity was common, and someone had gone through her locker and personal items. *See id.* Plaintiff further alleged that, on or about December 6, 2016, she was in a verbal altercation with her boss and she was "falsely accused of insubordination[.]" *See id.* Plaintiff claimed that the symptoms of her disability became very severe and she asked for time to calm down as a reasonable accommodation in order to seek medical assistance. *See id.* Plaintiff alleged that her request was denied, and she was told to go sit in her car. *See id.*

Plaintiff further alleged that, as a result, she was hospitalized and taken out of work. *See id.* at 6. Plaintiff claimed that, when she [*10] turned in her doctor's excuse for her absence, Defendant Kisloski requested that she report to his office the next day. *See id.* Plaintiff claimed that she was served papers and put on administrative leave within minutes of turning in her sick leave papers. *See id.* Plaintiff also alleged that, when she returned to work, she was accused of confrontation, insubordination, and going off-route. *See id.* Plaintiff claimed that, when she spoke with the Defendant Kisloski, he threatened her and told her to resign. *See id.* Plaintiff further complained that she had been subjected to a hostile, offensive, and intimidating work environment because of her gender and disability in willful violation of Title VII and the ADA. *See id.*

In Plaintiff's second complaint with the EEOC, she stated that "[o]n or about January 12, 2017, I filed an [EEOC] charge of discrimination" and, "[o]n or about January 25, 2017, I was informed that [Defendant District] had pressed criminal charges against me for carrying a pistol on a bus." *See* Dkt. No. 13-5, Ex. F, at 4. Plaintiff alleged that such accusation was "absolutely false." *See id.* However, Plaintiff claimed she was told that, if she resigned from her position [*11] and withdrew her charge with the EEOC, the criminal charges would be dropped. *See id.* Plaintiff further claimed that, on or about March 7, 2017, she was terminated. *See id.* at 6. Plaintiff alleged that she "believed [Defendant District] falsely accused [her] of carrying a pistol, pressed criminal charges against [her] and terminated [her] in retaliation for having filed a prior EEOC charge..." *See id.*

Under the "loose" pleading standard described in *Holtz*, the Court finds that Plaintiff's additional allegations in her complaint in this action were "reasonably related" to her complaints to the NYSDHR and EEOC that she was discriminated and retaliated against because of her gender and that she suffered a hostile work environment. Regarding

Defendants' claims that Plaintiff did not allege a "policy or practice" in these complaints, this does not preclude her from bringing claims pursuant to 42 U.S.C. § 1983 in federal court as there is "no exhaustion of remedies" requirement. *See Branch*, 239 F. Supp. 2d at 251 n.6. Thus, the Court denies Defendants' motion for judgment on the pleadings based on the theory of failure to exhaust administrative remedies.

### C. Defendants' motion for summary judgment

#### 1. Collateral estoppel

Defendants argue that Plaintiff [*12] is bound by the section 75 hearing officer's findings of fact and recommendation. *See* Dkt. No. 58-1, Defs' Memorandum in Support Mot. Summ. J, at 7-10. "State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 45 (2d Cir. 2014) (citations omitted). "'New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate.'" *Id.* (quoting *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir.), *cert. denied*, 546 U.S. 1062, 126 S. Ct. 801, 163 L. Ed. 2d 628 (2005)). "This rule applies to findings made by administrative officers after conducting section 75 hearings." *Id.* (citing *e.g., In re Cheeseboro*, 84 A.D.3d 1635, 1636, 923 N.Y.S.2d 772, 773 (3d Dep't 2011) (deciding that a finding of fact by a section 75 hearing officer that unemployment-insurance applicant had been terminated from prior employment for cause had preclusive effect with regard to a denial of a benefits application)).

"Like a prior judicial finding of fact, in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication." *Id.* (citing Restatement (Second) of Judgments § 27 (1982)) (footnote omitted). "But even if an identical issue was necessarily decided in the prior proceeding, [*13] issue preclusion does not apply unless there was 'a full and fair opportunity [for the party against whom preclusion is sought] to contest the decision now said to be controlling.'" *Id.* at 45-46 (quoting *Buechel v. Bain*, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919, 740 N.Y.S.2d 252, 257 (2001)).

