# Exhibit A

DocuSign Envelope ID: 44C89275-A225-4384-A79C-0388D31C05A8

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA  ☒ EEOC | 523-2020-00495 |

| Connecticut Commission on Human Rights | and EEOC |
|---|---|
| (State or Local Agency, If Any) | |

| NAME (Indicate Mr., Ms.., or Mrs.) | HOME TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|
| Dr. Ashley Eltorai | (212) 257-6800 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | New York, NY 10003 | 6/8/87 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|---|
| Yale University and Manuel Lopes Fontes, M.D. | 6,000+ | 203-432-4771 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |
| 333 Cedar Street | New Haven CT 06510 | | New Haven |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
| Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | 12,000+ | 203-688-4242 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |
| 20 York Street | New Haven, CT 06510 | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | EARLIEST | LATEST |
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | September 2018 | Present |
| ☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☒ OTHER (Specify) pregnancy | ☒ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s))


SEE ATTACHED SUPPLEMENT.


RECEIVED

DEC 05 2019

E.E.O.C
BOSTON AREA OFFICE


| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | DocuSigned by: |
| 12/04/2019 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: (Month, day and year) |
| Date   Charging Party (Signature) | 12/4/19 |

TANVIR HAQUE RAHMAN
Notary Public, State of New York
No. 02RA6259923
Qualified in Queens County
Commission Expires April 16, 2022

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**
———————————————————— X
HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN   :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and   :   EEOC No.: _____
ELIZABETH REINHART, M.D.,   :
   :
                      Claimants,   :   **SUPPLEMENT TO CHARGE OF**
   :   **DISCRIMINATION AND**
    v.   :   **RETALIATION**
   :
YALE UNIVERSITY YALE NEW HAVEN   :
HOSPITAL, INC., and MANUEL LOPES   :
FONTES, M.D.,   :
   :
                      Respondents.
———————————————————— X

      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

### PRELIMINARY STATEMENT

      1.     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

      2.     Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

previously worked) is well known and documented.  Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.     Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.     Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.     Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.     This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.     Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.      Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.      Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.      Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.      Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut.  Dr. Reinhart meets the definition of "employee" under all applicable statutes.  Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut.  Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale.  Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale.  At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof.  Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.   DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

4

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

6

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.     DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

11

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.    However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.    Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.    Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

Case 3:20-cv-00330-JBA   Document 56-1   Filed 06/22/20   Page 21 of 121
DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA<br>☒ EEOC | 523-2020-00498 |

| Connecticut Commission on Human Rights | and EEOC |
|---|---|
| *(State or Local Agency, if Any)* | |

| NAME *(Indicate Mr., Ms., or Mrs.)* | HOME TELEPHONE NUMBER *(include Area Code)* |
|---|---|
| Dr. Elizabeth Reinhart | (212) 257-6800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | New York, NY 10003 | 02/19/1990 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below).*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(include Area Code)* |
|---|---|---|
| Yale University and Manuel Lopes Fontes, M.D. | 6,000+ | 203-432-4771 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 333 Cedar Street | New Haven CT 06510 | New Haven |

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(include Area Code)* |
|---|---|---|
| Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | 12,000+ | 203-688-4242 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 20 York Street | New Haven, CT 06510 |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST: May 2019    LATEST: Present

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attached extra sheet(s))*

SEE ATTACHED SUPPLEMENT.

RECEIVED

DEC 05 2019

E E O C
BOSTON AREA OFFICE

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 12/04/2019 | DocuSigned by: |
| Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:<br>(Month, day and year) |

12|4|19

TANVIR HAQUE RAHMAN
Notary Public, State of New York
No. 02RA6259923
Qualified in Queens County
Commission Expires April 16, 20__

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
------------------------------------------------------ X
HEIDI BOULES, M.D., MIA CASTRO, M.D.,      :
ASHLEY ELTORAI, M.D., JODI-ANN            :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and   :     EEOC No.: _____
ELIZABETH REINHART, M.D.,                 :
                                          :
                    Claimants,            :     **SUPPLEMENT TO CHARGE OF**
                                          :     **DISCRIMINATION AND**
        v.                                :     **RETALIATION**
                                          :
YALE UNIVERSITY YALE NEW HAVEN            :
HOSPITAL, INC., and MANUEL LOPES          :
FONTES, M.D.,                             :
                                          :
                    Respondents.
------------------------------------------------------ X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3. Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4. Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5. Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6. This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7. Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

