# Exhibit E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
------------------------------------------------------------------ X

| | |
|---|---|
| MIA CASTRO, M.D., HEIDI BOULES, M.D., ASHLEY ELTORAI, M.D., JODI-ANN OLIVER, M.D., LORI-ANN OLIVER, M.D. and ELIZABETH REINHART, M.D., : : : : : | Index No.: 3:20-cv-00330 (JBA) |
| Plaintiffs, : : | **SECOND AMENDED COMPLAINT** |
| v. : : | |
| : | **Jury Trial Demanded** |
| YALE UNIVERSITY, YALE NEW HAVEN HOSPITAL, INC. and MANUEL LOPES FONTES, M.D., in his individual and professional capacities, : : : : | |
| : | |
| Defendants. : | |

------------------------------------------------------------------ X

      Plaintiffs Mia Castro, M.D., Heidi Boules, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Plaintiffs") allege against Defendants Yale University (the "University"), Yale New Haven Hospital, Inc. ("Yale New Haven Hospital," "YNHH" or the "Hospital") and Manuel Lopes Fontes, M.D. ("Dr. Fontes") (altogether "Defendants"):

## PRELIMINARY STATEMENT

      1.     Behind Yale University's veneer of prestige and privilege lies a troubling pattern and history wherein the voices of women within its student body, professor and employee ranks who courageously come forward with complaints of sexual harassment against men in positions of power are suppressed and ignored.

      2.     Powerful men at Yale University are repeatedly given "passes" and the "benefit of the doubt" when the victims of their sexual misconduct come forward, whereas their victims are forced to go through hoops just to obtain a modicum of justice.  Through this pattern of

deliberate indifference, Yale University intends to send a message that the University will not stand behind those who have been innocently victimized by persons in power; instead it will favor and protect the powerful who most contribute to the University's prestige and fortune.

3.      This lawsuit is intended to finally give a voice to those women whose stories of harrowing sexual misconduct at Yale University have been stifled for far too long, and to bring about justice against both the powerful men who have targeted them, and those at the University who have protected and supported these men.

4.      The six Plaintiffs in this lawsuit are all highly accomplished, dedicated and well-respected female doctors within Yale University's Department of Anesthesiology (the "Department of Anesthesiology" or the "Department") and Yale New Haven Hospital.  All six of them were sexually harassed by the same male supervisor, Defendant Manuel Lopes Fontes, M.D., a Professor of Anesthesiology at Yale University and (among other titles), incredibly, the Department of Anesthesiology's Vice Chair of Diversity, Equity and Inclusion.[1]

5.      Dr. Fontes's sordid history of sexually harassing and acting inappropriately towards female subordinates (both at Yale University and YNHH, and at other institutions at which he previously worked) is well known and documented.  Yet, Yale University and YNHH welcomed him with open arms, and he remains a distinguished leader within the Department of Anesthesiology and the Hospital.

6.      Shockingly, after complaining about Dr. Fontes's sexually harassing conduct to higher-ups at Yale University and YNHH, including to Department of Anesthesiology Chair and

---

[1]      That is, until Yale University caught wind that Plaintiffs had engaged counsel and removed him from this position to save face.

YNHH attending physician Dr. Roberta Hines, Dr. Fontes's unlawful behavior persisted, and, in fact, Plaintiffs have since been subjected to blatant retaliation for their complaints.

7.     Further, in addition to sexual harassment and unlawful retaliation, Defendants have also discriminated against Plaintiff Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

8.     Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful harassing behavior since the start of his tenure at Yale University and Yale New Haven Hospital (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale University and Yale New Haven Hospital took no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

9.     This dreadful reality cannot be better illustrated than by Dr. Fontes's appointment to serve as the Department of Anesthesiology's Vice Chair of Diversity, Equity and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Plaintiffs and other women Dr. Fontes has victimized would be a gross understatement.

10.     Apparently emboldened by Yale University's and Yale New Haven Hospital's decision to protect him at the expense of those he has abused -- of whom there are many -- even after Plaintiffs complained about his harassing behavior, Dr. Fontes sexually harassed Plaintiff Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably asked her where her "partner in crime" was, which was a reference to Plaintiff Dr. Eltorai, who too, like Ms. Reinhart, had lodged repeated complaints against him.

11.     Such brazen sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Defendants Yale University and Yale New Haven Hospital have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation, including, but not limited to, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*. ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), while Defendant Dr. Fontes has violated Connecticut's common law by committing assault, battery and invasion of privacy.

## <u>ADMINISTRATIVE REQUIREMENTS</u>

12.     On or about December 4, 2019, Plaintiffs Dr. Boules, Dr. Castro, Dr. Eltorai and Dr. Reinhart filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") naming all Defendants as respondents and alleging violations of Title VII; on or about December 5, 2019, Plaintiffs Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver filed charges of discrimination with the EEOC naming all Defendants as respondents and alleging violations of Title VII (together, the "Plaintiffs' EEOC Charges").

13.     The Plaintiffs' EEOC Charges were dual-filed/cross-filed with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") alleging violations of the Connecticut Fair Employment Practices Act ("CFEPA") against all Defendants at or around the same date they were filed with the EEOC.

14.     On January 27, 2020, Yale University submitted a position statement in response to Plaintiffs' EEOC Charges denying liability as to Plaintiffs' claims, and acknowledging that it employs Dr. Manuel Fontes.

15.     Pursuant to a request made by the CHRO, on May 1, 2020, Plaintiffs each completed a CHRO-specific "Charge of Discrimination" form, and incorporated thereto the

4

Plaintiffs' EEOC Charges that had already been filed previously with the EEOC and dual-filed/cross-filed with CHRO (together, the "Plaintiffs' CHRO Charges").  On May 13, 2020, the CHRO served Defendants with Plaintiffs' CHRO Charges, which the CHRO dated as having been received by the CHRO on December 6, 2019.

16.    On May 1, 2020, Plaintiffs received Notices of Right to Sue from the EEOC. Plaintiffs are herein asserting their causes of actions under Title VII within 90 days of receiving their Notices of Right to Sue.

17.    ~~When Plaintiffs receive their Release of Jurisdiction from the CHRO, they will seek leave to amend this Amended Complaint solely to assert claims, from the same facts as alleged herein, under the CFEPA against all Defendants, including Defendant Dr. Fontes for aiding and abetting CFEPA violations.~~

17.    On June 11, 2020, the CHRO issued Releases of Jurisdiction to all Plaintiffs. Plaintiffs are herein asserting their causes of actions under CFEPA within 90 days of receiving their Releases of Jurisdiction.

18.    Any and all other prerequisites to the filing of this suit have been met.

**JURISDICTION AND VENUE**

19.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under federal law, namely Title IX and Title VII.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because both the University and YNHH maintain their principal executive offices in this District, and a substantial part of the acts

or omissions giving rise to this action, including the unlawful employment practices alleged

herein, occurred in this District.

## **PARTIES**

21.     Plaintiff Heidi Boules, M.D. is an adult resident of Long Island City, New York.

Dr. Boules is an attending physician and assistant professor of clinical anesthesiology within the

Department of Anesthesiology, and is an employee of both Yale University and Yale New

Haven Hospital for purposes of all relevant statutes.

22.     Plaintiff Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr.

Castro is currently a pediatric anesthesiology fellow within the Department of Anesthesiology,

completed her anesthesiology residency at Yale University and YNHH in 2019, and is an

employee of both Yale University and Yale New Haven Hospital for purposes of all relevant

statutes.

23.     Plaintiff Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut.

Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within

the Department of Anesthesiology, and is an employee of both Yale University and Yale New

Haven Hospital for purposes of all relevant statutes.

24.     Plaintiff Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology

within the Department of Anesthesiology, and is an employee of both Yale University and Yale

New Haven Hospital for purposes of all relevant statutes.

25.     Plaintiff Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology

within the Department of Anesthesiology, and is an employee of both Yale University and Yale

New Haven Hospital for purposes of all relevant statutes.

6

26.     Plaintiff Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut.  Dr. Reinhart is currently a third-year anesthesiology resident at Yale University and YNHH, and is an employee of both Yale University and Yale New Haven Hospital for purposes of all relevant statutes.

27.     Yale University is an academic university and educational institution that receives financial assistance from the Federal government.  Yale University operates a School of Medicine, and works in conjunction with YNHH to operate a medical residency and fellowship program, the mission and purpose of which is educational.  At all relevant times, Defendant Yale University has employed and continues to employ all Plaintiffs, controls and has controlled the terms and conditions of Plaintiffs' employment and qualifies as an employer and/or joint employer under all relevant statutes.

28.     Yale University controls the terms and conditions of Dr. Reinhart's and Dr. Castro's employment, despite the fact that they may have entered into employment agreements with YNHH.  Dr. Reinhart and Dr. Castro both interviewed for their residency positions at Yale University and Yale New Haven Hospital with Department of Anesthesiology employees who were attending physicians at YNHH.  Dr. Castro was offered her fellowship position by Dr. Caroline Al Hadaddin, who was the then-Program Director of the Department of Anesthesiology's Pediatric Anesthesia fellowship program and an employee of Yale University. Among other things, Dr. Reinhart and Dr. Castro receive performance evaluations from Department of Anesthesiology physicians who are employed by Yale University and are attending physicians at YNHH.

