**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
------------------------------------------------------------------------ X

MIA CASTRO, M.D., HEIDI BOULES, M.D.,    :
ASHLEY ELTORAI, M.D., JODI-ANN    :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and    :
ELIZABETH REINHART, M.D.,    :     Civil Action No. 3:20-CV-00330 (JBA)
   :
            Plaintiffs,    :
   :
     v.    :     **Oral Argument Requested**
   :
YALE UNIVERSITY, YALE NEW HAVEN    :
HOSPITAL, INC., and MANUEL LOPES FONTES,   :
M.D., in his individual and professional capacities,    :
   :
            Defendants.    :
------------------------------------------------------------------------ X

# PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS' MOTION TO DISMISS

**WIGDOR LLP**

Douglas H. Wigdor
Michael J. Willemin
Parisis G. Filippatos
Tanvir H. Rahman
(All admitted *pro hac vice*)

85 Fifth Avenue
New York, NY 1003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845

dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
pfilippatos@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiffs*

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794

tsteigman@mppjustice.com

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     ARGUMENT ...............................................................................................................3

        A.      Applicable Standard.........................................................................................3

        B.      Title VII is Not the Exclusive Remedy for Plaintiffs' Employment-Related
                Claims ..............................................................................................................5

        C.      YNHH Qualifies as an Education Program for Purposes of Title IX .............9

        D.      The Attending Plaintiffs Have Standing to Bring Title VII and Title IX
                Claims Against YNHH ..................................................................................12

        E.      Plaintiffs Have Sufficiently Pleaded Gender Discrimination Claims...........15

        F.      Plaintiffs Have Sufficiently Pleaded that Yale and YNHH Had Actual
                Notice of Fontes's Sexually Harassing Conduct ..........................................21

        G.      Plaintiffs Eltorai and Castro Have Sufficiently Pleaded Retaliation Claims.........27

        H.      Plaintiff Eltorai Has Sufficiently Pleaded a Pregnancy Discrimination
                Claim..............................................................................................................31

        I.      The Court Should Exercise Supplemental Jurisdiction Over Fontes...................31

                i.      Plaintiffs Will be Able to Assert Viable and Timely CFEPA
                        Claims Against Fontes .................................................................33

        J.      Yale's Motion to Strike Should be Denied....................................................36

        K.      Yale's Motion for a More Definite Statement Should be Denied ..................39

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

## Cases

AB v. Rhinebeck Central School District,
224 F.R.D. 144 (S.D.N.Y. 2004) ............................................................ 6

Alexander v. Hunt,
No. 16 Civ. 192 (GWC), 2018 WL 3801240 (D. Vt. Aug. 9, 2018) ........................................ 20

Allocco v. Dow Jones & Co.,
No. 02 Civ. 1029 (LMM), 2002 WL 1484400 (S.D.N.Y. July 10, 2002) ................................ 39

Arculeo v. On-Site Sales & Marketing, LLC,
425 F.3d 193 (2nd Cir. 2005)................................................................ 13

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)............................................................................ 3

Brokke v. Stauffer Chem. Co.,
703 F. Supp. 215 (D. Conn. 1988)......................................................... 32

Brown v. General Services Administration,
425 U.S. 820 (1976)............................................................................. 6

Burgess v. Harris Beach PLLC,
346 F. App'x 658 (2d Cir. 2009)............................................................ 15

Burlington Indus., Inc. v. Ellerth,
524 U.S. 742 (1998)........................................................................ 21, 38

Burlington Northern & Santa Fe Railway Co. v. White,
548 U.S. 53 (2006)............................................................................ 29

Campisi v. The City University of New York,
No. 15 Civ. 4859(KPF),  2016 WL 4203549 (S.D.N.Y. 2016) ........................................... 6, 26

Cannon v. University of Chicago,
441 U.S. 677 (1979)........................................................................ 6, 7

Corley v. Louisiana ex rel Division of Admin. Office of Risk Management,

No. 06 Civ. 882 (SCR), 2010 WL 3259376 (M.D.La. Aug. 16, 2010) ................................... 39

Corrections Officers Benevolent Assn. v. Kralik,
    226 F.R.D. 175 (S.D.N.Y. 2005) ............................................................................... 39

Cowan v. City of Mount Vernon,
    No. 14 Civ. 8871 (KMK), 2017 WL 1169667 (S.D.N.Y. Mar. 28, 2017) ............................. 16

Crandell v. New York Coll. of Osteopathic,Med.,
    87 F. Supp.2d 304 (S.D.N.Y. 2000) ........................................................................ 12

Cruz v. Coach Stores, Inc.,
    202 F.3d 560 (2d Cir. 2000) ............................................................................... 15, 37

D'Alosio v. EDAC Techs. Corp.,
    No. 16 Civ. 769 (VAB), 2017 WL 1439663 (D.Conn. Apr. 21, 2017) ................................... 38

Daniel v. T & M Protection Resources, Inc.,
    992 F.Supp.2d 302 (S.D.N.Y. 2014) ........................................................................ 13

Davis v. Monroe Cty. Bd. of Educ.,
    526 U.S. 629 (1999) ........................................................................................ 27

Dawson v. N.Y. City Transit Auth.,
    624 F. App'x 763 (2d Cir. 2015) ............................................................................. 4

Demoret v. Zegarelli,
    451 F.3d 140 (2d Cir.2006) ................................................................................. 29

Dimitracopoulos v. City of New York,
    26 F.Supp.3d 200 (E.D.N.Y. 2014) .......................................................................... 29

Doe v. Board of Educ. of Prince George's County,
    888 F.Supp.2d 659 (D.Md. 2012) ............................................................................ 26

Doe v. Central Connecticut State University, No. 19 Civ. 418 (MPS),
    2020 WL 1169296 (D. Conn. Mar. 11, 2020) ................................................................. 6

Doe v. Columbia University,
    831 F.3d 46 (2d Cir. 2016) ............................................................................... 4, 5

Doe v. Mercy Catholic Medical Center,
  850 F.3d 545 (3d Cir. 2017)................................................................................ *passim*

Doe v. Univ. of Kentucky,
  357 F. Supp. 3d 620 (E.D. Ky. 2019) ....................................................... 15

Drees v. County of Suffolk,
  No. 06 Civ. 3298 (JFB), 2007 WL 1875623 (E.D.N.Y. June 27, 2007) ................................. 16

Evarts v. S. New Eng. Tel. Co.,
  No. 00 Civ. 1124 (WIG), 2006 WL 2864716 (D.Conn. Oct. 2, 2006)................................... 15

Faragher v. City of Boca Raton,
  524 U.S. 775 (1998)................................................................................ 21, 38

Fitzgerald v. Henderson,
  251 F.3d 345 (2d Cir. 2001).............................................................................. 16

Flores v. New York City Human Resources Admin.,
  No. 10 Civ. 02407 (RJH), 2011 WL 3611340 (S.D.N.Y. Aug, 16, 2011) ............................... 16

Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.,
  214 F. Supp. 2d 273 (E.D.N.Y. 2002) ..................................................................... 26

Gebser v. Lago Bista Indep. School. Dist.,
  524 U.S. 274 (1998)................................................................................... 27

Gethers v. McDonald,
  No. 15 Civ. 0177 (VLB), 2017 WL 1628403 (D.Conn. May 1, 2017) ................................... 39

Glaser v. Upright Citizens Brigade, LLC,
  377 F. Supp. 3d 387 (S.D.N.Y. 2019)...................................................................... 15

Glasser v. Grp. W Satellite Commc'ns,
  No. 89 Civ. 664 (WWE), 1990 WL 128563 (D. Conn. July 11, 1990) ................................... 32

Goldstein v. University of Maryland,
  No. 18 Civ. 2376 (CCB), 2019 WL 4467035 (D.Md. Sept. 17, 2019)..................................... 26

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010) ...................................................................... 20

Gupta v. New Britain Gen. Hosp.,
    687 A.2d 111 (Conn. 1996) ..................................................................... 11

Guzman v. Macy's Retail Holdings, Inc.,
    No. 09 Civ. 4472(PGG), 2010 WL 1222044 (S.D.N.Y. Mar. 29, 2010)................................... 30

Hampton v. Diageo North America, Inc.,
    No. 04 Civ. 346 (PCD), 2008 WL 350630 (D.Conn. 2008) .................................... 36

Harris v. Forklift Sys., Inc.,
    510 U.S. 17 (1993)................................................................................ 15, 37

Hauff v. State University of New York,
    425 F.Supp.3d 116 (E.D.N.Y. 2019) .............................................. 6, 20, 21

Henry Ford Health Sys. v. Department of Health & Human Servs.,
    654 F.3d 660 (6th Cir. 2011) .................................................................. 9

Henschke v. New York Hospital-Cornell Medical Center,
    821 F. Supp. 166 (S.D.N.Y. 1993)...................................................... 6, 11

Herling v. New York City Dep't of Educ.,
    No. 13 Civ. 5287 (JG), 2014 WL 1621966 (E.D.N.Y. Apr. 23, 2014).................................. 29

Hiatt v. Colorado Seminary,
    858 F.3d 1307 (10th Cir. 2017) ............................................................... 5

Hudson v. W. N.Y. Bics Div.,
    73 F. App'x 525 (2d Cir. 2003)................................................................ 16

Ivan v. Kent State Univ.,
    No. 94 Civ. 4090, 1996 WL 422496 n.10 (6th Cir. July 26,1996) ............................ 5

Jackson v. Birmingham Board of Education,
    544 U.S. 167 (2005)............................................................................ 7, 8

Jeldness v. Pearce,
        30 F.3d 1220 (9th Cir. 1994) ........................................................................... 11, 12

Johnson v. M&M Commc'ns, Inc.,
        242 F.R.D. 187 (D.Conn. 2007).............................................................................. 38

Johnson v. Railway Express Agency, Inc.,
        421 U.S. 454 (1975)................................................................................................. 6

Jones v. Gem Chevrolet,
        166 F.Supp.2d 647 (D.Conn.2001) ........................................................................ 36

Koehler v. Chesebrough-Ponds, Inc.,
        705 F. Supp. 721 (D. Conn. 1988) ......................................................................... 32

Kohlhausen v. SUNY Rockland Community College,
        No. 10 Civ. 3168 (JSG), 2011 WL 1404934 (S.D.N.Y. Feb. 9, 2011)...................... 6

Lakoski v. James,
        66 F.3d 751 (5th Cir. 1995) ..................................................................................... 6

Levitin v. Nw. Cmty. Hosp.,
        923 F.3d 499 (7th Cir. 2019) .................................................................................. 14

Lipsett v. University of Puerto Rico,
        864 F.2d 881 (1st Cir. 1988)............................................................................... 5, 11

Littlejohn v. City of New York,
        795 F.3d 297 (2d Cir. 2015)..................................................................................... 4

Loewen v. Grand Rapids Med. Educ. Partners,
        No. 10 Civ. 1284, 2012 WL 1190145 (W.D. Mich. Apr. 9, 2012).......................... 12

Lopez v. San Luis Valley, Bd. of Co-op. Educ. Services,
        977 F. Supp. 1422 (D. Colo. 1997)........................................................................ 15

Lopez v. Smiley,
        375 F. Supp. 2d 19 (D. Conn. 2005).................................................................. 32, 34

Lynch v. Southampton Animal Shelter Found. Inc.,
    278 F.R.D. 55 (E.D.N.Y. 2011) ........................................................................... 36

Martinetti v. Mangan,
    No. 17 Civ. 5484 (KMK), 2019 WL 1255955 (S.D.N.Y. Mar. 19, 2019) ............................. 20

McGullam v. Cedar Graphics, Inc.,
    609 F.3d 70 (2d Cir.2010)..................................................................................... 17

McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.,
    24 F.3d 519 (3d Cir. 1994)..................................................................................... 10

McLeod v. Parsons Corp.,
    73 F. App'x 846 (6th Cir. 2003) ............................................................................. 39

Morales v. Long Island R.R. Co.,
    No. 09 Civ. 8714 (HB), 2010 WL 1948606 ............................................................. 29

Moy v. Adelphi Inst.,
    866 F.Supp. 696 (E.D.N.Y. 1994) .......................................................................... 37

Murray v. N.Y. Univ. Coll. of Dentistry,
    57 F.3d 243 (2d Cir. 1995)..................................................................................... 13

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002).......................................................................................... 15, 17

North Haven Board of Education v. Bell,
    456 U.S. 512 (1982)......................................................................................... 7, 8, 10

O'Connor v. Davis,
    126 F.3d 112 (2d Cir. 1997)................................................................................... 11

Papelino v. Albany College of Pharmacy of Union University,
    633 F.3d 81 (2d Cir. 2011)............................................................................. *passim*

Pejovic v. State Univ. of New York at Albany,
    No. 17 Civ. 1092 (TJM), 2018 WL 3614169 (N.D.N.Y. July 26, 2018)...................................... 6

Perry v. Ethan Allen, Inc.,
    115 F.3d 142 (2d Cir. 1997) .................................................................................. 38

Perry v. Pediatric Inpatient Critical Care Servs., P.A.,
    No. 18 Civ. 404-XR, 2020 WL 1248263 (W.D. Tex. Mar. 16, 2020) ...................... 14

Peters v. City of Stamford,
    No. 99 Civ. 764 (CFD), 2003 WL 1343265 (D. Conn.  Mar. 17, 2003) ................... 35

