**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
------------------------------------------------------------------------ X

MIA CASTRO, M.D., HEIDI BOULES, M.D.,           :
ASHLEY ELTORAI, M.D., JODI-ANN              :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and     :
ELIZABETH REINHART, M.D.,                :            Civil Action No. 3:20-CV-00330 (JBA)
                           :
                    Plaintiffs,     :
          v.                  :
                           :
                           :
YALE UNIVERSITY, YALE NEW HAVEN       :
HOSPITAL, INC., and MANUEL LOPES FONTES,  :
M.D., in his individual and professional capacities,  :
                           :
                    Defendants.      :
------------------------------------------------------------------------ X


**PLAINTIFFS' REPLY TO DEFENDANT FONTES' MEMORANDUM OF LAW IN**
**OPPOSITION OF PLAINTIFFS' MOTION TO AMEND**

**WIGDOR LLP**

Douglas H. Wigdor
Michael J. Willemin
Parisis G. Filippatos
Tanvir H. Rahman
(All admitted *pro hac vice*)

85 Fifth Avenue
New York, NY 1003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845

dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
pfilippatos@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiffs*

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794

tsteigman@mppjustice.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................................... iii

ARGUMENT ..................................................................................................................................1

    I.     THREE PLAINTIFFS HAVE OBTAINED RELEASES OF
          JURISDICTIONS ("ROJ") FROM CHRO OVER FONTES AS IT
          PERTAINS TO THEIR CLAIMS, AND THE REMAINING THREE
          PLAINTIFFS ANTICIPATE RECEIVING ROJS SHORTLY ...................................1

    II.    PLAINTIFFS' CHRO CHARGES WERE FILED ON DECEMBER 6, 2019,
          AND THUS ARE TIMELY .........................................................................................2

    III.   FONTES IS LIABLE FOR AIDING AND ABETTING THE UNLAWFUL
          CONDUCT ALLEGED AGAINST YALE UNIVERSITY AND THE YALE
          NEW HAVEN HOSPITAL .........................................................................................8

    IV.   PLAINTIFFS CASTRO AND ELTORAI HAVE VIABLE RETALIATION
          CLAIMS THAT ARE NOT TIME-BARRED ............................................................9

CONCLUSION...............................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Cenac v. Department of Mental Health and Addiction Services,*
   No. 17 Civ. 683 (AWT), 2018 WL 8371549 (D.Conn. Feb. 28, 2019)..................................8

*Edwards v. William Raveis Real Estate, Inc.,*
   No. 08 Civ. 1907 (JCH), 2009 WL 1407233 (D. Conn. May 19, 2018) ...............................8

*Fitzgerald v. Henderson,*
   251 F.3d 345, 359 (2d Cir. 2001).............................................................................................4

*Hampton v. Diaego North America, Inc.*
   No. 04 Civ. 346 (PCD), 2008 WL 350630, at *13 (D.Conn. Feb. 7, 2008) ...........................9

*Hudson v. W.N.Y. Bics Div.,*
   73 F. App'x 525, 528 (2d Cir. 2003).......................................................................................4

*Jones v. Gem Chevrolet,,*
   166 F.Supp.2d 647, 650 (D.Conn.2001)..................................................................................9

*Peters v. City of Stamford,*
   No. 99 Civ. 764 (CFD), 2003 WL 1343265 (D.Conn. Mar. 17, 2003) ...................................4

*Wellington v. Norwalk Hospital,*
   No. 18 Civ. 02143 (WWE), 2019 WL 247578 (D.Conn. June 13, 2019) ...............................8

### <u>Other Authorities</u>

Ct. Gen. Stat. § 46a-100...............................................................................................................2

Plaintiffs Mia Castro, M.D., Heidi Boules, M.D, Ashley Eltorai, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D., and Elizabeth Reinhart, M.D. respectfully submit this reply memorandum of law in further support of their motion to amend (Dkt. No. 54-56, the "Motion to Amend") and in response to the opposition to this motion filed by Defendant Manuel Lopes Fontes, M.D. ("Fontes").  See Dkt. No. 57.  For the reasons stated below, Plaintiffs' Motion to Amend should be granted.

## I.    Three Plaintiffs Have Obtained Releases of Jurisdictions ("ROJ") from CHRO Over Fontes as it Pertains to their Claims, and the Remaining Three Plaintiffs Anticipate Receiving ROJs Shortly

For the most part Fontes hangs his futility argument with respect to the proposed Second Amended Complaint on the thin reed that Plaintiffs have not obtained proper subject matter jurisdiction for this Court with respect to their state law claims because such jurisdiction has not been released by the governing state agency.  As nothing could be further from the truth, that futile reed cannot hold.  While, Plaintiffs acknowledge that they mistakenly asserted that the Connecticut Commission on Human Rights and Opportunities ("CHRO") had issued Releases of Jurisdiction ("ROJ") with respect to their claims against Fontes[1] -- indeed, Plaintiffs only obtained ROJs over Yale University at the time they filed their Motion to Amend -- since Plaintiffs filed their Motion to Amend, on July 13, 2020, CHRO has issued ROJs for the CFEPA claims against Fontes asserted by Plaintiffs Boules, Jodi-Ann Oliver, and Lori-Ann Oliver.  See Exhibit ("Ex.") 1.  Therefore, as of the instant filing, the Court unquestionably has subject matter jurisdiction over the CFEPA claims against Fontes asserted by Plaintiffs Boules, Oliver, and Oliver.

The remaining three Plaintiffs -- Mia Castro, Ashley Eltorai, and Elizabeth Reinhart -- all requested ROJs from CHRO regarding their claims against Fontes at the same times as the other

---

[1]    Plaintiffs sincerely apologize to the Court for any confusion their error has caused.

Plaintiffs.  Accordingly, we anticipate that CHRO will issue similar ROJs to Plaintiffs Castro, Eltorai, and Reinhart in the coming days.  Of course, Plaintiffs will immediately notify the Court as soon as these remaining ROJs are issued by CHRO.

## II.   Plaintiffs' CHRO Charges Were Filed on December 6, 2019, and Thus are Timely

"Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities … and who has obtained a release from the commission … may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred."  Ct. Gen. Stat. § 46a-100.  To that end, "[a]ny person claiming to be aggrieved by an alleged discriminatory practice …may, by himself or herself or by such person's attorney, make, sign and file with [CHRO] a complaint in writing under oath, which shall state the name and address of the person alleged to have committed the discriminatory practice, and which shall set forth the particulars thereof and contain such other information as may be required by the commission."  Ct. Gen. Stat. § 46a-82.  "A complaint [with CHRO] may be filed by delivery in person, by United States mail or by document or other delivery service, to an office of the commission," and the "[t]he date of filing shall be the date the complaint is received by the commission in one of its offices."  Sec. 46a-54-36a (a-b).  While a "complainant is responsible for the timely filing of a complaint," "once [CHRO] receives a complaint, the commission's failure to promptly record the complaint, shall not affect the validity of the complaint or the commission's authority to process the complaint."  Id. at (c).

Notably, the EEOC/CHRO's Worksharing Agreement, which Fontes has appended to his opposition memorandum of law (see Dkt. No. 57-2, at 5-11 (the "Worksharing Agreement")), is "designed to provide individuals with an efficient procedure for obtaining redress for their grievances under appropriate the State of Connecticut and Federal laws."  Worksharing

Agreement § I(B), Dkt. No. 57-2, at 6. Accordingly, the Worksharing Agreement confirms that "[i]n order to facilitate the assertion of employment rights, the EEOC and the FEPA[2] each designate the other as its *agent for the purpose of receiving* and drafting *charges, including those that are not jurisdictional with the agency that initially receives the charges*." Worksharing Agreement § II(A), Dkt. No. 57-2, at 6 (emphasis added). As such, the expectation -- given the agreement between the EEOC and CHRO to serve as each other's agent for purposes of receiving charges of discrimination -- plainly is that a complainant's filing of a charge of discrimination with one agency, notwithstanding whether that agency even has jurisdiction over the alleged claims, serves as "recei[pt]" of the charge of discrimination by the other agency.

Here, notwithstanding Fontes's "speculation" about when Plaintiffs' CHRO Charges should be deemed to have been filed with CHRO, CHRO clearly regards Plaintiffs' CHRO Charges as having being filed on *December 6, 2019*. See Ex. 2 (Plaintiffs' CHRO Charges against Fontes).[3] The attendant facts support the conclusion that December 6, 2019 is indeed the date on which Plaintiffs' CHRO Charges were filed: (i) Plaintiffs filed Charges of Discrimination with the EEOC on December 4 and 5, 2019 respectively, which named Yale University *and* Fontes, an employee of Yale University, as respondents, and expressly stated that each Charge of Discrimination was being filed with "Connecticut Commission on Human Rights *and* EEOC" (see Dkt. No. 56-1, "Plaintiffs' EEOC Charges," pp. 2, 22, 42, 62, 82, and 102) (emphasis added);[4] and (ii) pursuant to the Worksharing Agreement, the EEOC is the CHRO's agent "for [] purpose[s] of receiving [] charges, including those that are not jurisdictional with

---

[2]       The Worksharing Agreement refers to CHRO as "FEPA."

[3]       Even CHRO's "Case Assessment Review" pertaining to the CHRO Charges of Plaintiffs Boules, Jodi-Ann Oliver, and Lori-Ann Oliver clearly state the Charges against Fontes were filed on *December 6, 2019*. See Ex. 3.

[4]       There is no dispute that Yale University was served with Plaintiffs' EEOC Charges as it submitted a position statement in response to the Charges on January 27, 2020, in which it acknowledged that Yale University was Fontes's employer. Amended Complaint ("AC"), Dkt. No. 44, at ¶ 14. While Fontes asserts that he was not "served" with Plaintiffs' Charges until May 2013 (see Dkt. No. 50-3), he tellingly does not claim to have been unaware of or not to have been given a copy of Plaintiffs' Charges before then.

the agency that initially received the charges."  Worksharing Agreement § II(A), Dkt. No. 57-2, at 6 (emphasis added).

In short, December 6, 2019, is the operative date that should be considered when determining whether Plaintiffs' CFEPA claims against Defendants are timely.  Accordingly, each Plaintiff has timely and viable sexual harassment and/or retaliation claims under CFEPA given that they all have alleged sexually harassing and/or retaliatory actions by Fontes that took place both within the 180-day period ending on December 6, 2019 (*i.e.*, between June 9, 2019, and December 6, 2019), as well as a series of similar acts that took place before that time, which together form one unlawful employment practice and thus may be considered together as one claim under the "continuing violation doctrine."  See Hudson v. W. N.Y. Bics Div., 73 F. App'x 525, 528 (2d Cir. 2003) (continuing violation doctrine applies when a plaintiff experiences a "'continuous practice and policy of discrimination" and as a result, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'") (quoting Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)); accord Peters v. City of Stamford, No. 99 Civ. 764 (CFD), 2003 WL 1343265, at *11 (D.Conn. Mar. 17, 2003) (applying continuing violation theory grounded in federal law to CFEPA claims)[5]  To wit:

1. Plaintiff Reinhart has alleged, *inter alia*, that: (i) during a May 2019 dinner, Fontes flirted profusely with her, including by commenting on her appearance, tried to persuade her to drink more alcohol, and at the end of the dinner, tried to kiss her on the lips but she was able to move her head so that his lips landed on her cheek and side of her mouth.  As she tried to escape him, Fontes chased her down on the street and tried to get her to come into his car; (ii) in June 2019, at a resident graduation ceremony, Fontes came up to her and asked whether she was "going out tonight," and referenced how he had "misbehaved in the past" at a graduation event, alluding to an incident in 2016 where a video surfaced of him sexually assaulting an inebriated female resident as the two danced at a graduation event.  He later came up behind Reinhart again, wrapped his arm around and hugged her by the waist, and said lewdly, "I can't wait to see you at Barcelona," referring to the location where the graduation ceremony afterparty would be, while ogling her body up and down.

---

[5]        Unpublished decisions cited to herein are attached as Ex. 4.

Reinhart was so terrified and shaken up by Fontes's behavior that she stayed at a female attending physician's home that night rather than go back to her apartment for fear that she might encounter Fontes later that night; (iii) in July 2019, while she was in a breakroom, Fontes suddenly came up behind her and unwantedly massaged her back and shoulders; (iv) after she made multiple complaints about his sexually harassing conduct in late-July and early-August 2019, the Department of Anesthesiology appointed Fontes to be its inaugural Vice Chair of Diversity, Equity and Inclusion; and (v) in October 2019, during a conference in Florida, Fontes came up to her as she was standing outside her hotel, grabbed her arm, linked his arms with hers, pulled her towards him and asked her, in an intimidating manner, "so where is your partner in crime?" When Reinhart asked him to whom he was referring, Fontes identified Plaintiff Eltorai, who too had recently lodged sexual harassment complaints against him (AC ¶¶ 190-211);

2.   Plaintiff Boules has alleged, *inter alia*, that: (i) during her own late-2017 interview dinner, Fontes sat and spoke uncomfortably close to her; (ii) in mid-2018, Fontes cornered her in a restaurant booth and repeatedly and unwantedly touched and groped her arm, leg and thigh, and later that night, she observed him harass Plaintiff Jodi-Ann Oliver as he sat next to her at dinner and unwantedly touched her; (iii) Fontes has made repeated attempts to entice her into having drinks with her outside of work; (iv) in mid to late-2018, when they were out together with another colleague, Fontes made repeated overtly sexist, sexual and inappropriate comments to her; (v) in October 2018, Fontes convinced her to meet him out alone at a restaurant, and forcibly and unwantedly kissed her on the lips three or four times that evening, and unwantedly touched her body in a sexual manner; (vi) days later, Fontes forcibly and unwantedly kissed her on the lips following a staff meeting; (vii) since then, Fontes has continuously unwantedly touched and hugged her nearly every time he has seen her, including a July 2019 incident during which he unwantedly hugged her, and an incident in mid-September 2019 during which he snuck up behind her as she was working in an operating room and grabbed both her shoulders, leaned the front of his body into her backside, put his cheek on her cheek, whispered into her ear, and asked her out for drinks; and (viii) Fontes took no action after she complained to him in May and July 2019 about a male surgeon who was harassing her, including by calling her a "bitch" and "cunt" (id. at ¶¶ 98-107, 178);

3.   Plaintiff Castro has alleged, *inter alia*, that: (i) beginning in August 2018 and continuing into the fall of 2018, Fontes repeatedly came behind her while she worked in large operating rooms, stood inappropriately and unnecessarily close to her, and put his arms on and/or around her shoulders and waist; (ii) in mid-August 2018, while the two worked together in an operating room, he made repeated crude jokes to her about being an "old man" from whom she could "learn something," unwantedly placed his hand on her shoulder, and suddenly came behind her and put his arm around her waist and stood extremely and unnecessarily close to her; (iii) after she resisted his advances, Fontes berated and demeaned her when they worked together, including an incident where he yelled at and commanded her to degradingly pick up a syringe cap that had fallen on the floor rather than tend to an ailing patient; (iv) in

July and August 2019, Fontes, who was the director of her fellowship, retaliated against Castro at the first meaningful opportunity he was presented with by refusing to grant her permission to go on a mission trip to Peru, on the contrived and false basis that such a trip would prevent her from fulfilling her fellowship requirements; and (vii) even after Fontes was later told that the American Board of Anesthesiology would approve and accredit such a trip, in late-August 2019, Fontes again inexplicably refused to permit Plaintiff Castro to go on this trip unless she used her own vacation time.  Notably, this last refusal by Fontes came right after Castro lodged complaints against him with various Yale officials (id. at ¶¶ 111-24, 208);

