# Exhibit 1



**State of Connecticut**
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702
*Promoting Equality and Justice for all People*

May 13, 2020

Yale University
Caroline Hendel/Senior Associate General Counsel
Caroline.hendel@yale.edu

Patrick Noonan/Donahue, Durham & Noonan, P.C.
pnoonan@ddnctlaw.com

RE:     CHRO No.:   2030529 - Oliver vs. Yale University
                    2030533 - Oliver vs. Yale University
                    2030537 - Castro vs. Yale University
                    2030538 – Reinhart vs. Yale University
                    2030542 – Boules vs. Yale University
                    2030544 - Eltorai vs. Yale University

Dear Respondent:

A complaint, referenced above, has been filed against you with the Commission.  A copy of the complaint is attached.

The enclosed General Notice advises you of your rights, duties and responsibilities.  Please read carefully the information contained in the notice.  The enclosed Notice Regarding Out of State Attorneys advises that all attorneys practicing before the Commission must be admitted to practice law in Connecticut and that it is the responsibility of all counsel to comply with Connecticut practice rules.  Also enclosed is important information with respect to the no fault conciliation process.  The Commission is available to assist you if you wish to pursue settlement of this complaint.  If you wish to conciliate the complaint prior to providing an answer, you must notify the Commission within **10 days** of receipt of the enclosed complaint.

**You must file a written answer to the complaint under oath with the Commission within 30 days of receipt of this complaint unless pre-answer conciliation has been requested.  If you fail to answer the complaint within this time, you may be defaulted by the Commission.  Parties are encouraged to submit all filings by email only without an additional hardcopy if possible.  You must email a scanned copy of your signed and notarized answer to susan.mota@ct.gov and chro.westcentral@ct.gov**

You have a duty to certify to the Commission that you have provided the complainant with copies of all documents you file with the Commission. You also have a duty to ensure that personal identifying



**State of Connecticut**

**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

information is redacted from any documents provided to the Commission. Personal identifying information includes an individual's mother's maiden name; motor vehicle operator's license number; Social Security number; other government issued identification number except for juris, license, permit or other business related identification numbers that are otherwise made available to the public directly by any government agency or entity; health insurance identification number; or any financial account number, security code or personal identification number (PIN). For your convenience and use, the enclosed Certification Form is made available.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Shawn Burns, Regional Manager
West Central Region

Enclosures:   Affidavit
              Schedule A Request for Additional Information
              General Notice
              Certification of Mailing
              Notice Regarding Out of State Attorneys



# State of Connecticut
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
West Central Region Office, 55 West Main Street, 2nd Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

May 13, 2020

RE:     2030529 - Oliver vs. Yale University
        2030533 - Oliver vs. Yale University
        2030537 - Castro vs. Yale University
        2030538 – Reinhart vs. Yale University
        2030542 – Boules vs. Yale University
        2030544 – Eltorai vs. Yale University

Dear Sir/Madam:

This letter confirms that your complaint, referenced above, has been filed with the Commission.

The enclosed General Notice advises you of your rights, duties and responsibilities. **Please read carefully the information contained in the notice.**

You have a duty to respond timely to any information or assistance requested and to cooperate with the Commission at all times. It is your sole duty and responsibility to notify the Commission of your whereabouts at all times throughout the pendency of this complaint. In the event that your address, telephone number or email address changes, it is your duty to notify the Commission immediately in writing. **Parties are encouraged to submit all filings by email only without an additional hardcopy if possible. Emailed filings with susan.mota@ct.gov; chro.westcentral@ct.gov should be emailed to: Commission on Human Rights & Opportunities, Rowland State Government Center, 55 West Main Street, Suite 210, Waterbury, CT  06702.**

Also, you have a duty to certify to the Commission that you have provided the Respondent with copies of all documents you file with the Commission. For your convenience and use, the enclosed Certification Form is made available.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Shawn Burns, Regional Manager
West Central Region
Encl.

cc:  Complainant's Attorney:   Tanvir Rahman/Wigdor LLP
                               trahman@wigdorlaw.com

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Tanvir H. Rahman**
trahman@wigdorlaw.com

May 1, 2020

**VIA EMAIL**

Rebecca J. Cannon-Klemenz
Human Rights and Opportunities Representative
Connecticut Commission on Human Rights and Opportunities
55 West Main Street, Suite 210
Waterbury, CT 06702

> Re:   CHRO Charges of Elizabeth Reinhart, M.D., Mia Castro, M.D., Jodi-Ann Oliver,
> M.D., Lori-Ann Oliver, M.D., Ashley Eltorai, M.D. and Heidi Boules, M.D.

Dear Ms. Cannon-Klemenz,

Enclosed, please find State of Connecticut Commission on Human Rights and Opportunities ("CHRO") Complaints (the "CHRO Charges") for Claimants Elizabeth Reinhart, M.D., Mia Castro, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D., Ashley Eltorai, M.D. and Heidi Boules, M.D. (together, "Claimants"), in connection with their previously filed Charges of Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC") (the "EEOC Charges"), which we understand were previously cross-filed with the CHRO. The EEOC Charges for Dr. Reinhart, Dr. Castro, Dr. Eltorai and Dr. Boules were filed on December 4, 2019, while the EEOC Charges for Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver were filed on December 5, 2019. As we have discussed, these are the dates on which the CHRO will consider Claimants' respective CHRO Charges to have been filed.

Please note that Claimants have already commenced an action in federal court against the Respondents named in their CHRO and EEOC Charges. Moreover, please note that earlier today, the EEOC issued Notices of Right to Sue to each Claimant. Claimants intend to promptly amend their federal court complaint to add claims under Title VII. Accordingly, we respectfully request that the CHRO also release jurisdiction over Claimants' Connecticut Fair Employment Practices Act ("FEPA") claims so that Claimants can also bring these claims in their federal court action.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Tanvir H. Rahman

Enc.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. __2030529__ | Date: __12/6/19__ |
| EEOC No. ____ | |

| | |
|---|---|
| My name is: | Lori-Ann Oliver M.D. |
| My mailing address is: | c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003 |
| My telephone number is: | (212) 257-6800 |
| My email address is: | trahman@wigdorlaw.com |
| The respondent is: | Yale University, Yale New Haven Hospital and ~~~~ |
| Whose business address is: | 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510 |

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | |
|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | |
| ☐ | terminated | _____ | ☐ not hired/promoted | _____ |
| ☐ | suspended | _____ | ☐ given unequal duties | _____ |
| ☐ | placed on probation | _____ | ☐ harassed | _____ |
| ☐ | demoted | _____ | ☒ sexually harassed | Ongoing |
| ☐ | warned | _____ | ☐ earning different pay | _____ |
| ☐ | given a poor evaluation | _____ | ☐ constructively discharged | _____ |
| ☐ | denied a raise | _____ | ☒ retaliated against | Ongoing |
| ☐ | less trained | _____ | ☐ transferred | _____ |
| ☐ | denied an office | _____ | ☐ given difficult assignment | _____ |
| ☐ | denied equal service(s) | _____ | ☐ not recalled | _____ |
| ☐ | other: _____ | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | |
|---|---|---|---|
| ☐ | Race _____ | ☐ | Mental disability _____ |
| ☐ | Color _____ | ☐ | Intellectual disability _____ |
| ☐ | Religious creed _____ | ☐ | Learning disability _____ |
| ☐ | Age _____ | ☐ | Physical disability _____ |
| ☐ | Gender identity/expression _____ | ☐ | Veteran status _____ |
| ☐ | Marital status _____ | ☐ | Prior criminal conviction _____ |
| ☐ | National origin _____ | ☐ | Sexual orientation _____ |
| ☒ | Sex:  ☐ Male  ☒ Female _____ | ☐ | Pregnancy _____ |
| ☐ | Ancestry _____ | ☐ | Lawful source of income _____ |
| ☐ | Other: _____ | ☐ | Genetic information _____ |
| ☐ | Previous opposition to discriminatory conduct | | _____ |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF68902A

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)
☐ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80
☐ CONN. GEN. STAT. § 46a-81

☐ Other

☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)

☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)

☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

☐ Equal Pay Act of 1964, U.S.C. § 206

☐ Section 504 of the Rehabilitation Act of 1973

I provide the following particulars:

See attached supplement.

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**
———————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,
ASHLEY ELTORAI, M.D., JODI-ANN
OLIVER, M.D., LORI-ANN OLIVER, M.D. and
ELIZABETH REINHART, M.D.,

                   Claimants,

        v.

YALE UNIVERSITY YALE NEW HAVEN
HOSPITAL, INC., and MANUEL LOPES
FONTES, M.D.,

                   Respondents.
———————————————————— X

EEOC No.: _____

**SUPPLEMENT TO CHARGE OF**
**DISCRIMINATION AND**
**RETALIATION**

     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

**PRELIMINARY STATEMENT**

    1.    Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

    2.    Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.    DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

4

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.    DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor.  However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey.  However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences.  However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: 93EE3763-73BC-4BA7-AB4B-732DFF88902A

72.    Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.    This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.    Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.    Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.    Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.   DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.   DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

DocuSign Envelope ID: 93EE37637FB87A64B732D7F88902B

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.    Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.    It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.    In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Lori-Ann Oliver, M.D. _____ being duly sworn, on oath, states that s/he is the Complainant herein; that s/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this ___05/01/2020___

Compl____ *Dr. Lori-Ann Oliver* _
DocuSigned by:
D2D32419D0F444C...

Subscribed and sworn before me on _____.
Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030533_ | Date: _12/6/19_ |
| EEOC No. _____ | |

My name is: Jodi-Ann Oliver M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Yale University,
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | | |
| ☐ | terminated | | ☐ | not hired/promoted | |
| ☐ | suspended | | ☐ | given unequal duties | |
| ☐ | placed on probation | | ☐ | harassed | |
| ☐ | demoted | | ☒ | sexually harassed | Ongoing |
| ☐ | warned | | ☐ | earning different pay | |
| ☐ | given a poor evaluation | | ☐ | constructively discharged | |
| ☐ | denied a raise | | ☒ | retaliated against | Ongoing |
| ☐ | less trained | | ☐ | transferred | |
| ☐ | denied an office | | ☐ | given difficult assignment | |
| ☐ | denied equal service(s) | | ☐ | not recalled | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | | ☐ | Mental disability |
| ☐ | Color | | ☐ | Intellectual disability |
| ☐ | Religious creed | | ☐ | Learning disability |
| ☐ | Age | | ☐ | Physical disability |
| ☐ | Gender identity/expression | | ☐ | Veteran status |
| ☐ | Marital status | | ☐ | Prior criminal conviction |
| ☐ | National origin | | ☐ | Sexual orientation |
| ☒ | Sex: ☐ Male ☒ Female | | ☐ | Pregnancy |
| ☐ | Ancestry | | ☐ | Lawful source of income |
| ☐ | Other: | | ☐ | Genetic information |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)
☐ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80
☐ CONN. GEN. STAT. § 46a-81

☐ Other

☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)

☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)

☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

☐ Equal Pay Act of 1964, U.S.C. § 206

☐ Section 504 of the Rehabilitation Act of 1973

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
—————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN   :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :   EEOC No.: _____
ELIZABETH REINHART, M.D.,   :
                  :
          Claimants,   :   **SUPPLEMENT TO CHARGE OF**
                  :   **DISCRIMINATION AND**
     v.           :   **RETALIATION**
                  :
YALE UNIVERSITY YALE NEW HAVEN   :
HOSPITAL, INC., and MANUEL LOPES   :
FONTES, M.D.,   :
                  :
          Respondents.   :
—————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.    Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.    Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut.  Dr. Reinhart meets the definition of "employee" under all applicable statutes.  Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut.  Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale.  Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale.  At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof.  Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.    DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

19. Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20. Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21. Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22. Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23. As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24. Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25. There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: 6FE84EC2-2CEAD-4EFF-B842-F0BEB7A78838

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

33. Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34. By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35. After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36. Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37. Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38. Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

V.     **PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI**

a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr, Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE67A76930

53.    Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.    The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.    The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.    Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.    Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.    Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-BB42-F0BE87A76930

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai).  Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her.  However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B842-FDBE67A76930

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.   This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.   Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.   Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.   Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.   Sexual Harassment

70.   Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.   In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: 6FE84EC2-0EA0-4EFE-B842-F6B267A7589C

72.    Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.    This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.    Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.    Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.    Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition.  Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project.  Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis.  Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.    However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.    Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.    Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

14

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.     DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94. Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95. Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96. As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97. Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98. Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99. Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100. While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.   Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.   It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.   In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 6FE84EC2-CEAD-4EFE-B642-F0BE87A76930

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Jodi-Ann Oliver, M.D._____ being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT_____ on this ____05/01/2020_____

Complainant ___*Dr. Jodi-Ann Oliver*___
835CCC809D3541E...

Subscribed and sworn before me on _____.
Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030537_ | Date: _12/6/19_ |
| EEOC No. _____ | |

My name is: Mia Castro, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Yale University,
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | ☐ | not hired/promoted | |
| ☐ | terminated | | ☐ | given unequal duties | |
| ☐ | suspended | | ☐ | harassed | |
| ☐ | placed on probation | | ☒ | sexually harassed | Ongoing |
| ☐ | demoted | | ☐ | earning different pay | |
| ☐ | warned | | ☐ | constructively discharged | |
| ☐ | given a poor evaluation | | ☒ | retaliated against | Ongoing |
| ☐ | denied a raise | | ☐ | transferred | |
| ☐ | less trained | | ☐ | given difficult assignment | |
| ☐ | denied an office | | ☐ | not recalled | |
| ☐ | denied equal service(s) | | | | |
| ☐ | other: | | | | |

**I believe that my …**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | ☐ | Mental disability | |
| ☐ | Color | ☐ | Intellectual disability | |
| ☐ | Religious creed | ☐ | Learning disability | |
| ☐ | Age | ☐ | Physical disability | |
| ☐ | Gender identity/expression | ☐ | Veteran status | |
| ☐ | Marital status | ☐ | Prior criminal conviction | |
| ☐ | National origin | ☐ | Sexual orientation | |
| ☒ | Sex: ☐ Male ☒ Female | ☐ | Pregnancy | |
| ☐ | Ancestry | ☐ | Lawful source of income | |
| ☐ | Other: | ☐ | Genetic information | |
| ☐ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

| | | | |
|---|---|---|---|
| ☒ | CONN. GEN. STAT. § 46a-60(b)(1) | ☒ | Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed) |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(4) | | |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(5) | | |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(7) | ☐ | Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed) |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(8) | | |
| ☐ | CONN. GEN. STAT. § 46a-64 | | |
| ☐ | CONN. GEN. STAT. § 46a-70 | ☐ | Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. |
| ☐ | CONN. GEN. STAT. § 46a-71 | | |
| ☐ | CONN. GEN. STAT. § 46a-80 | ☐ | Equal Pay Act of 1964, U.S.C. § 206 |
| ☐ | CONN. GEN. STAT. § 46a-81 | ☐ | Section 504 of the Rehabilitation Act of 1973 |
| ☐ | Other | | |

I provide the following particulars:

See attached supplement.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
————————————————————————— X
HEIDI BOULES, M.D., MIA CASTRO, M.D.,      :
ASHLEY ELTORAI, M.D., JODI-ANN            :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and   :    EEOC No.: _____
ELIZABETH REINHART, M.D.,                 :
                                          :
                      Claimants,          :    SUPPLEMENT TO CHARGE OF
                                          :    DISCRIMINATION AND
            v.                            :    RETALIATION
                                          :
YALE UNIVERSITY YALE NEW HAVEN            :
HOSPITAL, INC., and MANUEL LOPES          :
FONTES, M.D.,                             :
                                          :
                      Respondents.        :
————————————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

previously worked) is well known and documented.  Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion.  To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who

too, like Ms. Reinhart, has lodged repeated complaints against him.

8.     Such sexually harassing and intimidating conduct has no place in medicine.  As a

result of the other conduct described herein, Respondents have unquestionably violated relevant

statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.     Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York.

Dr. Boules meets the definition of "employee" under all applicable statutes.  Dr. Boules is

currently an attending physician and assistant professor of clinical anesthesiology within the

anesthesiology department at Yale.

10.    Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut.  Dr.

Castro meets the definition of "employee" under all applicable statutes.  Dr. Castro is currently a

pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.    Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut.

Dr. Eltorai meets the definition of "employee" under all applicable statutes.  Dr. Eltorai is

currently an attending physician and assistant professor of anesthesiology within the

anesthesiology department at Yale.

12.    Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is

currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.    Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut.

Dr. Oliver meets the definition of "employee" under all applicable statutes.  Dr. Oliver is

currently an attending physician and assistant professor of clinical anesthesiology at Yale.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut.  Dr. Reinhart meets the definition of "employee" under all applicable statutes.  Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut.  Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale.  Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale.  At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof.  Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.    DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

26.    Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.    While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.    However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.    While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.    This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.    Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.    DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.    Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

33.     Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show -- probably very soon, since you have such a flat stomach."

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66. This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67. Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68. Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69. Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b. Sexual Harassment

70. Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71. In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.    Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.    Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.    Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.    However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.    Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.    Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.   DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

101.    This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.    Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.    Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.    Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.    Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.    As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr.

Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his

behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email

in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's

inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new

departmental initiative aimed at promoting a departmental culture that values and supports

diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who

had been sexually harassed and discriminated against by Dr. Fontes because of their gender

and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department

had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful

behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints

against Dr. Fontes beyond the anesthesiology department, including to the Yale University

Graduate Medical Education ("GME") department, the University's Title IX Department and the

University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes

has continued to this day to sexually harass Claimants, as upon information, other female Yale

employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando,

Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes,

who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113.     Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.     It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.     In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: 95026B5B-072F-4266-8C46-4BC0BDBC309F

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Mia Castro, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in __New Haven, CT__ on this __05/01/2020__

Compl____ _____

Subscribed and sworn before me on _____.
Date

Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030538_ | Date: _12/6/19_ |
| EEOC No. _____ | |

| | |
|---|---|
| My name is: | Elizabeth Reinhart, M.D. |
| My mailing address is: | c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003 |
| My telephone number is: | (212) 257-6800 |
| My email address is: | trahman@wigdorlaw.com |
| The respondent is: | Yale University, ____ ~~Haven Hospital~~ ~~Manuel Lopez Fert~~ |
| Whose business address is: | 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510 |

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | | |
| ☐ | terminated | _____ | ☐ | not hired/promoted | _____ |
| ☐ | suspended | _____ | ☐ | given unequal duties | _____ |
| ☐ | placed on probation | _____ | ☐ | harassed | _____ |
| ☐ | demoted | _____ | ☒ | sexually harassed | Ongoing |
| ☐ | warned | _____ | ☐ | earning different pay | _____ |
| ☐ | given a poor evaluation | _____ | ☐ | constructively discharged | _____ |
| ☐ | denied a raise | _____ | ☒ | retaliated against | Ongoing |
| ☐ | less trained | _____ | ☐ | transferred | _____ |
| ☐ | denied an office | _____ | ☐ | given difficult assignment | _____ |
| ☐ | denied equal service(s) | _____ | ☐ | not recalled | _____ |
| ☐ | other: | _____ | | | _____ |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race _____ | ☐ | Mental disability _____ |
| ☐ | Color _____ | ☐ | Intellectual disability _____ |
| ☐ | Religious creed _____ | ☐ | Learning disability _____ |
| ☐ | Age _____ | ☐ | Physical disability _____ |
| ☐ | Gender identity/expression _____ | ☐ | Veteran status _____ |
| ☐ | Marital status _____ | ☐ | Prior criminal conviction _____ |
| ☐ | National origin _____ | ☐ | Sexual orientation _____ |
| ☒ | Sex: ☐ Male ☒ Female _____ | ☐ | Pregnancy _____ |
| ☐ | Ancestry _____ | ☐ | Lawful source of income _____ |
| ☐ | Other: _____ | ☐ | Genetic information _____ |
| ☐ | Previous opposition to discriminatory conduct | | |

**Was/Were in part a factor(s) in this action.**

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)  ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)

☐ CONN. GEN. STAT. § 46a-60(b)(4)

☒ CONN. GEN. STAT. § 46a-60(b)(5)

☐ CONN. GEN. STAT. § 46a-60(b)(7)  ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)

☒ CONN. GEN. STAT. § 46a-60(b)(8)

☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70  ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

☐ CONN. GEN. STAT. § 46a-71

☐ CONN. GEN. STAT. § 46a-80  ☐ Equal Pay Act of 1964, U.S.C. § 206

☐ CONN. GEN. STAT. § 46a-81  ☐ Section 504 of the Rehabilitation Act of 1973

☐ Other _____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN   :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and   :     EEOC No.: _____
ELIZABETH REINHART, M.D.,   :
    :
                            Claimants,   :     **SUPPLEMENT TO CHARGE OF**
    :     **DISCRIMINATION AND**
            v.   :     **RETALIATION**
    :
YALE UNIVERSITY YALE NEW HAVEN   :
HOSPITAL, INC., and MANUEL LOPES   :
FONTES, M.D.,   :
    :
                            Respondents.
————————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.      Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.      Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.        Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.        Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.        Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.        This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.        Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.     Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.     At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.     At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.     At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.     DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES**

18.     Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

4

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

33.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

7

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.     PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

### a.     Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.     This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.     Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.     Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.     Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.     Sexual Harassment

70.     Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.     In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

72.   Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.   This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.   Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.   Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.   Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.   Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.   At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.      Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.      Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.      Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.      However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.    DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.      Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.      Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85. Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86. Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87. Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88. During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89. At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90. Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91. Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII. DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92. Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93. In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

101.   This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.   Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.   Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.   Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.   Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.   As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.   Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.   Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.   This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.   Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.   Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.   Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.,* Dr. Eltorai.

