UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MIA CASTRO, M.D., HEIDI BOULES, M.D., ASHLEY ELTORAI, M.D., JODI-ANN OLIVER, M.D., LORI-ANN OLIVER, M.D. and ELIZABETH REINHART, M.D., <br>        *Plaintiffs*, <br>    *v.* <br><br><br>YALE UNIVERSITY, YALE NEW HAVEN HOSPITAL, INC. and MANUEL LOPES FONTES, M.D, in his individual and professional capacities, <br>        *Defendants*, | Civil No. 3:20cv330 (JBA) <br><br> February 9, 2021 |

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS'
MOTIONS TO DISMISS**

Plaintiffs Heidi Boules, M.D., Mia Castro, M.D., Ashley Eltorai, M.D., Jodi-Ann

Oliver, M.D., Lori-Ann Oliver, M.D., and Elizabeth Reinhart, M.D., bring suit against

Yale University ("Yale"), Yale New Haven Hospital, Inc. ("YNNH"), and Manuel Lopes

Fontes, M.D. claiming sex discrimination and retaliation in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, and Title IX of the Education Amendment

Act of 1972, 20 U.S.C. § 1681, and sex discrimination in violation of the Connecticut

Fair Employment Practices Act (CFEPA), Conn. Gen Stat. 46a-60, against Yale and

YNNH, retaliation in violation of the CFEPA against all three Defendants, aiding and

abetting in violation of the CFEPA against Dr. Fontes, and state tort claims of assault,

battery, and invasion of privacy against Dr. Fontes under the Court's supplemental

jurisdiction. (Second Amended Compl. (SAC) [Doc. # 102] at 53-63.) Defendants Yale,

YNNH, and Dr. Fontes move to dismiss. (Fontes Mot. to Dismiss [Doc. # 50]; YNNH's

Mot. to Dismiss [Doc. # 51]; Yale's Mot. to Dismiss [Doc. # 53].) Plaintiffs oppose all

motions. (Pls.' Omnibus Mem. of Law in Opp. to All Defs.' Mot. to Dismiss [Doc. # 61]

at 13-14.) For the reasons that follow, Defendants' Motions to Dismiss are DENIED in part and GRANTED in part.[1]

## I.      Background Allegations about Dr. Fontes

Plaintiffs Mia Castro, M.D., Heidi Boules, M.D., Ashley Eltorai, M.D., Jodi-Ann Oliver, M.D., Lori-Ann Oliver, M.D. and Elizabeth Reinhart, M.D., all female doctors in the Yale Department of Anesthesiology and involved with the residency program of YNNH, allege that Dr. Fontes, their supervisor at YNNH and Yale, sexually harassed them by making inappropriate and sexualized comments, forcibly touching and kissing them, and professionally punishing them for speaking out.  They allege that Yale and YNNH turned a blind eye to Fontes's actions by allowing him to harass his female subordinates with impunity and perpetuated a hostile environment by elevating Dr. Fontes to be Vice Chair of Diversity, Equity, and Inclusion for the Department of Anesthesiology despite repeated complaints about his behavior.

### i.      Dr. Jodi-Ann Oliver – Attending Physician at YNNH and Faculty Member at Yale

Dr. Jodi-Ann Oliver alleges her harassment began in 2016 when Dr. Fontes repeatedly "touch[ed] her lower back, slipp[ed] his hand down to her backside, and unwantedly and inappropriately hugg[ed] her" at a pediatric anesthesiology retreat. (SAC ¶ 173.) When she reported the misconduct to the Division Chief, he told her that Dr. Fontes was "handsy" and "affectionate" because of his heritage. The next year, when Dr. Oliver requested an accommodation for an injured wrist, "Dr. Fontes called her a 'malingerer,' told her to 'shut up' and 'shut the f--k up,' and that he would 'fire her if she kept talking.'" (*Id.* ¶ 176.) Dr. Fontes also opposed her appointment to a position on the Pediatric Anesthesiologist Fellowship committee because she was a

---

[1] On the record at Oral Argument on December 1, 2020, the Court denied Defendant Fontes's motion that the Court decline supplemental jurisdiction over the state law claims against him. (Fontes's Mot. at 1-2.)

"malingerer." She again reported the mistreatment to both the Division Chief and Dr. Roberta Hines, the Chair of the Department of Anesthesiology, but neither followed up.

Dr. Oliver's next incident with Dr. Fontes was at a colleague's' going-away party in mid-2018 when Dr. Fontes repeatedly rubbed her arms and back and made whispered sexual advances in her ear, commenting on her figure and calling her his "island girl." In April 2019, at another professional dinner, Dr. Fontes again rubbed Dr. Oliver's arms, neck, back, and shoulders, commented on her figure, and made whispered sexual advances to her throughout the dinner. At the end of the dinner, while inebriated, Dr. Fontes "gave her an unsolicited hug, put his hands all over her body, and proceeded to forcibly kiss her on the lips." (*Id.* ¶ 186.) Considering the lack of response to her prior reports, Dr. Oliver did not report the inappropriate touching, unwanted hug, or forcible kissing. As a result of Dr. Fontes's actions, Dr. Oliver was "deeply offended and deeply devasted." (*Id.* ¶ 192.)

> ii.    *Dr. Lori-Ann Oliver - Attending Physician at YNNH and Faculty Member at Yale*

Dr. Lori-Ann Oliver, sister of Jodi-Ann, describes her experience with Dr. Fontes's inappropriate comments about her figure and that he would "unwantedly grab her and rub her shoulders, touch her lower back, hug her, grab her by the waist and pull her towards him, and put his face close to hers, violating her personal space" when she would see him in the hallways. (*Id.* ¶ 188.) She informed the Division Chief of the Pain Management section of the Department of Anesthesiology about Dr. Fontes's behavior in fall of 2018, but no follow up occurred. Dr. Lori-Ann Oliver was also at the April 2019 dinner where Dr. Fontes forcibly kissed her sister Dr. Jodi-Ann Oliver and, after forcing himself on her sister, Dr. Fontes "grabbed [Dr. Lori-Ann Oliver] by her arms, pulled her towards him, and forced his tongue down her mouth and kissed her on the lips as well." (*Id.* ¶ 187.) Following this interaction, Dr. Fontes

3

continued harassing Dr. Oliver, coming up to squeeze her shoulders and "put his hand on her back and around her waist" at an anesthesiology conference in October 2019. (*Id.* ¶ 190.) Dr. Lori-Ann Oliver reports feeling "mortified" by and fearful of Dr. Fontes and was "deeply offended and deeply devasted" by Dr. Fontes's actions. (*Id.* ¶¶ 191-92.)