In *Matusick*, the section 75 hearing related to the defendant's articulated basis for terminating the plaintiff. *See id.* at 47-48. The Second Circuit noted that there was no indication that the

hearing officer was ever presented with evidence that the charges against the plaintiff were motivated, even in part, by an intent to discriminate, which was "at the heart" of the disparate treatment claims in the federal case. *See id.* at 48. Furthermore, the court stated that there was no indication that, had the hearing officer heard the evidence, it would have been within his statutorily defined authority to review that allegation, or that he would have found that the plaintiff's termination was warranted. *See id.* This is because "[a] section 75 hearing officer's sole responsibility is to consider whether the state employee facing charges has been 'incompeten[t] or [committed] misconduct.'" *Id.* at 48 n.11 (quoting N.Y. Civ. Serv. Law § 75(1)).

Nonetheless, the Second Circuit ruled that the hearing officer made findings of fact that bore on the issues raised on appeal, *i.e.*, that the **[*14]** plaintiff "had actually committed misconduct and that his conduct at work evinced an incompetence and carelessness not befitting his role as a dispatcher for a water authority." *Id.* at 48. The court found that, because the section 75 framework substantially differs from the legal framework for state and federal employment discrimination law, the hearing officer's conclusions did not preclude the jury from finding that the plaintiff was terminated for other, additional reasons, such as discrimination or retaliation. *See id.* at 49. The Second Circuit ultimately held that the plaintiff was precluded from arguing that he had failed to perform some of his duties, and "[t]he *factual* findings supporting the hearing officer's ultimate conclusion" must be accepted by the jury, even if the jury found that defendants terminated the plaintiff for illegal reasons. *Id.* (emphasis in original).

In other words, a plaintiff "is precluded from arguing that she did not engage in 'misconduct/insubordination'" but she is not precluded from arguing that she "'was also' ... terminated 'at least in part because' of discrimination or retaliation." *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 3:13-cv-1594 (BKS/DEP), 2016 U.S. Dist. LEXIS 50155, *41 (N.D.N.Y. Apr. 14, 2016) (quotation omitted).

Here, the **[*15]** hearing officer made several findings of fact, including that Plaintiff committed misconduct by knowingly deviating from her bus route in October of 2016, without approval from anyone in Defendant District, in hopes of finding discarded wine bottles at "The Barn" that she could use to make tiki torches. *See* Dkt. No. 58-20, Ex. N at 5-6. The hearing officer also found that Plaintiff's failure to move her bus from in front of the garage door constituted misconduct and that she "created an unnecessary problem" by leaving her bus out front. *See id.* at 7-9. Furthermore, the hearing officer found that Plaintiff's reaction to Defendant Nichols's request that she move the bus amounted to "an

unprofessional verbal tirade" which was "inappropriate and unprofessional." *See id.* Finally, the hearing officer found that Plaintiff's failure to follow Defendant Smith's first directive to leave the building on December 6, 2016, to diffuse the situation, constituted insubordination and misconduct. *See id.* at 10-11.

The hearing officer also considered Plaintiff's claim that the disciplinary proceeding was a pretext for discrimination on the basis of disability. *See id.* at 13. The hearing officer found no credible evidence that Defendant **[*16]** District officials had sufficient knowledge of Plaintiff's disability, and the medical notes lacked specificity and provided no indication that she had an impairment that substantially limited a major life activity. *See id.* at 13-14.

The hearing officer ultimately found that "[t]he totality of [Plaintiff's] conduct indicates a significant and continuing unwillingness to adhere to the basic and reasonable expectations of her employer that she safely transport students, that she cooperate with co-workers and that she follow instructions from supervisors. Her conduct is unacceptable in the workplace and warrants termination." *See id.* at 14. Based on the above-stated facts and caselaw, the Court finds that it must accept the hearing officer's findings of fact, including his findings that Plaintiff committed misconduct warranting termination. However, because the hearing officer did not consider whether Plaintiff was also terminated because of discrimination or retaliation, Plaintiff is *not* precluded from claiming that Defendants discriminated or retaliated against her because of her gender or that she suffered a hostile work environment.