2

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

### PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthesiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

5

26.    Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.    While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.    However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.    While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.    This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.    Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.    DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.    Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

6

33. Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34. By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35. After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36. Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37. Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38. Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

7

39.    Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.    Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.    Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.    Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.    Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.    This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.    Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.    Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.    However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.    Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.    There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.    PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.    Pregnancy Discrimination

50.    Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.    In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.    Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

10

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

11

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

   b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

13

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.    However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.    Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.    Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.   DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

16

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.  Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.  Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.  This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.  Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.  Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.  Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 0112761F-F2D1-4464-9933-9AE3C64AE3F6

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA  ☒ EEOC | 523-2020-00493 |

Connecticut Commission on Human Rights _____ and EEOC
*(State or Local Agency, if Any)*

| NAME *(Indicate Mr., Ms., or Mrs.)* | HOME TELEPHONE NUMBER *(Include Area Code)* | |
|---|---|---|
| Dr. Heidi Boules | (212) 257-6800 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | New York, NY 10003 | 11/01/1980 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below).*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* | |
|---|---|---|---|
| Yale University and Manuel Lopes Fontes, M.D. | 6,000+ | 203-432-4771 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |
| 333 Cedar Street | New Haven CT 06510 | | New Haven |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* | |
| Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | 12,000+ | 203-688-4242 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |
| 20 York Street | New Haven, CT 06510 | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | EARLIEST: October 2018   LATEST: Present |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE   *(If additional space is needed, attached extra sheet(s))*

SEE ATTACHED SUPPLEMENT.

RECEIVED

DEC 05 2019

E.E.O.C
BOSTON AREA OFFICE

| I want this charge filed with the EEOC and the State FEPA.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | DocuSigned by: Dr. Heidi Boules |
| 12/04/2019 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: |
| DocuSigned by: Dr. Heidi Boules | *(Month, day and year)* |
| Date   4C808DF08871475  Charging Party (Signature) | 12/4/19 |

TANVIR HAQUE RAHMAN
Notary Public, State of New York
No. 02RA6259923
Qualified in Queens County
Commission Expires April 16, 2020

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,      :
ASHLEY ELTORAI, M.D., JODI-ANN            :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and   :      EEOC No.: _____
ELIZABETH REINHART, M.D.,                 :
                                          :
                    Claimants,            :      **SUPPLEMENT TO CHARGE OF**
                                          :      **DISCRIMINATION AND**
            v.                            :      **RETALIATION**
                                          :
YALE UNIVERSITY YALE NEW HAVEN            :
HOSPITAL, INC., and MANUEL LOPES          :
FONTES, M.D.,                             :
                                          :
                    Respondents.          :
————————————————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

### PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented.  Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

2

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr.

Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to

employ all Claimants, controls and has controlled the terms and conditions of Claimants'

employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed

and continues to employ all Claimants, controls and has controlled the terms and conditions of

Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident

of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity,

and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical

Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale

University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department

at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and

authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the

definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left

and/or was dismissed from at least two other medical institutions after having engaged in sexual

harassment towards and/or inappropriate sexual conduct with female subordinates.

4

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

**II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES**

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

6

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and
traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually
harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from
him every time she sees him.

## III.    DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her
anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two
worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr.
Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on
and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted
touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for
resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up
a syringe cap that had fallen on the ground rather than tend to a patient who was severely
hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an
anonymous evaluation that specifically complained about Dr. Fontes's penchant for
inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr.
Fontes's behavior.

8

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

        b.      Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107. Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108. Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109. This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110. Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111. Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112. Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

18

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA  ☒ EEOC | 523-2020-00496 |

Connecticut Commission on Human Rights _____ and EEOC
*(State or Local Agency, If Any)*

| NAME *(Indicate Mr., Ms., or Mrs.)* | HOME TELEPHONE NUMBER *(include Area Code)* |
|---|---|
| Dr. Jodi-Ann Oliver | (212) 257-6800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | New York, NY 10003 | 02/04/1979 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below).*

√

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(include Area Code)* |
|---|---|---|
| Yale University and Manuel Lopes Fontes, M.D. | 6,000+ | 203-432-4771 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 333 Cedar Street | New Haven CT 06510 | New Haven |

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(include Area Code)* |
|---|---|---|
| Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | 12,000+ | 203-688-4242 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 20 York Street | New Haven, CT 06510 |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| | EARLIEST — LATEST |
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | January 2016 — Present |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE  *(If additional space is needed, attached extra sheet(s))*

SEE ATTACHED SUPPLEMENT.