29.     Yale New Haven Hospital, Inc. is a teaching hospital located at 20 York Street, New Haven, CT 06510, and works in conjunction with Yale University to operate a medical

residency and subspecialty fellow program, the mission and purpose of which is educational.  On its website, YNHH states that it is the "primary teaching hospital of Yale School of Medicine." YNHH's medical residency program is affiliated with Yale University's School of Medicine. Residents and subspecialty fellows such as Dr. Reinhart and Dr. Castro sign "agreements of appointment" with YNHH which state, *inter alia*, that YNHH "shall … provide such other support as shall be necessary to ensure a safe and appropriate work and educational environment," and that "[t]he institution does not tolerate sexual or other forms of harassment." These agreements also acknowledge that residents and fellows are subject to both YNHH and Yale University policies and procedures affecting their employment, including, but not limited to, that: (i) "[s]pecial rotations outside of the Hospital and the Affiliated Institutions are subject to the prior approval of the Chairman or the departmental residency Program Director and the Director/Associate Dean of Graduate Medical Education (GME)"; (ii)  they must "[a]bide by the GME policies as outlined in the House Staff Manual and Departmental policies as outlined by each program"; (iii) they must "[c]omply with institutional and departmental policies regarding moonlighting, including pre-approval of any moonlighting activity by program director"; (iv) they must "[c]omply with institutional and departmental duty hours policies to the best of his/her ability" and "[c]omplete the attestation form that they have reviewed the institutional and department policies," (v) "[p]romotion shall be in accordance with Institutional Policy (House Staff Manual) and Departmental Policies"; (vi) "[t]he Program Director, with the participation of the Program faculty shall evaluate, at least semi-annually, the knowledge, skills, and professional growth of a Resident/Fellow," and that "[u]nsatisfactory resident/fellow evaluation can result in required remedial activities, temporary suspension from duties, extension of training or termination of employment and residency education"; and (vii) "[i]n cases where the

Institution/Program is terminating the agreement, efforts will be made to give that decision four months prior to termination, or as early as possible prior to the expiration date of this agreement."  In other words, both Yale University, which is referred to as the "Department" or "Program," and YNHH, which is referred to as the "Hospital," "House" or "Institution," control the terms and conditions of employment of residents and fellows, including, but not limited to, the time and location where they perform their work, their ability to be promoted, the evaluation of their performance and subsequent disciplinary processes and the ability to terminate their employment.

30.     In fact, in the case of Plaintiff Dr. Castro, her employment agreement with respect to her fellowship position was signed by Thomas Balcezak, M.D., M.P.H., who is listed on the documents as "Chief of Staff," and also an Associate Clinical Professor, Internal Medicine at Yale University; thus, Dr. Balcezak is both a University employee and Chief Medical Officer at YNHH.

31.     YNHH is also a private corporation that is principally engaged in the business of providing health care, and receives financial assistance from the Federal government.  At all relevant times, Defendant YNNH has employed and continues to employ all Plaintiffs, controls and has controlled the terms and conditions of Plaintiffs' employment and qualifies as an employer and/or joint employer under all relevant statutes.

32.     YNHH controls the terms and conditions of employment o Plaintiffs Boules, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver (together, the "Attending Physician Plaintiffs"), Castro and Reinhart, including by setting their respective work schedules and hours.  YNHH also assigns Plaintiffs to work on particular surgical cases and in particular operating rooms within YNHH, which comprises nearly 100% of the time Plaintiffs spend working.  YNHH managers

and supervisors also assign the staff with whom Plaintiffs must perform their work, including

Certified Registered Nurse Anesthetists (CRNAs), operating room technicians, residents/fellows,

and operating room nurses, who are themselves all employees of YNHH.  The performance of

each of the Attending Physician Plaintiffs is also subject to "360 evaluations," which include

evaluations from YNHH employees including, but not limited to, operating room nurses, nursing

leadership, CRNAs and operating room technicians.  Plaintiffs perform the vast majority of their

work at YNHH and, to be able to work there, must be credentialed by both Yale University and

YNHH; if either entity does not grant credentials, Plaintiffs are effectively barred from being

able to work and from receiving compensation.

   33. Plaintiffs are all required to comply with YNHH's staff rules and regulations and

hospital by-laws, periodically participate in YNHH staff meetings and treat YNHH patients both

when they are assigned cases, usually during regular working hours, and when they are assigned

to be "on-call," which occurs regularly.  Plaintiffs were also required to participate in YNHH's

various peer review committees, whereby YNHH personnel review procedures that had been

conducted with regard to certain patients or cases that were "flagged" as problematic.  Through

these peer review committees, YNHH has the authority to discipline Plaintiffs and order them to

undergo remediation procedures or other discipline designed to change the methods by which

Plaintiffs arrived at diagnoses and treatments.  Through these processes, YNHH is able to

exercise substantial control over the details and methods of Plaintiffs' work, including control

over the treatment outcomes of their medical practice, with the ultimate aim of maximizing

YNHH's revenue and/or supervising treatment requirements.

   34. In particular, Plaintiffs' work is reviewed by YNHH's Medical Staff

Professionalism Committee (the "MSPC"), a peer review process for examining a physician's

practices, including when a potentially problematic surgical case is "flagged" for review,
including by YNHH's Patient Relations department.  For instance, in February 2020, when Dr.
Boules was involved in a case that had been "flagged," she had to meet with Lynn Tanoue, M.D.,
who was both Chair of the YNHH MSPC and a Professor and Vice Chair for Clinical Affairs,
Department of Internal Medicine, Yale University School of Medicine, and thus an employee of
both Yale University and YNHH.  Notably, Dr. Tanoue memorialized her meeting with Dr.
Boules in an email to Dr. Boules on which Dr. Hines and Theresa Zinck-Lederer, Executive
Director, Medical Staff Services at YNHH, were copied.  As such, both the University and the
Hospital were involved in the review of a problematic case that could have resulted in discipline
against Dr. Boules.

35.     Accordingly, at all relevant times herein, Plaintiffs were employed by both Yale
University and by Yale New Haven Hospital.

36.     The medical residency and fellowship program operated at YNHH inures benefit
to Yale University, and Yale University's affiliation to YNHH's medical residency inures benefit
to YNHH.  YNHH and the University share staff, funding and other support.  Residents and
fellows at YNHH provide valuable medical services to the residency and fellowship program in
exchange for remuneration and educational training as to the knowledge and techniques that are
applicable to the medical specialty in which the resident physician or fellow seeks certification.
YNHH's medical residency and fellowship program requires its residents and fellows, including
Dr. Reinhart and Dr. Castro, to train under Yale University faculty members and physicians,
attend lectures conducted by Yale University faculty and staff, conduct research and/or draft
scholarly papers with and/or under the supervision of Yale University faculty and staff, study
medical and scholarly literature, make case presentations to Yale University faculty and staff,

attend case presentations by Yale University faculty and staff and take annual examinations.

YNHH's residency and fellowship program prepares its residents and fellows to sit for

examinations for board certification in the area of medical specialty which is the focus of the

program.

37.      Defendant Manuel Fontes Lopes, M.D. is an adult resident of Connecticut.  Dr.

Fontes is a Professor of Anesthesiology, former Vice Chair of Diversity, Equity and Inclusion,

Division Chief of the Cardiac Anesthesiology division, former Director of Clinical Research,

Anesthesiology, within the Department of Anesthesiology at Yale University and an attending

physician at YNHH.  Dr. Fontes is an employee of and supervisor at Yale University and Yale

New Haven Hospital, Inc., and, in particular, the Department of Anesthesiology.  At all relevant

times, Dr. Fontes has had and still has supervisory power, control and authority over Plaintiffs'

employment and the terms and conditions thereof.  Thus, Dr. Fontes meets the definition of

"employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

## I.   YALE UNIVERSITY'S TROUBLING HISTORY OF PROTECTING MALE DOCTORS ACCUSED OF SEXUAL HARASSMENT

38.      Despite being considered one of the top universities in the world, Yale University

has a disturbing history of doing shockingly little to address or prevent the perpetration of sexual

harassment and misconduct against female subordinates by male doctors in positions of power,

which has allowed and encouraged this conduct to continue, resulting in a harassing and hostile

work environment.

39.      Even more alarming, and despite what has obviously been mere "lip service" by

administrators about how the University is "dedicate[ed to] eradicate[ing] sexual misconduct at

Yale," the University has displayed a well-chronicled pattern of failing to take complaints of

sexual harassment seriously.

40.     Rather, the default practice at Yale University has been to rush to the defense of perpetrators of sexual misconduct and to refuse to hold them accountable, especially those who generate revenue and grant funding for the University.

41.     Simply put, Yale University has a record of prioritizing revenues over the rights of its female workforce and student body, and of unfairly protecting powerful male harassers at the expense of their innocent female victims.

42.     For example, Dr. Michael Simons -- the former Chair of Yale University Department of Cardiology, attending physician at Yale New Haven Hospital and one of the University's more prodigious grant winners -- was found by a University-Wide Committee on Sexual Misconduct in 2013 of having sexually harassed a female postdoctoral researcher, creating a hostile work environment for her and mistreating her boyfriend who was also a cardiologist at Yale University and Yale New Haven Hospital.

43.     Despite these findings, Yale University and YNHH continued to employ Dr. Simons, and allowed him to retain two prestigious leadership posts within the Department of Cardiology.

44.     Then, in June 2018, Yale University astonishingly honored Dr. Simons by awarding him another esteemed endowed chair.  In fact, according to reports, Yale University's President, Peter Salovey, even wrote to Dr. Simons to personally congratulate him (referring to Dr. Simons as "Mike" in his letter), to tell him that he was "delighted to convey [Yale University's] pleasure in [his] accomplishments" and that "endowed chairs are awarded to those whose scholarship has brought distinction to the university."

45.     According to reports, the Yale University School of Medicine's Dean, Robert

Alpern, M.D., also even supported the University's tone-deaf decision to endow Dr. Simons a new chair, even though he referred to Dr. Simons as "defenseless."

46.     According to reports, months later, only after over one thousand faculty members, medical trainees, students and alumni signed a letter voicing their "disgust and disappointment," did Yale University rescind the chair endowment, but not before offering Dr. Simons the monetary bonus that came with the appointment – a minimum of $140,000 per year – to voluntarily relinquish the chair.

47.     Similarly, the current Chair of the Pharmacology Department at Yale University, Joseph Schlessinger, M.D., was sued in 2006 by a former secretary who accused him of sexual misconduct, and the University of doing nothing to stop him.

48.     The victim alleged that Dr. Schlessinger, among other things, would brag to her about having slept with 46 different women, joke about his penis size, show her photos of naked men ejaculating and comment on her breasts.

49.     The victim further alleged that when she brought Dr. Schlessinger's misconduct to the attention of Yale University officials, nothing was done to protect her.