Preston v. Com. of Va. Ex Rel. New River Com. Coll.,
    31 F. 3d 203 (4th Cir. 1994) ..................................................................................... 5

Reyes v. Galpin,
    No. 18 Civ. 831 (JBA), 2019 WL 959680 (D. Conn. Feb. 27, 2019) ...................... 32

Robinson v. Gucci America,
    No. 11 Civ. 3742 (JPO), 2012 WL 259409 (S.D.N.Y. Jan. 27, 2012) ...................... 4

Roubideaux v. North Dakota Dep't of Corr. & Rehab.,
    570 F.3d 966 (8th Cir. 2009) .................................................................................. 11

Salamon v. Our Lady of Victory Hosp.,
    867 F.Supp.2d 344 (W.D.N.Y. 2012) ................................................................ 12, 14

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997) .................................................................................. 37

Silvera v. Conn. Dept. of Corrections,
    726 F.Supp.2d 183 (D.Conn. 2010) ........................................................................ 35

Smith v. AVSC International Inc.,
    148 F.Supp 2d 302 (S.D.N.Y. 2001) ...................................................................... 39

Sternberg v. U.S.A. Nat'l KarateDo Fed'n, Inc.,
    123 F. Supp. 2d 659 (E.D.N.Y. 2000) .................................................................... 12

Stratton v. Dep't for the Aging for the City of New York,
    132 F.3d 869 ........................................................................................................ 31

Swierkiewicz v. Sorema N.A.,
  534 U.S. 506 (2002) ........................................................................................... 4

Tcherepnin v. Knight,
  389 U.S. 332 (1967) ......................................................................................... 10

Tennison v. Circus Enterprises, Inc.,
  244 F.3d 684, (9th Cir. 2001) .......................................................................... 39

Terry v. Ashcroft,
  336 F.3d 128 (2d Cir. 2003) ............................................................................ 15

Thomas Jefferson Univ. v. Shalala,
  512 U.S. 504 (1994) ........................................................................................... 9

Treglia v. Town of Manlius,
  313 F.3d 713 (2d Cir. 2002) ............................................................................ 29

Troeger v. Ellenville Cent. Sch. Dist.,
  523 F. App'x 848 (2d Cir. 2013) ...................................................................... 17

Tucker v. Am. Intern. Group, Inc.,
  936 F. Supp. 1 (D. Conn. 2013) ...................................................................... 36

Tucker v. Am. Int'l Group, Inc.,
  936 F.Supp.2d 1  (D.Conn. Ma 2013) ............................................................. 39

Vermont Mut. Ins. Co. v. LaCourse,
  No. 13 Civ. 664 (JBA), 2014 WL 5313714 (D. Conn. Oct. 16, 2014) .................... 32

Wahlstrom v, Metro-North Commuter Railroad Co.,
  89 F.Supp.2d 506 (S.D.N.Y. 2000) .................................................................. 20

Waid v. Merrill Area Public Schools,
  91 F.3d 857 (7th Cir. 1996) ............................................................................... 6

Walter v. Westdeutscher Rundfunk, ARD German Radio N.Y.,
  No. 03 Civ. 5676 (LAK)(JCF), 2004 WL 1052776 (S.D.N.Y. May 11, 2004) ........ 20

Wermann v. Excel Dentistry, P.C.,
      No. 13 Civ. 7028 (DAB), 2014 WL 846723 (S.D.N.Y. Feb. 25, 2014) ............................ 36, 37

Whidbee v. Garzarelli Food Specialties, Inc.,
      223 F.3d 62 (2d Cir. 2000) .................................................................................................... 15

Williams v. R.H. Donnelley, Corp.,
      368 F.3d 123 (2d Cir.2004) ................................................................................................... 30

Winfield v. Chicago State Univ.,
      No. 05 Civ. 5224, 2006 WL 2524137 (N.D. Ill. Aug. 30, 2006) ........................................... 12

Winfield v. Citibank, N. A.,
      No. 10 Civ. 7304 (JGK), 2012 WL 266887 (S.D.N.Y. January 30, 2012) .............................. 36

Wood v. Prudential Retirement Insurance,
      No. 15 Civ. 1785 (VLB), 2016 WL 5940946 (D.Conn. Sept. 19, 2016) ................................. 22

Yaba v. Roosevelt,
      961 F.Supp. 611 (S.D.N.Y. 1997) ......................................................................................... 20

**<u>Other Authorities</u>**

15 U.S.C. 37b(b)(1)(B)(i) ............................................................................................................... 10

20 U.S.C. 1681(a) ........................................................................................................... 5, 10, 11, 14

20 U.S.C. 1687 ............................................................................................................................... 10

42 U.S.C. 1395ww(d)(5)(B) and (h) ............................................................................................... 9

42 U.S.C. § 1981 ............................................................................................................................. 6

CT Gen Stat § 46a-82 .................................................................................................................... 34

CT Gen Stat § 46a-100 .................................................................................................................. 33

Pub. L. No. 100-259, 102 Stat. 28-31 ............................................................................................ 10

Federal Rule of Civil Procedure 12 ........................................................................................ 1, 3, 4

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................... 4

42 C.F.R. 412.105, 413.75– 413.83 ........................................................................... 9

42 C.F.R. 413.75(a) .................................................................................................. 11

H.R. Rep. No. 213 ................................................................................................. 9, 11

R. Reuter, <u>Professional Liability in Postgraduate Medical Education,</u>
    15 J. Legal Med. 485 (1994) ............................................................................. 10

S. Rep. No. 404 ......................................................................................................... 9

Plaintiffs Mia Castro, M.D., Heidi Boules, M.D, Ashley Eltorai, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D., and Elizabeth Reinhart, M.D. respectfully submit this omnibus memorandum of law in opposition to the Federal Rule of Civil Procedure ("Rule") 12 motions filed by Defendants Yale University ("Yale") (see Dkt. No. 53-1 ("Yale Mem.")), Yale New Haven Hospital, Inc. ("YNHH") (see Dkt. No. 52 ("YNHH Mem.")) and Manuel Lopes Fontes, M.D. ("Fontes") (see Dkt. No. 50-1 ("Fontes Mem")).  For the reasons stated below, Defendants' Rule 12 motions should all be denied *in toto*.

## I.   **Preliminary Statement**

The six Plaintiffs in this case are all highly accomplished female medical doctors at Yale and YNHH[1] who, over the course of several years, were terrorized at work by the sexualized conduct of their supervisor, Defendant Fontes.  Each Plaintiff recounts, in graphic detail, their harrowing experiences of being sexually harassed by Fontes, whose unlawful conduct against these women included forced kissing, grabbing, coercive hugging, uninvited touching, and/or unwanted sexual propositioning.  Two Plaintiffs allege that they were also unlawfully retaliated against after opposing Fontes's unlawful behavior.  All six Plaintiffs further allege tort claims of battery, assault and invasion of privacy against Fontes.

Defendants move to dismiss Plaintiffs' Amended Complaint (the "AC") (see Dkt. No. 44) on altogether faulty bases.  For instance, even though the majority of Circuit Courts addressing the issue have ruled that Title VII does *not* preempt Title IX employment discrimination claims, including the First, Third, Fourth, Sixth, and Tenth Circuits, Defendants Yale and YNHH ask this Court to take the minority position that Plaintiffs' Title IX claims are preempted by Title VII; to the contrary, Plaintiffs' Title IX claims are viable and not preempted by Title VII. Likewise, YNHH takes the position that it is not a covered entity under Title IX, despite

---

[1]      Plaintiff Castro completed her anesthesiology fellowship on June 30, 2020.  See Yale Mem. at 4.

incontrovertibly receiving Federal funding, because, according to YNHH, it purportedly does not qualify as an institution that operates an "educational program."  YNHH makes this argument even though it touts itself as Yale's "teaching hospital" and operates robust medical residency and fellowship programs– rigorous educational courses that medical residents and fellows must complete in order to qualify them to become licensed and certified medical physicians in their respective medical fields and specialties --  that trains hundreds of medical school graduates on how to practice medicine each year.  As explained further below, YNHH is wrong because it, indeed is an institution subject to Title IX.

Defendants further assert that Plaintiffs -- despite their detailed allegations in the AC where each Plaintiff provides multiple, vivid examples of how they were relentlessly subjected to a hostile, discriminatory, sexualized work environment by Fontes over the course of several years -- somehow fail to sufficiently plead their hostile work environment claims.  In so doing, Defendants not only turn a blind eye to reality but also ignore the lenient notice pleading standards that Plaintiffs need meet to sustain claims of this nature at this preliminary stage of the litigation.  Tellingly, Defendants also completely ignore the well-established "continuing violation doctrine" which permits courts to consider similar and related acts that may have occurred outside of the statute of limitations period when determining liability with respect to hostile work environment claims if the conduct is of a continuous nature and at least one discriminatory act falls within the statute of limitations.  Plaintiffs have more than adequately pled hostile work environment claims to survive a motion to dismiss.  In addition, despite the presence of detailed allegations in the AC describing how a multitude of high-level administrators and supervisors have been fully aware of Fontes's penchant for engaging in sexually harassing conduct towards his female subordinates from as early as *2015* --and yet did

2

nothing to prevent him from sexually harassing the six Plaintiffs -- Yale and YNHH incorrectly assert that Plaintiffs' claims fail because neither institution supposedly had notice of Fontes's harassing and discriminatory conduct.

Furthermore, Defendant Fontes moves to dismiss the state law tort claims asserted against him on the basis that the Court should not exercise supplemental jurisdiction, even though these claims are inextricably intertwined with Plaintiffs' federal Title IX and Title VII sexual harassment claims, and even though he will assuredly be a named defendant in this action pursuant to Plaintiffs' anticipated claims under the Connecticut Fair Employment Practices Act ("CFEPA") that will be subsequently brought in this action upon fulfillment of administrative prerequisites.  Lastly, Yale makes baseless motions (a) for a more definite statement, a shameful bid to publicly name (and shame) other victims of Fontes's sexual misconduct, where a far more proper channel to disclose this sensitive information exists through the discovery process, and (b) to strike clearly relevant and material allegations from the AC related to past similar sexual misconduct allegations against Yale which reinforce and corroborate the incredibly hostile, toxic, and highly sexualized work environment to which Plaintiffs were exposed.  Yet Yale's discomfort in having to face the harsh reality that it has done woefully little to address or prevent sexual misconduct against its constituents is not a proper basis to strike the allegations in question.  Accordingly, for the reasons set forth herein, Defendants' respective Rule 12 motions should each be denied in its entirety, and Plaintiffs should be permitted to proceed to discovery on all of their claims.

II.   **ARGUMENT**

A.   **Applicable Standard**

A valid complaint requires only a "short and plain statement of the claim."  Bell Atl.

Corp. v. Twombly, 550 U.S. 544 (2007).  Notably, the standard is even more favorable to the

plaintiff in the employment discrimination context, where the case law is clear that a well-pled

complaint "need not include such facts [sufficient to establish a prima facie case]."

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002); see also Robinson v. Gucci America,

No. 11 Civ. 3742 (JPO), 2012 WL 259409, at *3 (S.D.N.Y. Jan. 27, 2012) ("Reconciling

Swierkiewicz, Twombly, and Iqbal … the claim must be facially plausible and must give fair

notice to the defendants of the basis for the claim") (citation omitted).[2]

In Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016), the Second Circuit made

clear that lenient pleading standards apply to allegations of employment discrimination:

> In Littlejohn, we clarified that Iqbal applies to employment-discrimination
> complaints brought under Title VII.  To the same extent that the McDonnell
> Douglas temporary presumption reduces the facts a plaintiff would need to show
> to defeat a motion for summary judgment prior to the defendant's furnishing of a
> non-discriminatory motivation, that presumption also reduces the facts needed to
> be pleaded under Iqbal.  ***Because [t]he discrimination complaint, by definition,
> occurs in the first stage of the litigation . . . the complaint also benefits from the
> temporary presumption and must be viewed in light of the plaintiff's minimal
> burden to show discriminatory intent.***
> ***
> In other words, at the 12(b)(6) stage of a Title VII suit, allegation of facts
> supporting a minimal plausible inference of discriminatory intent suffices as to
> this element of the claim because this entitles the **plaintiff** to the temporary
> presumption of McDonnell Douglas until the defendant furnishes its asserted
> reasons for its action against the plaintiff.

Doe, 831 F.3d at 54 (citing Littlejohn v. City of New York, 795 F.3d 297, 307-08 (2d Cir. 2015))

(emphasis added); see also Dawson v. N.Y. City Transit Auth., 624 F. App'x 763, 770 (2d Cir.

---

[2]      Unreported cases cited herein, excluding those previously cited in Defendants' Rule 12 motions, are
attached hereto as Exhibit B.

2015) ("At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face.").  Notably, "[t]he role of the court at this [Rule 12(b)(6)] stage of the proceedings *is not in any way to evaluate the truth as to what really happened*, but merely to determine whether plaintiff's factual allegations are sufficient to allow the case to proceed." Doe, 831 F.3d at 59 (emphasis added).

Contrary to binding precedent, Defendants want this Court to "*evaluate the truth as to what really happened*," and *decide* that Plaintiffs' allegations are not true and that they could not have been sexually harassed, discriminated against, or retaliated against.  Cf. id.  Under binding precedent, however, this the Court cannot do.