4.   Plaintiff Eltorai has alleged, *inter alia*, that: (i) when she told Fontes she was pregnant in September 2018, he remarked about her body by saying, "I wonder when you'll start to show – probably very soon, since you have a flat stomach"; (ii) shortly after complaining to the Anesthesiology Department's Chair Dr. Roberta Hines that Fontes discriminated against her based on her pregnancy by refusing to support a research project because of her upcoming maternity leave, in January 2019, Fontes advised Eltorai that she would be unable to meet her unit requirements, and thus unable to receive her full salary, because of her upcoming maternity leave, which Dr. Eltorai regarded as discriminatory; (iii)  one week after Eltorai filed a pregnancy discrimination complaint with the Yale University Faculty Affairs Department, Fontes and two of his reports met with her to unfairly criticize her performance; (iv) in June 2019, weeks after she gave birth, Fontes slowly ogled her body up and down and said, "Oh wow you look good" and gave her a long, unwelcomed hug; (v) later that evening, Fontes tried to spoon feed Eltorai food from across the table as she held hew newborn son; (vi) also that night, after noticing that she was no longer wearing her wedding ring, Fontes asked her out to have "a bottle of wine" so he could "tell" her his "wisdom about  life and divorce (vii) in July 2019, while the two were in his office, Fontes got up from his desk, sat uncomfortably close to her, and when the meeting ended, gave her an uninvited full body hug in which he pressed his pelvis against hers; (viii) later in July 2019, Fontes snuck up behind her while she was in a breakroom and began to massage her neck unwantedly; (ix) in August 2019, while she was working in the hospital, Fontes came up to her, stood uncomfortably close, and unwantedly touched her shoulder while speaking with her in a flirtatious manner in front of a patient's family; and (x) a few weeks week after complaining about Fontes's sexually harassing behavior and other misconduct, in mid-August 2019, Fontes along with Dr. Hines and two other colleagues, banned Eltorai from continuing to work in the Intensive Care Unit ("ICU") (id. at ¶¶ 127-160);

5.   Plaintiff Lori-Ann Oliver has alleged, *inter alia*, that: (i) throughout her employment, Fontes has repeatedly, nearly every time they have run into each other, come up behind her and inappropriately and unwantedly hug and touch her body, including by grabbing her shoulders, lower back and waist, pull her towards him, and put his face close to hers, violating her personal space; (ii) in April 2019, after witnessing Fontes sexually harass her sister, Plaintiff Jodi-Ann Oliver, during a dinner for a potential new physician hire, including by giving her sister an unwanted kiss on the lip, Fontes then turned around and grabbed her by the arms, pulled her towards him, forced his

6

tongue down her mouth and kissed her on the lips; (iii) throughout her employment, multiple times a year, Fontes would make inappropriate sexual comments, including about how "skinny" she looked and how "nice" her "shape" was; (iv) in the fall of 2018, Fontes unwantedly grabbed her around the waist, which prompted her to complain that Fontes inappropriately touched her and other female employees to the Division Chief of the Pain Management section of the Department of Anesthesiology; and (v) even after the April 2019 incident in which Fontes unwantedly groped and kissed her, Fontes continued to inappropriately touch and grab her nearly every time he encountered her, including an incident in October 2019 when the two were both at a conference in Florida and Fontes came up to her, unwantedly squeezed her by the shoulders, and put his hand on her back and around her waist (id. at ¶¶ 168, 183-186); and

6.  Plaintiff Jodi-Ann Oliver has alleged, *inter alia*, that: (i) throughout her employment, which began in 2012 and continues to the present, Fontes has repeatedly come up behind her and inappropriately and unwantedly touched her bodies, including her back and shoulders, (ii) during a 2016 work retreat, Fontes continually touched her lower back, slipped his hand down her backside, and unwantedly and inappropriately hugged her; (iii) in 2017, after she injured her wrist and requested workplace accommodations, Fontes called her a "malingerer," told her to "shut up" and to "shut the fuck up," and that he would "fire [her] if [she] ke[pt] talking"; (iv) in late-2017, Fontes tried to have her kicked off a fellowship committee and accused her of being a "malingerer"; (v) in mid-2018, at a colleague's going away dinner, she observed Fontes inappropriately touch Plaintiff Boules's body; (vi) later that night, Fontes sat next to her during dinner and repeatedly and unwantedly rubbed her arm and back, and whispered sexual advances in her ear and made comments about her figure and health such as, "that's why you stay so thin," and referred to her as his "island girl"; and (vii) in April 2019, during a dinner with a potential new physician hire, Fontes continuously flirted with her throughout the evening, repeatedly leaned in towards her and commented on her "nice skin," "soft skin," "great figure," how she smelled "really nice," was "very thin," was a "pretty Caribbean girl," and asked her "do you work out?", unwantedly rubbed her arms, neck, back and shoulders, and at the end of the night, tried to get her to go home with him, and then gave her an unsolicited kiss on then lips while hugging her and putting his hands all over her body (id. at ¶¶ 168-182).

Based on CHRO's decision, Plaintiffs' CHRO Charges were deemed filed as of December 6, 2019, which is plainly when it appears CHRO actually received Plaintiffs' complaints.   It is respectfully submitted that for the purposes of this motion, the Court should as well.  It is irrelevant that CHRO later requested that Plaintiffs submit CHRO-specific forms to supplement their previously filed charges in order for CHRO to serve the charges on Defendants

given that, nevertheless, CHRO acknowledged that Plaintiffs' charges were filed with CHRO at

the same time they were filed with the EEOC by dating them as having been filed on ***December

6, 2019***.  AC ¶ 15.  Therefore, Plaintiffs' CHRO Charges are unquestionably timely and this

Court will have jurisdiction to hear Plaintiffs' CFEPA claims against Fontes, both as these

claims relate to events that occurred within 180 days of December 6, 2019, as well as to events

that occurred prior to that period but are part and parcel to Plaintiffs' claims pursuant to the

continuing violation doctrine.  See Peters, 2003 WL 1343265, at *11 (applying continuing

violation theory grounded in federal law to CFEPA claims).[6]

III.   **Fontes is Liable for Aiding and Abetting the Unlawful Conduct Alleged Against
       Yale University and Yale New Haven Hospital**

Fontes's assertion that he cannot be individually liable for "aiding and abetting"

violations of CFEPA claims because the underlying claims "involve allegation[s] that he,

himself, sexually harassed Plaintiffs" (Dkt. No. 57, at 9) is without merit.  Plaintiffs allege that

they were subject to an unlawful, hostile sexualized work environment that, while Fontes was

certainly a main perpetrator, other supervisors at Yale University, including the Department of

Anesthesiology's Chair, Roberta Hines, M.D. and countless high-ranking officials (the vast

majority of whom held dual roles with Yale New Haven Hospital) are alleged to have been

aware of Fontes's harassing behavior but did nothing to deter or address his continuing conduct.

See, e.g., AC ¶¶ 203-07 (Plaintiff Reinhart complaining to two Yale University supervisors, who

notify Dr. Hines of her complaints, but yet Fontes is promoted to become Vice Chair of

---

[6]   The cases Fontes cites in footnote 7 of his opposition papers (Dkt. No. 57, at 6) in support of his assertion
that this Court will not have jurisdiction over Plaintiffs' CFEPA claims are all inapposite and do not concern facts
such as those at issue here, which establish that CHRO considers Plaintiffs' CHRO Charges to have been filed on
December 6, 2019.  See Edwards v. William Raveis Real Estate, Inc., No. 08 Civ. 1907 (JCH), 2009 WL 1407233
(D. Conn. May 19, 2018) (plaintiff never filed complaint with CHRO); Cenac v. Department of Mental Health and
Addiction Services, No. 17 Civ. 683 (AWT), 2018 WL 8371549 (D.Conn. Feb. 28, 2019) (no claim by plaintiff that
he filed CHRO complaint at any time); Wellington v Norwalk Hospital, No. 18 Civ. 02143 (WWE), 2019 WL
247578 (D.Conn. June 13, 2019) (plaintiff failed to bring his claim to CHRO).

Diversity, Equity and Inclusion shortly thereafter).  In addition, and as just one example of how Fontes aided and abetted others at Yale University carry out the unlawful conduct alleged by Plaintiffs, Plaintiff Eltorai alleges that she was retaliated against for engaging in protected activity by being banned from working in the ICU by Fontes, Dr. Hines and two other Yale supervisory employees.  AC ¶¶ 143-45.  Unquestionably, Fontes "aided and abetted" the alleged retaliation against Dr. Eltorai carried out both by him and others.

Notably, courts in Connecticut have held that an individual can be held liable as an "aider and abettor" under CFEPA even where their conduct may form the crux of the plaintiff's underlying claims.  See Jones v. Gem Chevrolet, 166 F.Supp.2d 647, 650 (D.Conn.2001) (individual may aid and abet employer's discrimination even where discrimination is based on individual's conduct, as "individual liability is particularly applicable to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct"); Hampton v. Diageo North America, Inc., No. 04 Civ. 346 (PCD), 2008 WL 350630, at *13 (D.Conn. Feb. 7, 2008) (denying summary judgment on aiding and abetting claim; "while Waller's actions are certainly the primary source for the Company's liability, Plaintiffs have also offered evidence that Waller's discrimination was sanctioned or invited by the Company's values").

Accordingly, Plaintiffs will be able to allege viable CFEPA aiding and abetting claims against Fontes were they granted leave to file their proposed Second Amended Complaint.

**IV.**  **Plaintiffs Castro and Eltorai Have Viable Retaliation Claims That are Not Time-Barred**

For the reasons set forth in Section II, *supra*, the retaliation claims of Plaintiffs Castro and Eltorai would not be time-barred as they both allege that Fontes engaged in adverse retaliatory actions against them within the 180 days preceding their *December 6, 2019,* CHRO

Charge filings.  See AC ¶ 144 (Eltorai alleging that she was banned from working in the ICU in August 2019); ¶¶ 119 (Castro alleging that Fontes refused to approve her request that an anticipated mission trip to Peru be credited towards her fellowship requirements in July and August 2019).[7] Moreover, as explained in Plaintiffs' omnibus memorandum of law in opposition to Defendants' motion to dismiss, these same retaliation claims are, indeed, viable as Plaintiffs Castro and Eltorai have sufficiently alleged that they engaged in protected activity and suffered adverse employment actions as a result.  See Dkt. No. 61 at 27-31.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that their Motion to Amend be granted in its entirety and the Court afford Plaintiffs such other and further relief as it deems appropriate.

Dated: July 14, 2020
New York, New York

Respectfully submitted,

**MADSEN, PRESTLEY & PARENTEAU, LLC**

Todd D. Steigman (CT 26875)

402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com

**WIGDOR LLP**

By: _____

Douglas H. Wigdor
(admitted *pro hac vice*)
Michael J. Willemin
(admitted *pro hac vice*)

---

[7]     Plaintiffs do not contest that Fontes is not individually liable for Plaintiffs' CFEPA gender discrimination claim.

10

Parisis G. Filippatos
(admitted *pro hac vice*)
Tanvir H. Rahman
(admitted *pro hac vice*)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
pfilippatos@wigdorlaw.com
trahman@wigdorlaw.com
*Counsel for Plaintiffs*

# Exhibit 1

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Heidi Boules
**COMPLAINANT**                                          CHRO No. 2030543

vs.

Dr. Manuel Lopes Fontes
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

DATE: 7/13/20

_____

Tanya A. Hughes, Executive Director

**Service:**
Complainant's counsel: tsteigman@mppjustice.com
Respondent's counsel:   rbmitchell@mitchellandsheahan.com

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Lori-Ann Oliver
**COMPLAINANT**

CHRO No. 2030531

vs.

Dr. Manuel Lopes Fontes
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

DATE: 7/13/20

_____
Tanya A. Hughes, Executive Director

**Service:**
Complainant's counsel: tsteigman@mppjustice.com
Respondent's counsel:   rbmitchell@mitchellandsheahan.com

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Jodi-Ann Oliver
**COMPLAINANT**                                          CHRO No. 2030534

vs.

Dr. Manuel Lopes Fontes
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.


DATE: 7/13/20

_____
Tanya A. Hughes, Executive Director


**Service:**
Complainant's counsel: tsteigman@mppjustice.com
Respondent's counsel:   rbmitchell@mitchellandsheahan.com

# Exhibit 2

**State of Connecticut**

## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

May 13, 2020

Robert Mitchell/Mitchell & Sheahan, P.C.
rbmitchell@mitchellandsheahan.com

RE:     CHRO No.:    2030531 – Oliver vs. Manuel Lopes Fontes, M.D.
                              2030534 – Oliver vs. Manuel Lopes Fontes, M.D.
                              2030535 – Castro vs. Manuel Lopes Fontes, M.D.
                              2030540 – Reinhart vs. Manuel Lopes Fontes, M.D.
                              2030543 – Boules vs. Manuel Lopes Fontes, M.D.
                              2030546 – Eltorai vs. Manuel Lopes Fontes, M.D.

Dear Respondent:

A complaint, referenced above, has been filed against you with the Commission. A copy of the complaint is attached.

The enclosed General Notice advises you of your rights, duties and responsibilities. Please read carefully the information contained in the notice. The enclosed Notice Regarding Out of State Attorneys advises that all attorneys practicing before the Commission must be admitted to practice law in Connecticut and that it is the responsibility of all counsel to comply with Connecticut practice rules. Also enclosed is important information with respect to the no fault conciliation process. The Commission is available to assist you if you wish to pursue settlement of this complaint. If you wish to conciliate the complaint prior to providing an answer, you must notify the Commission within **10 days** of receipt of the enclosed complaint.

**You must file a written answer to the complaint under oath with the Commission within 30 days of receipt of this complaint unless pre-answer conciliation has been requested. If you fail to answer the complaint within this time, you may be defaulted by the Commission. Parties are encouraged to submit all filings by email only without an additional hardcopy if possible. You must email a scanned copy of your signed and notarized answer to susan.mota@ct.gov and chro.westcentral@ct.gov**

You have a duty to certify to the Commission that you have provided the complainant with copies of all documents you file with the Commission. You also have a duty to ensure that personal identifying information is redacted from any documents provided to the Commission. Personal identifying information includes an individual's mother's maiden name; motor vehicle operator's license number; Social Security number; other government issued identification number except for juris, license, permit or other business related identification numbers that are otherwise made available to the public directly by any government agency or entity; health insurance identification number; or

**State of Connecticut**

# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

any financial account number, security code or personal identification number (PIN). For your convenience and use, the enclosed Certification Form is made available.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Shawn Burns, Regional Manager
West Central Region

Enclosures:    Affidavit
Schedule A Request for Additional Information
General Notice
Certification of Mailing
Notice Regarding Out of State Attorneys

**State of Connecticut**

# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

May 13, 2020

RE:
        2030531 – Oliver vs. Manuel Lopes Fontes, M.D.
        2030534 – Oliver vs. Manuel Lopes Fontes, M.D.
        2030535 – Castro vs. Manuel Lopes Fontes, M.D.
        2030540 – Reinhart vs. Manuel Lopes Fontes, M.D.
        2030543 – Boules vs. Manuel Lopes Fontes, M.D.
        2030546 – Eltorai vs. Manuel Lopes Fontes, M.D.

Dear Sir/Madam:

This letter confirms that your complaint, referenced above, has been filed with the Commission.