113.   Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114.   It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

## CONCLUSION

115.   In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

DocuSign Envelope ID: F43146B4-E188-43E4-A51D-81F09518DAD5

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

_Elizabeth Reinhart, M.D._ being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this ___05/01/2020___

Complainant _____

Subscribed and sworn before me on _____.
                                          Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

### STATE OF CONNECTICUT
### COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. _2030542_ | Date: _12/6/19_ |
| EEOC No. _____ | |

My name is: Heidi Boules, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Yale University, Y_____
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

- ☒ discriminated against in terms and conditions   Ongoing
- ☐ terminated _____
- ☐ suspended _____
- ☐ placed on probation _____
- ☐ demoted _____
- ☐ warned _____
- ☐ given a poor evaluation _____
- ☐ denied a raise _____
- ☐ less trained _____
- ☐ denied an office _____
- ☐ denied equal service(s) _____
- ☐ other: _____

- ☐ not hired/promoted _____
- ☐ given unequal duties _____
- ☐ harassed _____
- ☒ sexually harassed   Ongoing
- ☐ earning different pay _____
- ☐ constructively discharged _____
- ☒ retaliated against   Ongoing
- ☐ transferred _____
- ☐ given difficult assignment _____
- ☐ not recalled _____

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

- ☐ Race _____
- ☐ Color _____
- ☐ Religious creed _____
- ☐ Age _____
- ☐ Gender identity/expression _____
- ☐ Marital status _____
- ☐ National origin _____
- ☒ Sex: ☐ Male ☒ Female _____
- ☐ Ancestry _____
- ☐ Other: _____
- ☐ Previous opposition to discriminatory conduct

- ☐ Mental disability _____
- ☐ Intellectual disability _____
- ☐ Learning disability _____
- ☐ Physical disability _____
- ☐ Veteran status _____
- ☐ Prior criminal conviction _____
- ☐ Sexual orientation _____
- ☐ Pregnancy _____
- ☐ Lawful source of income _____
- ☐ Genetic information _____

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

| | | |
|---|---|---|
| ☒ | CONN. GEN. STAT. § 46a-60(b)(1) | ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed) |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(4) | |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(5) | |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(7) | ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed) |
| ☒ | CONN. GEN. STAT. § 46a-60(b)(8) | |
| ☐ | CONN. GEN. STAT. § 46a-64 | |
| ☐ | CONN. GEN. STAT. § 46a-70 | ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. |
| ☐ | CONN. GEN. STAT. § 46a-71 | |
| ☐ | CONN. GEN. STAT. § 46a-80 | ☐ Equal Pay Act of 1964, U.S.C. § 206 |
| ☐ | CONN. GEN. STAT. § 46a-81 | ☐ Section 504 of the Rehabilitation Act of 1973 |
| ☐ | Other | |

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**

—————————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,   :
ASHLEY ELTORAI, M.D., JODI-ANN        
OLIVER, M.D., LORI-ANN OLIVER, M.D. and  :
ELIZABETH REINHART, M.D.,            :
                                        :
                  Claimants,     :
                                          :
         v.                 :
                                          :
YALE UNIVERSITY YALE NEW HAVEN     :
HOSPITAL, INC., and MANUEL LOPES    :
FONTES, M.D.,                 :
                                          :
                  Respondents.   :

—————————————————————— X

EEOC No.: _____

**SUPPLEMENT TO CHARGE OF
DISCRIMINATION AND
RETALIATION**

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.     Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3.      Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4.      Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5.      Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6.      This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7.      Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven,

Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr.

Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to

employ all Claimants, controls and has controlled the terms and conditions of Claimants'

employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed

and continues to employ all Claimants, controls and has controlled the terms and conditions of

Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident

of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity,

and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical

Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale

University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department

at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and

authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the

definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left

and/or was dismissed from at least two other medical institutions after having engaged in sexual

harassment towards and/or inappropriate sexual conduct with female subordinates.

4

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

19.    Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician.  We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.    Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.    Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.    Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.    As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.    Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.    There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.    Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.    While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.    However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.    While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.    This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.    Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.    DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.    Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

33.     Throughout her employment at Yale, she has reported to Dr. Fontes.  However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.     By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.     After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.     Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections.  Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.     Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification.  Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.     Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her.  This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case.  Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

DocuSign Envelope ID: F7327144-56B5-43DB-9108-797F94F1BA9B

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes. As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.   DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues. Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.    Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro, this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used her vacation time (of which residents and fellows are given very little), purportedly because the trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.    However, it was not true that such a trip would interfere with Dr. Castro's fellowship requirements, as such a trip is considered by many fellowship programs, and even the American Board of Anesthesiology, as an acceptable part of fellowship training.

48.    Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the American Board of Anesthesiology would approve and accredit this mission trip to Peru so long as the relevant application was submitted, he inexplicably continued to refuse to permit Dr. Castro to go on this trip unless she used her vacation time.

49.    There was no legitimate basis for Dr. Fontes to impose this unnecessary and punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform her job and caused her tremendous unnecessary stress.

## V.    PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND RETALIATION AGAINST DR. ELTORAI

a.    Pregnancy Discrimination

50.    Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of anesthesiology at Yale, specializing in cardiac anesthesiology.

51.    In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a due date of May 1, 2019.

52.    Dr. Fontes's immediate response was to remark about her body by saying: "I wonder when you'll start to show – probably very soon, since you have such a flat stomach."

9

53.     Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54.     The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55.     The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56.     Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57.     Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58.     Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

DocuSign Envelope ID: F7327144-56B5-43DB-9105-797F94F1BA9B

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with

these managers, they appeared confused and confirmed that they had no concerns with her.

66.    This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for

Dr. Eltorai's complaints about pregnancy discrimination.

67.    Dr. Eltorai returned to work from maternity leave in mid-July 2019.

Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr.

Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April

2019.

68.    Dr. Eltorai was criticized for her communications during this case, and although

she had not been interviewed or spoken to about this incident, was told that she would no longer

be permitted to work in the ICU.

69.    Tellingly, when Dr. Eltorai asked for further information about the alleged

"investigation," including any documentation, she was told there was "nothing in writing." This

was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for

engaging in protected activity.

   b.    Sexual Harassment

70.    Not only was Dr. Eltorai discriminated against because of her pregnancy and then

retaliated against because of her complaints of pregnancy discrimination, but she too has

experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.    In addition to the comment about her body referenced above, in June 2019, Dr.

Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a

table with Dr. Fontes.

72.    Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.    This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.    Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.    Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.    Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.    Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.    At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

13

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.     Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.     Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.     Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.     However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.     DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.     Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.     Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.   DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.    While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

16

101. This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102. Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down. This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103. Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104. Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105. Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106. As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair. Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy.  This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

DocuSign Envelope ID: 473E7F44-565E-43DB-9A08-2B7F541BA9B0

towards him and asked her in an unnerving and intimidating manner, "So where is your partner

in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said,

"Ashley," *i.e.*, Dr. Eltorai.

113.   Thus, not only has Dr. Fontes disregarded the complaints lodged against him by

Claimants, but, likely knowing that he will not suffer any meaningful consequences for his

predatory behavior from Yale, has decided to actively mock our Clients' complaints like some

big joke.

114.   It is truly shameful that such shocking conduct could occur at and be condoned by

what many regard to esteemed institutions such as Yale University and Yale New Haven

Hospital.

## **CONCLUSION**

115.   In conclusion, Claimants seek all available and appropriate relief to the fullest

extent of the law.

DocuSign Envelope ID: F7327144-56B5-43DB-9106-797F94F1BA9B

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

Heidi Boules, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this _____04/30/2020_____

DocuSigned by:

Dr. Heidi Boules

Complaint 4C80B3F0B87147E...

Subscribed and sworn before me on _____.

Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| FOR CHRO USE ONLY | |
|---|---|
| Case No. 2030544 | Date: |
| EEOC No. | |

My name is: Ashley Eltorai, M.D.
My mailing address is: c/o Wigdor LLP, 85 Fifth Avenue, New York, NY 10003
My telephone number is: (212) 257-6800
My email address is: trahman@wigdorlaw.com
The respondent is: Yale University, Ya~ _____ _ M _____ ___ ___ ___ .D.
Whose business address is: 333 Cedar Street, New Haven, CT 06510, 20 York Street, New Haven, CT 06510

**I was …**
(Include the date of the actions taken against you. If ongoing, write that in.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | discriminated against in terms and conditions | Ongoing | | | |
| ☐ | terminated | | ☐ | not hired/promoted | |
| ☐ | suspended | | ☐ | given unequal duties | |
| ☐ | placed on probation | | ☐ | harassed | |
| ☐ | demoted | | ☒ | sexually harassed | Ongoing |
| ☐ | warned | | ☐ | earning different pay | |
| ☒ | given a poor evaluation | | ☐ | constructively discharged | |
| ☐ | denied a raise | | ☒ | retaliated against | Ongoing |
| ☒ | less trained | | ☐ | transferred | |
| ☐ | denied an office | | ☐ | given difficult assignment | |
| ☐ | denied equal service(s) | | ☐ | not recalled | |
| ☐ | other: | | | | |

**I believe that my…**
(Identify the protected class status you believe you were discriminated against because of)

| | | | | |
|---|---|---|---|---|
| ☐ | Race | ☐ | Mental disability | |
| ☐ | Color | ☐ | Intellectual disability | |
| ☐ | Religious creed | ☐ | Learning disability | |
| ☐ | Age | ☐ | Physical disability | |
| ☐ | Gender identity/expression | ☐ | Veteran status | |
| ☐ | Marital status | ☐ | Prior criminal conviction | |
| ☐ | National origin | ☐ | Sexual orientation | |
| ☒ | Sex:  ☐ Male  ☒ Female | ☒ | Pregnancy | |
| ☐ | Ancestry | ☐ | Lawful source of income | |
| ☐ | Other: | ☐ | Genetic information | |
| ☒ | Previous opposition to discriminatory conduct | | | |

**Was/Were in part a factor(s) in this action.**

DocuSign Envelope ID: 8C4815AC-821E-4D40-B296-1B169DD5B0EC

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)  ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(4)
☒ CONN. GEN. STAT. § 46a-60(b)(5)
☒ CONN. GEN. STAT. § 46a-60(b)(7)  ☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)
☒ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64

☐ CONN. GEN. STAT. § 46a-70  ☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80  ☐ Equal Pay Act of 1964, U.S.C. § 206
☐ CONN. GEN. STAT. § 46a-81  ☐ Section 504 of the Rehabilitation Act of 1973

☐ Other
_____

I provide the following particulars:

See attached supplement.

(Law mail out complaint w/EEOC 01/01/10)

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

——————————————————— X

HEIDI BOULES, M.D., MIA CASTRO, M.D.,        :
ASHLEY ELTORAI, M.D., JODI-ANN              :
OLIVER, M.D., LORI-ANN OLIVER, M.D. and     :     EEOC No.: _____
ELIZABETH REINHART, M.D.,                    :
                                             :
                    Claimants,               :     **SUPPLEMENT TO CHARGE OF**
                                             :     **DISCRIMINATION AND**
           v.                                :     **RETALIATION**
                                             :
YALE UNIVERSITY YALE NEW HAVEN              :
HOSPITAL, INC., and MANUEL LOPES            :
FONTES, M.D.,                                :
                                             :
                    Respondents.             :

——————————————————— X

Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver,

M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. (together, "Claimants") allege

against Respondents Yale University (the "University"), Yale New Haven Hospital, Inc. (the

"Hospital") (together, "Yale") and Dr. Manuel Lopes Fontes as follows:

## PRELIMINARY STATEMENT

1.     Claimants Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D. are all presently employed as

physicians within Yale's Department of Anesthesiology, and were all sexually harassed by

Respondent Manuel Lopes Fontes, M.D., who is a Professor of Anesthesiology, one of their

supervisors, and (among other titles) incredibly the Vice Chair of Diversity, Equity, and

Inclusion for the anesthesiology department.