> iii.    *Dr. Heidi Boules – Attending Physician at YNNH and Assistant Professor at Yale*

Dr. Boules alleges Dr. Fontes began harassing her as early as her interview dinner in late 2017 when he sat and spoke so closely next to her that another doctor switched seats with her because she looked uncomfortable. Later, in mid-2018, Dr. Fontes "repeatedly touched and groped [her] arm, leg and thigh as he sat next to her" at a going-away dinner. (*Id.* ¶ 103.) After the dinner, Dr. Fontes solicited one-on-one meetings with Dr. Boules, sending messages with emojis of alcoholic beverages in them to imply that the meeting would not be professional, and eventually succeeded in securing a meeting with Dr. Boules and a male colleague, where Dr. Fontes "made repeated overtly sexist, sexual and inappropriate comments" that made Dr. Boules feel uncomfortable. (*Id.* ¶ 104.) Then, at a one-on-one professional meeting at a café in October 2018, Dr. Fontes proceeded to "grab Dr. Boules's face, pull her face close to his and forcibly and unwantedly kiss her on the lips" three or four times, despite Dr. Boules's repeated objections. (*Id.* ¶ 108.) Just a few days later, Dr. Fontes again attempted to "forcibly and unwantedly kiss [her] on the lips" while at the hospital. (*Id.* ¶ 109.) The physical touching continued in July 2019, when Dr. Fontes unwantedly hugged Dr. Boules, and in September 2019, when Dr. Fontes snuck up behind Dr. Boules in the operating room, "leaned the front of his body into her backside, put his cheek against her cheek, [] whispered into her ear about how quiet the operating room was," and asked her on a date. (*Id.* ¶ 110.)

In addition to the unwanted touching, Dr. Fontes failed to discipline a male surgeon at the hospital who told a third male colleague of Dr. Boules to "get your bitch under control, she's a cunt." (*Id.* ¶ 111.) Despite others witnessing the behavior and Dr. Boules reporting the male surgeon's actions, when Dr. Boules spoke to Dr. Hines, Dr. Hines "referred to the male surgeon, in sum and substance, as a 'bad boy, [] that 'everyone knows [is] crazy' and instructed Dr. Boules to not 'let it get to you.'" (*Id.*) When Dr. Boules reached out to Dr. Friedman, Chief Medical Experience Officer at YNNH, about the harassment, she did not receive a response. As result of Dr. Fontes's actions, Dr. Boules reports "feeling demeaned, traumatized, and afraid to be left alone with Dr. Fontes." (*Id.* ¶ 113.)

iv. *Dr. Elizabeth Reinhart – Anesthesiology Resident at Yale and YNNH*

Dr. Reinhart alleges that Dr. Fontes's harassment of her began in May 2019 when, at the end of a professional dinner with pharmaceutical representatives, Dr. Fontes "attempted to unwantedly kiss her on the lips" and then, after she avoided his advance by turning her face, followed her out of the restaurant and insisted on driving her home. (*Id.* ¶ 197-98.) The following month at a graduation ceremony, Dr. Fontes asked if she was going out later and tried to entice her by saying, "I have misbehaved in the past at Barcelona after graduation, so what happens there stays there." (*Id.* ¶ 201.) He later "wrapped his arm around and hugged her by the waist" and told her that he would see her at the bar later. (*Id.* ¶ 203.) Dr. Reinhart was so shaken up by the encounter that she spent the night at another physician's home, who then reported the incident to the Residency Coordinator. A few weeks later, Dr. Fontes came up behind Dr. Reinhart and began to unwantedly massage her shoulders. Dr. Reinhart reported his advances to the Residency Program Director and Assistant Clinical Director, received no follow up, and instead was informed by department-

wide email that Dr. Fontes would be appointed as the Vice Chair of Diversity, Equity, and Inclusion of the Department.

In response to Dr. Fontes's appointment, Dr. Reinhart, along with Dr. Castro, complained to the Yale University Graduate Medical Education Department, which assigned their complaints to Dr. Rosemarie Fisher, Director of Resident/Fellow Well-Being within the Office of the Provost at Yale. They also spoke with Attorney Aley Menon, the Secretary of the University-Wide Committee on Sexual Harassment, who instructed them to contact Dr. Friedman, in addition to pursuing their complaints within Yale. Dr. Friedman offered to work with Yale to address the complaints, but informed Dr. Reinhart and Dr. Castro that the claims of physical sexual harassment and assault were outside the scope of YNNH's established mechanism for dealing with complaints. In response to Dr. Reinhart's complaints, at a conference in October 2019, Dr. Fontes linked his arm with Dr. Reinhart and asked her where her "partner in crime" was, referring to Dr. Eltorai, who had also made formal complaints. (*Id.* ¶ 215.) As a result of Dr. Fontes's actions and the lack of response from Yale and YNNH, Dr. Reinhart reports "feeling offended and traumatized" and fearful of being alone with Dr. Fontes.  (*Id.* ¶ 218.)

> v.      *Dr. Mia Castro – Pediatric Anesthesiology Resident and Fellow at Yale and YNNH*

Dr. Castro describes how Dr. Fontes repeatedly came up behind her and "unwantedly put his arms on and/or around her shoulders and waist" in the operating room throughout the summer and fall of 2018. (*Id.* ¶ 115.) In one specific incident in mid-August 2018, Dr. Fontes placed his hand on her shoulder and "came up behind her and put his arm around her waist as he p[ee]ked over" her shoulder. (*Id.* ¶ 117.) When she rebuffed his advances, Dr. Fontes retaliated against her by "yell[ing] at [her] and command[ing] Dr. Castro to degradingly pick up a syringe cap that had fallen on the ground rather than tend to a patient who was severely

hypotensive." (*Id.* ¶ 120.) After this episode, Dr. Castro submitted an anonymous evaluation complaining about Dr. Fontes's conduct in the operating room.