### 2. Plaintiff's Title VII hostile work environment claim

"In order to state **[*17]** a claim for a hostile work environment under Title VII, the underlying harassment alleged 'must be sufficiently severe or pervasive,' both subjectively and objectively, 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Seale v. Madison Cnty.*, 929 F. Supp. 2d 51, 66 (N.D.N.Y. 2013) (Suddaby, J.) (quoting *Redd [v. New York Div. of Parole]*, 678 F.3d [166,] 175 [(2d Cir. 2012)] (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); *Harris*, 510 U.S. at 21-22, 114 S. Ct. 367)). "Further, the plaintiff must allege facts plausibly suggesting that the hostile or abusive treatment was because of his or her membership in a class of persons protected by Title VII." *Id.* (citing *Redd*, 678 F.3d at 175). "The types of workplace conduct that may be actionable on a claim for hostile work environment based on sex 'include unwelcome sexual advances, requests for sexual favors, and other verbal

or physical conduct of a sexual nature.'" *Id.* (quoting *Meritor [Sav. Bank, FSB v. Vinson*,] 477 U.S. [57,] 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (citing 29 C.F.R. § 1604.11(a) (1985))). "A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Redd*, 678 F.3d at 175) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367)).

"It is important to keep [*18] in mind, however, that 'while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace.'" *Id.* (quotation omitted). "Title VII is 'meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency.'" *Id.* (quoting *Taylor v. New York City Dep't of Educ.*, No. 11-CV-3582, 2012 U.S. Dist. LEXIS 108319, *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio*, 46 F. Supp. 2d 206, 213-14 (E.D.N.Y. 1999))).[6]

Here, Plaintiff does not dispute Defendants' contention that her complaint boils down to "petty personality conflicts" with Defendant Nichols, who was not in a supervisory position over her. *See* Dkt. No. 58-1 at 12. In fact, Plaintiff admitted that the totality of her issues with Defendant Nichols amounted to the following: (1) his being silent to her in the workplace; (2) raising his voice; (3) slamming doors; (4) once throwing a ladder, even though she was not present when it was thrown; (5) leaving notes on her bus to clean it; (6) giving her the middle finger once when they were driving by each other, though she does not recall when; (7) using profanity in the workplace, though she admits that men and women - including herself - used foul language in the workplace; [*19] and (8) reacting negatively when she brought mechanical issues with her bus to his attention. *See* Dkt. No. 62, Defs' Reply in Support of Mot. Summ J., at 8; *see also* Dkt. No. 58-2 at PP 16-18, 20; Dkt. No. 60-1 at PP 16-18, 20. Defendants contend that these issues were "nothing more than gender

neutral instances of minor incivility." *See* Dkt. No. 62 at 8. Furthermore, Plaintiff conceded that Defendant Nichols never used any negative gender-based language towards her or touched her in an inappropriate manner due to her gender. *See id.; see also* Dkt. No. 58-2 at P 19; 60-1 at P 19.

The only issue that Plaintiff alleged was gender-based was that Defendant Nichols "did not treat the male employees the way he treated the female employees, when men reported problems with their busses." *See* Dkt. No. 60-1 at P 17-a. However, Plaintiff conceded that Defendant Nichols had frequent confrontations with male employees, including Randy Murray. *See* Dkt. No. 58-2 at P 21; 60-1 at P 21. Plaintiff's witnesses, Rachel Shaver and Pamela Krause, testified that there were often conflicts between Defendants Nichols and Jensen and that Defendant Nichols confronted Michael Middaugh in the workplace. *See* Dkt. [*20] No. 58-2 at PP 170-72, 189; *see also* Dkt. No. 60-1 at PP 170-72, 189, 189-a. As Defendants aptly describe him, Defendant "Nichols was an equal opportunity unpleasant coworker." *See* Dkt. No. 58-1 at 14. The Court finds that these facts show that Defendant Nichols treated both males and females in the workplace equally and that any harassment that Defendant Nichols directed towards Plaintiff was gender-neutral and not so severe or pervasive as to create a hostile work environment.