RECEIVED
DEC - 6 2019
U.S. E.E.O.C
Boston Area Office

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *(When necessary to meet State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | ┌DocuSigned by:  Dr. Jodi-Ann Oliver |
| 12/05/2019 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: *(Month, day and year)* |
| ┌DocuSigned by:  Dr. Jodi-Ann Oliver | TAHNVIR HAQUE RAHMAN |
| Date   Charging Party (Signature) | 12/5/19   Notary Public, State of New York  No. 02RA6259923  Qualified in Queens County  Commission Expires April 16, 2022 |

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**
———————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,          :
ASHLEY ELTORAI, M.D., JODI-ANN               :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and    :          EEOC No.: _____
ELIZABETH REINHART, M.D.,                         :
                                                               :
                                     Claimants,          :          **SUPPLEMENT TO CHARGE OF**
                                                               :          **DISCRIMINATION AND**
                    v.                                         :          **RETALIATION**
                                                               :
YALE UNIVERSITY YALE NEW HAVEN          :
HOSPITAL, INC., and MANUEL LOPES           :
FONTES, M.D.,                                             :
                                                               :
                                     Respondents.       :
———————————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

### PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

2

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut.  Dr. Reinhart meets the definition of "employee" under all applicable statutes.  Dr.

Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to

employ all Claimants, controls and has controlled the terms and conditions of Claimants'

employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed

and continues to employ all Claimants, controls and has controlled the terms and conditions of

Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident

of Connecticut.  Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity,

and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical

Research, Anesthesiology, at Yale.  Dr. Fontes is an employee of and supervisor at Yale

University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department

at Yale.  At all relevant times, Dr. Fontes has had and still has supervisory power, control and

authority of Claimant's employment and the terms and conditions thereof.  Dr. Fontes meets the

definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left

and/or was dismissed from at least two other medical institutions after having engaged in sexual

harassment towards and/or inappropriate sexual conduct with female subordinates.

4

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

6

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.      Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and

traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually

harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from

him every time she sees him.

## III.     DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.      Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her

anesthesiology residency at Yale.

41.      Beginning in August 2018 and continuing in the fall of 2018, while the two

worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr.

Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on

and/or around her shoulders and waist.

42.      Each time this occurred, Dr. Castro actively resisted his advances and unwanted

touching.

43.      Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for

resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.      This included an instance in which he yelled at Dr. Castro to degradingly pick up

a syringe cap that had fallen on the ground rather than tend to a patient who was severely

hypotensive.

45.      Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an

anonymous evaluation that specifically complained about Dr. Fontes's penchant for

inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr.

Fontes's behavior.

8

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor.  However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey.  However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences.  However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

11

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

        b.      Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition.  Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project.  Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis.  Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.   DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

15

94. Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95. Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96. As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97. Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98. Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99. Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100. While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

17

107. Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108. Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109. This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110. Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111. Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112. Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 5053E297-8E7F-4D5C-9B4C-3A915200FAFE

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA<br>☒ EEOC | 523-2020-00497 |

| Connecticut Commission on Human Rights | and EEOC |
|---|---|
| *(State or Local Agency, if Any)* | |