50.     Likewise, in 2015, two federal lawsuits were filed against Rex Mahnensmith, M.D., a Yale University Nephrology professor and director of an affiliated clinic, accusing him of sexually harassing certain female clinic employees.

51.     These allegations included him pressing his erect penis against the back of a female social worker while she sat on a stool; approaching a nurse as she ate lunch and thrusting his pelvis into the back of her chair in a sexual manner; and going into a patient's room where a nurse was sitting on a stool and pressing his erect penis against her back while holding and rubbing her shoulders.

52.     When one of his victims reported Dr. Mahnensmith's behavior to her supervisor, she was allegedly told that this was simply the "culture of the clinic."

53.     The lawsuits alleged that Dr. Mahnensmith's inappropriate behavior towards many of the women he worked with was common knowledge at the University, yet nothing was done to stop it.

54.     Recently, Eugene Richmond, M.D., a Yale University Professor of Psychiatry and decades-long member of the Yale University School of Medicine faculty, was determined by an independent investigator to have sexually assaulted at least five Yale University students and sexually harassed at least eight students over a period of 25 years.

55.     The assaults allegedly took place in a bedroom Dr. Richmond required students to share with him at a research facility on the Caribbean island of St. Kitts.

56.     Most upsetting, even though Yale University investigated his behavior in *1994*, and reprimanded him for "failing to maintain professional and appropriate boundaries between himself and his students," it did nothing to ensure that he no longer brought students to his Caribbean research facility, allowing the attacks to continue for years.

57.     Notably, other departments at Yale University have also been accused of failing to protect female staff from being sexually harassed by male supervisors, including Susan Byrne, a professor in the University's Department of Spanish and Portuguese, who has accused a fellow Professor named Gonzalez Echevarria of using his power as a tenured professor to sexually harass her, and has accused the Yale University administration of already knowing that Professor Echevarria had engaged in unwanted conduct with other female students and faculty before he harassed her.  See Byrne v. Yale University, 17 Civ. 01104 (VLB), Dkt. No. 81-2 (Affidavit of Susan Byrne), at ¶¶ 13-14.

58.     Recently (and unsurprisingly given these incidents of sexual harassment and inappropriate sexual conduct, and Plaintiffs' own appalling experiences), a survey by the Association of American Universities found that Yale University has a substantially higher than average rate of sexual harassment as compared to other similar institutions.

59.     In fact, the survey found that 11.7% of women in graduate or professional programs at Yale University received unwanted sexual touching, and that 30.6% of women in graduate or professional schools were harassed by a faculty member or instructor.

60.     Moreover, almost half of all students (49.2%) experienced one or more sexually harassing behaviors, but only 15.6% of people reported these behaviors, which speaks to the lack of efficacy of Yale University's reporting resources.

61.     Clearly, Yale University has an endemic and not isolated problem with effectively addressing and preventing sexual harassment and sexual misconduct on its campus.

## II.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES, WHICH PUT YALE UNIVERSITY AND YNHH ON NOTICE OF HIS PROPENSITY TO PERPETRATE SEXUALLY HARASSING BEHAVIOR

62.     Dr. Manuel Fontes is a highly decorated and distinguished figure within the medical field, and in particular within the area of anesthesiology.

63.     Upon information, however, prior to joining Yale University's and YNHH's faculty, Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

64.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a female resident physician.

65.     Upon information, Dr. Fontes then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses before his departure from the institution.

66.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale University and YNHH as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

67.     In fact, upon information, in or around the Spring of 2015, the Department of Anesthesiology Residency Program Director, Dr. Jeffrey Schwartz, Associate Professor of Anesthesiology at Yale University, was specifically told about Dr. Fontes's alleged conduct perpetrated at Duke University.  Dr. Schwartz manages and coordinates Yale University's and YNHH's anesthesiology residency program,  leads the residency recruitment process, facilitates fellowship placements, initiates curriculum development, ensures compliance with Accreditation Council for Graduate Medical Education ("ACGME") requirements and is responsible for addressing and handling anesthesiology resident concerns.  Dr. Schwartz reported and still reports directly to the Chair of the Department of Anesthesiology, who was at that time, and is to this day, Roberta Hines, M.D.  Upon information and belief, Dr. Schwartz, the Department of Anesthesiology's Residency Program Coordinator, discussed his awareness of Dr. Fontes's alleged misconduct at Duke University with Dr. Hines and/or other supervisors at Yale University and/or YNHH.

68.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale University and YNHH, despite the administration's knowledge of his past conduct.

69.     Upon information, in 2015, shortly after he joined Yale University and YNHH, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female Professor of Anesthesiology at Yale University and attending physician at YNHH inside YNHH, who shall be identified herein as Dr. X.

70.     Specifically, in 2015, upon information, when Dr. X presented a research proposal to Dr. Fontes, who was the Director of Clinical Research within the Department of Anesthesiology at the time, Dr. Fontes berated her and criticized her research proposal.  Upon information, hours later, while Dr. X was in the Hospital, Dr. Fontes came up to her and told her that he would in fact be willing to help her with her research.  Upon information, Dr. Fontes then proceeded to suddenly kiss Dr. X, unwantedly, on the mouth.  Upon information, Dr. Fontes then proceeded to wipe the saliva off Dr. X's face, and told her, "I am looking out for you."

71.     Upon information, in the ensuing months, Dr. Fontes expressed to Dr. X multiple times that he wanted her to join the cardiac anesthesiology team at Yale University and YNHH.  Upon information, Dr. X repeatedly told Dr. Fontes that she did not want to join the cardiac anesthesiology team.

72.     Then, upon information, in or around September 2015, following a lecture at YNHH, Dr. X was in a kitchen adjacent to the lecture hall pouring a cup of coffee when Dr. Fontes suddenly came into the room and told her that he had started discussions with the Chair of the Department of Anesthesiology, Dr. Hines, about moving Dr. X to the cardiac anesthesiology team.  Upon information, Dr. Fontes also told Dr. X that he was someone who cared for her and loved her.

73.     Upon information, Dr. Fontes then proceeded to kiss Dr. X, unwantedly and uninvitedly, on the lips.

74.     Upon information, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine.  Upon information, however, no disciplinary actions were taken against Dr. Fontes.

75.     Then, in June 2016, following the Department of Anesthesiology's residency program graduation ceremony, Dr. Fontes went to an after-party with other Department of Anesthesiology residents and staff at Barcelona Wine Bar in New Haven, Connecticut.

76.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, who shall be referred to herein as Dr. Y.  Upon information, Dr. Y knew that Dr. Fontes was a high-ranking and important supervisor in the Department of Anesthesiology, and thus when he asked Dr. Y to dance with him, Dr. Y felt obligated to acquiesce.  Unfortunately, Dr. Fontes took this reluctant agreement to dance with him as an invitation to inappropriately touch and grope Dr. Y.

77.     Specifically, upon information, Dr. Fontes began to dance with Dr. Y in a very sexual and sultry manner, made inappropriate bodily contact with Dr. Y (including contact between his groin and Dr. Y's body), and unwantedly groped and placed his hands all over Dr. Y's body.  Dr. Fontes proceeded to call Dr. Y "sexy," and that he liked the dress Dr. Y was wearing, which was knee-length and red.  Upon information, Dr. Y was uncomfortable and deeply embarrassed by Dr. Fontes's inappropriate conduct, and tried to avoid making eye contact with him or anyone else in the room.  Upon information, Dr. Y was in a state of shock due to what Dr. Fontes was doing to her, and felt violated and taken advantage of, and had to gather her bearings and compose herself and her body after they stopped dancing.

78.     Upon information, others in attendance, who included other Yale University staff and YNHH attending physicians, also found Dr. Fontes's conduct not only inappropriate, but

19

also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

79.     While the two were ultimately separated, upon information, a video of this assault was provided to the Department of Anesthesiology shortly afterwards.

80.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, upon information, Dr. Hines, the Chair of the Department of Anesthesiology, merely advised the Department's senior physician staff, all of whom were also YNHH attending physicians, in a faculty meeting that took place in or around July 2016, that they should not attend parties or consume alcohol with residents.

81.     While, upon information, Dr. Hines acknowledged that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

82.     Dr. Hines's actions made it clear that she and Yale University and Yale New Haven Hospital were more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the Department of Anesthesiology rather than supporting a female resident who had been sexually assaulted.  It was apparent that no reasonable investigation was conducted into Dr. Fontes's clearly inappropriate behavior, including speaking with Dr. Y or other female residents or staff whom Dr. Fontes may have also inappropriately touched and/or others who may have witnessed the incident in question.  This sent a message that complaints or reports of inappropriate behavior by Dr. Fontes against female subordinates or staff would not be taken seriously, and effectively discouraged the reporting of such behavior.

83.     Upon information, following this incident, each time Dr. Y and Dr. Fontes would interact, Dr. Fontes would, incredibly, reference to Dr. Y "what a fun time" they supposedly had.

Dr. Y did not agree that they had had a "fun time," and actively tried to avoid interacting with

Dr. Fontes for the duration of her residency.

84.     While, as noted above, no one at Yale University or YNHH ever spoke with Dr. Y

about the incident with Dr. Fontes, upon information, it was obvious to Dr. Y that the institutions

knew full well what had happened to her.  Notably, upon information when Dr. Y had a

discussion with Adriana Herrera, M.D., an Assistant Professor of Clinical Anesthesiology at

Yale University and the Associate Director of the Department of Anesthesiology Residency

Program operated by YNHH, after the incident took place about an unrelated topic, Dr. Herrera

asked Dr. Y whether anyone at Yale University or YNHH had ever made her feel uncomfortable.

Given the timing and randomness of the question, it was clear that Dr. Herrera had also heard

about the incident involving Dr. Y and Dr. Fontes.

85.     Upon information, Dr. Y declined to implicate Dr. Fontes, but Dr. Herrera,

without Dr. Y's solicitation, told Dr. Y that the Department of Anesthesiology needed "creative

solutions" to handle inappropriate behavior from male superiors towards female subordinates.

86.     Upon information, Dr. Herrera then proceeded to mention how Dr. Hines, during

her own residency at Yale University and YNHH, had to contend with a male attending

physician who would stare at Dr. Hines's breasts when they worked together in operating rooms.