**B.      Title VII is Not the Exclusive Remedy for Plaintiffs' Employment Claims**

Title IX specifically provides that "[n]o person in the United states shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a).  While the Supreme Court has yet to weigh in on this issue, the majority of Circuit Courts (*i.e.*, the First, Third, Fourth, Sixth, and Tenth Circuits) that have weighed in have held that Title IX is not preempted by Title VII.  See Doe v. Mercy Catholic Medical Center, 850 F.3d 545, 560 (3d Cir. 2017) ("Title VII's concurrent applicability does not bar Doe's private causes of action for retaliation and *quid pro quo* harassment under Title IX") ("Mercy"); Lipsett v. University of Puerto Rico, 864 F.2d 881, 896 (1st Cir. 1988) (finding employment discrimination against a student-employee actionable under Title IX); Preston v. Com. of Va. Ex Rel. New River Com. Coll., 31 F. 3d 203, 206 (4th Cir. 1994) (holding that Title IX private cause of action "extends to employment discrimination on the basis of gender by educational institutions receiving federal funds."); Hiatt v. Colorado Seminary, 858 F.3d 1307, 1315 (10th

Cir. 2017); Ivan v. Kent State Univ., No. 94 Civ. 4090, 1996 WL 422496, at *2 n.10 (6th Cir. July 26,1996) (unpublished opinion overruling district court's conclusion that "Title VII preempts an individual's private remedy under Title IX").[3]

While the Second Circuit has not weighed in on this issue, many district courts, including, recently Judge Shea in Doe v. Central Connecticut State University, have found that Title IX claims are not preempted by Title VII.  See No. 19 Civ. 418 (MPS), 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) ("[plaintiff's] Title IX claims are cognizable and not foreclosed by Title VII").[4]

In Mercy, the Third Circuit engaged in an extensive analysis of Title IX and Supreme Court precedent to rule that the concurrent applicability of Title VII was not a bar to the plaintiff's Title IX claims.  850 F.3d at 560.  The Mercy court first analyzed two Supreme Court decisions -- Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975) and Brown v. General Services Administration, 425 U.S. 820 (1976) -- where the Court held that the remedies available under Title VII did not preempt other remedies.[5] The Mercy court then analyzed

---

[3]     The Fifth and Seventh Circuits have held to the contrary.  See Lakoski v. James, 66 F.3d 751, 755 (5th Cir. 1995); Waid v. Merrill Area Public Schools, 91 F.3d 857 (7th Cir. 1996).

[4]     See also Hauff v. State University of New York, 425 F.Supp.3d 116, 131 (E.D.N.Y. 2019) ("[t]his Court's analysis of the foregoing cases supports an implied cause of action under Title IX for employees of educational institutions receiving federal funding and that such a cause of action is not displaced by Title VII"); Pejovic v. State Univ. of New York at Albany, No. 17 Civ. 1092 (TJM), 2018 WL 3614169, at *4 (N.D.N.Y. July 26, 2018) (same); Kohlhausen v. SUNY Rockland Community College, No. 10 Civ. 3168 (JSG), 2011 WL 1404934, at *9 (S.D.N.Y. Feb. 9, 2011) abrogated on other grounds by Leitner v. Westchester Cmty. Coll., 779 F.3d 130 (2d Cir. 2015) ("Title IX provides a private right of action against gender discrimination to employees of federally-funded educational institutions … this Title IX right of action is not preempted although a remedy under Title VII is also available"); AB v. Rhinebeck Central School District, 224 F.R.D. 144, 153 (S.D.N.Y. 2004) ("this Court finds that [plaintiff], as an employee of the District, which receives federal educational funding, is eligible to bring an action under Title IX."); Henschke v. New York Hospital-Cornell Medical Center, 821 F. Supp. 166, 172 (S.D.N.Y. 1993) (court found "a private right of action for employment discrimination exists under Title IX separate and apart from Title VII and without regard to the availability of the Title VII remedy."); Campisi v. The City University of New York, No. 15 Civ. 4859 (KPF), 2016 WL 4203549 at *4 (S.D.N.Y. 2016) ("courts within this Circuit have suggested that such a cause of action may proceed").

[5]     In Johnson, 421 U.S. at 459, 461, referring to claims brought under 42 U.S.C. § 1981 ("Section 1981"), the Court reasoned that Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable federal statutes." Similarly in Brown, 425 U.S. at 833, the Court

several Supreme Court decision issued after Title IX's enactment, including <u>Cannon v.
University of Chicago</u>, 441 U.S. 677 (1979), where the Supreme Court inferred a private cause
of action for *individuals* (not merely students), "notwithstanding that Title IX doesn't expressly
authorize private action." <u>Mercy</u>, 850 F.3d at 561 (<u>citing</u> <u>Cannon</u>, 441 U.S. at 683).  Notably, the
Supreme Court made clear that a private cause of action is available under Title IX in <u>North
Haven Board of Education v. Bell</u>, 456 U.S. 512 (1982) ("<u>North Haven</u>"), by stating that, "even
if alternative remedies are available and their existence is relevant … this Court repeatedly has
recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate
employment discrimination." <u>Id.</u> at 535, n.26 (emphasis added).[6]  Then, in <u>Jackson v.
Birmingham Board of Education</u>, 544 U.S. 167 (2005), the Supreme Court reinforced its broad
interpretation of Title IX to permit a Title IX private cause of action for retaliation based on a
complaint about sex discrimination to proceed.  <u>Id.</u> at 171, 173-74 (finding that "[the] Eleventh
Circuit's conclusion that Title IX does not prohibit retaliation because it is silent on the subject
ignores the import of this Court's repeated holdings construing 'discrimination' under Title IX
broadly to include conduct, such as sexual harassment, *which the statute does not expressly
mention*.") (emphasis added); <u>see also</u> <u>North Haven</u>, 456 U.S. at 521 ("There is no doubt that if
we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its
language"; and defining "individuals" to include both students and employees) (internal citations
removed).

---

observed that "[i]n <u>Johnson</u>, the Court held that in the context of private employment Title VII did not pre-empt
other remedies."

[6]      <u>North Haven</u> is also notable because the Supreme Court rejected a challenge that was made to agency
promulgated regulations interpreting Title IX to extend to sex-based employment discrimination, and held that Title
IX's prohibition of sex discrimination applies not only to students, but also to "[e]mployees who directly participate
in federal programs or who directly benefit from federal grants, loans, or contract." 456 U.S. at 520.  In reaching that
conclusion, the Court reviewed Title IX's legislative history and found that employees of federally funded education
programs and employment discrimination in academia are important focal point of Title IX.  <u>Id.</u> at 523-30.

Lastly, the <u>Mercy</u> court analyzed <u>Jackson</u>, 544 U.S. 167, which involved a high school *employee* who was relieved of his coaching position after he complained that a girls' basketball team received unequal treatment on the basis of sex who sued alleging a Title IX retaliation claim. The Court allowed the claim to proceed, reasoning that if federal funding recipients were "permitted to retaliate freely," individuals who witness sex discrimination would be hesitant to report it and "all manner of Title IX violations might go unremedied." <u>Jackson</u>, 544 U.S. at 180. Although not explicitly addressed, the Court did not indicate that Title VII displaced relief under Title IX. Rather, it recognized that the two statutes are "vastly different": Title IX contains a "broadly written general prohibition on discrimination," whereas Title VII has "greater detail" as to "the conduct that constitutes discrimination." <u>Id.</u> at 175.

Accordingly, the <u>Mercy</u> court held that Title IX was available for employment discrimination claims based on its detailed analysis of Supreme Court precedent holding that: (i) Title IX extends to employment discrimination in employment settings (as set forth in <u>North Haven</u>); (ii) the private Title IX remedy was not merely limited to students (as set forth in <u>Cannon</u>); (iii) Congress did not foreclose an individual from pursuing their rights under both Title VII and other applicable federal statutes (as set forth in <u>Johnson</u>); and (iv) Title IX and Title VII are "vastly different" statutes (as set forth in <u>Jackson</u>). Nothing in these cases (or any other Supreme Court case addressing Title IX) suggests that the availability of a Title VII remedy to redress employment discrimination affects the availability of remedies under Title IX. <u>Mercy</u>, 850 F.3d at 562-63.

Notably, The U.S. Department of Justice ("DOJ") also recognizes such a cause of action. <u>See</u> U.S. Dep't of Justice, Title IX Legal Manual IV.B.2 (accessible at <u>https://www.feminist.org/education/pdfs/ixlegalmanualDOJ.pdf</u>) (last visited July 10, 2020)

("The Department takes the position that Title IX and Title VII are separate enforcement mechanisms.  Individuals can use both statutes to attack the same violations.  This view is consistent with the Supreme Court's decisions on Title IX's coverage of employment discrimination, as well as the different constitutional bases for Title IX and Title VII.").[7]

This Court should follow the Third Circuit's well-reasoned decision in <u>Mercy</u>, which joined its sister courts in the First and Fourth Circuits, in holding that Title VII does not foreclose a private right of action for unlawful gender-based employment discrimination or retaliation under Title IX.

### C.     <u>YNHH Qualifies as an "Education Program" For Purposes of Title IX</u>

Despite characterizing itself as a "teaching hospital" and operating a robust medical residency and fellowship program (AC at ¶¶ 27, 29, 36), YNHH claims that it is not a covered "education program" for purposes of Title IX.  YNHH is incorrect.  Teaching hospitals like YNHH unquestionably receive federal funds; indeed, as hospitals that provide medical residency programs, they are eligible under the Medicare statute and Department of Health and Human Services ("HHS") regulations to receive Medicare reimbursements for portions of the direct and indirect costs of their graduate medical education programs.[8]  <u>See</u> 42 U.S.C. 1395ww(d)(5)(B)

---

[7]     In fact, the DOJ filed an amicus brief in <u>Mercy</u>, arguing in favor of finding both that a private cause of action under Title VII for sex-based employment discrimination in an education-related program or activity does not preclude a private cause of action under Title IX for the same conduct, and that, indeed, a teaching hospital's medical residency program is an "education program or activity" covered by Title IX.  <u>See</u> 580 F. 3d at 555.

[8]     "Direct" costs are "education-related expenses," such as teachers' and residents' salaries, as well as classroom costs.  <u>Henry Ford Health Sys. v. Department of Health & Human Servs.</u>, 654 F.3d 660, 663 (6th Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 73 (2012). "Indirect" costs are "costs incurred by teaching hospitals due to the general inefficiencies and extra demands placed on other staff that result from educating residents." <u>Id.</u> (citation and internal quotation marks omitted).

and (h); 42 C.F.R. 412.105, 413.75– 413.83; <u>see generally</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 506-508 (1994).[9]

To that end, Title IX prohibits sex discrimination in "any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). The statute does not define the phrase "education program or activity."[10] The Supreme Court has emphasized, however, that courts must accord Title IX "a sweep as broad as its language" to give it "the scope that its origins dictate." <u>North Haven</u>, 456 U.S. at 521 (citation omitted); <u>see also</u> <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967) (observing "the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes").

Medical residency easily falls within the plain meaning of "any education program or activity" as set forth in Title IX.  20 U.S.C. 1681(a).  First, medical residency clearly involves "education." Thus, "[m]edical residencies are a vital component of medical education, providing new doctors with a supervised transition between the pure academics of medical school and the realities of medical practice." <u>McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.</u>, 24 F.3d 519, 525 (3d Cir. 1994) (citation and internal quotation marks omitted).  The purpose of residency is to train recent medical school graduates to practice medicine independently by giving them "graduated, progressive responsibility" for treating patients "under the watchful eye of a university faculty member or an attending private practitioner." Stewart R. Reuter, <u>Professional Liability in Postgraduate Medical Education</u>, 15 J. Legal Med. 485, 487

---

[9]      In providing for this payment, Congress expressly recognized the important role that "educational activities" like medical residency programs play in enhancing hospitals' quality of care.  H.R. Rep. No. 213, 89th Cong., 1st Sess. 32 (1965); S. Rep. No. 404, 89th Cong., 1st Sess. 36 (1965).

[10]      In 1988, Congress added a definition of "program or activity" to Title IX and three other civil rights statutes to make clear that that term includes "all of the operations of " a funding recipient, not just the specific activities receiving the funding. Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100-259, 102 Stat. 28-31; <u>see</u> 20 U.S.C. 1687.  That provision did not, however, add a definition of the modifier "education," which occurs only in Title IX.

(1994); <u>see</u> <u>also</u> 15 U.S.C. 37b(b)(1)(B)(i) (defining "graduate medical education program" as "a residency program for the medical education and training of individuals following graduation from medical school").[11]   In fact, it is precisely because residency programs are "educational activities" that teaching hospitals like YNHH receive Medicare payments for them.  <u>See</u> 42 C.F.R. 413.75(a); <u>see</u> <u>also</u> H.R. Rep. No. 213, 89th Cong., 1st Sess. 32 (1965) (deeming "residency programs" to be one of the "substantial education activities" hospitals undertake).[12]

In short, medical residency falls within the plain meaning of "any education program or activity." 20 U.S.C. 1681(a).  Had Congress wished to exclude residency programs from Title IX's coverage, it could have done so explicitly, as it did for military academies, religious schools, and social fraternities and sororities, among other things.  <u>See</u> <u>id.</u>  It did not, and "[w]hen a statute lists specific exemptions, other exemptions are not to be judicially implied." <u>Jeldness v. Pearce</u>, 30 F.3d 1220, 1225 (9th Cir. 1994) (holding that prisons receiving federal funding are bound by Title IX, which provides "no exemption for correctional institutions").