The enclosed General Notice advises you of your rights, duties and responsibilities. **Please read carefully the information contained in the notice.**

You have a duty to respond timely to any information or assistance requested and to cooperate with the Commission at all times. It is your sole duty and responsibility to notify the Commission of your whereabouts at all times throughout the pendency of this complaint. In the event that your address, telephone number or email address changes, it is your duty to notify the Commission immediately in writing. **Parties are encouraged to submit all filings by email only without an additional hardcopy if possible. Emailed filings with susan.mota@ct.gov; chro.westcentral@ct.gov should be emailed to: Commission on Human Rights & Opportunities, Rowland State Government Center, 55 West Main Street, Suite 210, Waterbury, CT 06702.**

Also, you have a duty to certify to the Commission that you have provided the Respondent with copies of all documents you file with the Commission. For your convenience and use, the enclosed Certification Form is made available.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Shawn Burns, Regional Manager
West Central Region
Encl.

cc:  Complainant's Attorney:   Tanvir Rahman/Wigdor LLP
                                   trahman@wigdorlaw.com

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Tanvir H. Rahman**
trahman@wigdorlaw.com

May 1, 2020

**VIA EMAIL**

Rebecca J. Cannon-Klemenz
Human Rights and Opportunities Representative
Connecticut Commission on Human Rights and Opportunities
55 West Main Street, Suite 210
Waterbury, CT 06702

> Re:  CHRO Charges of Elizabeth Reinhart, M.D., Mia Castro, M.D., Jodi-Ann Oliver,
> M.D., Lori-Ann Oliver, M.D., Ashley Eltorai, M.D. and Heidi Boules, M.D.

Dear Ms. Cannon-Klemenz,

Enclosed, please find State of Connecticut Commission on Human Rights and Opportunities
("CHRO") Complaints (the "CHRO Charges") for Claimants Elizabeth Reinhart, M.D., Mia
Castro, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D., Ashley Eltorai, M.D. and Heidi
Boules, M.D. (together, "Claimants"), in connection with their previously filed Charges of
Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC") (the
"EEOC Charges"), which we understand were previously cross-filed with the CHRO. The EEOC
Charges for Dr. Reinhart, Dr. Castro, Dr. Eltorai and Dr. Boules were filed on December 4, 2019,
while the EEOC Charges for Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver were filed on
December 5, 2019. As we have discussed, these are the dates on which the CHRO will consider
Claimants' respective CHRO Charges to have been filed.

Please note that Claimants have already commenced an action in federal court against the
Respondents named in their CHRO and EEOC Charges. Moreover, please note that earlier today,
the EEOC issued Notices of Right to Sue to each Claimant. Claimants intend to promptly amend
their federal court complaint to add claims under Title VII. Accordingly, we respectfully request
that the CHRO also release jurisdiction over Claimants' Connecticut Fair Employment Practices
Act ("FEPA") claims so that Claimants can also bring these claims in their federal court action.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Tanvir H. Rahman

Enc.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030531_ | Date: _12/6/19_ |
| EEOC No. _____ | |

My name is: Lori-Ann Oliver M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Manuel Lopes Fontes, M.D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | ☐ | not hired/promoted | |
| ☐ | terminated | | ☐ | given unequal duties | |
| ☐ | suspended | | ☐ | harassed | |
| ☐ | placed on probation | | ☒ | sexually harassed | Ongoing |
| ☐ | demoted | | ☐ | earning different pay | |
| ☐ | warned | | ☐ | constructively discharged | |
| ☐ | given a poor evaluation | | ☒ | retaliated against | Ongoing |
| ☐ | denied a raise | | ☐ | transferred | |
| ☐ | less trained | | ☐ | given difficult assignment | |
| ☐ | denied an office | | ☐ | not recalled | |
| ☐ | denied equal service(s) | | | | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | | ☐ | Mental disability |
| ☐ | Color | | ☐ | Intellectual disability |
| ☐ | Religious creed | | ☐ | Learning disability |
| ☐ | Age | | ☐ | Physical disability |
| ☐ | Gender identity/expression | | ☐ | Veteran status |
| ☐ | Marital status | | ☐ | Prior criminal conviction |
| ☐ | National origin | | ☐ | Sexual orientation |
| ☒ | Sex: ☐ Male ☒ Female | | ☐ | Pregnancy |
| ☐ | Ancestry | | ☐ | Lawful source of income |
| ☐ | Other: | | ☐ | Genetic information |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

- ☒ CONN. GEN. STAT. § 46a-60(b)(1)
- ☐ CONN. GEN. STAT. § 46a-60(b)(4)
- ☒ CONN. GEN. STAT. § 46a-60(b)(5)
- ☐ CONN. GEN. STAT. § 46a-60(b)(7)
- ☒ CONN. GEN. STAT. § 46a-60(b)(8)
- ☐ CONN. GEN. STAT. § 46a-64

- ☐ CONN. GEN. STAT. § 46a-70
- ☐ CONN. GEN. STAT. § 46a-71
- ☐ CONN. GEN. STAT. § 46a-80
- ☐ CONN. GEN. STAT. § 46a-81

- ☐ Other

- ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
- ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
- ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
- ☐ Equal Pay Act of 1964, U.S.C. § 206
- ☐ Section 504 of the Rehabilitation Act of 1973

_____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

————————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN   :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :
ELIZABETH REINHART, M.D.,   :
  :
                Claimants,   :
  :
        v.   :
  :
YALE UNIVERSITY YALE NEW HAVEN   :
HOSPITAL, INC., and MANUEL LOPES   :
FONTES, M.D.,   :
  :
            Respondents.   :

————————————————————————— X

EEOC No.: _____

**SUPPLEMENT TO CHARGE OF
DISCRIMINATION AND
RETALIATION**

     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

     1.     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

     2.     Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 93E2368-3320-4847-0938C-20B7A89027A

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8. Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9. Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10. Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11. Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12. Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13. Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthesiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.     **DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

4

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

II.     **DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES**

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

33. Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34. By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35. After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36. Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37. Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38. Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.    DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     <u>Pregnancy Discrimination</u>

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show -- probably very soon, since you have such a flat stomach."

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with

these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for

Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019.

Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr.

Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April

2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although

she had not been interviewed or spoken to about this incident, was told that she would no longer

be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged

"investigation," including any documentation, she was told there was "nothing in writing." This

was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for

engaging in protected activity.

b.      Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then

retaliated against because of her complaints of pregnancy discrimination, but she too has

experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr.

Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a

table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly

ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long

hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply

humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was

holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making

Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr.

Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of

wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome

proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been

unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research

project along (despite comments from other clinical research committee members that her idea

was excellent) in order to do her "a favor" because she "just had a baby and should be spending

all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research

project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it,

pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to

leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.    Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.    Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.    Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.    During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.    At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.    Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.    Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.    Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.    In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Lori-Ann Oliver, M.D. _____ being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this ___05/01/2020___

Compla[___Dr. Lori-Ann Oliver___]
DocuSigned by:
D2D32419D0F444C...

Subscribed and sworn before me on _____.
Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. __2030534__ | Date: __12/6/19__ |
| EEOC No. _____ | |

My name is:       Jodi-Ann Oliver M.D.
My mailing address is:    c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is:   (212) 257-6800
My email address is:    trahman@wigdorlaw.com
The respondent is:                                        Manuel Lopes Fontes, M.D.
Whose business address is:   333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | ☐ | not hired/promoted | |
| ☐ | terminated | | ☐ | given unequal duties | |
| ☐ | suspended | | ☐ | harassed | |
| ☐ | placed on probation | | ☒ | sexually harassed | Ongoing |
| ☐ | demoted | | ☐ | earning different pay | |
| ☐ | warned | | ☐ | constructively discharged | |
| ☐ | given a poor evaluation | | ☒ | retaliated against | Ongoing |
| ☐ | denied a raise | | ☐ | transferred | |
| ☐ | less trained | | ☐ | given difficult assignment | |
| ☐ | denied an office | | ☐ | not recalled | |
| ☐ | denied equal service(s) | | | | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | ☐ | Mental disability | |
| ☐ | Color | ☐ | Intellectual disability | |
| ☐ | Religious creed | ☐ | Learning disability | |
| ☐ | Age | ☐ | Physical disability | |
| ☐ | Gender identity/expression | ☐ | Veteran status | |
| ☐ | Marital status | ☐ | Prior criminal conviction | |
| ☐ | National origin | ☐ | Sexual orientation | |
| ☒ | Sex: ☐ Male ☒ Female | ☐ | Pregnancy | |
| ☐ | Ancestry | ☐ | Lawful source of income | |
| ☐ | Other: | ☐ | Genetic information | |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)  ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
☐ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)  ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70  ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80  ☐ Equal Pay Act of 1964, U.S.C. § 206
☐ CONN. GEN. STAT. § 46a-81  ☐ Section 504 of the Rehabilitation Act of 1973

☐ Other _____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**

——————————————————————X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,  :
ASHLEY ELTORAI, M.D., JODI-ANN  :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :
ELIZABETH REINHART, M.D.,  :

                        Claimants,  :

           v.  :

YALE UNIVERSITY YALE NEW HAVEN  :
HOSPITAL, INC., and MANUEL LOPES  :
FONTES, M.D.,  :
                        :

                   Respondents.  :

——————————————————————X

EEOC No.: _____

**SUPPLEMENT TO CHARGE OF**
**DISCRIMINATION AND**
**RETALIATION**

       Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

      1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

      2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.    Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.    Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.    Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.    This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.    Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.   **DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

II.     **DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES**

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

39.    Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

III.    **DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO**

40.    Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.    Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.    Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.    Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.    This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.    Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

V.     **PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI**

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition.  Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project.  Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis.  Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BC87A76350

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107. Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108. Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109. This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110. Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111. Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112. Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: 6FE84EC2-8EAB-4EFE-0642-FDE287A76930

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Jodi-Ann Oliver, M.D. _____ being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this _____ 05/01/2020 _____

DocuSigned by:

_Dr. Jodi-Ann Oliver_

Complainant — 835CCC809D3541E...

Subscribed and sworn before me on _____.

Date

_____

Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

## AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030535_ | Date: _12/6/19_ |
| EEOC No. | |

My name is: Mia Castro, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Manuel Lopes Fontes, M.D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | | |
| ☐ | terminated | _____ | ☐ | not hired/promoted | _____ |
| ☐ | suspended | _____ | ☐ | given unequal duties | _____ |
| ☐ | placed on probation | _____ | ☐ | harassed | _____ |
| ☐ | demoted | _____ | ☒ | sexually harassed | _Ongoing_ |
| ☐ | warned | _____ | ☐ | earning different pay | _____ |
| ☐ | given a poor evaluation | _____ | ☐ | constructively discharged | _____ |
| ☐ | denied a raise | _____ | ☒ | retaliated against | _Ongoing_ |
| ☐ | less trained | _____ | ☐ | transferred | _____ |
| ☐ | denied an office | _____ | ☐ | given difficult assignment | _____ |
| ☐ | denied equal service(s) | _____ | ☐ | not recalled | _____ |
| ☐ | other: | _____ | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race _____ | ☐ | Mental disability _____ |
| ☐ | Color _____ | ☐ | Intellectual disability _____ |
| ☐ | Religious creed _____ | ☐ | Learning disability _____ |
| ☐ | Age _____ | ☐ | Physical disability _____ |
| ☐ | Gender identity/expression _____ | ☐ | Veteran status _____ |
| ☐ | Marital status _____ | ☐ | Prior criminal conviction _____ |
| ☐ | National origin _____ | ☐ | Sexual orientation _____ |
| ☒ | Sex: ☐ Male ☒ Female _____ | ☐ | Pregnancy _____ |
| ☐ | Ancestry _____ | ☐ | Lawful source of income _____ |
| ☐ | Other: _____ | ☐ | Genetic information _____ |
| ☐ | Previous opposition to discriminatory conduct | | |

**Was/Were in part a factor(s) in this action.**

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)    ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)    ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70    ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80    ☐ Equal Pay Act of 1964, U.S.C. § 206
☐ CONN. GEN. STAT. § 46a-81    ☐ Section 504 of the Rehabilitation Act of 1973

☐ Other
_____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

——————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN       :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and :    EEOC No.: _____
ELIZABETH REINHART, M.D.,            :
                                        :
                Claimants,     :    **SUPPLEMENT TO CHARGE OF**
                               :    **DISCRIMINATION AND**
        v.                  :    **RETALIATION**
                               :
YALE UNIVERSITY YALE NEW HAVEN    :
HOSPITAL, INC., and MANUEL LOPES      :
FONTES, M.D.,                      :
                               :
                Respondents.   :

——————————————————————— X

        Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

### PRELIMINARY STATEMENT

       1.    Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

       2.    Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.       Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.       Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.       Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.       This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.       Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.       Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

<u>PARTIES</u>

9.       Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.      Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.      Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.      Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven. Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.      Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

II.     **DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES**

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

33.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and

traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually

harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from

him every time she sees him.

III.    **DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO**

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her

anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two

worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr.

Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on

and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted

touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for

resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up

a syringe cap that had fallen on the ground rather than tend to a patient who was severely

hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an

anonymous evaluation that specifically complained about Dr. Fontes's penchant for

inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr.

Fontes's behavior.

46.    Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.    However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.    Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.    There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.    PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.    Pregnancy Discrimination

50.    Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.    In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.    Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

53.    Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.    The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.    The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.    Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.    Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.    Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with

these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for

Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019.

Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr.

Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April

2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although

she had not been interviewed or spoken to about this incident, was told that she would no longer

be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged

"investigation," including any documentation, she was told there was "nothing in writing." This

was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for

engaging in protected activity.

b.      Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then

retaliated against because of her complaints of pregnancy discrimination, but she too has

experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr.

Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a

table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.    Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.    Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.    As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.    Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.    Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.    Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.   This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.   Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.   Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.   Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.   Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.   As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Mia Castro, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.                                                          .

Dated in ___New Haven, CT___ on this _____05/01/2020_____

Compla_____

Subscribed and sworn before me on _____.

Date

Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

**AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE**

| FOR CHRO USE ONLY | |
|---|---|
| Case No. 2030540 | Date: 12/6/19 |
| EEOC No. | |

My name is:                Elizabeth Reinhart, M.D.
My mailing address is:     c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is:    (212) 257-6800
My email address is:       trahman@wigdorlaw.com
The respondent is:         Y̶                                      Manuel Lopes Fontes, M.D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | ☐ | not hired/promoted | |
| ☐ | terminated | | ☐ | given unequal duties | |
| ☐ | suspended | | ☐ | harassed | |
| ☐ | placed on probation | | ☒ | sexually harassed | Ongoing |
| ☐ | demoted | | ☐ | earning different pay | |
| ☐ | warned | | ☐ | constructively discharged | |
| ☐ | given a poor evaluation | | ☒ | retaliated against | Ongoing |
| ☐ | denied a raise | | ☐ | transferred | |
| ☐ | less trained | | ☐ | given difficult assignment | |
| ☐ | denied an office | | ☐ | not recalled | |
| ☐ | denied equal service(s) | | | | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | ☐ | Mental disability | |
| ☐ | Color | ☐ | Intellectual disability | |
| ☐ | Religious creed | ☐ | Learning disability | |
| ☐ | Age | ☐ | Physical disability | |
| ☐ | Gender identity/expression | ☐ | Veteran status | |
| ☐ | Marital status | ☐ | Prior criminal conviction | |
| ☐ | National origin | ☐ | Sexual orientation | |
| ☒ | Sex: ☐ Male ☒ Female | ☐ | Pregnancy | |
| ☐ | Ancestry | ☐ | Lawful source of income | |
| ☐ | Other: | ☐ | Genetic information | |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

| | | | |
|---|---|---|---|
| ☒ | CONN. GEN. STAT. § 46a-60(b)(1) | ☒ | Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed) |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(4) | | |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(5) | | |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(7) | ☐ | Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed) |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(8) | | |
| ☐ | CONN. GEN. STAT. § 46a-64 | | |
| ☐ | CONN. GEN. STAT. § 46a-70 | ☐ | Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. |
| ☐ | CONN. GEN. STAT. § 46a-71 | | |
| ☐ | CONN. GEN. STAT. § 46a-80 | ☐ | Equal Pay Act of 1964, U.S.C. § 206 |
| ☐ | CONN. GEN. STAT. § 46a-81 | ☐ | Section 504 of the Rehabilitation Act of 1973 |
| ☐ | Other | | |

_____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
—————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,          :
ASHLEY ELTORAI, M.D., JODI-ANN               :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and       :        EEOC No.: _____
ELIZABETH REINHART, M.D.,                     :
                                              :
                          Claimants,          :        SUPPLEMENT TO CHARGE OF
                                              :        DISCRIMINATION AND
              v.                              :        RETALIATION
                                              :
YALE UNIVERSITY YALE NEW HAVEN                :
HOSPITAL, INC., and MANUEL LOPES              :
FONTES, M.D.,                                 :
                                              :
                          Respondents.        :
—————————————————————— X

   Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

   1. Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

   2. Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.   Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.   Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.   Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.   This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.   Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who

too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine.  As a

result of the other conduct described herein, Respondents have unquestionably violated relevant

statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York.

Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is

currently an attending physician and assistant professor of clinical anesthesiology within the

anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr.

Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a

pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut.

Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is

currently an attending physician and assistant professor of anesthesiology within the

anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is

currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is

currently an attending physician and assistant professor of clinical anesthesiology at Yale.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.     **DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

19.    Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.    Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.    Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.    Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.    As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.    Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.    There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

III.   **DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO**

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner. This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior. Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.   DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85. Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86. Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87. Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88. During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89. At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90. Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91. Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

VII.   **DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART**

92. Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93. In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

94. Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95. Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96. As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97. Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98. Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99. Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100. While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

_Elizabeth Reinhart, M.D._ being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this _____05/01/2020_____

Complainant _____

0E0E4545592C463...

Subscribed and sworn before me on _____.

Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
| --- | --- |
| Case No. _2030543_ | Date: _12/6/19_ |
| EEOC No. _____ | |

My name is: Heidi Boules, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Yale Universi... ... Manuel Lopes Fontes, M.D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| ☒ | discriminated against in terms and conditions | Ongoing | ☐ | not hired/promoted | |
| ☐ | terminated | | ☐ | given unequal duties | |
| ☐ | suspended | | ☐ | harassed | |
| ☐ | placed on probation | | ☒ | sexually harassed | Ongoing |
| ☐ | demoted | | ☐ | earning different pay | |
| ☐ | warned | | ☐ | constructively discharged | |
| ☐ | given a poor evaluation | | ☒ | retaliated against | Ongoing |
| ☐ | denied a raise | | ☐ | transferred | |
| ☐ | less trained | | ☐ | given difficult assignment | |
| ☐ | denied an office | | ☐ | not recalled | |
| ☐ | denied equal service(s) | | | | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
| --- | --- | --- | --- | --- |
| ☐ | Race | | ☐ | Mental disability |
| ☐ | Color | | ☐ | Intellectual disability |
| ☐ | Religious creed | | ☐ | Learning disability |
| ☐ | Age | | ☐ | Physical disability |
| ☐ | Gender identity/expression | | ☐ | Veteran status |
| ☐ | Marital status | | ☐ | Prior criminal conviction |
| ☐ | National origin | | ☐ | Sexual orientation |
| ☒ | Sex: ☐ Male ☒ Female | | ☐ | Pregnancy |
| ☐ | Ancestry | | ☐ | Lawful source of income |
| ☐ | Other: | | ☐ | Genetic information |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)
☐ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80
☐ CONN. GEN. STAT. § 46a-81

☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
☐ Equal Pay Act of 1964, U.S.C. § 206
☐ Section 504 of the Rehabilitation Act of 1973

☐ Other _____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
——————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,    :
ASHLEY ELTORAI, M.D., JODI-ANN
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :    EEOC No.: _____
ELIZABETH REINHART, M.D.,
                                         :
                    Claimants,           :    SUPPLEMENT TO CHARGE OF
                                         :    DISCRIMINATION AND
         v.                              :    RETALIATION
                                         :
YALE UNIVERSITY YALE NEW HAVEN           :
HOSPITAL, INC., and MANUEL LOPES         :
FONTES, M.D.,                            :
                                         :
                    Respondents.
——————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.     Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.     Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.     Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.     This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.     Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.     Such sexually harassing and intimidating conduct has no place in medicine.  As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.     Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr. Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.    **DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

19.    Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.    Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.    Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.    Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.    As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.    Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.    There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

33.    Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.    By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.    After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.    Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.    Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.    Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.    Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.    DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.    Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.    Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.    Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.    Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.    This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.    Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor.  However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey.  However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences.  However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66. This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67. Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68. Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69. Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

    b.    Sexual Harassment

70. Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71. In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly
ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long
hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply
humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was
holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making
Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr.
Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of
wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome
proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been
unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research
project along (despite comments from other clinical research committee members that her idea
was excellent) in order to do her "a favor" because she "just had a baby and should be spending
all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research
project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it,
pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to
leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85.    Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.    Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.    Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.    During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.    At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.    Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.    Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.    DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.    Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.    In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Heidi Boules, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this _____04/30/2020_____

Complaint _____

Subscribed and sworn before me on _____.

Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. 2030546 | Date: 12/6/19 |
| EEOC No. | |

My name is: Ashley Eltorai, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Manuel Lopes Fontes, M.D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was ...**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | | |
| ☐ | terminated | | ☐ | not hired/promoted | |
| ☐ | suspended | | ☐ | given unequal duties | |
| ☐ | placed on probation | | ☐ | harassed | |
| ☐ | demoted | | ☒ | sexually harassed | Ongoing |
| ☐ | warned | | ☐ | earning different pay | |
| ☒ | given a poor evaluation | | ☐ | constructively discharged | |
| ☐ | denied a raise | | ☒ | retaliated against | Ongoing |
| ☒ | less trained | | ☐ | transferred | |
| ☐ | denied an office | | ☐ | given difficult assignment | |
| ☐ | denied equal service(s) | | ☐ | not recalled | |
| ☐ | other: | | | | |

**I believe that my...**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | | ☐ | Mental disability |
| ☐ | Color | | ☐ | Intellectual disability |
| ☐ | Religious creed | | ☐ | Learning disability |
| ☐ | Age | | ☐ | Physical disability |
| ☐ | Gender identity/expression | | ☐ | Veteran status |
| ☐ | Marital status | | ☐ | Prior criminal conviction |
| ☐ | National origin | | ☐ | Sexual orientation |
| ☒ | Sex: ☐ Male ☒ Female | | ☒ | Pregnancy |
| ☐ | Ancestry | | ☐ | Lawful source of income |
| ☐ | Other: | | ☐ | Genetic information |
| ☒ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)   ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☒ CONN. GEN. STAT. § 46a-60(b)(7)
☒ CONN. GEN. STAT. § 46a-60(b)(8)   ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70   ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80   ☐ Equal Pay Act of 1964, U.S.C. § 206
☐ CONN. GEN. STAT. § 46a-81   ☐ Section 504 of the Rehabilitation Act of 1973

☐ Other _____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
———————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,          :
ASHLEY ELTORAI, M.D., JODI-ANN                 :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and        :          EEOC No.: _____
ELIZABETH REINHART, M.D.,                      :
                                               :
                      Claimants,               :          **SUPPLEMENT TO CHARGE OF**
                                               :          **DISCRIMINATION AND**
              v.                               :          **RETALIATION**
                                               :
YALE UNIVERSITY YALE NEW HAVEN                 :
HOSPITAL, INC., and MANUEL LOPES               :
FONTES, M.D.,                                  :
                                               :
                      Respondents.             :
———————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.      Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.      Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.      Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.      Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

19.    Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.    Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.    Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.    Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.    As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.    Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.    There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: 9C1915AC-821E-4D4C-B296-1D160DD5B0EC

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III. DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

V.     **PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI**

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53.    Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.    The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.    The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.    Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.    Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.    Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.    Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.    Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.    Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.    Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.    Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.    Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.    Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with

these managers, they appeared confused and confirmed that they had no concerns with her.

66. This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for

Dr. Eltorai's complaints about pregnancy discrimination.

67. Dr. Eltorai returned to work from maternity leave in mid-July 2019.

Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr.

Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April

2019.

68. Dr. Eltorai was criticized for her communications during this case, and although

she had not been interviewed or spoken to about this incident, was told that she would no longer

be permitted to work in the ICU.

69. Tellingly, when Dr. Eltorai asked for further information about the alleged

"investigation," including any documentation, she was told there was "nothing in writing." This

was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for

engaging in protected activity.

b.    Sexual Harassment

70. Not only was Dr. Eltorai discriminated against because of her pregnancy and then

retaliated against because of her complaints of pregnancy discrimination, but she too has

experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71. In addition to the comment about her body referenced above, in June 2019, Dr.

Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a

table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85. Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86. Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87. Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88. During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89. At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90. Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91. Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

VII.    **DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART**

92. Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93. In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol.  This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips.  Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?"  Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.     Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.     It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.     In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

 Ashley Eltorai, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this ___05/01/2020___

DocuSigned by:

Com[____6F84E242548F4E8...]ure

Subscribed and sworn before me on _____.

Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# Exhibit 3

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**



# CASE ASSESSMENT REVIEW

<u>Heidi Boules</u>
COMPLAINANT

VS.

<u>Dr. Manuel Lopes Fontes</u>
RESPONDENT

 CHRO NO.   2030543                    DATE FILED:   DECEMBER 6, 2019

Connecticut law requires the Commission on Human Rights and Opportunities (CHRO) to conduct a case assessment review (CAR) of this complaint. The purpose of the CAR review is to determine whether the complaint should be retained for further processing or dismissed.

The CHRO has conducted a thorough review of the file and has dismissed the complaint for the following reason(s):

☒    The complaint fails to state a claim for relief because:

The Complainant alleges that the Respondent, Dr. Manual Lopes Fontes, discriminated against her by sexually harassing her, retaliating against her, and by discriminating against her in the terms and conditions of her employment. As a general matter, Connecticut law does not impose liability on an individual for discriminatory employment practices. The exception to this is if that individual is alleged to have retaliated against a complainant based on their prior opposition to discrimination or if they have aided and abetted the discrimination of another. Neither of those exceptions apply here. While there are allegations of retaliation in the complaint, those allegations are focused on the Respondent's conduct directed towards Dr. Mia Castro and Dr. Ashley Eltorai, not the Complainant. As for allegations of aiding and abetting, those allegations are not specifically made in the complaint. Even if they were, the Respondent was acting as the Complainant's supervisor and is therefore an agent of Yale New Haven Hospital. Given that, his

actions are properly attributable to the employer rather than to him as an individual. As there are no allegations that could create liability for Dr. Fontes in his individual capacity, the complaint must be dismissed for failure to state a claim for which relief can be granted.

☐    The complaint is frivolous on its face because:

☐    The respondent is exempt because:

☐    There is no reasonable possibility that investigating the complaint will result in a finding of reasonable cause because:

As this complaint was dismissed, a release of jurisdiction allowing the complainant to bring a civil action in court has been attached to this notice.


July 13, 2020
Dated:

Commission on Human Rights and Opportunities
450 Columbus Boulevard, Suite 2
Hartford, CT 06103

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**



# CASE ASSESSMENT REVIEW

Jodi-Ann Oliver
COMPLAINANT

VS.

Dr. Manuel Lopes Fontes
RESPONDENT

CHRO NO.   2030534                    DATE FILED:   DECEMBER 6, 2019

Connecticut law requires the Commission on Human Rights and Opportunities (CHRO) to conduct a case assessment review (CAR) of this complaint. The purpose of the CAR review is to determine whether the complaint should be retained for further processing or dismissed.

The CHRO has conducted a thorough review of the file and has dismissed the complaint for the following reason(s):

☒      The complaint fails to state a claim for relief because:

The Complainant alleges that the Respondent, Dr. Manual Lopes Fontes, discriminated against her by sexually harassing her, retaliating against her, and by discriminating against her in the terms and conditions of her employment. As a general matter, Connecticut law does not impose liability on an individual for discriminatory employment practices. The exception to this is if that individual is alleged to have retaliated against a complainant based on their prior opposition to discrimination or if they have aided and abetted the discrimination of another. Neither of those exceptions apply here. While there are allegations of retaliation in the complaint, those allegations are focused on the Respondent's conduct directed towards Dr. Mia Castro and Dr. Ashley Eltorai, not the Complainant. As for allegations of aiding and abetting, those allegations are not specifically made in the complaint. Even if they were, the Respondent was acting as the Complainant's supervisor and is therefore an agent of Yale New Haven Hospital. Given that, his

Page 1 of 2

actions are properly attributable to the employer rather than to him as an individual. As there are no allegations that could create liability for Dr. Fontes in his individual capacity, the complaint must be dismissed for failure to state a claim for which relief can be granted.

☐   The complaint is frivolous on its face because:

☐   The respondent is exempt because:

☐   There is no reasonable possibility that investigating the complaint will result in a finding of reasonable cause because:

As this complaint was dismissed, a release of jurisdiction allowing the complainant to bring a civil action in court has been attached to this notice.

July 13, 2020
Dated:

Commission on Human Rights and Opportunities
450 Columbus Boulevard, Suite 2
Hartford, CT 06103

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**



# CASE ASSESSMENT REVIEW

<u>Lori-Ann Oliver</u>
COMPLAINANT

VS.

<u>Dr. Manuel Lopes Fontes</u>
RESPONDENT

CHRO NO.   2030531                DATE FILED:   DECEMBER 6, 2019

Connecticut law requires the Commission on Human Rights and Opportunities (CHRO) to conduct a case assessment review (CAR) of this complaint. The purpose of the CAR review is to determine whether the complaint should be retained for further processing or dismissed.

The CHRO has conducted a thorough review of the file and has dismissed the complaint for the following reason(s):

⊠       The complaint fails to state a claim for relief because:

The Complainant alleges that the Respondent, Dr. Manual Lopes Fontes, discriminated against her by sexually harassing her, retaliating against her, and by discriminating against her in the terms and conditions of her employment. As a general matter, Connecticut law does not impose liability on an individual for discriminatory employment practices. The exception to this is if that individual is alleged to have retaliated against a complainant based on their prior opposition to discrimination or if they have aided and abetted the discrimination of another. Neither of those exceptions apply here. While there are allegations of retaliation in the complaint, those allegations are focused on the Respondent's conduct directed towards Dr. Mia Castro and Dr. Ashley Eltorai, not the Complainant. As for allegations of aiding and abetting, those allegations are not specifically made in the complaint. Even if they were, the Respondent was acting as the Complainant's supervisor and is therefore an agent of Yale New Haven Hospital. Given that, his

actions are properly attributable to the employer rather than to him as an individual. As there are no allegations that could create liability for Dr. Fontes in his individual capacity, the complaint must be dismissed for failure to state a claim for which relief can be granted.

☐   The complaint is frivolous on its face because:

☐   The respondent is exempt because:

☐   There is no reasonable possibility that investigating the complaint will result in a finding of reasonable cause because:

As this complaint was dismissed, a release of jurisdiction allowing the complainant to bring a civil action in court has been attached to this notice.


July 13, 2020
Dated:

Commission on Human Rights and Opportunities
450 Columbus Boulevard, Suite 2
Hartford, CT 06103

# Exhibit 4

2008 WL 350630
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Meredith G. HAMPTON and
George Strakosch, Plaintiffs,

v.

DIAGEO NORTH AMERICA, INC.
and Mark Waller, Defendants.

No. 3:04cv346(PCD).
|
Feb. 7, 2008.

**Attorneys and Law Firms**

Burton Kainen, Kainen, Escalera & McHale, PC, Hartford, CT, Jane Boucher Monahan, Farmington, CT, for Plaintiffs.

Carla R. Walworth, Frances M. Nicastro, Paul, Hastings, Janofsky & Walker, New York, NY, Kenneth William Gage, Paul, Hastings, Janofsky & Walker, LLP, Chicago, IL, Sandra K. Lalli, Sarah Elizabeth Graves, Paul, Hastings, Janofsky & Walker, Stamford, CT, for Defendants.