2.     Respondent Dr. Fontes's sordid history of sexually harassing and acting

inappropriately towards female subordinates (both at Yale and at other institutions at which he

previously worked) is well known and documented. Yet, he joined Yale as and remains a distinguished leader within the anesthesiology department.

3. Shockingly, after complaining about Respondent Dr. Fontes's sexually harassing conduct to higher-ups at Yale, such as anesthesiology department Chair Dr. Roberta Hines, Respondent Dr. Fontes's unlawful behavior has persisted, and in fact, Claimants have been subjected to blatant retaliation for their complaints.

4. Further, in addition to sexual harassment and unlawful retaliation, Respondent Dr. Fontes has also discriminated against Claimant Dr. Eltorai based on her pregnancy and retaliated against her for raising pregnancy discrimination complaints.

5. Perhaps most disturbingly, despite receiving multiple complaints about Dr. Fontes's unlawful behavior since the start of his Yale tenure (including an incident in which he sexually assaulted a female anesthesiology resident following a residency graduation ceremony), Yale has taken no meaningful action against Dr. Fontes, choosing instead to champion a man in a powerful position no matter the heinous conduct he has perpetrated against his female subordinates.

6. This dreadful reality cannot be better illustrated than by Dr. Fontes's recent appointment to serve as the anesthesiology department's Vice Chair of Diversity, Equity, and Inclusion. To say that the bestowal of this honor and promotion was a direct slap to the face of Claimants and other women Dr. Fontes has victimized would be a gross understatement.

7. Apparently emboldened by Yale's decision to protect him at the expense of those (of whom there are many) he has abused, just weeks ago, Dr. Fontes sexually harassed Claimant Dr. Reinhart during an anesthesiology conference held in Orlando, Florida, and unbelievably

DocuSign Envelope ID: 8C1815AC-2E1E-4D40-B29D-1D06ADD868EC

asked her where her "partner in crime" was, which was a reference to Claimant Dr. Eltorai, who too, like Ms. Reinhart, has lodged repeated complaints against him.

8.      Such sexually harassing and intimidating conduct has no place in medicine. As a result of the other conduct described herein, Respondents have unquestionably violated relevant statutes meant to prevent workplace discrimination, harassment and retaliation.

## PARTIES

9.      Claimant Heidi Boules, M.D. is an adult resident of Long Island City, New York. Dr. Boules meets the definition of "employee" under all applicable statutes. Dr. Boules is currently an attending physician and assistant professor of clinical anesthesiology within the anesthesiology department at Yale.

10.     Claimant Mia Castro, M.D. is an adult resident of Woodbridge, Connecticut. Dr. Castro meets the definition of "employee" under all applicable statutes. Dr. Castro is currently a pediatric anesthesiology fellow at Yale and completed her anesthesiology residency at Yale.

11.     Claimant Ashley Eltorai, M.D. is an adult resident of New Haven, Connecticut. Dr. Eltorai meets the definition of "employee" under all applicable statutes. Dr. Eltorai is currently an attending physician and assistant professor of anesthesiology within the anesthesiology department at Yale.

12.     Claimant Jodi-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

13.     Claimant Lori-Ann Oliver, M.D. is an adult resident of New Haven, Connecticut. Dr. Oliver meets the definition of "employee" under all applicable statutes. Dr. Oliver is currently an attending physician and assistant professor of clinical anesthesiology at Yale.

14.    Claimant Elizabeth Reinhart, M.D. is an adult resident of New Haven, Connecticut. Dr. Reinhart meets the definition of "employee" under all applicable statutes. Dr. Reinhart is currently a third-year anesthesiology resident at Yale.

15.    At all relevant times, Respondent Yale University has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and qualifies as an employer under all relevant statutes.

16.    At all relevant times, Respondent Yale New Haven Hospital, Inc. has employed and continues to employ all Claimants, controls and has controlled the terms and conditions of Claimants' employment, and meets the definition of "employer" under all relevant statutes.

17.    At all relevant times, Respondent Manuel Fontes Lopes, M.D. is an adult resident of Connecticut. Dr. Fontes is a Professor of Anesthestiology, Vice Chair of Diversity, Equity, and Inclusion, Division Chief of the Cardiac Anesthesiology division, Director of Clinical Research, Anesthesiology, at Yale. Dr. Fontes is an employee of and supervisor at Yale University and Yale New Haven Hospital, Inc., and in particular, the anesthesiology department at Yale. At all relevant times, Dr. Fontes has had and still has supervisory power, control and authority of Claimant's employment and the terms and conditions thereof. Dr. Fontes meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    DR. FONTES'S WELL-DOCUMENTED HISTORY OF SEXUAL HARASSMENT AND INAPPROPRIATE SEXUAL CONDUCT TOWARDS FEMALE SUBORDINATES

18.    Upon information, prior to joining Yale's faculty, Respondent Dr. Fontes left and/or was dismissed from at least two other medical institutions after having engaged in sexual harassment towards and/or inappropriate sexual conduct with female subordinates.

4

19.     Upon information, Dr. Fontes left his position at Cornell University after having an affair with a resident physician. We understand that he then went to work at Duke University, where he was accused of harassing a female fellow and multiple nurses.

20.     Incredulously, despite this behavior, Dr. Fontes was offered and left Duke for a prominent position at Yale as a Professor of Anesthesiology, Division Chief for Cardiac Anesthesiology and Director of Clinical Research for the Department of Anesthesiology in 2015.

21.     Unfortunately, Dr. Fontes's well-known penchant for sexually harassing and behaving inappropriately towards female subordinates continued unabated at Yale, despite the administration's knowledge of his past conduct.

22.     Upon information, in 2015, shortly after he joined Yale, Dr. Fontes unwantedly kissed on the lips, on two separate instances, a female anesthesiology attending physician inside the Hospital.

23.     As we understand it, these incidents were reported to Merle Waxman, Associate Dean, Ombudsperson and Director, Women in Medicine at the Yale University School of Medicine, but no disciplinary actions were taken against Dr. Fontes.

24.     Then, in June 2016, following the anesthesiology department's residency graduation ceremony, Dr. Fontes went to an afterparty with other anesthesiology department residents and staff at Barcelona Wine Bar in New Haven.

25.     There, upon information, Dr. Fontes danced very closely and provocatively with a clearly inebriated female resident, whom he groped and made inappropriate bodily contact with (including contact between his private areas and the female resident's body).

26.     Others in attendance found Dr. Fontes's conduct not only inappropriate, but also predatory, as he was essentially taking advantage of a vulnerable and clearly drunk female subordinate for his own perverted gratification.

27.     While the two were ultimately separated, upon information, a video of this assault was provided to the anesthesiology department shortly afterwards.

28.     However, rather than discipline Dr. Fontes for his grossly unacceptable and predatory behavior, or take some other action to deter him from behaving in such an improper manner ever again, Dr. Roberta Hines, the Chair of the anesthesiology department, merely advised the department's attending physicians that they should not fraternize with residents.

29.     While, as we understand it, Dr. Hines acknowledged to attending physicians within the anesthesiology department that she had seen "a video," she did not elaborate on what she had seen or who the video implicated.

30.     This demonstrated that she was more concerned with sweeping this harrowing incident under the rug and protecting Dr. Fontes and the department rather than support a female resident who had been sexually assaulted.

31.     Most troubling, judging by his subsequent actions against Claimants, Dr. Fontes was clearly emboldened by the anesthesiology department's utter lack of action against him despite the existence of a video depicting what amounted to a sexual assault against his subordinate.

## II.     DR. FONTES'S SEXUAL HARASSMENT OF DR. BOULES

32.     Claimant Dr. Heidi Boules, is an attending physician and assistant professor in the anesthesiology department, specializing in pediatric anesthesiology.

33.    Throughout her employment at Yale, she has reported to Dr. Fontes. However, shortly after her career at Yale began, and continuing to the present, Dr. Boules became subjected to unrelenting sexual harassment at the hands of Dr. Fontes.

34.    By way of example only, in October 2018, Dr. Fontes asked to meet Dr. Boules at the Union League Café in New Haven to discuss work.

35.    After Dr. Boules reluctantly accepted this invitation, it soon became clear that Dr. Fontes had no desire to discuss their work, as he began to lean over and unwantedly touch her body.

36.    Soon thereafter, Dr. Fontes began to grab Dr. Boules's face and forcibly and unwantedly kiss her on the lips, despite Dr. Boules's objections. Dr. Boules was disgusted by her boss's conduct and refused his sexual advances.

37.    Days later, during a staff meeting, Dr. Fontes began to berate Dr. Boules in front of her colleagues, without any justification. Afterwards, Dr. Fontes directed Dr. Boules to walk him to an elevator, where he proceeded to once again forcibly and unwantedly kiss her on the lips.

38.    Despite Dr. Boules's objections and her clear expressions of discomfort and lack of interest, Dr. Fontes has continued to unwantedly touch and hug her nearly every time he sees her. This included an incident when Dr. Fontes unwantedly hugged Dr. Boules in or around July 2019, and another incident in mid-September 2019 when he unwantedly touched her on her back, grabbed her by both shoulders and put his cheek against hers to simply comment to her about how quiet her operating room was during a case. Dr. Fontes also unwantedly asked Dr. Boules out for drinks that day.

39.     Dr. Fontes's disgusting conduct has left Dr. Boules feeling demeaned and traumatized, and afraid to be left alone with Dr. Fontes.  As a result of Dr. Fontes sexually harassing conduct towards her, Dr. Boules has been forced to actively avoid and duck away from him every time she sees him.

## III.     DR. FONTES'S SEXUAL HARASSMENT OF AND RETALIATION AGAINST DR. CASTRO

40.     Claimant Dr. Mia Castro is a pediatric anesthesiology fellow, and completed her anesthesiology residency at Yale.

41.     Beginning in August 2018 and continuing in the fall of 2018, while the two worked together in large operating rooms at the Hospital, Dr. Fontes repeatedly came behind Dr. Castro and stood inappropriately and unnecessarily close to her, and unwantedly put his arms on and/or around her shoulders and waist.

42.     Each time this occurred, Dr. Castro actively resisted his advances and unwanted touching.

43.     Dr. Fontes became angry and agitated, and retaliated against Dr. Castro for resisting his advances by demeaning and berating Dr. Castro as the two worked together.

44.     This included an instance in which he yelled at Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely hypotensive.

45.     Dr. Castro was so upset by Dr. Fontes's actions towards her that she submitted an anonymous evaluation that specifically complained about Dr. Fontes's penchant for inappropriately touching colleagues.  Despite her complaint, nothing was done about Dr. Fontes's behavior.