In July and August 2019, Dr. Fontes retaliated against her for submitting the evaluation by declining to permit Dr. Castro to go on a mission trip to Peru unless she used her vacation time. Even after the American Board of Anesthesiology agreed to approve and accredit the trip upon receipt of the relevant application, Dr. Fontes refused to support Dr. Castro's application. He "derisively winked at her" on August 31, 2020 as a form of intimidation and hostility. (*Id.* ¶ 127.) Dr. Castro went on the trip but is uncertain if she will receive credits for it without Dr. Fontes's support. Dr. Castro reports "feeling belittled and traumatized, afraid to be left alone with [Dr. Fontes,] unable to, at times, focus on work," and avoiding educational opportunities where she knows he will be present. (*Id.* ¶ 128.)

> vi.    *Dr. Ashley Eltorai - Attending Physician at YNNH and Assistant Professor at Yale*

Dr. Eltorai describes how, in September 2018, she informed Dr. Fontes of her pregnancy, and he made an inappropriate comment about her "flat stomach" and refused to facilitate her research, writing to her in October 2018 that it "[d]oesn't look like you'll get any patients and with your leave coming up this spring – I don't see this project getting started let alone completed." (*Id.* ¶ 135.) Dr. Eltorai reported his comment to Dr. Hines on October 25, but was told that he was "just being a boy." (*Id.* ¶ 136.) Although Dr. Eltorai was assured by the Department of Anesthesiology, through email correspondence that included Dr. Fontes, that she would meet the requirements necessary to receive her full annual salary despite her maternity leave, Dr. Fontes told her that she would not meet her requirements or receive her full salary. Dr. Eltorai complained to the Faculty Affairs department that she felt she was being punished for taking maternity leave.

In response to her report, Dr. Eltorai recalls that she was called into a meeting with Dr. Fontes and the director of the Intensive Care Unit (ICU) to discuss her performance in the ICU. Despite only working three days in the unit over the past several months, Dr. Fontes and the ICU Director gave her "vague criticisms about her performance, referencing outdated performance evaluations, and told her that nurses and mid-level practitioners had complained about her." (*Id.* ¶ 144.) When Dr. Eltorai asked for more details, none were provided.  When she offered to speak to the nurses directly to understand their concerns, she was told to "wait a few days because we want to speak with them first." (*Id.* ¶ 145.) Upon speaking with the practitioners, Dr. Eltorai recalls that they appeared confused and did not communicate any concerns about her performance.

After returning from maternity leave, Dr. Eltorai attended a graduation dinner for anesthesiology fellows where Dr. Fontes made multiple comments about her body and marital status, and tried to spoon-feed her from across the table. Dr. Fontes also admitted that he had stymied her research efforts and offered to help more in the future. When Dr. Eltorai went to his office to discuss the project, Dr. Fontes pulled his chair around the desk to sit right next to her while they talked and then gave her a full body hug during which he "pressed his pelvis against her pelvis" as she tried to leave. (*Id.* ¶ 160.) After the office incident, he unwantedly massaged her shoulders and touched her unwantedly and in a flirtatious manner while she was speaking with a patient's family.

In August 2019, Dr. Eltorai, reported Dr. Fontes's behavior to Attorney Menon with the Yale Committee on Sexual Misconduct. A week after making the report, on August 15th, she was again asked to meet with Dr. Fontes and the ICU Director to discuss a performance issue that had purportedly occurred in the ICU in April 2019, before she went on maternity leave. She was told that the case had been flagged by

the YNNH peer review committee and that an investigation would be conducted that could result in discipline. However, when she asked for documentation about the investigation, she was told that there was none. When Dr. Eltorai asked member of YNNH if that was typical, she was told that it was "absolutely not the way clinical investigations are handled at our institution" and that it "sounds suspicious." (*Id.* ¶ 150.) She was then informed that she would no longer be permitted to work in the ICU.

After Dr. Eltorai filed this lawsuit in March 2020, she faced further retaliation. She had been permitted back into the ICU to work during the COVID-19 pandemic. However, on April 14, 2020, she received a call from the ICU leadership team chastising her for blocking a transfer patient, even though the refusal had happened during another physician's shift. On May 17, 2020, she was told that she could no longer volunteer for the virtual Tele-ICU that the Department of Medicine was hosting unless she received approval from Dr. Hines, even though Dr. Hines had already informed the faculty that they were permitted to engage in COVID-related volunteer work, so long as it was on their own time. When Dr. Eltorai, upon request of the Yale Department of Medicine, asked Dr. Hines if she could pick up some volunteer shifts in June, Dr. Hines denied her request.

### vii.  *Procedural Background*

Plaintiffs filed their initial complaint on March 12, 2020, (Complaint [Doc. 1]), at which time Plaintiffs were still awaiting the jurisdiction release of their Title VII and CFEPA claims from the Equal Employment Opportunity Commission (EEOC) and the Connecticut Commission on Human Rights and Opportunities (CHRO). Plaintiffs filed their amended complaint, including the released Title VII claims, on May 29, 2020, (Amended Compl. [Doc. # 44] at 4-5), and filed their second amended complaint, including the CFEPA claims, on January 4, 2021, (SAC).  Defendants Dr.

Fontes, YNNH, and Yale filed their Motions to Dismiss on June 17, 18, and 19, respectively, and Oral Argument was held, via video conference, on December 1, 2020.

> Defendant YNNH argues that Plaintiffs' Title IX claims fail because:
>
> (1) Title IX does not apply to YNHH, an entity not principally engaged in the business of education,
> (2) Plaintiffs Boules's, Eltorai's and Olivers' relationships to an educational program or activity are too attenuated to entitle them to Title IX coverage,
> (3) Title IX does not provide a private remedy for employment discrimination based on sex,
> (4) Plaintiffs have not established that YNHH had actual notice of the alleged wrongdoing, and
> (5) Plaintiffs Eltorai and Castro did not allege that they engaged in either a protected activity, or suffered an adverse employment action, both of which are necessary to sustain retaliation claims.

(YNNH's Mot. at 1-2.) YNNH further seeks dismissal of the Title VII claims because (6) Plaintiffs Eltorai and Castro fail to plead engagement in protected activities or adverse actions for their retaliation claims under Title VII and (7) Plaintiff Eltorai's failure to plead an adverse action similarly dooms her pregnancy discrimination claim. (*Id.*)

Yale's motion for dismissal similarly claims that Title IX does not provide a private remedy for employment discrimination and maintains that Drs. Jodi-Ann and Lori-Ann Oliver do not allege severe or pervasive harassment under Titles VII or IX, that Drs. Castro, Boules, Lori-Ann Oliver, and Jodi-Ann Oliver failed to establish that Yale had "actual notice" of the alleged wrongdoing, and that Drs. Eltorai and Castro have not alleged an adverse employment action under either Title VII or Title IX. (Yale's Mot. at 1-2.)