Defendant Smith is the only other Defendant whom Plaintiff alleges created a hostile work environment. Plaintiff claims that he called Rene Shaver a "cunt," told a "whole bunch" of employees that women were cancer on the school, and made a crude comment that women should be born without tongues. *See* Dkt. No. 60, Pl's Memorandum in Opposition Mot. Summ. J, at 4. However, Plaintiff admitted that none of this language was directed at her, but rather at other individuals, and she just happened to be present to overhear it. *See* Dkt. No. 58-2 at P 24; Dkt. No. 60-1 at P 24. Furthermore, those comments were made prior to February of 2016, more than 300 days before she filed the instant complaint, and she admits she [*21] never reported them to anyone. *See* Dkt. No. 58-2 at P 24; Dkt. No. 60-1 at P 24. Regarding the crude comment about women's tongues, Shaver testified that the comment took place in 2003 or 2004, more than fifteen years ago; and Defendant Smith apologized to Shaver. *See* Dkt. No. 58-2 at P 169; Dkt. No. 60-1 at P 169.

Based on these undisputed facts, the Court finds that Plaintiff has not met her burden to show that she experienced a hostile work environment under Title VII because the alleged facts did not create an environment of abuse that was so severe or pervasive as to alter the conditions of her employment. Thus, the Court grants Defendants' motion for summary judgment with respect to this claim.

---

[6] "In addition to establishing that she was subjected to a hostile work environment, [a] p]laintiff must also establish that the conduct which created the hostile environment should be imputed to the employer." *Shiner v. State Univ. of N.Y.*, No. 11-CV-01024, 2012 U.S. Dist. LEXIS 157728, *11 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001)). However, because the Court ultimately finds that Plaintiff has not established a *prima facie* case for her hostile work environment claim, it need not determine whether the complained of conduct should be imputed to Defendant District.

### 3. Plaintiff's Title VII gender-based discrimination claim

Employment discrimination cases are analyzed using the "*McDonnell Douglas* test," a three-stage, burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the "*McDonnell Douglas* test," a plaintiff must first establish a *prima facie* case of discrimination by showing that "'(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference [*22] of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1877)).

After a plaintiff has established a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). At that point, the burden shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817). If the employer can articulate such reasons for its actions, then "the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting [*McDonnell Douglas*, 411 U.S.] at 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668) (other citation omitted).

The parties do not dispute that Plaintiff is a woman, and thus she is a member of a protected class, nor do they dispute that she was qualified for her position with Defendant District. Although Defendants contend that Plaintiff did not allege an adverse employment action, Defendant District's Board of Education terminated Plaintiff's position on March 7, 2017. *See* Dkt. No. 58-2 at P 193. Plaintiff's termination clearly establishes an adverse employment action to satisfy the third element of her *prima facie* claim of discrimination. *See Vega*, 801 F.3d at 85

Finally, [*23] the parties dispute whether Plaintiff has established the fourth element of her *prima facie* claim, i.e., that the relevant circumstances give rise to an inference of discrimination. Plaintiff argues that men were permitted to deviate from their bus route and make personal stops. *See* Dkt. No. 60 at 13 (citing Dkt. No. 58-17, Krause Depo, at 40). Plaintiff also claims that she was not able to keep personal items on her bus while males were allowed to do so, she was compelled to write a letter stating that she enjoyed her job when she attempted to complain about the discriminatory

conduct to which "all female drivers" were subjected, and her supervisor, Defendant Smith, once made a crude statement that women should be born without tongues. *See id.* at 14.