| NAME *(Indicate Mr., Ms.., or Mrs.)* | HOME TELEPHONE NUMBER *(include Area Code)* | |
|---|---|---|
| Dr. Lori-Ann Oliver | (212) 257-6800 | |
| **STREET ADDRESS** | **CITY, STATE AND ZIP CODE** | **DATE OF BIRTH** |
| c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | New York, NY 10003 | 02/04/1979 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below).*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(include Area Code)* | |
|---|---|---|---|
| Yale University and Manuel Lopes Fontes, M.D. | 6,000+ | 203-432-4771 | |
| **STREET ADDRESS** | **CITY, STATE AND ZIP CODE** | | **COUNTY** |
| 333 Cedar Street | New Haven CT 06510 | | New Haven |
| **NAME** | **NO. OF EMPLOYEES/MEMBERS** | **TELEPHONE NUMBER** *(include Area Code)* | |
| Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | 12,000+ | 203-688-4242 | |
| **STREET ADDRESS** | **CITY, STATE AND ZIP CODE** | | |
| 20 York Street | New Haven, CT 06510 | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☑ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | *EARLIEST* April 2019   *LATEST* Present |
| ☑ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify) | ☑ CONTINUING ACTION |

THE PARTICULARS ARE   *(If additional space is needed, attached extra sheet(s))*

SEE ATTACHED SUPPLEMENT.

RECEIVED
DEC - 6 2019
U.S. E.E.O.C
Boston Area Office

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *(When necessary to meet State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT<br>DocuSigned by:<br>*Dr. Lori-Ann Oliver* |
| 12/05/2019 | *DocuSigned by:*<br>*Dr. Lori-Ann Oliver* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:<br>(Month, day and year) |
| Date | Charging Party *(Signature)* | TANVIR HAQUE RAHMAN<br>12/5/19<br>Notary Public, State of New York<br>No. 02RA6259923<br>Qualified in Queens County<br>Commission Expires April 16, 20 2 |

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
————————————————————————— X
HEIDI BOULES, M.D., MIA CASTRO, M.D.,        :
ASHLEY ELTORAI, M.D., JODI-ANN              :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :      EEOC No.: _____
ELIZABETH REINHART, M.D.,                    :
                                             :
                        Claimants,           :      **SUPPLEMENT TO CHARGE OF**
                                             :      **DISCRIMINATION AND**
            v.                               :      **RETALIATION**
                                             :
YALE UNIVERSITY YALE NEW HAVEN               :
HOSPITAL, INC., and MANUEL LOPES             :
FONTES, M.D.,                                :
                                             :
                        Respondents.
————————————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a

distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing

conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines,

Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been

subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr.

Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated

against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr.

Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he

sexually assaulted a female anesthesiology resident following a residency graduation ceremony),

Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a

powerful position no matter the heinous conduct he has perpetrated against his female

subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent

appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and

Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of

Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those

(of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant

Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr.

Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to

employ all Claimants, controls and has controlled the terms and conditions of Claimants'

employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed

and continues to employ all Claimants, controls and has controlled the terms and conditions of

Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident

of Connecticut. Dr. Fontes is a Professor of Anesthesiology, Vice Chair of Diversity, Equity,

and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical

Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale

University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department

at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and

authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the

definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left

and/or was dismissed from at least two other medical institutions after having engaged in sexual

harassment towards and/or inappropriate sexual conduct with female subordinates.

4

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

5

26.    Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.    While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.    However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.    While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.    This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.    Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.    DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.    Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

6

33.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

7

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and

traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually

harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from

him every time she sees him.

## III.     DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her

anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two

worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr.

Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on

and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted

touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for

resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up

a syringe cap that had fallen on the ground rather than tend to a patient who was severely

hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an

anonymous evaluation that specifically complained about Dr. Fontes's penchant for

inappropriately touching colleagues. Despite her complaint, nothing was done about Dr.

Fontes's behavior.

8

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro,

this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used

her vacation time (of which residents and fellows are given very little), purportedly because the

trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's

fellowship requirements, as such a trip is considered by many fellowship programs, and even the

American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the

American Board of Anesthesiology would approve and accredit this mission trip to Peru so long

as the relevant application was submitted, he inexplicably continued to refuse to permit Dr.

Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and

punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform

her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of

anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a

due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I

wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

11

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66. This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67. Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68. Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69. Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.   Sexual Harassment

70. Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71. In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent
physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague
in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage
her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient
whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood
extremely close to her, within six inches, for an entire conversation, while unwantedly touching
her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly
unprofessional and demeaning, particularly with the family of a pediatric patient observing
nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-
August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide
Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or
deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made
shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this
complaint led to that retaliatory decision as well.