Upon information, Dr. Herrera told Dr. Y about how Dr. Hines would place "sticky-notes" with

smiley faces on them near the opening of her scrubs where her breasts would be visible so that

when she bent over, the male attending in question would know that Dr. Hines did not welcome

his gawking.

87.     Upon information, Dr. Y was shocked and troubled by Dr. Herrera's decision to

share this "story" with her, particularly because it was clear to Dr. Y that Dr. Herrera was aware

of the incident between Dr. Fontes and Dr. Y.  The message from Dr. Herrera was that it was up to Dr. Y and fellow female staff who were being sexually harassed and objectified at work to take action to defend themselves, rather than being the University and YNHH administration's responsibility to take action to protect their female staff against known male harassers.

88.     Upon information, Dr. Y left this conversation with Dr. Herrera feeling disgusted and demoralized knowing that the University and YNHH would not support her after she had been victimized and sexually harassed by Dr. Fontes.

89.     Most troubling, judging by his subsequent actions against Plaintiffs described herein, Dr. Fontes was clearly emboldened by Yale University's and YNHH's utter lack of action against him despite the existence of a video recording depicting what amounted to a sexual assault against his female subordinate.  Yale University's and YNHH's inaction and deliberate indifference to the sexual harassment and assaults he committed made it more likely that Dr. Fontes would sexually assault or harass someone else, including Plaintiffs.

90.     Indeed, it was an "open secret," not just at Yale University, YNHH and within the Department of Anesthesiology, but an "open secret" within the greater academic anesthesiology field and profession, that Dr. Fontes harassed and behaved inappropriately towards female subordinates and other staff members.  In fact, female recruits to the Department of Anesthesiology, including some of the Plaintiffs, were warned about and told to keep their distance from Dr. Fontes prior to starting their employment.

91.     There is no question that appropriate persons at Yale University and YNHH who were in high-level, policy-setting positions of authority -- including, but not limited to, the Department of Anesthesiology's Chair, the Department's residency coordinator and associate residency coordinator, a Yale University Associate Dean and Ombudsperson and numerous

senior YNHH attending physicians -- were well aware and put on actual notice of Dr. Fontes's penchant, both at (and even before he joined) Yale University and YNHH, for sexually harassing and mistreating female subordinates and staff.  Yet, Yale University and YNHH did absolutely nothing to deter or prevent this serially harassing behavior from recurring, or to effectuate any meaningful change to what was clearly a sexually hostile environment.  Rather, it was Yale University's and YNHH's official policy and/or custom to permit and display deliberate indifference towards the grave risks of sexual harassment and assault against female subordinates and staff posed by Dr. Fontes.  This was a completely unreasonable and unacceptable manner in which to respond to serious accusations and evidence of sexual misconduct by a supervisor, and left Plaintiffs and other female subordinates of Dr. Fontes and staff vulnerable and dangerously exposed to Dr. Fontes's harassment and assaults.

92.     Yale University and YNHH were aware that Dr. Fontes posed a heightened risk to female subordinates and staff of being sexually harassed and assaulted.  Rather than take action to address this documented history of sexual misconduct, Yale University and YNHH, through their utter lack of remedial action, further emboldened Dr. Fontes and fostered an environment in which Dr. Fontes believed he could prey on female subordinates with impunity and without any consequences.

93.     Yale University and YNHH could have, but failed to, take steps to respond to reports and complaints it received about Dr. Fontes's sexually harassing and inappropriate conduct that would have prevented Dr. Fontes's sexual harassment and assaults perpetrated against Plaintiffs, as alleged below.

III.   **SEXUAL HARASSMENT OF DR. BOULES**

94.     Plaintiff Dr. Heidi Boules is an attending physician at YNHH and assistant

professor in the Yale Department of Anesthesiology, specializing in pediatric anesthesiology.

95.     Dr. Boules received her undergraduate degree from the University of Michigan in

2002, before graduating from Saint Louis University School of Medicine in 2009.  Dr. Boules

then completed her internship at Long Island College Hospital in 2010, before going to finish her

anesthesiology residency at Rutgers, New Jersey Medical School in 2013.  Dr. Boules then went

on to complete a fellowships at Albert Einstein College of Medicine for pediatric anesthesiology

in 2014, and then another at Stanford University for pediatric cardiac anesthesiology in 2015.

Thereafter, Dr, Boules began her employment at Yale University and Yale New Haven Hospital

in March 2018.

96.     Throughout her employment at Yale, Dr. Boules has reported to Dr. Fontes.

Before Dr. Boules began working at Yale University and YNHH, she was warned by at least one

peer who had previously worked with Dr. Fontes at Cornell University to "be careful" working

with Dr. Fontes, and that "he's a creep."  Indeed, Dr. Fontes's reputation for inappropriate

behavior towards female subordinates was well known and his infamy followed him to Yale

University and YNHH.

97.     Unfortunately, shortly after her career at Yale University and YNHH began, and

continuing to the present, Dr. Boules was subjected to an unrelenting onslaught of sexual

harassment at the hands of Dr. Fontes.

98.     In fact, at Dr. Boules's interview dinner in late-2017, Dr. Fontes initially sat next

to her, but was sitting and speaking so close to Dr. Boules that it made Dr. Boules visibly

uncomfortable, and prompted Dr. Hines, who was also in attendance, to tell Dr. Fontes to stop

dominating Dr. Boules's time and made him switch his seat with another woman at the dinner, Dr. Caroline Al Haddadin.

99.    On another occasion in mid-2018, Dr. Boules attended a going away dinner for a colleague at the Union League Café in New Haven, Connecticut.  Dr. Fontes was in attendance as well.  Prior to sitting down for dinner, Dr. Fontes cornered Dr. Boules as she sat at a booth in between him and Lorne McKay, M.D., the Associate Director of the Pediatric Anesthesiology section.  Without her consent or provocation, Dr. Fontes repeatedly touched and groped Dr. Boules's arm, leg and thigh as he sat next to her, which made Dr. Boules incredibly uncomfortable.  Dr. McKay would later comment to Dr. Boules about how inappropriate Dr. Fontes's conduct had been.  Dr. Boules was so disgusted by Dr. Fontes's behavior that as soon as the table where dinner was to be served opened up, she ran to it and grabbed a seat that was in between other colleagues, including Dr. McKay, so that Dr. Fontes would be unable to sit next to or near her, because she knew his harassment and unwanted touching of her would otherwise continue unabated.  Dr. McKay knew that Dr. Boules was using him as a buffer and gladly acted as a barrier between her and Dr. Fontes in order to thwart Dr. Fontes's harassing conduct towards and inappropriate touching and groping of Dr. Boules.

100.    Dr. Boules was made so uncomfortable by Dr. Fontes's advances and unwanted touching that she would try to avoid being alone with him or even attend meetings at which she knew he would be present.  Dr. Fontes made repeated attempts to schedule one-on-one meetings with Dr. Boules, and would try to entice her into agreeing by including emojis, or pictures, of alcoholic beverages in his text message invitations, signaling that he intended for the meeting to be more than just about work, and that alcohol would be involved.

101.    On another occasion shortly after the aforementioned incident at the Union

League Cafe, Dr. Boules met with Dr. Fontes and a male colleague at Barcelona Wine Bar in

New Haven.  At this meeting, the male colleague, who was aware of Dr. Fontes's penchant for

inappropriately touching female colleagues, purposely sat in between Dr. Fontes and Dr. Boules.

Nonetheless, throughout this meeting, Dr. Fontes made repeated overtly sexist, sexual and

inappropriate comments, which made Dr. Boules incredibly disgusted and uncomfortable, and

caused the male colleague to roll his eyes and shake his head in disbelief.

102.    Then, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League

Café in New Haven under the guise of discussing work.

103.    After Dr. Boules reluctantly accepted this invitation, it soon became clear when

the two later met that Dr. Fontes had no desire to actually discuss work.  Rather, as the two sat

side-by-side at the Union League Café, Dr. Fontes began to lean over and unwantedly touch Dr.

Boules's body in a sexual manner.

104.    Soon thereafter, Dr. Fontes began to grab Dr. Boules's face, pull her face close to

his and forcibly and unwantedly kiss her on the lips.  This occurred three or four separate times,

each time taking place despite Dr. Boules's steady objections.  Dr. Boules was disgusted by her

boss's conduct and definitvely refused his sexual advances.

105.    Days later, in a clear instance of retaliation, during a staff meeting, Dr. Fontes

berated Dr. Boules in front of her colleagues, without any justification.  After the meeting, Dr.

Fontes directed Dr. Boules to walk him to an elevator.  When Dr. Boules arrived with him at the

elevator, Dr. Fontes proceeded to once again forcibly and unwantedly kiss Dr. Boules on the lips.

106.    Despite Dr. Boules's objections and her unmistakable expressions of discomfort

and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time

he has seen her.  This has included an incident in which Dr. Fontes unwantedly hugged Dr.

Boules in or around July 2019, and another incident in mid-September 2019 when, while she was

working on a surgical case in an operating room, Dr. Fontes snuck up behind Dr. Boules,

grabbed both of her shoulders, leaned the front of his body into her backside, put his cheek

against her cheek, and whispered into her ear about how quiet the operating room was.  Dr.

Fontes had no business being in the room, as this was not even a pediatric surgery case which

was his specialty.  Dr.  Fontes also unwantedly asked Dr. Boules out for drinks that day.