Indeed, numerous courts have recognized that Title IX governs education programs outside of traditional educational institutions, in a variety of contexts — including medical residency programs.  <u>See</u> <u>Mercy</u>, 850 F.3d 545 (medical resident's Title IX claim against teaching hospital survives summary judgment); <u>Lipsett</u>, 864 F.2d at 897 (same); <u>Henschke</u>, 821

---

[11]     Completion of at least one year of residency is required for permanent licensure in most states, and graduation from a three-to-seven year residency program is a prerequisite to board certification in a particular specialty.  Reuter, 15 J. Legal Med. at 485-486.

[12]     The education that medical residents receive is not merely "incidental" to their employment or akin to "on-the-job training."  <u>See</u> <u>Roubideaux v. North Dakota Dep't of Corr. & Rehab.</u>, 570 F.3d 966, 977-978 (8th Cir. 2009) (holding that prison work program was not "education program" because, although prisoners may learn skills while working, "that benefit is incidental to and is not the primary focus of " the program, which was "to provide employment, not educational opportunities"); <u>O'Connor v. Davis</u>, 126 F.3d 112, 118 (2d Cir. 1997) (fact that a college student permitted to volunteer at hospital received "some modicum of on-the-job training" does not transform the ad hoc volunteer opportunity into an "education program"). Rather, educating new physicians is the core mission of medical residency programs.  <u>See</u> <u>Gupta v. New Britain Gen. Hosp.</u>, 687 A.2d 111, 117 (Conn. 1996) ("The ultimate objective of the residency program is to educate the physician in the healing arts.").

F. Supp. at 173 (allowing faculty physician at teaching hospital to proceed on Title IX employment discrimination claim).[13]

Accordingly, YNHH qualifies as an "education program" for purposes of Title IX.[14]

**D.**     **The Attending Plaintiffs Have Standing To Bring Title VII and Title IX Claims Against YNHH**

YNHH challenges whether Plaintiffs Boules, Eltorai and the two Olivers (the "Attending Plaintiffs") have standing to bring claims against YNHH under Title VII and Title IX, asserting that they are Yale employees who merely have staff privileges at YNHH.  However, the Attending Plaintiffs have more than sufficiently pled factual allegations that plausibly establish that they are employed by both YNHH and Yale based on the level of control YNHH exerts over their employment.  See Salamon v. Our Lady of Victory Hosp., 867 F.Supp.2d 344, 354 (W.D.N.Y. 2012) (denying summary judgment in Title VII action brought by physician against hospital with whom she had staff privileges, finding jury question whether plaintiff was hospital's employee based on degree of control exercised over physician's practice, noting hospital's apparent control over manner and means by which physician completed tasks, presence of peer review process that mandated performance of certain procedures and timing of others, and hospital's recommendation of changes to plaintiff's practice based on financial impact to the hospital).

---

[13]     See also Jeldness, 30 F.3d at 1224-1226 (Title IX governs correctional institutions); Sternberg v. U.S.A. Nat'l KarateDo Fed'n, Inc., 123 F. Supp. 2d 659, 662 (E.D.N.Y. 2000) (Title IX could apply to karate federation's training camp and preparatory contests).

[14]     The remaining cases YNHH cites in support of its argument that it is not an "education program" for purposes of Title IX are all inapposite.  See Winfield v. Chicago State Univ., No. 05 Civ. 5224, 2006 WL 2524137 (N.D. Ill. Aug. 30, 2006) (did not involve teaching hospital but a "human services organization" that helps underprivileged families); Crandell v. New York Coll. of Osteopathic Med., 87 F. Supp. 2d 304 (S.D.N.Y. 2000) (no analysis regarding whether teaching hospital qualified as education program under Title IX); Loewen v. Grand Rapids Med. Educ. Partners, No. 10 Civ. 1284 (GJQ), 2012 WL 1190145 (W.D. Mich. Apr. 9, 2012) (summary judgment decision where court did not reach question of whether hospital qualified as educational institution because plaintiff failed to present evidence of deliberate indifference).

In the Second Circuit, courts recognize that, pursuant to the joint employer doctrine, "an employee [who is] formally employed by one entity [but] has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer."  Arculeo v. On-Site Sales & Marketing, LLC, 425 F.3d 193, 198 (2d Cir. 2005).

The burden to sufficiently allege joint employment at the pleading stage is low; a plaintiff must merely plead facts that suggest an entity "exercised *a measure* of control over [] hiring, firing, supervision, leave and discipline" of an employee.  Daniel v. T & M Protection Resources, Inc., 992 F.Supp.2d 302, 314 (S.D.N.Y. 2014) (denying motion to dismiss Title VII claims for lack of employer-employee relationship).  Here, Attending Plaintiffs have more than sufficiently pled facts adequate to establish that they are employed by YNHH, which include, *inter alia*:

- YNHH sets their work schedules and work hours (AC at ¶ 32);

- YNHH assigns them to work on particular surgical cases and in particular operating rooms within YNHH's hospitals, which comprise nearly all of their work hours (id.);

- YNHH assigns the staff with whom they must perform their work, which include Certified Registered Nurse Anesthetists, operating room technicians, residents, fellows, and operating room nurses, all of whom are YNHH employees (id.);

- Their performance is evaluated by YNHH staff (id.);

- They spend the vast majority of their time working physically at YNHH, and must receive both Yale's and YNHH's permission in order to work there; if either entity denies permission, they are unable to work or receive pay (id.);

- They must comply with YNHH rules, regulations and by-laws, must attend YNHH staff meetings, and must treat YNHH patients assigned to them (id. at ¶ 33); and

- Their performance is subject to the evaluation of various YNHH peer review committees, which have the authority to discipline them, including by ordering them to undergo

remediation procedures, with the aim of changing the methods by which they arrive at diagnoses and treatments; *i.e., how* they perform their work (id. at ¶¶ 33-34, 145).

Even without the benefit of discovery which may shed further light on the issue of YNHH's control over the Attending Plaintiffs' employment, the factual allegations in the AC recited above are more than sufficient to allege a plausible employment relationship.  See Salamon, 867 F.Supp.2d at 355 ("genuine issues of material fact regarding whether [hospital] controlled the manner and means of Plaintiff's medical practice" preclude summary judgment).[15]

Moreover, the Attending Plaintiffs (who all hold associate professor titles at Yale (AC at ¶¶ 21, 23-25)), in effect: (a) teach residents and fellows who participate in YNHH's residency and fellowship program; (b) supervise residents during surgical cases; and (c) evaluate the performance of residents and fellows.  Id. at ¶ 28, 36.  Similarly situated Yale employees, who also serve as YNHH attending physicians, vet prospective YNHH residents and fellows during their interview process; indeed, some head fellowship programs and hire as well as interview fellows.  AC at ¶ 28.  In this regard, the Attending Plaintiffs are directly connected with, provide services to, participate in, and benefit from YNHH's residency and fellowship program, which, for the reasons set forth in Section II(C) *supra*, qualifies as an "education program" for purposes of Title IX.  Accordingly, given Title IX's broad prohibition against the discrimination on the basis of sex against all "persons," by "any education program or activity receiving Federal financial assistance," 20 U.S.C. §1681(a), the Attending Plaintiffs who are not only employees of

---

[15]     The two cases cited by YNHH in support of their argument that the Attending Plaintiffs are not YNHH employees are easily distinguishable, as both Perry v. Pediatric Inpatient Critical Care Servs., P.A., 18 Civ. 404-XR, 2020 WL 1248263 (W.D. Tex. Mar. 16, 2020) and Levitin v. Nw. Cmty. Hosp., 923 F.3d 499 (7th Cir. 2019) were decided at the summary judgment (not the pleading) stage (and thus after discovery), and the plaintiff in Levitin, unlike Attending Plaintiffs, owned her own medical practice, billed her patients directly, set her own hours, and used her own staff during surgeries.

YNHH but are also intricately tied to YNHH's residency program, have pleaded sustainable Title IX claims against YNHH.[16]

### E.     Plaintiffs Have Sufficiently Pleaded Gender Discrimination Claims

The Second Circuit has stated that a single incident of harassment — if "extraordinarily severe" — can provide a sufficient basis for a hostile work environment claim. <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000) ("[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, *or* that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.") (emphasis added). The Circuit has also "repeatedly cautioned against setting the bar [for a hostile work environment claim] too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of his employment altered for the worse." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotations omitted) (citing <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 70 (2d Cir. 2000)). As explained by the Supreme Court, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). "Hostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002); <u>Evarts v. S. New Eng. Tel. Co.</u>, No. 00 Civ. 1124 (WIG), 2006 WL 2864716

---

[16]     The case cited by YNHH in support of their assertion that the Attending Plaintiffs' Title IX claims fail because their relationship to an education program or activity is too attenuated are all distinguishable as well. <u>See</u> <u>Burgess v. Harris Beach PLLC</u>, 346 F. App'x 658 (2d Cir. 2009) (plaintiff was neither employee nor student of defendant school district, but an attorney who had brought discrimination action on behalf of client); <u>Doe v. Univ. of Kentucky</u>, 357 F. Supp. 3d 620 (E.D. Ky. 2019) (post-discovery ruling that plaintiff was neither student nor *participant*, actual or intended, in university's education program); <u>Glaser v. Upright Citizens Brigade, LLC</u>, 377 F. Supp. 3d 387 (S.D.N.Y. 2019) (plaintiff was neither employee nor student of defendant at time of alleged discrimination, but had been student "years before" alleged misconduct); <u>Lopez v. San Luis Valley, Bd. of Co-op. Educ. Services</u>, 977 F. Supp. 1422 (D. Colo. 1997) (summary judgment decision; plaintiff was "at most, [] forced … to work *with*" defendant).

(D.Conn. Oct. 2, 2006) (hostile work environment claims are composed of series of separate acts that collectively constitute one "unlawful employment practice" which "occurs over a series of days or perhaps years").

Significantly, to survive a Rule 12(b)(6) motion to dismiss, a Title VII plaintiff[17] need not establish every element of a *prima facie* hostile work environment claim, but "need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Cowan v. City of Mount Vernon, No. 14 Civ. 8871 (KMK), 2017 WL 1169667, at *4 (S.D.N.Y. Mar. 28, 2017) (internal quotation marks and alterations omitted). Rather, "at this stage, the proper inquiry is not whether the plaintiff has adduced sufficient evidence to prevail ultimately at trial, but rather whether she is entitled to offer evidence to support her claims." Drees v. County of Suffolk, No 06 Civ. 3298 (JFB), 2007 WL 1875623, at *11 (E.D.N.Y. June 27, 2007) (internal citations and quotation marks omitted); see also Flores v. New York City Human Resources Admin., No. 10 Civ. 02407 (RJH), 2011 WL 3611340, at *9 (S.D.N.Y. Aug, 16, 2011) (where complaint "presents an overarching picture of hostility," "[w]hether the environment was, in fact, sufficiently severe or pervasive, and whether [defendant] was motivated by [plaintiff's] race [or for other reasons]… are questions better left for summary judgment").

Furthermore, pursuant to the continuing violation doctrine, if a plaintiff experiences a "'continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Hudson v. W. N.Y. Bics Div., 73 F. App'x 525, 528 (2d Cir. 2003) (quoting Fitzgerald v. Henderson, 251

---

[17]    A Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence.  See Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 89 (2d Cir. 2011) (internal quotation marks omitted).

16

F.3d 345, 359 (2d Cir. 2001)); accord Papelino, 633 F.3d at 91 (2d Cir. 2011) (applying continuing violation doctrine to Title IX claims).  The continuing violation doctrine, therefore, enables "a plaintiff [to] bring claims for discriminatory acts that would have been barred by the statute of limitations as long as an act contributing to that hostile environment took place within the statutory time period." Id. (citing McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir.2010)).  The continuing violation doctrine applies to "claims that by their very nature involve[ ] repeated conduct." Troeger v. Ellenville Cent. Sch. Dist., 523 F. App'x 848, 851 (2d Cir. 2013) (citing Morgan, 536 U.S. at 115). The prototypical example is a hostile work environment claim, which "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117, 122.