*RULING ON MOTIONS FOR SUMMARY JUDGMENT*

PETER C. DORSEY, District Judge.

**\*1** Plaintiffs bring this action alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.,* the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. §§ 46a–60, *et seq.,* and breach of contract. Defendants Diageo North America, Inc. ("Diageo" or the "Company") and Mark Waller move for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that none of Plaintiffs' claims give rise to a triable issue of material fact and that the claims are unsustainable as a matter of law. For the reasons stated herein, Defendants' Motions for Summary Judgment as to Plaintiffs Meredith Hampton [Doc. No. 78] and George Strakosch [Doc No. 81] are **granted** in part and **denied** in part.

**I. BACKGROUND**
Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Plaintiffs as the non-moving parties. *See* Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir.2003).

**A. Background on Defendants**
Diageo, a manufacturer, marketer, and distributor of alcoholic beverages, was formed in December 1997 with the merger of Guinness and Grand Metropolitan. Until April 2001, Diageo conducted its national brand marketing from its offices in Stamford, Connecticut. This practice was referred to as "Regional Brand Strategy," but in fact the nationwide strategies for marketing each beverage were developed in Stamford and implemented by regional field offices, with local variations as appropriate.

In April 2001, Diageo discontinued this practice and replaced it with five regional In–Market Companies ("IMCs"). Each IMC was assigned lead responsibility for developing and implementing national brand marketing strategies for the products with the strongest market in that region. For example, there is reportedly a large market for Cuervo tequila in the Western states, so responsibility for developing national brand marketing strategy for Cuervo was assigned to the West IMC.

In June 2002, Diageo underwent another significant reorganization of its marketing functions, with a return to centralized development of national marketing strategy through the Consumer Strategy and Marketing group ("CSM"), again located in Stamford, Connecticut. During the summer of 2002, Defendant Mark Waller became the new senior executive of marketing and head of CSM, with the title Executive Vice President for Consumer Strategy and Marketing for Diageo North America. Before assuming this position, Waller had served as the head of the Central IMC in Chicago.

In conjunction with the marketing restructuring, Diageo had positions available for a number of Director-level (Level 4) jobs, including Director of Popular Brands, Director of High Energy, Director of Cuervo, Director of Category Management Brands, and Director of Captain Morgan Rums. The Director of High Energy position was initially posted as two separate positions that were later combined, and the Director of Captain Morgan Rums position was not posted because it became available only after a "lean-in" candidate declined the position. [1] Director-level employees such as Plaintiffs who were not selected for these or other available positions risked being left without jobs at Diageo because

their current positions would be eliminated following the restructuring. The Company made general assurances in its online "Resourcing Process" web-page regarding the fairness of the application and hiring process, and stated that all positions would be posted. As discussed in more detail below, Plaintiffs each applied for some of these jobs and had interviews, led by Waller, for those positions on June 26 and 27, 2002, and did not receive job offers for those positions.

**B. Background on Plaintiff Meredith G. Hampton**

*2 Meredith G. Hampton was born on January 13, 1956. She was hired by Diageo's predecessor company Heublein in 1984, at age 28. She was promoted in 1998 at age 42 from Brand Manager, a Level 5 position, to "Brand Strategy Director, Jose Cuervo Tequilas and Margarita Mix," a Level 4 position. [2] After the Cuervo Regional Brand Strategy Team she had worked on in Stamford was disbanded and the West IMC took over Cuervo marketing in 2001, Hampton was named at age 45 to be "Director of Marketing, Integration," which was also a Level 4 position. Throughout her career, Ms. Hampton received generally positive and in some respects quite strong job evaluations, which portray her as a hard worker who was very committed to the Company.

After the plan to recentralize marketing in the CSM was announced in June 2002, Hampton applied for the positions of Director of Popular Brands and Director of High Energy. Plaintiffs state that they were instructed by the Company to apply for those jobs which they most wanted, rather than apply for all available positions. She was interviewed on June 26 or 27, 2002 by Waller and Alan Weber, Vice President of Marketing Integration. Defendants claim that Waller informed Hampton at the beginning of the interview that she would also be considered for the Director of Captain Morgan Rums position which had become available on short notice (Waller Dep. at 66), while Hampton claims that she was not told this during the interview and was only informed after the fact that she had been considered, and that she does not believe that she was in fact considered for that position. (Pl.'s R. 9(c)(2) Statement of Disputed Facts, P 16; Hampton Dep. at 235–236). Hampton describes the interview as "odd," with Waller's questions focusing on her former supervisor Ted Hissey's management style, which Defendants suggest was intended to probe Hampton's viewpoints and style regarding confrontation but which Hampton felt unduly limited her opportunity to discuss her experience and qualifications for the positions. (Hampton Dep. at 226–230). However, there is

no indication that anything regarding age was said during the interview.

Hampton was informed by Waller on July 8, 2002 that she had not been selected for any of the three positions for which she applied or may have been considered. Hampton was 46 at the time. Director of Popular Brands was filled by Pamela Whiteside, age 38; Director of High Energy was filled by Jennifer Van Ness, age 34; and Director of Captain Morgan Rums was filled by Jennifer Young, age 29. Alan Weber, who had interviewed Hampton along with Waller, allegedly told Hampton on the day she found out that she did not get a position that "[T]he two of us are in the same boat. You may have the same problem as I do. You are not a young 35 year old." (Hampton Dep. at 331.) Defendant Waller allegedly told Hampton that she could apply for other positions but that all jobs would come back through him, which she took to mean that she shouldn't bother applying because he would prevent her selection. (Hampton Dep. at 239.) Nonetheless, she applied on October 23, 2002 for the Level 4 position of "Director of Innovation," a position under Waller in the CSM, for which she was not interviewed (Def.'s R. 56(a)(1) Statement, ¶ 23), and which was subsequently filled by Jennifer Young, age 29. This was the same Jennifer Young who had been named Director of Rums four months earlier.

*3 In November 2002, Hampton accepted a temporary position within Diageo working on the transition of the Bass beer distributorship to another company. From November 2002 until late February 2003, Hampton was relocated to the seventh floor, away from the others on the CMS team. She states that the move of her office occurred before she was assigned to the Bass job. Beginning in November 2002, she was periodically not invited to CMS lunches and meetings and felt that she was not given adequate supervision for purposes of professional development and performance management. (Hampton Dep. at 296.) In November 2002, Waller allegedly said to Hampton upon seeing her in the hallway that she was "like a bad penny," which Hampton took to mean that he was annoyed that he couldn't get rid of her because she just kept coming back. (Hampton Dep. at 247.) On December 4, 2002, Hampton made a report of age discrimination to Waller and Diageo Human Resources and filed an age discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

Hampton claims she had understood the Bass job to be a lateral transfer, meaning that she would stay at Level 4 (Director), but that she subsequently discovered that she

had been demoted to Level 5 (Manager). Diageo contests that the Bass job constituted a demotion, highlighting the undisputed fact that Hampton's salary did not change. In response, Hampton points to Diageo's Consumer Strategy and Marketing Organization Structure chart, dated December 12, 2002, which shows her listed as "Brand Manager: Bass." As further evidence that she was no longer a Level 4 Director, Hampton states that she was denied participation in December 2002 in the Share Option Plan, when the other Level 4 marketing directors received their options, thus constituting a change in her compensation. Diageo contends that she was denied the options because it was known that her future tenure with the company was limited, given that she had not received a permanent offer of employment and given that her current Bass position was transitional and temporary. On January 10, 2003, an email from Director of Lagers Damian Kernahan referred to Hampton as a "Brand Manager," which she contends was how she first learned of her demotion to Manager. She claims this caused her humiliation, noting that one colleague even called to inquire what had happened to bring about the demotion.

On April 10, 2003, Diageo responded to Hampton's CHRO complaint. Upon conclusion of her work on the Bass project, Hampton was terminated on June 30, 2003 at age 47. Hampton filed the Complaint in this case on March 1, 2004.

### C. Background on Plaintiff George Strakosch

George Strakosch was born on June 16, 1954. He was hired in October 1997 as a consultant and became a full time employee of Diageo in July 1998, at age 44, assuming the title of North American Strategy Manager for Jose Cuervo Super Premium Tequilas. In 2000, Strakosch settled a previous age discrimination claim against a former employer, Nielsen Marketing Research. (Strakosch Dep. at 156–157, 160.) In late 2000, Strakosch was made "Marketing Manager: Integration," a Level 5 job. In 2001, at age 47, he was promoted to "Marketing Director: Integration," a Level 4 job. Strakosch states that he attended a business dinner on October 10, 2001 at which Rob Malcolm, the head of Diageo Global Marketing, said, "You want young stallions to run your business, with a few wise old owls."

*4  After the plan to recentralize marketing in the CSM was announced in 2002, Strakosch applied for the positions of Director of Cuervo and Director of Popular Brands. He was interviewed on June 26 or 27, 2002 by Waller and Alan Weber. Strakosch states that, contrary to the assertions of Defendants, he was not told during the interview that he

would be considered for the unposted Director of Captain Morgan Rums position which had become available when the lean-in candidate had withdrawn at the last minute. Strakosch states that he, like Hampton, was asked questions regarding Ted Hissey's management style, which could not have been asked of other applicants because they had not worked for Hissey. Strakosch does not report any reference to age during the interview.

Strakosch, then age 48, was not selected for any of the three positions. Director of Cuervo was filled by Carl Swedberg, age 36; Director of Popular Brands was filled by Pamela Whiteside, age 38; and Director of Captain Morgan Rums was filled by Jennifer Young, age 29. Like Hampton, Strakosch has a history of generally positive performance reviews. However, with respect to the Director of Cuervo position, Defendants state that their contractual relationship with Jose Cuervo International ("JCI") gives JCI decision-making authority about who works on that brand, and that JCI had told Diageo that it would not approve Strakosch for the Director of Cuervo position based on their previous working experience with him. (Waller Dep. at 63–64, 126–127.)

In July 2002, Strakosch was approached by Mark Waller to inquire whether Strakosch would be interested in the "Director of Trends and Best Practices" position. The Director of Trends and Best Practices job was a Level 4 position, placing it on par with those for which Strakosch had applied, but he declined it on the basis of his belief that it would be "career suicide" to accept the job, given that he wanted to continue to build his career in the brand marketing field. Strakosch also states that he was interested in a Brand Innovation Group position for which he never applied because it was never posted, contrary to the stated policy. On October 8, 2002, Waller discussed the temporary Bass job with Strakosch, who was subsequently assigned to the position, along with Hampton. As with Hampton, Strakosch's salary did not change, but he was denied participation in December 2002 in the Share Option Plan, and was moved with Hampton to a different floor. Also as with Hampton, it is not clear whether Strakosch knew that the Bass job was a manager position rather than a Level 4 director position like his previous role, although they do appear to have understood that the position was not permanent and would end when the project was complete.

On December 4, 2002, Strakosch made an age discrimination report to Waller and to Diageo Human Resources and filed his complaint with the CHRO. On March 26, 2003, Diageo

2008 WL 350630

responded to Strakosch's CHRO complaint. Strakosch applied for the position of Director of Crown Royal in July 2003, and was interviewed by James Thompson, Vice President of Marketing, a position under Waller in the CSM. (Ex. EE.) Strakosch was not offered the position, and Jerry Knight, age 34, was selected as Director of Crown Royal. Strakosch was terminated on August 25, 2003, at age 49, and he filed this Complaint on March 1, 2004.

## II. STANDARD OF REVIEW

**\*5** Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56©. No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[c]onclusory allegations will not suffice to create a genuine issue." *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990). The moving party bears the burden of establishing that summary judgment is appropriate. *Anderson,* 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

## III. DISCUSSION

### A. Age Discrimination

Defendants move for summary judgment on Plaintiffs' claims, brought pursuant to the ADEA and CFEPA, that Diageo's failure to select Plaintiffs for newly created lateral positions during the restructuring of the marketing department during the summer of 2002, or for other positions for which they later applied, and their subsequent termination in the summer of 2003 upon expiration of their previous positions and the transitional positions to which they had been assigned, constituted discrimination on the basis of age.

Plaintiffs' age discrimination claims are analyzed under the three-step burden shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See, e.g., James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153 (2000) (applying *McDonnell Douglas* to ADEA claims). A plaintiff has the initial burden of establishing a prima facie case of discrimination by showing that, "(I) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination[.]" *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2006). A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination, *id.,* and the burden of production shifts to the defendant. If the defendant then proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001), "the presumption of discrimination drops out," *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001), and the plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). At all times, the ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated against the plaintiff. *Hicks,* 509 U.S. at 507 (quoting *Burdine,* 450 U.S. at 256).

Case 3:20-cv-00330-JBA  Document 63  Filed 07/14/20  Page 168 of 183

**\*6** To make out a prima facie case of employment discrimination under the ADEA, Plaintiffs must show that (1) they are members of a protected class; (2) they are qualified for the jobs; (3) they suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

*Reeves,* 530 U.S. at 142; *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335 (2d Cir.) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 311–12 (2d Cir.1997); *Shumway v. United Parcel Serv.,* 118 F.3d 60, 64 (2d Cir.1997). Plaintiffs' burden at this stage is not an onerous one; they merely have to present facts sufficient to give rise to a presumption of discrimination. *See Burdine,* 450 U.S. at 254; *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001) ("A plaintiff's burden of establishing a prima facie case is de minimis.").

Plaintiffs have established that they were at all relevant times over age 40 and therefore were members of the protected class. Plaintiffs' long tenure in marketing positions with the Company (18 years for Hampton and 4 years for Strakosch in 2002), with 4 years and one year, respectively, at the same level (Level 4) as the jobs for which they were applying, combined with their positive performance evaluations and the fact that they were selected for interviews in all but one instance, establishes that the plaintiffs had at least the minimum qualifications for the positions for which they applied. Plaintiffs suffered an adverse employment action when they were not hired for lateral positions for which they applied, given that their current jobs would be terminated when the reconfiguration of Diageo's marketing function was complete. Plaintiffs also suffered adverse employment actions when they were arguably demoted to lower level positions and then terminated from the Company.

The following evidence raises an inference of age discrimination. All the candidates selected for the six positions for which Plaintiffs applied or were considered in June 2002 and afterward were significantly younger, at 29 to 38 years of age, than Plaintiffs, who were ages 46 and 48 at the time. Specifically, they were Jennifer Van Ness, age 34, who was selected for Director of High Energy; Jennifer Young, age 29, who was selected for Director of Captain Morgan Rums; Pamela Whiteside, age 38, who was selected for Director of Popular Brands; and Carl Swedberg, age

36, who was selected for Director of Cuervo. In addition, Craig Joden, age 37, was selected for Director of Category Management Brands, the other Level 4 marketing position available in June 2002, although neither Plaintiff applied for this position. Subsequently, in October 2002, Jennifer Young, age 29, was hired for Director of Innovation, for which Plaintiff Hampton applied. Finally, in July 2003, Jerry Knight, age 34, was hired for Director of Crown Royal, for which Plaintiff Strakosch applied. Plaintiffs have successfully made a prima facie showing of employment discrimination on the basis of age.

**\*7** Defendants offer several reasons that they selected the other candidates rather than Plaintiffs, which, if credited, constitute legitimate, non-discriminatory reasons. Defendants assert that the selected candidates had more of the desired skills and experience than Plaintiffs. While the specifics vary by position, the justifications include that the selected individuals had more experience with marketing the relevant brand or category of alcohol; that they had more experience or success with the development and marketing of new products; that they had greater familiarity with the geographic region in which each product is most popular, particularly through work in an in-market company in that region; and that they were stronger in particular skill sets, such as strategic thinking.