46.     Then, in July and August 2019, Dr. Fontes further retaliated against Dr. Castro,
this time by refusing to permit Dr. Castro to go on a mission trip to Lima, Peru unless she used
her vacation time (of which residents and fellows are given very little), purportedly because the
trip would prevent Dr. Castro from fulfilling her fellowship requirements.

47.     However, it was not true that such a trip would interfere with Dr. Castro's
fellowship requirements, as such a trip is considered by many fellowship programs, and even the
American Board of Anesthesiology, as an acceptable part of fellowship training.

48.     Nonetheless, even after Dr. Fontes was made aware in late-August 2019 that the
American Board of Anesthesiology would approve and accredit this mission trip to Peru so long
as the relevant application was submitted, he inexplicably continued to refuse to permit Dr.
Castro to go on this trip unless she used her vacation time.

49.     There was no legitimate basis for Dr. Fontes to impose this unnecessary and
punitive requirement upon Dr. Castro, which has materially interfered with her ability to perform
her job and caused her tremendous unnecessary stress.

V.      **PREGNANCY DISCRIMINATION, SEXUAL HARASSMENT AND
        RETALIATION AGAINST DR. ELTORAI**

a.      Pregnancy Discrimination

50.     Claimant Dr. Ashley Eltorai is an attending physician and assistant professor of
anesthesiology at Yale, specializing in cardiac anesthesiology.

51.     In September 2018, Dr. Eltorai informed Dr. Fontes that she was pregnant, with a
due date of May 1, 2019.

52.     Dr. Fontes's immediate response was to remark about her body by saying: "I
wonder when you'll start to show – probably very soon, since you have such a flat stomach."

53. Dr. Eltorai was shocked and taken aback by this inappropriate comment by her supervisor. However, this was only the beginning of the egregious discrimination Dr. Eltorai would suffer as a result of her pregnancy.

54. The next month, in October 2019, Dr. Eltorai asked Dr. Fontes, who is also the Chair of the Clinical Research Committee, for support on a research project for which she had won a $10,000 national grant back in April 2018.

55. The support would involve facilitating anesthesiology resident breaks so that they could each have 20 minutes available to participate in a survey. However, Dr. Fontes's response was to refuse to help her because of her upcoming maternity leave (which would not be for nearly seven months), stating, "Doesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed."

56. Astonished by this blatantly discriminatory response, on or about October 25, 2018, Dr. Eltorai complained to Dr. Hines that she felt she was being discriminated against because of her pregnancy by Dr. Fontes.

57. Then, in December 2018, Dr. Eltorai, in anticipation of her maternity leave, sought and received assurances from the anesthesiology department that she would be able to meet all her unit requirements for the academic year prior to going on leave in order to qualify to receive her full annual salary (i.e., that she would be scheduled to work the sufficient number of days).

58. Dr. Fontes was copied on these correspondences. However, a few weeks later, in January 2019, Dr. Fontes suddenly told Dr. Eltorai that she would be 20 units short for the academic year.

59.     Dr. Fontes incredulously told Dr. Eltorai that she "should have told [him]" that she was concerned about making her units, despite the fact he was copied on the relevant emails concerning this issue.

60.     Later that day, Dr. Eltorai spoke to the University's Faculty Affairs department regarding other options for avoiding being punished for maternity leave, as this was the impression she received from Dr. Fontes.

61.     Just one week later, on February 7, 2019, Dr. Fontes and the director of the Intensive Care Unit ("ICU") within the anesthesiology department, Dr. Hossam Tantawy, requested to meet with Dr. Eltorai to discuss purported performance issues in the ICU.

62.     Dr. Eltorai was surprised that this meeting was called since she had only worked three days in the ICU over the prior two and a half months, and was not aware of any concerns about her performance or any of the cases she had handled.

63.     Then on February 11, 2019, Dr. Fontes and Dr. Tantawy met with Dr. Eltorai (along with Dr. Susan Garwood, who, Dr. Eltorai was told, was there "so that there will be a female here," despite the fact that she had no clinical interactions with Dr. Eltorai). Dr. Tantawy and Dr. Garwood both reported to Dr. Fontes at the time.

64.     Dr. Fontes and Dr. Tantawy proceeded to give Dr. Eltorai vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her. However, when Dr. Eltorai pressed them for details and examples, they were not able to provide any.

65.     Tellingly, when Dr. Eltorai said that she would speak to the nurses' and mid-level practitioners' managers to find out what their concerns about her were, she was told to "wait a

few days because we want to speak with them first." Notably, when Dr. Eltorai later spoke with these managers, they appeared confused and confirmed that they had no concerns with her.

66.    This meeting orchestrated by Dr. Fontes was clearly pretextual and retaliation for Dr. Eltorai's complaints about pregnancy discrimination.

67.    Dr. Eltorai returned to work from maternity leave in mid-July 2019. Subsequently, in August 2019, Dr. Eltorai was once again summoned to a meeting with Dr. Fontes and Dr. Tantawy, this time involving an ICU case that occurred all the way back in April 2019.

68.    Dr. Eltorai was criticized for her communications during this case, and although she had not been interviewed or spoken to about this incident, was told that she would no longer be permitted to work in the ICU.

69.    Tellingly, when Dr. Eltorai asked for further information about the alleged "investigation," including any documentation, she was told there was "nothing in writing." This was clearly yet another act of unlawful retaliation committed against Dr. Eltorai as retribution for engaging in protected activity.

b.    Sexual Harassment

70.    Not only was Dr. Eltorai discriminated against because of her pregnancy and then retaliated against because of her complaints of pregnancy discrimination, but she too has experienced numerous incidents of sexual harassment and misconduct at the hands of Dr. Fontes.

71.    In addition to the comment about her body referenced above, in June 2019, Dr. Eltorai attended a dinner for graduating anesthesiology fellows during which she was seated at a table with Dr. Fontes.

72.     Upon seeing Dr. Eltorai, who had just given birth weeks earlier, Dr. Fontes slowly ogled her body up and down, said, "Oh wow you look good," and gave her an unwanted, long hug.

73.     This remark was said in front of colleagues, and left Dr. Eltorai feeling deeply humiliated, embarrassed and mortified.

74.     Furthermore, Dr. Eltorai brought her newborn son to this event, and as she was holding him, Dr. Fontes attempted to spoon feed Dr. Eltorai food from across the table, making Dr. Eltorai and others around them extremely uncomfortable.

75.     Then, after noticing that Dr. Eltorai was no longer wearing a wedding ring, Dr. Fontes said to her, without solicitation, "we should go out, just the two of us, and have a bottle of wine and I can tell you all my wisdom about life and divorce."

76.     Dr. Eltorai was taken aback by this highly unprofessional and unwelcome proposition. Notably, at this dinner, Dr. Fontes shockingly admitted that he had been unresponsive regarding and effectively stymying Dr. Eltorai's efforts to move her research project along (despite comments from other clinical research committee members that her idea was excellent) in order to do her "a favor" because she "just had a baby and should be spending all [her] time with him."

77.     Then, in July 2019, Dr. Eltorai went to Dr. Fontes's office to discuss her research project. Upon seeing her, Dr. Fontes stood up from his desk, walked around to the front of it, pulled over a chair and sat uncomfortably close to Dr. Eltorai.

78.     At the conclusion of the meeting, Dr. Fontes got up as Dr. Eltorai was about to leave, gave her an uninvited full body hug and pressed his pelvis against her pelvis. Dr. Eltorai

backed away and left, feeling extremely disgusted and degraded by Dr. Fontes's indecent physical contact.

79.      Similarly, later that month, while Dr. Eltorai was speaking with another colleague in the anesthesiology breakroom, Dr. Fontes suddenly came up behind her and began to massage her neck unwantedly.

80.      Then, in August 2019, as Dr. Eltorai was putting in an order for a pediatric patient whose family was waiting for her nearby, Dr. Fontes suddenly came up to her and stood extremely close to her, within six inches, for an entire conversation, while unwantedly touching her shoulder and speaking and smiling in a flirtatious manner.  This conduct was highly unprofessional and demeaning, particularly with the family of a pediatric patient observing nearby.

81.      Exasperated with Dr. Fontes's constant harassing behavior towards her, in late-August 2019, Dr. Eltorai complained to Aley Menon, a member of the Yale University-Wide Committee on Sexual Misconduct.

82.      However, despite her complaint, nothing has been done to punish Dr. Fontes or deter his inappropriate behavior.  Notably, Dr. Eltorai's complaint to Ms. Menon was made shortly before Dr. Fontes banned Dr. Eltorai from working in the ICU, indicating that this complaint led to that retaliatory decision as well.

## VI.      DR. FONTES'S SEXUAL HARASSMENT OF DR. JODI-ANN OLIVER AND DR. LORI-ANN OLIVER

83.      Claimants Dr. Jodi-Ann Oliver and Dr. Lori-Ann Oliver (who are sisters), are both attending physicians within Yale's anesthesiology department.

84.      Throughout their employments, Dr. Fontes has repeatedly come up behind each of them and inappropriately and unwantedly touched their backs and shoulders.

85.     Notably, on an annual anesthesiology research retreat in or around 2016, Dr. Fontes sexually harassed Dr. Jodi-Ann Oliver by continually touching her lower back and slipping his hand down to her backside.

86.     Dr. Jodi-Ann Oliver was so mortified by Dr. Fontes's behavior that she refused to attend any subsequent research retreats for fear of being sexually harassed and inappropriately touched again by him.

87.     Then, in April 2019, both Dr. Olivers attended an applicant dinner with Dr. Fontes and another male attending physician at the Heirloom Restaurant & Lounge in New Haven.

88.     During the dinner, Dr. Fontes continuously flirted with Dr. Jodi-Ann Oliver, repeatedly commenting on her "nice skin" and "great figure," and asking her "do you work out?"

89.     At the end of the dinner, as they were standing on the steps outside the restaurant, Dr. Fontes came up to Dr. Jodi-Ann Oliver, gave her an unsolicited hug and proceeded to forcibly kiss her on the lips.

90.     Dr. Fontes then turned around, looked at Dr. Lori-Ann Oliver and unwantedly kissed her on the lips as well.

91.     Both Dr. Olivers have been deeply devastated by Dr. Fontes's unlawful and harassing behavior.

## VII.     DR. FONTES'S SEXUAL HARASSMENT OF DR. REINHART

92.     Claimant Dr. Elizabeth Reinhart, is a third-year anesthesiology resident at Yale.

93.     In May 2019, Dr. Reinhart attended a dinner hosted by representatives from a pharmaceutical company at the Union League Café in New Haven, along with Dr. Fontes and another female attending physician.

DocuSign Envelope ID: 8C1915AC-821E-4D4C-B296-19468DDE50EC

94.     Dr. Reinhart had had only one prior interaction with Dr. Fontes, which was when the two had a case together in an operating room and Dr. Fontes inappropriately and unnecessarily put his arm around her to look over at a patient.

95.     Dr. Reinhart was not aware that Dr. Fontes would also be attending this dinner. Throughout the dinner, Dr. Fontes flirted profusely with Dr. Reinhart, commenting on her appearance and trying to persuade her into drinking more alcohol. This caused Dr. Reinhart to feel very uncomfortable.