## II.   Discussion

The Court begins by addressing YNNH's claim that, even as a teaching hospital receiving federal funds, it is not subject to Title IX, and that the statute provides no

private right of action for employees of educational programs to bring sex-based discrimination claims. The Court will then address the claimed factual insufficiencies regarding notice, nature of the harassment, and non-existence of an adverse action.

   a.   *YNNH May Be Subject to Title IX*

Title IX prohibits sex-based discrimination in "any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Focusing on "educational program or activity," federal appellate courts apply a series of factors to determine the educational nature of the program or activity: the structure of the program, including the involvement of instructors and inclusion of examinations or formal evaluations; whether tuition is required; the benefits conferred through the program, such as degrees, diplomas, or other certifications; the "primary purpose" of the program; and whether regulators accrediting the institution "hold it out as educational in nature." *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 556 (3d Cir. 2017) (a teaching hospital directly affiliated with a university and "operati[ng] an ACGME-accredited residency program" is subject to Title IX because "its mission, at least in part, [is] educational"); *see also Robideaux v. North Dakota Dep't of Corr. and Rehab*, 570 F.3d 966, 978 (8th Cir. 2009) (holding that Title IX did not apply to the on-the-job-training offered at a prison because "the primary purpose [] is to provide employment, not educational opportunities"); *O'Connor v. Davis*, 126 F.3d 112, 118-19 (2d Cir. 1997) (finding Title IX inapplicable to a hospital where the relationship between the medical center and the school was too attenuated).

YNNH asserts that, even if "an academic medical center [is] affiliated with a postsecondary institution or [] considered part of the same entity as the postsecondary institution," recent amendments to Title IX regulations "clarif[y] that 'academic medical centers *are not* postsecondary institutions.'"(YNNH's Mem. in Supp. of Mot. to Dismiss [Doc. # 52] at 8-9 (citing Proposed Dep't of Ed. Reg. § 106.3,

85 Fed. Reg. 30026, 30447-48, Q&A § 106.45(b) (May 19, 2020) (emphasis added).)
Plaintiffs respond by quoting the Third Circuit that the "Supreme Court has twice
instructed us [] to give Title IX the scope its origins dictate [by] accord[ing] it a sweep
as broad as its language," *Mercy,* 850 F.3d at 555, and argue that the plain language of
Title IX necessarily extends to a teaching hospital because it is an educational
program or activity, (Pls.' Omnibus Opp. at 23).

The Court, heeding the Supreme Court's instruction to afford Title IX a broad
scope and construing the pleadings in favor of the Plaintiffs, rejects the significance
that YNNH attributes to the agency language that academic medical centers are not
postsecondary institutions because it ignores the clear comment given by the
Department of Education that "Congress *did not exempt* academic medical centers
that receive Federal financial assistance from Title IX," and that "[w]hether these final
[educational] regulations apply to a person, including a medical resident, *requires a
factual determination*" like that utilized in *Mercy* and *O'Connor*. § 106.3, 85 Fed. Reg.
at 30447 (emphasis added). For example, in marked contrast to this case, the
*O'Connor* court found that the medical institution at issue was not subject to Title IX
specifically because "[t]he environment [] is not [] analogous to a teaching hospital's
'mixed employment-training context'" such as is alleged to exist at YNNH.  *O'Connor*,
126 F.3d at 118.

Here, Plaintiffs allege the following relationship between YNNH and Yale:

31. Yale University is an academic university and educational institution that
receives financial assistance from the Federal government.  Yale University
operates a School of Medicine, and works in conjunction with YNHH to operate
a medical residency and fellowship program, the mission and purpose of
which is educational. . . .

33. Yale New Haven Hospital, Inc. is a teaching hospital . . . and works in
conjunction with Yale University to operate a medical residency and
subspecialty fellow program, the mission and purpose of which is educational.
On its website, YNHH states that it is the "primary teaching hospital of Yale
School of Medicine."  YNHH's medical residency program is affiliated with Yale

University's School of Medicine.  Residents and subspecialty fellows such as Dr. Reinhart and Dr. Castro sign "agreements of appointment" with YNHH which state, inter alia, that YNHH "shall . . . provide such other support as shall be necessary to ensure a safe and appropriate work and educational environment," and that "[t]he institution does not tolerate sexual or other forms of harassment."  These agreements also acknowledge that residents and fellows are subject to both YNHH and Yale University policies and procedures affecting their employment. . . .

40. The medical residency and fellowship program operated at YNHH inures benefit to Yale University, and Yale University's affiliation to YNHH's medical residency inures benefit to YNHH. YNHH and the University share staff, funding and other support.  Residents and fellows at YNHH provide valuable medical services to the residency and fellowship program in exchange for remuneration and educational training as to the knowledge and techniques that are applicable to the medical specialty in which the resident physician or fellow seeks certification.  YNHH's medical residency and fellowship program requires its residents and fellows, including Dr. Reinhart and Dr. Castro, to train under Yale University faculty members and physicians, attend lectures conducted by Yale University faculty and staff, conduct research and/or draft scholarly papers with and/or under the supervision of Yale University faculty and staff, study medical and scholarly literature, make case presentations to Yale University faculty and staff, attend case presentations by Yale University faculty and staff and take annual examinations. YNHH's residency and fellowship program prepares its residents and fellows to sit for examinations for board certification in the area of medical specialty which is the focus of the program.

(SAC ¶¶ 31, 33, 40.) Applying the *Mercy-O'Connor* factors, Yale and YNNH have a contractual arrangement formally integrating the hospital with the university to share both staff and resources; instructors at the hospital are employed by both the university and the hospital; YNNH receives federal funding because of its status as a teaching hospital; and participation in the residency program prepares residents and fellows to sit for the examinations necessary for board certification. Further, YNNH's website states that it is the "primary teaching hospital of Yale School of Medicine," thereby affiliating itself with the university and holding itself out as an educational institution. *Id.* Thus, Plaintiffs have satisfactorily pled facts to demonstrate that YNNH,

as a teaching hospital receiving federal funds for its residency program, is subject to the requirements of Title IX.