Plaintiff cites to Pamela Krause's deposition testimony to support her allegation that male drivers were permitted to make personal stops while transporting students. However, this is a mischaracterization of Ms. Krause's testimony. She did not testify that males were permitted to make personal stops while transporting students during the day. *See generally* Dkt. No. 58-17. Ms. Krause stated that on field trips or sports trips bus drivers (both male and female) could [*24] use the bus for personal pursuits such as traveling to a shopping mall or place to eat "within reason." *See id.* at 41. Ms. Krause clarified, however, that, while driving on a regular bus run delivering children to school and picking them up from school, bus drivers were *not* allowed to make personal stops. *See id.* at 40-41. Therefore, this does not show an inference of discrimination surrounding the circumstances of Plaintiff's termination; and, in fact, supports Defendants' legitimate, non-discriminatory reasons for terminating her.

Furthermore, Plaintiff does not point to any evidence to support her claim that she was unable to keep personal items on her bus while males were allowed to do so. In fact, Plaintiff admitted that she left personal items on her bus *in violation* of workplace policy. *See* Dkt. No. 58-2 at P 65 (citing Dkt. No. 58-7, Ex. A, Pl's Depo, at 59); Dkt. No. 60-1 at P 65. Defendant Nichols repeatedly directed Plaintiff to remove those items from her bus, and she reported those requests to Defendant Smith. As a result, Plaintiff met with Defendants Smith and Nichols and addressed the topic. *See* Dkt. 58-2 at P 65 (citing Dkt. No. 58-7, Ex. A at 60-61); Dkt. No. 60-1 at P 65. Plaintiff further [*25] admitted that Defendant Nichols posted a note to *all* bus drivers indicating that, if an item did not fit in their cubby, it could not be left on the bus and he warned her and five other drivers about leaving personal items on their buses after a run was complete. *See* Dkt. No. 58-2 at PP 66, 67; Dkt. No. 60-1 at PP 66, 67. Thus, this example does not reveal an inference of gender-based discrimination.

Regarding the letter, Plaintiff testified at her deposition that, in February of 2016, she met with Defendant Kisloski, and he asked her "to write a letter in order to keep [her] job" about why she "liked [her] job." *See* Dkt. No. 58-7, Ex. A at 62. During the meeting, Plaintiff alleges that Defendant Kisloski told her that, if she and Defendant Nichols could not get along, he was going to fire one or both of them. *See id.* at 63. In Plaintiff's letter, dated February 9, 2016, she wrote to Defendant Kisloski "you asked me to spend some time to reflect and think about 2 questions. The first question: Do I like my job and the second: What do I need to happen to

remain a positive part of our educational environment." *See* Dkt. No. 58-12, Ex. F. The context of this meeting and Plaintiff's letter do not [*26] show that she was compelled to write the letter as a form of discrimination or instead of making a complaint. It appears that Defendant Kisloski asked her to write the letter as a response to her complaints, to reflect on and recommend changes in the workplace. Furthermore, Plaintiff does not allege that she was singled out to write the letter because she was a woman or to keep her from complaining about discrimination. Thus, this example does not reveal Defendants' discriminatory intent.

Finally, with respect to Defendant Smith's remark about women being born without tongues, the remark was made fifteen years ago, not in Plaintiff's presence, and has absolutely nothing to do with her termination. For all of these reasons, the Court finds that Plaintiff has not satisfied the final element of her *prima facie* case of showing that the circumstances surrounding her termination allow an inference of discrimination and grants Defendants' motion for summary judgment with respect to this claim.

### 4. Plaintiff's Title VII gender-based retaliation claim

Title VII of the Civil Rights Act of 1964 includes an anti-retaliation provision, making it unlawful "for an employer to discriminate against any [*27] of his employees ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This provision "is intended to further the goals of the anti-discrimination provision 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting [*Burlington Northern & Santa Fe Ry. v.*] *White*, 548 U.S. [53,] 63, 126 S. Ct. 2405, 165 L. Ed. 2d 345 [(2006)]). Courts evaluate Title VII retaliation claims under the three-step burden-shifting analysis set out in *McDonnell Douglas. See id.*

"First, the plaintiff must establish a *prima facie* case of retaliation by showing: '"(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."'"[7] *Id.* (quotation omitted). The plaintiff's

burden in proving a *prima facie* case is "de minimis." *Id.* It is the court's role in evaluating a summary judgment motion "'to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact [*28] to infer a retaliatory motive.'" *Id.* (quotation omitted).