## VI.   DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are
both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of
them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.   DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

16

DocuSign Envelope ID: 8C27E3A2-8902-4171-B13F-80392743D4D1

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.   Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.   Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.   This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.   Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.   Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.   Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

18

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 6EB7500F-794D-4E95-B1D8-47D7969FC5C0

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | AGENCY<br>☐ FEPA<br>☒ EEOC | CHARGE NUMBER<br>523-2020-00494 |
|---|---|---|

| Connecticut Commission on Human Rights | and EEOC |
|---|---|
| (State or Local Agency, If Any) | |

| NAME (Indicate Mr., Ms., or Mrs.)<br>Dr. Mia Castro | HOME TELEPHONE NUMBER (Include Area Code)<br>(212) 257-6800 | |
|---|---|---|
| STREET ADDRESS<br>c/o Douglas H. Wigdor, Wigdor LLP, 85 Fifth Avenue | CITY, STATE AND ZIP CODE<br>New York, NY 10003 | DATE OF BIRTH<br>09/11/1988 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME<br>Yale University and Manuel Lopes Fontes, M.D. | NO. OF EMPLOYEES/MEMBERS<br>6,000+ | TELEPHONE NUMBER (Include Area Code)<br>203-432-4771 | |
|---|---|---|---|
| STREET ADDRESS<br>333 Cedar Street | CITY, STATE AND ZIP CODE<br>New Haven CT 06510 | COUNTY<br>New Haven | |
| NAME<br>Yale New Haven Hospital and Manuel Lopes Fontes, M.D. | NO. OF EMPLOYEES/MEMBERS<br>12,000+ | TELEPHONE NUMBER (Include Area Code)<br>203-688-4242 | |
| STREET ADDRESS<br>20 York Street | CITY, STATE AND ZIP CODE<br>New Haven, CT 06510 | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | EARLIEST: August 2018    LATEST: Present<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE   (If additional space is needed, attached extra sheet(s))

SEE ATTACHED SUPPLEMENT.

RECEIVED

DEC 05 2019

E.E.O.C
BOSTON AREA OFFICE

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT<br>DocuSigned by:<br>*Mia Castro, M.D.* |
| 12/04/2019<br>Date<br>DocuSigned by:<br>*Mia Castro, M.D.*<br>Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:<br>(Month, day and year)<br>12/4/19<br>TANVIR HAQUE RAHMAN<br>Notary Public, State of New York<br>No. 02RA6259923<br>Qualified in Queens County<br>Commission Expires April 16, 20 20 |

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
------------------------------------------------------------------ X
HEIDI BOULES, M.D., MIA CASTRO, M.D.,  :
ASHLEY ELTORAI, M.D., JODI-ANN        :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and :     EEOC No.: _____
ELIZABETH REINHART, M.D.,           :
                                        :
               Claimants,     :     **SUPPLEMENT TO CHARGE OF**
                             :     **DISCRIMINATION AND**
         v.                 :     **RETALIATION**
                             :
YALE UNIVERSITY YALE NEW HAVEN    :
HOSPITAL, INC., and MANUEL LOPES     :
FONTES, M.D.,                       :
                             :
               Respondents.   :
------------------------------------------------------------------ X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.     Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr.

Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to

employ all Claimants, controls and has controlled the terms and conditions of Claimants'

employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed

and continues to employ all Claimants, controls and has controlled the terms and conditions of

Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident

of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity,

and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical

Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale

University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department

at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and

authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the

definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left

and/or was dismissed from at least two other medical institutions after having engaged in sexual

harassment towards and/or inappropriate sexual conduct with female subordinates.

4

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

II.     **DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES**

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

33.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

7

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and

traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually

harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from

him every time she sees him.

## III.    DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her

anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two

worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr.

Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on

and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted

touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for

resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up

a syringe cap that had fallen on the ground rather than tend to a patient who was severely

hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an

anonymous evaluation that specifically complained about Dr. Fontes's penchant for

inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr.

Fontes's behavior.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

59. Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60. Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61. Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62. Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63. Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64. Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65. Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

11

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

12

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

72.    Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.    This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.    Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.    Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.    Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.     DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

15

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

17

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: 8F3E2650-DED6-4ABD-BB54-8C74FF1AD931

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.