107.     Even when Dr. Boules sought help from Dr. Fontes, then the Division

Chief/Director of the Pediatric Anesthesiology section and her supervisor, to address gender-

based harassment she was experiencing from a male surgeon at Yale University and YNHH, he

did nothing whatsoever to help her.  In particular, in March 2019, a male surgeon at Yale

University and YNHH approached Dr. Boules's colleague and the Associate Division Chief of

Pediatric Anesthesiology, Dr. McKay, and referring to Dr. Boules, told him (in front of another

one of Dr. Boules's colleagues) that Dr. McKay "need[ed] to get your bitch under control, she's

a cunt."  Dr. Boules then contacted Dr. Fontes to complain, and Dr. Fontes told her that he would

address the situation.  However, Dr. Fontes did nothing to address the male surgeon's behavior,

and the male surgeon continued to harass Dr. Boules for several months thereafter, including by

berating her when he saw her in the Hospital by yelling, at the top of his voice, "HELLO

HEIDI!" and by forcing her to view an offensive internet post on his phone, even as she tried to

look away.  The male surgeon made no effort to apologize to Dr. Boules for his behavior.  The

harassment became so unbearable and Dr. Boules felt such discomfort being around the male

surgeon that she would actively avoid being anywhere near him when he was in the operating

rooms.  Dr. Boules even sent a follow up email to Dr. Fontes in July 2019 in which she pleaded

with him to speak with the male surgeon in question, and told him that she did not "feel comfortable approaching him on [her] own." Notably, several others witnessed this male surgeon yell at Dr. Boules, and Dr. Hines, the Chair of the Department of Anesthesiology, referred to the male surgeon, in sum and substance, as a "bad boy," and that "everyone knows he's crazy so don't let it get to you." Clearly, Dr. Fontes was more interested in protecting a fellow male harasser than Dr. Boules, granting further license to men at Yale University and YNHH to behave inappropriately towards female staff without consequences.

108.    Then, in August 2019, Dr. Boules learned that Dr. Fontes had sexually harassed other female subordinates, including Drs. Castro and Reinhart, and decided to lodge a formal complaint against Dr. Fontes for sexually harassing her. She reached out via email to Alan H. Friedman, M.D., who is the Chief Medical Experience Officer for YNHH and a Professor of Pediatric Cardiology at the Yale University, and thus an employee of both Yale University and YNHH. Dr. Boules told Dr. Friedman that she had "[s]omething rather serious" that she would "like to take to [him] about," and asked for a "time to meet." Dr. Friedman never responded to Dr. Boules's correspondence.

109.    Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned, traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes's sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him and find a different route to get to where she wishes to go every time she sees him or thinks he may be approaching her, just to be able to do her job without being sexually harassed or assaulted.

IV.      **SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO**

110.      Plaintiff Dr. Mia Castro is a pediatric anesthesiology fellow at Yale University

and Yale New Haven Hospital, where she also completed her anesthesiology residency between

2015 and 2019.  Dr. Castro received an undergraduate degree from Cornell University, before

attending the Albert Einstein College of Medicine.

111.      Beginning in August 2018 and continuing into the fall of 2018, despite the fact

that the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly

came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and

unwantedly put his arms on and/or around her shoulders and waist.

112.      By then, Dr. Castro had already been made aware about how Dr. Fontes had

inappropriately touched and danced with Dr. Y at the 2016 anesthesiology resident graduation,

and had heard from other colleagues about how "touchy" he was.  As a result of this "open

secret," Dr. Castro actively avoided being put in a situation where she might have to encounter

Dr. Fontes's lascivious conduct.

113.      However, in mid-August 2018, Dr. Castro worked an entire day with Dr. Fontes

in an operating room within the South Pavilion of YNHH.  Throughout the day, Dr. Fontes made

repeated "jokes" about being "an old man," and about how Dr. Castro could "learn something

from this old man," seemingly in an effort to ingratiate himself with her and build trust.  When

Dr. Castro was able to successfully apply a technique Dr. Fontes had recommended for

intubating a patient, he told Dr. Castro that she had done a good job and unwantedly placed his

hand on her shoulder.  This surprised Dr. Castro and made her feel uncomfortable.  As the case

continued, Dr. Castro attempted to peer over the operating room drapes to check to see how the

surgery was progressing, when, suddenly, Dr. Fontes re-entered the operating room, came up

behind her and put his arm around her waist as he peaked over the drapes next to her.  This made Dr. Castro feel even more uncomfortable.  Dr. Fontes's hand was on Dr. Castro's waist, and he stood extremely and unnecessarily close to her.

114.    When Dr. Fontes finally let go of her, Dr. Castro was so upset and disgusted that she turned around and went over to the anesthesia medication and supply machine and pretended to prepare more medication in order to avoid him.  Dr. Castro avoided being anywhere near Dr. Fontes for the rest of that day, as she did not want him to touch her any further.  Dr. Castro was particularly disgusted by how Dr. Fontes had attempted to manipulate her and build trust by referring to how he was an "old man" just so he could later have his way with her and grope her. Dr. Castro was extremely relieved when her shift ended and colleagues came over to take over the case, as Dr. Fontes finally left her presence and she did not have to remain on guard to protect herself from being further touched by him.

115.    Throughout the course of that day, however, Dr. Fontes became increasingly angry and agitated at Dr. Castro for objecting to and resisting his unwanted sexual advances and intimate touching.  He then retaliated against Dr. Castro for resisting him by demeaning and berating her when the two later worked together.

116.    This included an instance thereafter in which Dr. Fontes yelled at and commanded Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

117.    Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Upon information, given the details in Dr. Castro's evaluation, and the close temporal proximity between when the evaluation was written and Dr.

Castro's objections and opposition to being touched by Dr. Fontes, Dr. Fontes was able to discern that the complaint was from Dr. Castro.  Nonetheless, despite her complaint, nothing was done to address Dr. Fontes's sexually harassing behavior.

118.    Dr. Castro was so afraid of further sexual harassment and retaliation from Dr. Fontes that she would fear seeing him at meetings, in the hallways, or in the break room, and would even arrive to work either extra early or purposely late in order to avoid seeing him as she prepared patients in the preoperative area.  Dr. Castro even told Department of Anesthesiology floor runners, who assign residents to specific cases, in or around August 2019, of the sexual harassment that she and others suffered at the hands of Dr. Fontes, how scared she was of him and how she did not want other female staff to have to be in operating room with him.

119.    Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro at the first meaningful opportunity he had to punish her , this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

120.    However, it was not true that such a trip, which would be a highly enriching academic and professional experience, would interfere with Dr. Castro's fellowship requirements, especially because such a trip is considered by many fellowship programs -- including at Vanderbilt University, Oregon Health and Sciences University and the University of Pittsburgh Medical Center, and even by the American Board of Anesthesiology -- as an acceptable part of fellowship training.

121.    Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long

as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

122.    There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

123.    Notably, on or about August 31, 2019, after Dr. Castro had lodged multiple complaints of sexual harassment against him (including complained that are described *infra* with regard to the harassment endured by Dr. Reinhart), Dr. Fontes continued to intimidate and express hostility towards her when Dr. Castro encountered him for the first time in months in the preoperative area of YNHH, where he derisively winked at her, which made Dr. Castro feel fearful and disgusted.

124.    While Dr. Castro was able to go on the mission trip to Peru, it is uncertain whether she will receive credit for it towards her fellowship requirements largely because of Dr. Fontes's unwillingness to support Dr. Castro's application in retaliation for her protected activity, which caused severe delays in the application and credit approval processes.

125.    Dr. Fontes's abhorrent conduct has left Dr. Castro feeling belittled and traumatized, afraid to be left alone with him and unable to, at times, focus on work.  As a result of Dr. Fontes's offensive sexually harassing and retaliatory conduct towards her, Dr. Castro has been forced to actively avoid him, including by ceasing to attend educational activities such as weekly grand rounds, where physician gather to discuss interesting or noteworthy clinical cases, and a research symposium in the fall of 2019.  Dr. Castro's employment, training and education has been interfered with as a result of Dr. Fontes conduct.

## V.   PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.   Pregnancy Discrimination

126.   Plaintiff Dr. Ashley Eltorai is an assistant professor of anesthesiology at Yale University and an attending physician at YNHH, specializing in cardiac anesthesiology, where she has been since 2017.  Dr. Eltorai received an undergraduate degree from the University of Notre Dame in 2008, and then graduated from Case Western University Medical School in 2012. Dr. Eltorai completed her anesthesiology residency at Brigham and Woman's Hospital between 2013 and 2016, and then trained as a fellow at Cleveland Clinic from 2016 to 2017.

127.   In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

128.   Dr. Fontes's immediate response was to remark about Dr. Eltorai's body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

129.   Dr. Eltorai was shocked and taken aback by this inappropriate comment about her body made by her supervisor.  However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

130.   The next month, in October 2018, Dr. Eltorai asked Dr. Fontes, who was also the Chair of the Department of Anesthesiology's Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

131.   The support would involve facilitating breaks for anesthesiology residents so that they could each have 20 minutes available to participate in a survey.  However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be

33

for nearly seven months), stating in an email, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

132.    Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.  Dr. Fontes's comments, however, were brushed aside, and his conduct was downplayed as him "just being a boy."

133.    Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the Department of Anesthesiology that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (*i.e.*, that she would be scheduled to work the sufficient number of days to meet all of her unit requirements).

134.    Dr. Fontes was copied on these correspondences.  However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

135.    Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

136.    Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department, and complained that she was being punished by Dr. Fontes for taking maternity leave.  Faculty Affairs told Dr. Eltorai that they would contact people in the Department of Anesthesiology to "look into" her complaint.

137.    Just one week after making these complaints, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the Department of Anesthesiology, and an

attending physician at YNHH, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

138.    By this time, Dr. Eltorai had only worked three days in the ICU over the previous two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.  Dr. Eltorai had discussed those three days of ICU coverage directly with the attending surgeon responsible for all of the high-acuity patients and he personally assured Dr. Eltorai that she had done nothing "wrong" and had done a tremendously good job as usual.

139.    Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that Dr. Garwood had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

140.    Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

141.    Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a few days because we want to speak with them first."  Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns about her.

142.    This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's protected pregnancy discrimination complaints.

143.    Dr. Eltorai returned to work from maternity leave in mid-July 2019.  Then, on August 15, 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide

Committee on Sexual Misconduct, about Dr. Fontes's sexually harassing behavior and other misconduct, which is described in more detail *infra*. Subsequently, just a week after Dr. Eltorai made this complaint, she was suddenly asked to meet again with Dr. Fontes and Dr. Tantawy to discuss performance purportedly in relation to an ICU case that occurred all the way back in April 2019, despite the fact that she had not worked in the ICU for four months by that point because of maternity leave, from which she had returned a month earlier.