Here, because each of the Plaintiffs have unquestionably alleged a series of similar acts of sexual harassment which that took place both during and before the applicable statute of limitations period that together form one unlawful employment practice (i.e., that Fontes was permitted to subject them to a hostile work environment by repeatedly sexually harassing them with impunity, all while Yale and YNHH "turned a blind eye" to and permitted his heinous conduct), all these acts may be considered together and are unquestionably sufficient to establish viable hostile work environment claims at the pleading stage.  To wit:

- Plaintiff Boules alleges, *inter alia*, that: (i) even during her own late-2017 interview dinner, Fontes sat and spoke uncomfortably close to her; (ii) in mid-2018, Fontes cornered her in a restaurant booth and repeatedly and unwantedly touched and groped her arm, leg and thigh, and later that night, she observed him harass Plaintiff Jodi-Ann Oliver as he sat next to her at dinner and unwantedly touched her; (iii) Fontes has made repeated attempts to entice her into having drinks with her outside of work; (iv) in mid to late-2018, when they were out together with another colleague, Fontes made repeated overtly sexist, sexual and inappropriate comments to her; (v) in October 2018, Fontes convinced her to meet him out alone at a restaurant, and forcibly and unwantedly kissed her on the lips three or four times that evening, and unwantedly touched her body in a sexual manner; (vi) days later, Fontes forcibly and unwantedly kissed her on the lips following a staff meeting; (vii) since then, Fontes has continuously unwantedly touched and hugged

17

her nearly every time he has seen, including a July 2019 incident during which he unwantedly hugged her, and an incident in mid-September 2019 during which he snuck up behind her as she was working in an operating room and grabbed both her shoulders, leaned the front of his body into her backside, put his cheek on her cheek, whispered into her ear, and asked her out for drinks; and (viii) Fontes took no action after she complained to him in May and July 2019 about a male surgeon who was harassing her, including by calling her a "bitch" and "cunt" (AC ¶¶ 98-107, 178);

- Plaintiff Castro alleges, *inter alia*, that: (i) beginning in August 2018 and continuing into the fall of 2018, Fontes repeatedly came behind her while she worked in large operating rooms, stood inappropriately and unnecessarily close to her, and put his arms on and/or around her shoulders and waist; (ii) in mid-August 2018, while the two worked together in an operating room, he made repeated crude jokes to her about being an "old man" from whom she could "learn something," unwantedly placed his hand on her shoulder, and suddenly came behind her and put his arm around her waist and stood extremely and unnecessarily close to her; (iii) after she resisted his advances, Fontes berated and demeaned her when they worked together, including an incident where he yelled at and commanded her to degradingly pick up a syringe cap that had fallen on the floor rather than tend to an ailing patient; and (iv) after she made multiple complaints about his harassing behavior, and after he retaliatorily refused to approve a request she made for his permission to apply a mission trip to Peru towards her fellowship requirements, Fontes derisively winked at her the first time she encountered him in months (id. at ¶¶ 111-123);

- Plaintiff Eltorai alleges, *inter alia*, that: (i) when she told Fontes she was pregnant in September 2018, he remarked about her body by saying, "I wonder when you'll start to show – probably very soon, since you have a flat stomach"; (ii) in June 2019, weeks after she had given birth, Fontes slowly ogled her body up and down and said, "Oh wow you look good" and gave her a long, unwelcomed hug; (iii) later that evening, Fontes tried to spoon feed her food from across the table as she held hew newborn son; (iv) also that night, after noticing that she was no longer wearing her wedding ring, Fontes asked her out to have "a bottle of wine" so he could "tell" her his "wisdom about life and divorce"; (v) in July 2019, while the two were in his office, Fontes got up from his desk, sat uncomfortably close to her, and when the meeting ended, gave her an uninvited full body hug in which he pressed his pelvis against hers; (vi) later in July 2019, Fontes snuck up behind her while she was in a breakroom and began to massage her neck unwantedly; and (vii) in August 2019, while she was working in the hospital, Fontes came up to her, stood uncomfortably close, and unwantedly touched her shoulder while speaking with her in a flirtatious manner in front of a patient's family (id. at ¶¶ 127-128, 149-158);

- Plaintiff Jodi-Ann Oliver alleges, *inter alia*, that: (i) throughout her employment, Fontes has repeatedly come up behind her and inappropriately and unwantedly touched her body, including her back and shoulders; (ii) during a 2016 work retreat, Fontes continually touched her lower back, slipped his hand down her backside, and unwantedly and inappropriately hugged her; (iii) in 2017, after she injured her wrist and requested workplace accommodations, Fontes called her a "malingerer," told her to "shut up" and to "shut the fuck up," and that he would "fire [her] if [she] ke[pt] talking"; (iv) in late-

2017, Fontes tried to have her kicked off a fellowship committee and accused her of being a "malingerer"; (v) in mid-2018, at a colleague's going away dinner, she observed Fontes inappropriately touch Plaintiff Boules's body; (vi) later that night, Fontes sat next to her during dinner and repeatedly and unwantedly rubbed her arm and back, and whispered sexual advances in her ear and made comments about her figure and health such as, "that's why you stay so thin," and referred to her as his "island girl"; and (vii) in April 2019, during a dinner with a potential new physician hire, Fontes continuously flirted with her throughout the evening, repeatedly leaned in towards her and commented on her "nice skin," "soft skin," "great figure," how she smelled "really nice," was "very thin," was a "pretty Caribbean girl," and asked her "do you work out?", unwantedly rubbed her arms, neck, back and shoulders, and at the end of the night, tried to get her to go home with him, and then gave her an unsolicited kiss on then lips while hugging her and putting his hands all over her body (id. at ¶¶ 168-182);

- Plaintiff Lori-Ann Oliver alleges, *inter alia*, that: (i) throughout her employment, Fontes has repeatedly, nearly every time they have run into each other, would come up behind her and inappropriately and unwantedly hug and touch her body, including by grabbing her shoulders, lower back and waist, pull her towards him, and put his face close to hers, violating her personal space; (ii) in April 2019, after witnessing Fontes sexually harass her sister, Plaintiff Jodi-Ann Oliver, during a dinner for a potential new physician hire, including by giving her sister an unwanted kiss on the lip, Fontes then turned around and grabbed her by the arms, pulled her towards him, forced his tongue down her mouth and kissed her on the lips; (iii) throughout her employment, multiple times a year, Fontes would make inappropriate sexual comments, including about how "skinny" she looked and how "nice" her "shape" was; (iv) in the fall of 2018, Fontes unwantedly grabbed her around the waist, which prompted her to complain that Fontes inappropriately touched her and other female employees to the Division Chief of the Pain Management section of the Department of Anesthesiology; (v) she was aware how her sister had been harassed by Fontes for years, and about how nothing had been done to address his conduct despite the fact that higher ups within the department were aware of his conduct; and (vi) even after the April 2019 incident in which Fontes unwantedly groped and kissed her, Fontes continued to inappropriately touch and grab her nearly every time he encountered her, including an incident in October 2019 when the two were both at a conference in Florida and Fontes came up to her, unwantedly squeezed her by the shoulders, and put his hand on her back and around her waist (id. at ¶¶ 168, 183-186); and

- Plaintiff Reinhart alleges, *inter alia*, that: (i) during a May 2019 dinner, Fontes flirted profusely with her, including by commenting on her appearance, and tried to persuade her to drink more alcohol, and that at the end of the dinner, Fontes tried to kiss her on the lips but she was able to move her head so that his lips landed on her cheek and side of her mouth. As she tried to escape him, Fontes chased her down on the street and tried to get her to come into his car; (ii) in June 2019, at a resident graduation ceremony, Fontes came up to her and asked whether she was "going out tonight," and then referenced how he had "misbehaved in the past" at a graduation event, alluding to an incident in 2016 where a video surfaced of him sexually assaulting an inebriated female resident as the two danced at a graduation event. Later than evening, Fontes came up behind Plaintiff.

19

Reinhart again, wrapped his arm around and hugged her by the waist, and said lewdly, "I can't wait to see you at Barcelona," referring to the location where the graduation ceremony afterparty would be, while ogling her body up and down.  Dr. Reinhart was so terrified and shaken up by Fontes's behavior that she stayed at a female attending physician's home that night rather than go back to her apartment for fear that she might encounter Fontes later that night; (iii) in July 2019, while she was in a breakroom, Fontes suddenly came up behind her and unwantedly massaged her back and shoulders; (iv) after she made multiple complaints about his sexually harassing conduct in late-July and early-August 2019, the Department of Anesthesiology appointed Fontes to be its inaugural Vice Chair of Diversity, Equity and Inclusion; and (v) in October 2019, during a conference in Florida, Fontes came up to her as she was standing outside her hotel, grabbed her arm, linked his arms with hers, pulled her towards him and asked her, in an intimidating manner, "so where is your partner in crime?"  When Dr. Reinhart asked him to whom he was referring, Fontes identified Plaintiff Eltorai, who too had recently lodged sexual harassment complaints against him (id. at ¶¶ 190-211).

Courts confronted with conduct similar or less serious to that alleged here by Plaintiffs have denied motions to dismiss, and some have even denied motions for summary judgment. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (evidence that defendant "made numerous (approximately six) sexual comments and on multiple occasions grabbed [plaintiff] and other women around the waist, tickled them, and stared as if he was mentally undressing them" sufficient to defeat *summary judgment* motion).[18] Here, Plaintiffs have given Defendants more than "fair notice" of what their claim is and on what grounds they rest for purposing of meeting their pleading requirements.[19]

---

[18]      See also Wahlstrom v, Metro-North Commuter Railroad Co., 89 F.Supp.2d 506, 511, 521 (S.D.N.Y. 2000) (single incident where co-worker approached plaintiff from behind, gave her a bear hug, made a grunting sound, and slapped her left buttock three times sufficient to defeat motion for summary judgment on hostile work environment claim as "physical contact between the parties was neither harmless nor accidental"); Hauff, 425 F.Supp.3d at 136 (hostile work environment claims stated where "[t]he conduct complained includes sexual advances and innuendo, leering and unwanted physical touching, including the slapping of Plaintiff's buttocks and encroaching on her personal space."); Yaba v. Roosevelt, 961 F.Supp. 611, 620 (S.D.N.Y. 1997) (denying motion to dismiss hostile work environment claims based on one event, because plaintiff alleged a "serious incident of sexual touching and harassment [that] ... if credited by a jury, could be judged sufficient to have created a hostile or offensive working environment"); Walter v. Westdeutscher Rundfunk, ARD German Radio N.Y., No. 03 Civ. 5676 (LAK)(JCF), 2004 WL 1052776 (S.D.N.Y. May 11, 2004) (report and recommendation adopted) (single incident where supervisor rubbed his own genitals in plaintiff's presence was sufficient to defeat motion to dismiss plaintiff's hostile work environment claim).

[19]      Notably, all but two of the over dozen cases that Yale cites in support of its argument that Plaintiffs have failed to sufficiently plead hostile work environment claims (see Yale Mem., Dkt. 53-1, at 16-23) are from the summary judgment stage or later, and thus wholly inapplicable here where there has been no discovery.  The

**F.      Plaintiffs Have Sufficiently Pleaded that Yale and YNHH Had Actual Notice of Fontes's Sexually Harassing Conduct**

Plaintiffs have sufficiently alleged that Yale and YNHH were on notice of Fontes's sexually harassing conduct to render her Title IX and Title VII viable at the pleading. Preliminarily, Plaintiffs have each pleaded plausible claims of *quid pro quo* sexual harassment as they each allege that they suffered tangible adverse actions in the form of continued sexual harassment after they refused to submit to their supervisor Fontes's sexual demands.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753–54 (1998) (describing how *quid pro quo* sexual harassment occurs when tangible adverse action results from an underling's refusal to submit to a higher-up's sexual demands, which, by its very nature, constitutes intentional unequal treatment based on sex); Papelino, 633 F.3d at 90 (sufficient proof of the elements of a *quid pro quo* claim to survive summary judgment where plaintiff adduced evidence that supervisor sexual advances toward him, he rejected them, and supervisor initiated Honor Code proceedings falsely accusing him of cheating).

Furthermore, with regard to Plaintiffs' hostile work environment claims, knowledge can be imputed to Yale and YNHH because of Fontes's supervisory position over Plaintiffs. "Where, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer unless the employer can prove by a preponderance of the evidence that it is protected by the *Faragher/Ellerth* defense."  Hauff, 425 F.Supp.3d at 137.[20]

---

remaining two decisions which are actually from the pleading stage are, likewise, irrelevant.  See Martinetti v. Mangan, No. 17 Civ. 5484 (KMK), 2019 WL 1255955 (S.D.N.Y. Mar. 19, 2019) (dismissing Title IX with leave to re-file complaint where "Plaintiff pleads virtually no facts about the assault in question, including where and when it was perpetrated, the attack's severity, and whether the alleged perpetrator was a student, teacher, or other member of the school community"); Alexander v. Hunt, No. 16 Civ. 192 (GWC), 2018 WL 3801240 (D. Vt. Aug. 9, 2018) (illegal search and seizure and not Title VII or Title IX claim).

[20]      The *Faragher/Ellerth* defense, to the extent it applies in this case of both *quid pro quo* and hostile work environment sexual harassment, consists of two elements: (1) that "the employer exercised reasonable care to

Moreover, Plaintiffs sufficiently allege that high-ranking members of the Department of Anesthesiology faculty, all of whom have worn dual hats with YNHH, and other Yale officials, had actual knowledge of Fontes's penchant for sexually harassing female subordinates.  See Papelino, 633 F.3d at 89 (sufficient evidence for reasonable jury to find that college had actual notice of sexual misconduct based on knowledge possessed by "high-ranking members of the College's administration" who was "responsible for administration of the Student Code.").

Notably, while YNHH claims that Plaintiffs have failed to adequately plead that any YNHH officials had notice of Fontes's conduct, YNHH actually *instructs* its staff, including its residents and fellows, to file complaints with *Yale University* officials when issues concerning sexual harassment/misconduct "involving a University employee" like Fontes occur, and to "contact [YNHH's] Human Resources Office" only when "the complaint involves another trainee or a hospital employee."  See Exhibit A (relevant pages from YNHH's "House Staff Orientation 2019" manual).[21] Thus, in effect, YNHH hands over responsibility for receiving complaints from its staff to officials at Yale, ostensibly because Yale officials will then notify YNHH of such complaints so that the two entities could determine the proper recourse since the two entities unquestionably share personnel.  As such, at a minimum, for pleading purposes, notice and knowledge possessed by Yale concerning misconduct by Fontes, who is an attending physician with privileges at YNHH, should be imputed to YNHH, and further fleshed out in discovery.