Under the *McDonnell Douglas* burden-shifting framework, Plaintiffs must proffer evidence to show that Defendants' apparently legitimate non-discriminatory reasons are actually a pretext for discrimination. Defendants' assertions that the candidates they selected were better qualified than Plaintiffs are undermined by the fact that, in two instances, the candidate hired did not have the minimum qualifications stated in the job description, whereas Plaintiff(s) did. [Doc. No. 86 at 28–29.] The Director of High Energy job description called for eight years of Fast Moving Consumer Goods experience, with two years at an advanced manager level. [Doc. No. 84, Ex. 16.] Jennifer Van Ness, who was selected for that position in 2002, had only six years of such experience, having received her MBA in 1995 [Doc. No. 90, Ex. Van Ness], while Plaintiff Hampton had as much as eighteen years of experience in this area. [Doc. No. 90, Ex. Hampton Affidavit, ¶ 5.] The Director of Popular Brands job description required an MBA or senior brand management experience [Doc. No. 84, Ex. 16.]. Pamela Whiteside, who was selected for the position, lacked an MBA, although she did have a Master of Marketing Research. [Doc. No. 90, Ex. Whiteside]. Ms. Whiteside had only one year of brand marketing experience, as she had been

2008 WL 350630

primarily a market researcher. *Id.* By contrast, Hampton had an MBA from Columbia and 21 years of brand marketing experience, and Strakosch had an MBA from the University of Virginia and 13 years of brand management experience. [Doc. No. 86 at 29.] Given that the candidates selected did not comport with the Company's own description of the job requirements, this procedural irregularity supports an inference that the qualification-based reason given for the selection was pretextual.

Since Plaintiffs were ten to twenty years older than the candidates selected, Plaintiffs generally had more years of marketing experience at Diageo and with other companies than did the people hired. However, the parties debate extensively the particular relevance of the posted jobs of the various types of experience possessed by each selected candidate as compared with that of Plaintiffs.

**\*8** Plaintiffs question the credibility of Defendants' emphasis on candidates having had experience in the regions where the brands of alcohol for which they would be responsible are most popular. Both sides raise numerous factual issues about which brands or categories of alcohol sell best or are most popular in which regions, suggesting that any differences in this respect may be negligible, both in magnitude and in importance. More significantly, Plaintiffs question why regional experience should be an important factor, especially since it would have been obtained primarily through the regional IMCs, a company structure which lasted only about a year, therefore limiting the duration and presumably the value of any regional experience gained through it. Plaintiffs question why, in returning to a national brand marketing strategy after a brief experiment with the regional strategy, Diageo would emphasize regional experience in the IMCs, such as that had by many of the selected individuals, rather than experience in national marketing, which was the nature of Plaintiffs' positions with the Company before the shift was made to IMCs.

Where, as here, Plaintiffs raise legitimate questions about whether the proffered reasons are credible or convincing, that goes toward establishing that the reason is pretextual. *Meiri v. Dacon,* 759 F.2d 989, 997 n. 13 (2d Cir.1985) (reasonableness of employer's justification for employment action is probative on question of pretext). Plaintiffs also contend that Defendants' explanations for the reasons certain candidates were selected have shifted over time.

That decision makers in the hiring process and some people who continued in their jobs essentially unchanged (called "lean-ins") were over 40 years old does not preclude age discrimination against Plaintiffs, as it is possible to discriminate against members of one's own protected class.

*See Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), quoting *Castaneda v. Partida,* 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Indeed, the alleged statement by Rob Malcolm, the head of Diageo Global Marketing, that "You want young stallions to run your business, with a few wise old owls" could be taken to evince an institutional preference for an age disparity between upper level management and the remainder of employees.

Plaintiffs have also testified about other comments arguably suggesting that the rationale offered by Defendants for their selection of other candidates over Plaintiffs is in fact a pretext for age discrimination, particularly the alleged statement to Hampton after the interviews by Alan Weber, who had conducted the interviews along with Waller, that "[T]he two of us are in the same boat. You may have the same problem as I do. You are not a young 35 year old." In support of their contention that Diageo has a "culture of age discrimination," Plaintiffs point to several other comments and actions, such as distribution of lists that contained interviewees' dates of birth, by persons in leadership roles within the company that appear to place an emphasis on age and to prefer younger workers. [Doc. No. 87 at 10–14.] Defendants raise various questions about whether these comments were in fact made, whether they were made by or known to persons with decision-making authority with respect to Plaintiffs' jobs, and what meaning and weight should be ascribed to the comments. It is appropriate for a jury as factfinder to make determinations regarding the weight, credibility, and meaning of such comments.

**\*9** Six people, all significantly younger than Plaintiffs, were selected for the available positions for which Plaintiffs applied, notwithstanding the fact that Plaintiffs had good records with the Company and were apparently qualified for the positions, and arguably more qualified than at least some of the applicants that were selected. The Court does not sit as a "super-personnel department" *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 106 (2d

Cir.2001), and Defendants offer reasons why each applicant was selected and why that person's experience was most suitable for the position. However, the alleged comments suggestive of age discrimination, the inconsistencies between the job descriptions and the qualifications of certain of the selected applicants, and the fact that some of the reasons given for selecting applicants are of questionable credibility and logic mean that Plaintiffs have demonstrated that the reasons articulated by Defendants for the selections may be a pretext for age discrimination. The evidence is strong enough to support an inference that Plaintiffs may not have been afforded the same consideration in the hiring/retention process as younger candidates. Therefore, a genuine issue of material fact exists as to whether Plaintiffs' age was a motivating factor in Defendants' failure to select them for the positions for which they applied or were considered, and in their resulting termination, and the Court is precluded from granting summary judgment to Defendants on Plaintiffs' age discrimination claims.

**B. Retaliation**

Plaintiffs' claims of retaliation are also analyzed under the three-part burden shifting analysis set forth in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. To make a prima facie case of retaliation, Plaintiffs must show by a preponderance of the evidence (1) that they participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Slattery,* 248 F.3d at 94. A plaintiff's burden at this stage is de minimus. *Id.* Once Plaintiff has established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 94–95. If Defendants are able to make this showing, then the burden shifts back to Plaintiff to prove that the proffered reason is merely a pretext for unlawful discrimination. *Id.* at 95.

The Plaintiffs engaged in protected activity when they filed an age discrimination claim with the CHRO on December 4, 2002. They notified Mark Waller and Diageo's Human Resources department. Waller, Suki Balet from Diageo Human Resources, and James Thompson subsequently attended a meeting to discuss the age discrimination claims. Therefore, Defendants were aware of Plaintiffs' participation in a protected activity.

The Second Circuit defines an "adverse employment action" as one in which a plaintiff endures a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal citations omitted); *see Williams v. R.H. Donnelley Corp.,* 368 F.3d 123, 128 (2d Cir.2004). For a change in working conditions to be "materially adverse," it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Employment actions that have been deemed sufficiently adverse include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (ellipsis in original) (citations omitted).

**\*10** Plaintiffs suffered adverse employment actions in that both were demoted from Level 4 (Director) to Level 5 (Manager), with the attendant loss of status and loss of opportunity to receive stock options, although their salaries were not decreased. In addition, Strakosch applied for the position of Director of Crown Royal in July 2003, and was interviewed but not selected. Finally, both Hampton and Strakosch were terminated during the summer of 2003.

Plaintiffs also allege a number of other retaliatory actions, including exclusion from meetings, the relocation of Plaintiff's offices, and inadequate supervision, among other complaints, some of which started before December 4, 2002, and none of which in themselves constitute an adverse employment actions. For an employment action to be sufficiently adverse, "there must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions or privileges of employment." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). Thus, courts have held that the relocation of a plaintiff's desk to another location, for example, does not constitute an adverse employment action. *See Sioson v. Knights of Columbus,* 160 F.Supp.2d 316, 322 (D.Conn.2001).

In order to establish a prima facie case, Plaintiffs must also show a causal connection between the protected activity and the adverse employment actions. In order for adverse employment action to be retaliatory, it must occur after the protected activity took place. Here, Plaintiffs filed their CHRO claim on December 4, 2002, which was after they began work on the Bass job in November 2002, undermining

their claim that the Bass assignment constituted retaliatory demotion. It is possible that retaliation could begin upon the employer's discovery of the employee's intent to file a claim or engage in other protected activity, but before the actual filing took place, but that has not been alleged here.

The issue of whether the Bass job could constitute retaliatory demotion is complicated by Plaintiffs' claim that they understood when they accepted the Bass position in November 2002 that it was a lateral move to another Level 4 position. They claim that they only subsequently discovered, through their failure to receive stock options at year end as Directors usually do, and through a mass email sent out by the Director of Lagers on January 10, 2003, that their new title was "Manager." Plaintiffs' contention that they initially understood the Bass job to be a lateral move is bolstered by the fact that their salaries did not change, and therefore they had no immediate notice in November 2002 of any change in rank. It is also supported by the fact, highlighted by Defendants, that "no one told [Plaintiffs that their] title or job level had officially been changed." [Doc. No. 82, at 34.] Defendants deny that Plaintiffs were demoted. *Id.* at 33–34. However, Plaintiffs have submitted Diageo's organizational charts dated December 2002 that show Plaintiffs labeled as "Manager."

**\*11** Notwithstanding that there is ample evidence upon which a reasonable jury could conclude that Plaintiffs were indeed demoted, Plaintiffs do not allege that the Bass jobs they accepted in November 2002 were Level 4 jobs that were only subsequently reconstituted as Level 5 jobs in retaliation for their December 2002 CHRO filing. While Plaintiffs clearly contend that they did not *know* in November 2002 that the Bass jobs were demotions [Doc. No. 87, at 43], Plaintiffs don't seem to dispute that, in reality, the jobs were indeed demotions from their inception in November 2002, and they offer no evidence to the contrary. *Id.* Therefore, while the demotions themselves and the less than forthright manner in which they were conducted may be relevant to the underlying claim of age discrimination, the November demotions cannot reasonably be attributed to retaliation for the December CHRO claim.

Similarly, the Bass jobs were characterized from the start as involving transitioning the product to a new distributor, and Plaintiffs knew when they accepted the Bass jobs in November 2002 that these were temporary positions that would not provide them with permanent employment with Diageo. [Doc. No. 87, at 43.] While they may have hoped to obtain other employment within the company in the interim,

the termination of their employment upon completion of the Bass project the following summer was a contingency they had agreed to in accepting the Bass jobs in November, and therefore the terminations cannot reasonably be attributed to retaliation for the December CHRO claim. Even if Hampton and Strakosch had been in permanent positions at the time of filing their CHRO complaint in early December, it is questionable whether their terminations seven and nine months later, respectively, would be sufficiently close in time to the CHRO complaint to demonstrate causation, given that temporal proximity of the adverse action to the protected activity is a key indicator of retaliation. *See Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at \*31–32, 2006 WL 413439 (D.Conn.2006); Clark City School Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Plaintiffs' failure to be selected, subsequent to their filing of the CHRO claims, for other Diageo positions for which they applied and were qualified, could potentially establish the causal connection between the protected activity and the adverse employment action that is required to establish a prima facie case of retaliation. However, during her approximately seven months of employment with Diageo following the filing of her CHRO claim, Plaintiff Hampton did not apply for any positions within the Company. She asserts that she did not apply because Mark Waller had told her she could apply but that all decisions would come through him, which she understood to mean that he would make sure she was not selected. Still, absent an application, there is no adverse employment action, and it is not reasonable to hold the Company accountable for Plaintiff's anticipation or speculation that she would be retaliated against if she were to apply, at least without more evidence than the single comment, which could be interpreted more than one way, to support her assessment.

**\*12** In the approximately nine months he was employed by Diageo after filing his CHRO claim, Plaintiff Strakosch applied for only one job, the Director of Crown Royal position, for which he was interviewed and not selected. Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment," "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *De Cintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987) (internal citations omitted). Strakosch offers

2008 WL 350630

no direct evidence that his failure to get the Crown Royal job was attributable to retaliatory animus, nor evidence of disparate treatment of similarly situated employees. While causation can be established for the sake of a prima facie case by temporal proximity alone, the gap between Strakosch's December 4, 2002 complaint and his failure to get the Crown Royal job in July 2003 makes the relationship between the two events rather remote.

Viewing all factual ambiguities in Plaintiffs' favor, the Court finds that there is insufficient evidence of any causal connection between the filing of the CHRO complaint and the subsequent adverse employment actions.

### C. Aiding and Abetting

Plaintiffs also brought an action for Aiding and Abetting Age Discrimination and Retaliation in Violation of Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen.Stat. 46a–60(a)(5), as to Defendant Mark Waller, contending that Waller aided and abetted his employer and co-defendant Diageo North America in its age discrimination. (Compl.¶ 45.) [Doc. No. 1.] The aiding and abetting claim was not among those that Defendants moved to dismiss. [Doc. No. 19.] Although Defendants move for summary judgment on "all counts" of Plaintiffs' Complaint [Doc. Nos. 78 & 81], Defendants' only argument with respect to the aiding and abetting claim appears in two sentences in a footnote, where they state that "[t]he aiding and abetting claim against Waller fails as a matter of law because Plaintiff does not allege discriminatory conduct by any person other than Waller himself." [Doc. Nos. 79 & 82 at n. 10, citing *Bolick v. Alea Group Holdings, Ltd.,* 278 F.Supp.2d 278, 282 (D.Conn.2003).]

Bolick held that a sole perpetrator cannot be held liable under the CFEPA for aiding and abetting, since by definition a person cannot aid and abet himself. *Id.* at 282–83. However, "an individual may aid and abet his employer's discrimination." *Id.* at 283, n. 5, citing *Jones v. Gem Chevrolet,* 166 F.Supp.2d 647, 650 (D.Conn.2001). Furthermore, "[t]his individual liability is particularly applicable to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct." *Id.,* citing *Wasik v. Stevens Lincoln–Mercury, Inc.,* 2000 U.S. Dist. LEXIS 15438, No. 3:98CV1083, 2000 WL 306048, at *6 (D.Conn. Mar.20, 2000). That is the scenario here.

*13 In deciding that the supervisor in *Bolick* was a sole perpetrator who was not aiding and abetting his employer, the court considered the fact that the company in that case had taken action against the supervisor with respect to the behavior at issue. *Bolick,* 278 F.Supp.2d at 282. No such evidence of attempts by Diageo to take action against Waller for age discrimination exist in this case. To the contrary, Plaintiffs have adduced evidence, discussed above, which could be construed as reflecting a culture of age discrimination within the Company, and in that context, Waller's actions can be seen as motivated by and responsive to cues regarding Company values, as transmitted from higher up within it. This paints Waller not as a sole perpetrator or rogue discriminator, in which case Diageo would be potentially liable for his actions only under the doctrine of respondeat superior, pursuant to Conn. Gen.Stat. § 46a–60(a)(1), and Waller could not be said to have aided and abetted himself. While Waller's actions are certainly the primary source for the Company's liability, Plaintiffs have also offered evidence that Waller's discrimination was sanctioned or invited by the Company's values. A factfinder could conclude that Waller's actions assisted Diageo in implementing an organizational preference for younger workers, and in that sense he aided and abetted age discrimination by the Company.

Alternatively, as *Bolick* noted, a perpetrator can also be subject to liability for aiding and abetting if acting in concert with others. *Bolick,* 278 F.Supp.2d at 282, citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1300–03 (2d Cir.1995) (abrogated on other grounds by *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)) and *Perks v. Town of Huntington,* 96 F.Supp.2d 222, 228 n. 2 (E.D.N.Y.2000) (interpreting the substantially similar New York correlate to CFEPA). To the extent that Waller was not the sole decision maker with respect to the non-selection of Plaintiffs for the jobs for which they applied, and for their subsequent demotions, he was acting in concert with others who had a say in those decisions. By its language, the aiding and abetting provision of the CFEPA "appears to contemplate liability towards a party who in some way helps or compels another to act in a discriminatory manner." *Bolick,* 278 F.Supp.2d at 282, quoting *Wasik,* 2000 U.S. Dist. LEXIS 15438, 2000 WL 306048, at *7. A reasonable factfinder could conclude that Waller exercised his authority to compel or

influence others to behave in ways that supported his and Diageo's alleged age bias against Plaintiffs.