96.     As the dinner was coming to an end, and as everyone stood up from the table to get ready to leave, Dr. Fontes leaned over towards Dr. Reinhart and attempted to kiss her on the lips. Dr. Reinhart managed to turn her head, but the kiss landed on her cheek and side of her mouth.

97.     Feeling disgusted by this, Dr. Reinhart quickly left the restaurant with the female attending physician, only to be chased down on the street by Dr. Fontes, who asked her, "Where are you going?" and insisted that he give Dr. Reinhart a ride home.

98.     Dr. Reinhart declined the invitation, quickly got into the female attending physician's car and was driven home.

99.     Then, in June 2019, Dr. Reinhart attended the anesthesiology department's residency graduation ceremony at the New Haven Lawn Club.

100.     While Dr. Reinhart was ordering a drink at the bar, Dr. Fontes suddenly came up behind her and suggestively asked, "Are you going out tonight?" Before Dr. Reinhart could respond, Dr. Fontes said, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there."

DocuSign Envelope ID: 8C1915AC-821E-4D4C-B296-1B169DD5B0EC

101.   This was not only an inappropriate proposition to a female subordinate, but also an obvious and defiant reference to the 2016 incident in which Dr. Fontes sexually assaulted an inebriated resident at the residency graduation afterparty at Barcelona Wine Bar, for which he received no discipline despite video evidence of the assault.

102.   Later that evening, as Dr. Reinhart was taking photographs with friends, Dr. Fontes approached her again, hugged her by the waist and said lewdly, "I can't wait to see you at Barcelona," as he ogled her body up and down.  This was witnessed by a female attending physician who came over to ask Dr. Reinhart whether she was alright.

103.   Dr. Reinhart was so terrified and shaken up by what Dr. Fontes had said to her that she asked to go home with the female attending physician because she did not want to go back to her own apartment building that night, where other resident physicians also live, fearing that they would convince her to go out with them to the afterparty, where she would encounter Dr. Fontes.

104.   Then, in July 2019, Dr. Fontes suddenly came up behind Dr. Reinhart while she was in the anesthesiology breakroom and began to unwantedly massage her back and shoulders.

105.   Fearing for her safety, Dr. Reinhart reported Dr. Fontes's sexual harassment and inappropriate conduct to higher-ups within the anesthesiology department, including to Residency Program Director Dr. Jeff Schwartz and to Dr. Trevor Banack, an attending physician and Assistant Clinical Director.

106.   As we understand it, both supervisors reported Dr. Reinhart's complaints to Dr. Hines, the department Chair.  Notably, after Dr. Banack spoke with Dr. Hines, rather than meaningfully address or investigate the substance of Dr. Reinhart's complaint, Dr. Hines directed Dr. Schwartz to ask Dr. Reinhart whether she was "taking legal action."

DocuSign Envelope ID: 8C1915AC-821E-4DAC-B296-1D46ADDF80EC

107.    Upon information, in response to these complaints, Dr. Hines once again gave Dr. Fontes a light slap on the wrist by advising him to not drink with residents, and tried to justify his behavior by saying, "Boys will be boys."

108.    Incredibly, days later, on August 7, 2019, Dr. Hines sent a department-wide email in which she announced "with pleasure" that Dr. Fontes had been appointed as the department's inaugural Vice Chair of Diversity, Equity, and Inclusion, and would be "leading this new departmental initiative aimed at promoting a departmental culture that values and supports diversity, equity and inclusion."

109.    This was a clear "kick to the gut" to Dr. Reinhart and all the other women who had been sexually harassed and discriminated against by Dr. Fontes because of their gender and/or pregnancy. This was also a transparent sign that Yale and the anesthesiology department had no intention of protecting Dr. Reinhart or any other victim of Dr. Fontes's unlawful behavior, nor to hold Dr. Fontes accountable in any way for his heinous conduct.

110.    Dr. Reinhart, along with Dr. Castro, then began to escalate their complaints against Dr. Fontes beyond the anesthesiology department, including to the Yale University Graduate Medical Education ("GME") department, the University's Title IX Department and the University-Wide Committee on Sexual Harassment.

111.    Unfortunately, despite the numerous complaints lodged against him, Dr. Fontes has continued to this day to sexually harass Claimants, as upon information, other female Yale employees.

112.    Indeed, just in October 2019, during an anesthesiology conference in Orlando, Florida, as Dr. Reinhart was exiting a social event held at the Ritz-Carlton Hotel, Dr. Fontes, who was standing outside the hotel, grabbed Dr. Reinhart, linked his arms with hers, pulled her

towards him and asked her in an unnerving and intimidating manner, "So where is your partner in crime?" When Dr. Reinhart asked him to whom he was referring, Dr. Fontes appallingly said, "Ashley," *i.e.*, Dr. Eltorai.

113. Thus, not only has Dr. Fontes disregarded the complaints lodged against him by Claimants, but, likely knowing that he will not suffer any meaningful consequences for his predatory behavior from Yale, has decided to actively mock our Clients' complaints like some big joke.

114. It is truly shameful that such shocking conduct could occur at and be condoned by what many regard to esteemed institutions such as Yale University and Yale New Haven Hospital.

<u>CONCLUSION</u>

115. In conclusion, Claimants seek all available and appropriate relief to the fullest extent of the law.

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

 Ashley Eltorai, M.D. being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in ___New Haven, CT___ on this ___05/01/2020___

Com|___ Signature ___ure
  6F84E242548F4E8...

Subscribed and sworn before me on _____.
                                     Date

_____
Notary Public/Commissioner of the Superior Court

My commission expires: _____

(Law mail out complaint w/EEOC 01/01/10)

# Exhibit 2

2003 WL 1343265
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Gregory PETERS, Plaintiff,
v.
CITY OF STAMFORD, Defendant

No. 3:99–CV–764 CFD.
|
March 17, 2003.

*RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT*

DRONEY, J.

I. *Introduction*

**\*1** In this action, plaintiff Gregory Peters ("Peters") alleges that his current employer, the City of Stamford ("Stamford") violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the First and Fourteenth Amendments, and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–60(a)(1) ("CFEPA"). Specifically, he alleges that Stamford discriminated against him based on his race and retaliated against him on the basis of his opposition to certain enforcement actions of other health inspectors. The relief requested by Peters includes compensatory damages, punitive damages, injunctive relief, and costs and reasonable attorney's fees.

Pending is Stamford's motion for summary judgment [Doc. # 43].

II. *Background* [1]

Peters, an African–American, was hired by the Department of Health of Stamford (the "Health Department") on March 13, 1989 as a health inspector. Peters began at the position of "Sanitarian I" and, after an examination, was promoted to "Sanitarian II" on March 13, 1991. On February 7, 1994, Peters left his employment with Stamford to work for the City of Hartford. A few years later, he re-applied for employment with Stamford. On October 28, 1996, Stamford re-hired Peters as a "Provisional Sanitarian II," a temporary position. [2]

At that time, Peters was denied the permanent position of "Sanitarian II."

On May 6, 1997, Peters entered into a letter agreement with his union and Stamford for a permanent position. In accordance with the letter agreement, Peters became a "Health Inspector II" at level S–13(A) on the pay scale, and another temporary employee, Jane Gibeault ("Gibeault"), a Caucasian, became a "Health Inspector I" at level S–11(E) on the pay scale. The letter agreement did not specify the actual salaries that correlated to the pay scale figures for Peters and Gibeault. The letter agreement also provided for the payment of certain "stipends" in December 1997. [3]

Peters and Gibeault secured their new, permanent positions with Stamford without the merit testing and selection process. However, presumably in response to the "waiver" of Peters and Gibeault into these permanent positions, both Peters' and Gibeault's starting salaries were lower than they might have otherwise been if they had tested into their positions. Also, the letter agreement resulted in Gibeault's starting salary being higher than Peters' starting salary, because, though the letter agreement placed Gibeault at a lower grade than Peters on the pay scale, she was at a higher "step" and was thus initially paid more because of the overlapping grade system. Subsequently, however, in May 1998, Peters' salary became higher than Gibeault's, because his "step" in his grade on the pay scale increased.

Peters claims that Stamford's hiring him as a "Provisional Sanitarian II," rather than a permanent "Sanitarian II," paying him a lower starting salary pursuant to the May 6, 1997 letter agreement, and delay in paying him the stipends were the result of discrimination on the basis of his race and retaliation on the basis of his opposition to certain enforcement actions of other Stamford Health Department employees during his previous employment with Stamford. As to retaliation, Peters claims that, during his previous employment with Stamford, he spoke out against certain health inspection activities of his co-workers. Peters claims that he opposed "Sanitarian's wanton disregard of Director of Health closure notice," "selective enforcement activity against Asian operators," "policy of Sanitarian demanding operators purchase equipment from select merchants," "unfair claims for overtime personal work done on City time," "manner in which Sanitarians were assigned overtime," "destruction and removal of information from Department files," "police [sic] of barring non-Caucasions from conducting food service plan review,"

"falsification of inspection records," and "being pressured to issue permits for projects not in accord with Health regulations." Def's Ex. 4, Response to ¶ 13.

**\*2** On September 22, 1998, Peters filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), regarding his denial of the permanent position of "Sanitarian II," the lower pay he initially received pursuant to the May 6, 1997 letter agreement, as well as Stamford's delay in paying him the stipends. The CHRO complaint was apparently forwarded to the Equal Employment Opportunity Commission ("EEOC") on October 28, 1998. [4]

Peters filed this action on April 23, 1999, claiming discrimination on the basis of his race and retaliation. Peters alleges violations of Title VII, the First and Fourteenth Amendments, and the CFEPA.

### III. *Standard*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).* A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir.1993)* (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.)* (quoting *Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992).* After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).*

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich, 963 F.2d at 523.* Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991), cert. denied, 502*

U.S. 849 (1991); *see also Suburban Propane v. Proctor Gas. Inc., 953 F.2d 780, 788 (2d Cir.1992).* Additionally "[w]here, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir.1999)* (citing *Celotex, 477 U.S. at 323–24* and *Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir.1998)).*

The Court exercises caution in granting summary judgment in favor of an employer in employment discrimination cases "when, as here, the employer's intent is at issue." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)* (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.1994)).* However, in order to defeat a defendant employer's motion for summary judgment, a plaintiff employee must offer "concrete evidence from which a reasonable juror could return a verdict in his favor" and may demand a trial simply because the central issue is the defendant employer's state of mind. *Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988)* (internal quotations omitted).

### IV. *Discussion*

#### A. *Standing*

**\*3** At the outset, the Court will address Stamford's argument in its motion for summary judgment that Peters lacks standing to bring any of his causes of action because he "cannot quantify his damages." Def.'s Mem. Supp. Mtn. Summ. J. at 13.