    *b. Employees of Educational Institutions May Bring Suit for Sex-based Discrimination Under Both Titles VII and IX*

Defendants Yale and YNNH claim that Title IX does not provide a private right of action for employment discrimination based on sex. (Yale's Mem. in Supp. of Mot. to Dismiss [Doc. # 53-1] at 2; YNNH's Mem. at 12.) Plaintiffs point to "the majority of Circuit Courts (i.e., the First, Third, Fourth, Sixth, and Tenth Circuits) that [] have held that Title IX is not preempted by Title VII" and predict that the Second Circuit could soon join them. *See Mercy,* 850 F.3d at 560 ("Title VII's concurrent applicability does not bar Doe's private causes of action for retaliation and quid pro quo harassment under Title IX"); *Lipsett*, 864 F.2d at 896 (permitting claims against a teaching hospital to proceed under both Titles IX and VII); *Preston v. Com. of Va. ex rel. New River Com. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) (holding that Title IX's private cause of action "extends to employment discrimination on the basis of gender by educational institutions receiving federal funds"); *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (allowing both Title VII and Title IX claims to proceed in the same suit because Title IX "includes a prohibition on employment discrimination in federally funded educational programs"); *Ivan v. Kent State Univ.*, No. 94 Civ. 4090, 1996 WL 422496, at *2 (6th Cir. July 26, 1996) (applying the *McDonnell-Douglas* framework for employment discrimination to a claim of employment discrimination made under Title IX); *but see Lakoski v. James,* 66 F.3d 751, 758 (5th Cir. 1995) ("we hold that individuals seeking money damages for employment discrimination on the basis of sex in federally funded educational institutions may not assert Title IX");

14

*Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 861 (7th Cir. 1996) (holding that Congress intended Title VII to be the exclusive remedy for sex-based employment discrimination).

While the Supreme Court has yet to directly decide the issue, it did permit a basketball coach to bring a Title IX claim of discrimination against the school district that employed him, which he alleged fired him for raising concerns about funding disparities among gendered programs. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 165, 173 (2005). The Supreme Court relied on its prior decisions in *Cannon v. Univ. of Chicago*, holding that a private right of action is "fully consistent with—and in some cases even necessary to—the orderly enforcement of [Title IX]," 441 U.S. 677, 705–06 (1979), and *North Haven Bd. of Educ. v. Bell*, "conclu[ding] that employment discrimination comes within the prohibition of Title IX," 456 U.S. 512, 530 (1982), to conclude that the basketball coach, despite not being a victim of sex discrimination himself, could still bring suit under Title IX because the disparities that he reported, and was fired for, were covered under that statute. Thus, while *Jackson* did not explicitly address the relationship between Title IX and Title VII, it unequivocally permitted an employee to bring suit *under Title IX* against his employer for discrimination that directly affected his employment. Relying on the Supreme Court's implicit recognition that employment discrimination suits are cognizable under Title IX, the Third Circuit, the only Circuit to address the issue post-*Jackson*, concluded that

Title IX encompasses a private right of action for employees seeking redress for sex-based employment discrimination.[2] *Mercy,* 850 F.3d at 560.

The Second Circuit has yet to rule on the matter, *see Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("we [] do not address the [] issue of whether there is a private right of action for employment discrimination under Title IX"), and there exists a split within the District of Connecticut as well. *Compare Doe v. Cent. Connecticut State Univ.*, No. 3:19-CV-418 (MPS), 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) (adopting the reasoning of *Mercy* to hold that Title IX employment claims are not foreclosed by Title VII) *with Othon v. Wesleyan Univ.*, No. 3:18-CV-00958 (KAD), 2020 WL 1492864, at *11 (D. Conn. Mar. 27, 2020) (finding that the legislative history of the 1972 and Educational Amendments "reflect Congress's selection of Title VII as the [sole] available private remedy for claims of employment discrimination"); *see also Piscitelli v. Univ. of Saint Joseph*, 3:19-CV-01589, 2020 WL 3316413 (KAD), at *1 (D. Conn. June 18, 2020) (adopting the reasoning of *Othon*); *Uyar v. Seli*, No. 3:16-CV-186, 2017 WL 886934 (VLB), at *6 (D. Conn. Mar. 6, 2017) (decided before *Mercy*, holding that "Title VII is Plaintiff's exclusive remedy" for employment discrimination, without discussion of *Jackson*); *Urie v. Yale Univ.*, 331 F. Supp. 2d 94 (RNC), 97–98 (D. Conn. 2004) (pre-*Jackson* denial of a Title IX claim for employment discrimination). With no controlling precedent in this Circuit, this issue is ripe for judicial review.

---

[2] Compare with the pre-*Jackson* contrary holdings of the Fifth and Seventh Circuits, *Lakoski*, 66 F.3d 751 and *Waid*, 91 F.3d 857, decided a decade before *Jackson.*

At heart, Title IX's private right of action is an enforcement tool used to hold educational institutions accountable for their actions. *See Cannon,* 441 U.S. at 706–08 ("[T]he individual remedy will provide effective assistance to achieving the statutory purposes [of Title IX]."). The educational nature of the employer, not the position of the litigant, determines its applicability, s*ee O'Connor*, 126 F.3d at 116–17 (2d Cir. 1997); *North Haven*, 456 U.S. at 530-31. While Title IX's private right of action is argued to be duplicative of Title VII, the enforcement mechanisms of each statute apply to different categories of employers and serve independent ends: Title VII provides redress to individual employees for the discriminatory actions of their employers, while Title IX encompasses both individual redress and systemwide compliance by recipients of federal funds.[3] *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("[W]hereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds."); *Jackson*, 544 U.S. at 175, 180 ("Title VII is a vastly different statute from Title IX" in part because "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also to provide individual citizens effective protection against those practices.") (internal quotations omitted). Even if the enforcement mechanisms may function similarly for litigants, the prospective impacts of each statute on the country's employment and educational sectors are distinct, and neither

---

[3] *See also* U.S. Dep't of Justice, Title IX Legal Manual IV.B.2 (captured February 13, 2018) ("Title IX and Title VII are separate enforcement mechanisms. Individuals can use both statutes to attack the same violations.").

statute's power should be limited by restricting the legal devices used to realize those goals.[4]

The Supreme Court has consistently held that Congress intended Title IX to be interpreted broadly and limiting its scope would be at odds with that directive. *See Jackson*, 544 U.S. at 175; *North Haven*, 456 U.S. at 521. Moreover, because the two Titles derive from two distinct sources of Congressional authority—Title VII was "enacted pursuant to the commerce power to regulate purely private decisionmaking," *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 207 n.6 (1979), and Title IX was passed under the Spending Power, conditioning the use of federal funds on "contractual" terms, *Jackson*, 544 U.S. at 181—they are not inherently incompatible. *See* § 106.3, 85 Fed. Reg. at 30441. Thus, this Court construes Title IX with the breadth intended by Congress and recognized by the Supreme Court, concluding that employees of educational programs may bring suit against their federally-funded employers for sex-based discrimination, including retaliation, even if they could also seek remedy by suit under Title VII.