If the plaintiff sustains this initial burden, "'a presumption of retaliation arises,'" and the burden shifts to the defendant. *Id.* (quotation omitted). Once the burden shifts to the defendant, it must then "'articulate a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* (quotation omitted). If the defendant can do this, then the "presumption of retaliation dissipates" and the burden shifts back to the employee to show that the retaliation "'was a substantial reason for the adverse employment action.'" *Id.* (quotation omitted). "A plaintiff can sustain this burden by proving that 'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause. . . .'" *Id.* (quotation omitted).

Plaintiff's second EEOC complaint, received by the EEOC on May 17, 2017, alleges that Plaintiff filed her first EEOC complaint of discrimination on January 12, 2017.[8] *See* Dkt. No. 13-5, Ex. F at 4. Plaintiff then claimed that, "[o]n or about January 25, 2017, I was informed that [Defendants] had pressed criminal charges against me for carrying a pistol on a bus. This is an accusation that [*29] is absolutely false. I was told that if I resigned from my position and withdrew my charge with the EEOC the criminal charges would be dropped." *See id.* Plaintiff then added that, "[o]n or about March 7, 2017, I was terminated. I believe [Defendants] falsely accused me of carrying a pistol, pressed criminal charges against me and terminated me in retaliation for having filed a prior EEOC charge in willful violation of Title VII..." *See id.* at 6.

---

VII retaliation standard is appropriate.

[8] The dates surrounding Plaintiff's two EEOC complaints cannot easily be identified by looking at the documents. Both EEOC complaints were notarized on May 15, 2017. *See* Dkt. Nos. 13-4, Ex. E and 13-5, Ex. F. However, in Plaintiff's complaint for retaliation she specifically addresses the EEOC complaint she made for discrimination on January 12, 2017. *See* Dkt. No. 13-5, Ex. F at 4. The NYSDHR Order and Determination, however, stated that the first complaint was filed on February 27, 2017. *See* Dkt. No. 13-6, Ex. G at 2. In Plaintiff's deposition, she claimed that she filed the first complaint in either late December 2016 or early January 2017 with the EEOC, and it appears she claims that the case was transferred to the NYSDHR on February 27, 2017. *See* Dkt. No. 58-7, Ex. A at 129-132. The date Plaintiff first filed her claim with the EEOC is important because her retaliation claim would be illogical if she filed her first EEOC complaint in February 2017. Thus, for purposes of this Memorandum-Decision and Order, the Court treats the filing date of the first EEOC complaint as January 12, 2017.

---

[7] Defendants appear to use a different standard, one for post-employment retaliation, but it includes these same elements. Because Plaintiff alleges that Defendants' retaliation occurred *before* she was terminated on March 7, 2017, the Court finds that the regular Title

Plaintiff has established at least the first and third elements of a retaliation claim. She engaged in a protected activity by filing her first complaint with the EEOC on January 12, 2017, and she was terminated from her position on March 7, 2017.[9] Defendants admit that Plaintiff can prove that it had knowledge of her first EEOC complaint. *See* Dkt. No. 58-1 at 22. Thus, the issue the Court must address is whether Plaintiff satisfied the fourth element, i.e., whether there was a causal connection between Plaintiff's filing her first EEOC complaint and her termination.

The evidence clearly demonstrates that Defendant District sought to terminate Plaintiff's as early as December 8, 2016, when she was placed on administrative leave after refusing [*30] to resign. *See* Dkt. No. 58-22, Ex. P at 2. In addition, Defendant District notified Plaintiff of the disciplinary charges on December 20, 2016. *See* Dkt. No. 58-2 at P 115. For these reasons, Plaintiff has not established a causal connection to satisfy the fourth element of her retaliation claim.