144.    Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told, in a subsequent meeting with Dr. Hines, Dr. Tantawy and Dr. Garwood, that she would no longer be permitted to work in the ICU.

145.    Dr. Eltorai was told that the ICU case that occurred back in April 2019 had been flagged by a YNHH peer review committee named the Provider Practice Evaluation Committee ("PPEC"), which requested information about all of the providers who were involved in the case from their respective departments. Upon information, in retaliation for Dr. Eltorai's protected activity, the Department of Anesthesiology, including Dr. Fontes, provided the YNHH PPEC with misleading, outdated and inaccurate information about Dr. Eltorai with the intention of painting Dr. Eltorai in a negative light, in the hopes that the YNHH PPEC would impose unwarranted discipline on Dr. Eltorai based on trumped-up and false assertions about Dr. Eltorai being unfit. Upon information, even though the YNHH PPEC ultimately did not find that any significant remediation efforts were required of Dr. Eltorai (and indeed, on November 4, 2019, the PPEC wrote to Dr. Eltorai to tell her that it was recommending merely that Dr. Eltorai meet with Dr. Tantawy to "discuss communication opportunities surrounding transfers"), Dr. Hines and Dr. Fontes used this opportunity to further retaliate against Dr. Eltorai for engaging in

protected activity by removing her from continuing to work in the ICU, purportedly in order to prevent YNHH from imposing a harsher penalty on Dr. Eltorai.

146.    Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told, incredibly, that there was "nothing in writing."  When Dr. Eltorai asked a YNHH off-shift clinical executive that evening about the claim that there was no documentation, she was told that this was "absolutely not the way clinical investigations are handled at our institution" and that it "sounds suspicious."

147.    As further evidence of the pretextual nature of the decision to remove Dr. Eltorai from working in the ICU, Dr. Hines attempted to justify the decision by falsely alleging that Dr. Eltorai was provided with a "month-long, individualized course in Cardiac Anesthesiology in September 2018" as an "opportunity[y] for improvement."  However, when Dr. Eltorai was hired to work at Yale University and YNHH, she made it clear to Dr. Fontes that she had almost no experience with the specific ICU population for whom she would be caring (cardiothoracic surgery).  Dr. Fontes assured Dr. Eltorai that she would receive an extensive orientation for the first month or so she was at Yale University and YNHH (she started in July 2017), rather than immediately begin independent practice in the Cardiothoracic ICU ("CTICU").  However, this training opportunity was not presented to Dr. Eltorai as promised until September 2018. Notably, the very next month, in October 2018, a new male hire to the CTICU group at Yale University and YNHH underwent the exact same extensive orientation training in the CTICU as Dr. Eltorai, before this male doctor was even permitted to practice one day in the CTICU.

b.   **Sexual Harassment and Retaliation**

148.   Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

149.   In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

150.   Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

151.   This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

152.   Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

153.   Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

154.   Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition.  Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea

38

was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

155.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project.  Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

156.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis.  Dr. Eltorai backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

157.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

158.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

159.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

160.    However, despite her complaint, nothing was done to seriously address her complaints, nor to punish or deter Dr. Fontes from continuing his inappropriate behavior.

Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Eltorai was banned from working in the ICU, indicating that this complaint also contributed to that retaliatory decision.

161.    Dr. Eltorai has been further retaliated against after filing the instant action in March 2020.  Specifically, after Dr. Eltorai was permitted to perform some work within the ICU during the COVID-19 pandemic, it was clear that the Department of Anesthesiology was looking for ways to unfairly criticize her work, in order to create a paper trail and further pretext to punish and discipline her.  In particular, on April 14, 2020, while working in the ICU, Dr. Eltorai received a sudden phone call from a member of the ICU leadership team stating, "So I hear you blocked a transfer from coming to the ICU."  Dr. Eltorai had no knowledge of any such transfer, and when she asked a nurse about what this was about, the nurse informed Dr. Eltorai that it had been the attending physician from the previous overnight shift that had supposedly "blocked the transfer."  When Dr. Eltorai told the person on the phone of this fact, the person suddenly became disinterested, and told her vaguely, "you need to never refuse anyone as a transfer."

162.    Then, on May 17, 2020, Dr. Eltorai was abruptly told by the individual who was creating the operating room schedule, and who was aware that Dr. Eltorai had been assisting with virtual Tele-ICU on behalf of the Department of Medicine on her own time in connection with the COVID-19 epidemic, that Dr. Eltorai would receive one unit for each day she had worked there, but going forward that Dr. Eltorai needed to ask Dr. Hines for approval before picking up additional shifts.  In contrast, others from the Department of Anesthesiology were still being assigned to cover the medical ICU in person due to COVID-related needs.  Prior to Dr. Eltorai beginning her Tele-ICU shifts, Dr. Hines had expressly stated via a Zoom faculty meeting that she could not/would not stop any faculty from COVID-related volunteer work (she gave the

example of New York City), but only that she expected people to self-quarantine for two weeks after returning from New York on their own time without compensation.

163.    However, Dr. Hines later expressly prohibited Dr. Eltorai from volunteering for her own institution, Yale, via Tele-ICU, even though Dr. Eltorai received excellent feedback and was being sought after to cover additional shifts.

164.    Indeed, on May 27, 2020, Dr. Eltorai was asked by the Department of Medicine if she could help cover some partial overnight shifts in June.  However, when Dr. Eltorai asked Dr. Hines for permission to do so, Dr. Hines abruptly refused this request.  Dr. Hines's refusal was retaliatory as there was no legitimate basis to deny Dr. Eltorai the opportunity to assist in the ICU on her own time, without pay, during a pandemic, in a location (Tele-ICU) where she had been well received.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

165.    Plaintiffs Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters) are both attending physicians at YNHH and faculty members of Yale University.

166.    Dr. Jodi-Ann Oliver received an undergraduate degree from Cornell University, and then graduated from the University of Buffalo Medical School in 2006.  She then had internship at New York Hospital – Queens, and completed an anesthesiology residency at Syracuse University in 2011.  She then completed a pediatric anesthesiology fellowship at Rainbow Babies and Children's Hospital, which is affiliated with Case Western University, in 2012.  She joined the Department of Anesthesiology at Yale University and became an attending at Yale New Haven Hospital in 2012.

167.    Dr. Lori-Ann Oliver also received her undergraduate degree from Cornell University, and then graduated from the University of Buffalo Medical School in 2006.  She then

completed an anesthesiology residency at the University of Buffalo, followed by a regional anesthesiology fellowship at the University of Pittsburgh in 2012. She then joined the Department of Anesthesiology at Yale University and became an attending at Yale New Haven Hospital in 2012.

168.    Throughout their respective employment, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their bodies, including their backs and shoulders.

169.    Notably, on an annual pediatric anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back, slipping his hand down to her backside, and unwantedly and inappropriately hugging her.

170.    Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

171.    Thereafter, Dr. Jodi-Ann Oliver complained about being inappropriately touched by Dr. Fontes at the retreat to the then-Division Chief/Director of Pediatric Anesthesiology, Dr. Lance Lichtor. Dr. Lichtor acknowledged that Dr. Fontes's touching was inappropriate, and that Dr. Fontes was "handsy," and that he was told that Dr. Fontes was "affectionate" because of his Portuguese heritage by his superiors. It was clear that it was not only an "open secret" at Yale University and Yale New Haven Hospital that Dr. Fontes acted inappropriately towards female subordinates, but that nothing would be done to meaningfully address or prevent this abhorrent behavior. Given the response she received from Dr. Lichtor, Dr. Jodi-Ann Oliver realized that she had nowhere to turn to and that any complaints she made against Dr. Fontes would not be taken seriously or addressed.

172.    Sometime in 2017, Dr. Jodi-Ann Oliver injured her wrist and made requests for certain workplace accommodations to Dr. Fontes.  In response, Dr. Fontes called her a "malingerer," told her to "shut up" and "shut the fuck up," and that he would "fire [her] if [she] ke[pt] talking."  Dr. Jodi-Ann Oliver initially complained to Dr. Lichtor about this abusive, gender-based misconduct, and then to Dr. Hines, who said that she was "sorry" for what had happened, and that Dr. Fontes owed Dr. Jodi-Ann Oliver an apology.  Dr. Jodi-Ann Oliver did not receive an apology from Dr. Fontes, despite later following up with Dr. Hines.  Thus, it became clear that Dr. Hines was going to do all she could to protect Dr. Fontes.

173.    Notably, at or around the end of 2017, Dr. Hines removed Dr. Lichtor from the Division Chief/Director of Pediatric Anesthesiology position, and replaced him with Dr. Fontes. Dr. Hines allowed Dr. Lichtor to remain on as the Program Director for the Pediatric Anesthesiology Fellowship.  Dr. Jodi-Ann Oliver was on the Pediatric Anesthesiology Fellowship committee at the time, and Dr. Lichtor saw no reason for not re-appointing Dr. Jodi-Ann Oliver to this post.  However, Dr. Fontes opposed Dr. Lichtor's decision to re-appoint Dr. Jodi-Ann Oliver to the position, and in particular, referenced Dr. Jodi-Ann Oliver's wrist injury, saying to Dr. Lichtor, in sum and substance, "how dare you put Jodi-Ann Oliver on the committee?  She is a malingerer.  There is no reason for her to be on the committee."  Dr. Fontes did not point to any evidence that Dr. Jodi-Ann Oliver was a malingerer, nor did Dr. Lichtor know of any reason or basis to conclude that this was the case.  Dr. Lichtor refused to remove Dr. Jodi-Ann Oliver from the Pediatric Anesthesiology Fellowship committee.

174.    Dr. Lichtor then complained about Dr. Fontes's discriminatory behavior towards Dr. Jodi-Ann Oliver to Dr. Hines, who again did not respond to or address Dr. Lichtor's complaint.  Instead, in or around February 2018, Dr. Lichtor was given a negative performance

assessment by Dr. Hines in retaliation for his complaints against Dr. Fontes, whom she had recently appointed as the Director of Pediatric Anesthesiology.  Dr. Lichtor decided to retire shortly thereafter.