---

prevent and correct promptly any [discriminatory] harassing behavior," and (2) that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Ellerth, 524 U.S. at 765. Discovery is, of course, necessary to test the viability of this defense.

[21]        YNHH's "House Staff Manual" is referenced in the AC (see AC at ¶ 29), and thus can be properly considered by the Court in connection with Defendants' Rule 12 motions.  See Wood v. Prudential Retirement Insurance, No. 15 Civ. 1785 (VLB), 2016 WL 5940946, at *3 (D.Conn. Sept. 19, 2016) ("In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.") (citations and quotations omitted).

Here are just some of the pleaded facts in the AC that establish that Yale and YNHH

were on actual notice of Fontes's penchant for sexually harassing his female subordinates, but

were deliberately indifferent to his conduct:

- In or around the Spring of 2016, the Anesthesiology Residency Coordinator, Dr. Jeffrey Schwartz, who is responsible for, among other things, managing and coordinating the anesthesiology residency program and handling anesthesiology resident concerns, and who reports directly to the Chair of the Department, Dr. Roberta Hines, was notified of Fontes's alleged sexual misconduct at Duke University, where he was accused of harassing a female fellow and multiple nurses.  By virtue of his position, Dr. Schwartz would have discussed his knowledge about Fontes's conduct at Duke with Dr. Hines and other officials (AC at ¶ 67);

- In late 2015, a female attending physician, referred to in the AC as Dr. X, complained to Merle Waxman, Yale Associate Dean and Ombudsperson (and someone to whom YNHH directs its staff to file sexual harassment/misconduct complaints involving Yale employees (see Ex. A)), about being unwantedly and forcibly kissed on the lips by Fontes on multiple occasions inside YNHH.  No disciplinary action was taken against Fontes (id. at ¶¶ 69-74);

- In July 2016, Dr. Hines was provided with a video of an incident during the recent residency graduation ceremony in which Fontes is seen dancing provocatively with and groping an inebriated female resident.  Dr. Hines acknowledged to the Department's senior physician staff (all of whom are also YNHH attending physicians) that she had in fact seen such a video, but rather than take any action to discipline Fontes for what was a sexual assault against a subordinate, Dr. Hines merely told staff that they should not fraternize or consume alcohol with residents, which further emboldened Fontes to continue his harassing conduct (id. at ¶¶ 75-83);[22]

- Following this incident, Adriana Herrera, the Associate Director of the Residency Program, spoke with the female resident whom Fontes had assaulted, Dr. Y, and acknowledged that the Department needed "creative solutions" to handle inappropriate behavior from male superiors towards female superiors, a clear allusion to Fontes's sexual misconduct at the graduation (id. at ¶¶ 84-85);

- Following a 2016 annual retreat during which Fontes continually touched her lower back, slipped his hand down her backside, and unwantedly hugged her, Plaintiff Jodi-Ann Oliver complained about being inappropriately touched by Fontes to the Division Chief and Director of Pediatric Anesthesiology, Lance Lichtor, who acknowledged that

---

[22]     Fontes would later defiantly reference this incident to Plaintiff Reinhart during the 2019 resident graduation, by suggestively asking whether she would be "going out tonight," and that he had "misbehaved in the past at Barcelona [the restaurant where the sexual misconduct had occurred in 2016] after graduation, so what happens there stays there."  Id. at ¶¶ 197-98.

Fontes's touching was inappropriate. Nothing was done to address the complaint however (id. at ¶¶ 169-71);

- In 2017, after Fontes called her a "malingerer," told her to "shut up," and "shut the fuck up," and that he would "fire [her] if [she] ke[pt] talking," Plaintiff Jodi-Ann Oliver complained about this abusive, gender-based misconduct again to Dr. Lichtor, and then to Dr. Hines, who told her merely that she was "sorry" for what happened, and that Fontes owed her an apology. Nothing was done by Dr. Hines or anyone else to discipline Fontes or to address his misconduct (id. at ¶¶ 172-73);

- At or around the end of 2017, Dr. Lichtor complained about Fontes's discriminatory behavior towards Plaintiff Jodi-Ann Oliver to Dr. Hines. Again, nothing was done to address this misconduct or to discipline Fontes (id. at ¶ 174);

- At Plaintiff Boules's interview dinner in late-2017, Dr. Hines witnessed Plaintiff Boules become visibly uncomfortable by how closely Fontes was sitting next to and speaking with her, and even ordered Fontes to stop dominating Dr. Boules's time, before making him switch seats with someone else there (id. at ¶ 98);

- In May 2018, Dr. Lichtor complained about Fontes's mistreatment of his subordinates to the Dean of Yale School of Medicine. Again, nothing was done to discipline Fontes or address his misconduct (id. at ¶ 175);

- In mid-2018, at a colleague's going away dinner, Fontes repeatedly touched and groped Plaintiff Boules's arm, leg and thigh, making her incredibly uncomfortable, in front of Lorne McKay, the Associate Director of the Pediatric Anesthesiology section, who would even later comment about how inappropriate Fontes's conduct had been (id. at ¶ 99);

- During this same going away dinner, Fontes repeatedly and unwantedly rubbed Plaintiff Jodi-Ann Oliver's arm and back, while whispering sexual advances in her ear, including inappropriate comments about her figure and health, such as "that's why you stay so thin," and referred to her as his "island girl." Caroline Al Haddadin, who was the Program Director of the Pediatric Anesthesiology Fellowship, witnessed this conduct and later expressed to Plaintiff Oliver how badly she felt that she had endure this harassment from Fontes (id. at ¶¶ 177-78);

- In the fall of 2018, after she was unwantedly grabbed around her waist by Fontes, Plaintiff Lori-Ann Oliver complained to the Division Chief of the Pain Management section about how Fontes has inappropriately touched her and other female employees. Again, no action was taken in response to this complaint (id. at ¶¶ 184);

- Between March and July 2019, Plaintiff Boules complained to Fontes about how a male surgeon was harassing her, including by calling her a "bitch" and a "cunt," yet Fontes did nothing to address this conduct, which continued for months. Even after Dr. Hines was made aware of the surgeon's behavior, nothing was done to stop the harassment, and instead, Dr. Hines characterized the surgeon as a "bad boy," brushed aside his behavior,

and told Plaintiff Boules, "everyone knows he's crazy so don't let it get to you" (id. at ¶ 107);

- Even when Dr. Boules tried to inform YNHH's Chief Medical Experience Officer Alan Friedman, who is also a Professor of Pediatric Cardiology at Yale, of Fontes's behavior, her requests to speak with to him went unanswered (id. at ¶ 108);

- In May 2019, Plaintiff Reinhart was sexually harassed by Fontes in front of a Professor of Anesthesiology at Yale and division director within the Department.  The harassment perpetrated by Fontes included his attempt to kiss her on the lips, inappropriate comments about her appearance, attempts to persuade her to drink more alcohol, and efforts to chase her down outside the restaurant and convince her to go home with him (id. at ¶¶ 190-95);

- In June 2019, at the anesthesiology resident graduation, a Professor of Anesthesiology at Yale and division director within the Department observed Fontes sexually harass Plaintiff Reinhart, including by wrapping his arm around her waist and telling her lewdly, "I can't wait to see you at Barcelona" (where Fontes had sexually assaulted a female resident in 2016) as he ogled her body up and down.  The Professor and division director came over and asked Plaintiff Reinhart if she was okay, but Plaintiff Reinhart was so shaken that she asked to go home with the Professor so as to make sure she did not run into Fontes later that evening (id. at ¶¶ 197-200);

- Soon thereafter, the Professor who drove Plaintiff Reinhart home reported Fontes's behavior to Dr. Schwartz, who is believed to have escalated the report to Dr. Hines.  Yet, nothing still was done to address Fontes's behavior or to discipline him (id. at ¶¶ 201);

- Then, in July 2019, Plaintiff Reinhart complained to Dr. Schwartz and Trevor Banack, an Assistant Clinical Director, who then reported the complaints to Dr. Hines.  Yet again, rather than discipline Fontes, Dr. Hines directed Dr. Schwartz to ask Plaintiff Reinhart whether she was "taking legal action," and merely advised Fontes to not consume alcohol with residents.  Incredibly, days after receiving these complaints about Fontes's sexual misconduct, Dr. Hines announced "with pleasure" that Fontes would be appointed as the Department's inaugural Vice Chair of Diversity, Equity and Inclusion (id. at ¶¶ 203-07);

- In August 2019, Plaintiff Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct about Fontes's sexually harassing behavior and other misconduct.  Rather than take any remedial action against Fontes, Fontes and others within the Department, including Dr. Hines, retaliated against Plaintiff Eltorai by banning her from working in the ICU (id. at ¶¶ 143-45);

- In mid-late August 2019, Plaintiffs Castro and Reinhart complained to various other Yale University officials about Fontes's conduct, including Ms. Waxman, Ms. Menon, and Rosemarie Fisher the Director of Resident/Fellow Well-being within the Office of the Provost at Yale (id. at ¶¶ 208); and

- Plaintiffs Castro and Reinhart tried to escalate their complaints to Mr. Friedman, the Chief Medical Experience Officer for YNHH, but were told that he was not equipped to handle those types of physical sexual harassment and assault complaints, and made it clear that YNHH was not willing to take the steps necessary to address their complaints (id. at ¶¶ 209).

To establish institutional liability for sexual harassment under Title IX, a plaintiff must show that "an official who has authority to address the alleged discrimination and to institute corrective measures on the institutional recipient's behalf has actual knowledge of discrimination and fails adequately to respond." Campisi, 2016 WL 4203549, at *4 (internal quotation marks omitted) (citing Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech., 214 F. Supp. 2d 273, 281-82 (E.D.N.Y. 2002)).  Here, countless high-level personnel at Yale – and therefore also YNHH, with whom Yale shared responsibility to address allegations of sexual harassment and misconduct (see Ex. A) – had actual knowledge of Fontes's harassing conduct beginning in 2015 when he first joined Yale and YNHH, yet nothing was ever done to prevent him from preying on Plaintiffs.  As such, Plaintiffs have more than sufficiently pleaded that Yale and YNHH had actual knowledge of Fontes's sexually harassing conduct for purposes of meeting the pleading requirements, and should be permitted to explore this issue further in discovery.  See Goldstein v. University of Maryland, No. 18 Civ. 2376 (CCB), 2019 WL 4467035, at *9 (D.Md. Sept. 17, 2019) ("the question of who has the power to take corrective action [for purposes of determining whether institution had actual notice for purposes of Title IX claim] is fact-specific and would be inappropriate for resolution here [at the motion to dismiss stage]) (citing Doe v. Board of Educ. of Prince George's County, 888 F.Supp.2d 659, 667 (D.Md. 2012) ("Here, discovery has yet to commence, let alone a trial terminate, and the Court considers merely whether Plaintiffs have stated a cognizable Title IX sexual harassment claim.")).[23]

---

[23]    Notably all of the cases YNHH cites in support of its argument that Plaintiffs have failed to allege actual knowledge (see YNHH Mem., Dkt. No. 52, at 14-15) were decided after discovery took place.

Furthermore, Plaintiffs have more than sufficiently pled that Yale and YNHH acted with deliberate indifference when they (repeatedly) became aware of Fontes's misconduct and not only did nothing to deter or prevent Fontes from sexually harassing Plaintiffs, but even appointed him to be the inaugural *Vice Chair of Diversity, Equity and Inclusion* for the Department of Anesthesiology (AC at ¶¶ 206).  See Gebser v. Lago Bista Indep. School. Dist., 524 U.S. 274, 290 (1998) (response is inadequate if the officer failed to provide one or if she provided one amounting to deliberate indifference to the discrimination alleged:); Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651, 654 (1999) (deliberate indifference where institution or its agents "knowing[ly] refus[ed] to take any action in response" to the behavior, such as "investigat[ing] or put[ting] an end to the harassment"); Papelino, 633 F.3d at 90 (denying summary judgment on Title IX claim where evidence supported finding of deliberate indifference where "high ranking" member of college administration with responsibility to administer student code knew of sexual misconduct but "kept … quiet" and did not speak to alleged harasser or "anyone else at the college" because he "didn't want to let it out," which demonstrated that he did nothing to investigate allegation).

### G.   Plaintiffs Eltorai and Castro Have Sufficiently Pleaded Retaliation Claims

Defendants Yale and YNHH allege that Plaintiffs Eltorai and Castro have failed to plausibly allege retaliation claims purportedly because they have not sufficiently alleged that they engaged in protected activity or suffered adverse actions.  Both assertions are incorrect.

As to Plaintiff Eltorai, on October 25, 2018, she complained to Dr. Hines that Fontes discriminated against her based on her pregnancy by refusing to support her research project

because of her upcoming maternity leave.  AC at ¶¶ 131-32.[24] Shortly thereafter, in January

2019, even though Plaintiff Eltorai had received assurances from the Department of

Anesthesiology otherwise, Fontes advised her that she would be unable to meet her unit

requirements, and thus would not receive her full salary, because of her upcoming maternity

leave, which Dr. Eltorai regarded as discriminatory.  Id. at ¶¶ 133-35.  Plaintiff Eltorai then filed

a pregnancy discrimination complaint with the Yale Faculty Affairs Department, and was told

that the Department of Anesthesiology would be contacted to "look into" her complaint.  Id. at ¶

136.  Then, just one week after making this latest complaint, Fontes and two of his reports

(including a female physician with whom Plaintiff Eltorai had no clinical relationship but was in

the room just "so that there will be a female here") met with her to unfairly criticize her

performance, while failing to offer any concrete examples of any purported performance

shortcomings.  Id. at ¶¶ 137-142.