Given that summary judgment has been granted with respect to the retaliation claim, Waller cannot be held liable for aiding and abetting retaliation which has been found not to have occurred, so summary judgment is **granted** as to Waller's aiding and abetting retaliation, but summary judgment is **denied** as to Waller's aiding and abetting age discrimination.

### D. Breach of Contract

 **\*14**  The breach of contract claim was limited in the Ruling on Defendants' Motion to Dismiss to the Resourcing Process, a series of web pages which provided information about the online application process and the selection process. A review of the Resourcing Process documents and consideration of the context in which they were presented reveals that they do not constitute a contract, express or implied, and therefore any deviation from them cannot constitute breach of contract.

Plaintiffs both signed contracts agreeing to at-will employment when they were hired. Hampton's employment contract additionally stated that "This agreement may be amended only in writing signed by the president of UDV NA on behalf of the company," and Strakosch's stated that "You understand that no manager or representative of UDV and/or its subsidiaries, other than the chairman or president of UDV Americas, has any authority to enter into any agreement for employment for any specific period of time, or to make any agreement contrary to the foregoing." Plaintiffs testified that they were at-will employees and that they had not received communications from the company president that indicated to them a change in that status.

Plaintiffs argue that Diageo President Paul Clinton's May 10, 2002 email, which announced the Resourcing Process and referred employees to an attached letter from Senior Human Resources Vice President Linda Sorrell for details, was intended to influence employees not to seek employment with other companies because of the statement in her letter that "My goal is to make sure that our resourcing process is clear, transparent, and—above all—fair." The letter then referred employees to the website which contained information about the procedures that would be used in the resourcing process through which employees would be selected for positions in the restructured marketing department. Neither the letter nor the resourcing process website itself contained a disclaimer of the intent to contract or to modify the terms of employees' existing employment contracts. Plaintiffs

maintain that Sorrell's statement regarding the goal to proceed fairly, combined with President Clinton's implicit endorsement of that statement through his email distribution of her letter, signified an intent to contract, and that Defendants' subsequent alleged deviations from certain of the procedures posted on the website, most notably the failure to post certain positions, constituted breach of contract.

Plaintiffs' argument is not persuasive. It seems doubtful that Clinton's circulation of Sorrell's letter constitutes an endorsement of the contents thereof that is significant enough to satisfy the express requirement in Plaintiffs' employment contracts that only the Company President or Chairman can modify employees' at-will employment status. Assuming, however, that the contents of the letter can be attributed to Clinton for this purpose, the statement regarding the goal of fairness is merely aspirational, and in any case fairness is so subjective that the announcement of the intent to pursue such, without more, can hardly be the basis for forming a contract modifying an at-will employment agreement. The Resourcing Process webpage is informational, and neither its content nor format can be reasonably construed as contractual. Furthermore, the Resourcing Process as described on the webpage clearly contemplates that some people will not receive offers for positions. Under "Selection Process," it reads, "If you are not selected for a position ..." and goes on to discuss severance policies.

 **\*15**  Because breach of contract requires both the existence of a contract and a violation of the terms of that contract, and because no reasonable factfinder could conclude that a contract had been formed, summary judgment is **granted** as to the breach of contract claim.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment [Doc. Nos. 78 and 81] are **granted** in part and **denied** in part. Defendants are awarded summary judgment on Plaintiffs' claims of retaliation, aiding and abetting retaliation, and breach of contract. Summary judgment is denied with respect to Plaintiffs' claims of age discrimination and aiding and abetting age discrimination.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 350630

2008 WL 350630

## Footnotes

1    A "lean-in" candidate was someone already performing a comparable function who was offered the position
     first.
2    A lower number indicates a higher level position; therefore, a Level 4 job entails more authority than a Level
     5 job.

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 1343265
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Gregory PETERS, Plaintiff,

v.

CITY OF STAMFORD, Defendant

No. 3:99–CV–764 CFD.
|
March 17, 2003.

*RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT*

DRONEY, J.

I. *Introduction*

**\*1** In this action, plaintiff Gregory Peters ("Peters") alleges that his current employer, the City of Stamford ("Stamford") violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the First and Fourteenth Amendments, and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–60(a)(1) ("CFEPA"). Specifically, he alleges that Stamford discriminated against him based on his race and retaliated against him on the basis of his opposition to certain enforcement actions of other health inspectors. The relief requested by Peters includes compensatory damages, punitive damages, injunctive relief, and costs and reasonable attorney's fees.

Pending is Stamford's motion for summary judgment [Doc. # 43].

II. *Background* [1]

Peters, an African–American, was hired by the Department of Health of Stamford (the "Health Department") on March 13, 1989 as a health inspector. Peters began at the position of "Sanitarian I" and, after an examination, was promoted to "Sanitarian II" on March 13, 1991. On February 7, 1994, Peters left his employment with Stamford to work for the City of Hartford. A few years later, he re-applied for employment with Stamford. On October 28, 1996, Stamford re-hired Peters as a "Provisional Sanitarian II," a temporary position. [2]

At that time, Peters was denied the permanent position of "Sanitarian II."

On May 6, 1997, Peters entered into a letter agreement with his union and Stamford for a permanent position. In accordance with the letter agreement, Peters became a "Health Inspector II" at level S–13(A) on the pay scale, and another temporary employee, Jane Gibeault ("Gibeault"), a Caucasian, became a "Health Inspector I" at level S–11(E) on the pay scale. The letter agreement did not specify the actual salaries that correlated to the pay scale figures for Peters and Gibeault. The letter agreement also provided for the payment of certain "stipends" in December 1997. [3]

Peters and Gibeault secured their new, permanent positions with Stamford without the merit testing and selection process. However, presumably in response to the "waiver" of Peters and Gibeault into these permanent positions, both Peters' and Gibeault's starting salaries were lower than they might have otherwise been if they had tested into their positions. Also, the letter agreement resulted in Gibeault's starting salary being higher than Peters' starting salary, because, though the letter agreement placed Gibeault at a lower grade than Peters on the pay scale, she was at a higher "step" and was thus initially paid more because of the overlapping grade system. Subsequently, however, in May 1998, Peters' salary became higher than Gibeault's, because his "step" in his grade on the pay scale increased.

Peters claims that Stamford's hiring him as a "Provisional Sanitarian II," rather than a permanent "Sanitarian II," paying him a lower starting salary pursuant to the May 6, 1997 letter agreement, and delay in paying him the stipends were the result of discrimination on the basis of his race and retaliation on the basis of his opposition to certain enforcement actions of other Stamford Health Department employees during his previous employment with Stamford. As to retaliation, Peters claims that, during his previous employment with Stamford, he spoke out against certain health inspection activities of his co-workers. Peters claims that he opposed "Sanitarian's wanton disregard of Director of Health closure notice," "selective enforcement activity against Asian operators," "policy of Sanitarian demanding operators purchase equipment from select merchants," "unfair claims for overtime personal work done on City time," "manner in which Sanitarians were assigned overtime," "destruction and removal of information from Department files," "police [sic] of barring non-Caucasions from conducting food service plan review,"

"falsification of inspection records," and "being pressured to issue permits for projects not in accord with Health regulations." Def's Ex. 4, Response to ¶ 13.

**\*2** On September 22, 1998, Peters filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), regarding his denial of the permanent position of "Sanitarian II," the lower pay he initially received pursuant to the May 6, 1997 letter agreement, as well as Stamford's delay in paying him the stipends. The CHRO complaint was apparently forwarded to the Equal Employment Opportunity Commission ("EEOC") on October 28, 1998. [4]

Peters filed this action on April 23, 1999, claiming discrimination on the basis of his race and retaliation. Peters alleges violations of Title VII, the First and Fourteenth Amendments, and the CFEPA.

III. *Standard*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).* A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir.1993)* (citation omitted). A dispute regarding a material fact is genuine " ' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.)* (quoting *Anderson, 477 U.S. at 248),* *cert. denied, 506 U.S. 965 (1992).* After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).*

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich, 963 F.2d at 523.* Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991), cert. denied, 502*

*U.S. 849 (1991); see also Suburban Propane v. Proctor Gas. Inc., 953 F.2d 780, 788 (2d Cir.1992).* Additionally "[w]here, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir.1999)* (citing *Celotex, 477 U.S. at 323–24* and *Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir.1998)).*

The Court exercises caution in granting summary judgment in favor of an employer in employment discrimination cases "when, as here, the employer's intent is at issue." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)* (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.1994)).* However, in order to defeat a defendant employer's motion for summary judgment, a plaintiff employee must offer "concrete evidence from which a reasonable juror could return a verdict in his favor" and may demand a trial simply because the central issue is the defendant employer's state of mind. *Dister v. Continental Group. Inc., 859 F.2d 1108, 1114 (2d Cir.1988)* (internal quotations omitted).

IV. *Discussion*

A. *Standing*

**\*3** At the outset, the Court will address Stamford's argument in its motion for summary judgment that Peters lacks standing to bring any of his causes of action because he "cannot quantify his damages." Def.'s Mem. Supp. Mtn. Summ. J. at 13.

Article III requires the Court to determine whether plaintiff has standing, prior to reaching the merits of the substantive claims. "To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some 'threatened or actual injury resulting from the putatively illegal action....' " *Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392 (1988)* (quoting *Warth v. Seldin, 422 U.S. 490, 499 (1975)).* The Supreme Court has further explained that "[t]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983)* (internal quotation

marks omitted). Resolving all ambiguities and drawing all inferences in favor of Peters, as the Court must on a motion for summary judgment, the Court concludes that Peters has set forth sufficient evidence of damages, specifically, evidence regarding the pay differential between his and Gibeault's salaries for the period where her salary was higher and the stipends that were allegedly delayed. Accordingly, the Court declines to grant summary judgment on this basis.

### B. *Title VII Claims* [5]

Title VII provides that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Peters alleges that Stamford violated Title VII in two ways: it discriminated against him on the basis of his race and it retaliated against him for opposing certain practices and policies of the Health Department and its employees. Each claim will be examined below.

#### 1. *Discrimination*

As to Peters' Title VII discrimination claim, Stamford makes two arguments in support of its motion for summary judgment: (1) Peters' complaint is untimely, and (2) the alleged adverse employment actions-Stamford's hiring him as a provisional, rather than permanent sanitarian, starting Peters at a lower salary then Gibeault pursuant to the May 6, 1997 letter agreement, and its delay in paying Peters certain stipends-did not occur under circumstances evincing an intent to discriminate, and thus, Peters has not put forward sufficient evidence to establish a prima facie case. Each issue will be discussed below.

#### a. *Untimeliness*

Generally, discrimination claims under Title VII must be filed with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). However, when one has filed a charge of discrimination in a state or locality that has its own anti-discrimination laws and an enforcement agency, the time period for filing claims with the EEOC is extended to 300 days of the occurrence of the allegedly unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1); *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996). Connecticut has both anti-discrimination laws and an anti-

discrimination agency-the CHRO-and Peters filed a charge of discrimination with the CHRO. Thus, the 300 day limit applies.

**\*4** Here, Peters filed his charge of discrimination with the CHRO on September 22, 1998. [6] As a result, incidents of discrimination that occurred before November 28, 1997, 300 days before September 22, 1998, are time-barred. *See* *Quinn v. Green Tree Credit Corp .,* 159 F.3d 759, 765 (2d Cir.1998).

Peters argues that the continuing violation exception applies in this case. *See* Pl.'s Opp'n Mtn. Summ. J. at 5. The Second Circuit has recognized an exception to the 300–day limitation period in cases involving a "continuing violation." *See* *Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir.1994).

As an initial matter, a plaintiff may not rely on the continuing violations exception unless he has asserted the theory in prior administrative proceedings. *See* *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001), *cert. denied,* 122 S.Ct. 2586 (2002). In his CHRO complaint, Peters alleged that Stamford violated his rights when it designated him as a "Health Inspector II" with a pay grade of S–13(A) on May 6, 1997 and later denied him certain stipends to which he was entitled. Def.'s Ex. 3. Peters also states in his CHRO complaint that he has "and continue[s] to feel aggrieved and humiliated by these circumstances." In the box entitled "Date Most Recent or Continuing Discrimination Took Place," Peters indicated September 22, 1998. While these statements do not clearly indicate Peters' reliance on a continuing violations theory, the Court concludes that they are sufficient to invoke the continuing violations exception here. *Cf.* *Fitzgerald,* 251 F.3d at 363 (determining that the plaintiff had sufficiently raised the issue where letters from the state agency indicated that the violations alleged began on a date that would otherwise have been time-barred, though in that case the agency also specifically stated that she was seeking to rely on a continuing violations theory).

The Second Circuit had previously held that the continuing violations doctrine extends the statute of limitations for all claims of discriminatory acts committed under an "ongoing policy of discrimination." *Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 82 (2d Cir.2001); *see also* *Fitzgerald,*

251 F.3d at 359 (holding that a continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice"); Quinn, 159 F.3d at 765 ("The continuing violation exception extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations.");

Harris v. City of New York, 186 F.3d 243, 250 (2d Cir.1999) (to allege a continuing violation, "the claimant must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy").

**\*5** The Supreme Court has recently clarified the continuing violation exception in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002). There, the Court foreclosed the use of the continuing violation doctrine to incorporate untimely claims for discrete discriminatory actions even though they may be related to a timely claim. The Court stated:

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act.... The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Morgan, 536 U.S. at ——, 122 S.Ct. at 2072. The Court also held, however, that "an employee need only file a charge within 180 or 300 days of any act that is part of [a] hostile work environment" because "incidents comprising a hostile

work environment are part of one unlawful employment practice, [and thus] the employer may be liable for all acts that are part of this single claim." Id. at 2075. According to the Court, discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." Id. at 2073.

Here, Stamford's hiring of Peters as a provisional sanitarian on October 28, 1996 is a discrete employment action. See id. (discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire"). Accordingly, the continuing violations theory does not apply to this employment action. Nor does Peters' complaint allege a hostile work environment. Accordingly, Peters' Title VII claim with regard to his failure to be hired as a permanent "Sanitarian II" on October 28, 1996 is time-barred. Moreover, Peters appears to have abandoned his claim of discrimination with regard to his October 28, 1996 hire. See Peters Dep. at 138 ("Q. Did anyone discriminate against you in hiring you back in October/ November of 1996? A. No, that's not my claim.").

Each paycheck issued to Peters pursuant to the May 6, 1997 letter agreement, until the increase in May 1998, is also a discrete employment action. See id. at 2071. In Bazemore v. Friday, 478 U.S. 385 (1986) (per curiam), the Supreme Court considered a discriminatory salary structure and held that although the salary discrimination began prior to the date that the act was actionable under Title VII, "[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII...."

478 U.S. at 395. Like termination, failure to promote, or refusal to hire, the issuance of a discriminatory paycheck is "easily identifiable" and "can be pinpointed in time."

Inglis v. Buena Vista Univ., 235 F.Supp.2d 1009, 1023 (N.D.Iowa 2002). Accordingly, the continuing violations theory does not apply to the pay issued to Peters pursuant to the May 6, 1997 letter agreement. However, Stamford's issuance of a discriminatory paycheck to Peters may be actionable even though it is part of a discriminatory pay structure that began outside the relevant limitations period. See id.; Morgan, 122 S.Ct. at 2071.