Article III requires the Court to determine whether plaintiff has standing, prior to reaching the merits of the substantive claims. "To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some 'threatened or actual injury resulting from the putatively illegal action....' " *Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392 (1988)* (quoting *Warth v. Seldin, 422 U.S. 490, 499 (1975)).* The Supreme Court has further explained that "[t]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983)* (internal quotation

marks omitted). Resolving all ambiguities and drawing all inferences in favor of Peters, as the Court must on a motion for summary judgment, the Court concludes that Peters has set forth sufficient evidence of damages, specifically, evidence regarding the pay differential between his and Gibeault's salaries for the period where her salary was higher and the stipends that were allegedly delayed. Accordingly, the Court declines to grant summary judgment on this basis.

### B. *Title VII Claims* [5]

Title VII provides that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Peters alleges that Stamford violated Title VII in two ways: it discriminated against him on the basis of his race and it retaliated against him for opposing certain practices and policies of the Health Department and its employees. Each claim will be examined below.

### 1. *Discrimination*

As to Peters' Title VII discrimination claim, Stamford makes two arguments in support of its motion for summary judgment: (1) Peters' complaint is untimely, and (2) the alleged adverse employment actions-Stamford's hiring him as a provisional, rather than permanent sanitarian, starting Peters at a lower salary then Gibeault pursuant to the May 6, 1997 letter agreement, and its delay in paying Peters certain stipends-did not occur under circumstances evincing an intent to discriminate, and thus, Peters has not put forward sufficient evidence to establish a prima facie case. Each issue will be discussed below.

### a. *Untimeliness*

Generally, discrimination claims under Title VII must be filed with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). However, when one has filed a charge of discrimination in a state or locality that has its own anti-discrimination laws and an enforcement agency, the time period for filing claims with the EEOC is extended to 300 days of the occurrence of the allegedly unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1); *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996). Connecticut has both anti-discrimination laws and an anti-

discrimination agency-the CHRO-and Peters filed a charge of discrimination with the CHRO. Thus, the 300 day limit applies.

**\*4** Here, Peters filed his charge of discrimination with the CHRO on September 22, 1998. [6] As a result, incidents of discrimination that occurred before November 28, 1997, 300 days before September 22, 1998, are time-barred. *See Quinn v. Green Tree Credit Corp .,* 159 F.3d 759, 765 (2d Cir.1998).

Peters argues that the continuing violation exception applies in this case. *See* Pl.'s Opp'n Mtn. Summ. J. at 5. The Second Circuit has recognized an exception to the 300–day limitation period in cases involving a "continuing violation." *See Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir.1994).

As an initial matter, a plaintiff may not rely on the continuing violations exception unless he has asserted the theory in prior administrative proceedings. *See Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001), *cert. denied,* 122 S.Ct. 2586 (2002). In his CHRO complaint, Peters alleged that Stamford violated his rights when it designated him as a "Health Inspector II" with a pay grade of S–13(A) on May 6, 1997 and later denied him certain stipends to which he was entitled. Def.'s Ex. 3. Peters also states in his CHRO complaint that he has "and continue[s] to feel aggrieved and humiliated by these circumstances." In the box entitled "Date Most Recent or Continuing Discrimination Took Place," Peters indicated September 22, 1998. While these statements do not clearly indicate Peters' reliance on a continuing violations theory, the Court concludes that they are sufficient to invoke the continuing violations exception here. *Cf. Fitzgerald,* 251 F.3d at 363 (determining that the plaintiff had sufficiently raised the issue where letters from the state agency indicated that the violations alleged began on a date that would otherwise have been time-barred, though in that case the agency also specifically stated that she was seeking to rely on a continuing violations theory).

The Second Circuit had previously held that the continuing violations doctrine extends the statute of limitations for all claims of discriminatory acts committed under an "ongoing policy of discrimination." *Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 82 (2d Cir.2001); *see also Fitzgerald,*

251 F.3d at 359 (holding that a continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice"); Quinn, 159 F.3d at 765 ("The continuing violation exception extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations."); Harris v. City of New York, 186 F.3d 243, 250 (2d Cir.1999) (to allege a continuing violation, "the claimant must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy").

**\*5** The Supreme Court has recently clarified the continuing violation exception in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002). There, the Court foreclosed the use of the continuing violation doctrine to incorporate untimely claims for discrete discriminatory actions even though they may be related to a timely claim. The Court stated:

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act.... The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Morgan, 536 U.S. at ——, 122 S.Ct. at 2072. The Court also held, however, that "an employee need only file a charge within 180 or 300 days of any act that is part of [a] hostile work environment" because "incidents comprising a hostile work environment are part of one unlawful employment practice, [and thus] the employer may be liable for all acts that are part of this single claim." Id. at 2075. According to the Court, discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." Id. at 2073.

Here, Stamford's hiring of Peters as a provisional sanitarian on October 28, 1996 is a discrete employment action. See id. (discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire"). Accordingly, the continuing violations theory does not apply to this employment action. Nor does Peters' complaint allege a hostile work environment. Accordingly, Peters' Title VII claim with regard to his failure to be hired as a permanent "Sanitarian II" on October 28, 1996 is time-barred. Moreover, Peters appears to have abandoned his claim of discrimination with regard to his October 28, 1996 hire. See Peters Dep. at 138 ("Q. Did anyone discriminate against you in hiring you back in October/ November of 1996? A. No, that's not my claim.").

Each paycheck issued to Peters pursuant to the May 6, 1997 letter agreement, until the increase in May 1998, is also a discrete employment action. See id. at 2071. In Bazemore v. Friday, 478 U.S. 385 (1986) (per curiam), the Supreme Court considered a discriminatory salary structure and held that although the salary discrimination began prior to the date that the act was actionable under Title VII, "[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII...." 478 U.S. at 395. Like termination, failure to promote, or refusal to hire, the issuance of a discriminatory paycheck is "easily identifiable" and "can be pinpointed in time." Inglis v. Buena Vista Univ., 235 F.Supp.2d 1009, 1023 (N.D.Iowa 2002). Accordingly, the continuing violations theory does not apply to the pay issued to Peters pursuant to the May 6, 1997 letter agreement. However, Stamford's issuance of a discriminatory paycheck to Peters may be actionable even though it is part of a discriminatory pay structure that began outside the relevant limitations period. See id.; Morgan, 122 S.Ct. at 2071.

**\*6** As in Bazemore, however, those acts of discriminatory payment that fall within the statutory period are actionable only if the discriminatory pay structure was in place within the 300 day limitations period. See Bazemore, 478 U.S. at 395; Inglis, 235 F.Supp.2d at 1023–24. Here, Peters

filed his administrative claim in September 1998, which is within 300 days of when his pay allegedly ceased to be discriminatory-May 1998. *Cf.* Inglis, 235 F.Supp.2d at 1023–25 (holding that Title VII claim was time-barred where administrative claim not brought within 300 days of discontinuance of discriminatory pay structure). Accordingly, each paycheck Peters received within 300 days of September 22, 1998, i.e., after November 28, 1997, that was less than Gibeault's is actionable under Title VII.

Peters has also presented evidence, namely his statements in interrogatory answers under oath, of other allegedly adverse employment actions that occurred after November 28, 1997. Specifically, Peters attests that Stamford failed to pay him certain stipends on several dates following November 28, 1997. [7] *See* Def.'s Ex. 4, Response to ¶ 10. According to *Morgan*, Peters' Title VII claims as to any adverse employment actions that occurred after November 28, 1997 are not time-barred. Thus, those stipends are actionable.

To sum up: as to Peters' allegation as to Stamford's hiring of him as a provisional sanitarian on October 28, 1996, the Court concludes that this claim is time-barred and must be dismissed. As to Peters' claims regarding the May 6, 1997 letter agreement and the stipends, the Court declines to grant summary judgment on the basis that these claims are time-barred. The Court will address the merits of these claims in the following section.

### b. *Merits of Discrimination Claim*

Stamford also argues that Peters has failed to establish a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) as to his Title VII claims.

Under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), a plaintiff alleging disparate treatment based on race in violation of Title VII must first establish a prima facie case of discrimination. To establish a prima facie case of race discrimination, a plaintiff must show (1) membership in a protected class, (2) qualification for continued employment, (3) an adverse employment action, and (4) circumstances that give rise to an inference of discrimination. *See* McDonnell Douglas, 411 U.S. at 802. The burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is "minimal." James

v. New York Racing Ass'n, 233 F.3d 149, 153 (2d Cir.2000) (internal quotation marks omitted).

Once a prima facie case is established, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the plaintiff's termination. *See id.* If the employer does so, the plaintiff bears the "ultimate burden" of proving " 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." ' , Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir.2001) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)); *see also* Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). A plaintiff's prima facie case plus a showing of pretext may defeat a properly supported summary judgment but will not always do so. *See* Lizardo v. Denny's, Inc., 270 F.3d 94, 103 (2d Cir.2001) (citing Reeves, 530 U.S. at 146–48). Instead, the court must determine whether the plaintiff's proof could convince a reasonable fact-finder that discrimination motivated his employer. *See id.* In making this determination, the court should consider the strength of the prima facie case, the proof that defendants' explanation was false, and any other probative proof in the record. *See* Allah v. City of New York Dep't of Parks & Recreation, 47 Fed. Appx. 45, *49, 2002 WL 31119698 at * *3 (2d Cir. Sept. 25, 2002).

**\*7** Stamford contends that it is entitled to summary judgment as to Peters' race discrimination claim because Peters has failed to present sufficient evidence of one of the prongs of his prima facie case, namely, that the adverse employment actions occurred under circumstances giving rise to an inference of race discrimination.

However, the Court finds that Peters has satisfied the minimal burden of proving a prima facie case. Stamford does not challenge whether Peters is a member of the protected class of African–Americans, whether Peters was qualified for continued employment, or whether his lower starting salary and stipends constitute adverse employment actions.

As to the final prong, the Court concludes that Peters has satisfied his "minimal" burden of proving circumstances that give rise to an inference of discrimination. It appears from the record that Peters and Gibeault were similarly situated. They were both temporary health inspector employees and appear to have been of roughly the same capability. As well, they were "promoted" to permanent employee status pursuant

to the same May 6, 1997 letter agreement. Finally, Stamford does not dispute that Peters' starting salary was lower than Gibeault's. "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination...." *McGuinness v. McGuinness c. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001)). Additionally, Stamford has not set forth any non-discriminatory reasons for the pay differential. Accordingly, the Court concludes that Peters has established a prima facie case of race discrimination, and Stamford's motion for summary judgment on this claim is denied.

As to the stipends, however, the Court concludes that Stamford has demonstrated a legitimate, non-discriminatory reason for the delay in paying Peters stipends in 1998, and Peters has not demonstrated that this reason was a pretext for discrimination. In the affidavit of Margaret Murray, annexed as Exhibit 1 to Stamford's submission in support of its motion for summary judgment, Murray states that the stipends referred to by Peters are payments for certificates earned from the State of Connecticut. Murray Aff. at ¶ 21. According to Murray, "[a]ll employees seeking payment for such stipends are required to submit copies of the certificates earned before payment is made." *Id.* at ¶ 25. Murray goes on to state that "[o]n or about October, 1998, the plaintiff's stipends were held up because he declined to provide copies of the certificates he allegedly earned, as such are required to pay the stipend." *Id.* at ¶ 22. After the plaintiff provided the copies of certificates, Murray states, "the plaintiff was paid his stipends on March 11, 1999." *Id.* at ¶ 24.