*c. Claimed Factual Insufficiency*

At the motion to dismiss stage, all factual allegations made by Plaintiffs are to be taken as true and Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Plaintiffs must rely on more

---

[4] As the Supreme Court has observed, "Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination," *North Haven*, 456 U.S. at 535, and it is up to Congress, not the courts, to make any corrective change deemed appropriate, *id.* at 535 n.26.

than "mere conclusory statements," "at the initial stage of a litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for [his] proposition.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) (denying the employer's motion to dismiss plaintiff's Title VII claims). "On a motion to dismiss, the question is not whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination." *Id.* at 87. Defendants Yale and YNNH further argue that Plaintiffs claims should be dismissed because they failed to sufficiently plead:

1. that YNNH or Yale had notice of the allegedly discriminatory behavior, as required under Title IX;
2. for the purposes of their retaliation claims, that Drs. Eltorai and Castro engaged in protected activities or suffered adverse actions under Titles VII or IX;
3. that Dr. Eltorai suffered an adverse action because of her pregnancy;
4. that Drs. Boules, Eltorai and Olivers were sufficiently integrated within the educational aspect of the residency program to receive protection from Title IX.

(Yale's Mot. at 2; YNNH's Mot. at 2.) Yale also argues that Plaintiffs' claimed incidents of sexual harassment occurring within the administrative filing time limit of Title VII were insufficient to constitute severe and pervasive harassment. (Yale's Mem. at 12-22.))

     i.    *Plaintiffs have plausibly alleged that they suffered from severe and pervasive harassment*

        A.  *Plaintiffs timely filed their claims with the EEOC*

As an administrative prerequisite to filing suit, a "complainant must file with the EEOC within 180 days after the alleged discriminatory act occurred; [or] if he has already filed the charge with a state or local agency [], he must file his EEOC charge

within 300 days of the alleged discriminatory act." *Blackwell v. City of Bridgeport*, 238 F. Supp. 3d 296, 306 (D. Conn. 2017); *see also* 42 U.S.C. § 2000e-5(e)(1). This requirement is not a jurisdictional prerequisite and therefore is "subject to waiver, estoppel, and equitable tolling." *Francis v. City of New York*, 235 F.3d 763, 767 (2d Cir. 2000).

Defendant Yale, applying the 300-day filing deadline, acknowledges that Plaintiffs Boules, Eltorai, Olivers, and Reinhart each alleged at least one discriminatory event within the 300-day time period prior to December 4, 2019, when Plaintiffs Boules, Eltorai, and Reinhart filed with the EEOC, or December 5, when Plaintiffs Olivers filed their EEOC complaint, but argues that a single incident is insufficient to allege a hostile work environment. (Yale's Mem. at 12.) Because "in the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing," *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004), Boules's, Eltorai's, Olivers', and Reinhart's complaints were timely brought before the EEOC and will not be dismissed on those grounds.

Dr. Castro's circumstances are more complicated. The incident of physical harassment occurred in August of 2018, far outside the 300-day limitation. (*See* SAC ¶¶ 115-120.) However, Dr. Castro timely alleges that, on August 31, 2019, Dr. Fontes "derisively winked" at her, making Dr. Castro feel afraid and disgusted. (*Id.* ¶ 127.) While this sexualized gesture standing alone would not constitute actionable sexual harassment, in the context of Dr. Fontes's pattern of sexually harassing conduct unremedied by Defendants, it plausibly represents an intentional continuation of Dr.

Fontes's long-standing behavior that contributed to the hostile environment that Dr. Castro was subjected to, beginning with Dr. Fontes's touching in August of 2018.[5] (*See* SAC ¶ 237.) Therefore, examining "the totality of the circumstances" of Dr. Castro's hostile work environment claims, including management's "failure to investigate or denounce" the harassment, *see Blackwell*, 238 F. Supp. 3d at *309, the Court concludes that Dr. Castro has pled sufficient facts to plausibly link the timely derisive wink as a gesture which was a part of, or contributed to, the hostile work environment that Dr. Castro experienced well into 2019. Her claim will not be dismissed on timeliness grounds.

> **B.  Plaintiffs have alleged sufficient facts to plausibly claim that they were subjected to a hostile environment under Titles VII and IX**

To succeed on a hostile environment claim under either Title VII or Title IX, Plaintiffs "must show that [they] subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (applying the Title VII sex discrimination framework to Title IX). While Plaintiffs will ultimately need to demonstrate they experienced severe *or* pervasive harassment,[6] at this early

---

[5] *See Wei Fu v. ISO Innovative Analytics*, No. 3:12-CV-01444 (JCH), 2014 WL 1289235, at *17 (D. Conn. Mar. 31, 2014) (granting summary judgment for the *employer* because a wink and smile during a business meeting, even when viewed in conjunction with a series of flirtatious emails, a number of invitations to unnecessary business trips, and sexual comments, did not create an objectively hostile environment).

[6] Although individual incidents *typically* do not rise to the level of severe and pervasive, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 354 (D. Conn. 2016) (quoting *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002)); *see also McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 516 (D. Conn.

stage, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse," and that she subjectively perceived the environment to be hostile. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *see also Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (vacating a district court's grant of summary judgment in favor of the employer because "the standard for establishing a hostile work environment is high, [but] we have repeatedly cautioned against setting the bar too high"). Given the fact-specific nature of a hostile environment claim, evaluation of Plaintiffs' claims is best able to be made at the trial or summary judgment stage. *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003); *see also McNeil v. Yale Univ.*, 436 F. Supp. 3d at 516 ("Second Circuit decisions probative of viable Title IX claims . . . have been resolved at the summary judgment stage, at the earliest."). As all Plaintiffs have alleged that their employment was altered for the worse by Dr. Fontes's harassment, namely his forcible touching and kissing of Drs. Boules, Jodi-Ann Oliver, Lori-Ann Oliver, and Reinhart, (SAC ¶¶ 103, 105, 107-10, 173, 181, 184, 186-88, 195-97, 203, 206), and forcible touching of Drs. Castro and Eltorai, (*id.* ¶¶ 117, 154, 157, 159-62), and all alleged that they subjectively suffered from their experience, (*see id.* ¶¶ 113, 129, 160, 162-63, 192, 218), Defendant's contention of insufficient factual pleading fails.