### 5. Plaintiff's claims pursuant to 42 U.S.C. § 1983

#### a. Supervisory liability[10]

Courts analyze discrimination claims brought pursuant to 42 U.S.C. § 1983 the same as claims brought under Title VII. Unlike Title VII, however, in § 1983 claims "[a]n individual may be held liable ... only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127

---

[9] The Court does not address whether "pressing criminal charges" against Plaintiff constitutes an adverse employment action because the facts clearly show that Defendant District only forwarded the report to the police and took no further action. Notably, Plaintiff was already on administrative leave, which had commenced on December 8, 2016, at the time her alleged prior pistol possession was reported. Neither the police nor Defendant District pursued the criminal case. *See* Dkt. No. 60 at 16 (citing Dkt. No. 58-9, Ex. C, Def. Kisloski Aff., at P 6; Dkt. No. 60-1 at PP 153-a, 154-a).

[10] In her complaint, Plaintiff seeks to hold the named defendants liable in both their individual and official capacities. *See generally* Dkt. No. 1. Plaintiff's counsel admits that her claims against the named Defendants in their official capacities are redundant of her claim against Defendant District. *See* Dkt. No. 23 at 7, n.3. Thus, the Court addresses these claims as only against the named Defendants in their *individual* capacities and dismisses any claims against them in their *official* capacities.

(2d Cir. 2004)) (other citations omitted). The Second Circuit has held that personal involvement can be established by showing the following:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed [*31] the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring."

*Id.* (quoting *Back*, 365 F.3d at 127).

If the defendant is a supervisor, then "'a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. Finally, as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic ...'" *Id.* (quoting *Raspardo [v. Carlone,]* 770 F.3d [97,] 116 [(2d Cir. 2014)] (citation omitted)).

Defendant Kisloski, as Superintendent of Schools, was clearly a "supervisor" in that he had the authority to hire, fire, demote, promote, transfer, or discipline employees. *See Vance v. Ball State Univ.*, 570 U.S. 421, 425, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013). Plaintiff also indicated that Defendant Smith hired her and promoted Defendant Nichols, and thus he was a "supervisor" as well. *See* Dkt. No. 58- 2 at P 4. She also referred to Defendant Jensen as her immediate supervisor, so the Court also treats him as a supervisor for this claim. *See id.* at 13.[11]

Plaintiff does not allege that Defendant Kisloski directly participated in any discrimination such as making gender-based derogatory [*32] remarks or treating her differently from men. Although in her complaint Plaintiff alleges that Defendant Kisloski, as Superintendent, perpetuated a policy of discriminating against female bus drivers, Plaintiff provides no evidence at this stage in the proceedings to support this contention. *See* Dkt. No. 1 at P 68. Plaintiff's only complaint about Defendant Kisloski is that she reported Defendant Nichols's conduct to him, and she alleges that

---

[11] The parties do not discuss whether Defendant Nichols should be held individually liable under § 1983, and they concede that he was not Plaintiff's supervisor. However, because Defendant Nichols's conduct was gender-neutral, he cannot be held individually liable under § 1983.

Defendant Kisloski gave her an ultimatum that she and Defendant Nichols would get along or one or both of them would be fired. *See* Dkt. No. 60 at 16. As discussed above, Plaintiff also contends that Defendant Kisloski required Plaintiff to write a letter to keep her job. *See id.* According to Plaintiff, Defendant Kisloski used the December 6, 2016 incident as pretext to cover up the discriminatory conduct to which Plaintiff had been subjected. *See id.*

Plaintiff reported her problems with Defendant Nichols to Defendant Kisloski, but none of these problems stemmed from *discrimination*. In fact, Plaintiff admits that "during the entire pendency of her employment with Defendant [District], she never made an accusation of sexbased discrimination regarding **[*33]** [Defendant] Nichols ...". *See* Dkt. No. 58-2 at P 34 (citing Dkt. No. 58-7, Ex. A at 125); Dkt. No. 60-1 at P 34.[12] Because Defendant Kisloski did not have any personal involvement in Plaintiff's alleged discrimination, the Court dismisses her § 1983 supervisory claim against him.