175.    Prior to his official retirement date, in May 2018, Dr. Lichtor complained about Dr. Fontes's mistreatment of his subordinates to the Dean of the Yale School of Medicine, who told him that he would address his complaint with Dr. Hines.  Dr. Lichtor would later learn, following his departure, from Dr. Caroline Al Haddadin, who took over as the Program Director of the Pediatric Anesthesiology Fellowship, that Dr. Hines was extremely upset at Dr. Lichtor for escalating his complaints to the Dean of the School of Medicine, particularly because his complaints implicated her, including her lack of oversight over Dr. Fontes and refusal to address his behavior.  Following his retirement, Dr. Lichtor has expressed to Dr. Hines that he would welcome the opportunity to come back to the Anesthesiology Department and educate and train pediatric anesthesiology fellows, but, tellingly, she has merely asked whether he would be able to "get along" with "Manny" (*i.e.*, Dr. Fontes), and has yet to afford Dr. Lichtor to opportunity to teach pediatric anesthesiology fellows.

176.    Then in mid-2018, Dr. Jodi-Ann Oliver attended a colleague's going away dinner at the Union League Café in New Haven.  Prior to sitting down for dinner, Dr. Jodi-Ann Oliver observed Dr. Fontes corner Dr. Boules inside a booth near the second floor bar, and inappropriately touch Dr. Boules on various parts of her body, including her arm.  Dr. Jodi-Ann Oliver could discern that Dr. Boules felt incredibly uncomfortable.  Dr. Jodi-Ann Oliver observed Dr. Boules pick a seat at the dinner table that was on the opposite side of the table from where Dr. Fontes sat so that she could be as far away from him as possible.

177.    Unfortunately, Dr. Jodi-Ann Oliver sat next to Dr. Fontes during this dinner. Throughout the entire dinner, which lasted about an hour, Dr. Fontes repeatedly and unwantedly rubbed Dr. Jodi-Ann Oliver's arm and back, while whispering sexual advances in her ear.  These sexual advances included inappropriate and uninvited comments about Dr. Jodi-Ann Oliver's figure and health, such as the comment, "that's why you stay so thin" after Dr. Jodi-Ann Oliver ordered a fruit-based dessert.  Dr. Fontes also referred to Dr. Jodi-Ann Oliver as his "island girl."

178.    After this dinner, both Dr. Boules and Dr. Caroline Al Haddadin, who was an Assistant Professor of Anesthesiology at Yale University and the then-Program Director of the Pediatric Anesthesiology Fellowship, came up to Dr. Jodi-Ann Oliver and referenced how they felt bad that Dr. Jodi-Ann Oliver was stuck sitting next to Dr. Fontes and was harassed the entire dinner.  While Dr. Al Haddadin expressed remorse about what had happened to Dr. Jodi-Ann Oliver at the hands of Dr. Fontes, she did not seem surprised by his conduct, demonstrating once again that it was an "open secret" at Yale University and YNHH that Dr. Fontes acted inappropriately toward female subordinates.

179.    Then, in April 2019, both Drs. Oliver attended a dinner for a potential new physician hire within the Department of Anesthesiology, who was a woman, with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven, Connecticut.

180.    During the approximately hour long dinner, Dr. Fontes, who sat next to Dr. Jodi-Ann Oliver, continuously flirted with her, repeatedly leaning in to her and commenting on her "nice skin" and "soft skin,"  her "great figure," how she smelled "really nice," how she was "very thin," that she was a "pretty Caribbean girl," and asking her "do you work out?"  Dr. Fontes also unwantedly rubbed his hands all over Dr. Jodi-Ann Oliver's arms and up and down

45

her neck, back, and on her shoulders.  Dr. Jodi-Ann Oliver was disgusted and deeply offended by Dr. Fontes's behavior, and was particularly upset that the female potential new hire had witnessed it all.  Dr. Jodi-Ann Oliver would later apologize to the female candidate, and express her disbelief at Dr. Fontes's inappropriate conduct.

181.    Dr. Fontes drank alcohol heavily during this dinner, so much so that the dinner tab had exceeded the acceptable amount that could be expensed for this type of work-related dinner, leading to argument with the restaurant staff about charging the alcohol he had drink onto a separate tab than the rest of the dinner.

182.    At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes offered Dr. Jodi-Ann Oliver and her sister, Dr. Lori-Ann Oliver, a ride home (despite the fact that he appeared to be inebriated), seemingly to continue his sexual harassment and inappropriate touching of Dr. Jodi-Ann Oliver.  Drs. Jodi-Ann Oliver and Lori-Ann Oliver declined Dr. Fontes's invitation.  Dr. Fontes then walked over toward Dr. Jodi-Ann Oliver, gave her an unsolicited hug, put his hands all over her body, and proceeded to forcibly kiss her on the lips.

183.    Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver, grabbed her by her arms, pulled her towards him, and forced his tongue down her mouth and kissed her on the lips as well.

184.    This had not been Dr. Lori-Ann Oliver's first run-in with Dr. Fontes, as he had consistently, approximately three to four times each year, inappropriately touched her nearly every single time they would run into each in the YNHH hallways or operating rooms.  Dr. Fontes would repeatedly come up to Dr. Lori-Ann Oliver and unwantedly grab her and rub her shoulders, touch her lower back, hug her, grab her by the waist and pull her towards him, and put

his face close to hers, violating her personal space.  Dr. Fontes would also make numerous

inappropriate comments that were sexual in nature to Dr. Lori-Ann Oliver, including comments

about how "skinny" she was and how "nice" her "shape" was.  After one occasion in or around

the fall of 2018 in which Dr. Fontes unwantedly grabbed her around the waist, Dr. Lori-Ann

Oliver mentioned how Dr. Fontes would inappropriately touch her and other female employees

to the Division Chief of the Pain Management section of the Department of Anesthesiology.  At

no point, to Dr. Lori-Ann Oliver's, was Dr. Fontes ever reprimanded for his inappropriate

conduct towards her.

185.    Dr. Lori-Ann Oliver knew that Dr. Fontes's inappropriate behavior would not be

addressed even if she escalated her complaints to higher ups within the Department of

Anesthesiology based on how Dr. Hines had done nothing to address Dr. Fontes's harassment of

her sister, Dr. Jodi-Ann Oliver, in connection with Dr. Jodi-Ann Oliver's wrist injury, despite the

fact that Dr. Fontes called her a "malingerer" and told her to "shut the fuck up," among other

things.

186.    Even after the April 2019 incident at Heirloom Restaurant in which Dr. Fontes

unwantedly groped and kissed her, Dr. Fontes continued to inappropriately touch and grab Dr.

Lori-Ann Oliver nearly every time he encountered her, including one time at the October 2019

American Society of Anesthesiologists conference in Orlando, Florida, during which Dr. Fontes

came up to her and squeezed her by the shoulders, and put his hand on her back and around her

waist.  This made Dr. Lori-Ann Oliver incredibly uncomfortable.

187.    Dr. Lori-Ann Oliver was so mortified by Dr. Fontes's behavior and fearful of

running into him that she would actively avoid him by duckling into the women's changing room

or into offices if she ever saw him or thought he was coming towards her.

188.    Both Drs. Oliver have been deeply devastated and deeply offended by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

189.    Plaintiff Dr. Elizabeth Reinhart is a third-year anesthesiology resident at Yale University and YNHH.  Dr. Reinhart received an undergraduate degree from The Ohio State University, before attending the University of Toledo College of Medicine.

190.    In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, Connecticut, along with Dr. Fontes and another female attending physician, who is a Professor of Anesthesiology at Yale University, a division director within the Department of Anesthesiology, and an attending physician at YNHH.

191.    Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

192.    Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol.  This caused Dr. Reinhart to feel very uncomfortable.

193.    As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to unwantedly kiss her on the lips.  Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

194.    Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

195.    Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

196.    Then, in June 2019, Dr. Reinhart attended the Department of Anesthesiology's residency graduation ceremony at the New Haven Lawn Club in New Haven, Connecticut.

197.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?"  Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

198.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident (Dr. Y) at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline from Yale University and YNHH despite video evidence of the assault and an acknowledgement by Dr. Hines in front of the Department of Anesthesiology's senior staff that she had viewed such video.

199.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, wrapped his arm around and hugged her by the waist, and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who is also a Professor of Anesthesiology at Yale, a division director within the Department of Anesthesiology, and attending physician at YNHH, who then came over to ask Dr. Reinhart whether she was alright.

200.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other Yale University and YNHH resident physicians also live, fearing that they would pressure and convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

201.    Soon thereafter, the female attending physician who drove Dr. Reinhart to her home reported to Dr. Schwartz, the Residency Coordinator, that, as a result of this incident, Dr. Reinhart did not feel safe or comfortable around Dr. Fontes.  Upon information, Dr. Schwartz then reported this incident to Dr. Hines, the Department of Anesthesiology's chair.

202.    Then, a few weeks later, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in a breakroom at YNHH and began to unwantedly massage her back and shoulders.

203.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the Department of Anesthesiology, including to Residency Program Director Dr. Jeffrey Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

204.    Upon information, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the Department's Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

205.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

206.    Incredibly, *days later*, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the Department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

207.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale University, YNHH and the Department of Anesthesiology had no intention to protect Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

208.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the Department of Anesthesiology at the urging of Dr. Schwartz, the residency Program Director, and Dr. Al Haddadin, the Pediatric Anesthesiology fellowship Program Director.  In mid-late August 2019, they complained to the Yale University Graduate Medical Education ("GME") department, who then directed them to the University's Title IX Department, and specifically to Merle Waxman.  Ms. Waxman then directed them to speak with Aley Menon, who is an attorney and the Secretary of the University-Wide Committee on Sexual Harassment.  After Dr. Castro pointed out a conflict between Ms. Waxman and Dr. Hines, the complaints were reassigned to Rosemarie Fisher, M.D., Professor Emeritus of Medicine (Digestive Diseases) and Director of Resident/Fellow Well-being within the Office of the Provost at Yale University, and an attending physician at YNHH.