Then, after returning from maternity leave in mid-July 2019, Plaintiff Eltorai complained

to Ms. Menon about Fontes's sexually harassing behavior and other misconduct.  Id. at ¶¶ 143.

However, just a week later, Plaintiff Eltorai was again abruptly called into a meeting with Fontes

and criticized for her performance related to a case that occurred in the ICU several months

earlier, even though she had been back at work for a month following maternity leave and was

not spoken to about this incident.  Id. at ¶ 143.  Plaintiff Eltorai was then banned from continuing

to work in the ICU, which she alleges was retaliation for her protected activities.  Id. at ¶¶ 144-

147.

Plaintiff Eltorai further alleges that she was retaliated against after filing this lawsuit by

being subjected to unwarranted and unfair performance criticism, denied opportunities to

---

[24]     Fontes would later admit, after Dr. Eltorai had her baby, that he had been unresponsive regarding -- and
therefore effectively stymied -- Dr. Eltorai's research project in order to do her a "favor" because she "just had a
baby and should be spending all [her] time with him." Id. at ¶ 154.

volunteer her services during the COVID-19 crisis, and denied permission to help cover certain

overnight shifts pursuant to requests from the Department of Medicine.  Id. at ¶¶ 161-64.

As such, it is irrefutable, for pleading purposes, that Dr. Eltorai engaged in protected

activity on no less than four occasions since October 2018, and suffered adverse employment

actions shortly after each of her complaints.  The adverse action to which she was subjected (i.e.,

being told she would not in fact be eligible to meet her unit requirements and thus receive her

full salary because of her maternity leave, criticized, without any support, about her

performance, abruptly banned from working in the ICU, and not permitted to volunteer during

the COVID-19 crisis and work additional shifts) all would "dissuade a reasonable worker from

making" a complaint, and thus constitute materially adverse actions.  See Burlington Northern &

Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006) ("materially adverse" employment action

is one that would merely "dissuade a reasonable worker from making or supporting a charge of

discrimination").[25]

Indeed, banning a doctor specializing in cardiac anesthesiology (AC at ¶ 126) from

working in the ICU is not merely a trivial reassignment, but is an unquestionable denial of an

opportunity to gain valuable professional experience in the ICU, which could have far-reaching

ramification on Plaintiff Eltorai's career and professional growth, thus constituting an adverse

action for pleading purposes.  See Morales v. Long Island R.R. Co., No. 09 Civ. 8714 (HB),

2010 WL 1948606, at *3–4 (S.D.N.Y. May 14, 2010) ("Although he does not allege specifically

---

[25]     See also Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) ("[N]egative employment
evaluation letters may ... be considered adverse" action if they trigger other negative consequences in the terms and
conditions of employment); Dimitracopoulos v. City of New York, 26 F.Supp.3d 200, 214 (E.D.N.Y. 2014) (jury
could find "unjustified negative evaluation" that "Trigger [] loss of valuable [] assignments" materially adverse");
Herling v. New York City Dep't of Educ., No. 13 Civ. 5287 (JG), 2014 WL 1621966, at *6 (E.D.N.Y. Apr. 23,
2014) ("Denying an employee the opportunity to work overtime, comp time, or additional per-session employment
may ... constitute an adverse employment action."); Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir.
2006) (preventing plaintiff from earning overtime and comp time and requiring only the plaintiff to request overtime
in writing may constitute adverse employment action).

what sort of promotion [he lost], this Court cannot determine on a motion to dismiss that Morales did not experience a setback to [his] career.  Indeed, with this kind of a write-up in his personnel file, promotions are likely to be few and far between.").[26]

With regard to Plaintiff Castro, she alleges that, in mid-August 2018, after resisting his verbal and physical advances, Fontes became increasingly angry and agitated by her protests, and retaliated against her by berating her, including by degradingly barking at her to pick up a syringe cap that had fallen on the ground rather than tend to a severely hypotensive patient.  AC at ¶¶ 113-16.  Plaintiff Castro then submitted an anonymous evaluation that specifically complained about Fontes's penchant for inappropriately touching colleagues, which, given the details and temporal proximity to Dr. Castro's earlier protests, Fontes could reasonably could have discerned came from Dr. Castro.  Id. at ¶ 117.  Further, in mid-late August 2019, Plaintiff Castro, along with Plaintiff Reinhart, complained about Fontes's behavior to Ms. Waxman, Ms. Menon, and Ms. Fisher.  Id. at ¶ 208.  Plaintiff Castro alleges that in July and August 2019, Fontes, who was the director of her fellowship, retaliated against her for having previously engaged in protected activity by protesting his unwanted sexual advances at the first meaningful opportunity he was presented with by refusing to grant her permission to go on a mission trip to Peru, on the contrived and false basis that such a trip would prevent Plaintiff Castro from fulfilling her fellowship requirements.  Id. at ¶¶ 119-24.  Even after Fontes was later told that the American Board of Anesthesiology would approve and accredit such a trip, in late-August 2019, Fontes again inexplicably refused to permit Plaintiff Castro to go on this trip unless she used her

---

[26]     See also Guzman v. Macy's Retail Holdings, Inc., No. 09 Civ. 4472 (PGG), 2010 WL 1222044, at *6 (S.D.N.Y. Mar. 29, 2010) ("loss of prestige or job responsibilities is [a] sufficient" adverse action to sustain retaliation claim); Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir.2004) ("Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include ... a demotion evidenced by ... a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.").

own vacation time, causing Plaintiff Castro tremendous unnecessary stress.  Id. at ¶¶ 121-22.

Notably, this last refusal by Fontes came on the heels of the complaints Dr. Castro lodged against

him with various Yale officials.  Id. at ¶ 208.  It remains uncertain whether Dr. Castro will

receive credit towards her fellowship requirements by going on this trip because of Fontes's

retaliatory refusal to support her application, which caused delays in the applications and credit

approval process.  Id. at ¶ 124.  Accordingly, Fontes's retaliatory and punitive actions, which

interfered with Plaintiff Castro's ability to complete her fellowship and receive credit for a

mission trip, and has clearly disadvantaged her, certainly constitutes adverse actions that would

"dissuade a reasonable worker from making" a complaint.  See Stratton v. Dep't for the Aging

for the City of New York, 132 F.3d 869, 880 n. 6 (2d Cir.1997) ("[a]ctions taken by an employer

that disadvantage an employee for no logical reason constitute strong evidence of an intent to

discriminate"); Papelino, 633 F.3d at 92 ("jury could find actionable retaliation" based on

"College's refusal to provide an unqualified certification of [plaintiff's] degree to the State of

Florida.").

**H.      Plaintiff Eltorai Has Sufficiently Pleaded a Pregnancy Discrimination Claim**

As described above in Section II(G), Plaintiff Eltorai has pled a plausible pregnancy

discrimination claim based on her allegations that Fontes (admittedly) interfered with her

proposed research project and with her ability to qualify to meet her units requirements (and thus

earn her full compensation) on account of her pregnancy and/or maternity leave.

**I.      The Court Should Exercise Supplemental Jurisdiction Over Fontes**

Fontes seeks dismissal of the tort claims alleged against him on the basis that the Court

should not exercise supplemental jurisdiction because the claims purportedly do not overlap with

Plaintiffs' Title IX and Title VII claims.  This is obviously incorrect.  The tort claims are, in fact,

related and inextricably tied to Plaintiffs' Title IX and Title VII claims.  Indeed, Plaintiffs each

allege that they were sexually harassed and unwantedly touched, grabbed and/or kissed by

Fontes, who was their supervisor.  Each Plaintiff's Title IX and Title VII claims, therefore, arose

directly from the tortious acts that Plaintiffs accuse Fontes of committing (*i.e.*, battery, assault,

and invasion of privacy).  Accordingly, supplemental jurisdiction over these tort claims is

appropriate.[27]

Further, any claimed "divergent interest" between Fontes and Yale that may create some

"potential" awkwardness does not compel a finding that the Court should decline to exercise

---

[27]        The cases Fontes cites in support of his position that the Court should decline to exercise jurisdiction of the inextricably linked tort claims asserted against him are all inapposite.  In <u>Vermont Mut. Ins. Co. v. LaCourse</u>, No. 13 Civ. 664 (JBA), 2014 WL 5313714 (D. Conn. Oct. 16, 2014), this Court declined to exercise supplemental jurisdiction over crossclaim defendants joined by the defendant on the basis, *inter alia*, that the defendant's joinder was untimely, exercising supplemental jurisdiction would require reopening discovery and delay adjudication of the original claims which were ready for trial, and the cross-complaint presented claims more complex than the claims in the original complaint, and concluded that retaining jurisdiction would be inconsistent with the values of economy, convenience and fairness.  None of these concerns are present here.  Likewise, <u>Reyes v. Galpin</u>, No. 18 Civ. 831 (JBA), 2019 WL 959680 (D. Conn. Feb. 27, 2019) is inapposite because the court there found that the individual officer defendants were entitled to the protections of qualified immunity, and deferred to Second Circuit precedent that specifically affirmed a "district court's decision to decline to exercise jurisdiction over" state law claims after a finding that officers were entitled to qualified immunity on federal excessive force claim.  Fontes does not point to any such analogous precedent applicable to the fact in this case.  Further, in <u>Glasser v. Grp. W Satellite Commc'ns</u>, Civ. No. 89 Civ. 664 (WWE), 1990 WL 128563 (D. Conn. July 11, 1990), the court declined to exercise pendent jurisdiction over a breach of contract claim because adjudicating the claim "would involve inquiry into facts having nothing to do with the age discrimination claim and into areas of state law which are best left to state judiciaries."  Here, again, the tort claims alleged against Fontes are inextricably tied to the federal claims at issue due to the overlapping nature of the underlying facts in support of each claim.  Moreover, in <u>Koehler v. Chesebrough-Ponds, Inc.</u>, 705 F. Supp. 721 (D. Conn. 1988), a case decided over 30 years ago, the court declined to exercise supplemental jurisdiction after noting the high number of cases in this district at that time where courts expressed reluctance to exercise pendent jurisdiction over state law claims in ADEA cases (not the case here), found that the state claims at issue permitted the plaintiff to pursue different remedies than under the ADEA (not the case here either), and that "additional evidence will be required to prove plaintiff's pendent claims, thus enlarging the scope of the trial here," which is also not present here since the same facts underlying the state tort claims against Fontes are those that comprise the basis of the Title IX and Title VII claims at issue.  Nor is there any assertion that adjudicating the tort claims against Fontes would "require the court to resolve thorny issue of unsettled law."  In addition, <u>Brokke v. Stauffer Chem. Co.</u>, 703 F. Supp. 215 (D. Conn. 1988) is distinguishable, as the court held there that, by "the sheer number of state law claims asserted" versus the federal claims, and because the plaintiff would need to "present a greater quantum of proof in order to establish a basis for recovery on those [state] claims than would be necessary under ADEA and ERISA," the "state law claims … substantially predominate the federal claims," thus warranting the declination of pendent jurisdiction.  Lastly, <u>Lopez v. Smiley</u>, 375 F. Supp. 2d 19 (D. Conn. 2005) is also of no help to Fontes where the court declined to exercise supplemental jurisdiction over "an entire suite of novel Connecticut constitutional tort causes of action for state prisoners in the absence of any guidance (and in some instances, in express defiance of) Connecticut decisional law" -- there has been no assertion that the tort claims of assault, battery and invasion of privacy present "novel" issues whatsoever.

supplemental jurisdiction over the tort claims asserted against Fontes.  While Fontes intimates

that he may possess some sort of discrimination claim against Yale, there is no assertion that he

has taken any steps nor has any intention to move forward on these claims, such as filing a

Charge of Discrimination with the EEOC or CHRO.  And to the extent Fontes holds actionable

claims against Yale, he certainly has the opportunity to assert cross-claims against Yale pursuant

to Rule 13(g), which permits a "crossclaim" to be brought "by one party against a co-party if the

claim arises out of the transaction or occurrence that is the subject matter of the original action."

<strong>i.  <u>Plaintiffs Will be Able to Assert Viable and Timely CFEPA Claims Against Fontes</u></strong>

However, *even arguendo* Fontes's position has merit -- which *ab initio* it does not –

declining to exercise supplemental jurisdiction over Plaintiffs' tort claims against Fontes will

ultimately be an exercise of futility because Fontes will be a defendant in this action regardless

pursuant to CFEPA.  While this issue is presently the subject of a concurrent motion to amend

Plaintiffs' Amended Complaint and will be decided by the Court in connection therewith,

Plaintiffs quickly respond to Defendants' assertions that Plaintiffs' filed their CHRO complaints

late and thus their CFEPA claims are untimely.