**\*6** As in Bazemore, however, those acts of discriminatory payment that fall within the statutory period are actionable only if the discriminatory pay structure was in place within the 300 day limitations period. See Bazemore, 478 U.S. at 395; Inglis, 235 F.Supp.2d at 1023–24. Here, Peters

filed his administrative claim in September 1998, which is within 300 days of when his pay allegedly ceased to be discriminatory-May 1998. *Cf.* *Inglis, 235 F.Supp.2d at 1023–25* (holding that Title VII claim was time-barred where administrative claim not brought within 300 days of discontinuance of discriminatory pay structure). Accordingly, each paycheck Peters received within 300 days of September 22, 1998, i.e., after November 28, 1997, that was less than Gibeault's is actionable under Title VII.

Peters has also presented evidence, namely his statements in interrogatory answers under oath, of other allegedly adverse employment actions that occurred after November 28, 1997. Specifically, Peters attests that Stamford failed to pay him certain stipends on several dates following November 28, 1997.[7] *See* Def.'s Ex. 4, Response to ¶ 10. According to *Morgan,* Peters' Title VII claims as to any adverse employment actions that occurred after November 28, 1997 are not time-barred. Thus, those stipends are actionable.

To sum up: as to Peters' allegation as to Stamford's hiring of him as a provisional sanitarian on October 28, 1996, the Court concludes that this claim is time-barred and must be dismissed. As to Peters' claims regarding the May 6, 1997 letter agreement and the stipends, the Court declines to grant summary judgment on the basis that these claims are time-barred. The Court will address the merits of these claims in the following section.

b. *Merits of Discrimination Claim*

Stamford also argues that Peters has failed to establish a prima facie case under *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)* as to his Title VII claims.

Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973),* a plaintiff alleging disparate treatment based on race in violation of Title VII must first establish a prima facie case of discrimination. To establish a prima facie case of race discrimination, a plaintiff must show (1) membership in a protected class, (2) qualification for continued employment, (3) an adverse employment action, and (4) circumstances that give rise to an inference of discrimination. *See* *McDonnell Douglas, 411 U.S. at 802.* The burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is "minimal." *James*

*v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000) (internal quotation marks omitted).

Once a prima facie case is established, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the plaintiff's termination. *See id.* If the employer does so, the plaintiff bears the "ultimate burden" of proving " 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." ' *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)); *see also* *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53 (1981). A plaintiff's prima facie case plus a showing of pretext may defeat a properly supported summary judgment but will not always do so. *See* *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 103 (2d Cir.2001) (citing *Reeves,* 530 U.S. at 146–48). Instead, the court must determine whether the plaintiff's proof could convince a reasonable fact-finder that discrimination motivated his employer. *See id.* In making this determination, the court should consider the strength of the prima facie case, the proof that defendants' explanation was false, and any other probative proof in the record. *See* *Allah v. City of New York Dep't of Parks & Recreation,* 47 Fed. Appx. 45, *49, 2002 WL 31119698 at * *3 (2d Cir. Sept. 25, 2002).

**\*7** Stamford contends that it is entitled to summary judgment as to Peters' race discrimination claim because Peters has failed to present sufficient evidence of one of the prongs of his prima facie case, namely, that the adverse employment actions occurred under circumstances giving rise to an inference of race discrimination.

However, the Court finds that Peters has satisfied the minimal burden of proving a prima facie case. Stamford does not challenge whether Peters is a member of the protected class of African–Americans, whether Peters was qualified for continued employment, or whether his lower starting salary and stipends constitute adverse employment actions.

As to the final prong, the Court concludes that Peters has satisfied his "minimal" burden of proving circumstances that give rise to an inference of discrimination. It appears from the record that Peters and Gibeault were similarly situated. They were both temporary health inspector employees and appear to have been of roughly the same capability. As well, they were "promoted" to permanent employee status pursuant

to the same May 6, 1997 letter agreement. Finally, Stamford does not dispute that Peters' starting salary was lower than Gibeault's. "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination...." *McGuinness v. McGuinness c. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001)). Additionally, Stamford has not set forth any non-discriminatory reasons for the pay differential. Accordingly, the Court concludes that Peters has established a prima facie case of race discrimination, and Stamford's motion for summary judgment on this claim is denied.

As to the stipends, however, the Court concludes that Stamford has demonstrated a legitimate, non-discriminatory reason for the delay in paying Peters stipends in 1998, and Peters has not demonstrated that this reason was a pretext for discrimination. In the affidavit of Margaret Murray, annexed as Exhibit 1 to Stamford's submission in support of its motion for summary judgment, Murray states that the stipends referred to by Peters are payments for certificates earned from the State of Connecticut. Murray Aff. at ¶ 21. According to Murray, "[a]ll employees seeking payment for such stipends are required to submit copies of the certificates earned before payment is made." *Id.* at ¶ 25. Murray goes on to state that "[o]n or about October, 1998, the plaintiff's stipends were held up because he declined to provide copies of the certificates he allegedly earned, as such are required to pay the stipend." *Id.* at ¶ 22. After the plaintiff provided the copies of certificates, Murray states, "the plaintiff was paid his stipends on March 11, 1999." *Id.* at ¶ 24.

Peters has not presented evidence sufficient to create a genuine issue of material fact "that the legitimate reason[ ] offered by the defendant were not its true reason[ ], but were a pretext for discrimination." *Reeves,* 530 U.S. at 143. That is, Peters has not presented sufficient evidence to suggest that his failure to timely submit the certificates was not the reason for Stamford's delay in paying him the stipends such that a reasonable fact-finder could conclude that discrimination motivated Stamford with regard to the stipends. *See Lizardo,* 270 F.3d at 103 (citing *Reeves,* 530 U.S. at 146–48).

**\*8** Thus, the Court declines to grant summary judgment as to Peters' Title VII claim of race discrimination regarding paychecks received after November 28, 1997 and pursuant

to the May 6, 1997 letter agreement. However, summary judgment is granted as to Peters' claim of race discrimination with regard to the stipends.

*2. Retaliation*

Under Title VII, "[i]t also ... [is] an unlawful employment practice for an employer to discriminate against any of his employees .... because [the employee] opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Fitzgerald,* 251 F.3d at 358 (quotations and citations omitted). To establish a prima facie case of retaliation, the plaintiff must show: (1) participation in a protected activity; [8] (2) the employer knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir.2001); *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999). Once a prima facie case is established, the burden of production shifts to the employer to show that a legitimate, nondiscriminatory reason existed for its action. *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001).

Peters claims that he opposed and spoke out against certain health inspection activities of his co-workers and that Stamford's hiring him as a provisional, rather than permanent, sanitarian on October 28, 1996, the lower pay he initially received in May 1997, and Stamford's delay in paying him certain stipends were in retaliation for such speech.

As to Peters Title VII retaliation claim regarding Stamford's hiring of him as a provisional sanitarian on October 28, 1996, the Court concludes, as above, that claim is time-barred. As to Peters' Title VII retaliation claim regarding the stipends, the Court concludes that, for the reasons discussed above, even assuming Peters has established a prima facie case of retaliation, Stamford has demonstrated a legitimate, non-discriminatory reason for the delay in paying Peters stipends, and he has not demonstrated that this reason was a pretext for retaliation.

As to Peters' retaliation regarding the paychecks received pursuant to the May 6, 1997 letter agreement, the Court

concludes that he has failed to establish a prima facie case of retaliation. As to the first prong of the inquiry, Peters stated in his answers to Stamford's supplemental interrogatories that he opposed and spoke out against selective enforcement practices by the Health Department against minorities. Def.'s Ex. 4, Responses to Interrogatories ¶ 13; Supplemental Responses to Interrogatories ¶ 22. Thus, he appears to have engaged in a protected activity. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) (stating first prong of inquiry to be whether plaintiff "engaged in protected activity by opposing a practice made unlawful by Title VII"). Peters' evidence also indicates that Stamford knew of the protected activity. As to the third prong, Stamford does not dispute that the lower pay he initially received in May 1997 is an adverse employment action.

 **\*9** As to the final prong, however, Peters has not produced any evidence indicating a causal connection between the protected activity and the adverse employment action. Peters' has not presented any direct evidence of such a causal connection. Nor has he presented any indirect evidence. "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. General Elec. Co.,* 252 F.3d 205, 218 (2d Cir.2001) (internal quotation marks omitted); *see also Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). To the extent Peters provided dates of his protected activity, *see* Def.'s Ex. 4, Responses to Interrogatories ¶ 15; Supplemental Responses to Interrogatories ¶ 19, those dates are not in close temporal proximity with the May 6, 1997 letter agreement or the subsequent discriminatory paychecks. *Cf. Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (two months between protected activity and allegedly adverse action sufficient to establish causation); *Phillips v. Bowen,* 278 F.3d 103, 109–11 (2d Cir.2002) (in First Amendment retaliation case, plaintiff presented some direct evidence of retaliation, as well as a close temporal relationship between the adverse action and the retaliatory actions, which, when viewed in combination, gave rise to a reasonable inference of retaliation).

Moreover, the fact that Stamford hired Peters after he voiced his opposition to the work practices belies the fact that his lower salary was attributable to retaliation. *Cf.*

*Rand v. CF Industries,* 42 F.3d 1139, 1147 (7th Cir.1994) (finding no reasonable inference of discrimination where discharged attorney was member of protected class when hired). Accordingly, summary judgment must be granted as to Peters' Title VII retaliation claims with regard to the May 6, 1997 letter agreement and the stipends.

### C. *Section 1983 Claims* [9]

#### 1. *Municipal Liability*

As to Peters' § 1983 claims, Stamford argues that Peters has failed to establish the municipal liability of Stamford. Although a city may not be liable under § 1983 for the unconstitutional actions of its employees under the doctrine of *respondeat superior,* it may be held responsible for its own conduct caused by unconstitutional policies. "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978). Thus, to impose liability on a municipality, the plaintiff must prove that a municipal policy or custom caused a deprivation. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 137 (2d Cir.1999). A "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690. A "custom" is a "persistent and widespread discriminatory practice ... so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691 (citation omitted.).

 **\*10** The policy or custom "need not be contained in an explicitly adopted rule or regulation," but actions by an official whose edicts or acts represent official policy may result in municipal liability under § 1983. *Wimmer,* 176 F.3d at 137. Thus, if the challenged action is directed by an official with "final policymaking authority," the municipality may be liable even in the absence of a broader policy. *See Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–83 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.")).

Such a policy may be inferred from circumstantial proof, but the mere assertion that a municipality has such a policy is generally insufficient to support such an inference.

*See* Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993). "A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id* .

The Court concludes that H. James Haselkamp, Jr.'s role as the Director of Labor Relations for Stamford, [10] and his signing of the May 6, 1997 letter agreement on behalf of Stamford, provide a sufficient basis for holding Stamford liable under § 1983. It appears from the record that Haselkamp had final policymaking authority with regard the hiring of Stamford employees and the terms and conditions of their employment. *See* Mandell, 316 F.3d at 385 ("Here, plaintiff challenges as retaliatory employment decisions made by Gallagher, who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies."); *cf.* Looby v. City of Hartford, 152 F.Supp.2d 181, 188 (D.Conn.2001) (finding no evidence that defendant fire chief had power to create policy with respect to employment decisions); DeLeon v. Little, 981 F.Supp. 728, 741 (D.Conn.1997) (finding no municipal liability where defendant had "lack of final decisionmaking authority over employment/personnel matters"). Accordingly, the Court declines to dismiss Peters' § 1983 claims against Stamford based on failure to show municipal liability. [11]

### 2. *Merits of* § 1983 *Claims*

As the Court found with regard to Peters' Title VII claims, Peters has established a prima facie case of race discrimination with regard to the May 6, 1997 letter agreement, failed to establish a prima facie case of race discrimination with regard to the stipends, and failed to establish a prima facie case of retaliation based on his opposition to certain of the Health Department's enforcement actions. Additionally, as noted above, Peters appears to have abandoned his claim of discrimination with regard

to Stamford's hiring of him as a provisional sanitarian on October 28, 1996. *See* Peters Dep. at 138 ("Q. Did anyone discriminate against you in hiring you back in October/November of 1996? A. No, that's not my claim.").

Accordingly, only Peters' § 1983 race discrimination claim with regard to the May 6, 1997 letter agreement remains in the case.

### D. *CFEPA Claim*

**\*11** The CFEPA provides that a claim of discrimination filed pursuant to Conn. Gen.Stat. § 46a–82 must be filed "within one hundred and eighty days after the alleged act of discrimination...." Conn. Gen.Stat. § 46a–82(e); *see* Williams v. Commission on Human Rights & Opportunities, 777 A.2d 645 (Conn.2001). Accordingly, for the reasons noted as to Peters' Title VII claims, the Court concludes that only Peters' race discrimination regarding paychecks received after March 26, 1998 and pursuant to the May 6, 1997 letter agreement are viable. *See* Maloney v. Connecticut Orthopedics, P.C., 47 F.Supp.2d 244, 247 (D.Conn.1999) (citing Malasky v. Metal Prods. Corp., 689 A.2d 1145 (Conn.App.1997), *cert. denied,* 241 Conn. 906, 695 A.2d 539 (1997)) (federal law on continuing violations theory is applicable to CFEPA).

### V. *Conclusion*

For the foregoing reasons, Stamford's motion for summary judgment [Doc. # 43] is GRANTED IN PART, DENIED IN PART. Only Peters' Title VII race discrimination claims with respect to paychecks received after November 28, 1997, Peters CFEPA race discrimination claims with respect to paychecks received after March 26, 1998, and Peters' section 1983 claims with regard to the May 6, 1997 letter agreement remain in the case.

### All Citations

Not Reported in F.Supp.2d, 2003 WL 1343265

**Footnotes**

1    The following facts are taken from the parties' Local Rule 9(c) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

2    The record does not make clear Peters' job duties. However, they appear to relate to health inspection and other environmental health functions.

3    These stipends appear to be payments for completing certain training programs.

4    The results of the CHRO and EEOC complaints are not apparent from the record.

5    Though it is unclear from the complaint, Peters appears to bring both race discrimination and retaliation claims pursuant to Title VII.

6    The Court assumes for the purposes of this ruling that Peters' filing with the CHRO controls for purposes of the determining the relevant limitations period.

7    Peters also states several other discriminatory and/or retaliatory employment actions allegedly occurred after November 28, 1997. Those include: barring him from certain job duties; confiscating certain of his work materials; harassing him; threatening him; unfairly reprimanding him; denying him training; denying him "due process and protection from harassment"; subjecting him to "racially derogatory statements about competence and qualifications of Black Inspectors." Def.'s Ex. 4. However, Peters does not allege these "adverse employment actions" in his CHRO complaint or the instant complaint. Accordingly, the Court will not address them as claimed "adverse employment actions" that resulted because of discrimination or retaliation.

8    Making informal complaints such as those to management is a protected activity under Title VII. *Gonzalez v. Bratton,* No. 96 CIV. 6330(VM), 97 CIV. 2264(VM), 2000 WL 1191558, at 12 n. 4 (S.D.N.Y. Aug. 22, 2000).

9    Again, though it is unclear from the complaint, Peters appears to bring both equal protection race discrimination and First Amendment retaliation claims pursuant to 42 U.S.C. § 1983.

10   According to the May 6, 1997 letter, Haselkamp was the Director of Labor Relations for Stamford. In the deposition of Peters, counsel for Stamford describes Haselkamp as the "former director of Human Resources." Peters Dep. at 227.

11   This is without prejudice to Stamford presenting evidence to the Court at trial that Haselkamp did not have such authority. However, this is a question of law for the Court to decide, not a question of fact for the jury to resolve. *See Jett v. Dallas Indep. School. Dist.,* 491 U.S. 701, 737 (1989) (whether a person has final decision-making authority is "a legal question to be resolved by the trial judge before the case is submitted to the jury").

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.