Peters has not presented evidence sufficient to create a genuine issue of material fact "that the legitimate reason[ ] offered by the defendant were not its true reason[ ], but were a pretext for discrimination." *Reeves,* 530 U.S. at 143. That is, Peters has not presented sufficient evidence to suggest that his failure to timely submit the certificates was not the reason for Stamford's delay in paying him the stipends such that a reasonable fact-finder could conclude that discrimination motivated Stamford with regard to the stipends. *See Lizardo,* 270 F.3d at 103 (citing *Reeves,* 530 U.S. at 146–48).

**\*8** Thus, the Court declines to grant summary judgment as to Peters' Title VII claim of race discrimination regarding paychecks received after November 28, 1997 and pursuant

to the May 6, 1997 letter agreement. However, summary judgment is granted as to Peters' claim of race discrimination with regard to the stipends.

### 2. *Retaliation*

Under Title VII, "[i]t also ... [is] an unlawful employment practice for an employer to discriminate against any of his employees .... because [the employee] opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Fitzgerald,* 251 F.3d at 358 (quotations and citations omitted). To establish a prima facie case of retaliation, the plaintiff must show: (1) participation in a protected activity; [8] (2) the employer knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir.2001); *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999). Once a prima facie case is established, the burden of production shifts to the employer to show that a legitimate, nondiscriminatory reason existed for its action. *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001).

Peters claims that he opposed and spoke out against certain health inspection activities of his co-workers and that Stamford's hiring him as a provisional, rather than permanent, sanitarian on October 28, 1996, the lower pay he initially received in May 1997, and Stamford's delay in paying him certain stipends were in retaliation for such speech.

As to Peters Title VII retaliation claim regarding Stamford's hiring of him as a provisional sanitarian on October 28, 1996, the Court concludes, as above, that claim is time-barred. As to Peters' Title VII retaliation claim regarding the stipends, the Court concludes that, for the reasons discussed above, even assuming Peters has established a prima facie case of retaliation, Stamford has demonstrated a legitimate, non-discriminatory reason for the delay in paying Peters stipends, and he has not demonstrated that this reason was a pretext for retaliation.

As to Peters' retaliation regarding the paychecks received pursuant to the May 6, 1997 letter agreement, the Court

concludes that he has failed to establish a prima facie case of retaliation. As to the first prong of the inquiry, Peters stated in his answers to Stamford's supplemental interrogatories that he opposed and spoke out against selective enforcement practices by the Health Department against ministers. Def.'s Ex. 4, Responses to Interrogatories ¶ 13; Supplemental Responses to Interrogatories ¶ 22. Thus, he appears to have engaged in a protected activity. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) (stating first prong of inquiry to be whether plaintiff "engaged in protected activity by opposing a practice made unlawful by Title VII"). Peters' evidence also indicates that Stamford knew of the protected activity. As to the third prong, Stamford does not dispute that the lower pay he initially received in May 1997 is an adverse employment action.

**\*9** As to the final prong, however, Peters has not produced any evidence indicating a causal connection between the protected activity and the adverse employment action. Peters' has not presented any direct evidence of such a causal connection. Nor has he presented any indirect evidence. "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. General Elec. Co.,* 252 F.3d 205, 218 (2d Cir.2001) (internal quotation marks omitted); *see also Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). To the extent Peters provided dates of his protected activity, *see* Def.'s Ex. 4, Responses to Interrogatories ¶ 15; Supplemental Responses to Interrogatories ¶ 19, those dates are not in close temporal proximity with the May 6, 1997 letter agreement or the subsequent discriminatory paychecks. *Cf. Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (two months between protected activity and allegedly adverse action sufficient to establish causation); *Phillips v. Bowen,* 278 F.3d 103, 109–11 (2d Cir.2002) (in First Amendment retaliation case, plaintiff presented some direct evidence of retaliation, as well as a close temporal relationship between the adverse action and the retaliatory actions, which, when viewed in combination, gave rise to a reasonable inference of retaliation).

Moreover, the fact that Stamford hired Peters after he voiced his opposition to the work practices belies the fact that his lower salary was attributable to retaliation. *Cf.*

*Rand v. CF Industries,* 42 F.3d 1139, 1147 (7th Cir.1994) (finding no reasonable inference of discrimination where discharged attorney was member of protected class when hired). Accordingly, summary judgment must be granted as to Peters' Title VII retaliation claims with regard to the May 6, 1997 letter agreement and the stipends.

### C. *Section 1983 Claims* [9]

#### 1. *Municipal Liability*

As to Peters' § 1983 claims, Stamford argues that Peters has failed to establish the municipal liability of Stamford. Although a city may not be liable under § 1983 for the unconstitutional actions of its employees under the doctrine of *respondeat superior,* it may be held responsible for its own conduct caused by unconstitutional policies. "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978). Thus, to impose liability on a municipality, the plaintiff must prove that a municipal policy or custom caused a deprivation. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 137 (2d Cir.1999). A "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690. A "custom" is a "persistent and widespread discriminatory practice ... so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691 (citation omitted.).

**\*10** The policy or custom "need not be contained in an explicitly adopted rule or regulation," but actions by an official whose edicts or acts represent official policy may result in municipal liability under § 1983. *Wimmer,* 176 F.3d at 137. Thus, if the challenged action is directed by an official with "final policymaking authority," the municipality may be liable even in the absence of a broader policy. *See Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–83 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.")).

Such a policy may be inferred from circumstantial proof, but the mere assertion that a municipality has such a policy is generally insufficient to support such an inference. *See* Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993). "A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id* .

The Court concludes that H. James Haselkamp, Jr.'s role as the Director of Labor Relations for Stamford,[10] and his signing of the May 6, 1997 letter agreement on behalf of Stamford, provide a sufficient basis for holding Stamford liable under § 1983. It appears from the record that Haselkamp had final policymaking authority with regard the hiring of Stamford employees and the terms and conditions of their employment. *See* Mandell, 316 F.3d at 385 ("Here, plaintiff challenges as retaliatory employment decisions made by Gallagher, who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies."); *cf.* Looby v. City of Hartford, 152 F.Supp.2d 181, 188 (D.Conn.2001) (finding no evidence that defendant fire chief had power to create policy with respect to employment decisions); DeLeon v. Little, 981 F.Supp. 728, 741 (D.Conn.1997) (finding no municipal liability where defendant had "lack of final decisionmaking authority over employment/personnel matters"). Accordingly, the Court declines to dismiss Peters' § 1983 claims against Stamford based on failure to show municipal liability.[11]

### 2. *Merits of* § 1983 *Claims*

As the Court found with regard to Peters' Title VII claims, Peters has established a prima facie case of race discrimination with regard to the May 6, 1997 letter agreement, failed to establish a prima facie case of race discrimination with regard to the stipends, and failed to establish a prima facie case of retaliation based on his opposition to certain of the Health Department's enforcement actions. Additionally, as noted above, Peters appears to have abandoned his claim of discrimination with regard

to Stamford's hiring of him as a provisional sanitarian on October 28, 1996. *See* Peters Dep. at 138 ("Q. Did anyone discriminate against you in hiring you back in October/November of 1996? A. No, that's not my claim.").

Accordingly, only Peters' § 1983 race discrimination claim with regard to the May 6, 1997 letter agreement remains in the case.

### D. *CFEPA Claim*

**\*11** The CFEPA provides that a claim of discrimination filed pursuant to Conn. Gen.Stat. § 46a–82 must be filed "within one hundred and eighty days after the alleged act of discrimination...." Conn. Gen.Stat. § 46a–82(e); *see* Williams v. Commission on Human Rights & Opportunities, 777 A.2d 645 (Conn.2001). Accordingly, for the reasons noted as to Peters' Title VII claims, the Court concludes that only Peters' race discrimination regarding paychecks received after March 26, 1998 and pursuant to the May 6, 1997 letter agreement are viable. *See* Maloney v. Connecticut Orthopedics, P.C., 47 F.Supp.2d 244, 247 (D.Conn.1999) (citing Malasky v. Metal Prods. Corp., 689 A.2d 1145 (Conn.App.1997), *cert. denied,* 241 Conn. 906, 695 A.2d 539 (1997)) (federal law on continuing violations theory is applicable to CFEPA).

### V. *Conclusion*

For the foregoing reasons, Stamford's motion for summary judgment [Doc. # 43] is GRANTED IN PART, DENIED IN PART. Only Peters' Title VII race discrimination claims with respect to paychecks received after November 28, 1997, Peters CFEPA race discrimination claims with respect to paychecks received after March 26, 1998, and Peters' section 1983 claims with regard to the May 6, 1997 letter agreement remain in the case.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1343265

### Footnotes

1    The following facts are taken from the parties' Local Rule 9(c) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

2    The record does not make clear Peters' job duties. However, they appear to relate to health inspection and other environmental health functions.

3    These stipends appear to be payments for completing certain training programs.

4    The results of the CHRO and EEOC complaints are not apparent from the record.

5    Though it is unclear from the complaint, Peters appears to bring both race discrimination and retaliation claims pursuant to Title VII.

6    The Court assumes for the purposes of this ruling that Peters' filing with the CHRO controls for purposes of the determining the relevant limitations period.

7    Peters also states several other discriminatory and/or retaliatory employment actions allegedly occurred after November 28, 1997. Those include: barring him from certain job duties; confiscating certain of his work materials; harassing him; threatening him; unfairly reprimanding him; denying him training; denying him "due process and protection from harassment"; subjecting him to "racially derogatory statements about competence and qualifications of Black Inspectors." Def.'s Ex. 4. However, Peters does not allege these "adverse employment actions" in his CHRO complaint or the instant complaint. Accordingly, the Court will not address them as claimed "adverse employment actions" that resulted because of discrimination or retaliation.

8    Making informal complaints such as those to management is a protected activity under Title VII. *Gonzalez v. Bratton,* No. 96 CIV. 6330(VM), 97 CIV. 2264(VM), 2000 WL 1191558, at 12 n. 4 (S.D.N.Y. Aug. 22, 2000).

9    Again, though it is unclear from the complaint, Peters appears to bring both equal protection race discrimination and First Amendment retaliation claims pursuant to 42 U.S.C. § 1983.

10    According to the May 6, 1997 letter, Haselkamp was the Director of Labor Relations for Stamford. In the deposition of Peters, counsel for Stamford describes Haselkamp as the "former director of Human Resources." Peters Dep. at 227.

11    This is without prejudice to Stamford presenting evidence to the Court at trial that Haselkamp did not have such authority. However, this is a question of law for the Court to decide, not a question of fact for the jury to resolve. *See Jett v. Dallas Indep. School. Dist.,* 491 U.S. 701, 737 (1989) (whether a person has final decision-making authority is "a legal question to be resolved by the trial judge before the case is submitted to the jury").

---

**End of Document**          © 2020 Thomson Reuters. No claim to original U.S. Government Works.