---

2020) (denying defendant's motion to dismiss because even a single incident of harassment could plausibly support university liability with a more developed factual record during discovery); *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (Under Title VII, "even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'"). Thus, Yale's assertion that a single incident of harassment is insufficient to constitute severe or pervasive overreaches.

ii.     *Yale and YNNH may have had "actual notice" of the Title IX violations*

In addition to alleging a hostile environment, Plaintiffs suing under Title IX must also demonstrate that the educational program or activity was deliberately indifferent to the alleged discrimination, meaning "that a school official with authority to address the alleged discrimination and to institute corrective measures had actual knowledge of the discrimination and failed to adequately respond." *McNeil*, 436 F. Supp. 3d at 513 (quoting *Papelino*, 633 F.3d at 89); *see also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999) (holding that "recipients of federal funding may be liable for [] discrimination where the recipient is deliberately indifferent to known acts of [] sexual harassment").

Defendant YNNH alleges that it did not have actual notice of the abusive behavior of Dr. Fontes because Plaintiffs failed to properly notify anyone with authority at the hospital about Dr. Fontes's misconduct.[7] (YNNH's Mem. at 14.) YNNH argues that Plaintiffs Boules and Lori-Ann Oliver failed to make any complaint and that Plaintiffs Castro, Eltorai, Jodi-Ann Oliver, and Reinhart only informed *Yale* staff and faculty members, not YNNH staff, about the alleged unlawful discrimination. (*Id.* at 15-16.) Yale argues that Plaintiffs either failed to make a complaint or only complained to a member of *YNNH's* staff.[8] (Yale's Mem. at 22-24.)

---

[7] As there is little doubt that the type of hostile environment claim pled by Plaintiffs falls within the ambit of proscribed activities under Title IX, the Court assumes that Defendants are arguing that, though aware generally that this type of sex discrimination was prohibited, no one in the program was informed that discrimination of this kind had actually occurred.

[8] Yale also argues that the Title VII claim should be dismissed because Yale did not have actual notice of the alleged harassment. However, Title VII does not have the same notice requirement as Title IX. Under Title VII, "[a]n employer is subject to

Plaintiffs allege that they made complaints to individuals who are employed by both Yale and YNNH and are persons of authority at both institutions. Plaintiffs also point to YNNH's employee handbook which "actually instructs its staff, including its residents and fellows, to file complaints with Yale University officials when issues concerning sexual harassment/misconduct 'involving a University employee' like Fontes occur, and to 'contact [YNHH's] Human Resources Office' only when 'the complaint involves another trainee or a hospital employee.'" (Pls.' Opp. at 43 (quoting Pls.' Ex. A [Doc # 61-1] at 4).) Because there remains a factual dispute related to the integration of the two institutions, Plaintiffs contend the motion should be denied.

Each Plaintiff states that she informed at least one person in authority about the discriminatory actions of Dr. Fontes and was either ignored or brushed off because Dr. Fontes's behavior towards female subordinates was an "open secret" at Yale that was tolerated as "boys will be boys." (*Id.* ¶¶ 107-08, 117, 159-60, 171-72, 174-75, 184, 199-201, 203-05, 208-09.) The apparently complex relationship between Yale and YNNH, and Plaintiffs' claim that the employee handbook instructs fellows working at YNNH to report allegations of harassment through Yale, suggests that both institutions could be at fault.  Regardless, neither institution may escape liability at this early stage by blaming the other, and dismissal will not be granted on these grounds.

---

vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Industries, Inc. v. Ellerth.* 524 U.S. 742, 765 (1998). As Dr. Fontes supervised all of the women physicians he allegedly harassed, no notice is required for the Title VII claims, and dismissal will not be granted on these grounds.

   iii.  *Drs. Eltorai and Castro may have suffered an adverse employment action sufficient to prove retaliation in violation of Titles VII and IX*

Drs. Eltorai and Castro both claim retaliation by YNNH and Yale, because the institutions "engag[ed] in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts," in violation of Title VII, and "fail[ed] to properly investigate their claims of discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices," in violation of Title IX. (SAC ¶¶ 243, 229.) Defendants' Yale and YNNH argue that both retaliation claims fail because neither doctor experienced an adverse educational or employment action and, as YNNH argues, plaintiffs did not allege engagement in a "protected activity" as required for liability under both Titles. (Yale's Mot. at 2; YNNH's Mot. at 2.)

Under Titles VII and IX, "a plaintiff claiming retaliation [] must [] establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse [] action; and (4) a causal connection between the protected activity and the adverse action." *Papelino*, 633 F.3d at 91; *see also Vega*, 801 F.3d at 90 ("[F]or a retaliation claim to survive a motion [] to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice."). A "protected activity" "refers to action taken to protest or oppose statutorily prohibited discrimination," *Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 96 (D. Conn. 2018) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)), and includes a wide range of activities, like reporting discrimination,

testifying in a proceeding, or otherwise participating in an investigation about discrimination, 42 U.S.C. § 2000e-3(a). In the context of a retaliation claim, an adverse action may be "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" and is *not* limited to those which materially alter the employee's position. *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  Adverse actions include intentionally failing to notify the individual of important workplace changes, *id.* at 91-92, negative performance reviews, *id.*, refusal to provide letters of recommendation or exclusion from job fairs and other networking events, *Novio v. New York Acad. of Art*, 286 F. Supp. 3d 566, 578-79 (S.D.N.Y. 2017); *see also Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 668 (S.D.N.Y. 2020). At the motion to dismiss stage, temporal proximity, often no more than a few months, between the protected activity and the adverse action may suffice for a *prima facie* showing of discrimination. *Vega*, 801 F.3d at 90; *see also Echevarria v. Utitec, Inc.*, No. 3:15-CV-1840 (VLB), 2017 WL 4316390, at *10 (D. Conn. Sept. 28, 2017) ("The case law in the Second Circuit is unclear with regard to how much time can pass between a protected action and the adverse employment action before no causal connection can be inferred . . . [but t]he three to four month gap present here is has been held sufficient to support an inference of causation.")