Plaintiff repeatedly alleged that Defendant Smith made crude comments about women. *See* Dkt. No. 23, Pl's Memorandum in Opposition Mot. on Pleadings, at 13. Plaintiff also claimed that Defendant Smith promoted Defendant Nichols, despite Defendant Nichols's regular conduct, such as using "daily sexual epithets" and "forcibly breaking into the compartment on [ ] [P]laintiff's bus to remove her personal items and throwing them on the floor." *See id.* However, as already addressed, Defendant Smith's alleged offensive remarks were made years ago, to other women, and were not personal to her. Plaintiff also admitted that she did not complain of gender discrimination to Defendant Smith; and, whenever she did complain to him about Defendant Nichols, he was helpful to her in working out their issues. *See* Dkt. No. 58-7, Ex. A at 35); Dkt. No. 60-1 at P 37. For these reasons, the Court finds that **[*34]** Defendant Smith cannot be held individually liable under § 1983.

Finally, Plaintiff claimed that Defendant Jensen, her immediate supervisor, did nothing to ameliorate the discriminatory conduct of which she complained. *See* Dkt. No. 23 at 16. Plaintiff alleges that, during the incident on

---

[12] The Court also notes that Defendant Kisloski acted on Plaintiff's reports of problems with Defendant Nichols. For example, Plaintiff admits that, on October 12, 2016, she complained to Defendant Kisloski regarding an incident where Defendant Nichols placed a screw through a lock on her bus, rendering it inoperable. *See* Dkt. No. 58-2 at P 58; Dkt. No. 60-1 at P 58. On October 14, 2016, Defendants Jensen and Smith informed Plaintiff that Defendant Nichols was disciplined for his actions, that he was "reflecting" on his actions for a week, and told her that the incident was not being taken lightly. *See* Dkt. No. 58-2 at P 59; Dkt. No. 60-1 at P 59.

December 6, 2016, Defendant Jensen began swearing at her. *See id.* (citing Dkt. No. 1 at P 32). Plaintiff notes that in his disciplinary proceeding testimony he admitted that "I cussed once at her[.]" *See id.* No reasonable factfinder could find that one cuss word during a tense situation would constitute "direct participation" in violating Plaintiff's constitutional rights. In fact, Jensen himself experienced the same negative treatment from Defendant Nichols, even though he was male. *See* Dkt. No. 58-1 at 25. Plaintiff admitted that she never asked Defendant Jensen to take any action against Defendant Nichols; although she contends that she complained to him, and Defendant Jensen told her nothing could or would be done about Defendant Nichols's conduct. *See* Dkt. No. 58-1 at P 40; Dkt. No. 60-1 at P 40; Dkt. No. 58-7, Ex. A at 46. Even the conduct about which Plaintiff complained - that Defendant Nichols left **[*35]** a note on her bus telling her to park somewhere else - was not a complaint about gender discrimination. *See* Dkt. No. 58-7, Ex. A at 46. Because there is no evidence that Defendant Jensen contributed to or was aware of any discriminatory actions and only learned of gender-neutral issues between Plaintiff and Defendant Nichols, the Court finds that Defendant Jensen cannot be held individually liable under § 1983.

### b. Municipal liability

"Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)) (other citation omitted). However, municipal entities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). They may be sued only when a government's policy or custom, made by policymakers or officials, inflicts injury. *See id.* The *Monell* court further ruled "that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

In other words, a municipal entity like a school district cannot be held liable under § 1983 unless one of the officials or policymakers violated the Constitution. Defendant **[*36]** Kisloski, as Superintendent, is the only individual Defendant who is a policymaking official within Defendant District. However, as the Court noted, Plaintiff has not come forward with any evidence that Defendant District, through its policymaker, Defendant Superintendent Kisloski, had a policy of discriminating against female bus drivers. Thus, the Court grants Defendants' motion for summary judgment with regard

2020 U.S. Dist. LEXIS 53465, *36

to Plaintiff's § 1983 municipal liability claim against Defendant District.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for judgment on the pleadings, *see* Dkt. No. 13, is **DENIED** insofar as Defendants argue that Plaintiff has failed to exhaust her administrative remedies and the remainder of that motion is **DENIED** as moot; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 58, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED**.

Dated: March 27, 2020

Syracuse, New York

/s/ Frederick J. Scullin, Jr. **[*37]**

Frederick J. Scullin, Jr.

Senior United States District Judge