209.    Ms. Menon referenced a YNHH-based "professional committee" headed by Dr. Alan Friedman to which Dr. Reinhart and Dr. Castro's complaints could also be directed.  Dr. Friedman serves as YNHH's Chief Medical Experience Officer.  However, Dr. Reinhart and Dr. Castro learned that Dr. Friedman, upon learning of the nature of their complaints against Dr. Fontes, which were coming from a resident and fellow who had signed employment agreements with YNHH, stated that his committee was not equipped to handle these types of physical sexual harassment and assault complaints.  While Dr. Friedman did say that he would be willing to work with the chair of the department at issue and with the University's Committee on Sexual Harassment with regard to the complaints, he made it clear that YNHH was not willing or able to take the steps necessary to address Dr. Reinhart's and Dr. Castro's complaints.

210.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes continued to sexually harass Plaintiffs, and, upon information, other female Yale University and YNHH employees.

211.    Indeed, in October 2019, during an American Society of Anesthesiologists conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?"  When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

212.    Thus, not only did Dr. Fontes disregard the countless complaints lodged against him by Plaintiffs, but, likely knowing that he would not suffer any meaningful consequences for his predatory behavior from Yale University or YNHH, decided to actively mock Plaintiffs for making complaints, as if their complaints were all a big joke.

213.     It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to be esteemed institutions such as Yale University and Yale New Haven Hospital.

214.     Dr. Fontes's abhorrent conduct has left Dr. Reinhart feeling offended and traumatized, fearful of being left alone with him, and has interfered with her employment, training and education.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title IX)
### *Against Yale University and Yale New Haven Hospital*

215.     Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

216.     Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

217.     By the above described conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart were discriminated against on the basis of their sex by Yale University and Yale New Haven Hospital, including, but not limited to, by sexual misconduct, sexual harassment and sexual assaults by Dr. Manuel Fontes.

218.     By the above described conduct, Defendants Yale University and Yale New Haven Hospital were on notice of the discriminatory conduct engaged in by faculty at Yale University and Yale New Haven Hospital.  Yale University and Yale New Haven Hospital failed to carry out their duties and obligations pursuant to Title IX to investigate and take corrective action.

219.    By the above described conduct, Yale University and Yale New Haven Hospital allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

220.    By the above described conduct, Yale University and Yale New Haven Hospital tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

221.    By reason of the continuous and ongoing nature of the above-described sexual assault, sexual abuse, sexual harassment and sexual discrimination conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

222.    As a direct and proximate result of Yale University's and Yale New Haven Hospital's unlawful actions or inactions, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

223.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title IX)
### *Against Yale University and Yale New Haven Hospital*

224.     Plaintiffs Castro and Eltorai hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

225.     By the above described conduct, Yale University and Yale New Haven Hospital has retaliated against Plaintiffs Castro and Eltorai in violation of Title IX by, *inter alia*, failing to properly investigate their claims of discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices.

226.     By the above described conduct, Yale University and Yale New Haven Hospital have retaliated against Plaintiffs Castro and Eltorai based on their protected activities in violation of Title IX by engaging in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts.

227.     As a direct and proximate result of Yale University's and Yale New Haven Hospital's unlawful conduct in violation of Title IX, Plaintiffs Castro and Eltorai have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which they are entitled to an award of monetary damages.

228.     As a direct and proximate result of Yale University's and Yale New Haven Hospital's unlawful actions, Plaintiffs Castro and Eltorai have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

229.     Plaintiffs Castro and Eltorai are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of Title VII)**
*Against Yale University and Yale New Haven Hospital*

230.     Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

231.     By the above described conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart were discriminated against on the basis of their sex and/or gender by Yale University and Yale New Haven Hospital, including but not limited to by sexual misconduct, sexual harassment and sexual assaults by Dr. Manuel Fontes, in violation of Title VII.

232.     By the above described conduct, among others, Defendants Yale University and Yale New Haven Hospital has discriminated against Plaintiff Eltorai on the basis of her pregnancy in violation of Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA") by denying her the same benefits, terms and conditions of employment, including, but not limited to, with respect to support for research projects and the ability to fulfill credit/unit requirements after taking leave from work, as those which are provided to men and/or non-pregnant employees.

233.     By the above described conduct, Yale University and Yale New Haven Hospital allowed and fostered an environment in which discriminatory and harassing practices that were,

and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

234.    By the above described conduct, Yale University and Yale New Haven Hospital tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Plaintiffs gender, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

235.    By reason of the continuous and ongoing nature of the above-described sexual assault, sexual abuse, sexual harassment and sexual/pregnancy discrimination conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

236.    As a direct and proximate result of Yale University's and Yale New Haven Hospital's unlawful actions or inactions, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages, for which they are entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs..

237.    Defendants Yale University's and Yale New Haven Hospital's unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of Title VII, for which Plaintiffs are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
*Against Yale University and Yale New Haven Hospital*

238.    Plaintiffs Castro and Eltorai hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

239.    By the above described conduct, Yale University and Yale New Haven Hospital have retaliated against Plaintiffs Castro and Eltorai based on their protected activities in violation of Title VII by engaging in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts.

240.    As a direct and proximate result of Yale University's and Yale New Haven Hospital's unlawful and retaliatory conduct in violation of Title VII, Plaintiffs Castro and Eltorai have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted under the law, in addition to reasonable attorneys' fees and costs.

241.    Defendants Yale University's and Yale New Haven Hospital's unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of Title VII, for which Plaintiffs are entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the CFEPA)**
*Against all Defendants*

~~**(Assault)**~~
~~*Against Manuel Lopes Fontes, M.D.*~~

242.    Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

58

243.    By the above described conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart were discriminated against on the basis of their sex and/or gender by Defendants, including but not limited to by sexual misconduct, sexual harassment and sexual assaults by Dr. Manuel Fontes, in violation of CFEPA.

244.    By the above described conduct, among others, Defendants discriminated against Plaintiff Eltorai on the basis of her pregnancy in violation of CFEPA by denying her the same benefits, terms and conditions of employment, including, but not limited to, with respect to support for research projects and the ability to fulfill credit/unit requirements after taking leave from work, as those which are provided to men and/or non-pregnant employees.

245.    By the above described conduct, Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

246.    By the above described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Plaintiffs' gender, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

247.    By reason of the continuous and ongoing nature of the above-described sexual assault, sexual abuse, sexual harassment and sexual/pregnancy discrimination conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

248.    As a direct and proximate result of Defendants' unlawful actions or inactions, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered,

and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages, for which they are entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs..

249.   Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of CFEPA, for which Plaintiffs are entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the CFEPA)**
***Against All Defendants***

250.   Plaintiffs Castro and Eltorai hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

251.   By the above described conduct, Defendants have retaliated against Plaintiffs Castro and Eltorai based on their protected activities in violation of CFEPA by engaging in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts.

252.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of CFEPA, Plaintiffs Castro and Eltorai have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted under the law, in addition to reasonable attorneys' fees and costs.

253.   Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of CFEPA, for which Plaintiffs are entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the CFEPA)**
***Against Manuel Lopes Fontes, M.D.***

254.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

255.     Defendant Fontes knowingly or recklessly aided and abetted the unlawful employment practices, discrimination and unlawful retaliation against Plaintiffs in violation of the CFEPA by actively participating in the unlawful conduct set forth above.

256.     As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

257.     As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

258.     Defendant Fontes's unlawful actions constitute malicious, willful, wanton and/or reckless violations of the CFEPA, for which Plaintiffs are entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Assault)**
***Against Manuel Lopes Fontes, M.D.***

259.     Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

243.260.      By the above described conduct, Defendant Fontes intentionally subjected

Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart to an

intentional attempt or threat to inflict injury upon Plaintiffs through harmful or offensive sexual

contact, which was coupled with an apparent ability to cause the harm, and which created a

reasonable or imminent apprehension of bodily harm or offensive contact in Plaintiffs.

244.261.      As a direct and proximate result of Defendant Fontes's unlawful conduct,

Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart to have

suffered, and continue to suffer, harm for which they are entitled to an award of damages to the

greatest extent permitted by law.

## SIXTHNINTH CAUSE OF ACTION
### (Battery)
### *Against Manuel Lopes Fontes, M.D.*

245.262.      Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and

Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of

the preceding paragraphs as if fully set forth herein.

246.263.      By the above described conduct, Defendant Fontes intentionally,

recklessly, or negligently, touched, contacted, or applied force to the body of Plaintiffs, in a

harmful or offensive manner, and without Plaintiffs' consent, which was intended to cause the

imminent apprehension, or fear, of physical harm to Plaintiffs, and caused physical impairment

and offended a reasonable sense of personal dignity.

247.264.      As a direct and proximate result of Defendant Fontes's unlawful conduct,

Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered,

and continue to suffer, harm for which they are entitled to an award of damages to the greatest

extent permitted by law.

62

~~SEVENTH~~

### TENTH CAUSE OF ACTION
**(Invasion of Privacy)**
***Against Manuel Lopes Fontes, M.D.***

~~248.~~265.       Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

~~249.~~266.       By the above described conduct, Defendant Fontes subjected Plaintiffs to intentional acts which invaded the privacy of Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart, including their privacy in their own body and their privacy in matters relating to sex, and unreasonably intruded into the seclusion of their person and their protected privacy interests.

~~250.~~267.       Defendant Fontes intentionally intruded, physically or otherwise, upon the solitude or seclusion of Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart in a manner that was highly offensive to a reasonable person.

~~251.~~268.       As a direct and proximate result of Defendant Fontes's unlawful conduct, Plaintiffs Boules, Castro, Eltorai, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

B.      An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

C.      An award of compensatory damages for emotional distress in an amount to be determined at trial;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputation and loss of career fulfillment;

E.      An award of punitive damages in an amount to be determined at trial;

F.      An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: ~~May 29,~~June___, 2020
New York, New York

Respectfully submitted,

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com

**WIGDOR LLP**

By: _____

Douglas H. Wigdor
(admitted *pro hac vice*)
Michael J. Willemin
(admitted *pro hac vice*)
Parisis G. Filippatos
(admitted *pro hac vice*)
Tanvir H. Rahman
(admitted *pro hac vice*)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
pfilippatos@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiffs*

65