"Any person who has timely filed a complaint with the Commission on Human Rights

and Opportunities … and who has obtained a release from the commission … may also bring an

action in the superior court for the judicial district in which the discriminatory practice is alleged

to have occurred." Ct. Gen. Stat. § 46a-100.  To that end, "[a]ny person claiming to be aggrieved

by an alleged discriminatory practice …may, by himself or herself or by such person's attorney,

make, sign and file with the commission a complaint in writing under oath, which shall state the

name and address of the person alleged to have committed the discriminatory practice, and

which shall set forth the particulars thereof and contain such other information as may be

33

required by the commission." Ct. Gen. Stat. § 46a-82. "A complaint may be filed by delivery in

person, by United States mail or by document or other delivery service, to an office of the

commission," and the "[t]he date of filing shall be the date the complaint is received by the

commission in one of its offices." Sec. 46a-54-36a (a-b). While a "complainant is responsible

for the timely filing of a complaint," "once the commission receives a complaint, the

commission's failure to promptly record the complaint, shall not affect the validity of the

complaint or the commission's authority to process the complaint." Id. at (c). Notably, the

EEOC/CHRO's Worksharing Agreement, which Fontes has appended to his memorandum of

law (see Dkt. No. 50-4), is "designed to provide individuals with an efficient procedure for

obtaining redress for their grievances under appropriate the State of Connecticut and Federal

laws" (Worksharing Agreement, at I(B), Dkt. No. 50-4 at 5), and confirms that "[i]n order to

facilitate the assertion of employment rights, the EEOC and the FEPA[28] each designate the other

as its agent for the purpose of receiving and drafting charges, *including those that are not

jurisdictional with the agency that initially receives the charges*." Worksharing Agreement, at

II(A), Dkt. No. 50-4 at 5 (emphasis added). In other words, Plaintiffs' filing with the EEOC on

December 4 and 5 respectively (AC at ¶¶ 12-13), regardless of whether or not the EEOC has

jurisdiction over their CFEPA claims, acted as a filing with and receipt of their CFEPA claims

with the CHRO.

Here, Plaintiffs each filed detailed and sworn charges of discrimination and retaliation

against all three defendants with the EEOC on December 4 and 5, 2019. Id. Based on the

Worksharing Agreement, there is no question that Plaintiffs also filed their charges with CHRO

on these dates. Indeed, this is plainly evident because, notwithstanding CHRO's subsequent

request that Plaintiffs submit CHRO-specific forms to supplement their previously filed charges

---

[28]     The Worksharing Agreement refers to the CHRO as "FEPA."

in order for CHRO to serve their charges on Defendants, CHRO acknowledged that Plaintiffs' charges were filed with CHRO at the same time they were filed with the EEOC when CHRO dated Plaintiffs' CHRO charges as having been filed on **December 6, 2019**.  Id. at ¶ 15.  And, ultimately, regardless of how the Worksharing Agreement is interpreted, CHRO's actions control as to the issue of *when* Plaintiffs are deemed to have filed their CHRO Charges.  Based on the CHRO's decision to date Plaintiffs' CHRO Charge as of December 6, 2019, which is when the CHRO actually received Plaintiffs' complaint, it is plainly evident that the CHRO considers the Charges to have been filed *on* December 6, 2019.  The Court should as well.  Therefore, Plaintiffs' CHRO charges are unquestionably timely and this Court will have jurisdiction to hear Plaintiffs' CFEPA claims against Fontes, both as they concern events that occurred 180 days before December 6, 2019, as well as events prior to then pursuant to the continuing violation doctrine.  See Peters v. City of Stamford, No. 99 Civ. 764(CFD), 2003 WL 1343265, at *11 (D.Conn. Mar. 17, 2003) (applying continuing violation theory grounded in federal law to CFEPA claims).

As such, it would violate Rule 1 for this Court to decline to exercise supplemental jurisdiction over the tort claims alleged against Fontes, as Rule 1 requires that the Federal Rules of Civil Procedure be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Here, even if, *arguendo*, the Court declines to exercise supplemental jurisdiction over Plaintiffs' tort claims, Plaintiffs will still have the ability to re-file their tort claims in state court.  See Silvera v. Conn. Dept. of Corrections, 726 F.Supp.2d 183, 199–200 (D.Conn. 2010) (declining to exercise supplemental jurisdiction over and dismissing, without prejudice, state law claims to allow plaintiff to file claims in state court).  Then, once the Court grants Plaintiffs leave to add CFEPA

claims against Yale, YNHH and Fontes in this action, which, respectfully, we anticipate the Court granting, two courts would then be simultaneously adjudicating Plaintiffs' claims against Fontes, with both actions involving the same parties and arising out of the same set of facts and controversies.  Such an outcome will certainly not promote the "just, speedy, and inexpensive determination" of Plaintiffs' claims.  Rather, such a scenario would lead to quite the opposite, as it would cause needless delay, an unnecessary waste of scarce resources (both judicial and private) and the real risk of inconsistent judgments.[29]

## J.      Yale's Motion to Strike Should be Denied

Motions to strike are highly disfavored and infrequently granted.  See Winfield v. Citibank, N. A., No. 10 Civ. 7304 (JGK), 2012 WL 266887 at * 9 (S.D.N.Y. January 30, 2012) ("[m]otions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so") (internal quotations and citation omitted).  The standard for striking allegations under Rule 12(f) is whether the defendant satisfies the "heavy burden" of showing that "(l) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting the allegations to stand would result in prejudice to the movant." Tucker v. Am. Intern. Group, Inc., 936 F. Supp. 1, 15-16 (D. Conn. 2013).  "On a motion to strike, however, '[i]t is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action.'"  Wermann v. Excel Dentistry, P.C., No. 13 Civ. 7028 (DAB), 2014 WL

---

[29]      Fontes's assertion that he cannot be individually liable for "aiding and abetting" violations of CFEPA claims because the underlying claims are based largely on his conduct is without merit.  See Jones v. Gem Chevrolet, 166 F.Supp.2d 647, 650 (D.Conn.2001) (individual may aid and abet employer's discrimination even where discrimination is based on individual's conduct, as "individual liability is particularly applicable to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct."); Hampton v. Diageo North America, Inc., No. 04 Civ. 346 (PCD), 2008 WL 350630, at *13 (D.Conn.,2008) (denying summary judgment on aiding and abetting claim; "while Waller's actions are certainly the primary source for the Company's liability, Plaintiffs have also offered evidence that Waller's discrimination was sanctioned or invited by the Company's values").

846723 (S.D.N.Y. Feb. 25, 2014) (citing Lynch v. Southampton Animal Shelter Found. Inc., 278

F.R.D. 55, 64-65 (E.D.N.Y. 2011)).  The Second Circuit has also cautioned that "[e]videntiary

questions . . . should especially be avoided at such a preliminary stage of the proceedings."  Id.;

see also Moy v. Adelphi Inst., 866 F.Supp. 696, 709 (E.D.N.Y. 1994) ("Courts recognize that the

decision on whether or not to strike portions of a Complaint based on evidentiary questions,

often may not be made until a trial begins to unfold") (citations omitted).

Yale has failed to meet the high burden necessary to strike references in the AC to other

lawsuits alleging sexual harassment and misconduct by supervisors at Yale, including within in

its medical program, about which Yale allegedly turned a "blind eye" towards, as well as a

reference to a report containing empirical data strongly suggesting that Yale's systems for

protecting its constituents from sexual misconduct are gravely inadequate.  The references to

other similar incidents of sexual misconduct and harassment at Yale are directly relevant and

material to Plaintiffs' claims that Yale fosters and condones a hostile, harassing and sexualized

workplace environment, even if the alleged conduct pre-dated Plaintiffs' employment and

involves non-parties.  See Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) (holding that

District Court of Connecticut erred by excluding incidents of alleged harassment simply because

they occurred before plaintiff's employment or during his employment but outside of his

presence, as incidents relating to others and "those occurring before Schwapp's tenure" "could

very well be relevant to Schwapp's reasonable perception of a hostile work environment"); Cruz,

202 F.3d at 570 ("Determining whether workplace harassment was severe or pervasive enough to

be actionable depends on the totality of the circumstances.  Because the crucial inquiry focuses

on the nature of the workplace environment as a whole, a plaintiff who herself experiences

discriminatory harassment need not be the target of other instances of hostility in order for those

incidents to support her claim."); Perry v. Ethan Allen, Inc., 115 F.3d 142, 150-151 (2d Cir.

1997) (finding that district court erred in excluding evidence of sexual harassment of other

women at plaintiff's workplace even though plaintiff did not witness their harassment, as

coworker sexual harassment, "if part of a pervasive of continuing pattern of conduct, was surely

relevant to show the existence of a hostile work environment," and "[s]ince one of the critical

inquiries with respect to hostile work environment claim is the nature of the environment itself,

evidence of the general work atmosphere is relevant").

Further, references to similar complaints by other employees are relevant to insofar as

Yale seeks to assert the so-called *Faragher/Ellerth* defense by claiming that it had no notice of

Plaintiffs' claims, despite the fact that Fontes was in a supervisory position over Plaintiffs.  See

Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  Here, the allegations in the AC that Yale

seeks to strike concerning prior similar complaints by female Yale employees are unquestionably

probative as to whether Yale exercised reasonable care to prevent and correct the hostile work

environment created by Fontes.

Moreover, any claimed prejudice is entirely speculative, and there is no certainty that a

jury in this case will even ever be shown the AC.  See D'Alosio v. EDAC Techs. Corp., No. 16

Civ. 769 (VAB), 2017 WL 1439663, at *2 (D.Conn. Apr. 21, 2017) ("'to the extent that

Defendants' aim is to avoid unduly inflaming and prejudicing the jury,' the court may take into

account that 'the Complaint will not be submitted to the jury.'") (citation omitted).  Furthermore,

Yale will have an opportunity, after the close of evidence, such as through a motion *in limine*, to

make an application to preclude the jury from being told about evidence that it deems prejudicial

or irrelevant.  See, e.g., Johnson v. M&M Commc'ns, Inc., 242 F.R.D. 187, 189 (D.Conn. 2007)

(allowing allegations from another lawsuit; "whether evidence of the prior investigations will be

admissible at trial is an issue to be resolved at a later stage of the litigation").  Yale's motion to strike is therefore not only without merit, but is wholly premature, and thus should be denied.[30]

### K.   Yale's Motion For a More Definite Statement Should be Denied

Yales requests that Plaintiffs be ordered to publically reveal the names of various private individuals who Plaintiffs have not identified by name in their AC, many of whom have themselves been victims of sexual harassment and other unlawful sexual conduct at the hands of Fontes.  This request should be denied.  The proper vehicle for revealing this highly sensitive information is through the discovery process, where appropriate confidentiality protections can be put in place.  Publically revealing the identities of these individuals, some of whom still work at Yale and YNHH and/or have never publically revealed the sexual misconduct they have endured, will cause substantial harm to their reputation, embarrassment, and shaming.  Moreover, Fontes knows the identities of the women he has harassed – they do not need to be publically shamed.  Furthermore, the fact that Defendants are accused of retaliating against multiple Plaintiffs herein after they engaged in protective activity is all the more reason why Plaintiffs should not be forced to reveal in their public pleadings the identities of victims and

---

[30]    The cases that Yale relies on in support of its motion to strike are not helpful and should be disregarded.  In Corrections Officers Benevolent Assn. v. Kralik, 226 F.R.D. 175 (S.D.N.Y. 2005), the court struck a prior *settlement agreement* attached as an exhibit to a complaint and referenced therein, as irrelevant without any meaningful analysis or examination of what the settlement agreement at issue concerned, or on what basis the plaintiffs asserted it was proper material to include in the complaint.  Smith v. AVSC International Inc., 148 F.Supp 2d 302, 318 (S.D.N.Y. 2001) actually runs counter to Yale's position, as the court refused to strike references to complaints made by other employees about the alleged wrongdoer, finding that they "pertain[] to the defendants' general receptivity to employee complaints of harassment," while striking allegations about the alleged wrongdoers behavior towards employees that were outside the plaintiff's protect class.  Corley v. Louisiana ex rel Division of Admin. Office of Risk Management, No. 06 Civ. 882 (SCR), 2010 WL 3259376 (M.D.La. Aug. 16, 2010) did not involve hostile work environment claims.  Tennison v. Circus Enterprises, Inc. 244 F.3d 684 (9th Cir. 2001) concerns a post-trial appeal of the trial court's evidentiary rulings.  Neither Allocco v. Dow Jones & Co., No. 02 Civ. 1029 (LMM), 2002 WL 1484400 (S.D.N.Y. July 10, 2002) or Tucker, 936 F.Supp.2d at 15 are employment discrimination cases, but involved claims of breach of a collective bargaining agreement and covenant and good faith and fair dealing brought by a former employee against his former employer, and an insurance dispute, respectively.   Similarly, neither Gethers v. McDonald, No. 15 Civ. 0177 (VLB), 2017 WL 1628403 (D.Conn. May 1, 2017) nor McLeod v. Parsons Corp., 73 F. App'x 846, 853 (6th Cir. 2003) concerned motions to strike, but were issued pursuant to a *motion in limine* and post-trial appeal, respectively.

witnesses of Fontes's sexual misconduct.  Yale can obtain this information through the discovery process.

## <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully requests that Defendants' respective motions to dismiss Plaintiffs' Amended Complaint each be denied in their entirety.

Dated: July 10, 2020
   New York, New York

Respectfully submitted,

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com

**WIGDOR LLP**

By: _____

Douglas H. Wigdor
(admitted *pro hac vice*)
Michael J. Willemin
(admitted *pro hac vice*)
Parisis G. Filippatos
(admitted *pro hac vice*)
Tanvir H. Rahman
(admitted *pro hac vice*)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
pfilippatos@wigdorlaw.com
trahman@wigdorlaw.com
*Counsel for Plaintiffs*