Both Drs. Castro and Eltorai state that they made formal complaints about Dr. Fontes's sexual harassment, thereby engaging in protected activity under Titles VII and IX. (*See* SAC ¶¶ 121, 127, 147, 163, 165.) Dr. Eltorai claims that she was banned from working in the ICU, without cause, shortly after she reported Dr. Fontes's harassment in August of 2019. (*Id.* ¶ 164.)  She further alleges that Dr. Fontes's

retaliation increased after she filed this lawsuit, when she was reprimanded for another doctor's refusal of a transfer patient and was prohibited from volunteering for Tele-ICU, in the midst of the pandemic, despite being requested by the Yale Department of Medicine to cover the shifts. (*Id.* ¶¶ 165-68.) While the events of 2020 will need factual development to demonstrate their degree of adversity, removing Dr. Eltorai from the ICU meets the threshold of plausibility required to permit Dr. Eltorai's retaliation claim to proceed to discovery.

Dr. Castro claims that she reported Dr. Fontes's inappropriate touching in mid-August of 2018, (*id.* ¶¶ 117, 121), but his retaliatory acts against her occurred in July of *2019* when he refused to credit her mission trip as educational and required her to use vacation time, (*id.* ¶¶ 123-25, 127). While refusing to credit the trip, in some circumstances, arguably could be an adverse action, the timing is far too attenuated to plausibly claim that Dr. Fontes's refusal was a direct result of Dr. Castro's report, and Plaintiff does not allege any other connection between the two events.[9] Thus, Defendant's motion to dismiss Dr. Castro's retaliation claim is granted.

> iv.   *Dr. Eltorai has pled facts sufficient to create an inference of discrimination for her pregnancy discrimination claim*

YNNH further argues that Dr. Eltorai's Title VII pregnancy discrimination claim should be dismissed because she failed to allege any adverse action. (YNNH's Mot. at 2.) Title VII, as amended by the Pregnancy Discrimination Act of 1978, prohibits workplace discrimination "on the basis of pregnancy, childbirth, or related

---

[9] Dr. Castro's claim regarding the derisive wink on August 31, 2019 may contribute to her hostile work environment claim, but it does not support her retaliation claim as the act could not be considered an adverse action.

medical conditions." 42 U.S.C. § 2000e–2(k); *see also Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1344 (2015). At the motion to dismiss stage, a plaintiff must "allege two elements: (1) the employer discriminated against [her] (2) because of [her] race, color, religion, sex [including pregnancy], or national origin." *Vega*, 801 F.3d at 85. Recognizing the "elusive nature of intentional discrimination," plaintiffs "may prove discrimination indirectly either by meeting the requirements of *McDonnell Douglas* . . . , or by otherwise creating a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 86, 87 (internal quotations omitted). At this early stage in litigation, the plaintiffs' burden is minimal, requiring that plaintiffs allege only "enough to nudge their claims across the line from conceivable to plausible." *Id.* at 87 (internal quotations omitted).

Dr. Eltorai claims that Dr. Fontes, shortly after learning about her pregnancy, refused to assist her with scheduling her research, failed to notify her that she had insufficient credits to qualify for her full annual salary, and suggested that she had "performance issues" in the ICU. (*See* SAC ¶¶ 135, 137-139, 141-150). These adverse actions, taken in quick succession after Dr. Eltorai informed Dr. Fontes about her pregnancy, create an inference of discrimination substantial enough to survive a motion to dismiss. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) (holding that the temporal proximity between when plaintiff disclosed her pregnancy and her termination met plaintiff's burden at the summary judgment stage). To determine the significance of these adverse actions, their relationship to Dr. Fontes's knowledge of

Dr. Eltorai's pregnancy requires a fully developed factual record, and dismissal is not warranted at this stage.

> v.     *The relationship between YNNH, Yale, and Plaintiffs Boules, Eltorai, and Olivers is not too attenuated to preclude application of Title IX to their claims against YNNH*

Defendant YNNH argues that "the relationships that the Attending Physician Plaintiffs [Boules, Eltorai, and Olivers] have with YNHH are too attenuated to allow them to sustain claims against YNHH under Title IX." (YNNH's Mem. at 11.) Plaintiffs respond that the nature of the institution, not the role of the individuals, determines the applicability of Title IX. The Third Circuit has held that residency programs are often subject to Title IX because "[c]ourts have repeatedly recognized the educational qualities of residency *programs* [], even where ultimately deeming *residents* nonstudents. So too has Congress." (*Mercy*, 850 F.3d at 557) (emphasis in original) (internal citations omitted). As Plaintiffs allege that Boules, Eltorai, and Olivers were not only employed by YNNH, but also faculty members of Yale and participants in the residency program at YNNH, it is difficult to see how these three doctors' relationships with YNNH, through its residency program, could be disentangled from YNNH's relationship with Yale at this early litigation stage. (*See* SAC ¶¶ 25, 27-29 (listing each attending physician as either an "assistant professor" or "assistant professor of clinical anesthesiology" in the Department of Anesthesiology Yale and attending physicians at YNNH).)[10] Their relationships with the educational program

---

[10] None of the cases Defendant cites reflects the factual situation claimed by these Plaintiffs in which the plaintiffs were both employed by the institution and directly involved in its educational components. *See Burgess v. Harris Beach PLLC,* 346 F. App'x 658, 661 (2d Cir. 2009) (granting a motion to dismiss against an attorney who had sued a school district who then sued the district under Title IX for

of Yale, housed within YNNH, appear to be directly related to their employment at the hospital, and Defendant's motion for dismissal will not be granted on these grounds.

### III.   Conclusion

Accordingly, Defendants' Motions to Dismiss are DENIED as to all claims except Dr. Castro's claim of retaliation, which is GRANTED.

IT IS SO ORDERED.

/s/ _____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of February 2021.

---

discriminating against her, as the attorney, in the prior suit); *Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387, 398 (S.D.N.Y. 2019) (granting a motion to dismiss because plaintiff's "time as a student at UCB ended years before Defendants' allegedly discriminatory conduct"); *Doe v. Univ. of Kentucky*, 357 F. Supp. 3d 620, 634 (E.D. Ky. 2019), *rev'd and remanded*, 971 F.3d 553 (6th Cir. 2020) ("Plaintiff has failed to show she was either a UK student or enrolled in a UK education program or activity.").